**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC and AMNEAL EU, LIMITED,<br><br>Defendants. | Civil Action No. 1:24-cv-04607-JFM |
| SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS, LTD., and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>NORWICH PHARMACEUTICALS, INC.,<br><br>Defendant. | Civil Action No. 1:24-cv-07140-JFM |

**JOINT APPENDIX INDEX**

| Ex. # | Document Description | Appx # |
|---|---|---|
| A | Ex. AA to First Amended Compl. (D.I. 59-1), Salix Pharms., Ltd. v. Norwich Pharms., Inc., No. 20-430 (D. Del. Nov. 13, 2020) | JA0001 |
| B | Ex. J to First Amended Compl. (D.I. 59-1), Salix Pharms., Ltd. v. Norwich Pharms., Inc., No. 20-430 (D. Del. Nov. 13, 2020) | JA0043 |
| C | XIFAX_AMN_0007015 ('561 Appl. File History, Amended Claims (Feb. 8, 2023)) | JA0067 |
| D | XIFAX_AMN_0006247 ('982 Appl. File History, Amendments (Aug. 22, 2022)) | JA0073 |
| E | October 17, 2025 Rebuttal Expert Report of David A. Johnson, M.D. | JA0080 |

| Ex. # | Document Description | Appx # |
|---|---|---|
| F | Transcript for January 9, 2026 Deposition of David A. Johnson, M.D. | JA0256 |
| G | September 17, 2025 Opening Expert Report of Albert Harary, M.D. | JA0275 |
| H | October 22, 2025 Rebuttal Expert Report of Eli D. Ehrenpreis, M.D. | JA0287 |
| I | Transcript for January 21, 2026 Deposition of Eli D. Ehrenpreis, M.D. | JA0323 |
| J | November 12, 2025 Reply Expert Report of David A. Johnson, M.D. | JA0341 |
| K | Transcript for January 19, 2026 Deposition of Albert Harary, M.D. | JA0349 |
| L | Transcript for December 10, 2025 Deposition of Herbert L. DuPont, M.D. | JA0362 |
| M | September 27, 2021 Rebuttal Expert Report of Philip Schoenfeld, M.D. (XIFAX_AMN_ 1890152) | JA0371 |
| N | Transcript for December 12, 2025 Deposition of Leonard Chyall, Ph.D. | JA0432 |
| O | September 17, 2025 Opening Expert Report of William C. Schinzer, Ph.D. | JA0451 |
| P | U.S. Patent No. 7,045,620 | JA0497 |
| Q | New Zealand Pat. Appl. Pub. No. NZ531622A | JA0508 |
| R | RESERVED | JA0538 |
| S | RESERVED | JA0539 |
| T | ’571 Pat. File History, Applicant Args. & Remarks (Jun. 14, 2023) | JA0540 |
| U | ’912 Pat. File History, Applicant Args. & Remarks (Nov. 29, 2022) | JA0543 |
| V | ’571 Pat. File History, Terminal Disclaimer (Jun. 14, 2023) | JA0546 |
| W | ’912 Pat. File History, Terminal Disclaimer (Nov. 29, 2022) | JA0550 |
| X | Transcript for January 6, 2026 Deposition of Jeffrey Crespin, M.D. | JA0554 |
| Y | October 22, 2025 Rebuttal Excerpt Report of Jeffrey Crespin, M.D. | JA0565 |
| Z | September 17, 2025 Expert Report of David A. Johnson, M.D. | JA0577 |
| AA | October 22, 2025 Rebuttal Expert Report of Herbert L. DuPont, M.D. | JA0592 |

| Ex. # | Document Description | Appx # |
|---|---|---|
| BB | October 22, 2025 Rebuttal Expert Report of Leonard Chyall, Ph.D. | JA0603 |
| CC | Transcript for the December 9, 2025 Deposition of William C. Schinzer, Ph.D. | JA0632 |
| DD | Transcript for the September 10, 2025 Deposition of Enoch Bortey, Ph.D. | JA0659 |
| EE | ’571 Pat. File History, IDS (Oct. 22, 2021); *id.* at IDS (Dec. 28, 2022) | JA0664 |
| FF | ’571 Pat. File History, References Considered (Mar. 20, 2023) | JA0693 |
| GG | ’571 Pat. File History, IDS (Jun. 14, 2023) | JA0703 |
| HH | ’571 Pat. File History, References Considered (Aug. 11, 2023) | JA0709 |
| II | ’571 Pat. File History, Notice of Allowance (Aug. 24, 2023) | JA0713 |
| JJ | ’912 Pat. File History, IDS (Aug. 22, 2022); *id.* at IDS (Nov. 29, 2022) | JA0719 |
| KK | ’912 Pat. File History, References Considered (Nov. 3, 2022) | JA0729 |
| LL | ’912 Pat. File History, References Considered (Dec. 7, 2022) | JA0735 |
| MM | ’912 Pat. File History, Notice of Allowance (Dec. 22, 2022) | JA0739 |
| NN | AMN-RFXMN_00037099 (January 10, 2006 Declaration of Giuseppe C. Viscomi) | JA0745 |
| OO | Transcript for the June 16, 2021 Deposition of Dr. Giuseppe Viscomi | JA0758 |
| PP | XIFAX_AMN_00008044 (’196 Pat. File History) | JA0765 |
| QQ | Viscomi 2008 | JA0787 |
| RR | Transcript for the July 30, 2025 Deposition of Dr. Donatella Confortini | JA0790 |
| SS | Braga 2012 | JA0794 |
| TT | November 12, 2025 Reply Expert Report of William C. Schinzer, Ph.D. | JA0797 |
| UU | October 22, 2025 Rebuttal Expert Report of Bart Kahr, Ph.D. | JA0802 |
| VV | Transcript for the January 9, 2026 Deposition of Bart Kahr, Ph.D. | JA0805 |
| WW | XIFAX_AMN_1996648 (Posserud 2007) | JA0808 |

| Ex. # | Document Description | Appx # |
|---|---|---|
| XX | Plaintiffs' July 25, 2025 Objections and Responses to Defendant's First Set of Requests for Admission to Plaintiffs (Nos. 1-14) | JA0816 |
| YY | Day 2 and Day 3 Trial Transcripts (D.I. 169, 170), Salix Pharms., Ltd. v. Norwich Pharms., Inc., No. 20-430 (D. Del. Apr. 12, 2022) | JA0824 |
| ZZ | Plaintiffs' Answering Post-Trial Brief on Validity (D.I. 181), Salix Pharms., Ltd. v. Norwich Pharms., Inc., No. 20-430 (D. Del. June 2, 2022) | JA0855 |
| AAA | Plaintiffs' Proposed Findings of Fact on Infringement and Secondary Considerations (D.I. 175), Salix Pharms., Ltd. v. Norwich Pharms., Inc., No. 20-430 (D. Del. Apr. 28, 2022) | JA0863 |

# EXHIBIT A

# EXHIBIT AA

US010765667B2

(12) **United States Patent**
**Forbes et al.**

(10) **Patent No.: US 10,765,667 B2**
(45) **Date of Patent: *Sep. 8, 2020**

(54) **METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)**

(71) Applicant: **Salix Pharmaceuticals, Inc.**, Bridgewater, NJ (US)

(72) Inventors: **William Forbes**, Raleigh, NC (US); **Enoch Bortey**, Chapel Hill, NC (US)

(73) Assignee: **Salix Pharmaceuticals, Inc.**, Bridgewater, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/738,392**

(22) Filed: **Jan. 9, 2020**

(65) **Prior Publication Data**

US 2020/0206199 A1 Jul. 2, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/575,769, filed on Sep. 19, 2019, which is a continuation of application No. 15/902,179, filed on Feb. 22, 2018, now Pat. No. 10,456,384, which is a continuation of application No. 15/398,283, filed on Jan. 4, 2017, now Pat. No. 9,931,325, which is a continuation of application No. 13/755,578, filed on Jan. 31, 2013, now Pat. No. 9,566,270, which is a continuation of application No. 12/880,739, filed on Sep. 13, 2010, now abandoned, which is a continuation-in-part of application No. 12/393,979, filed on Feb. 26, 2009, now Pat. No. 8,309,569.

(60) Provisional application No. 61/329,511, filed on Apr. 29, 2010, provisional application No. 61/262,475, filed on Nov. 18, 2009, provisional application No. 61/241,945, filed on Sep. 13, 2009, provisional application No. 61/102,801, filed on Oct. 3, 2008, provisional application No. 61/031,679, filed on Feb. 26, 2008.

(51) **Int. Cl.**
*A61K 31/437* (2006.01)

(52) **U.S. Cl.**
CPC .................................. *A61K 31/437* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,341,785 | A | 7/1982 | Marchi et al. |
| 4,557,866 | A | 12/1985 | Cannata et al. |
| 7,045,620 | B2 | 5/2006 | Viscomi et al. |
| 7,612,199 | B2 | 11/2009 | Viscomi et al. |
| 7,902,206 | B2 | 3/2011 | Viscomi et al. |
| 7,906,542 | B2 | 3/2011 | Viscomi et al. |
| 7,915,275 | B2 | 3/2011 | Viscomi et al. |
| 7,928,115 | B2 | 4/2011 | Forbes et al. |
| 8,158,644 | B2 | 4/2012 | Viscomi et al. |
| 8,158,781 | B2 | 4/2012 | Viscomi et al. |
| 8,193,196 | B2 | 6/2012 | Viscomi et al. |
| 8,309,569 | B2 | 11/2012 | Forbes et al. |
| 8,518,949 | B2 | 8/2013 | Viscomi et al. |
| 8,741,904 | B2 | 6/2014 | Viscomi et al. |
| 8,835,452 | B2 | 9/2014 | Viscomi et al. |
| 8,853,231 | B2 | 10/2014 | Viscomi et al. |
| 9,271,968 | B2 | 3/2016 | Viscomi et al. |
| 2005/0272754 | A1 | 12/2005 | Viscomi et al. |
| 2006/0029550 | A1 | 2/2006 | Lin et al. |
| 2007/0259906 | A1 | 11/2007 | Caras |
| 2008/0132530 | A1 | 6/2008 | Viscomi et al. |
| 2009/0012113 | A1 | 1/2009 | Lin et al. |
| 2009/0028940 | A1 | 1/2009 | Jahagirdar et al. |
| 2009/0192083 | A1 | 7/2009 | Currie |
| 2010/0136125 | A1 | 6/2010 | Jacobus et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| KR | 100137810 | | 2/1998 |
| NZ | 531622 | A | 10/2004 |
| WO | 20061094737 | A2 | 9/2006 |
| WO | 20071064964 | A2 | 6/2007 |
| WO | 2009/108814 | A1 | 9/2009 |
| WO | 2011/032085 | A1 | 3/2011 |

OTHER PUBLICATIONS

Amendment from U.S. Appl. No. 12/478,638 (U.S. Pat. No. 7,612,199), filed on Sep. 3, 2009 (14 pages).
Bacchi et al. Polymorphism-structure relationships of rifamexil, an antibiotic rifamycin derivative. Mol. Pharma. 47: 611-623 (1995).
Bavin, Polymorphism in process development. Chemistry & Industry. 16:527-529 (1989).
Boulware, Travel medicine for the extreme traveler. Dis. Mon. 52:309-325 (2006).
Byrn et al. Pharmaceutical solids: a strategic approach to regulatory considerations. Pharm. Res. 12(7): 945-954 (1995).
Byrn et al., Chapter 11: Hydrates and solvates. Solid-State Chemistry of Drugs. Second Edition. SSCI, Inc. West Lafayette, Indiana. 233-247 (1999).
Castelli et al., Epidemiology of travelers' diarrhea. J. Travel. Med. 8(Suppl. 2): S26-S30 (2001). b.
Cheng et al., Update on traveler's diarrhea. Current Infectious Disease Reports. 4:70-77 (2002).

(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — McCarter & English, LLP; Jonathan M. Sparks; Michael J. DeGrazia

(57) **ABSTRACT**

The present invention provides new methods and kits for treating IBS; treating IBS in females; treating IBS in older subjects; and treating IBS in non-white subjects.

**16 Claims, 13 Drawing Sheets**

(56) **References Cited**

OTHER PUBLICATIONS

ClinicalTrials.gov, NCT00098384. Rifaximin versus placebo in the prevention of travelers' diarrhea. Posted: Dec. 8, 2004, Updated: May 9, 2006, Accessed: Dec. 18, 2019. (6 pages).
ClinicalTrials.gov, NCT00292344. Rifaximin, loperamide and the combination to treat travelers' diarrhea. Posted: Feb. 15, 2006, Updated: Apr. 20, 2009, Accessed: Dec. 18, 2019. (6 pages).
Crum et al., New issues in infectious diarrhea. Rev. Gastroenterol. Disord.5(suppl. 3): S16-S25 (2005).
Datta et al., Crystal structures of drugs: advances in determination, prediction and engineering. Nature. 3: 42-57 (2004).
DuPont et al., A randomized, double-blind, placebo-controlled trial of rifaximin to prevent travelers' diarrhea. Ann. Intern. Med. 142(10): 805-812 (2005).
DuPont et al.' Rifaximin versus ciprofloxacin for the treatment of traveler's diarrhea: a randomized, double-blind clinicial trial. Clinical Infectious Diseases. 33: 1807-1815 (2001).
Dupont et al., Treatment of travelers' diarrhea: randomized trial comparing rifaximin, rifaximin plus loperamide, and loperamide alone. Clin Gastroenterol Hepatol. Apr. 2007;5(4):451-6.
DuPont, Treatment of travelers' diarrhea. J. Travel. Med. 8(Suppl. 2):S31-33 (2001).
Ericsson, Rifaximin: a new approach to the treatment of travelers' diarrhea. J. Travel Med. 8(Suppl. 2): S25, S40 (2001).
European Medicines Agency. ICH Topic Q 6 A. Specifications: test procedures and acceptance criteria for new drug substances and new drug products: chemical substances. 1-32. (May 2000).
FDA Guideline. Guildine for submitting supporting documentation in drug applications for the manufacture of drug substances. Center for Drug Evaluation and Research. Feb. 1987. (47 pages).
Fiorucci et al., Inhibition of intestinal bacterial translocation with rifaximin modulates Lamina propria monocytic cells reactivity and protects against inflammation in a rodent model of colitis. Digestion. 66: 246-256 (2002).
Gerard et al., Rifaximin: a nonabsorbable rifamycin antibiotic for use in nonsystemic gastrointestinal infections. Expert Rev Anti Infect Ther. Apr. 2005;3(2):201-11.
Ghoshal et al., Models for prediction of mortality from cirrhosis with special reference to artificial neural network: a critical review. Hepatol. Int. 2: 31-38 (2008).
Gillis et al., Rifaximin. A review of its antibacterial activity, pharmacokinetic properties and therapeutic potential in conditions mediated by gastrointestinal bacteria. Drugs. Mar. 1995;49(3):467-84.
Gionchetti et al., Rifaximin in patients with moderate or severe ulcerative colitis refractory to steroid-treatment: a double-blind, placebo-controlled trial. Digestive Diseases and Sciences. 44(6): 1220-1221 (1999).
Guillory, 5: Generation of polymorphs, hydrates, solvates, and amorphous solids. The University of Iowa. Iowa City, Iowa. 183-226 (1999).
Huang et al., Rifaximin—a novel antimicrobial for enteric infections. J. Infect. 5: 97-106 (2005).
Infante et al., Enteroaggregative *Escherichia coli* diarrhea in travelers: response to rifaximin therapy. Clin Gastroenterol Hepatol. 2(2):135-8 (2004).
Jozwiakowski, 15: Alteration of the sollid state of the drug substance: polymorphs, solvates, and amorphous forms. 3M Pharmaceuticals. St. Paul, Minnesota. 525-568. (2000).
Khankari et al., Pharmaceutical hydrates. Thermochimica Acta. 248: 61-79 (1995).
Koo et al., Current and future developments in travelers' diarrhea therapy. Expert Rev Anti Infect Ther. 4(3):417-27 (2006).
Koo et al., The role of rifaximin in the treatment and chemoprophylaxis of travelers' diarrhea. Ther Clin Risk Manag. 5:841-8 (2009).
Malamud et al., Treatment of gastrointestinal infections. Curr Opin Gastroenterol. 16(1):51-5, (13 pages), (2000).
Mas et al., Comparison of rifaximin and lactitol in the treatment of acute hepatic encephalopathy: results of a randomized, double-blind, double-dummy, controlled clinical trial. J Hepatol. Jan. 2003;38(1):51-8.
Miglioli et al., Effects of daily oral administration of rifaximin and neomycin on faecal aerobic flora in rats. Pharmacol Res. 44(5):373-5 (2001).
Neff et al., Analysis of hospitalizations comparing rifaximin versus lactulose in the management of hepatic encephalopathy. Transplant Proc. Dec. 2006;38(10):3552-5.
Newman et al., 1: Form selection of pharmaceutical compounds. Handbook of Pharmaceutical Analysis. eds. Ohannesian and Streeter. Marcel Dekker, Inc. New York, NY. 61 pages. (2002).
Paik et al., Comparison of Rifaximin and Lactulose for the Treatment of Hepatic Encephalopathy: A Prospective Randomized Study. Yonsei Med J. Jun. 2005;46(3):399-407.
Pakyz, Rifaximin: a new treatment for travelers' diarrhea. Ann Pharmacother. 39(2):284-9 (2005).
Pawlowski et al., Diagnosis and treatment of acute of persistent diarrhea. Gastroenterology. 136(6):1874-86 (2009).
Pelizza et al., Polymorphism of rifaximin. II Farmaco. 32(7):471-481 (1977).
Pigott, Foodbome illness. Emerg. Med. Clin. N. Am. 26: 475-497 (2008).
Preidis et al., Targeting the human microbiome with antibiotics, probiotics, and prebiotics: gastroenterology enters the metagenomics era. Gastroenterology. 136(6):2015-31 (2009).
Prescribing Information for Rifaximin, United States, May 2004 (13 pages).
Rifaximin Tablet Label, Jul. 2006 (16 pages).
Scarpignato et al., Prevention and treatment of traveler's diarrhea: a clinical pharmacological approach. Chemotherapy. 41 Suppl 1:48-81 (1995).
Steffen, Rifaximin: a nonabsorbed antimicrobial as a new tool for treatment of travelers' diarrhea. J Travel Med. 8 (Suppl 2):S34-9 (2001).
Su et al., Utility of nonabsorbed (<0.4%) antibiotic rifaximin in gastroenterology and hepatology. Gastroenterol Hepatol (N Y). 2(3):186-197 (2006).
Taylor et al., A randomized, double-blind, multicenter study of rifaximin compared with placebo and with ciprofloxacin in the treatment of travelers' diarrhea. Am J Trop Med Hyg. Jun. 2006;74(6):1060-6.
"Abstracts of the AGA Institute," Gastroenterology, Elsevier, Philadelphia, PA., vol. 130, No. 4, Apr. 1, 2006, pp. A1-A26, Abstract 134, XP005643844.
Adachi, J.A., "Rifaximin: A Novel Nonabsorbed Rifamycin for Gastrointestinal Disorders," Reviews of Anti-Infective Agents, 42, pp. 541-547, 2006.
Bass, N.M., "Review Article: The Current Pharmacological Therapies for Hepatic Encephalopathy," Aliment Pharmacol Ther., 25 (Suppl. 1), 23-31, 2006.
Brigidi et al., "Effects of rifaximin administration on the intestinal microbiota in patients with ulcerative colitis," Journal of Chemotherapy. 14(3): 290-5 (2002).
Chari et al. "Treatment of Hepatic Failure with ex Vivo Pig-Liver Perfusion Followed by Liver Transplantation"; Jul. 28, 1994 (Jul. 28, 1994) The New England Journal of Medicine vol. 331, n 4; p. 235, col. 1, para 1, col. 2, para 1; p. 236, col. 2, para 1.
de Melo, R.T., et al., "Rifaximin for the Treatment of Hepatic Encephalopathy," Am J Health-Syst Pharm, vol. 65, pp. 818-822, 2008.
DuPont et al. "Rifaximin: A Nonabsorbed Antimicrobial in the Therapy of Traveler's Diarrhea" Digestion. vol. 59, Issue 6, pp. 708-714 especially abstract, Nov. 1998. cited by other.
Frissora, Christine, "Premenstrual Syndrome Exacerbates Irritable Bowel Syndrome (PMS-IBS): Can the Nonsystemic Antibiotic Rifaximin Alleviate Cyclical Symptoms of Bloating, Abdominal Discomfort, and Diarrhea in Women?" American Journal of Gastroenterology, vol. 103, No. Suppl. S, Sep. 2008, pp. S463-S464, XP002688387.
Frissora, C.L., et al., "Review Article: The Role of Antibiotics vs. Conventional Pharmacotherapy in Treating Symptoms of Irritable

(56) **References Cited**

OTHER PUBLICATIONS

Bowel Syndrome," Alimentary Pharmacology & Therapeutics, vol. 25, No. 11, Jun. 1, 2007, pp. 1271-1281.
Gionchetti et. al. "Antibiotic treatment in inflammatory bowel disease; rifaximin a new possible approach"European Review for Medical and Pharmacological Sciences; 1999; vol. 3; p. 27-30.; p. 29, col. 1, para 1.
Gordon, S., et al., "Validation of Irritable Bowel Syndrome Global Improvement Scale: An Integrated Symptom End Point for Assessing Treatment Efficacy" Dig. Dis. Sci., 2003; 48(7), p. 1317-23 PMID: 12870789 (Abstract Only).
Lauritano et al. "Association between Hypothyroidism and Small Intentinal Bacterial Overgrowth" The journal of Clinical Endrocrinology & Metabolism. vol. 92, Issue 11, pp. 4180-4184 especially p. 4181. Nov. 2007. cited by other.
Lawrence, K.R., et al., "Rifaximin for the Treatment of Hepatic Encephalopathy," Pharmacotherapy, 28(8), pp. 1019-1032, 2008.
Marchina, M., "Infectious Diarrhea in the Aged: Controlled Clinical Trial of Rifaximin" Chemioterapta, vol. 7, No. 5, pp. 336-340, 1988.
Miglio F. et al., "Rifaximin, A Non-Absorbable Rifamycin, for the Treatment of Hepatic Encephalopathy. A Double-Blind, Randomised Trial" Curr. Med. Res. Opin., 1997; 13(10), p. 593-601, PMID: 9327194 (Abstract Only).
Mintz, et al., Ocular Manifestations of Inflammatory Bowel Disease, Inflammatory Bowel Diseases, vol. 20, Issue 2, pp. 13-139, Mar. 24.
Pimental, Mark, et al., "A 10-day Course of Rifaximin, A Non-Absorbable Antibiotic, Produces a Durable Improvement in All Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study," Gastroenterology, vol. 130, No. 4, Suppl. 2, Apr. 2006, p. A26, XP002718616.
Pimentel et al. "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome" Annals of InternalMedicine. vol. 145, Issue 8, p. 557-563, Oct. 17, 2006, entire document. cited by other.
Pimental, Mark, "Review of Rifaximin as Treatment for SIBO and IBS," Expert Opinion on Investigational Drugs, vol. 18, No. 3, Mar. 1, 2009, pp. 349-358, XP055046239.
"Rifaximin Demonstrates Statistically Significant Improvement in Co-Primary Endpoints in Treatment of Diarrhea-Associated Irritable Bowel Syndrome in Phase 11b Study," URL:http://www.drugs.com/ clinical_trials/rifaximin-demonstrates-statistically-significant-improvement-co-primary-endpoints-diarrhea-1851.html, Sep. 2007, KP002718618.
Salix Pharmaceuticals "Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome" Dec. 6, 2007, <http://clinicaltrials.gov/ct2/show/NCT00269412>, p. 1,para 1. cited by other.
Scarpellini, E., et al., "High Dosage Rifaximin for the Treatment of Small Intestinal Bacterial Overgrowth" Aliment Pharmacol Ther., Apr. 1, 2007; 25(7), p. 781-786.
Scarpignato, C., et al., "Rifaximin, a Poorly Absorbed Antibiotic: Pharmacology and Clinical Potential" Chemotherapy, 2005:51(suppl. 1):36-66.
Shahara et al. "Randomized Double-Blind Placebo-Controlled Trial of Rifaximin in Patients with Abdominal Bloating and Flatulence" American Journal of Gastroenterology. vol. 101, Issue 2, p. 326-333, Feb. 2006. cited by other.
Steffen, Robert, et al., "Therapy of Travelers' Diarrhea with Rifaximin on Various Continents," The American Journal of Gastroenterology, May 5, 2003, vol. 98, No. 5, pp. 1073-1078.
Taylor et. al. "Systemic Pharmacokinetics of Rifaximin in Volunteers with Shigellosis"; Mar. 2008 (Mar. 2008) Antimicrobial Agents and Chemotherapy, vol. 52, No. 3; p. 1179-1181; table 1; p. 1179, col. 1, para 1, col. 2, para 4; p. 1180, col. 1, para 1; p. 1181, col. 1, para 1-2.
Tillisch, et al., "Characterization of the Alternating Bowel Habit Subtype in Patients with Irritable Bowel Syndrome," The American Journal of Gastroenterology, vol. 100, No. 4, Apr. 1, 2005, pp. 896-904 (XP055175635).
Vaira et al., "Rifaximin suspension for the eradication of helicobacter pylori." Current Therapeutic Research. 58(5): 300-8 (1997).
Vignali et. al. "TIPS with Expanded Polytetrafluoroethylene-Covered Stent: Results of an Italian Multicenter Study"; Aug. 2005 (Aug. 2005) American Roentgen Ray Society, 185;472-480; table 1, figure 5, abstract; p. 474, col. 1, para 2; p. 478, col. 3, para 1.
Trinh et al., Diarrheal diseases in the elderly.Clin Geriatr Med. 23(4):833-56 (2007).
Vippagunta et al., Crystalline solids. Adv Drug Deliv Rev. 48(1):3-26 (2001).
Viscomi Declaration under 37 C.F.R. 1.132 filed in U.S. Appl. No. 10/728,090. Dated Jan. 10, 2006 (12 pages).
Williams et al., Evaluation of the efficacy and safety of rifaximin in the treatment of hepatic encephalopathy: a double-blind, randomized, dose-finding multi-centre study. Eur J Gastroenterol Hepatol. Feb. 2000;12(2):203-8.
Williams et al., Rifaximin, a nonabsorbed oral antibiotic, in the treatment of hepatic encephalopathy: antimicrobial activity, efficacy, and safety. Antibiotics for Hepatic Encephalopathy. 5(Suppl. 1):S10-S18 (2005).
Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. Jul. 28, 2005. (45 pages).
Transcript of Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. Jul. 28, 2005. (14 pages).

FIG. 1


Percent of Subjects with Adequate Relief
100
90
80
70
60
50
40
5
6
7
8
9
10
11
12
13
14
15
16
Week
PBO 4w
RFX 550 2w

FIG. 2


Percent of Subjects with Adequate Relief
100
90
80
70
60
50
5
6
7
8
9
10
11
12
13
14
15
16
Week
PBO 4w
RFX 550 2w

FIG. 3


Screen
Washout & IBS Symptom Eligibility Assessment
Randomize
Day 1
Day - 10 to 0
Placebo 4w
RFX 275 2w/ PBO 2w
RFX 550 2w/ PBO 2w
RFX 1100 2w/ PBO 2w
RFX 550 4w
4 Week Treatment Period
Post - Treatment Phase (12 Wks)
Ineligible for Post-Treatment (Visit 28 days after withdrawal/Wk 4 completion)

FIG. 4


Adequate Relief of IBS Symptoms
Percent of Subjects with Adequate Relief
60
50
40
30
20
1
2
3
4
Week
p=0.0189
p=0.0102
PBO 4w
RFX 550 2w

FIG. 5


Adequate Relief of Bloating Symptom
p=0.0145
p=0.0122
Percent of Subjects with Adequate Relief
60
50
40
30
20
1
2
3
4
Week
PBO 4w
RFX 550 2w

FIG. 6


Change from Basline in Bloating
Mean Change
-0.3
-0.4
-0.5
-0.6
-0.7
-0.8
-0.9
-1.0
-1.1
-1.2
1
2
3
4
Week
PBO 4w
RFX 1100 2w
RFX 275 2w
RFX 550 2w
RFX 550 4w

FIG. 7
Primary Endpoint SGA IBS
Weeks 3 Through 6 (PEP)




Key Secondary Endpoint: IBS Bloating
Weeks 3 Through 6 (PEP)
Percentage of Responders
p = 0.0045
Δ = 11
40
29
p = 0.0167
Δ = 9
41
32
p = 0.0002
Δ = 10
40
30
Rifaximin
Placebo

FIG. 8

# FIG. 9

Consistency of Benefit Across Endpoints
Weeks 3 Through 6 (PEP)




| | Efficacy Outcome | Study | Proportion of Responders PBO n / N | Rfx n / N | p-value |
|---|---|---|---|---|---|
| Primary | SGA-IBS Weekly | TARGET 1 | 98 / 314 | 126 / 309 | 0.0125 |
| | | TARGET 2 | 103 / 320 | 128 / 315 | 0.0263 |
| | | Combined | 201 / 634 | 254 / 624 | 0.0008 |
| Key Secondary | ISB Bloating Weekly | TARGET 1 | 90 / 314 | 122 / 309 | 0.0045 |
| | | TARGET 2 | 102 / 320 | 129 / 315 | 0.0167 |
| | | Combined | 192 / 634 | 251 / 624 | 0.0002 |
| Other Secondary | SGA-IBS Daily | TARGET 1 | 96 / 314 | 132 / 309 | 0.0009 |
| | | TARGET 2 | 91 / 320 | 119 / 315 | 0.0072 |
| | | Combined | 187 / 634 | 251 / 624 | <0.0001 |
| | IBS Bloating Daily | TARGET 1 | 102 / 314 | 121 / 309 | 0.0486 |
| | | TARGET 2 | 99 / 320 | 137 / 315 | 0.0008 |
| | | Combined | 201 / 634 | 258 / 624 | 0.0004 |
| | IBS Abdominal Pain Daily | TARGET 1 | 114 / 314 | 137 / 309 | 0.0255 |
| | | TARGET 2 | 110 / 320 | 135 / 315 | 0.0232 |
| | | Combined | 224 / 634 | 272 / 624 | 0.0028 |
| | Ab Pain Daily (FDA) | TARGET 1 | 132 / 314 | 159 / 309 | 0.0157 |
| | | TARGET 2 | 138 / 320 | 165 / 315 | 0.0194 |
| | | Combined | 270 / 634 | 324 / 624 | 0.0009 |
| | Stool Consist. Daily (FDA) | TARGET 1 | 212 / 314 | 244 / 309 | 0.0015 |
| | | TARGET 2 | 206 / 320 | 233 / 315 | 0.0096 |
| | | Combined | 418 / 634 | 477 / 624 | <0.0001 |
| | Ab Pain & Stool Daily (FDA) | TARGET 1 | 121 / 314 | 144 / 309 | 0.0401 |
| | | TARGET 2 | 116 / 320 | 147 / 315 | 0.0077 |
| | | Combined | 237 / 634 | 291 / 624 | 0.0009 |

Case 1:20-cv-00430-RGA Document 59-1 Filed 11/13/20 Page 925 of 952 PageID #: 2831

# FIG. 10

Consistency of Benefit Across Endpoints for the Entire 3 Month Study

| | Efficacy Outcome | Study | Odds Ratio | (95% CI) | p-value |
|---|---|---|---|---|---|
| Primary | SGA-IBS Weekly | TARGET 1 | 1.35 | (1.01, 1.82) | 0.0477 |
| | | TARGET 2 | 1.52 | (1.13, 2.03) | 0.0053 |
| | | Combined | 1.44 | (1.17, 1.77) | 0.0007 |
| Key Secondary | ISB Bloating Weekly | TARGET 1 | 1.28 | (1.95, 1.75) | 0.1042 |
| | | TARGET 2 | 1.56 | (1.15, 2.09) | 0.0031 |
| | | Combined | 1.42 | (1.15, 1.75) | 0.0011 |
| Other Secondary | SGA-IBS Daily | TARGET 1 | 1.60 | (1.18, 2.18) | 0.0025 |
| | | TARGET 2 | 1.47 | (1.09, 1.99) | 0.0127 |
| | | Combined | 1.48 | (1.20, 1.83) | 0.0003 |
| | IBS Bloating Daily | TARGET 1 | 1.50 | (1.10, 2.04) | 0.0103 |
| | | TARGET 2 | 1.67 | (1.24, 2.25) | 0.0008 |
| | | Combined | 1.53 | (1.24, 1.89) | <0.0001 |
| | IBS Abdominal Pain Daily | TARGET 1 | 1.35 | (1.01, 1.83) | 0.0495 |
| | | TARGET 2 | 1.35 | (1.01, 1.81) | 0.0435 |
| | | Combined | 1.31 | (1.09, 1.64) | 0.0058 |
| | Ab Pain Daily (FDA) | TARGET 1 | 1.31 | (0.98, 1.75) | 0.0725 |
| | | TARGET 2 | 1.37 | (1.03, 1.83) | 0.0298 |
| | | Combined | 1.33 | (1.09, 1.64) | 0.0058 |
| | Stool Consist. Daily (FDA) | TARGET 1 | 1.70 | (1.24, 2.33) | 0.1009 |
| | | TARGET 2 | 1.48 | (1.09, 2.00) | 0.0114 |
| | | Combined | 1.58 | (1.27, 1.97) | <0.0001 |
| | Ab Pain & Stool Daily (FDA) | TARGET 1 | 1.36 | (1.01, 1.83) | 0.0396 |
| | | TARGET 2 | 1.44 | (1.08, 1.92) | 0.0141 |
| | | Combined | 1.40 | (1.14, 1.72) | 0.0014 |



# FIG. 11

Impact of Rifaximin on Relief of IBS Symptoms at Month 1

| | Efficacy Outcome | Study | Odds Ratio | (95% CI) | p-value |
|---|---|---|---|---|---|
| Primary | SGA-IBS Weekly | TARGET 1 | 1.55 | (1.12, 2.15) | 0.0081 |
| | | TARGET 2 | 1.50 | (1.09, 2.06) | 0.0121 |
| | | Combined | 1.53 | (1.22, 1.91) | 0.0030 |
| Key Secondary | ISB Bloating Weekly | TARGET 1 | 1.50 | (1.08, 2.07) | 0.0150 |
| | | TARGET 2 | 1.51 | (1.10, 2.09) | 0.0112 |
| | | Combined | 1.50 | (1.20, 1.89) | 0.0005 |
| Other Secondary | SGA-IBS Daily | TARGET 1 | 1.77 | (1.24, 2.52) | 0.0016 |
| | | TARGET 2 | 1.47 | (1.03, 2.11) | 0.0344 |
| | | Combined | 1.54 | (1.20, 1.97) | 0.0006 |
| | IBS Bloating Daily | TARGET 1 | 1.72 | (1.20, 2.46) | 0.0030 |
| | | TARGET 2 | 1.46 | (1.05, 2.05) | 0.0264 |
| | | Combined | 1.51 | (1.19, 1.92) | 0.0007 |
| | IBS Abdominal Pain Daily | TARGET 1 | 1.38 | (0.98, 1.94) | 0.0614 |
| | | TARGET 2 | 1.28 | (0.91, 1.78) | 0.1533 |
| | | Combined | 1.28 | (1.02, 1.62) | 0.0369 |
| | Ab Pain Daily (FDA) | TARGET 1 | 1.31 | (0.95, 1.80) | 0.1010 |
| | | TARGET 2 | 1.31 | (0.96 1.80) | 0.0881 |
| | | Combined | 1.31 | (1.05, 1.64) | 0.0186 |
| | Stool Consist. Daily (FDA) | TARGET 1 | 1.62 | (1.13, 2.32) | 0.0088 |
| | | TARGET 2 | 1.72 | (1.21, 2.45) | 0.0024 |
| | | Combined | 1.67 | (1.30, 2.15) | <0.0001 |
| | Ab Pain & Stool Daily (FDA) | TARGET 1 | 1.44 | (1.04, 1.99) | 0.0270 |
| | | TARGET 2 | 1.39 | (1.01, 1.92) | 0.0428 |
| | | Combined | 1.42 | (1.13, 1.78) | 0.0027 |




Case 1:20-cv-00430-RGA Document 59-1 Filed 11/13/20 Page 926 of 952 PageID #: 2832

# FIG. 12

Impact of Rifaximin on Relief of IBS Symptoms at Months 1 through 2

| | Efficacy Outcome | Study | Odds Ratio | (95% CI) | p-value |
|---|---|---|---|---|---|
| Primary | SGA-IBS Weekly | TARGET 1 | 1.41 | (1.04, 1.91) | 0.0260 |
| | | TARGET 2 | 1.48 | (1.10, 1.99) | 0.0103 |
| | | Combined | 1.45 | (1.17, 1.79) | 0.0007 |
| Key Secondary | ISB Bloating Weekly | TARGET 1 | 1.36 | (1.01, 1.85) | 0.0476 |
| | | TARGET 2 | 1.47 | (1.09, 1.98) | 0.0122 |
| | | Combined | 1.41 | (1.14, 1.75) | 0.0015 |
| Other Secondary | SGA-IBS Daily | TARGET 1 | 1.72 | (1.25, 2.35) | 0.0007 |
| | | TARGET 2 | 1.51 | (1.11, 2.07) | 0.0097 |
| | | Combined | 1.56 | (1.25, 1.94) | <0.0001 |
| | IBS Bloating Daily | TARGET 1 | 1.60 | (1.17, 2.20) | 0.0037 |
| | | TARGET 2 | 1.66 | (1.22, 2.25) | 0.0013 |
| | | Combined | 1.57 | (1.26, 1.95) | <0.0001 |
| | IBS Abdominal Pain Daily | TARGET 1 | 1.35 | (1.00, 1.84) | 0.0521 |
| | | TARGET 2 | 1.39 | (1.03, 1.88) | 0.0317 |
| | | Combined | 1.33 | (1.07, 1.64) | 0.0088 |
| | Ab Pain Daily (FDA) | TARGET 1 | 1.33 | (0.99, 1.79) | 0.0597 |
| | | TARGET 2 | 1.43 | (1.07, 1.92) | 0.0169 |
| | | Combined | 1.38 | (1.12, 1.70) | 0.0027 |
| | Stool Consist. Daily (FDA) | TARGET 1 | 1.64 | (1.18, 2.27) | 0.0030 |
| | | TARGET 2 | 1.59 | (1.16, 2.18) | 0.0037 |
| | | Combined | 1.62 | (1.29, 2.03) | <0.0001 |
| | Ab Pain & Stool Daily (FDA) | TARGET 1 | 1.40 | (1.04, 1.89) | 0.0276 |
| | | TARGET 2 | 1.48 | (1.10, 1.99) | 0.0101 |
| | | Combined | 1.44 | (1.16, 1.78) | 0.0007 |



Case 1:20-cv-00430-RGA Document 59-1 Filed 11/13/20 Page 928 of 952 PageID #: 2834

FIG. 13



Case 1:24-cv-00430-RGA Document 138-3 Filed 01/30/26 Page 925 of 2501 PageID #: 2835



# METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

## RELATED APPLICATIONS

This application is a continuation of U.S. Ser. No. 16/575,769, filed 19 Sep. 2019; which is a continuation of U.S. Ser. No. 15/902,179, filed 22 Feb. 2018; which is a continuation of U.S. Ser. No. 15/398,283 filed 4 Jan. 2017; which is a continuation of U.S. Ser. No. 13/755,578 filed 31 Jan. 2013; which is a continuation of U.S. Ser. No. 12/880,739 filed 13 Sep. 2010; which claims the benefit of U.S. 61/241,945 filed 13 Sep. 2009, U.S. 61/262,475 filed 18 Nov. 2009, and U.S. 61/329,511 filed 29 Apr. 2010; and U.S. Ser. No. 12/880,739 is a CIP of Ser. No. 12/393,979 filed 26 Feb. 2009, which claims the benefit of U.S. 61/031,679 filed 26 Feb. 2008 and 61/102,801 filed 3 Oct. 2008; the entire contents of which are expressly incorporated herein by reference.

## BACKGROUND

Rifaximin (INN; see The Merck Index, XIII Ed., 8304) is an antibiotic belonging to the rifamycin class of antibiotics, e.g., a pyrido-imidazo rifamycin. Rifaximin exerts its broad antibacterial activity, for example, in the gastrointestinal tract against localized gastrointestinal bacteria that cause infectious diarrhea, irritable bowel syndrome, small intestinal bacterial overgrowth, Crohn's disease, and/or pancreatic insufficiency. It has been reported that rifaximin is characterized by a negligible systemic absorption, due to its chemical and physical characteristics (Descombe J. J. et al. *Pharmacokinetic study of rifaximin after oral administration in healthy volunteers. Int J Clin Pharmacol Res,* 14 (2), 51-56, (1994)).

## SUMMARY

Disclosed herein are methods of preventing, ameliorating and/or treating bowel diseases (BDs). In general, subjects who may benefit from treatment with a rifamycin class antibiotic (e.g., rifaximin) include those who are susceptible to BDs, those who have active or acute diseases and those who are in remission from one or more BDs. BDs include, for example, irritable bowel syndrome (IBS), diarrhea-predominant Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease and/or hepatic encephalopathy. Subjects who may particularly benefit from this treatment include those who are or may be suffering from or susceptible to IBS.

In one aspect, presented herein are methods of treating bowel disease (BD) with a durability of antibiotic response, comprising administering a therapeutically effective amount of a rifamycin class antibiotic to a subject in need thereof, selecting subjects who respond to treatment after being treated for between about 1 and about 24 weeks, and removing a responding subject from treatment wherein after removal of treatment there is a durability of response.

In one aspect, presented herein are methods of treating bowel disease (BD), comprising administering to a subject in need thereof 550 mg of rifaximin TID, thereby treating BD.

In one embodiment, the bowel disease comprises Irritable Bowel Syndrome (IBS).

In one embodiment, the bowel disease comprises diarrhea-associated Irritable Bowel Syndrome (dIBS).

In one embodiment, the bowel disease comprises hepatic encephalopathy.

In another embodiment, hepatic encephalopathy (HE) will be administered a rifamycin class antibiotic for between about 28 days weeks and 24 months. In treating HE, the rifamycin class antibiotic may be administered for as long a necessary, for example, for 12 months and longer, or for a subject's entire life span, for example, after being suspected of or diagnosed as having HE.

In one embodiment, at least 50% of patients respond.

In one embodiment, the therapeutically effective amount comprises from between about 25 mg to about 6000 mg.

In one embodiment, the therapeutically effective amount comprises 550 mg TID.

In one embodiment, the therapeutically effective amount comprises 550 mg BID.

In one embodiment, the therapeutically effective amount comprises 600 mg TID.

In one embodiment, the therapeutically effective amount comprises 600 mg BID.

In one embodiment, the therapeutically effective amount comprises 1650 mg/day.

In one embodiment, the BD comprises diarrhea-predominant irritable bowel syndrome (dIBS). In one embodiment, the BD comprises alternating-predominant irritable bowel syndrome.

In one embodiment, the rifamycin class antibiotic comprises a compound of Formula I.

In one embodiment, the rifamycin class antibiotic comprises rifaximin. In one embodiment, the BD comprises alternating-predominant irritable bowel syndrome.

In one embodiment, subjects are treated from between about 7 days and about 4 weeks prior to selection.

In one embodiment, the subject is selected upon response to the rifamycin class antibiotic.

In one embodiment, the subject is selected when response to the rifamycin class antibiotic is recognized.

In one embodiment, the durability of response comprises from at least between about 1 and about 24 weeks of adequate relief of symptoms.

In one embodiment, the durability of response comprises from at least between about 1 and about 5 weeks of adequate relief of symptoms.

In one embodiment, symptoms comprise one or more of overall BD symptoms or bloating.

In one embodiment, adequate relief of BD symptoms comprises a reduction of BD symptoms.

In one embodiment, the reduction in BD symptoms is a reduction from baseline symptoms.

In one embodiment, baseline symptoms are established prior to treatment.

In one embodiment, adequate relief of BD symptoms comprises a 'yes' response from a subject when asked the question comprising or similar to, "In the past 7 days, have you had adequate relief of your symptom of your BD symptoms?" In one embodiment, adequate relief of BD symptoms comprises an affirmative response (e.g., yes) from a subject if asked weather they have had adequate relief of symptom of BD.

In one embodiment, BD symptoms comprise one or more of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and/or urgency.

In one embodiment, wherein adequate relief of bloating symptoms comprises a reduction of bloating symptoms.

In one embodiment, wherein the reduction in bloating symptoms is a reduction from baseline symptoms.

In one embodiment, baseline symptoms are established prior to treatment.

In one embodiment, adequate relief of bloating symptoms comprises a 'yes' response from a subject when asked the question comprising or similar to "In the past 7 days, have you had adequate relief of your symptom of bloating?" In one embodiment, adequate relief of BD symptoms comprises an affirmative response (e.g., yes) from a subject if asked a weather they have had adequate relief of bloating.

In one embodiment, bloating symptoms comprise one or more of the symptoms of abdominal fullness, bloating, gas, or swelling.

In one embodiment, a BD comprises one or more of irritable bowel syndrome (IBS), uncontrolled diarrhea-associated Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease, hepatic encephalopathy, and/or or pouchitis.

In one embodiment, a BD may also comprise one or more of fibromyalgia (FM), chronic fatigue syndrome (CFS), depression, attention deficit/hyperactivity disorder (ADHD), multiple sclerosis (MS), and/or systemic lupus erythematosus (SLE).

In one aspect, presented herein are methods of treating bowel disease (BD) in males comprising, administering a therapeutically effective amount of rifaximin to a male in need thereof.

In one aspect, presented herein are methods of treating bowel disease (BD) in females comprising, administering a therapeutically effective amount of rifaximin to a female in need thereof.

In one embodiment, the methods further comprise determining the gender of a subject and administering the therapeutically effective amount to a male subject.

In one embodiment, the methods further comprise determining the gender of a subject and administering the therapeutically effective amount to a female subject.

In one embodiment, the methods further comprise determining symptom relief in a male subject and administering a second course of rifaximin treatment if symptoms remain unresolved.

In one aspect, presented herein are methods of treating bloating due to BD in males comprising administering a therapeutically effective amount of rifaximin to a male in need thereof.

In one aspect, presented herein are methods of treating BD in older subjects comprising administering a therapeutically effective amount of rifaximin to an older subject in need thereof, determining symptom relief in the older subject and administering a second course of rifaximin treatment if symptoms were unresolved. As used herein, an older subject, refers for example to a subject greater than 65 years of age, a subject about 50 years of age or older, a subject about 55 years of age or older, a subject about 60 years of age or older, or a subject about 70 years of age or older. A "long duration of disease," as used herein refers, for example, to a subject suffering from the disease for about 4 to about 10 or more years, or to a subject suffering from the disease from about 5 years to about 10 years, or to a subject suffering from the disease from about 5 years to about 20 years or greater.

In one aspect, presented herein are methods of predicting response to rifaximin treatment for BD comprising: assessing a subject suffering from BD and administering a therapeutically effective amount of rifaximin to one or more of a subject determined to be old, with long duration of BD, men or those having a baseline severity of mild to moderate.

In one aspect, presented herein are methods of treating BD in older subjects comprising administering a therapeutically effective amount of rifaximin to an older subject in need thereof. As used herein, an older subject, refers for example to a subject 65 years of age or older.

In one embodiment, the method further comprises determining, based on clinical data, weather a subject will have a positive response to treatment. In one embodiment, the determination is made based on one or more of a subject's age, a subject's duration of BD, gender, or baseline severity of BD. In one embodiment, the clinical data is presented in a label on a pharmaceutical product.

In one embodiment, the method further comprises determining, based on clinical data, weather a subject will have a positive response to treatment. In one embodiment, the determination is made based on one or more of a subject's age, race or gender. In one embodiment, the clinical data is presented in a label on a pharmaceutical product.

In one embodiment, if a subject is male, there is a prediction of response.

In one embodiment, if a subject is older, there is a prediction of response.

In one embodiment, if a subject has had a long duration of disease, there is a prediction of response.

In one embodiment, the method further comprises determining, based on clinical data, weather a subject will have a positive response to treatment. In one embodiment, the determination is made based on one or more of a subject's age, race or gender. In one embodiment, the clinical data is presented in a label on a pharmaceutical product.

In one embodiment, baseline severity determination comprises a 7-point Lickert scale.

In one embodiment, the methods further comprise notifying the subject of a likelihood of response.

In one embodiment, a subject's likelihood of response increases with age and with length of duration of BD.

In one embodiment, the therapeutically effective amount comprises from between about 100 mg and about 6000 mg; 550 mg TID; 550 mg BID; 600 mg TID; 600 mg BID; or 1650 mg.

In one aspect, presented herein are methods of treating BD, comprising: providing a container comprising a rifamycin class antibiotic, wherein the container comprises printed labeling which describes a durability of antibiotic response and suggests selecting subject's who respond to treatment have a durability of response after removal from treatment; and administering rifaximin from the container to the subject.

In one aspect, presented herein are methods of treating BD, comprising: providing a container comprising rifaximin, wherein the container comprises printed labeling which describes the administration instructions; and administering rifaximin from the container to the subject to treat BD.

In one embodiment, the rifamycin class antibiotic comprises rifaximin.

In one aspect, presented herein are kits for treating BD comprising a container comprising a rifamycin class antibiotic and a label which describes that administration of a therapeutically effective amount of the antibiotic results in a durability of response in a subject that responds to the treatment. In one embodiment, the rifamycin class antibiotic is rifaximin.

In one embodiment, the label describes adverse events comprising one or more of infections and infestations,

gastrointestinal disorders, nervous system disorders, and musculoskeletal and connective tissue disorders.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is selected as responding to treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one embodiment, the label describes a length of treatment with rifaximin, whereby a subject is selected as responding to treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is removed from treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one embodiment, the label describes a length of treatment with rifaximin, whereby a subject is removed from treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one aspect, the rifamycin class antibiotic comprises one or more of rifaximin or a Form α, Form β, Form γ, Form δ, Form ε, Form ζ, Form η, Form α-dry, Form ι, Form β-1, Form β-2, Form ε-dry, mesylate Form or amorphous Forms of rifaximin and a pharmaceutically acceptable carrier. The rifaximin may be formulated as a pharmaceutical composition. In one embodiment, the rifamycin class antibiotic comprises rifaximin.

In one embodiment, the pharmaceutical composition further comprises excipients.

According to another embodiment, the excipients comprise one or more of a diluting agent, binding agent, lubricating agent, disintegrating agent, coloring agent, flavorings agent or sweetening agent.

In another embodiment, the composition is formulated for selected coated and uncoated tablets, hard and soft gelatin capsules, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packet. In one embodiment, the composition is formulated for topical use.

According to another embodiment, the bowel related disorder is one or more of irritable bowel syndrome (IBS), diarrhea-predominant Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease, hepatic encephalopathy, and/or or pouchitis.

According to one aspect, provided herein are methods of improving QOL measures in a BD subject comprising administering rifaximin.

According to one aspect, provided herein are methods of improving QOL measures in a BD subjects comprising administering a rifamycin class antibiotic.

In one embodiment, rifaximin is administered for 14 days.

In one embodiment, one or more of quality of life (QOL) measures comprising dysphoria, body image, health worry, social reaction, and relationship are improved upon administration of rifaximin.

In one embodiment, selecting comprises following dosing instructions on a package insert of a pharmaceutical product.

In one embodiment, the package insert instructs to administer the rifamycin class antibiotic for 14 days.

In one embodiment, removing comprises instructing a subject by following dosing instructions on a package insert of a pharmaceutical product.

In one embodiment, the package insert instructs to administer the rifamycin class antibiotic for 14 days.

In one embodiment, the package insert instructs to administer the rifaximin for 14 days.

In one embodiment, the product comprises 550 mg of rifaximin labeled for treatment of irritable bowel syndrome.

In one embodiment, the product comprises 550 mg of rifaximin labeled for treatment of hepatic encephalopathy.

In one embodiment, the product comprises 600 mg of rifaximin labeled for treatment of irritable bowel syndrome.

In one embodiment, the product comprises 600 mg of rifaximin labeled for treatment of hepatic encephalopathy.

In one embodiment, the product comprises 550 mg of rifaximin labeled for treatment of one or more of irritable bowel syndrome, Travelers' diarrhea or hepatic encephalopathy.

In one embodiment, the product comprises 550 mg of rifaximin.

In one embodiment, the product comprises 600 mg of rifaximin.

In one embodiment, the product comprises 200 mg of rifaximin.

In one embodiment, the product comprises 400 mg of rifaximin.

In one embodiment, the product comprises 400 mg of rifaximin BID.

In one embodiment, the product comprises 400 mg of rifaximin TID.

In one embodiment, the method further comprises determining risk of BD in a subject prior to administration of the rifamycin class antibiotic by genetically profiling the subject risk of BD and selecting to administer a rifamycin class antibiotic to an at risk subject.

In one embodiment, determining risk comprises determining polymorphisms at one or more of Nod2, CFTR, CARD15, rs6822844, rs2305767, rs6822844, 8q24 region; Marker:rs6983267, LOC727677, IL23R(1), NKX2-3, 5p13 region, PTPN2, MST1, IRGM, IL23R(2), or 10q21 region.

Provided herein, according to one aspect are methods of providing acute treatment for symptomatic diarrhea-predominant Irritable Bowel Syndrome (dIBS) comprising: administering 1650 mg/day of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response.

In one embodiment, the 1650 mg is administered as 550 mg three times a day.

Provided herein, according to one aspect are methods of providing acute treatment for uncontrolled diarrhea-predominant Irritable Bowel Syndrome (dIBS) comprising: administering 550 mg rifaximin two or three times a day for two weeks to a subject in need thereof, wherein removing the subject from treatment after the two weeks results in a durability of response.

In one embodiment, the treatment provides symptomatic relief of dIBS.

In one embodiment, a package insert of a pharmaceutical product warns of adverse events, including, for example, infections and infestations, gastrointestinal disorders, nervous system disorders, and musculoskeletal and connective tissue disorders.

In another embodiment, the invention provides methods of treating abdominal pain associated with Irritable Bowel Syndrome (IBS) by administering 550 mg of rifaximin TID to a subject in need thereof, thereby treating abdominal pain Irritable Bowel Syndrome (IBS).

In one embodiment, the IBS is diarrhea-predominant IBS. In another embodiment, the IBS is alternating-predominant IBS.

In one embodiment, treating IBS comprises treating an IBS symptom of pain.

In one embodiment, the IBS symptom of pain comprise abdominal pain.

In one embodiment, treating the IBS symptom of pain comprise adequate relief of pain.

In one embodiment, adequate relief of pain comprises a reduction of pain symptoms.

In one embodiment, the reduction in pain comprises a reduction from baseline symptoms.

In one embodiment, baseline symptoms are established prior to treatment.

In one embodiment, a subject having a diabetes history of longer than 20 years is predicted to respond to treatment with rifaximin.

Other embodiments of the invention are disclosed infra.

## DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a graph of continuous adequate relief of IBS symptoms during non-treatment follow-up.

FIG. **2** shows a graph of continuous adequate relief of bloating symptoms during non-treatment follow-up.

FIG. **3** shows proposed study design for treatment with rifaximin to show durability of response.

FIG. **4** shows graphical results of adequate relief of IBS symptoms.

FIG. **5** shows results of adequate relief of bloating symptoms.

FIG. **6** shows results of change from baseline in bloating symptoms after treatment with rifaximin.

FIG. **7** shows an analysis of IBS weeks 3 through 6.

FIG. **8** shows IBS bloating data for weeks 3 through 6.

FIG. **9** shows IBS consistency data for weeks 3 through 6.

FIG. **10** shows IBS data for the entire 3 month study.

FIG. **11** shows relief of IBS symptoms for the first 4 weeks.

FIG. **12** shows relief of IBS symptoms for the first two months.

FIG. **13** shows daily IBS symptoms weeks 1 through 12.

## DETAILED DESCRIPTION

Rifaximin (USAN, INN; see The Merck Index, XIII Ed., 8304, CAS No. 80621-81-4), (2S,16Z,18E,20S,21S,22R, 23R,24R,25S,26S,27S,28E)-5,6,21,23,25 Pentahydroxy-27-methoxy-2,4,11,16,20,22,24,26-octamethyl-2,7-(epoxypentadeca-(1,11,13)trienimino)benzofuro (4,5-e) pyrido(1,2,-a) benzimidazole-1,15(2H)-dione,25-acetate), is a semi-synthetic antibiotic produced from rifamycin O. Rifaximin is a molecule belonging to the rifamycin class of antibiotics, e.g., a pyrido-imidazo rifamycin. Rifaximin exerts a broad antibacterial activity, for example, in the gastrointestinal tract against localized gastrointestinal bacteria that cause infectious diarrhea, irritable bowel syndrome, small intestinal bacterial overgrowth, Crohn's disease, and/or pancreatic insufficiency.

Rifaximin is also described in Italian Patent IT 1154655 and EP 0161534. EP patent 0161534 discloses a process for rifaximin production using rifamycin O as the starting material (The Merck Index, XIII Ed., 8301). U.S. Pat. No. 7,045,620 B1 discloses polymorphic forms of rifaximin, as do U.S. Ser. No. 11/658,702; U.S. Ser. No. 61/031,329; U.S. Ser. No. 12/119,622; U.S. Ser. No. 12/119,630; U.S. Ser. No. 12/119,612; U.S. Ser. No. 12/119,600; U.S. Ser. No. 11/873,841; Publication WO 2006/094662; and U.S. Ser. No. 12/393,012. The applications and patents referred to here are incorporated herein by reference in their entirety for all purposes.

A rifamycin class antibiotic is, for example, a compound having the structure of Formula I:




wherein A may be the structure $A_1$:

$A_1$




,

or the structure $A_2$

$A_2$




,

wherein, -x- is a covalent chemical bond or nil; R is hydrogen or acetyl;

$R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$ alkyl, benzyloxy, mono- and di-$(C_{1-3})$ alkylamino-$(C_{1-4})$ alkyl, $(C_{1-3})$alkoxy-$(C_{1-4})$alkyl, hydroxymethyl, hydroxy-$(C_{2-4})$-alkyl, nitro or $R_1$ and $R_2$ taken together with two consecutive carbon atoms of the pyridine nucleus form a benzene ring unsubstituted or substituted by one or two methyl or ethyl groups; $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Also described herein is a compound as defined above, wherein A is $A_1$ or $A_2$ as above indicated, -x- is a covalent chemical bond or nil, R is hydrogen or acetyl, $R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$alkyl, benzyloxy, hydroxy-$(C_{2-4})$ alkyl, di-$(C_{1-3})$ alkylamino-$(C_{1-4})$ alkyl, nitro or $R_1$ and $R_2$ taken together with two consecutive

carbon atoms of the pyridine nucleus form a benzene ring and $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Also described herein is a compound as defined above, wherein A is $A_1$ or $A_2$ as above indicated, -x- is a covalent chemical bond or nil, R is acetyl, $R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$ alkyl or $R_1$ and $R_2$ taken together with two consecutive carbon atoms of the pyridine nucleus form a benzene ring and $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Also described herein is a compound as defined above, which is 4-deoxy-4'-methyl-pyrido[1',2'-1,2]imidazo[5,4-c] rifamycin SV. Also described herein is a compound as defined above, which is 4-deoxy-pyrido[1',2':1,2]imidazo[5, 4-c] rifamycin SV.

Also described herein is a compound as defined above, wherein A is as described above,-x- is a covalent chemical bond or nil; R is hydrogen or acetyl; $R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$ alkyl, benzyloxy, mono- and di-$(C_{1-3})$alkylamino$(C_{1-4})$alkyl, $(C_{1-3})$alkoxy-$(C_{1-4})$ alkyl, hydroxymethyl, hydroxy-$(C_{2-4})$-alkyl, nitro or $R_1$ and $R_2$ taken together with two consecutive carbon atoms of the pyridine nucleus form a benzene ring unsubstituted or substituted by one or two methyl or ethyl groups; $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Rifaximin is a compound having the structure of formula II:

(II)




In certain embodiments, the antibiotic comprises one or more of a rifamycin, aminoglycoside, amphenicol, ansamycin, β-Lactam, carbapenem, cephalosporin, cephamycin, monobactam, oxacephem, lincosamide, macrolide, polypeptide, tetracycline, or a 2,4-diaminopyrimidine class antibiotic. Exemplary antibiotics of these classes are listed below.

Without wishing to be bound by any particular scientific theories, rifaximin acts by binding to the beta-subunit of the bacterial deoxyribonucleic acid-dependent ribonucleic acid (RNA) polymerase, resulting in inhibition of bacterial RNA synthesis. It is active against numerous gram (+) and (−) bacteria, both aerobic and anaerobic. In vitro data indicate rifaximin is active against species of *Staphylococcus, Streptococcus, Enterococcus*, and *Enterobacteriaceae.*

"Rifaximin", as used herein, includes solvates and polymorphous forms of the molecule, including, for example, Form α, Form β, Form γ Form δ, Form ε, Form ζ, Form η, Form α-dry, Form ι, Form β-1, Form β-2, Form ε-dry, mesylate Form or amorphous Forms of rifaximin. These forms are described in more detail, for example, in U.S. Ser. No. 11/873,841; U.S. Ser. No. 11/658,702; EP 05 004 635.2, filed 3 May 2005; U.S. Pat. No. 7,045,620; U.S. 61/031,329; G. C. Viscomi, et al., CrystEngComm, 2008, 10, 1074-1081 (April 2008), US Patent Publication 2010/0174064, US Patent Publication 2009/0234114; US Patent Publication 2009/0262012, US Patent Publication 2009/0130201, US Patent Publication 2009/0082558, US Patent Publication 2009/0028940, US Patent Publication 2005/0272754. Each of these references is hereby incorporated by reference in entirety.

Medicinal preparations may contain gastrointestinal specific antibiotics together with usual excipients, discussed infra.

"Polymorphs" or "polymorphic forms" as used herein, refer to the occurrence of different crystalline forms of a single compound in distinct hydrate status, e.g., a property of some compounds and complexes. Thus, polymorphs are distinct solids sharing the same molecular formula, yet each polymorph may have distinct physical properties. Therefore, a single compound may give rise to a variety of polymorphic forms where each form has different and distinct physical properties, such as solubility profiles, melting point temperatures, hygroscopicity, particle shape, density, flowability, compatibility and/or x-ray diffraction peaks. The solubility of each polymorph may vary, thus, identifying the existence of pharmaceutical polymorphs is essential for providing pharmaceuticals with predictable solubility profiles. It is desirable to investigate all solid state forms of a drug, including all polymorphic forms, and to determine the stability, dissolution and flow properties of each polymorphic form. Polymorphic forms of a compound can be distinguished in a laboratory by X-ray diffraction spectroscopy and by other methods such as, infrared spectrometry. For a general review of polymorphs and the pharmaceutical applications of polymorphs see G. M. Wall, Pharm Manuf. 3, 33 (1986); J. K. Haleblian and W. McCrone, J Pharm. Sci., 58, 911 (1969); and J. K. Haleblian, J. Pharm. Sci., 64, 1269 (1975), all of which are incorporated herein by reference. As used herein, the term polymorph is occasionally used as a general term in reference to the forms of rifaximin and include within the context, salt, hydrate, polymorph and amorphous forms of rifaximin disclosed herein. This use depends on context and will be clear to one of skill in the art. Exemplary polymorphic forms of rifaximin useful in the methods and kits of the invention are set forth in the published patent applications set forth above.

"GI specific antibiotic," and "GI antibiotic" as used herein include antibiotic known to have an effect on GI disease. For example, a rifamycin class antibiotic (e.g., rifaximin), neomycin, metronidazole, teicoplanin, ciprofloxacin, doxycycline, tetracycline, augmentin, cephalexin, penicillin, ampicillin, kanamycin, rifamycin, vancomycin, and combinations thereof are useful GI specific antibiotics. Even more preferable are GI specific antibiotics with low systemic absorption, for example, rifaximin. Low systemic absorption includes, for example, less than 10% absorption, less than 5% absorption, less than 1% absorption and less than 0.5%

absorption. Low systemic absorption also includes, for example, from between about 0.01-1% absorption, from between about 0.05-1% absorption, from between about 0.1-1% absorption, from between about 1-10% absorption, or from between about 5-20% absorption.

"Ameliorate," "amelioration," "improvement" or the like refers to, for example, a detectable improvement or a detectable change consistent with improvement that occurs in a subject or in at least a minority of subjects, e.g., in at least about 2%, 5%, 10%, 15%, 20%, 25%, 30%, 40%, 50%, 60%, 70%, 75%, 80%, 85%, 90%, 95%, 98%, 100% or in a range between about any two of these values. Such improvement or change may be observed in treated subjects as compared to subjects not treated with rifaximin, where the untreated subjects have, or are subject to developing, the same or similar disease, condition, symptom or the like. Amelioration of a disease, condition, symptom or assay parameter may be determined subjectively or objectively, e.g., self assessment by a subject(s), by a clinician's assessment or by conducting an appropriate assay or measurement, including, e.g., a quality of life assessment, a slowed progression of a disease(s) or condition(s), a reduced severity of a disease(s) or condition(s), or a suitable assay(s) for the level or activity(ies) of a biomolecule(s), cell(s) or by detection of BD episodes in a subject. Amelioration may be transient, prolonged or permanent or it may be variable at relevant times during or after a GI specific antibiotic is administered to a subject or is used in an assay or other method described herein or a cited reference, e.g., within timeframes described infra, or about 1 hour after the administration or use of a GI specific antibiotic to about 7 days, 2 weeks, 28 days, or 1, 3, 6, 9 months or more after a subject(s) has received such treatment.

The "modulation" of, e.g., a symptom, level or biological activity of a molecule, or the like, refers, for example, that the symptom or activity, or the like is detectably increased or decreased. Such increase or decrease may be observed in treated subjects as compared to subjects not treated with a GI specific antibiotic, where the untreated subjects have, or are subject to developing, the same or similar disease, condition, symptom or the like. Such increases or decreases may be at least about 2%, 5%, 10%, 15%, 20%, 25%, 30%, 40%, 50%, 60%, 70%, 75%, 80%, 85%, 90%, 95%, 98%, 100%, 150%, 200%, 250%, 300%, 400%, 500%, 1000% or more or within any range between any two of these values. Modulation may be determined subjectively or objectively, e.g., by the subject's self assessment, by a clinician's assessment or by conducting an appropriate assay or measurement, including, e.g., quality of life assessments or suitable assays for the level or activity of molecules within a subject. Modulation may be transient, prolonged or permanent or it may be variable at relevant times during or after a GI specific antibiotic is administered to a subject or is used in an assay or other method described herein or a cited reference, e.g., within times descried infra, or about 1 hour of the administration or use of a GI specific antibiotic to about 2 weeks, 28 days, 3, 6, 9 months or more after a subject(s) has received a GI specific antibiotic.

The term "modulate" may also refer to increases or decreases in the activity of a cell in response to exposure to a GI specific antibiotic, e.g., the inhibition of proliferation and/or induction of differentiation of at least a sub-population of cells in an animal such that a desired end result is achieved, e.g., a therapeutic result of GI specific antibiotic used for treatment may increase or decrease over the course of a particular treatment.

The language "a prophylactically effective amount" of a compound refers to an amount of a compound of the invention of formula I, formula II, or otherwise described herein which is effective, upon single or multiple dose administration to the subject, in preventing or treating BD.

As used herein, "subject" includes organisms which are capable of suffering from a bowel disease or other disorder treatable by a rifamycin class antibiotic (e.g., rifaximin) or who could otherwise benefit from the administration of a rifamycin class antibiotic (e.g., rifaximin) as described herein, such as human and non-human animals. Preferred human animals include human subjects.

The term "non-human animals" of the invention includes all vertebrates, e.g., mammals, e.g., rodents, e.g., mice, and non-mammals, such as non-human primates, e.g., sheep, dog, cow, chickens, amphibians, reptiles, etc. Susceptible to a bowel disorder is meant to include a subject at risk of developing a bowel disorder or a person who is in remission from a BD or a person who may relapse from a BD, e.g., a subject suffering from immune suppression, a subject that has been exposed to a bacterial infection, physicians, nurses, a subject traveling to remote areas known to harbor bacteria that cause travelers' diarrhea, a family history of BD, an aging person, a person with liver damage, a subject in IBS remission, a subject who has had HE episodes in the past, a person with mind HE, a subject with uncontrollable diarrhea, a subject with dIBS, etc.

The language "a prophylactically effective amount" of a compound refers to an amount of a compound of the invention of formula I, formula II, or otherwise described herein which is effective, upon single or multiple dose administration to the subject, in preventing or treating BD or IBS.

The term "administration" or "administering" includes routes of introducing a GI specific antibiotic to a subject to perform their intended function. Examples of routes of administration that may be used include injection, oral, inhalation, vaginal, rectal and transdermal. The pharmaceutical preparations may be given by forms suitable for each administration route. For example, these preparations are administered in tablets or capsule form, by injection, inhalation, eye lotion, eye drops, ointment, suppository, etc. administration by injection, infusion or inhalation; topical by lotion or ointment; and rectal by suppositories. Oral administration is preferred. The injection can be bolus or can be continuous infusion. Depending on the route of administration, a GI specific antibiotic can be coated with or disposed in a selected material to protect it from natural conditions that may detrimentally effect its ability to perform its intended function. A GI specific antibiotic can be administered alone, or in conjunction with either another agent or agents as described above or with a pharmaceutically-acceptable carrier, or both. A GI specific antibiotic can be administered prior to the administration of the other agent, simultaneously with the agent, or after the administration of the agent. Furthermore, a GI specific antibiotic can also be administered in a proform, which is converted into its active metabolite, or more active metabolite in vivo.

Administration "in combination with" one or more further therapeutic agents includes simultaneous (concurrent) and consecutive administration in any order.

As will be readily apparent to one skilled in the art, the useful in vivo dosage to be administered and the particular mode of administration will vary depending upon the age, weight and mammalian species treated, the particular compounds employed, and/or the specific use for which these compounds are employed. The determination of effective

Case 1:20-cv-00430-RGA Document 138-3 Filed 10/26 Page 35 of 952 PageID #: 3341



dosage levels, that is the dosage levels necessary to achieve the desired result, can be accomplished by one skilled in the art using routine pharmacological methods. Typically, human clinical applications of products are commenced at lower dosage levels, with dosage level being increased until the desired effect is achieved.

The term "obtaining" as in "obtaining a GI specific antibiotic" is intended to include purchasing, synthesizing or otherwise acquiring a GI specific antibiotic.

The language "a prophylactically effective amount" of a compound refers to an amount of a GI specific antibiotic which is effective, upon single or multiple dose administration to the subject, in preventing or treating IBS.

The term "pharmaceutical agent composition" (or agent or drug) as used herein refers to a chemical compound, composition, agent or drug capable of inducing a desired therapeutic effect when properly administered to a patient. It does not necessarily require more than one type of ingredient.

As used herein, "durability of response" includes for example, adequate relief of symptoms after removal of treatment, continuous adequate relief of symptoms after removal of treatment, or response that is greater than or superior to placebo response. A response by a subject may be considered durable, for example, if they have a response to the rifamycin class antibiotic after removal from treatment. The duration of response, may be, for example, 2 days, 7 days, two weeks, 3 weeks, 4 weeks, 12 weeks, between about 1 week and about 24 weeks or longer. The response may be measured, for example using one or more of the methods outlined below, including, for example, a subject's subjective assessment of their symptoms or a healthcare provider's or caretaker's assessment of a subject's symptoms.

As used herein, "selecting subject's who respond," "selection of subject's who respond" or the like, include, for example, determining that a subject has responded to treatment based on a decrease of BD or IBS symptoms and/or following label instructions to administer a product (e.g., a rifamycin class antibiotic) for a certain period of time or the like. The determination or selection may be based on the label (e.g., package or package insert) instructions or on the a subject's subjective assessment of their symptoms or a healthcare provider's or caretaker's assessment of a subject's symptoms.

Methods of Treatment

Provided herein are methods of treating, preventing, or alleviating bowel related disorders comprising administering to a subject in need thereof an effective amount of rifaximin. Bowel related disorders (e.g., bowel diseases) include one or more of irritable bowel syndrome (IBS), alternating predominant IBS, diarrhea-predominant Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease, hepatic encephalopathy, abdominal pain associated with IBS and/or pouchitis.

Table 1 below demonstrates differential response to to treatment with rifaximin based on gender, age and IBS type. Table 2 demonstrates response to the treatment is correlated with the duration of disease.

TABLE 1

| | Thresholds | Treatment effect (IBS Sx, Bloating) |
|---|---|---|
| Gender | M versus. | 21%*, 13.6% |
| | F | 3.5%, 3.9% |
| Age | <65 versus. | 6.9%, 6.8% |
| | ≥65 | 19.1%, 3.2% |
| dIBS Type | dIBS only versus. | 6.3%, 4.5% |
| | aIBS | 31.4%*, 31.4% |

*p-value < 0.05

TABLE 2

| | Thresholds | Treatment effect (IBS Sx, Bloating) |
|---|---|---|
| Diabetes History | Y versus. | −12.7%, −5.6% |
| | N | 9.5%, 7.4% |
| Disease Duration: | ≤10 y | 1.8%, 2.8% |
| | 10-20 y | 20.1%, 11.7% |
| | >20 y | 46.6%*, 35.1% |

*p-value < 0.05

It was surprisingly shown that a rifamycin class antibiotic (e.g., rifaximin) is particularly efficacious in males for the treatment of IBS.

Durability of Response

Embodiments of the invention relate to the discovery that the dosing regimes described herein of rifaximin results in a durability of response and amelioration of IBS symptoms in subjects in need thereof. One embodiment of the invention is a method of treating bowel disease (BD) with a durability of antibiotic response, by administering a therapeutically effective amount of a rifamycin class antibiotic to a subject in need thereof, selecting subjects who respond to treatment after being treated for between about 1 and about 24 weeks, and removing a responding subject from treatment wherein after removal of treatment there is a durability of response. The selecting may be by a healthcare professional, by self selection or by selection of one in a position to decide or discern symptoms or to diagnose a response to the antibiotic. Removal of treatment comprises, for example, ceasing to administer, ceasing to recommend administration of the antibiotic, and/or advising responding subjects to stop taking the antibiotic.

In one embodiment, the recommendation (e.g., selection) is made on a label of a pharmaceutical product, which indicates that the product should be administered for 14 days (e.g., two weeks). For example, a subject in need of treatment is administered rifaximin 550 mg TID for two weeks and instructed by a label. In one embodiment, the recommendation (e.g., selection) is made on a label of a pharmaceutical product, which indicates that the product should be administered for two weeks. For example, a subject in need of treatment is administered rifaximin 550 mg TID for two weeks as instructed by a label. In one embodiment, selecting is following dosing instructions on a package insert of a pharmaceutical product.

Also described herein are methods for maintenance of remission of bowel disease in a subject comprising administering a therapeutically effective amount of rifaximin for at least 25 weeks to a subject in need thereof.

Yet another aspect of this invention relates to a method of treating a subject (e.g., mammal, human, horse, dog, cat) with rifaximin who is in need thereof. Identifying a subject in need of such treatment can be in the judgment of a subject

or a health care professional and can be subjective (e.g., opinion) or objective (e.g., measurable by a test or diagnostic method).

Rifaximin may be used in various treatment regimes. These regimes may vary depending upon the subject and the type of treatment.

Rifaximin may be administered, for example, twice a day, three times a day, or four times or more often as necessary per day. Rifaximin may be administered in doses, for example of from about between 25 mg BID to about 3000 mg TID. Another example is administering rifaximin from between about 4.0 g/day to about 7.25 g/day. The rifaximin may be administered, for example, in tablet form, powered form, liquid for or in capsules.

Subjects in need thereof include subjects having or that are susceptible to BD, are in remission from BD, males and/or older subjects with long duration of disease, as disclosed further below.

As used herein, a therapeutically effective amount means an amount effective, when administered to a human or non-human subject, to provide a therapeutic benefit such as an amelioration of symptoms, e.g., an amount effective to decrease the symptoms of IBS, or maintenance of remission of a IBS.

In certain embodiments, the rifaximin is administered to a subject from between about 1 week to about 6 weeks in duration, from between about 8 weeks to about 12 weeks in duration, or from between 1 day to about 7 days. The rifaximin may be administered from between about 1 day and about 1 year, or from 1 week to about 24 weeks. The rifaximin may be administered, for example, for the remainder of a subject's life. The rifaximin may be administered intermittently or continuously during the course of treatment. Length of treatment may vary depending on the type and length of disease and the proper length of treatment may be easily determined by one of skill in the art having the benefit of this disclosure.

For any of the embodiments, rifaximin may be administered, for example, once daily, twice daily, three times daily, or four times daily (or more often as necessary for a particular subject) to a subject. In some methods of the present invention comprise administering the rifaximin once daily to the subject because it may, for example, minimize the side effects and increase patient compliance. Also preferred, are twice and three times daily administration of rifaximin.

Dosages, according to certain preferred embodiments, range from between about 50 to about 6000 mg of rifaximin administered daily. For example, a dose of 550 mg may be administered to a subject twice daily. Other appropriate dosages for methods according to this invention may be determined by health care professionals or by the subject. The amount of rifaximin administered daily may be increased or decreased based on the weight, age, health, sex or medical condition of the subject. One of skill in the art would be able to determine the proper dose for a subject based on this disclosure.

According to certain embodiments, rifaximin may be administered in combination with other compounds, including for example, chemotherapeutic agents, anti-inflammatory agents, anti-pyretic agents radiosensitizing agents, radioprotective agents, urologic agents, anti-emetic agents, and/or anti-diarrheal agents. For example, cisplatin, carboplatin, docetaxel, paclitaxel, flurouracil, capecitabine, gemcitabine, irinotecan, topotecan, etoposide, mitomycin, gefitinib, vincristine, vinblastine, doxorubicin, cyclophosphamide, celecoxib, rofecoxib, valdecoxib, ibuprofen, naproxen, ketoprofen, dexamethasone, prednisone, prednisolone, hydrocortisone, acetaminophen, misonidazole, amifostine, tamsulosin, phenazopyridine, ondansetron, granisetron, alosetron, palonosetron, promethazine, prochlorperazine, trimethobenzamide, aprepitant, diphenoxylate with atropine, and/or loperamide.

Risk Selection Methods

The methods described herein may also further comprise genetically profiling for genetic risk of BD and selecting to treat an at risk subject. For example, an at-risk subject may be determined to be at risk of a bowel disease by genetic screening, family history, lifestyle, travel plans and the like. Genetic screening may, for example, be for genes and expression profiles or epigenetic modifiers shown to affect or predict bowel disease or susceptibility for bowel diseases. Mutations which may be screened for include mutations or polymorphisms in, for example, Nod2, CFTR, or CARD15. Nod2, a gene involved in the immune systems initial response to bacterial infection, significantly increases the risk of Crohn's disease. The CFTR protein resides in the surface of cells lining the digestive system, lungs and sweat glands. In normal cells, it acts as an ion channel that transports chloride into and out of cells. It also controls the regulation of other transport pathways regulating the passage of fluid and bicarbonate across cell membranes. DNA sequence variations (or mutations) alone do not explain CFTR-related gastrointestinal disease patterns; rather, epigenetic modifiers, or changes that leave the gene's sequence of DNA intact, influence CFTR expression.

For example, a subject may be typed for rs6822844 and/or rs2305767 to indicate risk of celiac disease. One study examined 778 individuals with celiac disease and 1,422 healthy controls. The authors found that each T at rs6822844 lowered subjects' risk of celiac disease by about 1.6 times. See Zhernakova A et al. (2007) "Novel association in chromosome 4q27 region with rheumatoid arthritis and confirmation of type 1 diabetes point to a general risk locus for autoimmune diseases." Am J Hum Genet 81(6):1284-8; and van Heel D A et al. (2007) "A genome-wide association study for celiac disease identifies risk variants in the region harboring IL2 and IL21." Nat Genet 39(7):827-9. Another study examined 463 individuals with celiac disease and 686 healthy controls. The authors found that people with a C at both copies had 2.3 times lower odds for celiac disease than those with the TT genotype. See Hunt K A et al. (2006) "Lack of association of MYO9B genetic variants with coeliac disease in a British cohort." Gut 55(7):969-72; NPfiez C et al. (2006) "No evidence of association of the MYO9B polymorphisms with celiac disease in the Spanish population." Tissue Antigens 68(6):489-92; Cirillo G et al. (2007) "Do MYO9B genetic variants predispose to coeliac disease? An association study in a cohort of South Italian children." Dig Liver Dis 39(3):228-31; Cirillo G et al. (2007) "Do MYO9B genetic variants predispose to coeliac disease? An association study in a cohort of South Italian children." Dig Liver Dis 39(3):228-31; Cirillo G et al. (2007) "Do MYO9B genetic variants predispose to coeliac disease? An association study in a cohort of South Italian children." Dig Liver Dis 39(3):228-31.

For example, a subject may be typed for 8q24 region; Marker:rs6983267 to determine risk for colon cancer. This SNP occurs in a hypothetical gene called LOC727677. It has been suggested that the riskier version of this SNP is associated not only with an increased risk of colorectal cancer, but also with formation of the precancerous adenomatous polyps. The riskier version of this SNP has also been linked to prostate cancer in some studies, though

more research is needed to confirm this association. See Haiman et al. (2007) "A common genetic risk factor colorectal and prostate cancer." Nat Genet 39(8):954-6; and Tomlinson et al. (2007) "A genome-wide association scan of tag SNPs identifies a susceptibility variant for colorectal cancer at 8q24.21." Nat Genet 39(8):984-988; and Zanke et al. (2007) "Genome-wide association scan identifies a colorectal cancer susceptibility locus on chromosome 8q24." Nat Genet 39(8):989-994.

For example, a subject may be typed for NOD2(1) SNP: rs2066844; NOD2(2) SNP: rs2066845; NOD2(3) SNP: rs2066847; IL23R(1) SNP: rs11209026; NKX2-3 SNP: rs11190140; 5p13 region SNP: rs17234657; PTPN2 SNP: rs1893217; MST1 SNP: rs3197999; IRGM SNP: rs7714584; IL23R(2) SNP: rs11805303; and/or 10q21 region SNP: rs10761659 to determine risk of Crohn's disease. See Hugot et al. (2001) "Association of NOD2 leucine-rich repeat variants with susceptibility to Crohn's disease." Nature 411(6837):599-603; Ogura et al. (2001) "A frameshift mutation in NOD2 associated with susceptibility to Crohn's disease." Nature 411(6837):603-6; Rioux et al. (2007) "Genome-wide association study identifies new susceptibility loci for Crohn disease and implicates autophagy in disease pathogenesis." Nat Genet 39(5):596-604; Libioulle et al. (2007) "Novel Crohn's disease locus identified by genome-wide association maps to a gene desert on 5p13.1 and modulates expression of PTGER4." PLoS Genet 3(4):e58; Hampe et al. (2007) "A genome-wide association scan of non-synonymous SNPs identifies a susceptibility variant for Crohn disease in ATG16L1." Nat Genet 39(2): 207-11; Duerr et al. (2006) "A genome-wide association study identifies IL23R as an inflammatory bowel disease gene." Science 314(5804):1461-1463; van Limbergen et al. (2007) "IL23R Arg381Gln is associated with childhood onset inflammatory bowel disease in Scotland." Gut 56(8): 1173-4; Wellcome Trust Case Control Consortium (2007) "Genome-wide association study of 14,000 cases of seven common diseases and 3,000 shared controls." Nature 447 (7145):661-78; Parkes et al. (2007) "Sequence variants in the autophagy gene IRGM and multiple other replicating loci contribute to Crohn's disease susceptibility." Nat Genet 39(7):830-2; Sheibanie et al. (2007) "The proinflammatory effect of prostaglandin E2 in experimental inflammatory bowel disease is mediated through the IL-23→IL-17 axis." J Immunol 178(12):8138-47; Simoncic et al. (2007) "The T cell protein tyrosine phosphatase is a negative regulator of janus family kinases 1 and 3." Curr Biol 12(6):446-53; You-Ten et al. (1997) "Impaired bone marrow microenvironment and immune function in T cell protein tyrosine phosphatase-deficient mice." J Exp Med 22(16):5662-8; Barrett et al. (2008) "Genome-wide association defines more than 30 distinct susceptibility loci for Crohn's disease." Nat Genet 40(8):955-62; Goyette et al. (2008) "Gene-centric association mapping of chromosome 3p implicates MST1 in IBD pathogenesis" Mucosal Immunology 1:131-138; Barrett et al. (2008). "Genome-wide association defines more than 30 distinct susceptibility loci for Crohn's disease." Nat Genet 40(8):955-62; McCarroll et al (2008) "Deletion polymorphism upstream of IRGM associated with altered IRGM expression and Crohn's disease." Nat Genet 40(9):1107-1112; and Singh et al. (2006) "Human IRGM induces autophagy to eliminate intracellular mycobacteria." Science 313(5792):1438-41.

Pharmaceutical Preparations

The invention also provides pharmaceutical compositions, comprising an effective amount of a rifamycin class antibiotic (e.g., rifaximin or a rifaximin polymorph) described herein and a pharmaceutically acceptable carrier. In a further embodiment, the effective amount is effective to treat a bacterial infection, e.g., small intestinal bacterial overgrowth, Crohn's disease, hepatic encephalopathy, antibiotic associated colitis, and/or diverticular disease.

For examples of the use of rifaximin and formulations thereof to treat Travelers' diarrhea, see Infante R M, Ericsson C D, Zhi-Dong J, Ke S, Steffen R, Riopel L, Sack D A, DuPont, H L. Enteroaggregative *Escherichia coli* Diarrhea in Travelers: Response to Rifaximin Therapy. Clinical Gastroenterology and Hepatology. 2004; 2:135-138; and Steffen R, M.D., Sack D A, M.D., Riopel L, Ph.D., Zhi-Dong J, Ph.D., Sturchler M, M.D., Ericsson C D, M.D., Lowe B, M. Phil., Waiyaki P, Ph.D., White M, Ph.D., DuPont H L, M.D. Therapy of Travelers' Diarrhea With Rifaximin on Various Continents. The American Journal of Gastroenterology. May 2003, Volume 98, Number 5, all of which are incorporated herein by reference in their entirety.

One embodiment pharmaceutical compositions comprising rifaximin or any polymorphic form thereof and a pharmaceutically acceptable carrier. That is, formulations may contain only one polymorph or may contain a mixture of more than one polymorph. Polymorph, in this context, refers to any physical form, hydrate, acid, salt or the like of rifaximin. Mixtures may be selected, for example on the basis of desired amounts of systemic adsorption, dissolution profile, desired location in the digestive tract to be treated, and the like. The pharmaceutical composition further comprises excipients, for example, one or more of a diluting agent, binding agent, lubricating agent, disintegrating agent, coloring agent, flavoring agent or sweetening agent. Compositions may be formulated for selected coated and uncoated tablets, hard and soft gelatin capsules, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packet. For example, compositions may be formulated for topical use, for example, ointments, pomades, creams, gels and lotions.

In an embodiment, the rifamycin class antibiotic (e.g., rifaximin) is administered to the subject using a pharmaceutically-acceptable formulation, e.g., a pharmaceutically-acceptable formulation that provides sustained delivery of the rifamycin class antibiotic (e.g., rifaximin) to a subject for at least 12 hours, 24 hours, 36 hours, 48 hours, one week, two weeks, three weeks, or four weeks after the pharmaceutically-acceptable formulation is administered to the subject.

In certain embodiments, these pharmaceutical compositions are suitable for topical or oral administration to a subject. In other embodiments, as described in detail below, the pharmaceutical compositions of the present invention may be specially formulated for administration in solid or liquid form, including those adapted for the following: (1) oral administration, for example, drenches (aqueous or non-aqueous solutions or suspensions), tablets, boluses, powders, granules, pastes; (2) parenteral administration, for example, by subcutaneous, intramuscular or intravenous injection as, for example, a sterile solution or suspension; (3) topical application, for example, as a cream, ointment or spray applied to the skin; (4) intravaginally or intrarectally, for example, as a pessary, cream or foam; or (5) aerosol, for example, as an aqueous aerosol, liposomal preparation or solid particles containing the compound.

The phrase "pharmaceutically acceptable" refers to those rifamycin class antibiotic (e.g., rifaximin) described herein, compositions containing such compounds, and/or dosage forms which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of human

Case 1:24-cv-00486-RGA Document 50-3 Filed 10/30/24 Page 33 of 874 PageID #: 2344



beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio.

The phrase "pharmaceutically-acceptable carrier" includes pharmaceutically-acceptable material, composition or vehicle, such as a liquid or solid filler, diluent, excipient, solvent or encapsulating material, involved in carrying or transporting the subject chemical from one organ, or portion of the body, to another organ, or portion of the body. Each carrier must be "acceptable" in the sense of being compatible with the other ingredients of the formulation and not injurious to the patient. Some examples of materials which can serve as pharmaceutically-acceptable carriers include: (1) sugars, such as lactose, glucose and sucrose; (2) starches, such as corn starch and potato starch; (3) cellulose, and its derivatives, such as sodium carboxymethyl cellulose, ethyl cellulose and cellulose acetate; (4) powdered tragacanth; (5) malt; (6) gelatin; (7) talc; (8) excipients, such as cocoa butter and suppository waxes; (9) oils, such as peanut oil, cottonseed oil, safflower oil, sesame oil, olive oil, corn oil and soybean oil; (10) glycols, such as propylene glycol; (11) polyols, such as glycerin, sorbitol, mannitol and polyethylene glycol; (12) esters, such as ethyl oleate and ethyl laurate; (13) agar; (14) buffering agents, such as magnesium hydroxide and aluminum hydroxide; (15) alginic acid; (16) pyrogen-free water; (17) isotonic saline; (18) Ringer's solution; (19) ethyl alcohol; (20) phosphate buffer solutions; and (21) other non-toxic compatible substances employed in pharmaceutical formulations.

Wetting agents, emulsifiers and lubricants, such as sodium lauryl sulfate and magnesium stearate, as well as coloring agents, release agents, coating agents, sweetening, flavoring and perfuming agents, preservatives and antioxidants can also be present in the compositions.

Examples of pharmaceutically-acceptable antioxidants include: (1) water soluble antioxidants, such as ascorbic acid, cysteine hydrochloride, sodium bisulfate, sodium metabisulfite, sodium sulfite and the like; (2) oil-soluble antioxidants, such as ascorbyl palmitate, butylated hydroxyanisole (BHA), butylated hydroxytoluene (BHT), lecithin, propyl gallate, alpha-tocopherol, and the like; and (3) metal chelating agents, such as citric acid, ethylenediamine tetraacetic acid (EDTA), sorbitol, tartaric acid, phosphoric acid, and the like.

Compositions containing a rifamycin class antibiotic (e.g., rifaximin) include those suitable for oral, nasal, topical (including buccal and sublingual), rectal, vaginal, aerosol and/or parenteral administration. The compositions may conveniently be presented in unit dosage form and may be prepared by any methods well known in the art of pharmacy. The amount of active ingredient which can be combined with a carrier material to produce a single dosage form will vary depending upon the host being treated, the particular mode of administration. The amount of active ingredient which can be combined with a carrier material to produce a single dosage form will generally be that amount of the compound which produces a therapeutic effect. Generally, out of one hundred percent, this amount will range from about 1% to about 99% of active ingredient, preferably from about 5% to about 70%, most preferably from about 10% to about 30%.

Liquid dosage forms for oral or rectal administration of the rifamycin class antibiotic (e.g., rifaximin) include pharmaceutically-acceptable emulsions, microemulsions, solutions, suspensions, syrups and elixirs. In addition to the active ingredient, the liquid dosage forms may contain inert diluents commonly used in the art, such as, for example, water or other solvents, solubilizing agents and emulsifiers, such as ethyl alcohol, isopropyl alcohol, ethyl carbonate, ethyl acetate, benzyl alcohol, benzyl benzoate, propylene glycol, 1,3-butylene glycol, oils (in particular, cottonseed, groundnut, corn, germ, olive, castor and sesame oils), glycerol, tetrahydrofuryl alcohol, polyethylene glycols and fatty acid esters of sorbitan, and mixtures thereof.

In addition to inert diluents, the oral compositions can include adjuvants such as wetting agents, emulsifying and suspending agents, sweetening, flavoring, coloring, perfuming and preservative agents.

Suspensions, in addition to the active rifamycin class antibiotic (e.g., rifaximin) may contain suspending agents as, for example, ethoxylated isostearyl alcohols, polyoxyethylene sorbitol and sorbitan esters, microcrystalline cellulose, aluminum metahydroxide, bentonite, agar-agar and tragacanth, and mixtures thereof.

Pharmaceutical compositions of the invention for rectal or vaginal administration may be presented as a suppository, which may be prepared by mixing one or more rifamycin class antibiotic (e.g., rifaximin) with one or more suitable nonirritating excipients or carriers comprising, for example, cocoa butter, polyethylene glycol, a suppository wax or a salicylate, and which is solid at room temperature, but liquid at body temperature and, therefore, will melt in the rectum or vaginal cavity and release the active agent. Compositions which are suitable for vaginal administration can include pessaries, tampons, creams, gels, pastes, foams or spray formulations containing such carriers as are known in the art to be appropriate.

Dosage forms for the topical or transdermal administration of a rifamycin class antibiotic (e.g., rifaximin) can include powders, sprays, ointments, pastes, creams, lotions, gels, solutions, patches and inhalants. The active rifamycin class antibiotic (e.g., rifaximin) may be mixed under sterile conditions with a pharmaceutically-acceptable carrier, and with any preservatives, buffers, or propellants which may be required.

The ointments, pastes, creams and gels may contain, in addition to rifamycin class antibiotic (e.g., rifaximin), excipients, such as animal and vegetable fats, oils, waxes, paraffins, starch, tragacanth, cellulose derivatives, polyethylene glycols, silicones, bentonites, silicic acid, talc and zinc oxide, or mixtures thereof.

Powders and sprays can contain, in addition to a rifamycin class antibiotic (e.g., rifaximin), excipients such as lactose, talc, silicic acid, aluminum hydroxide, calcium silicates and polyamide powder, or mixtures of these substances. Sprays can additionally contain customary propellants, such as chlorofluorohydrocarbons and volatile unsubstituted hydrocarbons, such as butane and propane.

The rifamycin class antibiotic (e.g., rifaximin) can be alternatively administered by aerosol. This is accomplished, for example, by preparing an aqueous aerosol, liposomal preparation or solid particles containing the compound. A non-aqueous (e.g., fluorocarbon propellant) suspension could be used. Sonic nebulizers are preferred because they minimize exposing the agent to shear, which can result in degradation of the compound.

Examples of suitable aqueous and non-aqueous carriers which may be employed in the pharmaceutical compositions can include water, ethanol, polyols (such as glycerol, propylene glycol, polyethylene glycol, and the like), and suitable mixtures thereof, vegetable oils, such as olive oil, and injectable organic esters, such as ethyl oleate. Proper fluidity can be maintained, for example, by the use of coating

Case 1:24-cv-00486-RGA Document 59-1 Filed 11/30/24 Page 33 of 874 PageID #: 3082



materials, such as lecithin, by the maintenance of the required particle size in the case of dispersions, and by the use of surfactants.

These compositions may also contain adjuvants such as preservatives, wetting agents, emulsifying agents and dispersing agents. Prevention of the action of microorganisms may be ensured by the inclusion of various antibacterial and antifungal agents, for example, paraben, chlorobutanol, phenol sorbic acid, and the like. It may also be desirable to include isotonic agents, such as sugars, sodium chloride, and the like into the compositions. In addition, prolonged absorption of the injectable pharmaceutical form may be brought about by the inclusion of agents which delay absorption such as aluminum monostearate and gelatin.

In some cases, to prolong the effect of a drug, it is desirable to alter the absorption of the drug. This may be accomplished by the use of a liquid suspension of crystalline, salt oramorphous material having poor water solubility. The rate of absorption of the drug may then depend on its rate of dissolution which, in turn, may depend on crystal size and crystalline form. Alternatively, delayed absorption of a drug form is accomplished by dissolving or suspending the drug in an oil vehicle. When the rifamycin class antibiotic (e.g., rifaximin) are administered as pharmaceuticals, to humans and animals, they can be given per se or as a pharmaceutical composition containing, for example, 0.1 to 99.5% (more preferably, 0.5 to 90%) of active ingredient in combination with a pharmaceutically-acceptable carrier.

Regardless of the route of administration selected, the rifamycin class antibiotic (e.g., rifaximin), which may be used in a suitable hydrated form, and/or the pharmaceutical compositions of the present invention, are formulated into pharmaceutically-acceptable dosage forms by conventional methods known to those of skill in the art.

Actual dosage levels and time course of administration of the active ingredients in the pharmaceutical compositions of the invention may be varied so as to obtain an amount of the active ingredient which is effective to achieve the desired therapeutic response for a particular patient, composition, and mode of administration, without being toxic to the patient. An exemplary dose range is from 25 to 3000 mg per day.

In combination therapy treatment, both the compounds of this invention and the other drug agent(s) are administered to mammals (e.g., humans, male or female) by conventional methods. The agents may be administered in a single dosage form or in separate dosage forms. Effective amounts of the other therapeutic agents are well known to those skilled in the art. However, it is well within the skilled artisan's purview to determine the other therapeutic agent's optimal effective-amount range. In one embodiment of the invention in which another therapeutic agent is administered to an animal, the effective amount of the compound of this invention is less than its effective amount in case the other therapeutic agent is not administered. In another embodiment, the effective amount of the conventional agent is less than its effective amount in case the compound of this invention is not administered. In this way, undesired side effects associated with high doses of either agent may be minimized. Other potential advantages (including without limitation improved dosing regimens and/or reduced drug cost) will be apparent to those skilled in the art.

In various embodiments, the therapies (e.g., prophylactic or therapeutic agents) are administered less than 5 minutes apart, less than 30 minutes apart, 1 hour apart, at about 1 hour apart, at about 1 to about 2 hours apart, at about 2 hours to about 3 hours apart, at about 3 hours to about 4 hours apart, at about 4 hours to about 5 hours apart, at about 5 hours to about 6 hours apart, at about 6 hours to about 7 hours apart, at about 7 hours to about 8 hours apart, at about 8 hours to about 9 hours apart, at about 9 hours to about 10 hours apart, at about 10 hours to about 11 hours apart, at about 11 hours to about 12 hours apart, at about 12 hours to 18 hours apart, 18 hours to 24 hours apart, 24 hours to 36 hours apart, 36 hours to 48 hours apart, 48 hours to 52 hours apart, 52 hours to 60 hours apart, 60 hours to 72 hours apart, 72 hours to 84 hours apart, 84 hours to 96 hours apart, or 96 hours to 120 hours part. In preferred embodiments, two or more therapies are administered within the same patient's visit.

In certain embodiments, one or more of the rifamycin class antibiotic (e.g., rifaximin) and one or more other therapies (e.g., prophylactic or therapeutic agents) are cyclically administered. Cycling therapy involves the administration of a first therapy (e.g., a first prophylactic or therapeutic agent) for a period of time, followed by the administration of a second therapy (e.g., a second prophylactic or therapeutic agent) for a period of time, optionally, followed by the administration of a third therapy (e.g., prophylactic or therapeutic agent) for a period of time and so forth, and repeating this sequential administration, i.e., the cycle in order to reduce the development of resistance to one of the therapies, to avoid or reduce the side effects of one of the therapies, and/or to improve the efficacy of the therapies.

In certain embodiments, the administration of the same compounds may be repeated and the administrations may be separated by at least about 1 day, 2 days, 3 days, 5 days, 10 days, 15 days, 30 days, 45 days, 3 weeks, 4 weeks, 5 weeks, 6 weeks, 12 weeks, 2 months, 75 days, 3 months, or at least 6 months. In other embodiments, the administration of the same therapy (e.g., prophylactic or therapeutic agent) other than a rifamycin class antibiotic (e.g., rifaximin) may be repeated and the administration may be separated by at least at least 1 day, 2 days, 3 days, 5 days, 10 days, 15 days, 30 days, 45 days, 2 months, 75 days, 3 months, or at least 6 months. In one embodiment, a label on a rifamycin class antibiotic may instruct, for example, do not repeat more often than every 6 weeks. In another embodiment, a label on a rifamycin class antibiotic may instruct, for example, do not repeat more often than every 3 weeks. In another embodiment, a label on a rifamycin class antibiotic may instruct, for example, do not repeat more often than every 3-12 weeks. Included within ranges given herein for dosage or administration are any value within the range.

In certain embodiments, retreatment is efficacious in combination with the methods disclosed herein. See for example, Rifaximin versus Other Antibiotics in the Primary Treatment and Retreatment of Bacterial Overgrowth in IBS, Janet Yang, Hyo-Rang Lee, Kimberly Low, Soumya Chatterjee, and Mark Pimentel, Dig Dis Sci (2008) 53:169-174. For example, methods as described herein may further comprise determining symptom relief in a subject and administering a second course of rifaximin treatment if symptoms remain unresolved. Methods may also further comprise, for example, determining the gender of a subject and administering the therapeutically effective amount to a male subject.

Certain indications may require longer treatment times. For example, travelers' diarrhea treatment may only last from between about 12 hours to about 72 hours, while a treatment for Crohn's disease may be from between about 1 day to about 3 months and a treatment for hepatic encephalopathy may be from between 1 day and 12 months. For

example, HE may require chronic therapy for the remainder of a subject's life. Crohn's disease subjects may also require chronic therapy.

Kits

Kits are also provided herein, for example, kits for treating a bowel disorder in a subject treating bowel disease (BD) with a durability of antibiotic response; methods of treating bowel disease (BD) in females methods of treating bowel disease (BD) in males; methods of treating bloating due to BD in males; methods of treating bloating due to BD; methods of treating non-white subjects having BD; and/or methods of treating BD in older subjects; methods of treating BD in older subjects with long duration of disease; and/or methods of predicting response to rifaximin treatment for BD. The kits may contain, for example, a polymorph or amorphous form of rifaximin and instructions for use. The instructions for use may contain prescribing information, dosage information, storage information, and the like.

In one embodiment, the label describes adverse events comprising one or more of infections and infestations, gastrointestinal disorders, nervous system disorders, and musculoskeletal and connective tissue disorders.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is selected as responding to treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is removed from treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

Label instructions, include, for example, instructions to take the rifamycin class antibiotic for 14 days for the treatment of IBS. The instructions could also read, for example, take for 1650 mg/day of rifaximin for 14 days for acute treatment of Irritable Bowel Syndrome (IBS).

Label instructions may also include instructions that a higher percentage of non-white subjects, female subjects and subjects 65 years of age or older have an adequate relief of IBS symptoms an/or adequate relief of IBS symptom of bloating.

Packaged compositions are also provided, and may comprise a therapeutically effective amount of one or more of a one or more of an amorphous form, Form α, Form β, Form γ, Form δ, Form ε, Form ζ, or Form η polymorph of rifaximin of rifaximin and a pharmaceutically acceptable carrier or diluent, wherein the composition is formulated for treating a subject suffering from or susceptible to a bowel disorder, and packaged with instructions to treat a subject suffering from or susceptible to a bowel disorder.

## EXAMPLES

It should be appreciated that the invention should not be construed to be limited to the example, which is now described; rather, the invention should be construed to include any and all applications provided herein and all equivalent variations within the skill of the ordinary artisan.

### Example 1

This example relates to a study of rifaximin in subjects with dIBS. Subjects received daily one of BID doses of placebo, rifaximin 275 mg, 550 mg, or 1100 mg for 14 days. A fifth group of subjects received rifaximin 550 mg BID for a period of 28 days. There were two measures of efficacy assessed. Subjects were questioned on the relief of overall IBS symptoms and bloating. Adequate relief of IBS related symptoms (SGA) and IBS-related bloating (IBS-B) were assessed, and a dose of 550 mg BID for 2 weeks demonstrated statistically significant relief. The analyses defined success as a "yes" response to questions regarding adequate relief.

Predictors of response analyses showed that the response was similar across some subgroups however, there were differences. Analyses on predictors of response demonstrated that age (older subjects and those with a longer IBS duration); sex (males) and baseline severity (mild to moderate symptoms) were predictors of response. All subpopulations in the study responded to therapy. Baseline severity was determined using 7-point Lickert scales during screening for Abdominal Pain/Discomfort and Bloating, and the number, type (normal, hard, loose) and urgency of bowel movements.

Duration of effect was assessed in a follow-up period. Subjects that responded in the 4 week treatment period were followed for an additional 3 months. The subjects in the placebo group had a greater rate of decline in response than the 550 mg BID 2 week group, demonstrating that subjects treated with rifaximin had a better chance of maintaining symptom relief than their placebo treated counterparts.

Percentage of Subjects with Adequate Relief of IBS and Bloating Symptoms

The effect of treatment on the percentage of subjects who reported adequate relief of IBS and bloating symptoms for at least two of the final three weeks during the treatment phase (Weeks 1 to 4) is shown in Tables 3-5 and FIG. **4** through FIG. **6** below.

During the treatment phase, 52.4% of subjects on RFX 550 mg BID met the IBS symptoms responder criterion, compared with 44.2% of the placebo subjects (odds ratio of 1.6 and p value=0.0314). Similarly, 46.1% of subjects in the 550 mg BID group met the bloating symptom responder criterion, compared with 39.6% of the placebo group (odds ratio of 1.6 and p value=0.0402).

TABLE 3

Percentage of Subjects with Adequate Relief of IBS and Bloating Symptoms - ITT Population

| Measure | Placebo [N = 197] | RFX 550 mg BID [N = 191] | Odds Ratio Estimate (95% CI) | P-Value |
|---|---|---|---|---|
| IBS Symptoms | 44.2% | 52.4% | 1.60 (1.04, 2.45) | 0.0314 |
| Bloating Symptom | 39.6% | 46.1% | 1.58 (1.02, 2.45) | 0.0402 |

TABLE 4

Percentage of Subjects with Number of Weeks with Adequate Relief of IBS Symptoms - ITT Population

| Number of Weeks - IBS Symptoms | Placebo [N = 197] | RFX 550 mg BID [N = 191] | Odds Ratio Estimate | P-Value |
|---|---|---|---|---|
| | | | 1.54 (1.07, 2.24) | 0.0216 |
| 0 | 45% | 33% | | |
| 1 | 7% | 11% | | |
| 2 | 15% | 15% | | |
| 3 | 16% | 23% | | |
| 4 | 15% | 16% | | |

TABLE 5

| Percentage of Subjects with Number of Weeks with Adequate Relief of Bloating Symptoms - ITT Population | | | | |
|---|---|---|---|---|
| Number of Weeks - Bloating Symptom | Placebo [N = 197] | RFX 550 mg BID [N = 191] | Odds Ratio Estimate | P-Value |
| | | | 1.57 (1.08, 2.29) | 0.0182 |
| 0 | 47% | 35% | | |
| 1 | 10% | 14% | | |
| 2 | 12% | 15% | | |
| 3 | 15% | 20% | | |
| 4 | 13% | 14% | | |

Daily Symptom Score

Subjects recorded the following information on dIBS symptoms daily throughout the duration of the study:

Number of normal stools/day;

Number of hard and lumpy stools/day;

Number of loose or watery stools/day;

Number of loose or watery stools/day with the symptom of urgency;

How bothersome is abdominal pain and discomfort? [7-point response scale: 0 (not at all) to 6 (a very great deal)];

How bothersome is bloating? [(7-point response scale: 0 (not at all) to 6 (a very great deal)].

Changes from baseline variables were computed for each weekly summary score.

Long Term Follow-Up of Adequate Relief

The study assessed the effect over 12 weeks of follow-up on long-term adequate relief. Subjects who had adequate relief by Week 4 and remained symptom-free at Week 5 were followed during the post-treatment phase and shown in FIG. **1** and FIG. **2**. Superiority to placebo was maintained during the 12 weeks post-treatment follow-up. Results for IBS symptoms were RFX 550 mg BID 62.3% versus placebo 49.2%, and RFX 550 mg BID 59.3% versus 50.9% for placebo for the symptom of bloating through week 16. In assessing the follow-up data, there was statistical significance ($p<0.05$) of bloating and IBS symptoms for RFX 550 mg BID versus placebo.

TABLE 6

| Adequate Relief of Bloating, Post Treatment | | PBO4 w (N = 57) n (%) | RFX 550 2 w (N = 54) n (%) |
|---|---|---|---|
| Week 6 | Success | 47 (82.5%) | 49 (90.7%) |
| | Failures | 10 (17.5%) | 5 (9.3%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.1303, odds ratio: 3.840 (0.672, 21.95) | | | |
| Week 7 | Success | 47 (82.5%) | 45 (83.3%) |
| | Failures | 10 (17.5%) | 9 (16.7%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.1311, odds ratio: 2.931 (0.726, 11.84) | | | |
| Week 8 | Success | 46 (80.7%) | 47 (87.0%) |
| | Failures | 11 (19.3%) | 7 (13.0%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.2858, odds ratio: 2.107 (0.536, 8.276) | | | |
| Week 9 | Success | 36 (63.2%) | 39 (72.2%) |
| | Failures | 21 (36.8%) | 15 (27.8%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0814, odds ratio: 2.737 (0.882, 8.492) | | | |
| Week 10 | Success | 32 (56.1%) | 39 (72.2%) |
| | Failures | 25 (43.9%) | 15 (27.8%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0217, odds ratio: 3.828 (1.217, 12.04) | | | |

TABLE 6-continued

| Adequate Relief of Bloating, Post Treatment | | PBO4 w (N = 57) n (%) | RFX 550 2 w (N = 54) n (%) |
|---|---|---|---|
| Week 11 | Success | 31 (54.4%) | 35 (64.8%) |
| | Failures | 26 (45.6%) | 19 (35.2%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0398, odds ratio: 3.115 (1.054, 9.205) | | | |

TABLE 7

| Adequate Relief of Bloating, Post Treatment | | PBO 4 w (N = 57) n (%) | RFX 550 2 w (N = 54) n (%) |
|---|---|---|---|
| Week 12 | Success | 32 (56.1%) | 36 (66.7%) |
| | Failure | 25 (43.9%) | 18 (33.3%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0596, odds ratio: 2.891 (0.958, 8.726) | | | |
| Week 13 | Success | 29 (50.9%) | 33 (61.1%) |
| | Failure | 28 (49.1%) | 21 (38.9%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0142, odds ratio: 4.187 (1.333, 13.15) | | | |
| Week 14 | Success | 29 (50.9%) | 34 (63.0%) |
| | Failure | 28 (49.1%) | 20 (37.0%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0121, odds ratio: 4.230 (1.372, 13.05) | | | |
| Week 15 | Success | 30 (52.6%) | 31 (57.4%) |
| | Failure | 27 (47.4%) | 23 (42.6%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0391, odds ratio: 3.323 (1.062, 10.40) | | | |
| Week 16 | Success | 29 (50.9%) | 32 (59.3%) |
| | Failure | 28 (49.1%) | 22 (40.7%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0212, odds ratio: 3.700 (1.216, 11.25) | | | |

TABLE 8

| Baseline Disease Characteristics Across All Treatment Groups | | |
|---|---|---|
| Daily Symptom | Median | Min, Max |
| Total No. bowel movements/day | 3.0 | 1, 15 |
| No. loose/watery bowel movements/day | 2.0 | 0, 10 |
| No. loose/watery with urgency | 1.6 | 0, 10 |
| Abdominal pain/discomfort* | 3.4 | 0, 6 |
| Bloating* | 3.4 | 0, 6 |

*7 pt. scale asking "How bothersome . . ." [0 = not at all to 6 = a very great deal]

Two measures of efficacy were assessed independently. The first was the proportion of subjects who provided a 'yes' response to the weekly SGA question: "In the past 7 days, have you had adequate relief of your IBS symptoms? (yes/no)". The second endpoint was the proportion of subjects who provide a 'yes' response to the weekly individual symptom question: "In the past 7 days, have you had adequate relief of your symptom of bloating? (yes/no)". Durability was based on the proportion of subjects that had adequate relief over the entire treatment phase.

TABLE 9

Summary of Correlation between Subjects Satisfied with Relief of Bloating Discomfort and Relief of IBS Symptoms

| Time Point | Number of Subject | Relief [1] | Responder [2] | Non-Responder [2] | Spearman Correlation Coefficient |
|---|---|---|---|---|---|
| Week 1 | 680 | Yes | 49/169 (29.0%) | 45/511 (8.8%) | 0.2508 |
| | | No | 120/169 (71.0%) | 458/511 (89.6%) | |
| | | Missing | | 8/511 (1.6%) | |
| Week 2 | 680 | Yes | 113/274 (41.2%) | 50/406 (12.3%) | 0.3218 |
| | | No | 159/274 (58.0%) | 327/406 (80.5%) | |
| | | Missing | 2/274 (0.7%) | 29/406 (7.1%) | |
| Week 3 | 680 | Yes | 130/303 (42.9%) | 48/377 (12.7%) | 0.3201 |
| | | No | 169/303 (55.8%) | 281/377 (74.5%) | |
| | | Missing | 4/303 (1.3%) | 48/377 (12.7%) | |
| Week 4 | 680 | Yes | 145/309 (46.9%) | 52/371 (14.0%) | 0.3362 |
| | | No | 153/309 (49.5%) | 252/371 (67.9%) | |
| | | Missing | 11/309 (3.6%) | 67/371 (18.1%) | |

[1] Responses to the questions 'How bothersome was your bloating today?' include: 0 = not at all, 1 = hardly, 2 = somewhat, 3 = moderately, 4 = a good deal, 5 = a great deal, 6 = a very great deal; Relief is score of 0 or 1.
[2] Responder is defined as relief of IBS symptoms.

TABLE 10

Efficacy Analysis: Adequate Relief of IBS Symptoms and Bloating at the End of the Treatment Phase

| Gender | Category | PBO 4 w (N = 197) n (%) | RFX 275 2 w (N = 95) n (%) | RFX 550 2 w (N = 191) n (%) | RFX 550 2 w (N = 99) n (%) | RFX 550 4 w (N = 98) n (%) |
|---|---|---|---|---|---|---|
| Male | Adequate Relief of IBS Symptoms [1] | | | | | |
| | Success | 17 (32.7%) | 5 (35.7%) | 29 (53.7%) | 12 (46.2%) | 7 (31.8%) |
| | Failure | 35 (67.3%) | 9 (64.3%) | 25 (46.3%) | 14 (53.8%) | 15 (68.2%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.0326, odds ratio: 2.511 (1.079, 5.842) | | | | | |
| | Adequate Relief of Bloating [2] | | | | | |
| | Success | 17 (32.7%) | 6 (42.9%) | 25 (46.3%) | 10 (38.5%) | 6 (27.3%) |
| | Failure | 35 (67.3%) | 8 (57.1%) | 29 (53.7%) | 16 (61.5%) | 16 (72.7%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.0802, odds ratio: 2.148 (0.912, 5.057) | | | | | |
| Female | Adequate Relief of IBS Symptoms [1] | | | | | |
| | Success | 70 (48.3%) | 35 (43.2%) | 71 (51.8%) | 29 (39.7%) | 34 (44.7%) |
| | Failure | 75 (51.7%) | 46 (56.8%) | 66 (48.2%) | 44 (60.3%) | 42 (55.3%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.7608, odds ratio: 1.078 (0.665, 1.747) | | | | | |
| | Adequate Relief of Bloating [2] | | | | | |
| | Success | 61 (42.1%) | 29 (35.8%) | 63 (46.0%) | 28 (38.4%) | 32 (42.1%) |
| | Failure | 84 (57.9%) | 52 (64.2%) | 74 (54.0%) | 45 (61.6%) | 44 (57.9%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.5366, odds ratio: 1.166 (0.716, 1.898) | | | | | |

[1] Subjects achieved success if they reported a 'yes' response to whichever question about IBS symptoms was posed by the IVR system(i.e. adequate relief or control) for = 2 out of the 3 final treatment weeks.
[2] Subjects achieved success if they reported a 'yes' response to whichever question about symptoms of bloating was posed by the IVR system (i.e. adquate relief or control) for = 2 out of the 3 final treatment weeks.

The treatment effect is more pronounced when accounting for milder disease severity, i.e., bloating, abdominal pain/discomfort and bowel movements.

## Example 2

A study (FIG. **3**) is designed to evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg TID in providing adequate relief from diarrhea-associated IBS (dIBS) symptoms over four weeks. A measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) questions over the 4 week study duration in relation to their IBS symptoms. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your IBS symptoms?" (Yes/No.) Subjects in the treatment group taking oral rifaximin respond "Yes" more often than Subjects who are not taking oral rifaximin. Another measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) question over the 4 week study duration in relation to their IBS symptom of bloating. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your IBS symptom of bloating?" (Yes/No. Subjects in the treatment group taking oral rifaximin respond "Yes" more often than subjects who are not taking oral rifaximin. Other measures of efficacy include the changes in dIBS symptoms from baseline to each week of the 4 weeks in the study (e.g., abdominal pain and

discomfort, bloating, number of stools per day, stool consistency, urgency with loose or watery stools).

Example 3

Improvements in Quality of Life

A study showed the rifaximin 550 mg twice daily (BID) significantly improved IBS symptoms versus placebo in patients with diarrhea-predominant IBS (dIBS). Analyses from that study evaluated the efficacy of rifaximin for improving quality of life (QOL) measures in patients with dIBS.

Adults diagnosed with dIBS (Rome II criteria) received rifaximin 550 mg BID or placebo for 14 days. Both groups received placebo for an additional 14 days after the initial 2-week treatment. Quality of life was assessed with the 34-item IBS-QOL questionnaire at baseline and 4 weeks after initiating treatment. Each item was scored on a 5-point scale (1=not at all; 2=slightly; 3=moderately; 4=quite a bit; and 5=extremely or a great deal). Results for composite and subscale scores were converted to a scale ranging from 0 to 100, with higher scores indicating better QOL.

A total of 388 patients were treated; 191 patients received rifaximin and 197 patients received placebo during the 2-week initial treatment period. The mean improvement from baseline in overall QOL scores at week 4 was significantly greater with rifaximin compared with placebo (Table 11). Patients in the rifaximin group reported significantly greater mean improvement from baseline in QOL scores for dysphoria, body image, health worry, social reaction, and relationship subscales compared with placebo (Table 11). Rifaximin was well tolerated, with similar incidence of adverse events compared with placebo.

In patients with IBS-D, rifaximin 1100 mg/d for 14 days significantly improved QOL measures compared with placebo. These findings suggest a potential therapeutic role for rifaximin 550 mg BID for improving symptoms and QOL in patients with IBS-D and are summarized in Table 11.

TABLE 11

Mean Change From Baseline in IBS-QOL Scores at Week 4

| Domain | Rifaximin 1100 mg/d (n = 191) | Placebo (n = 197) | Improvement with rifaximin over placebo, % | P value |
|---|---|---|---|---|
| Overall score | 20.4 | 15.8 | 28.7 | 0.020 |
| Dysphoria | 24.8 | 19.8 | 25.3 | 0.027 |
| Interference with activity | 22.2 | 18.1 | 22.2 | 0.083 |
| Body image | 20.1 | 14.6 | 37.4 | 0.012 |
| Health worry | 16.0 | 12.2 | 30.6 | 0.047 |
| Food avoidance | 25.0 | 20.5 | 22.1 | 0.088 |
| Social reaction | 17.3 | 13.2 | 31.6 | 0.047 |
| Sexual | 13.6 | 10.9 | 24.9 | 0.199 |
| Relationship | 14.9 | 10.7 | 39.5 | 0.030 |

A 2-week course of rifaximin (1100 mg/day) significantly improved quality of life (QOL) measures, compared with placebo.

In a study, 191 adult patients diagnosed with diarrhea-predominant IBS (dIBS) by Rome II criteria were randomized to receive rifaximin 550 mg twice daily (BID) and 197 patients were randomized to placebo. Following a 2-week initial treatment period, both groups of patients received placebo for an additional 14 days. Quality of life was assessed via the 34-item IBS-QOL questionnaire at baseline and 4 weeks after initiating treatment. Each item was scored on a 5-point scale (1=not at all; 2=slightly; 3=moderately; 4=quite a bit; 5=extremely or a great deal); results for composite and subscale scores were converted to a scale ranging from 0 to 100, with higher scores indicating better QOL.



At Week 4, the mean improvement from baseline in the overall QOL score was significantly greater with rifaximin compared with placebo (20.4 vs. 15.8, respectively; p=0.020). Patients in the rifaximin group also reported significantly greater mean improvement from baseline in QOL subscale scores for dysphoria (restlessness or agitation, 24.8 vs. 19.8; p=0.027), body image (20.1 vs. 14.6; p=0.012), health worry (16.0 vs. 12.2; p=0.047), social reaction (17.3 vs. 13.2; p=0.047), and relationships (14.9 vs. 10.7; p=0.030), compared with placebo. Rifaximin was well tolerated in the study, with a similar incidence of adverse events compared with placebo.

Example 4

Severity of Baseline Symptoms as Predictor of Clinical Response

It is reported herein that the severity of baseline symptoms of abdominal pain and bloating influenced the response to rifaximin treatment. The co-primary endpoints in this analysis assessed weekly yes/no responses to questions regarding adequate relief of global IBS symptoms and IBS-associated bloating. Severity of baseline IBS symptoms was evaluated as a potential confounder of clinical response and was categorized as mild/moderate or severe based on a mean score of ≤4 vs. >4 (on a 7-point scale) for bloating and abdominal pain.

A significantly larger percentage of patients treated with rifaximin reported adequate relief of global IBS symptoms (52% vs. 44% for placebo; p=0.03) and bloating (46% vs. 40%; p=0.04), compared with placebo-treated patients. In patients with mild/moderate abdominal pain, rifaximin produced a greater degree of improvement, compared with placebo, in global symptoms of IBS (50% vs. 39%, respectively; p=0.04) and bloating (44% vs. 35%; p=0.09). Similarly, in patients with mild/moderate bloating, rifaximin treatment was associated with greater improvement, compared with placebo, in global IBS symptoms (56% vs. 41%, respectively; p=0.006) and bloating (47% vs. 36%; p=0.03). This demonstrates that patients with mild/moderate IBS symptoms are more likely than those with severe disease to achieve symptomatic relief with rifaximin.

These results show that rifaximin improves gastrointestinal (GI) symptoms associated with IBS. In this study of rifaximin versus placebo, patients with diarrhea-predominant IBS (IBS-D) were studied, a supplemental analysis examined the association between severity of baseline IBS symptoms and clinical response to rifaximin.

A comparison involved 2 groups of adult patients with IBS-D (Rome II) who received rifaximin 550 mg twice daily or placebo for 14 days, followed by an additional 14 days of placebo in both groups. The Weekly yes/no responses to questions regarding adequate relief of global IBS symptoms

and IBS-associated bloating were assessed. Clinical response was defined as adequate relief for 2 of the final 3 treatment weeks (wk 2, 3, or 4). Severity of baseline IBS symptoms was evaluated as a potential confounder of clinical response and was categorized as mild/moderate or severe based on a mean score of ≤4 versus >4 (on a 7-point scale (0=not bothersome; 6=very bothersome)) for bloating and abdominal pain.

A significantly larger percentage of patients who received rifaximin versus placebo reported adequate relief of global IBS symptoms (52% versus 44%, respectively; P=0.03) and bloating (46% versus 40%, respectively; P=0.04). In patients with mild/moderate abdominal pain, rifaximin produced a greater degree of improvement versus placebo in symptoms of IBS (50% versus 39%, respectively; P=0.04) and bloating (44% versus 35%, respectively; P=0.09). In patients with mild/moderate bloating, rifaximin also achieved greater improvement versus placebo in global symptoms of IBS (56% versus 41%, respectively; P=0.006) and bloating (47% versus 36%, respectively; P=0.03). Severity of baseline symptoms of abdominal pain and bloating influenced the response to rifaximin 1100 mg/d for 14 days. Patients with mild/moderate IBS symptoms had a greater likelihood of relief of global IBS-related symptoms with rifaximin treatment versus individuals with severe IBS symptoms.

## Example 5

A study was designed to evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg TID in providing adequate relief from diarrhea-predominant IBS (dIBS) symptoms over four weeks. A measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) questions over the 4 week study duration in relation to their IBS symptoms. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your IBS symptoms?" (Yes/No.) Subjects in the treatment group taking oral rifaximin respond "Yes" more often than Subjects who are not taking oral rifaximin. Another measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) question over the 4 week study duration in relation to their IBS symptom of bloating. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your IBS symptom of bloating?" (Yes/No). Subjects in the treatment group taking oral rifaximin respond "Yes" more often than subjects who are not taking oral rifaximin. Other measures of efficacy include the changes in dIBS symptoms from baseline to each week of the 4 weeks in the study (e.g., abdominal pain and discomfort, bloating, number of stools per day, stool consistency, urgency with loose or watery stools).

The randomized, double-blind, placebo-controlled, multicenter trial was designed to evaluate the efficacy and safety of rifaximin 550 mg TID in the treatment of patients with nonconstipation irritable bowel syndrome (non-C IBS). In the trial rifaximin versus placebo treated patients demonstrated a statistically significant improvement for the primary endpoint of the adequate relief of IBS symptoms as assessed over one month (weeks 3, 4, 5 and 6) following completion of a 14-day course of therapy (weeks 1 and 2). Consistent with the primary endpoint in each trial, the key secondary endpoint of relief of IBS-related bloating also demonstrated statistical significance of rifaximin versus placebo in each trial.

The study was designed to assess the clinical efficacy and safety of a 550 mg TID dosing regimen of rifaximin (1650 mg/day) compared with placebo in a broad population comprised of males and females 18 years of age and older who have been diagnosed with non-constipation IBS, e.g., diarrhea-predominant IBS or alternating IBS. The primary efficacy endpoint of the study was the proportion of subjects who achieve adequate relief of IBS symptoms for at least 2 weeks during 10 the first 4 weeks of the 10-week follow-up phase.

Subjects received 550 mg of rifaximin three times daily (TID) for 14 days and then were followed for 10 weeks for study duration of 12 weeks. Two measures of efficacy were assessed.

Subjects were questioned on the relief of overall IBS symptoms and bloating. Adequate relief of IBS related symptoms (SGA) and IBS-related bloating (IBS-B) were assessed, and a dose of 550 mg TID 15 for 2 weeks demonstrated statistically significant relief. The analyses defined success as a "yes" response to questions regarding adequate relief.

A measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) questions over the 4 week study duration in relation to their IBS symptoms. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your 20 IBS symptoms?" (Yes/No.) Subjects in the treatment group taking oral rifaximin respond "Yes" more often than Subjects who are not taking oral rifaximin. Another measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) question over the 4 week study duration in relation to their IBS symptom of bloating. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your IBS symptom of bloating?" (Yes/No). Subjects in the treatment group taking oral rifaximin respond "Yes" more often than subjects who are not taking oral rifaximin.

All subpopulations in the study responded to therapy. Baseline severity was determined during screening for Abdominal Pain/Discomfort and Bloating, and the number, type (normal, hard, loose) and urgency of bowel movements. Duration of effect was assessed in a ten week follow-up period.

Study Demographics

Subjects enrolled in the study are detailed in Table 13. Demographics of the population are set forth in Tables 14, 15, and 16.

Rifaximin Exposure

Rifaximin exposure in subjects having IBS is similar to the levels of exposure in healthy subjects and more than 520-fold lower than rifampin exposure, and more than 66-fold lower than neomycin exposure. As previously disclosed by Applicants, the rifaximin exposure in healthy subjects is significantly lower than the level of exposure in subjects having hepatic encephalopathy.

Percentage of Subjects with Adequate Relief of IBS and Bloating Symptoms

The primary and secondary endpoints evaluated in this study were the effect of treatment on the percentage of subjects who reported adequate relief of IBS and the adequate relief of IBS symptom of bloating. These results are shown in Tables 17, 18, 19 and 20. The data demonstrates that more subjects taking rifaximin had adequate relief of IBS symptoms and of bloating.

To further evaluate the study results, efficacy of rifaximin treatment on subpopulations of study participants was evaluated.

Primary and secondary endpoints were evaluated for male and female populations independently. This analysis indicated that higher percentage of female subjects taking rifaximin had adequate relief of IBS symptoms and the IBS symptom of bloating. See Table 21.

Primary and secondary endpoints were evaluated for subpopulations of study participants based on age. Analysis of subjects less than 65 and those 65 years old and older demonstrated that a higher percentage of subjects 65 years old or older that were administered rifaximin had adequate relief of IBS symptom of bloating. See Table 22.

The efficacy of rifaximin treatment of white and non-white study participants demonstrated that a higher percentage of non-white participants administered rifaximin had adequate relief of IBS symptoms. See Table 23.

The efficacy of rifaximin treatment was also evaluated for subjects having diarrhea-predominant IBS and alternating-predominant IBS. The data indicate that a higher percentage of subjects having alternating-predominant IBS had adequate relief of IBS symptoms and adequate relief of IBS symptom of bloating than subjects with diarrhea-predominant. See Table 24.

The study also evaluated the effect of rifaximin administration on the average number of stools per day from the baseline value for each subject. The data indicate that rifaximin effectively decreased the weekly average of stool frequency by at least one for subjects in the study. In particular, the last four weeks of the study show significant decrease in the stool frequency for subject administered rifaximin when compared to those administered a placebo. See Table 25.

TABLE 25

Stool Frequency (SF).

| Week | Placebo % with decrease in SF | Rafaximin (550 mg TID)% with decrease in SF | P-value |
|---|---|---|---|
| 1 | 16.9 | 14.4 | .3853 |
| 2 | 21.6 | 20.6 | .7562 |
| 3 | 23.1 | 22.2 | .7677 |
| 4 | 24.1 | 21.6 | .4464 |
| 5 | 21.3 | 25.7 | .1901 |
| 6 | 23.4 | 22.9 | .8402 |
| 7 | 23.8 | 23.8 | .9945 |
| 8 | 20.9 | 24.4 | .3029 |
| 9 | 24.7 | 25.4 | .8581 |
| 10 | 21.6 | 26.7 | .1360 |
| 11 | 24.1 | 25.4 | .6994 |
| 12 | 25.3 | 27.0 | .6390 |

Interestingly, subjects administered 550 mg rifaximin TID showed a decrease in skin and subcutaneous tissue disorders as compared to the placebo group. 3.8% of the placebo group had skin or subcutaneous tissue disorders as compared to 1.3% of the rifaximin treated group.

TABLE 13

Subject Disposition by Treatment Group Population: Randomized Subjects

| | Placebo n (%) | Rifaximin 550 mgTID n (%) | Total n | (%) |
|---|---|---|---|---|
| Subjects Randomized | 321 | 316 | 637 | |
| Intent-to-Treat Subjects [1] | 320 (99.7%) | 315 (99.7%) | 635 | (99.70%) |
| Subjects Completed the Treatment Phase | 313 (97.5%) | 310 (98.1%) | 623 | (97.80%) |
| Subjects Completed through Week 6 | 307 (95.6%) | 308 (97.5%) | 615 | (96.50%) |
| Subjects Completed the Study | 302 (94.1%) | 301 (95.3%) | 603 | (94.70%) |
| Subjects Discontinued Study Early | 19 (5.9%) | 15 (4.7%) | 34 | (5.30%) |
| Primary Reason For Early Discontinuation of Study | | | | |
| Adverse Event/Serious | 2 (0.6%) | 0 | 2 | (0.30%) |
| Adverse Event | 8 (2.5%) | 6 (1.9%) | 14 | (2.20%) |
| Subject Request | | | | |
| Lost to Follow-Up | 6 (1.9%) | 6 (1.9%) | 12 | (1.90%) |
| Noncompliance | 2 (0.6%) | 1 (0.3%) | 3 | (0.50%) |
| Pregnancy | 0 | 0 | 0 | |
| Other | 1 (0.3%) | 2 (0.6%) | 3 | (0.50%) |

Note:

Percentage calculation is based on the number of subjects randomized.

[1] Intent-to-Treat population includes all randomized subjects who ingested at least one dose of the study drug.

TABLE 14

| Summary of Demographic by Treatment Group: Population: ITT | mg TID (N = 320) | Total (N = 315) | (N = 635) |
|---|---|---|---|
| Age (years) | | | |
| n | 320 | 315 | 635 |
| Mean | 46.3 | 45.9 | 46.1 |
| SD | 14.57 | 13.87 | 14.22 |
| Median | 46 | 45 | 46 |
| Min | 18 | 19 | 18 |
| Max | 82 | 88 | 88 |
| Age group - n (%) | | | |
| <65 | 283 (88.4%) | 285 (90.5%) | 568 (89.4%) |
| >=65 | 37 (11.6%) | 30 (9.5%) | 67 (10.6%) |
| Gender - n (%) | | | |
| Male | 95 (29.7%) | 88 (27.9%) | 183 (28.8%) |
| Female | 225 (70.3%) | 227 (72.1%) | 452 (71.2%) |
| Race [1] - n (%) | | | |
| American Indian or Alaskan Native | 2 (0.6%) | 1 (0.3%) | 3 (0.5%) |
| Asian | 2 (0.6%) | 6 (1.9%) | 8 (1.3%) |
| Black or African American | 14 (4.4%) | 21 (6.7%) | 35 (5.5%) |
| Native Hawaiian or Other Pacific Islander | 0 | 3 (1.0%) | 3 (0.5%) |
| White | 302 (94.4%) | 282 (89.5%) | 584 (92.0%) |
| Other | 0 | 2 (0.6%) | 2 (0.3%) |

TABLE 15

| Summary of Demographic by Treatment Group Population ITT | Placebo (N = 320) | Rifaximin 550 mg TID (N = 315) | Total (N = 635) |
|---|---|---|---|
| Ethnicity - n (%) | | | |
| Hispanic or Latino | 29 (9.1%) | 29 (9.2%) | 58 (9.1%) |
| Not Hispanic or Latino | 291 (90.9%) | 286 (90.8%) | 577 (90.9%) |
| Height (cm) | | | |
| n | 320 | 315 | 635 |
| Mean | 167.85 | 167.32 | 167.59 |
| SD | 9.684 | 10.342 | 10.011 |
| Median | 167.60 | 165.50 | 167.60 |
| Min | 147.3 | 104.8 | 104.8 |
| Max | 193.0 | 198.1 | 198.1 |
| Weight - n | 320 | 315 | 635 |
| Mean | 81.30 | 80.91 | 81.11 |
| SD | 19.715 | 20.233 | 19.959 |
| Median | 78.95 | 78.90 | 78.90 |
| Min | 40.8 | 46.7 | 40.8 |
| Max | 161.5 | 166.9 | 166.9 |

Note:
Percentages are based on the number of subjects in the ITT population in each treatment group.
[1] If more than one race are checked, the subject is only included in the 'Other' category.

TABLE 16

| Summary of Demographic by Treatment Group Population ITT | Placebo N = 320 | Rifaximin 550 mgTID N = 315 | Total N = 635 |
|---|---|---|---|
| BMI(kg/m^2) | | | |
| n | 320 | 315 | 635 |
| Mean | 28.8 | 28.92 | 28.86 |

TABLE 16-continued

| Summary of Demographic by Treatment Group Population ITT | Placebo N = 320 | Rifaximin 550 mgTID N = 315 | Total N = 635 |
|---|---|---|---|
| SD | 6.546 | 6.872 | 6.705 |
| Median | 27.6 | 27.8 | 27.7 |
| Min | 15.7 | 17.3 | 15.7 |
| Max | 55.7 | 55.8 | 55.8 |
| BMI (kg/m^2) - Male | | | |
| n | 95 | 88 | 183 |
| Mean | 28.09 | 28.45 | 28.27 |
| SD | 4.903 | 5.526 | 5.2 |
| Median | 27.7 | 27.55 | 27.7 |
| Min | 18.9 | 19.4 | 18.9 |
| Max | 46.6 | 54.3 | 54.3 |
| BMI (kg/m^2) - Female | | | |
| n | 225 | 227 | 452 |
| Mean | 29.1 | 29.11 | 29.1 |
| SD | 7.116 | 7.33 | 7.216 |
| Median | 27.5 | 27.9 | 27.75 |
| Min | 15.7 | 17.3 | 15.7 |
| Max | 55.7 | 55.8 | 55.8 |

TABLE 17

| Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group | Placebo (N = 320) n (%) | Rifaximin 550 mg TID (N = 315) n (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.0256 |
| Success | 100 (31.3%) | 125 (39.7%) | |
| Failure | 220 (68.8%) | 190 (60.3%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0198 |
| Success | 99 (30.9%) | 125 (39.7%) | |
| Failure | 221 (69.1%) | 190 (60.3%) | |

Note:
Last observation carried forward method (LOCF) was used to handle missing responses. Baseline responses were not carried forward.
[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm and analysis center.
[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).
[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

TABLE 18

| Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group Population: PP | Placebo (N = 310) N (%) | Rifaximin 550 mg TID (N = 311) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.0159 |
| Success | 95 (30.6%) | 124 (39.9%) | |
| Failure | 215 (69.4%) | 187 (60.1%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.012 |

Case 1:20-cv-01034-RGA Document 138-3 Filed 11/07/20 Page 94 of 952 PageID #: 2853



TABLE 18-continued

Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group Population: PP

| | Placebo (N = 310) N (%) | Rifaximin 550 mg TID (N = 311) N (%) | p-value |
|---|---|---|---|
| Success | 94 (30.3%) | 124 (39.9%) | |
| Failure | 216 (69.7%) | 187 (60.1%) | |

Note:
Subjects failed to meet inclusion criteria 3, 4, 5, or exclusion criteria 1 or 8 are excluded from this table.
Note:
Last observation carried forward method (LOCF) was used to handle missing responses. Baseline responses were not carried forward.
[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm and analysis center.
[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).
[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

TABLE 19

Adequate Relief of IBS Symptoms and IBS Symptom of Bloating Based on Daily Measures by Treatment Group Population: ITT

| | Placebo (N = 320) N (%) | Rifaximin 550 mg TID (N = 315) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.0139 |
| Success | 88 (27.5%) | 115 (36.5%) | |
| Failure | 232 (72.5%) | 200 (63.5%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0139 |
| Success | 95 (29.7%) | 133 (42.2%) | |
| Failure | 225 (70.3%) | 182 (57.8%) | |

Note:
[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm and analysis center.
[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).
[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

TABLE 20

Adequate Relief of IBS Symptoms and IBS Symptom of Bloating Based on Daily Measures by Treatment Group Population: PP

| | Placebo (N = 310) N (%) | Rifaximin 550 mg TID (N = 311) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.0075 |
| Success | 84 (27.1%) | 115 (37.0%) | |
| Failure | 226 (72.9%) | 196 (63.0%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0012 |
| Success | 92 (29.7%) | 131 (42.1%) | |
| Failure | 218 (70.3%) | 180 (57.9%) | |

Note:
[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm and analysis center.
[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).
[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

The results of each trial demonstrate that each of the daily measures of IBS-related symptoms, bloating and abdominal pain demonstrates significant relief with in the primary evaluation period (weeks 3-6) as well as consistent results across all time periods. This finding adds several key observations to what is known about the durable effect of rifaximin on IBS. Namely, that daily questioning, which reduces recall bias presumed to be part of the primary and key secondary endpoints, demonstrates significant and robust finding. Secondly, these finding correlate significantly with the results of the primary and key secondary, yielding interclass correlations which are very strong indicating construct validity (e.g., daily measures show strong relationship and validated measure of disease activity for IBS, weekly SGA). Thirdly, the daily measures were all highly correlated with each other (correlation coefficient of at least 80%). Taken in totality, the results of the primary, key secondary, daily measures of symptoms, bloating and abdominal pain strongly support the reliability, validity, responsiveness, and utility of these outcomes used as endpoints in the studies suggests that each of these questionnaires validates the results from the other.

In addition, using the primary endpoint to assess effect over the entire 3 months of the trial, adequate relief of global IBS symptoms was superior in rifaximin treated as compared to placebo treated patients in each of the trials respectively. This endpoint was tested previously and accepted by the review division, specifically with lotronex, that is, the number of months with adequate relief of IBS symptoms during the entire study duration (typical responses include 0 months, 1 month, 2 months, or 3 months with adequate relief). This approach uses all of the data across the period (12 week/3 months) and demonstrates that 2 weeks of treatment provides 3 months of relief.

The two studies, independently, demonstrate that rifaximin 550 mg TID for 14 days provides statistically significant relief of IBS symptoms during the primary evaluation period (Days 15-42) as measured in:

Weekly IBS Global Symptoms (Primary Endpoint);

Weekly IBS Symptom of Bloating (Key Secondary Endpoint);

IBS Daily Assessment of Symptoms;

Daily IBS Global Symptoms;

Daily IBS Symptom of Bloating; and

Daily IBS Symptom of Abdominal Pain.

Two studies, independently, demonstrate that rifaximin 550 mg TID for 14 days provides statistically significant relief of IBS symptoms during all 3 months as demonstrated by:

Weekly Global IBS Symptoms; and

Daily Global IBS symptoms.

TABLE 21

Subgroup Analysis: Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group and Gender

| Gender: Male | Placebo (N = 91) N (%) | Rifaximin 550 mg TID (N = 85) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.2636 |
| Success | 23 (25.3%) | 28 (32.9%) | |
| Failure | 68 (74.7%) | 57 (67.1%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.7695 |
| Success | 26 (28.6%) | 26 (30.6%) | |
| Failure | 65 (71.4%) | 59 (69.4%) | |

TABLE 21-continued

Subgroup Analysis: Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group and Gender

| Gender: Female | Placebo (N = 219) N (%) | Rifaximin 550 mg TID (N = 226) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.0371 |
| Success | 72 (32.9%) | 96 (42.5%) | |
| Failure | 147 (67.1%) | 130 (57.5%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0075 |
| Success | 68 (31.1%) | 98 (43.4%) | |
| Failure | 151 (68.9%) | 128 (56.6%) | |

Note:

Last observation carried forward method (LOCF) was used to handle missing responses. Baseline responses were not carried forward.

[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm.

[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

TABLE 22

Subgroup Analysis: Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group and Age Group

| | Placebo (N = 274) N (%) | Rifaximin 550 mg TID (N = 281) N (%) | p-value |
|---|---|---|---|
| Age Group: <65 | | | |
| Adequate Relief of IBS symptoms [2] | | | 0.0228 |
| Success | 82 (29.9%) | 110 (39.1%) | |
| Failure | 192 (70.1%) | 171 (60.9%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0106 |
| Success | 79 (28.8%) | 110 (39.1%) | |
| Failure | 195 (71.2%) | 171 (60.9%) | |
| Age Group: >=65 | | | |
| Adequate Relief of IBS symptoms [2] | | | 0.3862 |
| Success | 13 (36.1%) | 14 (46.7%) | |
| Failure | 23 (63.9%) | 16 (53.3%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.6838 |
| Success | 15 (41.7%) | 14 (46.7%) | |
| Failure | 21 (58.3%) | 16 (53.3%) | |

Note:

Last observation carried forward method (LOCF) was used to handle missing responses. Baseline responses were not carried forward.

[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm.

[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

TABLE 23

Subgroup Analysis: Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group and Race

| Race: White | Placebo (N = 292) N (%) | Rifaximin 550 mg TID (N = 280) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.0341 |
| Success | 89 (30.5%) | 109 (38.9%) | |
| Failure | 203 (69.5%) | 171 (61.1%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0172 |
| Success | 87 (29.8%) | 110 (39.3%) | |
| Failure | 205 (70.2%) | 170 (60.7%) | |
| **Race: Non-White** | **Placebo (N = 18) N (%)** | **Rifaximin 550 mg TID (N = 31) N (%)** | **p-value** |
| Adequate Relief of IBS symptoms [2] | | | 0.3074 |
| Success | 6 (33.3%) | 15 (48.4%) | |
| Failure | 12 (66.7%) | 16 (51.6%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.6691 |
| Success | 7 (38.9%) | 14 (45.2%) | |
| Failure | 11 (61.1%) | 17 (54.8%) | |

Note:

Last observation carried forward method (LOCF) was used to handle missing responses. Baseline responses were not carried forward.

[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm and analysis center.

[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

TABLE 24

Subgroup Analysis: Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group and IBS Sub-type IBS Subtype: Diarrhoea-predominant

| IBS Subtype: Diarrhoea-predominant | Placebo (N = 292) N (%) | Rifaximin 550 mg TID (N = 280) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.0337 |
| Success | 87 (31.4%) | 111 (40.1%) | |
| Failure | 190 (68.6%) | 166 (59.9%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0928 |
| Success | 90 (32.5%) | 109 (39.4%) | |
| Failure | 187 (67.5%) | 168 (60.6%) | |
| **IBS Subtype: Alternating-predominant** | **Placebo (N = 18) N (%)** | **Rifaximin 550 mg TID (N = 31) N (%)** | **p-value** |
| Adequate Relief of IBS symptoms [2] | | | 0.2202 |
| Success | 8 (24.2%) | 13 (38.2%) | |
| Failure | 25 (75.8%) | 21 (61.8%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.006 |

TABLE 24-continued

| Subgroup Analysis: Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group and IBS Sub-type IBS Subtype: Diarrhoea-predominant | | |
|---|---|---|
| Success | 4 (12.1%) | 15 (44.1%) |
| Failure | 29 (87.9%) | 19 (55.9%) |

Note:
Last observation carried forward method (LOCF) was used to handle missing responses. Baseline responses were not carried forward.
[1] p-value is obtained from a Logistic regression model with fixed effects treatment arm.
[2] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptoms', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).
[3] Subjects achieved success if they answered 'Yes' to the weekly SGA question, 'In the past 7 days, have you had adequate relief of your IBS symptom of bloating', for at least 2 of the first 4 weeks during the follow-up phase (ie, Weeks 3 through 6).

## Example 6: Analysis of Two Studies after 3 Months

Studies were designed to evaluate the efficacy of oral rifaximin at 550 mg TID in providing adequate relief from diarrhea-predominant IBS (dIBS) symptoms over three months. A measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) questions over the study duration in relation to their IBS symptoms.

The two studies, independently, demonstrate that rifaximin 550 mg TID for 14 days provides statistically significant relief of IBS symptoms during the primary evaluation period and the 10 weeks of monitoring after the administration period ends. The results are presented in Table 25 below.

TABLE 25A

| Endpoints | | | | |
|---|---|---|---|---|
| Global IBS symptoms | 31% vs 41% (p = 0.0125) | 32% vs 41% (p = 0.0263) | 32% vs 41% (p = 0.0008) | At least 2 out of 4 weeks adequate relief of IBS symptoms during weeks 3 through 6 (weekly question) |
| AUC in abdominal pain during PEP | P = 0.0128 | P = 0.0328 | P = 0.0017 | |

TABLE 25B

| Endpoints for Abdominal Pain (Change from baseline in median) | | | | |
|---|---|---|---|---|
| Endpoint | Study ` | Study 2 | Combined | Description |
| Abdominal pain reduction of 1 point in median | 52% vs 63% (p = 0.0039) | 53% vs 62% (p = 0.0382) | 53% vs 63% (p = 0.0005) | Responder is defined as who had reduction of 1 point in the weekly median score of abdominal pain compared to baseline for at least 2 weeks during PEP. Baseline median is based on the last three diary entries prior to the first dose date. Post-baseline weekly median is based on all diary entries in that week. |
| Abdominal Pain reduction of 2 point in median | 33% vs 37% (p = 0.3155) | 30% vs 41% (p = 0.0049) | 32% vs 39% (p = 0.0064) | See above |
| Abdominal Pain reduction of 3 point in median | 19% vs 22% (p = 0.3443) | 17% vs 21% (p = 0.2329) | 18% vs 21% (p = 0.1333) | See above |
| Daily abdominal pain <2 | 32% vs 40% (p = 0.0373) | 31% vs 39% (p = 0.0383) | 31% vs 39% (p = 0.0036) | Responder is defined as who had daily abdominal pain <2 for at least 50% of days in a given week for at least 2 weeks during PEP. |
| Overall reduction of median weekly abdominal pain by >=25% | 52% vs 63% (p = 0.0051) | 52% vs 62% (p = 0.0170) | 52% vs 62% (p = 0.0003) | Responder is defined as whose weekly median abdominal pain score dropped by at least 25% comparing to baseline median pain score for at least 2 weeks during PEP. Baseline median is based on the last three diary entries prior to the first dose date. Post-baseline weekly median is based on all diary entries in that week. |
| Overall reduction of median weekly abdominal pain by >=50% | 34% vs 44% (p = 0.0080) | 35% vs 44% (p = 0.0117) | 34% vs 44% (p = 0.0003) | See above |

TABLE 25B-continued

| Endpoints for Abdominal Pain (Change from baseline in median) | | | | |
|---|---|---|---|---|
| Endpoint | Study ` | Study 2 | Combined | Description |
| Overall reduction of median weekly abdominal pain by >=75% | 19% vs 23% (p = 0.2169) | 17% vs 20% (p = 0.3648) | 18% vs 21% (p = 0.1334) | See above |
| Abdominal pain reduction of 1 point in mean | 41% vs 52% (p = 0.0065) | 43% vs 52% (p = 0.0156) | 42% vs 52% (p = 0.0003) | Responder is defined as who had reduction of 1 point in the weekly mean score of abdominal pain compared to baseline for at least 2 weeks during PEP. |
| Abdominal Pain reduction of 2 point in mean | 18% vs 26% (p = 0.0181) | 18% vs 25% (p = 0.0198) | 18% vs 25% (p = 0.001) | See above |
| Abdominal Pain reduction of 3 point in mean | 6% vs 7% (p = 0.4475) | 6% vs 7% (p = 0.4828) | 6% vs 7% (p = 0.3676) | See above |
| Daily abdominal pain <2 | 32% vs 40% (p = 0.0373) | 31% vs 39% (p = 0.0383) | 31% vs 39% (p = 0.0036) | Responder is defined as who had daily abdominal pain <2 for at least 50% of days in a given week for at least 2 weeks during PEP. |
| Overall reduction of mean weekly abdominal pain by >=25% | 47% vs 56% (p = 0.0125) | 47% vs 58% (p = 0.0036) | 47% vs 57% (p = 0.0001) | Responder is defined as whose weekly mean abdominal pain score dropped by at least 25% comparing to baseline mean pain score for at least 2 weeks during PEP. |
| Overall reduction of mean weekly abdominal pain by >=50% | 28% vs 36% (p = 0.0280) | 29% vs 35% (p = 0.1101) | 28% vs 35% (p = 0.0075) | See above |
| Overall reduction of mean weekly abdominal pain by >=75% | 10% vs 14% (p = 0.1045) | 11% vs 14% (p = 0.3617) | 11% vs 14% (p = 0.0780) | See above |
| IBS symptom of Bloating | 29% vs 40% (p = 0.0045) | 32% vs 41% (p = 0.0167) | 30% vs 40% (p = 0.0002) | At least 2 out of 4 weeks adequate relief of IBS symptom of bloating during weeks 3 through 6 (weekly question) |
| Durable response during the entire 3-month study period | | | | |
| Global IBS symptoms (weekly) | P = 0.0477 (See Table 14.2.5a) | P = 0.0053 (See Table 14.2.5a) | P = 0.0007 (See Table 3.05a) | Number of months that subjects are monthly responders during the 3-month study period. Monthly responders are defined as at least 2 out of 4 weeks adequate relief. |
| IBS symptom of bloating (weekly) | P = 0.1042 (See Table 14.2.5a) | P = 0.0031 (See Table 14.2.5a) | P = 0.0011 (See Table 3.05a) | See above |
| Abdominal pain (daily) | P = 0.0495 (See Table 14.2.6a) | P = 0.0435 (See Table 14.2.6a) | P = 0.0118 (See Table 3.06a) | Number of months that subjects are monthly responders during the 3-month study period. Monthly responders are defined as at least 2 out of 4 weeks relief of abdominal pain. Weekly relief is defined as subjects who had 0 (not at all) or 1 (hardly) 50% of days within a given week, OR 0, 1 or 2(somewhat) 100% of days within a given week. |

Case 1:24-cv-00469-RGA Document 58-3 Filed 11/20/24 Page 95 of 452 PageID #: 2357



TABLE 25

| Definitions | | | |
|---|---|---|---|
| Study Population | Study 1 | Study 2 | Definition |
| Intent to Treat | 623 | 635 | Randomized subjects who took at least one dose of the study drug. |
| Modified Intent to Treat | 461 (73%) | 501 (78%) | Randomized subjects who took at least one dose of the study drug and met the following criteria:<br>Compliance rate is at least 90%<br>Had at least 4 weeks follow-up after the end of dosing. |

The study endpoints of the studies were Global IBS symptoms and AUC in abdominal pain during the study.

Other Endpoints Measured were:

Reduction of abdominal pain by 1 point from baseline in mean;

Reduction of abdominal pain by 2 point from baseline in mean;

Reduction of abdominal pain by 3 point from baseline in mean;

Daily abdominal pain of <2 from baseline in mean;

Overall reduction of median weekly abdominal pain by >=25% from baseline in mean;

Overall reduction of median weekly abdominal pain by >=50% from baseline in mean;

Overall reduction of median weekly abdominal pain by >=75% from baseline in mean;

Reduction of abdominal pain by 1 point from baseline in mean;

Reduction of abdominal pain by 2 point from baseline in mean;

Reduction of abdominal pain by 3 point from baseline in mean;

Daily abdominal pain of <2 from baseline in mean;

Overall reduction of median weekly abdominal pain by >=25% from baseline in mean;

Overall reduction of median weekly abdominal pain by >=50% from baseline in mean;

Overall reduction of median weekly abdominal pain by >=75% from baseline in mean;

IBS Symptom of bloating;

Durable response during the three month study

Global IBS symptoms (weekly);

IBS symptom of bloating (weekly);

Abdominal pain (daily).

Also, the proportions of subjects with adequate relief are set forth in Tables 25, 25A and 25B.

The two studies demonstrate that rifaximin 550 mg TID for 14 days provides statistically significant relief of IBS symptoms over a three month period as demonstrated by evaluating the primary and secondary endpoints.

The primary and secondary endpoints evaluated in this study were the effect of treatment on the percentage of subjects who reported adequate relief of Global IBS symptoms, reduction in abdominal pain and the adequate relief of IBS symptom of bloating. These results are shown in Appendices. The data demonstrates that more subjects taking rifaximin had adequate relief of Global IBS symptoms, abdominal pain and of bloating.

## INCORPORATION BY REFERENCE

The contents of all references, patents, pending patent applications and published patents, cited throughout this application are hereby expressly incorporated by reference.

## EQUIVALENTS

Those skilled in the art will recognize, or be able to ascertain using no more than routine experimentation, many equivalents to the specific embodiments of the invention described herein. Such equivalents are intended to be encompassed by the following claims.

What is claimed is:

**1**. A method of treating one or more symptoms of irritable bowel syndrome (IBS) in a subject 65 years of age or older, said method comprising administering, 550 mg of rifaximin TID for 14 days to the subject, thereby treating one or more symptoms of IBS in the subject 65 years of age or older.

**2**. The method of claim **1**, wherein the one or more symptoms are selected from one or more of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and urgency.

**3**. The method of claim **1**, wherein the IBS is diarrhea-predominant IBS.

**4**. The method of claim **1**, wherein the IBS is alternating IBS.

**5**. The method of claim **1**, wherein the treating one or more symptoms of IBS comprises a reduction of the one or more symptoms from baseline symptoms established prior to treatment.

**6**. The method of claim **5**, wherein the reduction of the one or more symptoms is achieved following 7 days after the administration of rifaximin.

**7**. The method of claim **1**, wherein treating one or more symptoms of IBS comprises a reduction in symptoms defined by an affirmative response from the subject when asked whether they had a reduction in symptoms of IBS.

**8**. A method of treating bloating associated with diarrhea-predominant IBS in a subject 65 years old or older, said method comprising administering, 550 mg of rifaximin TID for 14 days to the subject, thereby treating bloating associated with diarrhea-predominant IBS in the subject 65 years old or older.

**9**. The method of claim **8**, wherein the treating of bloating comprises a reduction of bloating.

**10**. The method of claim **9**, wherein the reduction of bloating is achieved following 7 days of the administration of the rifaximin.

**11**. The method of claim **9**, wherein the reduction of bloating comprises an affirmative response from a subject if asked whether they have had a reduction in bloating.

Case 1:24-cv-00460-RGA Document 59-1 Filed 11/30/20 Page 52 of 874 PageID #: 2858



**12**. The method of claim **8**, further comprising treating one or more symptoms associated with diarrhea-predominant IBS selected from cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, urgency, and tenesmus.

**13**. The method of claim **9**, wherein the reduction in bloating is a reduction as compared with baseline.

**14**. The method of claim **13**, wherein baseline is established prior to treatment.

**15**. The method of claim **14**, wherein the reduction in bloating is achieved following 7 days of the administration of the rifaximin.

**16**. The method of claim **15**, wherein the reduction in bloating comprises an affirmative response from a subject if asked whether they have had a reduction in bloating.

* * * * *

# EXHIBIT B

# EXHIBIT J

Case 1:24-cv-00436-RGA Document 59-1 Filed 11/20/24 Page 49 of 874 PageID #: 3098

US008309569B2

(12) **United States Patent**
**Forbes et al.**

(10) **Patent No.: US 8,309,569 B2**
(45) **Date of Patent: Nov. 13, 2012**

(54) **METHODS FOR TREATING DIARRHEA-ASSOCIATED IRRITABLE BOWEL SYNDROME**

(75) Inventors: **William Forbes**, Raleigh, NC (US); **Lorin Johnson**, Palo Alto, CA (US)

(73) Assignee: **Salix Pharmaceuticals, Ltd.**, Raleigh, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 142 days.

(21) Appl. No.: **12/393,979**

(22) Filed: **Feb. 26, 2009**

(65) **Prior Publication Data**

US 2011/0118295 A1 May 19, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/031,679, filed on Feb. 26, 2008, provisional application No. 61/102,801, filed on Oct. 3, 2008.

(51) **Int. Cl.**
*A61K 31/437* (2006.01)

(52) **U.S. Cl.** ........................................................ **514/279**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2005/0272754 A1 12/2005 Viscomi et al.
2007/0259906 A1 11/2007 Caras

FOREIGN PATENT DOCUMENTS

WO WO-2006/094737 A2 9/2006
WO WO-2007/064964 A2 6/2007

OTHER PUBLICATIONS

Pimentel et al. "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome" Annals of Internal Medicine. vol. 145, Issue 8, p. 557-563, Oct. 17, 2006, entire document.

Salix Pharmaceuticals "Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome" Dec. 6, 2007, <http://clinicaltrials.gov/ct2/show/NCT00269412>, p. 1, para 1.

DuPont et al. "Rifaximin: A Nonabsorbed Antimicrobial in the Therapy of Traveler's Diarrhea" Digestion. vol. 59, Issue 6, pp. 708-714 especially abstract, Nov. 1998.

Shahara et al. "Randomized Double-Blind Placebo-Controlled Trial of Rifaximin in Patients with Abdominal Bloating and Flatulence" American Journal of Gastroenterology. vol. 101, Issue 2, p. 326-333, Feb. 2006.

Lauritano et al. "Association between Hypothyroidism and Small Intentinal Bacterial Overgrowth" The journal of Clinical Endrocrinology & Metabolism. vol. 92, Issue 11, pp. 4180-4184 especially p. 4181. Nov. 2007.

*Primary Examiner* — Phyllis G. Spivack
(74) *Attorney, Agent, or Firm* — McCarter & English, LLP; Jonathan M. Sparks; Michael DeGrazia

(57) **ABSTRACT**

The present invention provides methods of treating diarrhea-associated irritable bowel syndrome (IBS-D) following rifaximin administration.

**2 Claims, 6 Drawing Sheets**




Continuous Adequate Relief of IBS Symptoms during Nontreatment Follow—up

FIGURE 1


RFIB2001
Percent of Subjects with Adequate Relief
100
90
80
70
60
PBO 4w
RFX 550 2w
5
6
7
8
9
10
11
12
13
14
15
16
Week
Continuous Adequate Relief of Bloating Symptoms during Nontreatment Follow—up

FIGURE 2


Screen
Washout & IBS Symptom Eligibility Assessment
Randomize
Day 1
Placebo 4w
RFX 275 2w/ PBO 2w
RFX 550 2w/ PBO 2w
RFX 1100 2w/ PBO 2w
RFX 550 4w
Post-Treatment Phase (12 Wks)
Ineligible for Post-Treatment (visit 28 days after withdrawal/Wk 4 completion)
Day -10 to 0
4 Week Treatment Period
RFX = Rifaximin

FIGURE 3

FIGURE 4

Adequate Relief of IBS Symptoms




Adequate Relief of IBS Symptoms

FIGURE 5

Adequate Relief of Bloating Symptom



FIGURE 6

Change from Baseline in Bloating




Change from Baseline in Bloating

# METHODS FOR TREATING DIARRHEA-ASSOCIATED IRRITABLE BOWEL SYNDROME

## RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Applications 61/031,679 and U.S. 61/102,801 filed Feb. 26, 2008 and Oct. 3, 2008, respectively, the entire contents of which are expressly incorporated herein by reference. The Assignee of the instant application, Salix Pharmaceuticals, Inc, was a party to a joint research agreement with Alfa Wassermann, S.p.A. at the time the invention was made.

## BACKGROUND

Rifaximin (INN; see The Merck Index, XIII Ed., 8304) is an antibiotic belonging to the rifamycin class of antibiotics, e.g., a pyrido-imidazo rifamycin. Rifaximin exerts its broad antibacterial activity, for example, in the gastrointestinal tract against localized gastrointestinal bacteria that cause infectious diarrhea, irritable bowel syndrome, small intestinal bacterial overgrowth, Crohn's disease, and/or pancreatic insufficiency. It has been reported that rifaximin is characterized by a negligible systemic absorption, due to its chemical and physical characteristics (Descombe J. J. et al. *Pharmacokinetic study of rifaximin after oral administration in healthy volunteers. Int J Clin Pharmacol Res,* 14 (2), 51-56, (1994)).

## SUMMARY

Disclosed herein are methods of preventing, ameliorating and/or treating bowel diseases (BDs). In general, subjects who may benefit from treatment with a rifamycin class antibiotic (e.g., rifaximin) include those who are susceptible to BDs, those who have active or acute diseases and those who are in remission from one or more BDs. BDs include, for example, irritable bowel syndrome (IBS), uncontrolled diarrhea-associated Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease and/or hepatic encephalopathy. Subjects who may particularly benefit from this treatment include those who are or may be suffering from or susceptible to IBS.

In one aspect, presented herein are methods of treating bowel disease (BD) with a durability of antibiotic response, comprising administering a therapeutically effective amount of a rifamycin class antibiotic to a subject in need thereof, selecting subjects who respond to treatment after being treated for between about 1 and about 24 weeks, and removing a responding subject from treatment wherein after removal of treatment there is a durability of response.

In one embodiment, the bowel disease comprises Irritable Bowel Syndrome (IBS).

In one embodiment, the bowel disease comprises diarrhea-associated Irritable Bowel Syndrome (dIBS).

In one embodiment, the bowel disease comprises hepatic encephalopathy.

In another embodiment, hepatic encephalopathy (HE) will be administered a rifamycin class antibiotic for between about 28 days weeks and 24 months. In treating HE, the rifamycin class antibiotic may be administered for as long a necessary, for example, for 12 months and longer, or for a subject's entire life span, for example, after being suspected of or diagnosed as having HE.

In one embodiment, at least 50% of patients respond.



In one embodiment, the therapeutically effective amount comprises from between about 25 mg to about 6000 mg.

In one embodiment, the therapeutically effective amount comprises 550 mg TID.

In one embodiment, the therapeutically effective amount comprises 550 mg BID.

In one embodiment, the therapeutically effective amount comprises 600 mg TID.

In one embodiment, the therapeutically effective amount comprises 600 mg BID.

In one embodiment, the therapeutically effective amount comprises 1650 mg/day.

In one embodiment, the BD comprises uncontrolled diarrhea-associated irritable bowel syndrome (dIBS).

In one embodiment, the rifamycin class antibiotic comprises a compound of Formula I.

In one embodiment, the rifamycin class antibiotic comprises rifaximin.

In one embodiment, subjects are treated from between about 7 days and about 4 weeks prior to selection.

In one embodiment, the subject is selected upon response to the rifamycin class antibiotic.

In one embodiment, the subject is selected when response to the rifamycin class antibiotic is recognized.

In one embodiment, the durability of response comprises from at least between about 1 and about 24 weeks of adequate relief of symptoms.

In one embodiment, the durability of response comprises from at least between about 1 and about 5 weeks of adequate relief of symptoms.

In one embodiment, symptoms comprise one or more of overall BD symptoms or bloating.

In one embodiment, adequate relief of BD symptoms comprises a reduction of BD symptoms.

In one embodiment, the reduction in BD symptoms is a reduction from baseline symptoms.

In one embodiment, baseline symptoms are established prior to treatment.

In one embodiment, adequate relief of BD symptoms comprises a 'yes' response from a subject when asked the question comprising or similar to, "In the past 7 days, have you had adequate relief of your symptom of your BD symptoms?" In one embodiment, adequate relief of BD symptoms comprises an affirmative response (e.g., yes) from a subject if asked weather they have had adequate relief of symptom of BD.

In one embodiment, BD symptoms comprise one or more of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and/or urgency.

In one embodiment, wherein adequate relief of bloating symptoms comprises a reduction of bloating symptoms.

In one embodiment, wherein the reduction in bloating symptoms is a reduction from baseline symptoms.

In one embodiment, baseline symptoms are established prior to treatment.

In one embodiment, adequate relief of bloating symptoms comprises a 'yes' response from a subject when asked the question comprising or similar to "In the past 7 days, have you had adequate relief of your symptom of bloating?" In one embodiment, adequate relief of BD symptoms comprises an affirmative response (e.g., yes) from a subject if asked a weather they have had adequate relief of bloating.

In one embodiment, bloating symptoms comprise one or more of the symptoms of abdominal fullness, bloating, gas, or swelling.

In one embodiment, a BD comprises one or more of irritable bowel syndrome (IBS), uncontrolled diarrhea-associ-

ated Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease, hepatic encephalopathy, and/or or pouchitis.

In one embodiment, a BD may also comprise one or more of fibromyalgia (FM), chronic fatigue syndrome (CFS), depression, attention deficit/hyperactivity disorder (ADHD), multiple sclerosis (MS), and/or systemic lupus erythematosus (SLE).

In one aspect, presented herein are methods of treating bowel disease (BD) in males comprising, administering a therapeutically effective amount of rifaximin to a male in need thereof.

In one embodiment, the methods further comprise determining the gender of a subject and administering the therapeutically effective amount to a male subject.

In one embodiment, the methods further comprise determining symptom relief in the male subject and administering a second course of rifaximin treatment if symptoms remain unresolved.

In one aspect, presented herein are methods of treating bloating due to BD in males comprising administering a therapeutically effective amount of rifaximin to a male in need thereof.

In one aspect, presented herein are methods of treating BD in older subjects comprising administering a therapeutically effective amount of rifaximin to an older subject in need thereof, determining symptom relief in the older subject and administering a second course of rifaximin treatment if symptoms were unresolved. As used herein, an older subject, refers for example to a subject >65 years of age, a subject about 50 years of age or older, a subject about 55 years of age or older, a subject about 60 years of age or older, or a subject about 70 years of age or older. A "long duration of disease," as used herein refers, for example, to a subject suffering from the disease for about 4 to about >10 years, or to a subject suffering from the disease from about 5 years to about 10 years, or to a subject suffering from the disease from about 5 years to about 20 years or greater.

In one aspect, presented herein are methods of predicting response to rifaximin treatment for BD comprising: assessing a subject suffering from BD and administering a therapeutically effective amount of rifaximin to one or more of a subject determined to be old, with long duration of BD, men or those having a baseline severity of mild to moderate.

In one embodiment, the method further comprises determining, based on clinical data, weather a subject will have a positive response to treatment. In one embodiment, the determination is made based on one or more of a subject's age, a subject's duration of BD, gender, or baseline severity of BD. In one embodiment, the clinical data is presented in a label on a pharmaceutical product.

In one embodiment, if a subject is male, there is a prediction of response.

In one embodiment, if a subject is older, there is a prediction of response.

In one embodiment, if a subject has had a long duration of disease, there is a prediction of response.

In one embodiment, baseline severity determination comprises a 7-point Lickert scale.

In one embodiment, the methods further comprise notifying the subject of a likelihood of response.

In one embodiment, a subject's likelihood of response increases with age and with length of duration of BD.



In one embodiment, the therapeutically effective amount comprises from between about 100 mg and about 6000 mg; 550 mg TID; 550 mg BID; 600 mg TID; 600 mg BID; or 1650 mg.

In one aspect, presented herein are methods of treating BD, comprising: providing a container comprising a rifamycin class antibiotic, wherein the container comprises printed labeling which describes a durability of antibiotic response and suggests selecting subject's who respond to treatment have a durability of response after removal from treatment; and administering rifaximin from the container to the subject.

In one embodiment, the rifamycin class antibiotic comprises rifaximin.

In one aspect, presented herein are kits for treating BD comprising a container comprising a rifamycin class antibiotic and a label which describes that administration of a therapeutically effective amount of the antibiotic results in a durability of response in a subject that responds to the treatment.

In one embodiment, the label describes adverse events comprising one or more of infections and infestations, gastrointestinal disorders, nervous system disorders, and musculoskeletal and connective tissue disorders.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is selected as responding to treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is removed from treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one aspect, the rifamycin class antibiotic comprises one or more of rifaximin or a Form $\alpha$, Form $\beta$, Form $\gamma$, Form $\delta$, Form $\epsilon$, Form $\zeta$, Form $\eta$, Form $\alpha$-dry, Form $\tau$, Form $\beta$-1, Form $\beta$-2, Form $\epsilon$-dry, mesylate Form or amorphous Forms of rifaximin and a pharmaceutically acceptable carrier. The rifaximin may be formulated as a pharmaceutical composition. In one embodiment, the rifamycin class antibiotic comprises rifaximin.

In one embodiment, the pharmaceutical composition further comprises excipients.

According to another embodiment, the excipients comprise one or more of a diluting agent, binding agent, lubricating agent, disintegrating agent, coloring agent, flavorings agent or sweetening agent.

In another embodiment, the composition is formulated for selected coated and uncoated tablets, hard and soft gelatin capsules, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packet. In one embodiment, the composition is formulated for topical use.

According to another embodiment, the bowel related disorder is one or more of irritable bowel syndrome (IBS), uncontrolled diarrhea-associated Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease, hepatic encephalopathy, and/or or pouchitis.

According to one aspect, provided herein are methods of improving QOL measures in a BD subject comprising administering rifaximin.

According to one aspect, provided herein are methods of improving QOL measures in a BD subjects comprising administering a rifamycin class antibiotic.

In one embodiment, rifaximin is administered for 14 days.

In one embodiment, one or more of quality of life measures comprising dysphoria, body image, health worry, social reaction, and relationship are improved upon administration of rifaximin.

In one embodiment, selecting comprises following dosing instructions on a package insert of a pharmaceutical product.

In one embodiment, the package insert instructs to administer the rifamycin class antibiotic for 14 days.

In one embodiment, removing comprises instructing a subject by following dosing instructions on a package insert of a pharmaceutical product.

In one embodiment, the package insert instructs to administer the rifamycin class antibiotic for 14 days.

In one embodiment, the product comprises 550 mg of rifaximin labeled for treatment of irritable bowel syndrome.

In one embodiment, the product comprises 550 mg of rifaximin labeled for treatment of hepatic encephalopathy.

In one embodiment, the product comprises 600 mg of rifaximin labeled for treatment of irritable bowel syndrome.

In one embodiment, the product comprises 600 mg of rifaximin labeled for treatment of hepatic encephalopathy.

In one embodiment, the product comprises 550 mg of rifaximin labeled for treatment of one or more of irritable bowel syndrome, Travelers' diarrhea or hepatic encephalopathy.

In one embodiment, the product comprises 550 mg of rifaximin.

In one embodiment, the product comprises 600 mg of rifaximin.

In one embodiment, the product comprises 200 mg of rifaximin.

In one embodiment, the product comprises 400 mg of rifaximin.

In one embodiment, the product comprises 400 mg of rifaximin BID.

In one embodiment, the product comprises 400 mg of rifaximin TID.

In one embodiment, the method further comprises determining risk of BD in a subject prior to administration of the rifamycin class antibiotic by genetically profiling the subject risk of BD and selecting to administer a rifamycin class antibiotic to an at risk subject.

In one embodiment, determining risk comprises determining polymorphisms at one or more of Nod2, CFTR, CARD15, rs6822844, rs2305767, rs6822844, 8q24 region; Marker: rs6983267, LOC727677, IL23R(1), NKX2-3, 5p13 region, PTPN2, MST1, IRGM, IL23R(2), or 10q21 region.

Provided herein, according to one aspect are methods of providing acute treatment for symptomatic diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: administering 1650 mg/day of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response.

In one embodiment, the 1650 mg is administered as 550 mg three times a day.

Provided herein, according to one aspect are methods of providing acute treatment for uncontrolled diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: administering 550 mg rifaximin two or three times a day for two weeks to a subject in need thereof, wherein removing the subject from treatment after the two weeks results in a durability of response.

In one embodiment, the treatment provides symptomatic relief of dIBS.

In one embodiment, a package insert of a pharmaceutical product warns of adverse events, including, for example, infections and infestations, gastrointestinal disorders, nervous system disorders, and musculoskeletal and connective tissue disorders.

Other embodiments of the invention are disclosed infra.



## DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a graph of continuous adequate relief of IBS symptoms during non-treatment follow-up.

FIG. **2** shows a graph of continuous adequate relief of bloating symptoms during non-treatment follow-up.

FIG. **3** shows proposed study design for treatment with rifaximin to show durability of response.

FIG. **4** shows graphical results of adequate relief of IBS symptoms.

FIG. **5** shows results of adequate relief of bloating symptoms.

FIG. **6** shows results of change from baseline in bloating symptoms after treatment with rifaximin.

## DETAILED DESCRIPTION

Rifaximin (USAN, INN; see The Merck Index, XIII Ed., 8304, CAS No. 80621-81-4), (2S,16Z,18E,20S,21 S,22R, 23R,24R,25S,26S,27S,28E)-5,6,21,23,25 Pentahydroxy-27-methoxy-2,4,11,16,20,22,24,26-octamethyl-2,7-(epoxypentadeca-(1,11,13) trienimino) benzofuro (4,5-e) pyrido(1,2,-a) benzimidazole-1,15(2H)-dione,25-acetate), is a semi-synthetic antibiotic produced from rifamycin O. Rifaximin is a molecule belonging to the rifamycin class of antibiotics, e.g., a pyrido-imidazo rifamycin. Rifaximin exerts a broad antibacterial activity, for example, in the gastrointestinal tract against localized gastrointestinal bacteria that cause infectious diarrhea, irritable bowel syndrome, small intestinal bacterial overgrowth, Crohn's disease, and/or pancreatic insufficiency.

Rifaximin is also described in Italian Patent IT 1154655 and EP 0161534. EP patent 0161534 discloses a process for rifaximin production using rifamycin O as the starting material (The Merck Index, XIII Ed., 8301). U.S. Pat. No. 7,045, 620 B1 discloses polymorphic forms of rifaximin, as do U.S. Ser. No. 11/658,702; U.S. Ser. No. 61/031,329; U.S. Ser. No. 12/119,622; U.S. Ser. No. 12/119,630; U.S. Ser. No. 12/119, 612; U.S. Ser. No. 12/119,600; U.S. Ser. No. 11/873,841; Publication WO 2006/094662; and U.S. Ser. No. 12/393,012. The applications and patents referred to here are incorporated herein by reference in their entirety for all purposes.

A rifamycin class antibiotic is, for example, a compound having the structure of Formula I:



wherein A may be the structure $A_1$:



or the structure $A_2$



wherein, -x- is a covalent chemical bond or nil; R is hydrogen or acetyl;

$R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$ alkyl, benzyloxy, mono- and di-$(C_{1-3})$ alkylamino-$(C_{1-4})$ alkyl, $(C_{1-3})$alkoxy-$(C_{1-4})$alkyl, hydroxymethyl, hydroxy-$(C_{2-4}$-alkyl, nitro or $R_1$ and $R_2$ taken together with two consecutive carbon atoms of the pyridine nucleus form a benzene ring unsubstituted or substituted by one or two methyl or ethyl groups; $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Also described herein is a compound as defined above, wherein A is $A_1$ or $A_2$ as above indicated, -x- is a covalent chemical bond or nil, R is hydrogen or acetyl, $R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$alkyl, benzyloxy, hydroxy-$(C_{2-4})$ alkyl, di-$(C_{1-3})$ alkylamino-$(C_{1-4})$ alkyl, nitro or $R_1$ and $R_2$ taken together with two consecutive carbon atoms of the pyridine nucleus form a benzene ring and $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Also described herein is a compound as defined above, wherein A is $A_1$ or $A_2$ as above indicated, -x- is a covalent chemical bond or nil, R is acetyl, $R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$ alkyl or $R_1$ and $R_2$ taken together with two consecutive carbon atoms of the pyridine nucleus form a benzene ring and $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Also described herein is a compound as defined above, which is 4-deoxy-4'-methyl-pyrido[1',2'-1,2]imidazo[5,4-c] rifamycin SV. Also described herein is a compound as defined above, which is 4-deoxy-pyrido[1',2':1,2]imidazo[5,4-c]rifamycin SV.

Also described herein is a compound as defined above, wherein A is as described above, -x- is a covalent chemical bond or nil; R is hydrogen or acetyl; $R_1$ and $R_2$ independently represent hydrogen, $(C_{1-4})$ alkyl, benzyloxy, mono- and di-$(C_{1-3})$alkylamino$(C_{1-4})$alkyl, $(C_{1-3})$alkoxy- $(C_{1-4})$alkyl, hydroxymethyl, hydroxy-$(C_{2-4})$-alkyl, nitro or $R_1$ and $R_2$ taken together with two consecutive carbon atoms of the pyridine nucleus form a benzene ring unsubstituted or substituted by one or two methyl or ethyl groups; $R_3$ is a hydrogen atom or nil; with the proviso that, when A is $A_1$, -x- is nil and $R_3$ is a hydrogen atom; with the further proviso that, when A is $A_2$, -x- is a covalent chemical bond and $R_3$ is nil.

Rifaximin is a compound having the structure of formula II:

(II)



In certain embodiments, the antibiotic comprises one or more of a rifamycin, aminoglycoside, amphenicol, ansamycin, β-Lactam, carbapenem, cephalosporin, cephamycin, monobactam, oxacephem, lincosamide, macrolide, polypeptide, tetracycline, or a 2,4-diaminopyrimidine class antibiotic. Exemplary antibiotics of these classes are listed below.

Without wishing to be bound by any particular scientific theories, rifaximin acts by binding to the beta-subunit of the bacterial deoxyribonucleic acid-dependent ribonucleic acid (RNA) polymerase, resulting in inhibition of bacterial RNA synthesis. It is active against numerous gram (+) and (−) bacteria, both aerobic and anaerobic. In vitro data indicate rifaximin is active against species of *Staphylococcus, Streptococcus, Enterococcus*, and Enterobacteriaceae.

"Rifaximin", as used herein, includes solvates and polymorphous forms of the molecule, including, for example, Form α, Form β, Form γ Form δ, Form ϵ, Form ζ, Form η, Form α-dry, Form τ, Form β-1, Form β-2, Form ϵ-dry, mesylate Form or amorphous Forms of rifaximin. These forms are described in more detail, for example, in U.S. Ser. No. 11/873,841; U.S. Ser. No. 11/658,702; EP 05 004 635.2, filed 3 May 2005; U.S. Pat. No. 7,045,620; U.S. 61/031,329; and G. C. Viscomi, et al., CrystEngComm, 2008, 10, 1074-1081 (April 2008). Each of these references is hereby incorporated by reference in entirety.

Medicinal preparations may contain gastrointestinal specific antibiotics together with usual excipients, discussed infra.

"Polymorphism", as used herein, refers to the occurrence of different crystalline forms of a single compound in distinct hydrate status, e.g., a property of some compounds and complexes. Thus, polymorphs are distinct solids sharing the same molecular formula, yet each polymorph may have distinct physical properties. Therefore, a single compound may give rise to a variety of polymorphic forms where each form has different and distinct physical properties, such as solubility profiles, melting point temperatures, hygroscopicity, particle shape, density, flowability, compatibility and/or x-ray diffraction peaks. The solubility of each polymorph may vary, thus, identifying the existence of pharmaceutical polymorphs is

Case 1:24-cv-00436-RGA Document 59-1 Filed 11/30/24 Page 139 of 952 PageID #: 3109



essential for providing pharmaceuticals with predictable solubility profiles. It is desirable to investigate all solid state forms of a drug, including all polymorphic forms, and to determine the stability, dissolution and flow properties of each polymorphic form. Polymorphic forms of a compound can be distinguished in a laboratory by X-ray diffraction spectroscopy and by other methods such as, infrared spectrometry. For a general review of polymorphs and the pharmaceutical applications of polymorphs see G. M. Wall, Pharm Manuf. 3, 33 (1986); J. K. Haleblian and W. McCrone, J Pharm. Sci., 58, 911 (1969); and J. K. Haleblian, J. Pharm. Sci., 64, 1269 (1975), all of which are incorporated herein by reference. As used herein, the term polymorph is occasionally used as a general term in reference to the forms of rifaximin and include within the context, salt, hydrate, polymorph and amorphous forms of rifaximin disclosed herein. This use depends on context and will be clear to one of skill in the art.

"GI specific antibiotic," and "GI antibiotic" as used herein include antibiotic known to have an effect on GI disease. For example, a rifamycin class antibiotic (e.g., rifaximin), neomycin, metronidazole, teicoplanin, ciprofloxacin, doxycycline, tetracycline, augmentin, cephalexin, penicillin, ampicillin, kanamycin, rifamycin, vancomycin, and combinations thereof are useful GI specific antibiotics. Even more preferable are GI specific antibiotics with low systemic absorption, for example, rifaximin. Low systemic absorption includes, for example, less than 10% absorption, less than 5% absorption, less than 1% absorption and less than 0.5% absorption. Low systemic absorption also includes, for example, from between about 0.01-1% absorption, from between about 0.05-1% absorption, from between about 0.1-1% absorption, from between about 1-10% absorption, or from between about 5-20% absorption.

"Ameliorate," "amelioration," "improvement" or the like refers to, for example, a detectable improvement or a detectable change consistent with improvement that occurs in a subject or in at least a minority of subjects, e.g., in at least about 2%, 5%, 10%, 15%, 20%, 25%, 30%, 40%, 50%, 60%, 70%, 75%, 80%, 85%, 90%, 95%, 98%, 100% or in a range between about any two of these values. Such improvement or change may be observed in treated subjects as compared to subjects not treated with rifaximin, where the untreated subjects have, or are subject to developing, the same or similar disease, condition, symptom or the like. Amelioration of a disease, condition, symptom or assay parameter may be determined subjectively or objectively, e.g., self assessment by a subject(s), by a clinician's assessment or by conducting an appropriate assay or measurement, including, e.g., a quality of life assessment, a slowed progression of a disease(s) or condition(s), a reduced severity of a disease(s) or condition(s), or a suitable assay(s) for the level or activity(ies) of a biomolecule(s), cell(s) or by detection of BD episodes in a subject. Amelioration may be transient, prolonged or permanent or it may be variable at relevant times during or after a GI specific antibiotic is administered to a subject or is used in an assay or other method described herein or a cited reference, e.g., within timeframes described infra, or about 1 hour after the administration or use of a GI specific antibiotic to about 7 days, 2 weeks, 28 days, or 1, 3, 6, 9 months or more after a subject(s) has received such treatment.

The "modulation" of, e.g., a symptom, level or biological activity of a molecule, or the like, refers, for example, that the symptom or activity, or the like is detectably increased or decreased. Such increase or decrease may be observed in treated subjects as compared to subjects not treated with a GI specific antibiotic, where the untreated subjects have, or are subject to developing, the same or similar disease, condition, symptom or the like. Such increases or decreases may be at least about 2%, 5%, 10%, 15%, 20%, 25%, 30%, 40%, 50%, 60%, 70%, 75%, 80%, 85%, 90%, 95%, 98%, 100%, 150%, 200%, 250%, 300%, 400%, 500%, 1000% or more or within any range between any two of these values. Modulation may be determined subjectively or objectively, e.g., by the subject's self assessment, by a clinician's assessment or by conducting an appropriate assay or measurement, including, e.g., quality of life assessments or suitable assays for the level or activity of molecules within a subject. Modulation may be transient, prolonged or permanent or it may be variable at relevant times during or after a GI specific antibiotic is administered to a subject or is used in an assay or other method described herein or a cited reference, e.g., within times descried infra, or about 1 hour of the administration or use of a GI specific antibiotic to about 2 weeks, 28 days, 3, 6, 9 months or more after a subject(s) has received a GI specific antibiotic.

The term "modulate" may also refer to increases or decreases in the activity of a cell in response to exposure to a GI specific antibiotic, e.g., the inhibition of proliferation and/or induction of differentiation of at least a sub-population of cells in an animal such that a desired end result is achieved, e.g., a therapeutic result of GI specific antibiotic used for treatment may increase or decrease over the course of a particular treatment.

The language "a prophylactically effective amount" of a compound refers to an amount of a compound of the invention of formula I, formula II, or otherwise described herein which is effective, upon single or multiple dose administration to the subject, in preventing or treating BD.

As used herein, "subject" includes organisms which are capable of suffering from a bowel disease or other disorder treatable by a rifamycin class antibiotic (e.g., rifaximin) or who could otherwise benefit from the administration of a rifamycin class antibiotic (e.g., rifaximin) as described herein, such as human and non-human animals. Preferred human animals include human subjects. The term "non-human animals" of the invention includes all vertebrates, e.g., mammals, e.g., rodents, e.g., mice, and non-mammals, such as non-human primates, e.g., sheep, dog, cow, chickens, amphibians, reptiles, etc. Susceptible to a bowel disorder is meant to include a subject at risk of developing a bowel disorder or a person who is in remission from a BD or a person who may relapse from a BD, e.g., a subject suffering from immune suppression, a subject that has been exposed to a bacterial infection, physicians, nurses, a subject traveling to remote areas known to harbor bacteria that cause travelers' diarrhea, a family history of BD, an aging person, a person with liver damage, a subject in IBS remission, a subject who has had HE episodes in the past, a person with mind HE, a subject with uncontrollable diarrhea, a subject with dIBS, etc.

The language "a prophylactically effective amount" of a compound refers to an amount of a compound of the invention of formula I, formula II, or otherwise described herein which is effective, upon single or multiple dose administration to the subject, in preventing or treating BD.

The term "administration" or "administering" includes routes of introducing a GI specific antibiotic to a subject to perform their intended function. Examples of routes of administration that may be used include injection, oral, inhalation, vaginal, rectal and transdermal. The pharmaceutical preparations may be given by forms suitable for each administration route. For example, these preparations are administered in tablets or capsule form, by injection, inhalation, eye lotion, eye drops, ointment, suppository, etc. administration by injection, infusion or inhalation; topical by lotion or oint-

ment; and rectal by suppositories. Oral administration is preferred. The injection can be bolus or can be continuous infusion. Depending on the route of administration, a GI specific antibiotic can be coated with or disposed in a selected material to protect it from natural conditions that may detrimentally effect its ability to perform its intended function. A GI specific antibiotic can be administered alone, or in conjunction with either another agent or agents as described above or with a pharmaceutically-acceptable carrier, or both. A GI specific antibiotic can be administered prior to the administration of the other agent, simultaneously with the agent, or after the administration of the agent. Furthermore, a GI specific antibiotic can also be administered in a proform, which is converted into its active metabolite, or more active metabolite in vivo.

Administration "in combination with" one or more further therapeutic agents includes simultaneous (concurrent) and consecutive administration in any order.

As will be readily apparent to one skilled in the art, the useful in vivo dosage to be administered and the particular mode of administration will vary depending upon the age, weight and mammalian species treated, the particular compounds employed, and/or the specific use for which these compounds are employed. The determination of effective dosage levels, that is the dosage levels necessary to achieve the desired result, can be accomplished by one skilled in the art using routine pharmacological methods. Typically, human clinical applications of products are commenced at lower dosage levels, with dosage level being increased until the desired effect is achieved.

The term "obtaining" as in "obtaining a GI specific antibiotic" is intended to include purchasing, synthesizing or otherwise acquiring a GI specific antibiotic.

The language "a prophylactically effective amount" of a compound refers to an amount of a GI specific antibiotic which is effective, upon single or multiple dose administration to the subject, in preventing or treating BD, e.g., IBS.

The term "pharmaceutical agent composition" (or agent or drug) as used herein refers to a chemical compound, composition, agent or drug capable of inducing a desired therapeutic effect when properly administered to a patient. It does not necessarily require more than one type of ingredient.

As used herein, "durability of response" includes for example, adequate relief of symptoms after removal of treatment, continuous adequate relief of symptoms after removal of treatment, or response that is greater than or superior to placebo response. A response by a subject may be considered durable, for example, if they have a response to the rifamycin class antibiotic after removal from treatment. The duration of response, may be, for example, 2 days, 7 days, two weeks, 3 weeks, 4 weeks, 12 weeks, between about 1 week and about 24 weeks or longer. The response may be measured, for example using one or more of the methods outlined below, including, for example, a subject's subjective assessment of their symptoms or a healthcare provider's or caretaker's assessment of a subject's symptoms.

As used herein, "selecting subject's who respond," "selection of subject's who respond" or the like, include, for example, determining that a subject has responded to treatment based on a decrease of BD symptoms and/or following label instructions to administer a product (e.g., a rifamycin class antibiotic) for a certain period of time or the like. The determination or selection may be based on the label (e.g., package or package insert) instructions or on the a subject's subjective assessment of their symptoms or a healthcare provider's or caretaker's assessment of a subject's symptoms.

Methods of Treatment

Provided herein are methods of treating, preventing, or alleviating bowel related disorders comprising administering to a subject in need thereof an effective amount of a rifamycin class antibiotic (e.g., rifaximin). Bowel related disorders (e.g., bowel diseases) include one or more of irritable bowel syndrome (IBS), uncontrolled diarrhea-associated Irritable Bowel Syndrome (dIBS), Crohn's disease, traveler's diarrhea, ulcerative colitis, enteritis, small intestinal bacterial overgrowth, chronic pancreatitis, pancreatic insufficiency, colitis, diverticular disease, hepatic encephalopathy, and/or pouchitis.

Table 1 below demonstrates that men respond differentially to treatment with rifaximin. Table 2 demonstrates response to the treatment is correlated with the duration of disease.

TABLE 1

| | Thresholds | Treatment effect (IBS Sx, Bloating) |
|---|---|---|
| Gender | M versus. | 21%*, 13.6% |
| | F | 3.5%, 3.9% |
| Age | <65 versus. | 6.9%, 6.8% |
| | ≧65 | 19.1%, 3.2% |
| dIBS Type | dIBS only versus. | 6.3%, 4.5% |
| | aIBS | 31.4%*, 31.4% |

*p-value <0.05

TABLE 2

| | Thresholds | Treatment effect (IBS Sx, Bloating) |
|---|---|---|
| Diabetes History | Y versus. | −12.7%, −5.6% |
| | N | 9.5%, 7.4% |
| Disease Duration: | ≦10 y | 1.8%, 2.8% |
| | 10-20 y | 20.1%, 11.7% |
| | >20 y | 46.6%*, 35.1% |

*p-value <0.05

It was surprisingly shown that a rifamycin class antibiotic (e.g., rifaximin) is particularly efficacious in men and in subjects with long duration of disease.

Durability of Response

Embodiments of the invention relate to the discovery that the dosing regimes described herein of rifaximin results in a durability of response and amelioration of BD symptoms in subjects in need thereof. One embodiment of the invention is a method of treating bowel disease (BD) with a durability of antibiotic response, by administering a therapeutically effective amount of a rifamycin class antibiotic to a subject in need thereof, selecting subjects who respond to treatment after being treated for between about 1 and about 24 weeks, and removing a responding subject from treatment wherein after removal of treatment there is a durability of response. The selecting may be by a healthcare professional, by self selection or by selection of one in a position to decide or discern symptoms or to diagnose a response to the antibiotic. Removal of treatment comprises, for example, ceasing to administer, ceasing to recommend administration of the antibiotic, and/or advising responding subjects to stop taking the antibiotic.

In one embodiment, the recommendation (e.g., selection) is made on a label of a pharmaceutical product, which indicates that the product should be administered for 14 days (e.g., two weeks). For example, a subject in need of treatment is administered rifaximin 550 mg TID for two weeks and

instructed by a label. In one embodiment, the recommendation (e.g., selection) is made on a label of a pharmaceutical product, which indicates that the product should be administered for two weeks. For example, a subject in need of treatment is administered rifaximin 550 mg BID for two weeks as instructed by a label. In one embodiment, selecting is following dosing instructions on a package insert of a pharmaceutical product.

Also described herein are methods for maintenance of remission of bowel disease in a subject comprising administering a therapeutically effective amount of rifaximin for at least 25 weeks to a subject in need thereof.

Yet another aspect of this invention relates to a method of treating a subject (e.g., mammal, human, horse, dog, cat) with rifaximin who is in need thereof. Identifying a subject in need of such treatment can be in the judgment of a subject or a health care professional and can be subjective (e.g., opinion) or objective (e.g., measurable by a test or diagnostic method). Rifaximin may be used in various treatment regimes. These regimes may vary depending upon the subject and the type of treatment.

Rifaximin may be administered, for example, twice a day, three times a day, or four times or more often as necessary per day. Rifaximin may be administered in doses, for example of from about between 25 mg BID to about 3000 mg TID. Another example is administering rifaximin from between about 4.0 g/day to about 7.25 g/day. The rifaximin may be administered, for example, in tablet form, powered form, liquid for or in capsules.

Subjects in need thereof include subjects having or that are susceptible to BD, are in remission from BD, males and/or older subjects with long duration of disease, as disclosed further below.

As used herein, a therapeutically effective amount means an amount effective, when administered to a human or non-human subject, to provide a therapeutic benefit such as an amelioration of symptoms, e.g., an amount effective to decrease the symptoms of BDs, or maintenance of remission of a BD.

In certain embodiments, the rifaximin is administered to a subject from between about 1 week to about 6 weeks in duration, from between about 8 weeks to about 12 weeks in duration, or from between 1 day to about 7 days. The rifaximin may be administered from between about 1 day and about 1 year, or from 1 week to about 24 weeks. The rifaximin may be administered, for example, for the remainder of a subject's life. The rifaximin may be administered intermittently or continuously during the course of treatment. Length of treatment may vary depending on the type and length of disease and the proper length of treatment may be easily determined by one of skill in the art having the benefit of this disclosure.

For any of the embodiments, rifaximin may be administered, for example, once daily, twice daily, three times daily, or four times daily (or more often as necessary for a particular subject) to a subject. In some methods of the present invention comprise administering the rifaximin once daily to the subject because it may, for example, minimize the side effects and increase patient compliance. Also preferred, are twice and three times daily administration of rifaximin.

Dosages, according to certain preferred embodiments, range from between about 50 to about 6000 mg of rifaximin administered daily. For example, a dose of 550 mg may be administered to a subject twice daily. Other appropriate dosages for methods according to this invention may be determined by health care professionals or by the subject. The amount of rifaximin administered daily may be increased or decreased based on the weight, age, health, sex or medical condition of the subject. One of skill in the art would be able to determine the proper dose for a subject based on this disclosure.

According to certain embodiments, rifaximin may be administered in combination with other compounds, including for example, chemotherapeutic agents, anti-inflammatory agents, anti-pyretic agents radiosensitizing agents, radioprotective agents, urologic agents, anti-emetic agents, and/or anti-diarrheal agents. for example, cisplatin, carboplatin, docetaxel, paclitaxel, fluorouracil, capecitabine, gemcitabine, irinotecan, topotecan, etoposide, mitomycin, gefitinib, vincristine, vinblastine, doxorubicin, cyclophosphamide, celecoxib, rofecoxib, valdecoxib, ibuprofen, naproxen, ketoprofen, dexamethasone, prednisone, prednisolone, hydrocortisone, acetaminophen, misonidazole, amifostine, tamsulosin, phenazopyridine, ondansetron, granisetron, alosetron, palonosetron, promethazine, prochlorperazine, trimethobenzamide, aprepitant, diphenoxylate with atropine, and/or loperamide.

Risk Selection Methods

The methods described herein may also further comprise genetically profiling for genetic risk of BD and selecting to treat an at risk subject. For example, an at-risk subject may be determined to be at risk of a bowel disease by genetic screening, family history, lifestyle, travel plans and the like. Genetic screening may, for example, be for genes and expression profiles or epigenetic modifiers shown to affect or predict bowel disease or susceptibility for bowel diseases. Mutations which may be screened for include mutations or polymorphisms in, for example, Nod2, CFTR, or CARD15. Nod2, a gene involved in the immune systems initial response to bacterial infection, significantly increases the risk of Crohn's disease. The CFTR protein resides in the surface of cells lining the digestive system, lungs and sweat glands. In normal cells, it acts as an ion channel that transports chloride into and out of cells. It also controls the regulation of other transport pathways regulating the passage of fluid and bicarbonate across cell membranes. DNA sequence variations (or mutations) alone do not explain CFTR-related gastrointestinal disease patterns; rather, epigenetic modifiers, or changes that leave the gene's sequence of DNA intact, influence CFTR expression.

For example, a subject may be typed for rs6822844 and/or rs2305767 to indicate risk of celiac disease. One study examined 778 individuals with celiac disease and 1,422 healthy controls. The authors found that each T at rs6822844 lowered subjects' risk of celiac disease by about 1.6 times. See Zhernakova A et al. (2007) "Novel association in chromosome 4q27 region with rheumatoid arthritis and confirmation of type 1 diabetes point to a general risk locus for autoimmune diseases." Am J Hum Genet. 81(6):1284-8; and van Heel D A et al. (2007) "A genome-wide association study for celiac disease identifies risk variants in the region harboring IL2 and IL21." Nat Genet. 39(7):827-9. Another study examined 463 individuals with celiac disease and 686 healthy controls. The authors found that people with a C at both copies had 2.3 times lower odds for celiac disease than those with the TT genotype. See Hunt K A et al. (2006) "Lack of association of MYO9B genetic variants with coeliac disease in a British cohort." Gut 55(7):969-72; Núñz C et al. (2006) "No evidence of association of the MYO9B polymorphisms with celiac disease in the Spanish population." Tissue Antigens 68(6): 489-92; Cirillo G et al. (2007) "Do MYO9B genetic variants predispose to coeliac disease? An association study in a cohort of South Italian children." Dig Liver Dis 39(3):228-31; Cirillo G et al. (2007) "Do MYO9B genetic variants predispose to coeliac disease? An association study in a cohort of

South Italian children." Dig Liver Dis 39(3):228-31; Cirillo G et al. (2007) "Do MYO9B genetic variants predispose to coeliac disease? An association study in a cohort of South Italian children." Dig Liver Dis 39(3):228-31.

For example, a subject may be typed for 8q24 region; Marker:rs6983267 to determine risk for colon cancer. This SNP occurs in a hypothetical gene called LOC727677. It has been suggested that the riskier version of this SNP is associated not only with an increased risk of colorectal cancer, but also with formation of the precancerous adenomatous polyps. The riskier version of this SNP has also been linked to prostate cancer in some studies, though more research is needed to confirm this association. See Haiman et al. (2007) "A common genetic risk factor colorectal and prostate cancer." Nat Genet. 39(8):954-6; and Tomlinson et al. (2007) "A genome-wide association scan of tag SNPs identifies a susceptibility variant for colorectal cancer at 8q24.21." Nat Genet. 39(8):984-988; and Zanke et al. (2007) "Genome-wide association scan identifies a colorectal cancer susceptibility locus on chromosome 8q24." Nat Genet. 39(8):989-994.

For example, a subject may be typed for NOD2(1) SNP: rs2066844; NOD2(2) SNP: rs2066845; NOD2(3) SNP: rs2066847; IL23R(1) SNP: rs11209026; NKX2-3 SNP: rs11190140; 5p13 region SNP: rs17234657; PTPN2 SNP: rs1893217; MST1 SNP: rs3197999; IRGM SNP: rs7714584; IL23R(2) SNP: rs11805303; and/or 10q21 region SNP: rs10761659 to determine risk of Crohn's disease. See Hugot et al. (2001) "Association of NOD2 leucine-rich repeat variants with susceptibility to Crohn's disease." Nature 411(6837):599-603; Ogura et al. (2001) "A frameshift mutation in NOD2 associated with susceptibility to Crohn's disease." Nature 411(6837):603-6; Rioux et al. (2007) "Genome-wide association study identifies new susceptibility loci for Crohn disease and implicates autophagy in disease pathogenesis." Nat Genet. 39(5):596-604; Libioulle et al. (2007) "Novel Crohn's disease locus identified by genome-wide association maps to a gene desert on 5p13.1 and modulates expression of PTGER4." PLoS Genet. 3(4):e58; Hampe et al. (2007) "A genome-wide association scan of non-synonymous SNPs identifies a susceptibility variant for Crohn disease in ATG16L1." Nat Genet. 39(2):207-11; Duerr et al. (2006) "A genome-wide association study identifies IL23R as an inflammatory bowel disease gene." Science 314(5804):1461-1463; van Limbergen et al. (2007) "IL23R Arg381Gln is associated with childhood onset inflammatory bowel disease in Scotland." Gut 56(8):1173-4; Wellcome Trust Case Control Consortium (2007) "Genome-wide association study of 14,000 cases of seven common diseases and 3,000 shared controls." Nature 447(7145):661-78; Parkes et al. (2007) "Sequence variants in the autophagy gene IRGM and multiple other replicating loci contribute to Crohn's disease susceptibility." Nat Genet. 39(7):830-2; Sheibanie et al. (2007) "The proinflammatory effect of prostaglandin E2 in experimental inflammatory bowel disease is mediated through the IL-23→IL-17 axis." J Immunol 178(12):8138-47; Simoncic et al. (2007) "The T cell protein tyrosine phosphatase is a negative regulator of janus family kinases 1 and 3." Curr Biol 12(6):446-53; You-Ten et al. (1997) "Impaired bone marrow microenvironment and immune function in T cell protein tyrosine phosphatase-deficient mice." J Exp Med 22(16):5662-8; Barrett et al. (2008) "Genome-wide association defines more than 30 distinct susceptibility loci for Crohn's disease." Nat Genet. 40(8):955-62; Goyette er al. (2008) "Gene-centric association mapping of chromosome 3p implicates MST1 in IBD pathogenesis" Mucosal Immunology 1:131-138; Barrett et al. (2008). "Genome-wide association defines more than 30 distinct susceptibility loci for Crohn's disease." Nat Genet. 40(8):955-62; McCarroll et al (2008) "Deletion polymorphism upstream of IRGM associated with altered IRGM expression and Crohn's disease." Nat Genet. 40(9):1107-1112; and Singh et al. (2006) "Human IRGM induces autophagy to eliminate intracellular mycobacteria." Science 313(5792):1438-41.

Pharmaceutical Preparations

The invention also provides pharmaceutical compositions, comprising an effective amount of a rifamycin class antibiotic ((e.g., rifaximin or a rifaximin polymorph) described herein and a pharmaceutically acceptable carrier. In a further embodiment, the effective amount is effective to treat a bacterial infection, e.g., small intestinal bacterial overgrowth, Crohn's disease, hepatic encephalopathy, antibiotic associated colitis, and/or diverticular disease.

For examples of the use of rifaximin and formulations thereof to treat Travelers' diarrhea, see Infante R M, Ericsson C D, Zhi-Dong J, Ke S, Steffen R, Riopel L, Sack D A, DuPont, H L. Enteroaggregative *Escherichia coli* Diarrhea in Travelers: Response to Rifaximin Therapy. Clinical Gastroenterology and Hepatology. 2004; 2:135-138; and Steffen R, M.D., Sack D A, M.D., Riopel L, Ph.D., Zhi-Dong J, Ph.D., Sturchler M, M.D., Ericsson C D, M.D., Lowe B, M. Phil., Waiyaki P, Ph.D., White M, Ph.D., DuPont H L, M.D. Therapy of Travelers' Diarrhea With Rifaximin on Various Continents. The American Journal of Gastroenterology. May 2003, Volume 98, Number 5, all of which are incorporated herein by reference in their entirety.

One embodiment pharmaceutical compositions comprising rifaximin or any polymorphic form thereof and a pharmaceutically acceptable carrier. That is, formulations may contain only one polymorph or may contain a mixture of more than one polymorph. Polymorph, in this context, refers to any physical form, hydrate, acid, salt or the like of rifaximin. Mixtures may be selected, for example on the basis of desired amounts of systemic adsorption, dissolution profile, desired location in the digestive tract to be treated, and the like. The pharmaceutical composition further comprises excipients, for example, one or more of a diluting agent, binding agent, lubricating agent, disintegrating agent, coloring agent, flavoring agent or sweetening agent. Compositions may be formulated for selected coated and uncoated tablets, hard and soft gelatin capsules, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packet. For example, compositions may be formulated for topical use, for example, ointments, pomades, creams, gels and lotions.

In an embodiment, the rifamycin class antibiotic (e.g., rifaximin) is administered to the subject using a pharmaceutically-acceptable formulation, e.g., a pharmaceutically-acceptable formulation that provides sustained delivery of the rifamycin class antibiotic (e.g., rifaximin) to a subject for at least 12 hours, 24 hours, 36 hours, 48 hours, one week, two weeks, three weeks, or four weeks after the pharmaceutically-acceptable formulation is administered to the subject.

In certain embodiments, these pharmaceutical compositions are suitable for topical or oral administration to a subject. In other embodiments, as described in detail below, the pharmaceutical compositions of the present invention may be specially formulated for administration in solid or liquid form, including those adapted for the following: (1) oral administration, for example, drenches (aqueous or non-aqueous solutions or suspensions), tablets, boluses, powders, granules, pastes; (2) parenteral administration, for example, by subcutaneous, intramuscular or intravenous injection as, for example, a sterile solution or suspension; (3) topical application, for example, as a cream, ointment or spray applied to the skin; (4) intravaginally or intrarectally, for example, as a

pessary, cream or foam; or (5) aerosol, for example, as an aqueous aerosol, liposomal preparation or solid particles containing the compound.

The phrase "pharmaceutically acceptable" refers to those rifamycin class antibiotic (e.g., rifaximin) described herein, compositions containing such compounds, and/or dosage forms which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio.

The phrase "pharmaceutically-acceptable carrier" includes pharmaceutically-acceptable material, composition or vehicle, such as a liquid or solid filler, diluent, excipient, solvent or encapsulating material, involved in carrying or transporting the subject chemical from one organ, or portion of the body, to another organ, or portion of the body. Each carrier must be "acceptable" in the sense of being compatible with the other ingredients of the formulation and not injurious to the patient. Some examples of materials which can serve as pharmaceutically-acceptable carriers include: (1) sugars, such as lactose, glucose and sucrose; (2) starches, such as corn starch and potato starch; (3) cellulose, and its derivatives, such as sodium carboxymethyl cellulose, ethyl cellulose and cellulose acetate; (4) powdered tragacanth; (5) malt; (6) gelatin; (7) talc; (8) excipients, such as cocoa butter and suppository waxes; (9) oils, such as peanut oil, cottonseed oil, safflower oil, sesame oil, olive oil, corn oil and soybean oil; (10) glycols, such as propylene glycol; (11) polyols, such as glycerin, sorbitol, mannitol and polyethylene glycol; (12) esters, such as ethyl oleate and ethyl laurate; (13) agar; (14) buffering agents, such as magnesium hydroxide and aluminum hydroxide; (15) alginic acid; (16) pyrogen-free water; (17) isotonic saline; (18) Ringer's solution; (19) ethyl alcohol; (20) phosphate buffer solutions; and (21) other non-toxic compatible substances employed in pharmaceutical formulations.

Wetting agents, emulsifiers and lubricants, such as sodium lauryl sulfate and magnesium stearate, as well as coloring agents, release agents, coating agents, sweetening, flavoring and perfuming agents, preservatives and antioxidants can also be present in the compositions.

Examples of pharmaceutically-acceptable antioxidants include: (1) water soluble antioxidants, such as ascorbic acid, cysteine hydrochloride, sodium bisulfate, sodium metabisulfite, sodium sulfite and the like; (2) oil-soluble antioxidants, such as ascorbyl palmitate, butylated hydroxyanisole (BHA), butylated hydroxytoluene (BHT), lecithin, propyl gallate, alpha-tocopherol, and the like; and (3) metal chelating agents, such as citric acid, ethylenediamine tetraacetic acid (EDTA), sorbitol, tartaric acid, phosphoric acid, and the like.

Compositions containing a rifamycin class antibiotic (e.g., rifaximin) include those suitable for oral, nasal, topical (including buccal and sublingual), rectal, vaginal, aerosol and/or parenteral administration. The compositions may conveniently be presented in unit dosage form and may be prepared by any methods well known in the art of pharmacy. The amount of active ingredient which can be combined with a carrier material to produce a single dosage form will vary depending upon the host being treated, the particular mode of administration. The amount of active ingredient which can be combined with a carrier material to produce a single dosage form will generally be that amount of the compound which produces a therapeutic effect. Generally, out of one hundred percent, this amount will range from about 1% to about 99% of active ingredient, preferably from about 5% to about 70%, most preferably from about 10% to about 30%.

Liquid dosage forms for oral or rectal administration of the rifamycin class antibiotic (e.g., rifaximin) include pharmaceutically-acceptable emulsions, microemulsions, solutions, suspensions, syrups and elixirs. In addition to the active ingredient, the liquid dosage forms may contain inert diluents commonly used in the art, such as, for example, water or other solvents, solubilizing agents and emulsifiers, such as ethyl alcohol, isopropyl alcohol, ethyl carbonate, ethyl acetate, benzyl alcohol, benzyl benzoate, propylene glycol, 1,3-butylene glycol, oils (in particular, cottonseed, groundnut, corn, germ, olive, castor and sesame oils), glycerol, tetrahydrofuryl alcohol, polyethylene glycols and fatty acid esters of sorbitan, and mixtures thereof.

In addition to inert diluents, the oral compositions can include adjuvants such as wetting agents, emulsifying and suspending agents, sweetening, flavoring, coloring, perfuming and preservative agents.

Suspensions, in addition to the active rifamycin class antibiotic (e.g., rifaximin) may contain suspending agents as, for example, ethoxylated isostearyl alcohols, polyoxyethylene sorbitol and sorbitan esters, microcrystalline cellulose, aluminum metahydroxide, bentonite, agar-agar and tragacanth, and mixtures thereof.

Pharmaceutical compositions of the invention for rectal or vaginal administration may be presented as a suppository, which may be prepared by mixing one or more rifamycin class antibiotic (e.g., rifaximin) with one or more suitable nonirritating excipients or carriers comprising, for example, cocoa butter, polyethylene glycol, a suppository wax or a salicylate, and which is solid at room temperature, but liquid at body temperature and, therefore, will melt in the rectum or vaginal cavity and release the active agent. Compositions which are suitable for vaginal administration can include pessaries, tampons, creams, gels, pastes, foams or spray formulations containing such carriers as are known in the art to be appropriate.

Dosage forms for the topical or transdermal administration of a rifamycin class antibiotic (e.g., rifaximin) can include powders, sprays, ointments, pastes, creams, lotions, gels, solutions, patches and inhalants. The active rifamycin class antibiotic (e.g., rifaximin) may be mixed under sterile conditions with a pharmaceutically-acceptable carrier, and with any preservatives, buffers, or propellants which may be required.

The ointments, pastes, creams and gels may contain, in addition to rifamycin class antibiotic (e.g., rifaximin), excipients, such as animal and vegetable fats, oils, waxes, paraffins, starch, tragacanth, cellulose derivatives, polyethylene glycols, silicones, bentonites, silicic acid, talc and zinc oxide, or mixtures thereof.

Powders and sprays can contain, in addition to a rifamycin class antibiotic (e.g., rifaximin), excipients such as lactose, talc, silicic acid, aluminum hydroxide, calcium silicates and polyamide powder, or mixtures of these substances. Sprays can additionally contain customary propellants, such as chlorofluorohydrocarbons and volatile unsubstituted hydrocarbons, such as butane and propane.

The rifamycin class antibiotic (e.g., rifaximin) can be alternatively administered by aerosol. This is accomplished, for example, by preparing an aqueous aerosol, liposomal preparation or solid particles containing the compound. A non-aqueous (e.g., fluorocarbon propellant) suspension could be used. Sonic nebulizers are preferred because they minimize exposing the agent to shear, which can result in degradation of the compound.

Examples of suitable aqueous and non-aqueous carriers which may be employed in the pharmaceutical compositions can include water, ethanol, polyols (such as glycerol, propylene glycol, polyethylene glycol, and the like), and suitable mixtures thereof, vegetable oils, such as olive oil, and injectable organic esters, such as ethyl oleate. Proper fluidity can be maintained, for example, by the use of coating materials, such as lecithin, by the maintenance of the required particle size in the case of dispersions, and by the use of surfactants.

These compositions may also contain adjuvants such as preservatives, wetting agents, emulsifying agents and dispersing agents. Prevention of the action of microorganisms may be ensured by the inclusion of various antibacterial and antifungal agents, for example, paraben, chlorobutanol, phenol sorbic acid, and the like. It may also be desirable to include isotonic agents, such as sugars, sodium chloride, and the like into the compositions. In addition, prolonged absorption of the injectable pharmaceutical form may be brought about by the inclusion of agents which delay absorption such as aluminum monostearate and gelatin.

In some cases, to prolong the effect of a drug, it is desirable to alter the absorption of the drug. This may be accomplished by the use of a liquid suspension of crystalline, salt oramorphous material having poor water solubility. The rate of absorption of the drug may then depend on its rate of dissolution which, in turn, may depend on crystal size and crystalline form. Alternatively, delayed absorption of a drug form is accomplished by dissolving or suspending the drug in an oil vehicle.

When the rifamycin class antibiotic (e.g., rifaximin) are administered as pharmaceuticals, to humans and animals, they can be given per se or as a pharmaceutical composition containing, for example, 0.1 to 99.5% (more preferably, 0.5 to 90%) of active ingredient in combination with a pharmaceutically-acceptable carrier.

Regardless of the route of administration selected, the rifamycin class antibiotic (e.g., rifaximin), which may be used in a suitable hydrated form, and/or the pharmaceutical compositions of the present invention, are formulated into pharmaceutically-acceptable dosage forms by conventional methods known to those of skill in the art.

Actual dosage levels and time course of administration of the active ingredients in the pharmaceutical compositions of the invention may be varied so as to obtain an amount of the active ingredient which is effective to achieve the desired therapeutic response for a particular patient, composition, and mode of administration, without being toxic to the patient. An exemplary dose range is from 25 to 3000 mg per day.

In combination therapy treatment, both the compounds of this invention and the other drug agent(s) are administered to mammals (e.g., humans, male or female) by conventional methods. The agents may be administered in a single dosage form or in separate dosage forms. Effective amounts of the other therapeutic agents are well known to those skilled in the art. However, it is well within the skilled artisan's purview to determine the other therapeutic agent's optimal effective-amount range. In one embodiment of the invention in which another therapeutic agent is administered to an animal, the effective amount of the compound of this invention is less than its effective amount in case the other therapeutic agent is not administered. In another embodiment, the effective amount of the conventional agent is less than its effective amount in case the compound of this invention is not administered. In this way, undesired side effects associated with high doses of either agent may be minimized. Other potential advantages (including without limitation improved dosing regimens and/or reduced drug cost) will be apparent to those skilled in the art.

In various embodiments, the therapies (e.g., prophylactic or therapeutic agents) are administered less than 5 minutes apart, less than 30 minutes apart, 1 hour apart, at about 1 hour apart, at about 1 to about 2 hours apart, at about 2 hours to about 3 hours apart, at about 3 hours to about 4 hours apart, at about 4 hours to about 5 hours apart, at about 5 hours to about 6 hours apart, at about 6 hours to about 7 hours apart, at about 7 hours to about 8 hours apart, at about 8 hours to about 9 hours apart, at about 9 hours to about 10 hours apart, at about 10 hours to about 11 hours apart, at about 11 hours to about 12 hours apart, at about 12 hours to 18 hours apart, 18 hours to 24 hours apart, 24 hours to 36 hours apart, 36 hours to 48 hours apart, 48 hours to 52 hours apart, 52 hours to 60 hours apart, 60 hours to 72 hours apart, 72 hours to 84 hours apart, 84 hours to 96 hours apart, or 96 hours to 120 hours part. In preferred embodiments, two or more therapies are administered within the same patient's visit.

In certain embodiments, one or more of the rifamycin class antibiotic (e.g., rifaximin) and one or more other therapies (e.g., prophylactic or therapeutic agents) are cyclically administered. Cycling therapy involves the administration of a first therapy (e.g., a first prophylactic or therapeutic agent) for a period of time, followed by the administration of a second therapy (e.g., a second prophylactic or therapeutic agent) for a period of time, optionally, followed by the administration of a third therapy (e.g., prophylactic or therapeutic agent) for a period of time and so forth, and repeating this sequential administration, i.e., the cycle in order to reduce the development of resistance to one of the therapies, to avoid or reduce the side effects of one of the therapies, and/or to improve the efficacy of the therapies.

In certain embodiments, the administration of the same compounds may be repeated and the administrations may be separated by at least about 1 day, 2 days, 3 days, 5 days, 10 days, 15 days, 30 days, 45 days, 3 weeks, 4 weeks, 5 weeks, 6 weeks, 12 weeks, 2 months, 75 days, 3 months, or at least 6 months. In other embodiments, the administration of the same therapy (e.g., prophylactic or therapeutic agent) other than a rifamycin class antibiotic (e.g., rifaximin) may be repeated and the administration may be separated by at least at least 1 day, 2 days, 3 days, 5 days, 10 days, 15 days, 30 days, 45 days, 2 months, 75 days, 3 months, or at least 6 months. In one embodiment, a label on a rifamycin class antibiotic may instruct, for example, do not repeat more often than every 6 weeks. In another embodiment, a label on a rifamycin class antibiotic may instruct, for example, do not repeat more often than every 3 weeks. In another embodiment, a label on a rifamycin class antibiotic may instruct, for example, do not repeat more often than every 3-12 weeks. Included within ranges given herein for dosage or administration are any value within the range.

In certain embodiments, retreatment is efficacious in combination with the methods disclosed herein. See for example, Rifaximin versus Other Antibiotics in the Primary Treatment and Retreatment of Bacterial Overgrowth in IBS, Janet Yang, Hyo-Rang Lee, Kimberly Low, Soumya Chatterjee, and Mark Pimentel, Dig Dis Sci (2008) 53:169-174. For example, methods as described herein may further comprise determining symptom relief in a subject and administering a second course of rifaximin treatment if symptoms remain unre-

solved. Methods may also further comprise, for example, determining the gender of a subject and administering the therapeutically effective amount to a male subject.

Certain indications may require longer treatment times. For example, travelers' diarrhea treatment may only last from between about 12 hours to about 72 hours, while a treatment for Crohn's disease may be from between about 1 day to about 3 months and a treatment for hepatic encephalopathy may be from between 1 day and 12 months. For example, HE may require chronic therapy for the remainder of a subject's life. Crohn's disease subjects may also require chronic therapy.

Kits

Kits are also provided herein, for example, kits for treating a bowel disorder in a subject treating bowel disease (BD) with a durability of antibiotic response; methods of treating bowel disease (BD) in males; methods of treating bloating due to BD in males; methods of treating BD in older subjects; methods of treating BD in older subjects with long duration of disease; and/or methods of predicting response to rifaximin treatment for BD. The kits may contain, for example, a polymorph or amorphous form of rifaximin and instructions for use. The instructions for use may contain proscribing information, dosage information, storage information, and the like.

In one embodiment, the label describes adverse events comprising one or more of infections and infestations, gastrointestinal disorders, nervous system disorders, and musculoskeletal and connective tissue disorders.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is selected as responding to treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

In one embodiment, the label describes a length of treatment with the rifamycin class antibiotic, whereby a subject is removed from treatment if a healthcare professional prescribes the rifamycin class antibiotic according to the label instructions.

Label instructions, include, for example, instructions to take the rifamycin class antibiotic for 14 days for the treatment of dIBS. The instructions could also read, for example, take for 1650 mg/day of rifaximin for 14 days for acute treatment for symptomatic diarrhea-associated Irritable Bowel Syndrome (dIBS).

Packaged compositions are also provided, and may comprise a therapeutically effective amount of one or more of a one or more of an amorphous form, Form α, Form β, Form γ, Form δ, Form ϵ, Form ζ, or Form η polymorph of rifaximin of rifaximin and a pharmaceutically acceptable carrier or diluent, wherein the composition is formulated for treating a subject suffering from or susceptible to a bowel disorder, and packaged with instructions to treat a subject suffering from or susceptible to a bowel disorder.

## EXAMPLES

It should be appreciated that the invention should not be construed to be limited to the example, which is now described; rather, the invention should be construed to include any and all applications provided herein and all equivalent variations within the skill of the ordinary artisan.

### Example 1

This example relates to a study of rifaximin in subjects with dIBS. Subjects received daily one of BID doses of placebo, rifaximin 275 mg, 550 mg, or 1100 mg for 14 days. A fifth group of subjects received rifaximin 550 mg BID for a period of 28 days. There were two measures of efficacy assessed. Subjects were questioned on the relief of overall IBS symptoms and bloating. Adequate relief of IBS related symptoms (SGA) and IBS-related bloating (IBS-B) were assessed, and a dose of 550 mg BID for 2 weeks demonstrated statistically significant relief. The analyses defined success as a "yes" response to questions regarding adequate relief.

Predictors of response analyses showed that the response was similar across some subgroups however, there were differences. Analyses on predictors of response demonstrated that age (older subjects and those with a longer IBS duration); sex (males) and baseline severity (mild to moderate symptoms) were predictors of response. All subpopulations in the study responded to therapy. Baseline severity was determined using 7-point Lickert scales during screening for Abdominal Pain/Discomfort and Bloating, and the number, type (normal, hard, loose) and urgency of bowel movements.

Duration of effect was assessed in a follow-up period. Subjects that responded in the 4 week treatment period were followed for an additional 3 months. The subjects in the placebo group had a greater rate of decline in response than the 550 mg BID 2 week group, demonstrating that subjects treated with rifaximin had a better chance of maintaining symptom relief than their placebo treated counterparts.

Percentage of Subjects with Adequate Relief of IBS and Bloating Symptoms

The effect of treatment on the percentage of subjects who reported adequate relief of IBS and bloating symptoms for at least two of the final three weeks during the treatment phase (Weeks 1 to 4) is shown in Tables 3-5 and FIGS. **4-6** below.

During the treatment phase, 52.4% of subjects on RFX 550 mg BID met the IBS symptoms responder criterion, compared with 44.2% of the placebo subjects (odds ratio of 1.6 and p value=0.0314). Similarly, 46.1% of subjects in the 550 mg BID group met the bloating symptom responder criterion, compared with 39.6% of the placebo group (odds ratio of 1.6 and p value=0.0402).

TABLE 3

Percentage of Subjects with Adequate Relief of IBS and Bloating Symptoms - ITT Population

| Measure | Placebo [N = 197] | RFX 550 mg BID [N = 191] | Odds Ratio Estimate (95% CI) | P-Value |
|---|---|---|---|---|
| IBS Symptoms | 44.2% | 52.4% | 1.60 (1.04, 2.45) | 0.0314 |
| Bloating Symptom | 39.6% | 46.1% | 1.58 (1.02, 2.45) | 0.0402 |

TABLE 4

Percentage of Subjects with Number of Weeks with Adequate Relief of IBS Symptoms - ITT Population

| Number of Weeks - IBS Symptoms | Placebo [N = 197] | RFX 550 mg BID [N = 191] | Odds Ratio Estimate | P-Value |
|---|---|---|---|---|
| | | | 1.54 (1.07, 2.24) | 0.0216 |
| 0 | 45% | 33% | | |
| 1 | 7% | 11% | | |
| 2 | 15% | 15% | | |
| 3 | 16% | 23% | | |
| 4 | 15% | 16% | | |

TABLE 5

| Percentage of Subjects with Number of Weeks with Adequate Relief of Bloating Symptoms - ITT Population | | | | |
|---|---|---|---|---|
| Number of Weeks Bloating Symptom | Placebo [N = 197] | RFX 550 mg BID [N = 191] | Odds Ratio Estimate | P-Value |
| | | | 1.57 (1.08, 2.29) | 0.0182 |
| 0 | 47% | 35% | | |
| 1 | 10% | 14% | | |
| 2 | 12% | 15% | | |
| 3 | 15% | 20% | | |
| 4 | 13% | 14% | | |

Daily Symptom Score

Subjects recorded the following information on dIBS symptoms daily throughout the duration of the study:

- Number of normal stools/day;
- Number of hard and lumpy stools/day;
- Number of loose or watery stools/day;
- Number of loose or watery stools/day with the symptom of urgency;
- How bothersome is abdominal pain and discomfort? [7-point response scale: 0 (not at all) to 6 (a very great deal)];
- How bothersome is bloating? [(7-point response scale: 0 (not at all) to 6 (a very great deal)].

Changes from baseline variables were computed for each weekly summary score.

Long Term Follow-Up of Adequate Relief

The study assessed the effect over 12 weeks of follow-up on long-term adequate relief. Subjects who had adequate relief by Week 4 and remained symptom-free at Week 5 were followed during the post-treatment phase and shown in FIGS. **1** and **2**. Superiority to placebo was maintained during the 12 weeks post-treatment follow-up. Results for IBS symptoms were RFX 550 mg BID 62.3% versus placebo 49.2%, and RFX 550 mg BID 59.3% versus 50.9% for placebo for the symptom of bloating through week 16. In assessing the follow-up data, there was statistical significance ($p<0.05$) of bloating and IBS symptoms for RFX 550 mg BID versus placebo.

TABLE 6

| Adequate Relief of Bloating, Post Treatment | | PBO 4 w (N = 57) n (%) | RFX 550 2 w (N = 54) n (%) |
|---|---|---|---|
| Week 6 | Success | 47 (82.5%) | 49 (90.7%) |
| | Failures | 10 (17.5%) | 5 (9.3%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.1303, odds ratio: 3.840 (0.672, 21.95) | | | |
| Week 7 | Success | 47 (82.5%) | 45 (83.3%) |
| | Failures | 10 (17.5%) | 9 (16.7%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.1311, odds ratio: 2.931 (0.726, 11.84) | | | |
| Week 8 | Success | 46 (80.7%) | 47 (87.0%) |
| | Failures | 11 (19.3%) | 7 (13.0%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.2858, odds ratio: 2.107 (0.536, 8.276) | | | |
| Week 9 | Success | 36 (63.2%) | 39 (72.2%) |
| | Failures | 21 (36.8%) | 15 (27.8%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0814, odds ratio: 2.737 (0.882, 8.492) | | | |
| Week 10 | Success | 32 (56.1%) | 39 (72.2%) |
| | Failures | 25 (43.9%) | 15 (27.8%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0217, odds ratio: 3.828 (1.217, 12.04) | | | |

TABLE 6-continued

| Adequate Relief of Bloating, Post Treatment | | PBO 4 w (N = 57) n (%) | RFX 550 2 w (N = 54) n (%) |
|---|---|---|---|
| Week 11 | Success | 31 (54.4%) | 35 (64.8%) |
| | Failures | 26 (45.6%) | 19 (35.2%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0398, odds ratio: 3.115 (1.054, 9.205) | | | |

TABLE 7

| Adequate Relief of Bloating, Post Treatment | | PBO 4 w (N = 57) n (%) | RFX 550 2 w (N = 54) n (%) |
|---|---|---|---|
| Week 12 | Success | 32 (56.1%) | 36 (66.7%) |
| | Failure | 25 (43.9%) | 18 (33.3%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0596, odds ratio: 2.891 (0.958, 8.726) | | | |
| Week 13 | Success | 29 (50.9%) | 33 (61.1%) |
| | Failure | 28 (49.1%) | 21 (38.9%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0142, odds ratio: 4.187 (1.333, 13.15) | | | |
| Week 14 | Success | 29 (50.9%) | 34 (63.0%) |
| | Failure | 28 (49.1%) | 20 (37.0%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0121, odds ratio: 4.230 (1.372, 13.05) | | | |
| Week 15 | Success | 30 (52.6%) | 31 (57.4%) |
| | Failure | 27 (47.4%) | 23 (42.6%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0391, odds ratio: 3.323 (1.062, 10.40) | | | |
| Week 16 | Success | 29 (50.9%) | 32 (59.3%) |
| | Failure | 28 (49.1%) | 22 (40.7%) |
| Comparison of RFX 550 2 w vs. PBO p-value: 0.0212, odds ratio: 3.700 (1.216, 11.25) | | | |

TABLE 8

| Baseline Disease Characteristics Across All Treatment Groups | | |
|---|---|---|
| Daily Symptom | Median | Min, Max |
| Total No. bowel movements/day | 3.0 | 1, 15 |
| No. loose/watery bowel movements/day | 2.0 | 0, 10 |
| No. loose/watery with urgency | 1.6 | 0, 10 |
| Abdominal pain/discomfort* | 3.4 | 0, 6 |
| Bloating* | 3.4 | 0, 6 |

*7 pt. scale asking "How bothersome . . ." [0 = not at all to 6 = a very great deal]

Two measures of efficacy were assessed independently. The first was the proportion of subjects who provided a 'yes' response to the weekly SGA question: "In the past 7 days, have you had adequate relief of your IBS symptoms? (yes/no)". The second endpoint was the proportion of subjects who provide a 'yes' response to the weekly individual symptom question: "In the past 7 days, have you had adequate relief of your symptom of bloating? (yes/no)". Durability was based on the proportion of subjects that had adequate relief over the entire treatment phase.

TABLE 9

Summary of Correlation between Subjects Satisfied with Relief of Bloating Discomfort and Relief of IBS Symptoms

| Time Point | Number of Subject | Relief [1] | Responder [2] | Non-Responder [2] | Spearman Correlation Coefficient |
|---|---|---|---|---|---|
| Week 1 | 680 | Yes | 49/169 (29.0%) | 45/511 (8.8%) | 0.2508 |
| | | No | 120/169 (71.0%) | 458/511 (89.6%) | |
| | | Missing | | 8/511 (1.6%) | |
| Week 2 | 680 | Yes | 113/274 (41.2%) | 50/406 (12.3%) | 0.3218 |
| | | No | 159/274 (58.0%) | 327/406 (80.5%) | |
| | | Missing | 2/274 (0.7%) | 29/406 (7.1%) | |
| Week 3 | 680 | Yes | 130/303 (42.9%) | 48/377 (12.7%) | 0.3201 |
| | | No | 169/303 (55.8%) | 281/377 (74.5%) | |
| | | Missing | 4/303 (1.3%) | 48/377 (32.7%) | |
| Week 4 | 680 | Yes | 145/309 (46.9%) | 52/371 (14.0%) | 0.3362 |
| | | No | 153/309 (49.5%) | 252/371 (67.9%) | |
| | | Missing | 11/309 (3.6%) | 67/371 (18.1%) | |

[1] Responses to the questions 'How bothersome was your bloating today?' include: 0 = not at all, 1 = hardly, 2 = somewhat, 3 = moderately, 4 = a good deal, 5 = a great deal, 6 = a very great deal; Relief is score of 0 or 1.
[2] Responder is defined as relief of IBS symptoms.

TABLE 10

Efficacy Analysis:
Adequate Relief of IBS Symptoms and Bloating at the End of the Treatment Phase

| Category | | PBO 4 w (N = 197) n (%) | RFX 275 2 w (N = 95) n (%) | RFX 550 2 w (N = 191) n (%) | RFX 1100 2 w (N = 99) n (%) | RFX 550 4 w (N = 98) n (%) |
|---|---|---|---|---|---|---|
| Gender | | | | | | |
| Male | Adequate Relief of IBS Symptoms [1] | | | | | |
| | Success | 17 (32.7%) | 5 (35.7%) | 29 (53.7%) | 12 (46.2%) | 7 (31.8%) |
| | Failure | 35 (67.3%) | 9 (64.3%) | 25 (46.3%) | 14 (53.8%) | 15 (68.2%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.0326, odds ratio: 2.511 (1.079, 5.842) | | | | | |
| | Adequate Relief of Bloating [2] | | | | | |
| | Success | 17 (32.7%) | 6 (42.9%) | 25 (46.3%) | 10 (38.5%) | 6 (27.3%) |
| | Failure | 35 (67.3%) | 8 (57.1%) | 29 (53.7%) | 16 (61.5%) | 16 (72.7%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.0802, odds ratio: 2.143 (0.912, 5.057) | | | | | |
| Female | Adequate Relief of IBS Symptoms [1] | | | | | |
| | Success | 70 (48.3%) | 35 (43.2%) | 71 (51.8%) | 29 (39.7%) | 34 (44.7%) |
| | Failure | 75 (51.7%) | 46 (56.8%) | 66 (48.2%) | 44 (60.3%) | 42 (55.3%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.7608, odds ratio: 1.073 (0.665, 1.747) | | | | | |
| | Adequate Relief of Bloating [2] | | | | | |
| | Success | 61 (42.1%) | 29 (35.8%) | 63 (46.0%) | 28 (38.4%) | 32 (42.1%) |
| | Failure | 84 (57.9%) | 52 (64.2%) | 74 (54.0%) | 45 (61.6%) | 44 (57.9%) |
| | Comparison of RFX 550 2 w vs. PBO p-value: 0.5366, odds ratio: 1.166 (0.716, 1.898) | | | | | |

[1] Subjects achieved success if they reported a 'yes' response to whichever question about IBS symptoms was posed by the IVR system(i.e. adequate relief or control) for = 2 out of the 3 final treatment weeks.
[2] Subjects achieved success if they reported a 'yes' response to whichever question about symptoms of bloating was posed by the IVR system (i.e. adquate relief or control) for = 2 out of the 3 final treatment weeks.

The treatment effect is more pronounced when accounting for milder disease severity, i.e., bloating, abdominal pain/discomfort and bowel movements.

Example 2

A study (FIG. **3**) is designed to evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg TID in providing adequate relief from diarrhea-associated IBS (dIBS) symptoms over four weeks. A measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) questions over the 4 week study duration in relation to their IBS symptoms. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your IBS symptoms?" (Yes/No.) Subjects in the treatment group taking oral rifaximin respond "Yes" more often than Subjects who are not taking oral rifaximin. Another measure of efficacy is based on subjects' answers to the Weekly Subject Global Assessment (SGA) question over the 4 week study duration in relation to their IBS symptom of bloating. The SGA question is asked weekly as follows: "In the past 7 days, have you had adequate relief of your IBS symptom of bloating?" (Yes/No. Subjects in the treatment group taking oral rifaximin respond "Yes" more often than subjects who are not taking oral rifaximin. Other measures of efficacy include the changes in dIBS symptoms from baseline to each week of the 4 weeks in the study (e.g., abdominal pain and discomfort, bloating, number of stools per day, stool consistency, urgency with loose or watery stools).

Example 3

Improvements in Quality of Life

A study showed the rifaximin 550 mg twice daily (BID) significantly improved IBS symptoms versus placebo in

Case 1:24-cv-00436-RGA Document 59-1 Filed 11/30/24 Page 143 of 852 PageID #: 3118



patients with diarrhea-predominant IBS (IBS-D). Analyses from that study evaluated the efficacy of rifaximin for improving quality of life (QOL) measures in patients with IBS-D.

Adults diagnosed with IBS-D (Rome II criteria) received rifaximin 550 mg BID or placebo for 14 days. Both groups received placebo for an additional 14 days after the initial 2-week treatment. Quality of life was assessed with the 34-item IBS-QOL questionnaire at baseline and 4 weeks after initiating treatment. Each item was scored on a 5-point scale (1=not at all; 2=slightly; 3=moderately; 4=quite a bit; and 5=extremely or a great deal). Results for composite and subscale scores were converted to a scale ranging from 0 to 100, with higher scores indicating better QOL.

A total of 388 patients were treated; 191 patients received rifaximin and 197 patients received placebo during the 2-week initial treatment period. The mean improvement from baseline in overall QOL scores at week 4 was significantly greater with rifaximin compared with placebo (Table 11). Patients in the rifaximin group reported significantly greater mean improvement from baseline in QOL scores for dysphoria, body image, health worry, social reaction, and relationship subscales compared with placebo (Table 11). Rifaximin was well tolerated, with similar incidence of adverse events compared with placebo.

In patients with IBS-D, rifaximin 1100 mg/d for 14 days significantly improved QOL measures compared with placebo. These findings suggest a potential therapeutic role for rifaximin 550 mg BID for improving symptoms and QOL in patients with IBS-D and are summarized in Table 11.

TABLE 11

Mean Change From Baseline in IBS-QOL Scores at Week 4

| Domain | Rifaximin 1100 mg/d (n = 191) | Placebo (n = 197) | Improvement with rifaximin over placebo, % | P value |
|---|---|---|---|---|
| Overall score | 20.4 | 15.8 | 28.7 | 0.020 |
| Dysphoria | 24.8 | 19.8 | 25.3 | 0.027 |
| Interference with activity | 22.2 | 18.1 | 22.2 | 0.083 |
| Body image | 20.1 | 14.6 | 37.4 | 0.012 |
| Health worry | 16.0 | 12.2 | 30.6 | 0.047 |
| Food avoidance | 25.0 | 20.5 | 22.1 | 0.088 |
| Social reaction | 17.3 | 13.2 | 31.6 | 0.047 |
| Sexual | 13.6 | 10.9 | 24.9 | 0.199 |
| Relationship | 14.9 | 10.7 | 39.5 | 0.030 |

A 2-week course of rifaximin (1100 mg/day) significantly improved quality of life (QOL) measures, compared with placebo.

In a study, 191 adult patients diagnosed with diarrhea-predominant IBS (IBS-D) by Rome II criteria were randomized to receive rifaximin 550 mg twice daily (BID) and 197 patients were randomized to placebo. Following a 2-week initial treatment period, both groups of patients received placebo for an additional 14 days. Quality of life was assessed via the 34-item IBS-QOL questionnaire at baseline and 4 weeks after initiating treatment. Each item was scored on a 5-point scale (1=not at all; 2=slightly; 3=moderately; 4=quite a bit; 5=extremely or a great deal); results for composite and subscale scores were converted to a scale ranging from 0 to 100, with higher scores indicating better QOL.

At Week 4, the mean improvement from baseline in the overall QOL score was significantly greater with rifaximin compared with placebo (20.4 vs. 15.8, respectively; p=0.020). Patients in the rifaximin group also reported significantly greater mean improvement from baseline in QOL subscale scores for dysphoria (restlessness or agitation, 24.8 vs. 19.8; p=0.027), body image (20.1 vs. 14.6; p=0.012), health worry (16.0 vs. 12.2; p=0.047), social reaction (17.3 vs. 13.2; p=0.047), and relationships (14.9 vs. 10.7; p=0.030), compared with placebo. Rifaximin was well tolerated in the study, with a similar incidence of adverse events compared with placebo.

## Example 4

### Severity of Baseline Symptoms as Predictor of Clinical Response

It is reported herein that the severity of baseline symptoms of abdominal pain and bloating influenced the response to rifaximin treatment. The co-primary endpoints in this analysis assessed weekly yes/no responses to questions regarding adequate relief of global IBS symptoms and IBS-associated bloating. Severity of baseline IBS symptoms was evaluated as a potential confounder of clinical response and was categorized as mild/moderate or severe based on a mean score of ≦4 vs. >4 (on a 7-point scale) for bloating and abdominal pain.

A significantly larger percentage of patients treated with rifaximin reported adequate relief of global IBS symptoms (52% vs. 44% for placebo; p=0.03) and bloating (46% vs. 40%; p=0.04), compared with placebo-treated patients. In patients with mild/moderate abdominal pain, rifaximin produced a greater degree of improvement, compared with placebo, in global symptoms of IBS (50% vs. 39%, respectively; p=0.04) and bloating (44% vs. 35%; p=0.09). Similarly, in patients with mild/moderate bloating, rifaximin treatment was associated with greater improvement, compared with placebo, in global IBS symptoms (56% vs. 41%, respectively; p=0.006) and bloating (47% vs. 36%; p=0.03). This demonstrates that patients with mild/moderate IBS symptoms are more likely than those with severe disease to achieve symptomatic relief with rifaximin.

These results show that rifaximin improves gastrointestinal (GI) symptoms associated with IBS. In this study of rifaximin versus placebo, patients with diarrhea-predominant IBS (IBS-D) were studied, a supplemental analysis examined the association between severity of baseline IBS symptoms and clinical response to rifaximin.

A comparison involved 2 groups of adult patients with IBS-D (Rome II) who received rifaximin 550 mg twice daily or placebo for 14 days, followed by an additional 14 days of placebo in both groups. The Weekly yes/no responses to questions regarding adequate relief of global IBS symptoms and IBS-associated bloating were assessed. Clinical response was defined as adequate relief for 2 of the final 3 treatment weeks (wk 2, 3, or 4). Severity of baseline IBS symptoms was evaluated as a potential confounder of clinical response and was categorized as mild/moderate or severe based on a mean score of ≦4 versus >4 (on a 7-point scale (0=not bothersome; 6=very bothersome)) for bloating and abdominal pain.

A significantly larger percentage of patients who received rifaximin versus placebo reported adequate relief of global IBS symptoms (52% versus 44%, respectively; P=0.03) and bloating (46% versus 40%, respectively; P=0.04). In patients with mild/moderate abdominal pain, rifaximin produced a greater degree of improvement versus placebo in symptoms of IBS (50% versus 39%, respectively; P=0.04) and bloating (44% versus 35%, respectively; P=0.09). In patients with mild/moderate bloating, rifaximin also achieved greater improvement versus placebo in global symptoms of IBS (56% versus 41%, respectively; P=0.006) and bloating (47% versus 36%, respectively; P=0.03). Severity of baseline symptoms of abdominal pain and bloating influenced the

Case 1:20-cv-00430-RGA Document 59-13 Filed 11/01/22 Page 149 of 952 PageID #: 2055



response to rifaximin 1100 mg/d for 14 days. Patients with mild/moderate IBS symptoms had a greater likelihood of relief of global IBS-related symptoms with rifaximin treatment versus individuals with severe IBS symptoms.

Incorporation by Reference

The contents of all references, patents, pending patent applications and published patents, cited throughout this application are hereby expressly incorporated by reference.

EQUIVALENTS

Those skilled in the art will recognize, or be able to ascertain using no more than routine experimentation, many equivalents to the specific embodiments of the invention described herein. Such equivalents are intended to be encompassed by the following claims.

What is claimed is:

**1**. A method of providing acute treatment for diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: administering 1650 mg/day of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms.

**2**. The method of claim **1**, wherein the 1650 mg is administered as 550 mg three times per day.

* * * * *

# EXHIBIT C

8508191

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*July 18, 2024*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** ***17/197,561***
**FILING DATE:** ***March 10, 2021***
**PATENT NUMBER:** ***11779571***
**ISSUE DATE:** ***October 10, 2023***

Certified by

Katherine Kelly Vidal

Performing the Functions and Duties of the
Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

Docket No.: 119557-04013
(PATENT)

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Utility Application of:
William Forbes et al.

Application No.: 17/197,561

Confirmation No.: 4033

Filed: March 10, 2021

Art Unit: 1629

For: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

Examiner: Not Yet Assigned

MS Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**THIRD SUPPLEMENTAL PRELIMINARY AMENDMENT**

Prior to examination on the merits, please amend the above-identified U.S. patent application as follows:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 3 of this paper.

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings of claims, in this application.

Listing of Claims

1-36. (Cancelled)

37. (Currently Amended) A method of treating bloating associated with diarrhea-predominant irritable bowel syndrome (dIBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the female subject, thereby treating bloating associated with ~~one or more symptoms of~~ dIBS in the female subject.

38-40. (Cancelled)

41. (Currently Amended) The method of Claim 37, wherein the treating of bloating comprises a reduction of bloating~~the one or more symptoms~~ from baseline symptoms established prior to treatment.

42. (Currently Amended) The method of Claim 41, wherein the reduction of bloating~~the one or more symptoms~~ is achieved following 7 days after the administration of rifaximin.

43. (Currently Amended) The method of Claim [[37]]41, wherein the reduction of bloating~~treating~~ comprises ~~a reduction in symptoms defined by~~ an affirmative response from the subject when asked whether they had a reduction in bloating~~symptoms of IBS~~.

## REMARKS

Claim 37 is now directed to treating bloating associated with diarrhea-predominant irritable bowel syndrome (dIBS) in a female subject. Dependent claims are updated accordingly. Support for this amendment can be found in the application as filed e.g., on pages 2-4 and the examples, including Example 5. No new matter is added. With entry of this amendment, Claims 37 and 41-43 are pending.

For the Examiner's reference, below please find Table 21 from Example 5 and compare the success associated with female subjects as compared to male subjects for both "Adequate Relief of IBS Symptoms" and "Adequate Relief of IBS symptom of Bloating".

TABLE 21

Subgroup Analysis: Adequate Relief of IBS Symptoms and IBS Symptom of Bloating by Treatment Group and Gender

| Gender: Male | Placebo (N = 91) N (%) | Rifaximin 550 mg TID (N = 85) N (%) | p-value |
|---|---|---|---|
| Adequate Relief of IBS symptoms [2] | | | 0.2636 |
| Success | 23 (25.3%) | 28 (32.9%) | |
| Failure | 68 (74.7%) | 57 (67.1%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.7695 |
| Success | 26 (28.6%) | 26 (30.6%) | |
| Failure | 65 (71.4%) | 59 (69.4%) | |
| **Gender: Female** | **Placebo (N = 219) N (%)** | **Rifaximin 550 mg TID (N = 226) N (%)** | **p-value** |
| Adequate Relief of IBS symptoms [2] | | | 0.0371 |
| Success | 72 (32.9%) | 96 (42.5%) | |
| Failure | 147 (67.1%) | 130 (57.5%) | |
| Adequate Relief of IBS symptom of Bloating [3] | | | 0.0075 |
| Success | 68 (31.1%) | 98 (43.4%) | |
| Failure | 151 (68.9%) | 128 (56.6%) | |

Please charge any deficiency in the fees filed herewith to our Deposit Account No. 50-4876, under Docket No. 119557-04013, from which the undersigned is authorized to draw.

Dated: February 8, 2023

Respectfully submitted,

Electronic signature: /Michael DeGrazia/
Michael DeGrazia, Ph.D.
Registration No.: 68,901
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6575
(617) 607-9200 (Fax)
Attorney/Agent For Applicant

# EXHIBIT D

8508191

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*July 18, 2024*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** *17/892,982*
**FILING DATE:** *August 22, 2022*
**PATENT NUMBER:** *11564912*
**ISSUE DATE:** *January 31, 2023*

Certified by

Katherine Kelly Vidal

Performing the Functions and Duties of the
Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

Docket No.: 119557-04014
(PATENT)

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Utility Application of:
William Forbes et al.

Application No.: To be Assigned

Confirmation No.: To be Assigned

Filed: Filed Herewith

Art Unit: To be Assigned

For: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

Examiner: To be Assigned

**Track One Expedited Examination**
MS Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**PRELIMINARY AMENDMENT**

Please amend the above-identified U.S. patent application as follows:

**Amendments to the Specification** begin on page 2 of this paper.

**Amendments to the Claims** begin on page 3 of this paper.

**Remarks** begin on page 5 of this paper.

## AMENDMENTS TO THE SPECIFICATION

Please see the clean copy and the marked up copy of the Substitute Specification filed herewith.

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings of claims, in this application.

Listing of Claims

1-36. (Cancelled)

37. (New) A method of treating one or more symptoms of irritable bowel syndrome (IBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the female subject, thereby treating one or more symptoms of IBS in the female subject.

38. (New) The method of Claim 37, wherein the one or more symptoms are selected from one or more of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and urgency.

39. (New) The method of Claim 37, wherein the IBS is diarrhea-predominant IBS.

40. (New) The method of Claim 37, wherein the IBS is alternating IBS.

41. (New) The method of Claim 37, wherein the treating one or more symptoms of IBS comprises a reduction of the one or more symptoms from baseline symptoms established prior to treatment.

42. (New) The method of Claim 41, wherein the reduction of the one or more symptoms is achieved following 7 days after the administration of rifaximin.

43. (New) The method of Claim 37, wherein treating one or more symptoms of IBS comprises a reduction in symptoms defined by an affirmative response from the subject when asked whether they had a reduction in symptoms of IBS.

**REMARKS**

Applicant has amended the specification in compliance with 37 C.F.R. §§ 1.52, 1.121(b)(3), and 1.125. Applicant has removed the shading from Tables 25B on page 61 and Table 25 on page 64. Applicant has updated the drawing description section so each figure label matches the drawings as filed herein. Applicant has also formatted the Substitute Specification to amend the font on pages 44-45 to Times New Roman and to add page numbers to pages 39-40, 48, and 50-65. No new matter is added by these amendments.

The original claims in this application have been cancelled and replaced by new Claims 37-43. These new claims correspond to Claims 1-7 of issued U.S. patent No. 10/765,667, except that the subject population is now gender specific (females) and without an age restriction. Support for this update can be found in the application as filed, e.g., page 4, lines 20-21 and the clinical data in Table 14.

No new matter is added. With entry of this amendment, Claims 37-43 are pending.

Please charge any deficiency in the fees filed herewith to our Deposit Account No. 50-4876, under Docket No. 119557-04014, from which the undersigned is authorized to draw.

Dated: August 22, 2022

Respectfully submitted,
Electronic signature: /Michael J. DeGrazia, Ph.D./

Michael J. DeGrazia, Ph.D.
Registration No.: 68,901
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6500
(617) 607-9200 (Fax)
Attorney/Agent For Applicant

# EXHIBIT E

**CONTAINS INFORMATION MARKED AS CONFIDENTIAL INFORMATION**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A., and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC and AMNEAL EU, LIMITED,<br><br>Defendants. | Case No. 1:24-CV-04607-JFM |
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>NORWICH PHARMACEUTICALS, INC.,<br><br>Defendant. | Case No. 1:24-CV-07140-JFM |

# EXPERT REPORT OF DR. DAVID A. JOHNSON REGARDING VALIDITY OF THE ASSERTED IBS-D PATENTS

I declare under penalty of perjury under the laws of the United States that the following is true and correct. Executed in Norfolk, Virginia on October 17, 2025.

Dr. David A. Johnson

## III. COMPENSATION

6. I am being compensated for my time spent on this matter at my usual and customary rate of $700 per hour. My compensation is not related to the outcome of this action, and I have no financial interest in the outcome of this action.

## IV. PRIOR TESTIMONY

7. A list of all the times I have testified as an expert at trial or by deposition can be found in my CV attached as **Exhibit A**.

## V. MATERIALS CONSIDERED

8. In preparing my opinion, I have reviewed the materials identified in **Exhibit B** to this Report, as well as any other materials referenced herein.

9. In preparing my opinion, I also relied upon my over 49 years of experience in the medical field; however, the testimony I offer is from the perspective of a person of ordinary skill in the art ("POSITA") as discussed below.

## VI. SUMMARY OF OPINIONS

10. In my opinion, the asserted claim of the '571 Patent are valid.

11. Claims 1-4 of the '571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

12. Claim 4 of the '571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol, in further view of Sharara.

13. Claims 1-4 of the '571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Cuoco and the RFIB 2001 Study Protocol.

14. Claim 4 of the '571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Cuoco and the RFIB 2001 Study Protocol, in further view of Sharara.

15. Claims 1-4 of the ’571 Patent would not have been obvious to a POSITA as of February 26, 2008 over the Weinstock Email in view of Pimentel 2006 or the RFIB 2001 Study Protocol.

16. Claim 4 of the ’571 Patent would not have been obvious to a POSITA as of February 26, 2008 over the Weinstock Email in view of Pimentel 2006 or the RFIB 2001 Study Protocol, in further view of Sharara.

17. In my opinion, multiple objective indicia with a nexus to the Asserted Claims exist, indicating the claimed methods of claims 1–4 of the ’571 Patent are not obvious.

18. In my opinion, the asserted claim of the ’912 Patent are valid.

19. Claims 1-7 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

20. Claim 7 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol and further in view of Sharara.[2]

21. Claims 1-7 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Cuoco in view of the RFIB 2001 Study Protocol.

22. Claim 7 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Cuoco in view of the RFIB 2001 Study Protocol, in further view of Sharara.

---

[2] In his Summary of Opinions, Dr. Harary opines claim 2 of the ’912 Patent would have been obvious over (1) Pimentel 2006 in view of the RFIB 2001 Study Protocol, in further view of Sharara; (2) Cuoco in view of the RFIB 2001 Study Protocol, in further view of Sharara; and (3) the Weinstock Email in view of the RFIB 2001 Study Protocol or Pimentel 2006, in further view of Sharara. Harary Opening Report ¶ 41. However, his analysis of these alternative combinations relates only to claim 7. *Id.* ¶¶ 381-391, 456-462, 538-544.

23. Claims 1-7 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over the Weinstock Email in view of Pimentel 2006 or the RFIB 2001 Study Protocol.

24. Claim 7 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over the Weinstock Email in view of Pimentel 2006 or the RFIB 2001 Study Protocol, in further view of Sharara.

25. In my opinion, multiple objective indicia with a nexus to the Asserted Claims exist, indicating the claimed methods of claims 1-7 of the ’912 Patent are not obvious.

26. Claim 2 of the ’912 Patent is not invalid for lack of written description.

27. The claims of the ’571 and ’912 Patents are materially different than the claims of the patents adjudicated in *Salix Pharm., Ltd. v. Norwich Pharm., Inc.*, No. CV 20-430-RGA, 2022 WL 3225381 (D. Del. Aug. 10, 2022), *aff’d*, 98 F.4th 1056 (Fed. Cir. 2024).

28. Both Provisional Application No. 61/031,679 and Provisional Application No. 61/102,801 contain adequate written description to demonstrate the inventors had possession of the asserted claims of the ’912 and ’571 Patents when those applications were filed.

## VII. SUMMARY OF APPLICABLE LEGAL STANDARDS

29. This section describes my understanding of currently applicable legal principles based on my conversations with counsel, which I have used in forming the opinions set forth herein. I have used my understanding of these legal principles, as set forth in this section, to analyze the validity of the IBS-D Patents. However, I am not a legal expert, and I do not offer legal opinions.

30. I have been informed by counsel and understand that issued patent claims are presumed valid by law, and defendants bear the burden of overcoming this presumption of validity by clear and convincing evidence, meaning it is highly likely to be true. I further have been

informed by counsel and understand that where the examiner has considered prior art during prosecution, the clear and convincing burden becomes particularly important.

**A. Obviousness**

31. I have been informed by counsel and understand that a patent claim is obvious if, at the time of the invention, its subject matter as a whole would have been obvious to a POSITA.

32. I have been informed by counsel and understand that the court will determine whether the claimed invention is obvious by assessing (i) the scope and content of the prior art; (ii) the differences between the prior art and the claims; (iii) the level of ordinary skill in the art; and (iv) relevant objective evidence of non-obviousness. To show obviousness, Defendants must establish by clear and convincing evidence that a POSITA would have been motivated to combine the teachings in the prior art to achieve the claimed invention and would have had a reasonable expectation of success in achieving the claimed invention.

33. I further have been informed by counsel and understand that a showing that the prior art includes separate references disclosing separate limitations is not enough to show a claim is obvious. Instead, the party asserting obviousness must how that a POSITA would have combined those elements in the prior art to successfully achieve the claimed limitation. It likewise is not enough to show that a POSITA would have tried numerous possibilities until she achieved the claimed invention. Indeed, modification of an element of the prior art, such as a drug dose, may be patentable if it produces an unexpected result or the prior art teaches away or did not recognize that modification.

34. I have been informed by counsel and understand that an inventor's own work is not prior art and cannot be used to invalidate patents protecting his or her inventions. Defendants have the burden of showing clear and convincing evidence that the prior art on which they rely is not the inventor's work.

35. I have been informed by counsel and understand that references published after the priority date of a patent cannot be used to invalidate that patent. Defendants have the burden of showing by clear and convincing evidence that the prior art they rely on is not published after the priority date of the Asserted Patents.

36. I have been informed by counsel and understand that, objective evidence of non-obviousness causally related to the claimed invention is relevant to the validity analysis, including (1) a long-felt but unmet need, (2) unexpected results, (3) commercial success and (4) skepticism.

**B. Written Description**

37. I have been informed by counsel and understand that the law requires a patent specification to contain a written description of the claimed invention. I further understand that description must convey to a POSITA with reasonably clarity that the inventor was in possession of the claimed invention as of the filing date of the patent.

38. I understand that to satisfy the written description requirement, a patent specification need not contain examples or actual reduction to practice, or describe every possible future embodiment of the invention. It need only describe the invention so that a POSITA would understand that the inventor had made the invention at the time of the filing. I further understand from counsel that prophetic examples can be enough to satisfy the written description requirement.

**C. Collateral Estoppel**

39. I understand that Defendants allege Plaintiffs are collaterally estopped from asserting the IBS-D Patents in this cased based on the decision in *Norwich I* invaliding claims in other patents. In other words, the *Norwich I* decision also invalidates the Asserted Claims. I have been informed by counsel and understand that collateral estoppel only applies where the differences between the invalidated claims and the claims in this case do not materially alter the

question of invalidity. I further understand from counsel that where claims include limitations not considered in previous litigation, collateral estoppel does not apply.

### D. Priority Date

40. I have been informed by counsel and understand that to claim the benefit of a priority date based on an earlier filed provisional application, the provisional application must satisfy the written description and enablement requirements with respect to the asserted claims. As described above in Section VII.B, to satisfy the written description requirement, a specification does not need to describe every possible embodiment of the invention or contain examples or an actual reduction to practice.

## VIII. PERSON OF ORDINARY SKILL IN THE ART

41. I understand from counsel that the "person of ordinary skill in the art," or "POSITA," is a legal construct employed in patent law. It refers to a hypothetical person who is presumed to have knowledge of all the relevant prior art at the time of the invention. I understand that my analysis in this case is to be conducted from the perspective of a POSITA at the time of the inventions.

42. I have been informed by counsel and understand that assessing the level of ordinary skill in an art may involve considering various factors as of the priority date of the invention (here, February 26, 2008), including the type of problems encountered in the art, prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field.

43. By the priority date (February 26, 2008), I had been practicing as a board-certified gastroenterologist for over 20 years and was deeply involved in the field. In the years preceding the priority date (2006-2007), for example, I was the president of the American College of Gastroenterology.

44. In my opinion, a POSITA at the time of the invention of the ’912 and ’571 Patents would have had either (i) a Ph.D. in pharmacology, microbiology, or a biological science or (ii) an M.D. with board certification in internal medicine or gastroenterology. This person also would have had training in, experience with, or an ability to interpret gastrointestinal (“GI”) disease research, and would have collaborated with others having ordinary skill in related fields. In addition, to the extent needed, the person of ordinary skill in the art would have collaborated with others having ordinary skill in the areas pertinent to the subject matter of the asserted claims in the Asserted Patents. In reaching this opinion, I have relied on my extensive experience and familiarity with the field (particularly around the priority date and before) and considered all the materials cited herein and **Exhibit B** (particularly references published around the priority date and before).

45. I understand that Dr. Harary has offered the following definition of a POSITA: “a POSA would have possessed a medical degree with training in gastroenterology, or would have possessed a medical degree with a practice in family or internal medicine having experience in treatment of irritable bowel syndrome or small intestinal bacterial overgrowth. To the extent necessary, a medical doctor may collaborate with one or more researchers in the fields of pharmaceutics or statistics.”[3]

46. I disagree with Dr. Harary that only persons with medical degrees could have qualified as a POSITA. In my experience, at the time of the invention, persons with a Ph.D. in pharmacology, microbiology, or a biological science also would have been skilled in the art because they would have conducted extensive research on GI issues, including IBS, IBS-D and alternating IBS. Many of those Ph.D. holders also would have treated patients suffering from IBS,

[3] Harary Opening Expert Report at ¶ 61.

- Salix, *Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of patients with Diarrhea-Associated Irritable Bowel Syndrome*, December 6, 2007 ("RFIB 2001 Study Protocol")[22]
- Sharara et al., *A Randomized Double-Blind Placebo-Controlled Trial of Rifaximin in Patients with Abdominal Bloating and Flatulence*, American Journal of Gastroenterology, vol. 101, issue 2, page 326-333, February 2006 ("Sharara")[23]
- Cuoco et al., *Small Intestinal Bacterial Overgrowth in Irritable Bowel Syndrome: A Retrospective Study with Rifaximin*, Minera Gastroenterol Dietol, vol. 52, page 89-95, 2006 ("Cuoco")[24]
- Della Marchina, *Infectious Diarrhea in the Aged: Controlled Clinical Trial of Rifaximin*, 7 Chemioterapia 7:336 (1998) ("Della Marchina")[25]
- U.S. Patent No. 7,718,608 ("Lin '608")[26]
- *Rifaximin versus Other Antibiotics in the Primary Treatment and Retreatment of Bacterial Overgrowth in IBS*, 53 Dig. Dis. Sci. 169 (2007) allegedly published online on May 23, 2007 ("Yang")[27]
- Barrett et al, *Benefits of the Antibiotic Rifaximin as Empiric Therapy in Patients with Irritable Bowel Syndrome*, 101 Am. J. of Gastroenterology S479-S480 (2006) ("Barrett")[28]
- Rifaximin Demonstrates Statistically Significant Improvement in Co-Primary Endpoints in Treatment of Diarrhea-Associated Irritable Bowel Syndrome in Phase IIb Study ("RFIB 2001 Press Release")[29]
- International Publication No. WO 2006/102536, *Treatment of Disease Conditions Through Modulation of Hydrogen Sulfide Produced by Small Intestinal Bacterial Overgrowth* ("Lin 2006")[30]
- Lauritano, *Rifaximin Dose-Finding Study for the Treatment of Small Intestinal Bacterial Overgrowth*, 22 Aliment Pharmacol Ther. 31-35 (2005) ("Lauritano")[31]
- Scarpignato, *Rifaximin, a Poorly Absorbed Antibiotic: Pharmacology and Clinical Potential*, 51 Chemotherapy 36 (2005) ("Scarpignato")[32]

---

[22] XIFAX_AMN_1882456.
[23] XIFAX_AMN_0310894.
[24] XIFAX_AMN_0690728.
[25] NORWICH_NJ_INV_000023-27.
[26] NORWICH_NJ_INV_000153-181.
[27] NORWICH_NJ_INV_000546 -51.
[28] NORWICH_NJ_INV_000001 -05.
[29] NORWICH_NJ_INV_000336-38.
[30] NORWICH_NJ_INV_000211-75.
[31] NORWICH_NJ_INV_000095-99.
[32] NORWICH_NJ_INV_000389-419.

- Scarpellini et al., *High Dosage Rifaximin for the Treatment of Small Intestinal Bacterial Overgrowth*, 25 Aliment Pharmacol Ther. 781-786 (2007) ("Scarpellini")[33]
- U.S. Patent Application Publication No. US2005/0272754 ("Viscomi")
- *Salix Pharmaceuticals, Ltd et al, v. Norwich Pharmaceuticals, Inc.*, Trial Opinion, Case 1:20-cv-00430-RGA, Civil Action No. 20-430-RGA, Proceedings. 46 pages, Aug. 10, 2022

### C. IBS and IBS-D

66. As I explained in my Opening Report ("Johnson Opening Report"), "[i]rritable bowel syndrome (IBS) is a chronic, often debilitating, and highly prevalent disorder."[34] The most common functional gastrointestinal disorder in clinical practice, IBS affects millions of Americans, substantially impacting their lives.[35] Between 10 to 15% of the U.S. population suffers from IBS, which accounts for approximately 30% of all health-related costs in gastroenterology.[36] IBS is more prevalent in females.[37] "In clinical practice, IBS is characterized by symptoms of recurrent abdominal pain and disordered defecation."[38]

67. "While IBS is one of the most common chronic medical conditions[,] the etiology of IBS is unknown."[39] IBS is a "syndrome" rather than a "disease" because it describes a collection of symptoms without a single defined cause.

68. Before diagnosing IBS or IBS-D, doctors generally rule out other potential causes for symptoms.[40] In 2008 and today, no medical test—not blood analysis, colonoscopy, CT scan, breath test, or anything else—exists to confirm whether a patient has IBS.

---

33 NORWICH_NJ_INV_000383-88.

34 Johnson Opening Report, ¶ 47 (citing XIFAX_AMN_1994084).

35 10/8/08 Final Clinical Study Report: RFIB2001, XIFAX_AMN_1900330 at -356; XIFAX_AMN_0969861 at -9861–62.

36 XIFAX_AMN_0870632 at -639.

37 10/8/08 Final Clinical Study Report: RFIB2001, XIFAX_AMN_1900330 at -356.

38 Johnson Opening Report, ¶ 47 (citing XIFAX_AMN_1994084); *see also* Longstreth, et al., *Functional Bowel Disorders*, Gastroenterology 2006;130:1480 –1491.

39 RFIB 2001 Study Protocol, XIFAX_AMN_1882456 at -2457.

40 Cuoco, XIFAX_AMN_0690728 at -730.

69. Since no anatomical or biological marker exists for IBS (and did not exist in 2008), physicians can only diagnose IBS by excluding other causes for the symptoms associated with IBS.

70. Traditionally, clinicians used the Manning criteria to diagnose IBS. That criteria included the presence of several characteristic symptoms, including abdominal pain and discomfort relieved by defecation or associated with a change in stool frequency or consistency, abdominal pain or discomfort, abdominal distension, sensation of incomplete evacuation or passage of mucus.[41]

71. In the 1990s, an international committee established the Rome criteria, the standard diagnostic guideline for classifying functional gastrointestinal disorders developed by the Rome Foundation, which has become the standard of care for treating IBS patients.[42] The Rome criteria "recommend the use of symptom-based criteria to aid clinicians towards making a positive diagnosis of IBS without the need to perform extensive investigations."[43] An international panel of experts periodically updates the Rome criteria.[44]

72. Rome II, published in 1999, divided IBS subjects into 3 subtypes: diarrhea-predominant IBS (IBS-D), constipation-predominant IBS (IBS-C), and alternating or mixed IBS (where symptoms alternate between diarrhea and constipation).[45] Roughly, one-third of IBS patients suffer from IBS-D.

73. In 2008, Rome III would have been the operative criteria. Under the Rome III criteria, a POSITA would have considered bloating associated with IBS-D to be distinct from

[41] 10/8/08 Final Clinical Study Report: RFIB2001, XIFAX_AMN_1900330 at -356.
[42] *Id; see also* XIFAX_AMN_1994061.
[43] XIFAX_AMN_1994061.
[44] *Id*. at -061–062.
[45] 10/8/08 Final Clinical Study Report: RFIB2001, XIFAX_AMN_1900330 at -356; *see also* Thompson WG, Longstreth GF, Drossman DA, *et al.*, Functional bowel disorders and functional abdominal pain, *Gut* 1999;**45:**II43-II47.

irritable bowel syndrome.[46] Under Rome III, "IBS (C1) is more specifically defined as pain associated with change in bowel habit, and this is *distinct* from functional diarrhea (C4) characterized by loose stools and no pain, or functional bloating (C2) when there is no change in bowel habit. Each condition also has *different diagnostic and treatment approaches*."[47] Rome III recognizes that a patient suffering from bloating would not necessarily meet the diagnostic criteria for IBS or IBS-D, even though bloating can be a symptom of IBS or IBS-D or a broad number of other causalities.

74. In general, symptom-focused diagnosis and treatment of IBS are important because "[t]he exact cause of IBS is unknown[.]"[48] Irritable bowel syndrome is "defined by no identifiable structural or biochemical abnormality to explain the symptoms on routine clinical tests."[49] IBS patients may present with a variety of different symptoms, including abdominal pain, constipation, and diarrhea.[50] Therefore, as a practical matter, treating IBS-D on an individual patient basis requires identifying that particular patient's baseline symptoms and periodically evaluating whether treatment is improving those symptoms.[51] "IBS subtypes related to bowel habit abnormalities," such as IBS-D, "can only be confidently established when the patients is evaluated off medications used to treat bowel habit abnormalities."[52]

75. In weighing the risks and benefits of an IBS-D treatment at the time of the invention, a POSITA would have considered all information about the various therapies available.

---

[46] Longstreth, et al., *Functional Bowel Disorders,* Gastroenterology 2006;130:1480 –1491; *see also* D. Drossman, *The Functional Gastrointestinal Disorders and the Rome III Process*, Gastroenterology, vol. 130, No. 5, 1379 (2006) (emphasis added); D. Drossman et al., *Rome III The Functional Gastrointestinal Disorders* at 5-7 (3d Ed. 2006) (same).
[47] *Id.*
[48] *Id.* at ¶ 53 (citing XIFAX_AMN_1994061 at -62).
[49] *Id.*
[50] *Id.* (citing XIFAX_AMN_1994138 at -143–144).
[51] *Id.* (citing XIFAX_AMN_1994138 at -143).
[52] Johnson Opening Report at ¶ 53 (citing XIFAX_AMN_1994138 at -143).

76. In 2008, the only drug approved to treat IBS-D was alosetron, but, due to safety reasons, its use was limited to treat women with severe IBS-D who had failed previous treatment.[53] In particular, the use of alosetron included the risk of ischemic colitis and serious constipation which could result in hospitalization, blood transfusion and even death.[54]

77. However, other therapies did exist and were used by clinicians at that time. Treatment options included dietary restrictions, fiber supplementation, antidiarrheals, muscle relaxants, prokinetics, and psychotropics and serotonin receptor antagonists. Some showed strong evidence of efficacy, including Imodium®, and serotonin receptor antagonists. Others did not, such as special diets, antispasmodics, and antibiotics. Some clinicians, when deemed appropriate, also prescribed psychological therapy including cognitive behavioral therapy, relaxation and stress management.

78. In 2008, the treatment options varied because the causes of IBS, IBS-D, and alternating IBS were unknown. A POSITA would have been aware of many hypotheses about causes of these diseases, but without knowing the underlying cause(s), she could not reasonably predict which drugs might work. From a clinician perspective, the disease needs to be identified to direct the appropriate therapy among the different treatment options. In 2008, the Rome III criteria was the recognized standard of care for defining IBS.

79. Moreover, in reviewing the various opinions and research, a POSITA would have recognized that not all data is equal, even if in a publication. In the mid-1990's, a movement began

[53] 10/8/08 Final Clinical Study Report: RFIB2001, XIFAX_AMN_1900330 at -356.
[54] Camilleri M, Andresen V. Current and novel therapeutic options for irritable bowel syndrome management. Dig Liver Dis. 2009;doi:10.1016/j.d1d.2009.07.009.

that directed clinicians to make conscientious, explicit and judicious decisions about the care of individual patients.[55]

80. In 2008, clinicians also were aware of publications that led to FDA approval and blockbuster billion dollar annual sales for some drugs, but were later withdrawn or redacted because of conflicts, bias, inappropriate data review, methodology or safety concerns. One example involves the COX-2 inhibitors that received much attention in the most revered journals in the early 2000s.[56] However, by 2004, it became apparent that COX-2 inhibitors posed a potential cardiovascular risk.[57] Ultimately, a critique of the trial data from one of the original publications lauding COX-2 inhibitors led to their voluntary removal from the market due to safety concerns.[58]

81. As a POSITA engaged in active clinical practice in 2008, I was very much aware of the "rules of evidence" for published trials and reports. The period around the time of the invention was particularly one of guarded skepticism as to longer term safety concerns due to the publicity surrounding the recall of the COX-2 inhibitors. As a result of these concerns with clinical trial reporting, a POSITA would have scrutinized publication data and not necessarily assume it was all accurate or absolute. In particular, POSITAs would have integrated published data with

---

[55] *See Evidence-based Medicine Working Group. Evidence-based medicine. A new approach to the teaching of medicine*. JAMA 1992;268:2420; Rosenberg W, Donald A. *Evidence based medicine: an approach to clinical problem-solving*. BMJ. 1995 Apr 29; 310(6987): 1122-6.

[56] *See* Silverstein et al., *Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study: a randomized controlled trial*. JAMA. 2000; 284(10):1247–1255; Bombardier C, et al., *Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis*. N Engl J Med 2000;343:1520-28; Goldstein JL, et al., *Reduced incidence of gastroduodenal ulcers with celecoxib, a novel cyclooxygenase-2 inhibitor, compared to naproxen in patients with arthritis*. Am J Gastroenterol. 2001 Apr;96(4):1019-27; Francis K.L. Chan, M.D. et al., *Celecoxib versus Diclofenac and Omeprazole in Reducing the Risk of Recurrent Ulcer Bleeding in Patients with Arthritis*, NEJM 2002: 347:2104-2110.

[57] Mukherjee D, et al., *Risk of cardiovascular events associated with selective COX-2 inhibitors*. JAMA. 2001;286(8):954–959; Solomon, et al., *And then….Cardiovascular Risk Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention*, NEJM 2005; 352:1071-1080.

[58] *See* Curfman GD, et al., *Expression of concern: Bombardier et al., NEJM 2000*" N Engl J Med. 2005;353:2813–2814.

their own clinical experience and concerns, to best interpret data and appropriately formulate opinions.

82. For IBS, IBS-D, and alternating IBS specifically, placebo-controlled clinical trials are the most reliable data because they allow a POSITA to determine if improvement is due to the treatment, the large placebo effect or the natural fluctuations in symptoms. In contrast, a POSITA would have recognized that case series (e.g., retrospective chart reviews) are at the low end of reliability due to their multiple types and sources of bias. And, even more concerning, these types of reports would do little if anything, to address safety concerns beyond whatever the length of exposures reported in these publications.

83. Given the lack of understanding of what causes IBS, the safety concerns about some current therapy and the lack of efficacy about others, a significant unmet need existed for a safe and effective IBS treatment in 2008.[59]

**D. Small Intestinal Bacterial Overgrowth**

84. In 2008, many in the field were uncertain about whether small intestinal bacterial overgrowth ("SIBO") was a cause of IBS. Indeed, the pre-2008 literature expressed much skepticism about whether SIBO caused IBS.[60]

85. Many questioned the reliability of the methods used to "diagnose" SIBO. Breath tests, such as hydrogen breath tests, were commonly used due to their non-invasiveness, but studies highlighted their low sensitivity and specificity. For example, a 2006 study by Simrén and Stotzer questioned the use of such breath tests to establish a causal link between SIBO and IBS because they often produced inconsistent results: "Hydrogen breath tests are widely used to explore the

[59] *See* RFIB 3007 Clinical Report, XIFAX_AMN_0058937 at -080.

[60] In his Rebuttal Expert Report, Dr. Eli Ehrenpreis extensively discusses the skepticism about the causal relationship between SIBO and the many criticisms of that theory. I have reviewed his report and agree with his opinions.

rifaximin to a large patient population would induce resistance or cause adverse events. She also would have been concerned (i) about the emergence of resistance that could make rifaximin clinically resistant to the gut bacteria that causes IBS, IBS-D, and alternating IBS and (ii) that the resistant bacteria could cause infections in the gut or other parts of the host's body.

95. Indeed, by 2008, a POSITA would have been aware of the concept of antibiotic stewardship, which emerged in the early 1990s.[72] Recognizing the problems with antibiotic resistance, the idea behind antibiotic stewardship was to develop strategies to promote the judicious use of antibiotics through monitoring, feedback and education. In 2007, the Infectious Diseases Society of America and Society for Healthcare Epidemiology of America published the first guidelines for their Antimicrobial Stewardship Programs.[73]

96. By 2008, a POSITA also would have known that (i) rifaximin is part of the rifamycin family of antibiotics, which was known to rapidly cause resistance; (ii) if a bacterial strain developed rifaximin-resistance, it would also become resistant to other antibiotics in the same family; and (iii) investigators had identified and isolated rifaximin-resistant strains in subjects.[74]

97. A POSITA also would not have known if the effects of rifaximin would continue after repeated courses of therapy. She would have been concerned that clinical resistance could occur after a single short-term administration of rifaximin, making retreatment not viable.

98. A POSITA likewise would have known that determining the appropriate dose and length of administration of rifaximin to treat symptoms of IBS, IBS-D and alternating IBS was

[72] McGowen JE Jr, et la. Infect Control Hosp Epidemiol 1994;15:478-485.
[73] Dellit, T.H. et al.; Infectious Diseases Society of America; Society for Healthcare Epidemiology of America. Infectious Diseases Society of America and the Society for Healthcare Epidemiology of America guidelines for developing an institutional program to enhance antimicrobial stewardship. Clin Infect Dis. 2007 Jan 15;44(2):159-77.
[74] DuPont Rebuttal Report at ¶¶ 71–77.

essential to preventing resistance.[75] Taking into account the medical community's concern about the development of resistance and the large population of IBS, IBS-D and alternating IBS patients, a POSITA a would have wanted to know (i) whether rifaximin could safely and effectively treat those diseases, (ii) the most safe and effective dose and length of time for administration, and (iii) whether rifaximin would continue to remain safe and effective following retreatment.[76]

99. Dose and duration of treatment are fundamental to treatment and the prevention of adverse reactions, infections, and antibiotic resistance. However, at the time of the inventions, investigators were using rifaximin at various doses and various durations for various conditions. A POSITA would have recognized that not all data is created equal to best indicate efficacy or safety. As discussed, safety issues raised by the COX-2 inhibitors and evidence-based medicine were a significant concern for what was ascribed to be a functional GI disorder. For IBS, IBS-D, and alternating IBS, placebo-controlled clinical trials produce the most reliable data because they permit a POSITA to determine if improvement is due to the treatment, as opposed to a placebo effect or symptom fluctuations.

100. In addition, many of these studies of rifaximin were retrospective chart reviews, which a POSITA would have understood to be at the low end of reliability due to their multiple types and sources of bias, thereby not providing quality evidence-based data to accurately and appropriately assess clinical outcomes efficacy or safety. As a result, a POSITA would not have reasonably relied on them to determine the best dosing regimen or evaluate the safety beyond the length of the trial reported.

101. Finally, at the time of the inventions, none of these studies examined the safety and efficacy of administering 550 mg of rifaximin TID (1650 mg/day) for 14 days.

---

[75] *Id.*
[76] *Id.*

102. Before February 2008, key opinion leaders in the GI field were skeptical that an antibiotic like rifaximin could safely and effectively treat IBS, IBS-D or alternating IBS. For example, a 2007 Education Practice note by Dr. Eamonn M.M. Quigley (past President of the American College of Gastroenterology and the World Gastroenterology Organization) stated that a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[77] Dr. Quigley also observed that "[a]ntibiotic dose and duration of therapy have not been established."[78]

103. In addition, a 2007 publication from the British Society of Gastroenterology recognized that antibiotic treatment "cannot be recommended until replicated in well-designed studies by others [i.e., doctors outside of Cedars-Sinai]."[79]

104. Less than a month before the priority date of the asserted patents, Dr. Stephen Vanner (Director of the Gastrointestinal Diseases Research Unit at Kingston Health Sciences Centre, Professor of Medicine at Queen's University, and clinician-scientist) likewise wrote: "There is *insufficient evidence* to recommend antibiotics for the treatment of irritable bowel syndrome at present."[80] In particular, he noted that "[a]though the favorable short-term profile of newer non-absorbable antibiotics, such as rifaximin, may make the use of antibiotics in IBS more attractive, enthusiasm should be tempered by several considerations."[81] Like other experts discussed above, Vanner noted "no long-term studies with antibiotics in IBS" existed, and "less [was] known about the safety of these antibiotics in the long term."[82] Further, "IBS is a common

---

[77] Quigley, E. M., *A 51-Year-Old With Irritable Bowel Syndrome: Test or Treat for Bacterial Overgrowth?*, Clinical Gastroenterology and Hepatology (2007) 5:1140-1143, XIFAX_AMN_1253920 at -3922.
[78] *Id.*
[79] Spiller et al., *Guidelines on the irritable bowel syndrome: mechanisms and practical management*, Gut (2007) 56:1770-1798, XIFAX_AMN_1874288 at -4306.
[80] Vanner, S., *The small intestinal bacterial overgrowth. Irritable bowel syndrome hypothesis: implications for treatment*, Gut (2008) 57:1315-1321, XIFAX_AMN_1874266, at -4270 (emphasis added).
[81] *Id*.
[82] *Id*.

disorder with a recognized high placebo response rate, and studies show[ed] that the effects of antibiotics on measurable outcomes [were] short lived."[83] Importantly, as Dr. Vanner noted, "[t]here [were] also indirect studies which imply that antibiotics could play a role in the pathogenesis of IBS."[84] Indeed, "[a] study in a general practice setting found that prior antibiotic use strongly correlated with patients having the symptoms of IBS."[85] Moreover, "it ha[d] also been shown that the use of antibiotics is related to increased reporting of functional bowel symptoms," and "[i]n an animal model, the use of non-absorbable antibiotics was shown to induce low level colonic inflammation and visceral hypersensitivity."[86] "[G]iven that antibiotics suppress bacteria in the small and large bowel," these studies, as Dr. Vanner noted, "highlight the potential for antibiotic use to have detrimental effects, particularly with continuous repeated courses."[87] Therefore, considering "the absence of reasonable proof for the SIBO-IBS hypothesis [as of 2008] and the concerns about antibiotic use, it [was] difficult to recommend antibiotic treatment for IBS" according to Dr. Vanner.[88]

## X. PRIORITY DATE

105. Dr. Harary opines the '912 and '571 Patents are not entitled to the February 26, 2008 priority date because Salix's provisional patent application No. 61031679 ("'679 provisional") does not provide adequate written description of their claims.[89] In particular, he argues the '679 provisional does not specifically disclose treating a female subject.[90] I disagree.

---

83 *Id.*
84 *Id.*
85 *Id.*
86 *Id.*
87 *Id.*
88 *Id.*
89 Harary Opening Report at ¶¶ 71-76.
90 *Id.*

106. As I understand from counsel, for Salix to satisfy the written description requirement, the specification need not describe every possible embodiment of an invention or contain examples or an actual reduction to practice. I also understand prophetic examples may satisfy the written description requirement.

107. Example 2 of the '679 provisional describes a study "to evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg TID in providing adequate relief from diarrhea-associated IBS (dIBS) symptoms over four weeks."[91] The study included subjects diagnosed with IBS-D according to the Rome III protocol using the subtype protocol for IBS-D from Rome II.[92] The measure of efficacy was based on the subjects' answers to the Weekly Global Assessment question "*In the past 7 days, have you had adequate relief of your IBS symptoms?*"[93] Example 2 reported that "Subjects in the treatment group taking oral rifaximin respond "Yes" more often than Subjects who are not taking oral rifaximin."[94] Another measure of efficacy was based on the subjects' answers to the Weekly Global Assessment question "*In the past 7 days, have you had adequate relief of your IBS symptom of bloating?*"[95] Example 2 likewise reported that "Subjects in the treatment group taking oral rifaximin respond 'Yes' more often than Subjects who are not taking oral rifaximin."[96] Other measures of efficacy in Example 2 "include the changes in [IBS-D] symptoms from baseline to each week of the 4 weeks in the study (e.g., abdominal pain and discomfort, bloating, number of stools per day, stool consistency, urgency with loose or watery stools)."[97]

---

[91] XIFAX_AMN_0025387 at -427.
[92] *Id*.
[93] *Id*. at -427-428.
[94] *Id*. at -428.
[95] *Id*.
[96] *Id*.
[97] *Id*.

108. Dr. Harary concedes the ’679 provisional discloses a “prophetic” example “to evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg TID in providing adequate relief from diarrhea-associated IBS (dIBS) symptoms over four weeks.”[98] As discussed, Example 2 describes how subjects who received rifaximin reported more bloating relief than those who did not.

109. In my opinion, the ’679 provisional application contains adequate written description to demonstrate the inventors had possession of the asserted claims of both the ’912 and ’571 Patents.

110. The specification and claims of the ’801 provisional application are identical to those of the ’679 provisional application. Accordingly, I believe the ’801 provisional application also contains adequate written description to demonstrate the inventors had possession of the asserted claims of the ’912 and ’571 Patents.[99]

111. Dr. Harary seems to agree and states “to the extent Plaintiffs contend or the Court determines that ‘a female subject’ is distinct from, or not immediately envisaged, by disclosure of ‘a subject,’” the ’679 and ’801 provisional applications do not disclose the invention in the ’571 and ’912 Patents.[100] I understand from counsel that Plaintiffs do not intend to make such an argument.

---

[98] Harary Opening Report at ¶ 73.

[99] *Compare* XIFAX_AMN_0025395-398 *with* XIFAX_AMN_0025452-455; *compare* XIFAX_AMN_0025427-428 *with* XIFAX_AMN_0025490-491; and *compare* XIFAX_AMN_0025429-431 *with* XIFAX_AMN_0025496-498.

[100] Harary Opening Report at ¶ 71.

## XI. COLLATERAL ESTOPPEL

112. Dr. Harary opines the claims of the ’571 and ’912 Patents do not materially differ from the claims invalidated in *Norwich I*, namely, claim 2 of U.S. Patent No. 8,309,569 (“’569 patent”) and claim 3 of U.S. Patent No. 10,765,667 (“’667 patent”).[101] I disagree.

113. As discussed, I understand from counsel that collateral estoppel only applies where the differences between the invalidated claims and the asserted claims do not materially alter the question of invalidity. I further understand from counsel that where claims include limitations not considered in previous litigation, collateral estoppel does not apply.

114. The adjudicated claims of the ’569 patent are:

> 1. A method of providing acute treatment for diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: administering 1650 mg/day of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms.
> 2. The method of claim 1, wherein the 1650 mg is administered as 550 mg three times a day.

115. The adjudicated claims of the ’667 patent are:

> 1. A method of treating one or more symptoms of irritable bowel syndrome (IBS) in a subject 65 years of age or older, said method comprising administering, 550 mg of rifaximin, TID for 14 days to the subject, thereby treating one or more symptoms of IBS in the subject 65 years of age or older.
> 2. The method of claim 1, wherein the IBS is diarrhea-predominant IBS.

116. In my opinion, at the time of the invention, a POSITA would have understood that material differences exist between the adjudicated claims of the ’569 and ’667 patents and the asserted claims of the ’571 and ’912 patents. I incorporate by reference the details of those material

[101] *Id.* at ¶¶ 733-743.

differences in my Declaration In Support Of Plaintiffs' Response To Motion For Summary Judgment, filed August 4, 2025.[102]

**A. Asserted Claims**

117. Each of the claims of the '571 Patent recites the treatment and reduction of "bloating associated with diarrhea-predominant irritable bowel syndrome (dIBS)."[103]

118. Dr. Harary opines the treatment of bloating associated with IBS-D is not materially different from treating one or more symptoms of IBS or IBS-D as recited in the adjudicated claims of the '569 and '667 patents.[104] I disagree.

119. As of the priority date, a POSITA would have been aware of and consulted the Rome III criteria, the standard diagnostic guideline for defining and classifying functional gastrointestinal disorders as developed by the Rome Foundation. Under the Rome III criteria, a POSITA would have considered bloating associated with IBS-D to be distinct from irritable bowel syndrome.[105] Rome III recognizes that a patient suffering from bloating would not necessarily have IBS or IBS-D, even though bloating can be a symptom of IBS or IBS-D.

120. Claim 1 of the '667 patent recites a "method of treating one or more symptoms" of IBS. Claim 2 of the '667 patent recites the "method of claim 1, wherein the one or more symptoms are selected from one or more of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and urgency." Since claim 2

[102] Dkt. 121-1.
[103] XIFAX_AMN_0007928 at -968, col. 46:39-43.
[104] Harary Opening Report at ¶ 740.
[105] *See* D. Drossman, *The Functional Gastrointestinal Disorders and the Rome III Process*, Gastroenterology, vol. 130, No. 5, 1379 (2006) (Under Rome III, "IBS (C1) is more specifically defined as pain associated with change in bowel habit, and this is *distinct* from functional diarrhea (C4) characterized by loose stools and no pain, or functional bloating (C2) when there is no change in bowel habit. Each condition also has *different diagnostic and treatment approaches*.") (emphasis added); D. Drossman et al., *Rome III The Functional Gastrointestinal Disorders* at 5-7 (3d Ed. 2006) (same).

does not include bloating, a POSITA would have understood that bloating was not a claimed IBS symptom in the ’667 patent.

121. Based on the Rome III criteria and the differing claim language of the adjudicated patents and the Asserted Patents in this case, I believe a POSITA would have understood that material differences exist between the Asserted Claims of the ’571 Patent and the adjudicated claims of the ’667 patent.

122. Each of the claims of the ’571 and ’912 Patents recites a method for treating and a reduction of IBS symptoms or bloating associated with IBS-D for 14 days. In contrast, the claims of the ’569 patent recite the durability of response of that treatment for 12 weeks after the 14-day treatment period.

123. Claims 2 of the ’571 Patent and 5 of the ’912 Patents recite a reduction of bloating associated with IBS-D or one or more symptoms of IBS “from baseline symptoms established prior to treatment.”[106] None of the adjudicated claims of the ’569 and ’667 patents disclose such a reduction from baseline symptoms.

124. Claims 3 of the ’571 Patent and 6 of the ’912 Patent are both dependent on claim 1 and recite the reduction of bloating associated with IBS-D and the reduction of IBS symptoms “is achieved following 7 days after the administration of rifaximin” (“7 days limitation”).

125. Dr. Harary opines claim 3 of the ’571 Patent and claim 6 of the ’912 Patent “do not modify the ‘subject’ population, alter the recited disease or adjust the recited dosing regimen,” but instead conclusory states “an intended result or observation flowing from the method recited.”[107] He provides no further analysis or supportive citation. In my opinion, Dr. Harary fails to analyze

[106] XIFAX_AMN_0007928 at -968, col. 46:44-46; XIFAX_AMN_0006830 at -870, col. 46:21-24.
[107] Harary Opening Report at ¶ 743.

the material differences between claims 3 of the ’571 Patent and 6 of the ’912 Patent and the claims adjudicated in *Norwich I*.

126. Claim 3 of the ’571 Patent and claim 6 of the ’912 Patent are both dependent on claim 1, which recites a treatment period of 14 days. Thus, a POSITA would have understood that the 7 days limitation must occur during this 14 day treatment.

127. Claim 1 of the ’569 patent recites “wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms” (“durability of response limitation”).

128. The claim language specifies that durability of response occurs after 14 days of treatment: “wherein *removing the subject from treatment* after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms.” (emphasis added). In addition, the identical specifications of the ’569, ’571 and ’912 patents define “durability of response” as “adequate relief of symptoms after removal of treatment, continuous adequate relief of symptoms after removal of treatment.”[108]

129. Thus, a POSITA would have understood that the durability of response limitation materially differs from the 7 days limitation in the Asserted Patents.

130. Claims 4 of the ’571 and 7 of the ’912 Patents recite a reduction of bloating associated with IBS-D or one or more symptoms of IBS comprising “an affirmative response from the subject when asked if they had a reduction. . . .”[109] None of the adjudicated claims of the ’569 and ’667 patents disclose such a reduction comprising an affirmative response from the subject.

---

[108] Dkt. 113-3 at Da0024, 13:27-34.

[109] XIFAX_AMN_0007928 at -968, col. 46:50-52; XIFAX_AMN_0006830 at -870, col. 46:28-31.

131. Claim 4 of the ’912 Patent claims the method of claim 1, “wherein the IBS is alternating IBS.”[110] None of the adjudicated claims of the ’569 and ’667 patents disclose the treatment of alternating IBS.

132. Based on the claim language and specifications of the adjudicated patents and the patents at issue in this case, I believe a POSITA would have understood material differences exist between the Asserted Claims of the IBS-D Patents and the adjudicated claims of the ’569 and ’667 patents.

### B. Prior Art References

133. I understand *Norwich I* found the asserted claims of the ’569 and ’667 patents obvious based on the combination of Pimentel 2006 and the RFIB 2001 Study Protocol.

134. As discussed more fully below, in my opinion, a POSITA (i) would not have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the inventions recited in the asserted claims of the ’571 and ’912 Patents and (ii) would not have had a reasonable expectation of success in achieving those inventions.

## XII. OBVIOUSNESS

### A. References Cited by Dr. Harary

#### 1. Della Marchina

135. Dr. Harary cites to a 1988 article by M. Della Marchina et al. titled *Infectious Diarrhea in the Aged: Controlled Clinical Trial of* Rifaximin, 7 Chemioterapia 7:336 (1998) (“Della Marchina”).[111] Salix disclosed Della Marchina during prosecution of both the ’912 and ’571 Patents, and it appears on the face of those patents.[112]

---

[110] XIFAX_AMN_0006830 at -870, col. 46:19-20.
[111] Harary Opening Report at ¶ 77-78 (citing NORWICH_NJ_INV_000023-27).
[112] XIFAX_AMN_0007928; XIFAX_AMN_0006830.

136. Della Machina is a study of rifaximin in patients with "diarrheic syndromes of ascertained bacterial origin" who "exhibited an acute and serious diarrheic syndrome (at least 5 discharges within the last 24 hours)."[113] The authors "excluded all subjects suffering from chronic diarrhea of any etiology" and "patients affected with intestinal inflammatory diseases."[114] The patients in the Della Marchina study did not suffer from any form of IBS. Della Marchina teaches that that "[s]ecretive diarrheas are, as a general rule, self-limiting and disappear within 7-10 days," and that "an antibiotic therapy is often believed to be unnecessary."[115] Study subjects receiving rifaximin received "200 mg per oz, three times a day," and the "treatment lasted 7 days."[116] Della Marchina only reports "number of discharges, stool consistency and associated symptoms."[117]

137. Della Marchina does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D, or alternating IBS patients. It contains no information about the reduction of bloating associated with IBS-D or other IBS symptoms specifically in a female subject achieved following 7 days after administration of rifaximin.

**2. Di Stefano**

138. Dr. Harary cites to a 2000 article by M. Di Stefano et al. titled *Rifaximin versus chlortetracycline in the short-term treatment of small intestinal bacterial overgrowth*, 14 Aliment Pharmacol. Ther. 551 (2000) ("Di Stefano").[118]

139. The Di Stefano study only evaluated "21 patients affected by small intestinal bacterial overgrowth" (SIBO).[119] Most notably, the patients in the Di Stefano study did not suffer from any form of IBS. Patient outcomes were reported using "$H_2$ breath excretion" and a "global

---

[113] NORWICH_NJ_INV_000023 at -24.
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.* at -25.
[118] Harary Opening Report at ¶¶ 79-81 (citing NORWICH_NJ_INV_000028-33).
[119] NORWICH_NJ_INV_000028-33 at -28; *see also id.* at -29-30 (describing how SIBO "diagnosis was made").

symptom score" applying a "semi-quantitative scale."[120] Di Stefano does not report how many patients remained positive for SIBO according to the criteria used to diagnosis SIBO upon study entry. Di Stefano compared a rifaximin group to a chlortetracycline group, and noted that "[t]etracyclines do not have direct activity against anaerobes, may be ineffective against Bacteroides and their pharmacokinetics are markedly deranged in patients with malnutrition, which is a common finding in small intestinal bacterial overgrowth."[121]

140. Di Stefano does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise contains no information about the reduction of bloating associated with IBS-D or other IBS symptoms specifically in a female subject achieved following 7 days after administration of rifaximin.

### 3. Normix Label

141. Dr. Harary cites to a June 6, 2000 Italian label for the drug "Normix."[122] The label fails to describe the scope and and/or nature of the drug at any point before June 6, 2000 despite listing April 23, 1985 as the date of first authorization.[123] The Normix Label describes rifaximin as a broad-spectrum antibiotic against various Gram-positive and Gram-negative, aerobic or anaerobic species,[124] and in 200 mg coated tablets.[125] The Label only lists doses for different indications, but ***fails to mention any form of IBS***.[126] The Normix Label states that "Unless prescribed otherwise, treatment should not exceed 7 days."[127] While the Normix Label states that "[e]xperimental studies have shown that there are neither local nor general adverse effects up to a

---

[120] *Id.* at -30-31.
[121] *Id.* at -32 (explaining that its "negative results . . . are not completely unexpected").
[122] Harary Opening Report at ¶¶ 82-84 (citing AMN-RFXMN_00036885).
[123] AMN-RFXMN_00036847 at ¶ 10; *see also* AMN-RFXMN_00036885 (English translation).
[124] *Id.* ¶ 5.1.
[125] *Id.* ¶¶ 2-3.
[126] *Id.* ¶¶ 4.1-4.2.
[127] *Id.*

dose of 1600 mg/daily," it does not describe the nature of the experimental studies or length of administration involved.

142. The Normix Label does not contain information about (i) the reduction of bloating or other IBS symptoms specific to a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D, or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does the Normix Label disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D, or alternating IBS patients. The Normix Label also fails to disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**4. Xifaxan Label**

143. Dr. Harary cites to a May 21, 2004 label for the drug "XIFAXAN."[128] This Label describes rifaximin in 200 mg coated tablets that were indicated only "for the treatment of patients (≥12 years of age) with travelers' diarrhea caused by noninvasive strains of *Escherichia coli*."[129] For that indication, the "recommended dose" was "one 200 mg tablet taken three times a day for 3 days."[130] Further, the May 2004 XIFAXAN Label teaches that the "recommended" administration occurs for "three days."[131] It also explains that there is limited knowledge regarding the use of rifaximin. For example, the May 2004 XIFAXAN Label teaches that the "pharmacokinetics of rifaximin . . . has not been studied" in "patients ≥65 years of age" or "pediatric patients," that use "during lactation" was unstudied, that the "effect of gender on the

[128] Harary Opening Report at ¶¶ 85-86 (citing NORWICH_NJ_INV_000533-45).
[129] AMN-RFXMN_00037134.
[130] *Id.* at -7138.
[131] *Id.*

pharmacokinetics of rifaximin has not been studied," and that there "are no adequate and well controlled studies in pregnant women."[132] It further teaches that "XIFAXAN™ Tablets should not be used in patients with . . . diarrhea due to pathogens other than *Escherichia coli*" and that they "were not found to be effective in patients with . . . . diarrhea due to pathogens other than *Escherichia coli*."[133] It also teaches that rifaximin was "not effective" in certain cases of "travelers' diarrhea" and that its "effectiveness . . . has not be proven" in yet others. *Id.* The May 2004 XIFAXAN Label teaches to "discontinue[]" treatment "if diarrhea symptoms . . . persist more than 24-48 hours," and that XIFAXAN "should not be used in patients with diarrhea complicated by fever or blood in the stool or diarrhea due to pathogens other than *Escherichia coli*."[134]

144. The May 2004 XIFAXAN Label does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does the May 2004 XIFAXAN Label disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**5. Lin '053 Patent**

145. Dr. Harary cites to U.S. Patent No. 6,861,053 ("Lin '053").[135] In the Lin '053 Patent Abstract, Drs. Lin and Pimentel's hypothesized that SIBO can be used to diagnose irritable

[132] *Id.* at -7133, -7136.
[133] *Id.* at -7134.
[134] *Id.*
[135] Harary Opening Report at ¶¶ 91-94 (citing NORWICH_NJ_INV_000100-23).

bowel syndrome; fibromyalgia; chronic fatigue syndrome; depression; ADHD; and autoimmune diseases, such as multiple sclerosis, lupus erythematosus, and Crohn's disease – which is referred to as the "universal hypothesis" for SIBO. It states "at least partially eradicating [] SIBO" with an antimicrobial, probiotic, or prokinetic agent, treats those disorders "and other disorders caused by SIBO," and that this would be accomplished by administering an antimicrobial agent," such as neomycin, metronidazole, teicoplanin, doxycycline, tetracycline, ciprofloxacin, augmentin, cephalexin, penicillin, ampicillin, kanamycin, rifamycin, rifaximin, or vancomycin.[136] The Lin '053 Patent does not contain frequencies of administration, dosages, or lengths of administration for rifaximin. Nor does the Lin '053 Patent distinguish IBS subtypes, such as IBS-C, IBS-D, or IBS-A. Notably, the Lin '053 Patent definition of IBS does not comport with the standard definition at the time.

146. Examples 1, 2, and 3 in the Lin '053 Patent discuss the same criticized study reported in Pimentel 2000.[137] Jones 2001 found the Pimentel 2000 study "received a great deal of attention in the lay press but may have sent a misguided message. The [Pimentel 2000] authors conclude that 'small intestinal bacterial overgrowth is associated with irritable bowel syndrome.' We feel that this conclusion is not justified."[138] Jones 2001 also questioned the retrospective diagnosis of IBS in Pimentel 2000 and its use of the lactulose hydrogen breath testing to diagnose SIBO. It further disagreed that patients with IBS should be tested for SIBO based on Pimentel 2000's "retrospective trolling through a database."[139] Riordan 2001 and Mishkin 2001 similarly

---

[136] NORWICH_NJ_INV_000100-23 at -116, Abstract, col. 16:61-17:3.
[137] *Id.* at -119, col. 22:1-23:34.
[138] XIFAX_AMN_1874117.
[139] *Id.*

were concerned with Pimentel 2000's use of the hydrogen breath test to both diagnose SIBO and assess whether antibiotic treatment had been effective.[140]

147. Examples 4-9 in the Lin '053 Patent were directed to fibromyalgia, chronic fatigue syndrome, multiple sclerosis, ADHD, depression, Crohn's disease, and hyperalgesia. Example 8 reported a study of phase III interdigestive motility in 15 subjects "having a suspected diagnosis of IBS, as defined by Rome Criteria, corroborated by concomitant SIBO."[141] Example 9 reported two subjects "with recurrent IBS symptoms" who received "prokinetic treatment" with erythromycin, explaining that erythromycin is a motilin agonist that can induce phase III of interdigestive motility."[142]

148. The Lin '053 Patent fails to disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It similarly does not disclose information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. The Lin '053 Patent also does not disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

---

[140] XIFAX_AMN_1874184 (stating that Pimentel's approach "may result in both false positive and false negative diagnoses of SIBO" and "cannot reliably be used to assess for eradication of SIBO"); XIFAX_AMN_1874122 (stating that this "will be a dynamic field that still needs to be explored").
[141] NORWICH_NJ_INV_000100 at -120, col. 23:35-28:52.
[142] *Id.*at -122, col. 28:1-24.

### 6. Lin ’857 Patent

149. Dr. Harary cites to U.S. Patent No. 7,452,857 (Lin ‘857 Patent”).[143] The Lin ’857 Patent is not prior art because it issued on November 18, 2008, after the February 26, 2008 priority date for the IBS-D Patents.

150. The Lin ’857 Patent Abstract hypothesizes that SIBO can be used to diagnose “irritable bowel syndrome; fibromyalgia; chronic fatigue syndrome; depression; ADHD; and autoimmune diseases, such as multiple sclerosis, lupus erythematosus, and Crohn’s disease.”[144] It states “at least partially eradicating [] SIBO” with an antimicrobial or probiotic, treats those disorders “and other disorders caused by SIBO,” and that this would be accomplished by “administering an antimicrobial agent,” such as neomycin, metronidazole, teicoplanin, doxycycline, tetracycline, ciprofloxacin, augmentin, cephalexin, penicillin, ampicillin, kanamycin, rifamycin, rifaximin, or vancomycin.[145] The Lin ’857 Patent does not include dosages, frequencies of administration, or lengths of administration for rifaximin. It also does not distinguish IBS subtypes, including IBS-D and alternating IBS. Moreover, the Lin ’857 Patent does not report any decrease in bloating associated with IBS-D or other IBS symptoms from the use of rifaximin, let alone that any decrease occurred following 7 days after the administration of rifaximin.

151. Examples 1, 2, and 3 in the Lin ’857 Patent discuss the study reported in Pimentel 2000, which was widely critiqued.[146] For example, Jones 2001 noted Pimentel 2000 “received a great deal of attention in the lay press but may have sent a misguided message. The [Pimentel 2000] authors conclude that ‘small intestinal bacterial overgrowth is associated with irritable

[143] Harary Opening Report at ¶¶ 95-99 (citing NORWICH_NJ_INV_000182-210).
[144] NORWICH_NJ_INV_000182-210 at -203, Abstract, col. 16:26-29.
[145] *Id.* at 16:26-54.
[146] *Id.* at -206, col. 21:36-23:9.

bowel syndrome.' We feel that this conclusion is not justified."[147] Jones 2001 also criticized Pimentel 2000's use of a retrospective diagnosis of IBS and the lactulose hydrogen breath testing used to diagnose SIBO. It did not agree with testing IBS patients for SIBO based on Pimentel 2000's "retrospective trolling through a database."[148] Riordan 2001 and Mishkin 2001 also criticized Pimentel 2000's use of the hydrogen breath test used to diagnose SIBO and assess whether the effectiveness of antibiotic treatment. In particular, Riordan 2001 noted that Pimentel's approach "may result in both false positive and false negative diagnoses of SIBO" and "cannot reliably be used to assess for eradication of SIBO."[149] Mishkin 2001 similarly noted this "will be a dynamic field that still needs to be explored."[150]

152. Examples 4-7 and 10 of the Lin '857 Patent are directed to fibromyalgia, chronic fatigue syndrome, multiple sclerosis, ADHD, depression, Crohn's disease, and hyperalgesia. Example 8 reports a study of phase III interdigestive motility in 15 subjects "having a suspected diagnosis of IBS, as defined by Rome Criteria, corroborated by concomitant SIBO."[151] Example 9 reported two subjects "with recurrent IBS symptoms" received "prokinetic treatment" with erythromycin, explaining that erythromycin is a motilin agonist that can induce phase III of interdigestive motility."[152]

153. The Lin '857 Patent does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It also discloses no information about the reduction of bloating associated with IBS-Dor other IBS symptoms specifically in a female

---

[147] Jones et al., *Small intestinal bacterial overgrowth is associated with irritable bowel syndrome: the cart lands squarely in front of the horse*, Am. J. Gastroenterol. 96(11) 3204-3205 at 3204 (2001), XIFAX_AMN_1874117.
[148] *Id.*
[149] XIFAX_AMN_1874184-5.
[150] Mishkin et al., *Re: Pimentel et al.--Eradication of small intestinal bacterial overgrowth reduces symptoms of irritable bowel syndrome*, Am. J. Gastroenterol. 96(8):2505-2506 (2001), XIFAX_AMN_1874224-5.
[151] NORWICH_NJ_INV_000182 at -207-209, col. 23:11-28:18, 28:21-52.
[152] *Id.* at -209, col. 27:57-28:17.

subject. Nor does the Lin ’857 Patent disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**7. Lin ’608 Patent**

154. Dr. Harary cites to U.S. Patent No. 7,718,608 (“Lin ’608 Patent”), titled “Methods of Treating Irritable Bowel Syndrome And Other Disorders Caused by Small Intestinal Bacterial Overgrowth.”[153] It is not prior art because the Lin ’608 Patent was not filed until September 19, 2008, after the priority date of the IBS-D Patents. Furthermore, during the prosecution of the ’912 and ’571 Patents, Salix disclosed the Lin ’608 Patent, which appears on the face of those patents. Columns 1 through 28 (up through Example 9) of the Lin ’608 Patent contain the same disclosure as the Lin ’053 Patent previously discussed. The Lin ’608 Patent contains a new example (Example 10) titled “Treatment of SIBO-related Hyperalgesia” with several case studies.[154] This new Example 10 does not disclose the antibiotic or antibiotics administered to any patient. Dr. Harary does not identify any previously-filed application to which the Lin ’608 Patent claims priority that disclosed the subject matter of this new example.

155. The Lin ’608 Patent does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise does not contain any information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. The Lin ’608 Patent also does not

[153] Harary Opening Report at ¶¶ 100-104 (citing NORWICH_NJ_INV_000153-181).
[154] NORWICH_NJ_INV_000153-181 at -180, col. 28:34-64.

disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**8. Lin ’240 Patent**

156. Dr. Harary cites to U.S. Patent No. 7,605,240 (“Lin ’240 Patent”), titled “Methods of Treating Diarrhea and Bloating Caused by Small Intestinal Bacterial Overgrowth,[155] which is not prior art because it issued on October 20, 2009, after the February 26, 2008 priority date for the IBS-D Patents. He provides no evidence that Plaintiffs’ listing of this patent in the 38th Edition of the FDA’s Orange Book was known or otherwise disclosed in the prior art. The 38th Edition of the Orange Book was not published until 2018—years after the applicable priority date. The Xifaxan®’s 2020 Label’s reference to the Lin ’240 Patent is irrelevant because that disclosure occurred many years after the applicable priority date.

157. The Lin ’240 Patent Abstract discloses Drs. Lin and Pimentel’s “universal hypothesis” for SIBO, in which they assert SIBO can be used to diagnose “irritable bowel syndrome; fibromyalgia; chronic fatigue syndrome; depression; ADHD; and autoimmune diseases, such as multiple sclerosis, lupus erythematosus, and Crohn’s disease.”[156] It states “at least partially eradicating [] SIBO” with an antimicrobial, probiotic, or prokinetic agent, treats those disorders “and other disorders caused by SIBO,” and that this would be accomplished by “administering an antimicrobial agent,” such as neomycin, metronidazole, teicoplanin, doxycycline, tetracycline, ciprofloxacin, augmentin, cephalexin, penicillin, ampicillin, kanamycin, rifamycin, rifaximin, or vancomycin.[157] The Lin ’240 Patent did not include dosages, frequencies of administration, or lengths of administration for rifaximin. The Lin ’240 Patent does not

[155] Harary Opening Report at ¶¶ 105-109 (citing NORWICH_NJ_INV_000124-52).
[156] NORWICH_NJ_INV_000124-52 at -145, Abstract, col. 16:26-29.
[157] *Id.* at -145, Abstract, col. 16:26-54.

distinguish between IBS subtypes but instead disclosing treating bloating in a subject suffering from SIBO, which is a different indication.

158. Examples 1, 2, and 3 in the Lin '240 Patent discuss the same study that is reported in Pimentel 2000.[158] As discussed, this study was widely critiqued. Jones 2001 stated that the study "received a great deal of attention in the lay press but may have sent a misguided message. The [Pimentel 2000] authors conclude that 'small intestinal bacterial overgrowth is associated with irritable bowel syndrome.' We feel that this conclusion is not justified."[159] Jones 2001 questioned Pimentel 2000's retrospective diagnosis of IBS and the lactulose hydrogen breath testing used to diagnose SIBO and disagreed that patients with IBS should be tested for SIBO based on Pimentel 2000's "retrospective trolling through a database."[160] Riordan 2001 and Mishkin 2001 also expressed concern with the use of the hydrogen breath test used to both diagnose SIBO and assess whether antibiotic treatment had been effective.[161]

159. Examples 4-7, 10 disclosed treatment of fibromyalgia, chronic fatigue syndrome, multiple sclerosis, ADHD, depression, Crohn's disease, and hyperalgesia. Example 8 reported a study of phase III interdigestive motility in 15 subjects "having a suspected diagnosis of IBS, as defined by Rome Criteria, corroborated by concomitant SIBO."[162] Example 9 reported two subjects "with recurrent IBS symptoms" received "prokinetic treatment" with erythromycin, explaining that erythromycin is a motilin agonist that can induce phase III of interdigestive motility."[163]

---

[158] *Id.* at -148-149, col. 22:1-23:34.
[159] XIFAX_AMN_1874117.
[160] *Id.*
[161] XIFAX_AMN_1874184-5 (stating that Pimentel's approach "may result in both false positive and false negative diagnoses of SIBO" and "cannot reliably be used to assess for eradication of SIBO"); XIFAX_AMN_1874224 (stating that this "will be a dynamic field that still needs to be explored").
[162] NORWICH_NJ_INV_000124 at -149-151, col. 23:12-28:3, 28:34-67.
[163] *Id.* at -151, col. 28:5-32

160. The Lin '240 Patent does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise contains no information about the reduction of bloating associated with IBS-D or other IBS symptoms specifically in a female subject following 7 days after administration of rifaximin.

**9. Pimentel 2005**

161. Dr. Harary cites to a 2005 article by Mark Pimentel et al. titled *Rifaximin, a Non-Absorbable Antibiotic, Improves the Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study*, Am. J. Gastroenterology, vol. 100, num. 9, suppl. S324 (2005) ("Pimentel 2005").[164] Pimentel 2005 is an abstract of a study. In the abstract, Pimentel 2005 explains that subjects (i) first undertook "a 7-day stool diary," "a questionnaire and a lactulose breath test"; (ii) subjects were then randomized and "receive either placebo or rifaximin 400 mg p.o. t.i.d. for 10 days,; and (iii) then "[d]uring the 7 days following antibiotic therapy, subjects were asked to repeat the stool diary followed by a symptom questionnaire and lactulose breath test."[165] Pimentel 2005 provides no results for any IBS subgroup or gender. Nor does Pimentel 2005 report an improvement in bloating at the $p < 0.05$ level, and states that "[n]o difference was seen with constipation."[166] The Pimentel 2005 abstract stated the "primary outcome was global improvement in IBS," but did not explain how and when it was measured, the statistical analysis done, or anything more than the endpoint. Pimentel 2005 also does not report the number of patients with positive lactulose breath tests either before or after drug administration.

162. Pimentel 2005 does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It also contains no information about (i) the reduction

[164] Harary Opening Report at ¶¶ 110-113 (citing NORWICH_NJ_INV_000282-84).
[165] *Id.* at -282, Methods.
[166] *Id.* at -282, Results.

of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Pimentel 2005 also fails to disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**10. Salix Business Wire**

163. Dr. Harary cites to a press release: Salix Pharmaceuticals Reports American College of Gastroenterology XIFAXAN(R) Update; XIFAXAN(R) Studied in Six Investigator-Initiated Trials, Business Wire (https://fintel.io/doc/sec-salix-pharmaceuticals-ltd-1009356-ex991-2005-october-31-18823-5611) ("Salix Business Wire"), which he states was published on October 31, 2005.[167] The press release describes the same study as in in Pimentel 2005, and provides no new information other than announcing the abstract would be presented orally on November 1, 2005.

164. Salix Business Wire does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It also contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Salix Business Wire fails to disclose that the

[167] Harary Opening Report at ¶¶ 114-115 (citing NORWICH_NJ_INV_000347-350).

reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**11. Pimentel Conference Call**

165. Dr. Harary cites to a conference call published November 14, 2005 ("Pimentel Conference Call").[168] The conference call describes the same study as in in Pimentel 2005, and provides no new information.

166. Dr. Harary claims the "Pimentel Conference Call further discloses that 'nearly 50 percent of the GI's on the West Coast' had used antibiotics, including rifaximin, to treat IBS by November 2005."[169] But he provides no validation for this claim beyond Dr. Pimentel's representations. The call transcript states Dr. Pimentel responded to a question about the off-label use of rifaximin "for Irritable Bowel" by saying "nearly 50% of GIs on the west coast are in tune with this already." He offered no support for the claim, did not explain what "in tune" meant or whether "this" meant the use of rifaximin.

167. The Pimentel Conference Call furthermore does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. The Pimentel Conference Call fails to disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

[168] Harary Opening Report at ¶¶ 116-118 (citing NORWICH_NJ_INV_000317-326).
[169] *Id.* at ¶ 117.

**12. Pimentel 2006**

168. As discussed above, Salix disclosed Pimentel 2006 during the prosecution of the IBS-D Patents and it appears on the face of both of those patents.[170]

169. Pimentel 2006 describes an 87-patient study of 400 mg rifaximin or placebo TID (1200 mg/day) for 10 days for patients who met the Rome I criteria for IBS.[171] The dosage was based on a previous study using rifaximin to treat bacterial overgrowth.[172] The "primary end point was global improvement in IBS symptoms during follow-up" for 10 weeks, although data was not available for all 10 weeks.[173] The study involved both males and females but did not delineate the results by gender. Only 72 subjects completed the final follow-up visit.[174]

170. Pimentel 2006 "assessed the individual bowel symptoms of abdominal pain, bloating, diarrhea, and constipation."[175] "A questionnaire was administered before treatment and 7 days after treatment."[176] "We asked patients to rate the severity of their symptoms on the VAS again 7 days after the completion of rifaximin treatment or placebo."[177] After 10 days of treatment, patients also were asked to keep a weekly symptom diary for 10 weeks: "[a]fter completing the 10-day course of study medication, patients immediately began another stool diary for 7 days then returned to complete a follow-up questionnaire[.]"[178] The study reports greater improvement in IBS symptoms over 10 weeks of follow up and lower bloating score after rifaximin treatment, but

[170] XIFAX_AMN_0007928; XIFAX_AMN_0006830.
[171] XIFAX_AMN_0310652.
[172] *Id*. at -653.
[173] *Id*. at -654.
[174] *Id*.
[175] *Id*. at -656.
[176] *Id*. at -652.
[177] *Id*. at -654.
[178] *Id*. at -653.

"[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups.[179]

171. Pimentel 2006 does not disclose a method of using 550 mg TID (1650 mg/day) rifaximin for 14 days to treat IBS or the safety and efficacy of using that dosage. It further does not address the treatment of IBS-D or alternating IBS at all. Pimentel 2006 also does not disclose the reduction of bloating associated with IBS-D or other IBS symptoms specifically in a female subject.

172. Pimentel 2006 teaches that rifaximin 400 mg TID for 10 days was ***no*** better than placebo in improving diarrhea in IBS patients: "[n]o major differences in abdominal pain, diarrhea, or constipation" among patients treated with 400 mg TID rifaximin or a placebo.[180] Although breath testing was performed, Pimentel 2006 does not report the results.[181] Pimentel 2006 acknowledges the limitations of its study, including how (i) the small size may make it difficult to assess side effects; (ii) a larger study would be necessary to evaluate the use of rifaximin on other symptoms; (iii) the short duration made it impossible to evaluate recurrence; and (iv) all the subjects came from only one center.[182] Indeed, the editors noted that "[n]o major differences in abdominal pain, diarrhea, or constipation [was] observed between the groups" and cautioned that the "duration of therapy and follow-up was short":[183]

---

[179] *Id*. at -653, -656.
[180] *Id*. at -653.
[181] *Id*. at -654.
[182] *Id*. at -657.
[183] *Id*. at -653 (alteration added).

***Context***

Few trials have evaluated the effects of antibiotics on symptoms of the irritable bowel syndrome (IBS).

***Contribution***

In this double-blind trial, 87 patients with IBS were randomly assigned to either rifaximin (400 mg 3 times daily) or placebo for 10 days. Over a 10-week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients. No major differences in abdominal pain, diarrhea, or constipation were observed between the groups.

***Cautions***

The duration of therapy and follow-up was short.

***Implications***

Rifaximin may improve some symptoms in some patients with IBS.

*—The Editors*

173. Nor does Pimentel 2006 disclose that the reduction of bloating associated with IBS-D or any IBS symptoms was achieved following 7 days after administration of rifaximin. Instead, Pimentel 2006 did not disclose changes in symptoms until day 17, because the questionnaire was administered 7 days after the 10-day treatment.[184] Moreover, the endpoint of the study was global improvement of symptoms during the 10-week follow-up, not achieving the reduction of symptoms following 7 days after administration.

174. In an editorial following Pimentel 2006, Dr. Douglas A. Drossman, one of the world's leading experts on IBS and IBS-D treatment, criticized Pimentel 2006 because "[t]he clinical challenge is to identify the subset of patients with IBS who are most likely to have bacterial overgrowth that produces symptoms relative to the many other factors …. Unfortunately, no data are available to help us in this decision[.]"[185] He concluded "Pimentel and colleagues should be congratulated for their efforts to increase awareness of this important subgroup of patients [likely to have SIBO] with IBS symptoms who need to be identified and treated. However, until better

---

[184] *Id.* at -652, -654.

[185] XIFAX_AMN_0887874 at -7875.

evidence is available, decisions relating to diagnosis and treatment remain within the art of medicine."[186] In particular, Dr. Drossman noted that "[d]emonstrating benefit from a short course of an antibiotic for a sustained period of time in unselected patients with IBS is certainly novel and important. However, several methodologic issues must be addressed before drawing such conclusions from the [Pimentel 2006] study."[187]

175. Dr. Drossman identified six methodological issues with Pimentel 2006, including (1) differences in "site recruitment"; (2) a unique endpoint that made comparisons with other studies difficult; (3) potentially imbalanced baseline pain scores; (4) no improvement of secondary end points that are integral to IBS, including pain, diarrhea and constipation; (5) the unconventional mixed model analysis; and (6), the failure to report study data on the breath tests.[188] He concluded that "the limitations of the study make the findings ***inconclusive*** and ***raise questions about the clinical significance of the results***."[189]

176. Dr. Drossman was particularly concerned about the relationship between IBS and bacterial overgrowth and effectiveness of the lactulose breath test.[190] In his opinion, the trial's statistical methods allowed the investigators to minimize the impact of treatment failures on the overall outcome, and rifaximin failed to improve the symptoms "integral in defining IBS (namely, pain, diarrhea, and constipation)[.]"[191] Given the negative critique of Pimentel 2006 by Dr. Drossman, one of the leading experts in the field of IBS and IBS-D, a POSITA would have been skeptical of Pimentel 2006's finding and would have been reluctant to rely on them.

---

[186] *Id.*
[187] *Id.* at -7874.
[188] *Id.* at -7874-75.
[189] *Id.* at -7875 (emphasis added).
[190] *Id.* at -7874-75.
[191] *Id.* at -7874.

177. In addition, in February 2008 (at the time of the inventions), Dr. Stephen Vanner (a leading Gastroenterologist from Queen's University in Ontario, Canada) surveyed the scientific evidence, including publications by Dr. Pimentel and his colleagues at Cedars-Sinai Hospital, and concluded that Dr. Pimentel's research (and other studies on using antibiotics to treat IBS) presented an "*unproven hypothesis*."[192] He also criticized Pimentel 2006's use of a statistical mixed model because it created a "blending of symptom responses over the entire period rather than a conventional single end point."[193]

178. In my opinion, given these critiques by key opinion leaders and experts and the limitations of Pimentel 2006, a POSITA would not have been motivated to combine Pimentel 2006 with other references, let alone having a reasonable expectation of success in achieving the claimed inventions.

179. Before February 2008, key opinion leaders in the GI field also were skeptical that an antibiotic like rifaximin could safely and effectively treat IBS-D. For example, a 2007 Education Practice note by Dr. Eamonn M.M. Quigley (past president of the American College of Gastroenterology and the World Gastroenterology Organization) stated that a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[194] Dr. Quigley also observed that "[a]ntibiotic dose and duration of therapy have not been established."[195] Moreover, a 2007 publication from the British Society of Gastroenterology recognized that antibiotic treatment "cannot be recommended until replicated in well-designed studies by others [i.e., doctors outside of Cedars-Sinai]."[196] Less than a month

---

[192] XIFAX_AMN_1874266 at -4271.
[193] *Id*. at -4270.
[194] XIFAX_AMN_1253920 at -3922.
[195] *Id.*
[196] XIFAX_AMN_1874288 at -4306.

before the priority date of the asserted patents, Dr. Vanner likewise wrote: "There is *insufficient evidence* to recommend antibiotics for the treatment of irritable bowel syndrome at present."[197]

180. In the 2006 authoritative treatise *Rome III The Functional Gastrointestinal Disorders*, Dr. Drossman et al. were skeptical of the notion that SIBO caused IBS, concluding (i) this thesis was "unproven" and (ii) the "methodological weaknesses" of the cited SIBO study—Pimentel 2000, discussed above—"undermined the credibility of this report."[198]

181. A POSITA likewise would have been skeptical that SIBO contributed to IBS, IBS-D or alternating IBS and that antibiotics like Xifaxan® could treat IBS, IBS-D or alternating IBS by eradicating SIBO. *First*, a POSITA would have understood that IBS, IBS-D and alternating IBS are different conditions than SIBO.[199] Therefore, a POSITA would not have reasonably relied on SIBO research in treating IBS, IBS-D, or alternating IBS. *Second*, a POSITA would have known that the breath tests used to detect the prevalence of SIBO was unreliable.[200] Thus, a POSITA would have been skeptical that SIBO was common in IBS, IBS-D or alternating IBS if that assertion was based on a positive breath test.[201] *Third*, the theory that SIBO was common in IBS was controversial because others in the field were unable to replicate Dr. Pimentel's experiments involving SIBO.[202]

182. Dr. Harary also relies on Pimentel 2006's statement that "[r]ecent data suggest that the optimal dose of rifaximin may, in fact, be higher than that used in our study."[203] Pimentel 2006

[197] XIFAX_AMN_1874266, at -4270 (emphasis added).
[198] XIFAX_AMN_1906298-373 at -319.
[199] XIFAX_AMN_1874288 at -4299.
[200] Sleisenger et al., *Sleisenger & Fordtran's Gastrointestinal and Liver Disease: Pathophysiology, Diagnosis, Management*, 8th ed., Saunders Elsevier (2006), XIFAX_AMN_1874317 at -4327.
[201] *Id.*
[202] Drossman, D., *Treatment for Bacterial Overgrowth in the Irritable Bowel Syndrome*, Ann Intern Med. 145(8):626-628 (2006), XIFAX_AMN_0887874 at -7875; XIFAX_AMN_1874121; XIFAX_AMN_1874193 at -4193; XIFAX_AMN_1874281 at -4284.
[203] Harary Opening Report at ¶ 124 (citing NORWICH_NJ_INV_000285-92).

cites Lauritano for support that of its higher dose suggestion.[204] But Lauritano studied dosing for the treatment of SIBO, not IBS, IBS-D or alternating IBS, and the subjects were not asked about their symptoms. Moreover, the highest reported dose used Lauritano was 1,200 mg of rifaximin—the same dose used in Pimentel 2006.[205] Therefore, Lauritano fails to support Pimentel 2006's assertion "that optimal doses of rifaximin may, in fact, be higher than those used in our study." In any event, Pimentel 2006 does not suggest or even hint what the "higher" dose might be (the 1,650 mg/day dosage in the Asserted Claims is nearly ***40 percent higher*** than the 1,200 mg/day dosage in Pimentel 2006), and Lauritano discloses no dosage higher than 1,200 mg/day.[206] And neither Pimentel 2006 nor Lauritano provides any data that would allow a POSITA to evaluate the safety and efficacy of any unspecified "higher" dosage to treat IBS, IBS-D, or alternating IBS.

**13. Pimentel Book**

183. Dr. Harary cites to book authored by Mark Pimentel titled Bacteria – The Missing Link in Treating Irritable Bowel Syndrome, Health Point Press (2006) ("Pimentel Book"), which he states was published in 2006 by Health Point Press.[207] The Pimentel Book reported no new data or research regarding rifaximin. It explains that "only a handful of researchers in the United States are working to identify a cause for IBS"; "most physicians continue to have a poor understanding about IBS;" and "the research is often complex even for those in the field; physicians and patients alike may get lost trying to understand the quagmire of opinions and research findings."[208] The Pimentel Book provides background chapters on IBS, diverging IBS theories, and includes chapters on the brain-gut axis, motility, and the SIBO/IBS hypothesis. As

[204] Pimental et al., *The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome*, Ann Intern Med. 145(8):557-563 (2006), XIFAX_AMN_0310652 at -657.
[205] XIFAX_AMN_0690550 at -0553.
[206] XIFAX_AMN_1677384.
[207] Harary Opening Report at ¶¶ 125-130 (citing NORWICH_NJ_INV_000420-27).
[208] XIFAX_AMN_1875748 at -755-756, 759.

discussed, by the time of the claimed inventions, the SIBO/IBS hypothesis had been criticized and lacked support.

184. Chapter 6 of the Pimentel Book describes the "Cedars-Sinai Protocol for Treating IBS," involving various testing including celiac testing, blood testing, thyroid testing, and colonoscopies. The description of rifaximin treatment confirms that rifaximin "is FDA approved for traveler's diarrhea but not for IBS."[209] It does not describe the rifaximin treatment regimen used, other than noting it follows "an initial ten-day period."[210]

185. While the Pimentel Book discussed how neomycin and rifaximin were not likely to affect bacteria in other areas of the body, bacterial resistance is relevant regardless of whether a drug is an absorbed antibiotic or non-absorbed antibiotic.[211]

186. Dr. Harary cites no basis or evidence of Salix's alleged citation of the Pimentel Book in its Final Study Report for the RFIB 2001 Study. He also does not cite any support for Salix's receipt of previews of the Pimentel Book, or dissemination/distribution of the Pimentel Book. He also provides no evidence that these alleged facts were known in the art or otherwise disclosed in prior art. In any event, the Patent Office reviewed and considered multiple publications describing Pimentel's work during prosecution of the IBS-D Patents, as the face of each IBS-D Patent reflects.

187. The Pimentel Book does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise does not contain information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating

[209] *Id.* at -823.
[210] *Id.* at -822-824.
[211] *Id.* at -759.

IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does the Pimentel Book disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**14. Sharara**

188. As discussed, Salix disclosed Sharara during prosecution of both the ’912 and ’571 Patents, and it appears on the face of those patents.[212]

189. Sharara describes a trial with three 10-day phases for patients with “gas-related symptoms (bloating, abdominal distension, and flatulence)”: baseline (phase 1); 400 mg BID rifaximin (800 mg/day) or placebo (phase 2); and post-treatment (phase 3).[213] Patients did not have to satisfy the Rome criteria for IBS to enroll.[214] Not all of the patients satisfied the Rome criteria: “[o]ur study is the first of its kind to primarily address the common complaints of bloating, abdominal distension, and flatulence in the community regardless of whether these subjects fit the … criteria used in IBS studies.”[215] The aims of the study include: verifying whether patients suffer SIBO as shown by exaggerated release of hydrogen; examining the effect of rifaximin on gas-related symptoms; and attempting to link symptom improvement with hydrogen excretion.[216] Patients assessed symptoms at baseline and the end of the study.[217] None of the patients in the

[212] XIFAX_AMN_0007928; XIFAX_AMN_0006830.
[213] XIFAX_AMN_0310894 at -895.
[214] *Id*. at -897.
[215] *Id*. at -898.
[216] *Id*.
[217] *Id*. at -896.

study had an abnormal breath test at baseline.[218] At the end of the study, patients reassessed their symptoms and took a Lactulose H2-breath test.[219]

190. Sharara did not delineate its results by gender or type of IBS and only reported results for bloating.[220] Sharara acknowledged the shortcomings of its study, including the presence of both IBS and non-IBS patients, the short treatment and follow-up duration and the small number of patients with a positive response.[221] Indeed, 70 of the 124 subjects in the study had been diagnosed with IBS, but just 20% of those 70 subjects had IBS-D. The authors also noted the "pathophysiology of IBS remains poorly understood, although various mechanisms, including altered gut flora and/or small bowel bacterial overgrowth, have been suggested to play a role in the development of gas-related symptoms."[222] They concluded that "efficacy of long-term or cyclic use of rifaximin, as primary or adjuvant therapy in this patient population deserves further investigation."[223]

191. In addition, experts in the field, including Dr. Quigley, noted Sharara's results were "far from overwhelming and the duration of the study was exceedingly short in a condition that is notoriously chronic and remittent."[224]

192. Sharara does not disclose the use of 550 mg TID (1650 mg/day) of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS. It likewise contains no information about the reduction of bloating or other IBS symptoms specifically in a female subject. Nor does Sharara disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin. The subjects reported on their symptoms—i.e., "bloating, abdominal distension, and

[218] *Id*. at -897.
[219] *Id*. at -896.
[220] *Id*. at -897.
[221] *Id*. at -900.
[222] *Id*. at -894.
[223] *Id*. at -900.
[224] XIFAX_AMN_0936198-211.

flatulence in the community regardless of whether these subjects fit the strict and complex criteria used in IBS studies"—at some unspecified time after the 10 day treatment of 400 mg BID rifaximin.[225]

**15. Ebell**

193. Dr. Harary cites an article by M. Ebell titled *Rifaximin Reduces Flatulence, Bloating with IBS*, 74 Am. Fam. Physician 152 (2006) ("Ebell").[226] Ebell notes that "[i]t is thought that bloating and flatulence, … may be caused by bacterial overgrowth in the small intestine."[227] Subjects received 400 mg rifaximin BID for 10 days. Not all of the subjects suffered from IBS. Ebell notes that the "authors did some data dredging and found that changes in LHBT results correlated with bloating scores in those who responded to rifaximin but not in those who did not. This post-hoc analysis may point toward future research but cannot guide therapy."[228]

194. Ebell does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It also contains no information about the reduction of bloating or other IBS symptoms specifically in a female subject or the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment. Nor does Ebell disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**16. Cuoco**

195. As discussed, Salix disclosed Cuoco during prosecution of both the '912 and '571 Patents, and it appears on the face of those patents.[229]

[225] XIFAX_AMN_0310894 at -896.
[226] Harary Opening Report at ¶¶ 138-140 (citing NORWICH_NJ_INV_000051-53).
[227] NORWICH_NJ_INV_000051-53 at -51.
[228] *Id*. at -52.
[229] XIFAX_AMN_0007928; XIFAX_AMN_0006830.

196. Cuoco concerns a retroactive case study of SIBO, which, as discussed, is not the same diagnosis as IBS, IBS-D or alternating IBS.[230] IBS and SIBO have a number of distinctions, such as SIBO appearing more frequently in older adults. SIBO also was not part of the Rome III criteria diagnosis of IBS.

197. As discussed in the Expert Report of Dr. Ehrenpreis, in 2008, the association between SIBO and IBS was unproven.[231] Cuoco does not disclose the use of 550 mg TID rifaximin for 14 days to treat IBS, IBS-D or alternating IBS. It also has no information about the reduction of bloating associated with IBS-D or other IBS symptoms specifically in a female subject. Indeed, Cuoco does not even mention bloating. Cuoco also does not disclose that the reduction of bloating associated with IBS-D or any IBS symptoms was achieved following 7 days after administration of rifaximin.

198. Cuoco "evaluated the real presence of small intestinal bacterial overgrowth (SIBO) by retrospectively examining the glucose hydrogen (H2) breath test in 96 patients with a previous symptoms-based IBS diagnosis" and "the efficacy of locally acting antibiotic rifaximin in eradicating a SIBO syndrome."[232] The authors of Cuoco reviewed medical charts of 96 patients with a prior IBS diagnosis and a breath test. Only 44 of those subjects had a positive breath test.[233] Those SIBO patients were treated with 1200 mg /day of rifaximin for 14 days followed by a twenty-day cycle of probiotics.[234] They were "advised" to come back within 4-5 months after therapy for another glucose breath test, but only 23 patients returned.[235] Cuoco reports that 19 out

[230] XIFAX_AMN_0690728.
[231] Ehrenpreis Report ¶¶ 44-64.
[232] XIFAX_AMN_0690728 at-729.
[233] *Id.* at -730.
[234] *Id.* at -732.
[235] *Id.* at -729, -731.

small intestinal bacterial overgrowth (SIBO) may contribute to IBS pathophysiology."[261] In 2007, the association between SIBO and IBS was unproven. *See* discussion of SIBO in Section IX.D.

215. The review evaluated the use of rifaximin, either alone or in combination with other therapies, to treat GI symptoms in IBS patients. Patients received 400 mg rifaximin either BID or TID for 10 days. Patients "reporting partial relief of GI symptoms, or return of symptoms after completing rifaximin treatment," received additional rifaximin.[262] In Muska, patients could also receive concomitant medications, including tegaserod, hyoscyamine, rabeprazole, loperamide, chlordiazepoxide/clidinium, dicyclomine, belladonna, oxybutynin, doxycycline and fiber. Only 33% of patients reported experiencing complete relief after receiving the initial rifaximin regimen. Muska did not disclose the treatment of female patients and contains no information on the gender of the patients whose charts were reviewed. Finally, Muska reports that "[c]ontrolled trials are warranted to further evaluate these findings."[263]

216. Muska does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does Muska disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

---

[261] XIFAN_AMN_0970160.
[262] *Id.*
[263] *Id.*at -161.

217. A POSITA in 2008 would have identified Muska's many limitations, including (i) the size and nature of the study, (ii) its uncontrolled nature, (iii) its focus on the relationship between SIBO and IBS, and (iv) its use of confounding combination therapy with rifaximin and a probiotic, much less any concerns about safety beyond the duration of the studies he analyzed.

**20. Weinstock 2007**

218. Dr. Harary cites to U.S. Patent Application Publication No. 2008/0161337 ("Weinstock '337").[264] Weinstock was published on July 3, 2008 and therefore is not prior art.[265] Weinstock '337 discloses the "use of rifaximin for the treatment of chronic prostatitis."[266] It notes research indicating that SIBO may underlie some IBS symptoms. In 2008, the association between SIBO and IBS was unproven. *See* discussion of SIBO in Section IX.D.

219. Weinstock '337 does not discuss the use of rifaximin to treat IBS, IBS-D or alternating IBS. Nor does it disclose the use of 550 mg TID (1650 mg/day) of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS. It also contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does Weinstock '337 disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

[264] Harary Opening Report at ¶¶ 157-61 (citing NORWICH_NJ_INV_000518-24).
[265] NORWICH_NJ_INV_000513.
[266] *Id.*

### 21. RFIB 2001 Study Protocol

220. As discussed above, Salix disclosed the RFIB 2001 Study Protocol during prosecution of both the ’912 and ’571 Patents, and it appears on the face of those patents.[267]

221. The RFIB 2001 Study Protocol describes the design of a future phase II study “to assess the efficacy and safety of three different doses of rifaximin administered BID either two or four weeks in the treatment of patients with diarrhea-associated irritable bowel syndrome.”[268] Patients would receive either 275 mg BID (550 mg/day), 550 mg BID (1100 mg/day) or 1100 mg BID (2200 mg/day) for 14 days.[269] The “primary objective of th[e] trial [was] to evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg BID versus placebo in providing adequate relief from Diarrhea-associated IBS (IBS-D) symptoms.”[270] Those symptoms included “abdominal pain and altered bowel habits, including diarrhea, constipation, or alternating diarrhea and constipation.”[271] Secondary outcomes included evaluating (i) the “dose-response relationship of placebo administered for 28 days and rifaximin administered at 275 mg BID, 550 mg BID, or 1100 mg BID for 14 days”; (ii) “the efficacy of 550 mg BID for 4 weeks to determine if there are any differences when treatment is extended for an additional 2-week period when compared to a similar dosing regimen for 2 weeks”; and (iii) the “durability of response over a 12-week Post-treatment Phase in subjects with IBS-D who achieved a response during the acute Treatment Phase[.]”[272]

222. The RFIB 2001 Study Protocol does not include any results. A POSITA would not have reasonably expected that RFIB 2001 Study would be successful just because it had been

[267] XIFAX_AMN_0007928; XIFAX_AMN_0006830.
[268] XIFAX_AMN_1882456 at -2458.
[269] *Id.*
[270] *Id.*
[271] *Id.* at -2457.
[272] *Id.* at -2458.

designed. The RFIB 2001 Study Protocol does not disclose the use of 550 mg TID (1650 mg/day) for 14 days to treat IBS, IBS-D, or alternating IBS. In fact, alternating IBS patients with constipation were excluded.[273] Since it is only a study design, the RFIB 2001 Study Protocol contains no information about the safety and efficacy of any rifaximin dosage to treat IBS, IBS-D or alternating IBS. The RFIB 2001 Study Protocol also contains no information about the reduction of bloating associated with IBS-D or other IBS symptoms specifically in a female subject. In fact, it does not address bloating at all. Nor does the RFIB 2001 Study Protocol disclose that the reduction of bloating associated with IBS-D or any IBS symptoms was achieved following 7 days after administration of rifaximin.

223. Dr. Harary relies on the RFIB Study Protocol as evidence of the 7-day limitation.[274] But the RFIB 2001 Study Protocol says nothing about patients whose symptoms were reduced following 7 days after the administration of rifaximin. In addition, the "acute Treatment Phase" described in the RFIB 2001 Study Protocol would last 14 days, not 7.

**22. RFIB Press Release**

224. Dr. Harary cites to a September 5, 2007 Salix Pharmaceuticals, Ltd. press release titled *Rifaximin Demonstrates Statistically Significant Improvement in Co-Primary Endpoints in Treatment of Diarrhea-Associated Irritable Bowel Syndrome in Phase IIb Study* ("RFIB 2001 Press Release").[275] Salix disclosed the RFIB 2001 Press Release during prosecution of both the '912 and '571 Patents, and it appears on the face of those patents.

225. I understand from counsel that the RFIB 2001 Press Release is not prior art because Defendants have not established it was "by others" as required by pre-AIA 35 U.S.C. §102(a).

[273] *Id.* at -2459.
[274] Harary Opening Report at ¶¶ 162-68 (NORWICH_NJ_INV_000339-46).
[275] Harary Opening Report at ¶¶ 169-72 (citing NORWICH_NJ_INV_000336-38).

226. The RFIB Press Release quotes Dr. Bill Forbes, a named inventor, discussing the results of "our" study, and was issued within one year of the priority date of the IBS-D Patents.

227. The RFIB 2001 Press Release describes the results of the RFIB trial on the administration of 550 mg BID (1100 mg/day) rifaximin for 14 days to IBS-D patients. It does not report the results of the 275 mg BID (550 mg/day) and 1100 mg BID (2200 mg/day), which a POSITA would have understood to mean that those regimens were unsuccessful. The RFIB 2001 Press Release reports that the treatment "provides a statistically significant improvement in both adequate relief of dIBS symptoms and adequate relief of bloating, compared to placebo." It further states that the "results provide a solid rationale and basis for the further investigation of rifaximin by means of a Phase III program[.]" The study involved both males and females but did not delineate results by gender.[276]

228. The RFIB 2001 Press Release does not disclose the use of 550 mg TID (1650 mg/day) of rifaximin for 14 days to treat IBS, IBS-D, or alternating IBS patients. Since it does not report on the efficacy and safety of the 275 mg BID or 1100 mg BID dosing that was part of the study, a POSITA would have understood the results were negative for those dosages. The RFIB 2001 Press Release likewise contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does the RFIB 2001 Press Release disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

[276] NORWICH_NJ_INV_000336-38.

### 23. Pimentel 2011 and Pimentel Ex. 21

229. Dr. Harary cites to an article titled *Effects of Rifaximin Treatment and Retreatment in Nonconstipated IBS Subjects*, 56 Dig. Dis. Sci. 2067 (May 11, 2011) ("Pimentel 2011").[277]

230. Pimentel 2011 is not prior art, as Defendants cite no evidence that the alleged rifaximin treatments "for the years from January 2007 through January 2011" were "public" before February 26, 2008, that the patients had consented to their treatment information becoming public before February 26, 2008, or that Dr. Pimentel was authorized before February 26, 2008 to publish the information ultimately published in Pimentel 2011.

231. There is therefore no evidence that such uses, to the extent they occurred, reflect the state of the art, the level of skill in the art, and the knowledge, motivations and expectations of skilled artisans before the claimed filing dates of the IBS-D Patents. Pimentel 2011 does not offer any analysis limited to rifaximin treatments that allegedly occurred before February 26, 2008. Accordingly, even if Pimentel 2011 did establish prior art "public uses" of rifaximin, its teachings and findings necessarily rely upon post-priority-date information that would have been unavailable to a POSITA at the time of the claimed inventions.

232. Dr. Harary offers no support or evidence of (1) Plaintiffs' alleged reliance on Pimentel 2011 in its submission to FDA; (2) Plaintiffs allegedly obtaining the underlying "database" supporting Pimentel 2011; or (3) the alleged contents of that database. Nor does he provide any evidence suggesting that these facts were known in the art or otherwise disclosed in prior art. Given Pimentel 2011's publication date, they were not known (if at all) until at least after the applicable priority date.

[277] Harary Opening Report at ¶¶ 178-83 (citing NORWICH_NJ_INV_000293-31).

233. Pimentel 2011 retrospectively reviewed 522 charts of patients diagnosed with IBS-D or IBS-A (described in the chart as having diarrhea).[278] Pimentel 2011 noted that "the precise etiology of IBS remains unknown" and did not assert that it had yet been proven whether "gut flora have a pathological role in this condition."[279] The chart review identified 169 patients treated with rifaximin, 71 of whom had received at least one retreatment with rifaximin, and for some of these cases, patients reportedly received treatments in 2004.[280] Patients who had been treated concurrently with another antibiotic were excluded, but Pimentel 2011 did not say whether patients on other medications were excluded.[281] Pimentel 2011 does not report data by IBS subtype, for females, or for individual IBS symptoms. Pimentel 2011 does not report what rifaximin treatment regimen were used, let alone before the priority date.

234. Xifaxan® 200 mg tablets were approved in 2004 for the treatment of travelers' diarrhea. Xifaxan® 550 mg tablets became commercially available in 2010, when approved to reduce the risk of recurrence of overt HE episodes. Thus, it would have been impossible for Dr. Pimentel (or others in his practice) to have administered rifaximin in a dosage of 1650 mg (or 550 mg TID) before the 2010 date of approval of Xifaxan® 550 mg.

235. Pimentel 2011 does not disclose the prior art use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It similarly contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the

[278] NORWICH_NJ_INV_000293 at -296.
[279] *Id.* -296 (stating only that "recent evidence" had "suggested" this role, and citing a 2010 publication).
[280] *Id.* at -298.
[281] *Id.*

subject had a reduction of bloating or other IBS symptoms. Pimentel 2011 also does not disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**24. Weinstock 2011**

236. Dr. Harary cites to a 2011 article by Dr. Leonard B. Weinstock titled *Long-Term Outcome of Rifaximin Therapy in Non-constipation Irritable Bowel Syndrome,* Correspondence to the Editor, 56 *Dig*. Dis. Sci 3389 (2011) ("Weinstock 2011").[282]

237. Given the date of publication, Weinstock 2011 is not prior art as it is not evidence of alleged "public use" before at least February 26, 2008. Dr. Harary does not identify evidence that the alleged rifaximin treatments were "public" before February 26, 2008, that the patients had consented to their treatment information becoming public before February 26, 2008, or that Dr. Weinstock was authorized before February 26, 2008 to publish what was ultimately included Weinstock 2011. There is therefore no evidence that any uses that occurred reflect the state of the art, the level of skill in the art, and the knowledge, motivations and expectations of skilled artisans before the claimed filing dates of the IBS-D Patents. Weinstock 2011 offers no analysis confined to rifaximin treatments that allegedly occurred before February 26, 2008. Even if Weinstock 2011 did establish prior art "public uses" of rifaximin, its teachings and findings necessarily rely upon post-priority date information that would have been unavailable to one of skill at the time of the claimed inventions.

238. Dr. Harary does not offer support or evidence of (1) Plaintiffs relying on Weinstock 2011 in its submission to FDA; (2) Plaintiffs having access to the "final data"; or (3) the contents of that "final data." Dr. Harary similarly offers no evidence that these facts were known in the art

[282] Harary Opening Report at ¶¶ 188-90 (citing NORWICH_NJ_INV_000511-12).

or otherwise disclosed in prior art. Given Weinstock 2011's publication date, they were not known (if at all) until at least after the applicable priority date. Further, the suggestion that Plaintiffs allegedly offered funding and editorial assistance for Weinstock 2011 does not constitute evidence that Plaintiffs endorsed Weinstock's findings or deemed them important.

239. Weinstock 2011 is a letter to the editor responding to Pimentel 2011. It is not peer-reviewed. The letter noted "two concerns with [Pimentel 2011]. First, the patients in the study were recruited from a university medical center and therefore may not be representative of a community practice patient population. Second, use of prophylactic medication was not outlined, and this could influence the rate of IBS recurrence after rifaximin therapy."[283] Weinstock 2011 reported its own "retrospective chart review of patients with diarrhea-predominant or alternating IBS . . . who received rifaximin 800-1,800 day for 10-14 days between 2005 and 2011."[284] Weinstock 2011 reported that 70 patients had an "adequate response" to initial rifaximin treatment, based on clinical notes and patient reporting.[285] And of those 70 patients, 49 received one or more retreatment courses, either without initial prophylactic therapy (7 patients), or in combination with tegaserod (13 patients), erythromycin (45 patients), naltrexone (26 patients), or probiotics (20 patients).[286] Weinstock 2011 reported that 74% of the patients "experienced relief of IBS symptoms after their initial course of rifaximin and that most responded to rifaximin retreatment." *Id.* Weinstock 2011 does not report data by IBS subtype, for females, or for individual IBS symptoms.

240. Xifaxan® 200 mg tablets were approved in 2004 for the treatment of travelers' diarrhea. Xifaxan® 550 mg tablets became commercially available in 2010, after being approved

[283] NORWICH_NJ_INV_000511.
[284] *Id.*
[285] *Id.*
[286] *Id.*

to reduce the risk of recurrence of overt HE episodes. It therefore would have been impossible for Dr. Weinstock (or others in his practice) to have administered rifaximin in a dosage of 1650 mg (or 550 mg TID) before the 2010 date of approval of Xifaxan® 550 mg.

241. Weinstock 2011 does not disclose the prior art use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does Weinstock 2011 disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**25. Jolley 2011**

242. Dr. Harary cites to a 2011 article by Dr. John Jolley titled *High-dose rifaximin treatment alleviates global symptoms of irritable bowel syndrome*, 4 Clin. & Experimental Gastroenterology 43 (2011) ("Jolley").[287] Jolley is not prior art, as it does not provide evidence of alleged "public use" before at least February 26, 2008. Defendants cite no evidence that the alleged rifaximin treatments were "public" before February 26, 2008, that the patients had consented to their treatment information becoming public before February 26, 2008, or that Dr. Jolley was authorized before February 26, 2008 to publish the information ultimately published in Jolley. There is therefore no evidence that any such uses reflect the state of the art, the level of

[287] Harary Opening Report at ¶¶ 191-97 (citing NORWICH_NJ_INV_000079-84).

skill in the art, and the knowledge, motivations and expectations of skilled artisans before the claimed filing dates of the IBS-D Patents.

243. Dr. Harary also provides no supporting reasoning or evidence of Salix's allegedly relying on Jolley in its submission to FDA, nor that this fact was known in the art or was otherwise disclosed in prior art. Based on Jolley's publication date, it was not known (if at all) until at least after the priority date.

244. Jolley reports a retrospective chart review of patients diagnosed with IBS using Rome III criteria, who had an abnormal lactulose breath tests between October 2006 and July 2007, and who had received rifaximin 1200 mg/day for 10 days at any time.[288] Jolley only reports patients receiving "additional rifaximin (2400 mg/day for 10 days, n = 81)" if they "did not respond to initial rifaximin."[289] Jolley reported similar percentages of mean improvement of global IBS symptoms (53% and 53%, respectively) for both groups. Jolley does not report data after 7 days of treatment, for females, or for individual IBS symptoms.

245. Jolley does not disclose the prior art use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It also does not disclose information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does Jolley disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

[288] NORWICH_NJ_INV_000079-84 at -80.
[289] *Id.* at -81.

**26. Infantalino**

246. Dr. Harary cites to a 2009 article by Dr. Anthony Infantalino et al., Small Intestinal Bacterial Overgrowth (SIBO) in Patients With Irritable Bowel Syndrome (IBS); A Retrospective Review of Symptoms Following Treatment, Am. J. Gastroenterology, vol. 104, supp. 3, S488-489 (2009) ("Infantalino").[290]

247. Infantalino was published after the applicable priority and therefore is not prior art. Infantalino is a retrospective chart review of adult patients with SIBO. It reports that IBS is associated with SIBO. In 2009, the association between SIBO and IBS was unproven. *See* discussion of SIBO in Section IX.D. A POSITA would have considered Infantalino's many limitations, including (i) the retrospective nature of the study, (ii) its uncontrolled nature, (iii) its focus on the relationship between SIBO and IBS, (iv) its use of combination therapy, and (v) its use of the unreliable breath test.

248. Infantalino does not disclose the use of 550 mg TID (1650 mg/day) of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS. It likewise contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Infantalino also fails to disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

---

[290] Harary Opening Report at ¶¶ 199-201 (citing Infantalino at S488).

**27. Weinstock Email**

249. The Weinstock Email is an email sent by Dr. Leonard Weinstock to Dr. Mark Pimentel, Tracy Robinson, David Taylor, and named inventor William Forbes on February 25, 2006. There is no evidence that the Weinstock Email was publicly available and would have been known to a POSITA.

250. The Weinstock Email contains three lines describing a patient who reported an improvement in "global sx response with 1800 mg Xifaxan/day x 14 days."[291] The Weinstock Email does not specify the frequency of dosing or the amount of dosing at each frequency. I understand from counsel that at the time of the email, only 200 mg rifaximin was available on the market. The Weinstock Email does not state whether the patient suffered from IBS, IBS-D or alternating IBS. Nor does it specify particular IBS symptoms that were improved, but merely comments that the patient had suffered from various symptoms for years.[292] In my opinion, the Weinstock Email, which vaguely recounts the experience of one patient, was too small, uncontrolled and lacked significant data to have been of any value to a POSITA if it had become publicly available.

251. The Weinstock Email does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. Weinstock does not identify the patient's diagnosis. It likewise contains no information about the reduction of bloating associated with IBS-D or other IBS specific symptoms. Nor does the Weinstock Email disclose that the reduction of bloating associated with IBS-D or any IBS symptoms was achieved following 7 days after administration of rifaximin.

---

[291] NORWICH_NJ_INV_000525.
[292] *Id.*

**28. Lin 2006**

252. Dr. Harary cites to International Publication No. WO 2006/102536, with named inventor listed as Dr. Henry Lin, which Dr. Harary alleges was published as of September 28, 2006 ("Lin 2006").[293] The Publication is titled *Treatment of Disease Conditions Through Modulation of Hydrogen Sulfide Produced by Small Intestinal Bacterial Overgrowth.* Salix disclosed Lin 2006 during prosecution of both the '912 and '571 Patents, and it appears on the face of those patents.

253. Lin 2006 described the "Field Of The Invention" as "the treatment of various physiological conditions by modulating the level of hydrogen sulfide (H2S) in the body," and stated that "[t]here is therefore a significant need in the art to identify a therapeutic method by which one can modulate the levels of H2S in the body; particularly insofar as a harmful level of H2S is based on escape of this gas from the gastrointestinal tract due to SIBO."[294]

254. Lin 2006 did not, however, focus on any one particular H2S- or SIBO-linked condition—IBS was one of many conditions that Lin 2006 stated related to or were modulated by H2S, and that were "believed to be appropriate to treat in connection with various embodiments of the present invention."[295] Lin 2006 discusses a "[t]ypical dose of rifaximin" for "achieving . . . partial eradication of SIBO," and describes a rifaximin treatment for chronic fatigue syndrome.[296] Lin 2006 did not provide a "typical dose of rifaximin" for IBS, and none of the 14 examples discussed using rifaximin to treat IBS. Dr. Lin failed to pay fees or request examination of the patent, and Lin 2006 was deemed withdrawn in May 2007.

255. Lin 2006 does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise contains no information about (i) the reduction

---

[293] Harary Opening Report at ¶¶ 212-215 (citing NORWICH_NJ_INV_000211-75).
[294] NORWICH_NJ_INV_000211-75 at 219.
[295] *Id.* at -222-224.
[296] *Id.* at -232-237.

of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Lin 2006 also fails to disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**29. Viscomi**

256. Dr. Harary cites to rely on U.S. Patent Application Publication No. US2005/0272754 ("Viscomi"), allegedly published on December 8, 2005 titled "Polymorphic Forms of Rifaximin, Processes for Their Production and Uses Thereof."[297] Salix disclosed Viscomi during prosecution of both the '912 and '571 Patents, and it appears on the face of those patents.

257. Viscomi primarily discussed polymorphs of rifaximin. Viscomi discussed IBS as one in a long list of bowel related disorders and did not focus on a particular bowel-related disorder.[298] Viscomi did not analyze IBS subtypes, particular IBS symptoms, or gender-specific treatment. Viscomi explained that the length of administration "will depend in part on the disorder," and that dosages of rifaximin "will also vary depending on the diseases state."[299] It failed to disclose a length of rifaximin administration (or range) for IBS, a rifaximin dosage (or range) for IBS, or rifaximin dosage frequency (e.g., BID, TID). Viscomi's examples did not discuss administration of rifaximin for treatment of SIBO or IBS.

[297] Harary Opening Report at ¶¶ 216-219 (citing NORWICH_NJ_INV_000480-510).
[298] Viscomi at ¶ 0198.
[299] *Id.* at ¶ 0199.

258. Viscomi does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It also does not contain information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Viscomi also fails to disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**30. Fanigliulo 2006**

259. Dr. Harary cites to a 2006 article by Libera Fanigliulo et al. titled *Role of Gut Microflora and Probiotic* Effects *in the Irritable Bowel Syndrome*, 77 Acta Biomed 85 (2006) ("Fanigliulo").[300] Fanigliulo described a study "to evaluate the efficacy of rifaximin alone or in association with the probiotic strain of Bifidobacterium longum W11 in reducing symptoms in patients with IBS."[301] Subjects received 200 mg rifaximin BID for 10 days and then the probiotic strain of Bifidobacterium longum W11 or only 200 mg rifaximin BID.[302] After two months, "there was a statistically significant difference between [the groups] in the decrease" of symptoms, with those receiving rifaximin and a probiotic reporting that their symptoms improved more than those receiving rifaximin alone.[303] Fanigliulo therefore concluded that "[t]he results of this study indicate that the administration of Bifidobacterium longum W11 in association with rifaximin decreases symptoms in patients with IBS" and "symptoms benefited most from the combined

[300] Harary Opening Report at ¶¶ 220-228 (citing NORWICH_NJ_INV_000054-59).
[301] NORWICH_NJ_INV_000054 at -55.
[302] *Id*. at -56.
[303] *Id*. at -57-58.

therapy," as opposed to rifaximin alone therapy.[304] Fanigliulo noted that an "abnormal lactulose breath test in some of the patients with IBS suggested bacterial overgrowth of the small intestine." It did not involve patients with IBS-D.

260. Fanigliulo does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It likewise contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Nor does Fanigliulo disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

261. Experts at the time criticized Fanigliulo's study design, including Dr. Steve Vanner, who concluded it was "seriously limited" because it "lack[ed] a placebo group, [was] retrospective and/or d[id] not examine a clearly defined group of patients with IBS."[305]

**31. Lauritano**

262. Dr. Harary cites a 2005 article by E. C. Lauritano, *Rifaximin Dose-Finding Study for the Treatment of Small Intestinal Bacterial Overgrowth* ("Lauritano").[306] Salix disclosed Lauritano during prosecution of both the '912 and '571 Patents, and it appears on the face of those patents.

263. Like Cuoco, Lauritano concerns the treatment of SIBO – ***not*** the same indication as IBS, IBS-D, or alternating IBS. In 2008, the association between SIBO and IBS was unproven.

---

[304] *Id*. at -58.
[305] Vanner 2008, XIFAX_AMN_1874266 at -4270.
[306] Harary Opening Report at ¶¶ 229-231 (citing NORWICH_NJ_INV_000095-99).

diagnosed with non-constipation IBS, e.g., diarrhea-predominant IBS or alternating IBS."[345] It fails to disclose results, and a POSITA would not have reasonably expected that study would have been successful simply because the patient enrollment had been initiated. The Target Press Release contains no information about the study results, including the safety and efficacy of any rifaximin dosage to treat IBS, IBS-D, or alternating IBS – it is only announcing the initiation of patient enrollment.

286. The Target Press Release also does not contains information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. In fact, it does not address bloating at all. The Target Press Release also does not disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**38. Hungin**

287. Dr. Harary cites to a 2005 article by A. Hungin et al. titled *Irritable Bowel Syndrome in the United States: Prevalence, Symptom Patterns and Impact*, 21 Aliment Pharmacol. Ther. 1365 (2005) ("Hungin").[346] Hungin describes a community survey designed "to determine the prevalence, symptom patterns and impact of irritable bowel syndrome in the US."[347] Hungin does not discuss the use of or a dosing regimen for rifaximin to treat IBS-D. Nor does Hungin disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS

[345] NORWICH_NJ_INV_000435 at -435.
[346] Harary Opening Report at ¶¶ 265-268 (citing NORWICH_NJ_INV_000066-76).
[347] NORWICH_NJ_INV_000066.

patients. It also contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a reduction of bloating or other IBS symptoms. Hungin also does not disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

**39. Kim 2003**

288. Dr. Harary cites to a 2003 article by Kim et al. titled *A Randomized Controlled Trial of a Probiotic, VSL#3 on Gut* Transit *and Symptoms in Diarrhea-Predominant Irritable Bowel Syndrome*, Aliment Pharmacol. Ther. 2003; 17:895-904 (2003) ("Kim").[348] Kim involves a study of 25 patients to "investigate the effects of a probiotic formation, VSL#3, on gastrointestinal transit and symptoms" of IBS-D patients.[349] Subjects in the study received either a probiotic or placebo for 8 weeks.[350] Kim fails to discuss the use of rifaximin to treat IBS-D. Kim in particular does not disclose the use of 550 mg TID of rifaximin for 14 days to treat IBS, IBS-D or alternating IBS patients. It also contains no information about (i) the reduction of bloating or other IBS symptoms specifically in a female subject, (ii) the reduction of bloating or other IBS symptoms in a female subject with IBS, IBS-D or alternating IBS from baseline symptoms established prior to treatment, or (iii) the reduction of bloating or other IBS symptoms defined by an affirmative response from the subject when asked whether the subject had a

[348] Harary Opening Report at ¶¶ 269-273 (citing NORWICH_NJ_INV_000085-94).
[349] NORWICH_NJ_INV_000085.
[350] *Id*. at -87.

reduction of bloating or other IBS symptoms. Nor does Kim disclose that the reduction of bloating or any IBS symptoms was achieved following 7 days after administration of rifaximin.

### B. The ’571 Patent Is Not Obvious

#### 1. Claims 1–4 of the ’571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol

289. Claims 1–4 of the ’571 Patent generally involve the treatment and reduction of bloating associated with IBS-D in a female subject.

290. As of February 26, 2008, under the Rome III criteria, a POSITA would have considered bloating associated with IBS-D distinct from irritable bowel syndrome. Under Rome III, “IBS (C1) is more specifically defined as pain associated with change in bowel habit, and this is ***distinct*** from functional diarrhea (C4) characterized by loose stools and no pain, or functional bloating (C2) when there is no change in bowel habit. Each condition also has ***different diagnostic and treatment approaches***.”[351]

##### a. Claim 1 of the ’571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol

291. Claim 1 of the ’571 Patent recites a “method of treating bloating associated with diarrhea predominant irritable bowel syndrome (dIBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the female subject, thereby treating bloating associated with dIBS in the female subject.”[352]

292. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 1 of the ’571 Patent.[353]

---

[351] D. Drossman, *The Functional Gastrointestinal Disorders and the Rome III Process*, Gastroenterology, vol. 130, No. 5, 1378 (2006) (emphasis added); D. Drossman et al., *Rome III The Functional Gastrointestinal Disorders* at 5-7 (3d Ed. 2006) (same).
[352] XIFAX_AMN_0007928 at -7968, col. 46:39-44.
[353] Harary Opening Report at p. 159.

293. I disagree. Pimentel 2006 describes a study of treating 87 patients who met the *Rome I criteria* for IBS, with 400 mg rifaximin TID for 10 days.[354] It does not disclose treating ***IBS-D patients*** with 550 mg rifaximin TID for 14 days to treat ***bloating associated with IBS-D***. As I discussed above, in 2008, Rome III would have been the operative criteria. Under the Rome III criteria, a POSITA would have considered bloating associated with IBS-D distinct from irritable bowel syndrome.[355]

294. Pimentel 2006 found no improvement in diarrhea or abdominal pain: "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[356] In particular, the "VAS scores for abdominal pain (P=0.32), diarrhea (P=0.67), and constipation (P=0.069) did not significantly differ."[357] Indeed, even after controlling for abdominal pain, "VAS scores for diarrhea were still not statistically significant over placebo."[358]

295. Pimentel 2006's "primary end point was global improvement in IBS symptoms during follow-up."[359] Accordingly, Pimentel 2006 "assessed the primary end point (percentage of global improvement) across the 10 weeks of follow-up[,]" however "data was not available for all 10 weeks of follow-up."[360] Pimentel 2006 reported "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[361] Thus, the focus of Pimentel 2006 was the post-treatment

---

[354] XIFAX_AMN_0310652.
[355] *See* D. Drossman, *The Functional Gastrointestinal Disorders and the Rome III Process*, Gastroenterology, vol. 130, No. 5, 1379 (2006) (emphasis added); D. Drossman et al., *Rome III The Functional Gastrointestinal Disorders* at 5-7 (3d Ed. 2006) (same).
[356] XIFAX_AMN_0310652 at -653.
[357] *Id.* at -656.
[358] *Id.*
[359] *Id.* at -654.
[360] *Id.*
[361] *Id.* at -653.

maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[362]

296. The RFIB 2001 Study Protocol does not disclose a method of treating bloating associated with IBS-D with 550 mg of rifaximin TID for 14 days. It discloses a Phase II clinical study design for three dosages (275 mg BID, 550 mg BID or 1100 mg BID) over 14 days.[363] It describes the "primary objective" of the RFIB 2001 Study Protocol as "evaluat[ing] the efficacy of a 14-day course of oral rifaximin at 550 mg BID versus placebo."[364] While the RFIB 2001 Study Protocol mentions bloating in the exclusion criteria, it nowhere mentions bloating in the inclusion criteria of the study, let alone describes treating bloating associated with IBS-D with 550 mg TID.

297. The RFIB 2001 Study Protocol describes the design for a Phase II dose ranging study only. It does not disclose the clinical results of any of the dosing regimen. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated. To the contrary, it was well known that Phase II study "is a poor predictor of drug success: >30% of drugs entering phase II studies fail to progress, and >58% of drugs go on to fail in phase III."[365]

298. Dr. Harary asserts that "a POSA would have been motivated to adjust, improve, or optimize the rifaximin dosing regimen taught by Pimentel 2006 in view of the RFIB 2001 Study Protocol with a reasonable expectation of success."[366] I disagree.

---

[362] *Id*. at -657.
[363] XIFAX_AMN_1882456.
[364] *Id*. at -2458.
[365] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).
[366] Harary Opening Report at ¶ 554.

**Motivation to Combine**

299. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention of claim 1 of the '571 Patent.[367] His analysis, however, ignores that (i) Pimentel 2006 found "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups,"[368] (ii) the widespread criticism of Pimentel 2006 at the time of the invention; and (iii) the RFIB 2001 Study Protocol fails to disclose the clinical results of any of the dosing regimen.

300. As discussed, Dr. Drossman, one of the world's leading GI expert at the time, authored an editorial accompanying Pimentel 2006. Dr. Drossman publicly cautioned that "several methodologic issues [in Pimentel 2006] must be addressed before drawing . . . conclusions from the study."[369] He also emphasized that "the limitations of the study make the findings ***inconclusive*** and ***raise questions about the clinical significance of the results***."[370] Given Dr. Drossman's preeminence in the field, POSITAs would have considered his critique of Pimentel 2006 significant, and, as a result, they would not have relied on Pimentel 2006 to achieve the inventions of the '571 Patent, particularly given Pimentel 2006's finding that rifaximin made "[n]o major difference[]" in the diarrhea group.

301. Equally significant, in February 2008 – the exact time of the invention – Dr. Stephen Vanner (Director of the Gastrointestinal Diseases Research Unit at Kingston Health Sciences Centre, Professor of Medicine at Queen's University, and clinician-scientist) surveyed

[367] Harary Opening Report at ¶¶ 555-575.
[368] XIFAX_AMN_0310653.
[369] XIFAX_AMN_0887874 at -7874-75 (emphasis added).
[370] *Id.*

publications by Dr. Pimentel and his colleagues at Cedars-Sinai Hospital, and concluded that their research presented an "***unproven hypothesis***."[371]

302. A POSITA would not have been motivated to combine the "unproven hypothesis" of Pimentel 2006 with the RFIB 2001 Study Protocol lacking any clinical data.

303. The 2006 authoritative treatise *Rome III The Functional Gastrointestinal Disorders*, by Dr. Drossman et al., also was skeptical of the notion that SIBO caused IBS, concluding the thesis was "unproven" and the "methodological weaknesses" of the cited SIBO study by Dr. Pimentel et al. "undermined the credibility of this report."[372]

304. In addition to these specific criticisms of Dr. Pimentel's research and findings, Dr. Vanner and other experts in the field also questioned the use of antibiotics to treat IBS. As discussed, in a 2007 Education Practice note, Dr. Eamonn M.M. Quigley (then Professor of Medicine and Human Physiology and a Principal Investigator at the Alimentary Pharmabiotic Centre at the National University of Ireland in Cork) stated that a "***sound rationale for antibiotic therapy has not been established***," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[373] He also cautioned "[a]ntibiotic dose and duration of therapy have not been established."[374]

305. Similarly, in 2007, the British Society of Gastroenterology warned that antibiotic treatment "cannot be recommended until replicated in well-designed studies by others [i.e., doctors outside of Cedars-Sinai]."[375]

---

[371] XIFAX_AMN_1874266 at -4271 (emphasis added).
[372] XIFAX_AMN_1906298-373 at -319.
[373] XIFAX_AMN_1253920 at -3922.
[374] *Id.*
[375] XIFAX_AMN_1874288 at -4306.

306. Dr. Drossman likewise noted that "the benefit of using antibiotics is not fully proven and must be balanced with potential risks in terms of side effects, high costs (a 10-day course of rifaximin is $250, and a breath test, if ordered, costs an additional $304), and the need for recurrent treatments."[376]

307. Sharara, a publication Dr. Harary repeatedly relies on, also warned "the use of antibiotics in patients with IBS . . . is limited by their potential side effects, the ***risk of development of bacterial resistance***, and their ***untested long-term clinical efficacy***."[377]

308. These critiques would have deterred a POSITA from combining Pimentel 2006 with other references, such as the RFIB 2001 Study Protocol, to achieve the invention of claim 1 of the '571 Patent.

309. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol. Since it merely described the design of a Phase II dose-ranging study of rifaximin, the RFIB 2001 Study Protocol lacked any data about the study results. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials as discussed above.[378]

310. As a result, a POSITA would not have been motivated to combine the RFIB 2001 Study Protocol with Pimentel 2006 to achieve a method of treating bloating associated with IBS-D as required by claim 1 of the '571 Patent.

311. Thus, given the limitations and criticism of Pimentel 2006 and the lack of data in the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine them to achieve claim 1.

---

[376] XIFAX_AMN_0887874 at -7875.
[377] XIFAX_AMN_0310894 at -899.
[378] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).

312. Dr. Harary also asserts that a "POSA would have been motivated to adjust, improve, or optimize the dosing regimen of Pimentel 2006 based on the known rifaximin dose range (i.e., 550 mg to 2,200 mg/day) and known duration of therapy (i.e., 14 days) for IBS-D taught by RFIB 2001 Study Protocol with a reasonable expectation of success based on teachings, suggesting, or motivations found in the prior art."[379] He asserts that a "POSA would have been motivated to treat with this dosing regimen bloating associated with IBS-D in female subjects based on teachings, suggestions, or motivations of at least Pimentel 2006 and the RFIB 2001 Study Protocol."[380]

313. I disagree for multiple reasons.

314. *First*, as noted above, each of Pimentel 2006 and the RFIB 2001 Study Protocol fails to disclose (i) the claimed dosage of 550 mg of rifaximin TID for 14 days, and (ii) treating bloating associated with IBS-D with this dosage. As discussed, Pimentel 2006 found no improvement in diarrhea or abdominal pain: "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[381] In particular, the "VAS scores for abdominal pain (P=0.32), diarrhea (P= 0.67), and constipation (P = 0.069) did not significantly differ."[382] Indeed, even after controlling for abdominal pain, "VAS scores for diarrhea were still not statistically significant over placebo."[383]

315. Thus, I disagree that a POSITA would have even looked to Pimentel 2006 for treating bloating associated with IBS-D, let alone sought to modify its dosage to arrive at the claimed invention. Moreover, even if a POSITA would have been motivated to modify the dosing

[379] Harary Opening Report at ¶ 555.
[380] *Id.*
[381] XIFAX_AMN_0310652 at -653.
[382] *Id.* at -656.
[383] *Id.*

regimen of Pimentel 2006, as Dr. Harary asserts, that reference still fails to disclose other requirements of claim 1 of the ’571 Patent, i.e., treating bloating associated with IBS-D.

316. *Second*, even assuming a POSITA would have relied on Pimentel 2006, Dr. Harary fails to explain why a POSITA would have been motivated to modify the Pimentel 2006 dosing regimen given that Pimentel 2006 concluded “the antibiotic rifaximin resulted in statistically greater global improvement in IBS than placebo in our randomized, double-blind study.”[384] Although Pimentel 2006 also states “[r]ecent data suggests that the optimal dosage of rifaximin may, in fact, be higher than that used in our study,”[385] I disagree that this would have motivated a POSITA to seek out the claimed 550 mg TID dosage administered over 14 days. At the time of the invention, it was a foundational concept, that medicines should be used at the lowest effective dose to achieve the desired therapeutic response. The dose response curve became central both in regulatory guidance and clinical trial design. Antimicrobial stewardship reinforced the minimal dose concept, particularly with antibiotics, to prevent resistance and consequent related harm. In any event, Pimentel 2006 does not suggest or even hint what the “higher” dose might be (the 1,650 mg/day dosage in the Asserted Claims is nearly ***40 percent higher*** than the 1,200 mg/day dosage in Pimentel 2006).[386]

317. A POSITA also would have known that Pimentel 2006 relies on Lauritano for its assertion “[r]ecent data suggest[ing] that the optimal dosage of rifaximin may, in fact, be higher than that used in our study.” As discussed, however, the highest reported dose used in Lauritano was 1,200 mg of rifaximin—***the same dose used in Pimentel 2006***. Therefore, a POSITA would have understood (i) Lauritano fails to support Pimentel 2006’s assertion “that optimal doses of

[384] XIFAX_AMN_1677384.
[385] *Id.*
[386] *Id.*

rifaximin may, in fact, be higher than those used in our study" and (ii) thus fails to provide a motivation for a POSITA to experiment with other dosages of rifaximin—let alone to select the claimed 550 mg TID for 14 days.

318. *Third*, while Pimentel 2006 discloses administering rifaximin TID, it teaches administering it at a ***lower*** dose (400 mg) than the claimed 550 mg dose and for a shorter duration (10 days) than the claimed 14 days. While the RFIB 2001 Study Protocol discloses a 550 mg dose as one of three options (275 mg, 550 mg, or 1100 mg), it only teaches administering this dose ***BID***, not the claimed ***TID***. Dr. Harary nowhere explains why a POSITA would have been motivated to modify the dosing described in Pimentel 2006 to select a 550 mg TID dosage administered over 14 days. Dr. Harary's opinion amounts to impermissible hindsight relying on the claim as a roadmap.

319. As noted, I disagree that a POSITA would have been motivated to look to the RFIB 2001 Study Protocol, which is nothing more than a clinical study design with no clinical results, to modify the dosing regimen described in Pimentel 2006. Putting that aside, even if a POSITA looked to the RFIB 2001 Study Protocol, Dr. Harary fails to explain why she would have selected the claimed total dose of 1,650 mg per day (550 mg TID). Even if a POSITA selected the 550 mg dose provided as one option in the RFIB 2001 Protocol, the RFIB 2001 Protocol states it should be administered **BID** for a total daily dose of 1,100 mg. This provides a **lower** daily dose than taught by Pimentel 2006, which describes a 1,200 mg daily dose (400 mg TID), which undercuts Dr. Harary's assertion that a POSITA would have been motivated to modify Pimentel 2006's dose based on the teaching of the RFIB 2001 Protocol. Dr. Harary's piecemeal compilation of snippets from Pimentel 2006 and the RFIB 2001 Study Protocol to arrive at the claimed invention lacks support and improperly relies on the claims as a roadmap to reconstruct the invention.

320. Dr. Harary cites 21 additional references to support his opinion that a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve claim 1, including Cuoco, Lauritano, Scarpellini, Viscomi, Weinstock 2011, Jolley 2011, Weinstock 2007, Muska, Lin 2006, Weinstock Email, Infantalino, Normix Label, Prantera, Gionchetti, Barrett, Della Marchina, Di Stefano, Xifaxan Label, Sharara, Hungin, and Kim 2003, each of which I have discussed above.[387] In my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1 based on these additional references.

321. Indeed, Dr. Harary fails to explain why any of these references would have motivated a POSITA to modify the dosing regimen in Pimentel 2006. Dr. Harary first asserts that a "POSA would have recognized that the goal of administering rifaximin, a non-absorbed antibiotic, to IBS and IBS-D patients would have been to alter, or partially eradicate, the bacteria in the small intestine" and then cites generally to Cuoco and Pimentel 2006.[388] But Dr. Harary provides no pin-cite to either reference to support his assertion. From there, Dr. Harary makes the leap that a "POSA would have understood that it was desirable to achieve a sufficient concentration of rifaximin in the gut for a sufficient period of time to alter and reduce the population of bacteria" and that in "view of this knowledge, a POSA would have at least been motivated to adjust the dosing of rifaximin to improve the efficacy and/or length of therapeutic response taught by Pimentel 2006."[389]

322. Yet Dr. Harary falsely assumes that Pimentel 2006 failed to provide this "sufficient concentration of rifaximin in the gut for a sufficient period of time" such that a POSITA would

[387] Harary Opening Report at ¶¶ 555-575.
[388] *Id.* ¶ 556.
[389] *Id.*

have been motivated to seek out different dosages and/or durations To the contrary, as discussed above, Pimentel 2006 states "the antibiotic rifaximin resulted in statistically greater global improvement in IBS than placebo in our randomized, double-blind study."[390]

323. Dr. Harary also asserts that "[a]s of February 2008, it would have been well within the knowledge and capability of a POSA to routinely optimize the dosage of rifaximin within a known therapeutic range."[391] He then cites to Lauritano, Scarpellini, and the RFIB 2001 Study Protocol as "each describ[ing] dose ranging studies for rifaximin in the treatment of SIBO, IBS, and IBS-D."[392] Dr. Harary again falsely assumes a POSITA would have been motivated to rely on Pimentel 2006 to treat bloating related to IBS-D and also been motivated to modify the dose outlined in Pimentel 2006.

324. Even assuming that a POSITA would have been motivated to modify the dose described in Pimentel 2006, Dr. Harary fails to explain how any of Lauritano, Scarpellini, or the RFIB 2001 Study Protocol would have motivated a POSITA to select the specifically claimed 550 mg TID dose for 14 days. I address why a POSITA would not have been motivated based on the RFIB 2001 Study Protocol to modify the dose in Pimentel 2006 above.

325. Lauritano and Scarpellini involved the treatment of SIBO. As discussed, at the time of the invention, SIBO was not well understood, and leading authorities in the field, such as Drs. Drossman and Vanner, considered the relationship between SIBO and IBS unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to look to Lauritano or Scarpellini when seeking to modify the dose of rifaximin described in Pimentel 2006.

---

[390] XIFAX_AMN_1677384.
[391] Harary Opening Report at ¶ 559.
[392] *Id.*

326. Dr. Harary also asserts that "it is well within the skill of a clinician to select and optimize an effective dose for a patient within a known therapeutic window" and then cites to the '571 Patent and Viscomi.[393] But, even if true, he fails to explain *why* a POSITA would have been motivated to modify the dose described in Pimentel 2006, let alone rely on Pimentel 2006 in the first place to treat bloating associated with IBS-D, particularly since Pimentel 2006 concluded that administered dosing regimen "resulted in statistically greater global improvements in IBS than placebo" as I discuss above.

327. Viscomi involves the treatment of conditions other than IBS-D—i.e., irritable bowel disease and Crohn's disease, and thus I disagree that a POSITA would have been motivated to look to it to provide motivation to modify the dosing regimen in Pimentel 2006 to treat bloating associated with IBS-D.

328. Dr. Harary also asserts that a "clinician would have monitored a patient's response to a particular treatment regimen and would have adjusted the dosage and duration of administration to manage, for example, recurring or continuing symptoms" and then cites generically to his Section IX.E (Prior Clinical Uses); Weinstock 2011; Jolley; Weinstock 2007; and Muska.[394] Again, even if true, Dr. Harary fails to explain *why* a POSITA would have sought to even modify the dosing regimen in Pimentel 2006, let alone relied on Pimentel 2006 for treating bloating associated with IBS-D.

329. The additional references cited by Dr. Harary fail to overcome this deficiency. His citation to an entire section IX.E (Prior Clinical Use) fails to specify what in that section he is relying on as allegedly motivating a POSITA to modify the dosing in Pimentel 2006.

---

393 *Id.*
394 *Id.*

330. I understand that Weinstock 2011 and Jolley are not prior art because they were published after February 26, 2008. Accordingly, a POSITA could not have relied on these publications to provide motivation to optimize the dosing regimen of Pimentel 2006 at the time of the invention. Weinstock 2011, Jolley, and Muska are retrospective chart reviews, which a POSITA would have considered unreliable because of the multiple types and sources of bias inherent in such reviews, including the small and unrandomized sample, lack of controls and inevitable reviewer bias. Thus, I disagree a POSITA would have looked at any of these references to provide motivation to modify the Pimentel 2006 dose, let alone to arrive at the claimed dose of 550 mg TID for 14 days. I also note that Muska discloses a dosage of 400 mg either BID or TID for 10 days. This is either the same dosage as Pimentel 2006 or a lower dosage if administered BID instead of TID such that a POSITA would not have been motivated based on the teachings of Muska to modify the dosing of Pimentel 2006, let alone to modify it to achieve the claimed 550 mg TID for 14 days.

331. Weinstock 2007 involved the treatment of SIBO in patients with interstitial cystitis. As discussed, at the time of the invention, SIBO was not well understood, and leading authorities in the field, such as Drs. Drossman and Vanner, considered the relationship between SIBO and IBS unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 1 based on references involving SIBO treatment nor would a POSITA have been motivated to even look to Weinstock 2007 to provide a motivation to modify the dose in Pimentel 2006. Moreover, Dr. Harary never explains why a POSITA would have been motivated to modify the dosing of Pimentel 2006 to treat bloating associated with IBS-D when Weinstock 2007 is directed to patients with interstitial cystitis.

332. Dr. Harary also asserts that a "POSA would have been motivated to optimize the rifaximin dose in the range of 1200 mg per day, as taught by Pimentel 2006 and Lauritano, to 2200 mg per days, as taught by the RFIB 2001 Study Protocol."[395] Dr. Harary again assumes that a POSITA would have been motivated in the first place to rely on Pimentel 2006 for treating bloating associated with IBS-D *and* then have been motivated to modify the dosing described in Pimentel 2006. As I have discussed, both premises are false.

333. That other references teach rifaximin doses within this range does not change my opinion that Dr. Harary has failed to explain *why* a POSITA would have been motivated to rely on Pimentel 2006 and then modify its dosing regimen.

334. Moreover, I understand that several of these references that Dr. Harary points to as disclosing rifaximin doses within the stated range are not prior art because they were published after February 26, 2008, including Weinstock 2011, Jolley 2011, and Infantalino (2009). The Weinstock Email was a private email sent to a Salix employee that was not publicly available prior art. Accordingly, a POSITA could not have relied on these publications as a motivation to combine Pimentel 2006 and the RFIB 2001 Study Protocol or as motivation to optimize the dosing regimen of Pimentel 2006 at the time of the invention.

335. Weinstock 2011, Jolley 2011, Infantalino, Barrett, Muska, and Cuoco are retrospective chart reviews, which a POSITA would have considered unreliable because of the multiple types and sources of bias inherent in such reviews, including the small and unrandomized sample, lack of controls and inevitable reviewer bias. In my opinion, the Weinstock Email, which vaguely recounts the experience of **one** patient, also was too small, uncontrolled and lacked significant data to have been of any value to a POSITA if it had become publicly available.

[395] Harary Opening Report at ¶ 560.

336. Hungin is a community survey designed to determine the prevalence of IBS in the US. It does not contain any dosing information or clinical results.

337. Cuoco, Lauritano, Scarpellini, Weinstock 2007, Lin 2006, Infantalino, and Di Stefano involved the treatment of SIBO. As discussed, at the time of the invention, SIBO was not well understood, and leading authorities in the field, such as Drs. Drossman and Vanner, considered the relationship between SIBO and IBS as unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 1 based on references involving SIBO treatment and would not have been motivated to modify the dosing in Pimentel 2006 based on dosages provided in references directed to SIBO.

338. Several publications cited by Dr. Harary involve the treatment of other conditions, including Viscomi (IBD and Crohn's disease); Weinstock 2007 (Interstitial Cystitis); Prantera (Crohn's disease); Gionchetti (pouchitis); Della Marchina (Infectious Diarrhea); Normix Label (intestinal infections, diarrhoeic syndrome, summer diarrhea, traveler's diarrhea, enterocholitis, pre- and post-operative infective complications in gastroenteric surgery); Xifaxan Label (traveler's diarrhea); and Sharara (bloating and flatulence). As with SIBO, a POSITA would not have relied on these studies of indications other than IBS-D to motivate her to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve the invention in claim 1 or to motivate her to modify the dosing in Pimentel 2006 to achieve the claimed 550 mg TID for 14 days dosing.

339. Many of the studies cited by Dr. Harary also involved confounding concomitant therapies, including Cuoco (1200 mg/day rifaximin for 14 days followed by 21 days of probiotics); Weinstock 2011 (tegaserod, erythromycin, naltrexone, probiotics); Infantalino (concomitant therapies allowed); Gionchetti (ciprofloxacin). Kim did not even involve rifaximin. It studied the

use of a probiotic to treat IBS-D.[396] Because concomitant therapy makes it impossible to know what caused any change in patient symptoms, a POSITA would not have relied on these studies to motivate her to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve the invention in claim 1 or to motivate her to modify the dosing in Pimentel 2006 to achieve the claimed 550 mg TID for 14 days dosing.

340. Moreover, none of the references cited by Dr. Harary involve the use of 550 mg rifaximin TID for 14 days to treat bloating associated with IBS-D: Cuoco (1200 mg/day for 14 days); Lauritano (600 mg, 800 mg or 1200 mg/day for 7 days); Scarpellini (1200 or 1600 mg/day for 7 days); Viscomi (no dosage or duration disclosed); Weinstock 2011 (800-1800 mg/day for 10-14 days); Jolley 2011 (1200-2400 mg/day for 10 days); Weinstock 2007 (1200-1800 mg/day for 10 days); Muska (400 mg either BID or TID for 10 days); Lin 2006 (no dose or duration disclosed); Weinstock Email (1800 mg/day for 14 days); Infantalino (800, 1200 or 1800/day for 10, 14 or 30 days); Normix Label (200 mg BID, TID or QID); Prantera (800 mg/day or BID); Gionchetti (1 g BID); Barrett (400 mg TID for one to five months); Della Marchina (200 mg TID for 7 days); Di Stefano (400 mg TID for 7 days); Xifaxan Label (200 mg TID for 3 days); Sharara (400 mg BID for 10 days); Hungin (no dosage or duration); and Kim 2003 (no dosage or duration).

341. Dr. Harary also asserts that a "POSA also would have been motivated to combine the known elements of Pimentel 2006 (i.e., administering rifaximin three times per day to female IBS patients) and the RFIB 2001 Study Protocol (i.e., administering a 550 mg unit dose of rifaximin for 14 days to a female patient having IBS-D) to obtain a predictable result (i.e., treatment of bloating)."[397] I disagree.

---

[396] H. J. Kim et al., *A randomized controlled trial of a probiotic, VSL#3, on gut transit and symptoms in diarrhea predominant irritable bowel syndrome*, 17 Aliment Pharmacology & Therapeutics 895 (2003), NORWICH_NJ_INV_000085.
[397] Harary Opening Report at ¶ 565.

342. As I have explained above, claim 1 of the ’571 Patent requires treating bloating associated with IBS-D, but Pimentel 2006 found no improvement in diarrhea or abdominal pain: “[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups.”[398] In particular, the “VAS scores for abdominal pain (P=0.32), diarrhea (P= 0.67), and constipation (P = 0.069) did not significantly differ.”[399] Indeed, even after controlling for abdominal pain, “VAS scores for diarrhea were still not statistically significant over placebo.”[400] This refutes Dr. Harary’s assertion that a “predictable result” could have been obtained by combining Pimentel 2006 with the RFIB 2001 Study Protocol.

343. Dr. Harary’s assertion also fails to explain *why* a POSITA would have selected the 550 mg unit dose of rifaximin described as one of three options in the RFIB 2001 Study Protocol to treat bloating, particularly since the RFIB 2001 Study Protocol only mentions bloating in the *exclusion criteria* of the study, and then elected to administer this 550 mg dose TID instead of BID as the RFIB 2001 Study Protocol suggests. As I have explained, Dr. Harary’s assertions appear to rely on the claims as a roadmap to reconstruct the claimed invention.

344. While Dr. Harary opines that at least by February 2008, “it was common technique to administer a daily dose of rifaximin through the use of divided doses,”[401] he never explains why a POSITA looking at Pimentel 2006 and the RFIB 2001 Study Protocol would select the claimed TID dosing schedule instead of the BID dosing schedule. Indeed, as discussed above, it was well-known to administer rifaximin BID instead of TID. While Dr. Harary argues that a POSITA would have known “that rifaximin had been administered three times daily for the treatment of symptoms in female patients comprising the IBS-D subgroup,” the references he relies on (Barrett, Muska,

---

[398] XIFAX_AMN_0310652 at -653.
[399] *Id.* at -656.
[400] *Id.*
[401] Harary Opening Report at ¶ 566.

Della Marchina) for this assertion nowhere explain why a POSITA would have been motivated to select TID dosing over, for example, BID dosing to treat bloating associated with IBS-D in a female subject.[402]

345. As discussed, Barrett is a disfavored retrospective review and does not include any contemporaneous patient reports on symptoms or disclose the treatment of female patients. Barrett concludes that its "chart review suggests that some patients with IBS ***may*** benefit from rifaximin ***and*** probiotic combination therapy" and thus recommends "further studies on the potential benefit of this nonsystemic antibiotic for IBS are warranted."[403] Thus, to a POSITA, Barrett would have offered a mere hypothesis that rifaximin combined with a probiotic may have benefit for IBS (but not bloating associated with IBS-D) and would not have motivated a POSITA to select TID dosing over BID dosing.

346. Muska also describes both dosing options of BID and TID.

347. Finally, the patients in Della Marchina did not suffer from any form of IBS.

348. Dr. Harary also asserts that a "POSA would have been motivated to optimize the rifaximin dose to obtain the desired therapeutic effect, reduce overall pill burden, and avoid a pill that was so large that it would negatively impact patient care and compliance."[404] Even if true, Dr. Harary fails to explain why a POSITA would have been motivated to rely on the dosing regimen in Pimentel 2006 to treat bloating associated with IBS-D, let alone modify the stated dosing to achieve the claimed 550 mg TID for 14 days.

349. I also disagree with Dr. Harary opinion that "a POSA would have been motivated to administer a higher unit dose of rifaximin, such as the 550 mg unit dose taught by the RFIB

[402] *Id.*
[403] NORWICH_NJ_INV_000001-05 at -02 (emphasis added).
[404] Harary Opening Report at ¶ 567.

2001 Study Protocol, to reduce the pill burden (i.e., one pill three times per day)."[405] Pimentel 2006 already discloses administering rifaximin TID, just at a lower dose. Upping the dose to 550 mg would not reduce the "pill burden" because the same amount of pills per day would be administered (i.e., three). And modifying Pimentel to change the duration of dose from 10 days to 14 days would ***increase*** the "burden" on the patients by requiring them to take the rifaximin doses for 4 more days than Pimentel 2006 teaches.

350. Dr. Harary also cites to testimony from Lorin Johnson regarding manufacturing and supply-related burdens relative to a 200 mg dosage strength.[406] I disagree that these manufacturing concerns would provide the missing motivation to modify the Pimentel 2006 dose. Pimentel 2006 teaches a 400 mg dose, not a 200 mg dose. Dr. Harary also fails to explain why, even if there were manufacturing concerns related to a ***200*** mg dose, this would result in a POSITA selecting the claimed ***550*** mg dose, particularly because they would not have had the benefit of Mr. Johnson's testimony.

351. Dr. Harary also asserts that a "POSA would have also been motivated to administer rifaximin for 14 days based on the teachings of the prior art."[407] I disagree. As Dr. Harary acknowledges, Pimentel 2006 taught improvement in IBS symptoms by administering the drug for only 10 days. If anything, Pimentel 2006 would have motivated a POSITA not to increase the duration of treatment: she would have understood that patients would more likely comply with dosing instructions over a shorter treatment period than a longer one. While the RFIB 2001 Study Protocol teaches a 14 day treatment duration, as I have noted, it provides no clinical results from

[405] *Id.*
[406] *Id.* ¶ 569.
[407] Harary Opening Report at ¶ 570.

which a POSITA would have been motivated to modify the duration of treatment disclosed in Pimentel 2006.

352. Dr. Harary also points to Cuoco as teaching a 14 day duration of rifaximin treatment. As I note above, Cuoco is directed to SIBO, not bloating associated with IBS-D, and thus it is not a reference that a POSITA would have been motivated to look to modify Pimentel 2006. In addition, Dr. Harary's argument cherry-picks the two references (RFIB 2001 Study Protocol and Cuoco) that have a 14 day duration of treatment while ignoring that numerous other references in the art describing a shorter duration of treatment.

353. Dr. Harary also argues that a "POSA would have been motivated to combine the known elements of Pimentel 2006 (i.e., administering rifaximin three times per day for 10 days to IBS patients) and the RFIB 2001 Study Protocol (i.e., administer rifaximin 550 mg twice per day for 14 days to patients having IBS-D) to obtain a predictable result (i.e., relief of IBS-related symptoms."[408] I disagree for the reasons I have discussed above, and disagree that even if combined, this would yield a predictable result. As discussed, neither reference teaches treating bloating associated with IBS-D in female patients, and thus a POSITA would not have believed combining the references would have produced a "predictable result."

354. In support of this opinion, Dr. Harary also cherry-picks references in the art without remedying the deficiencies I have identified regarding POSITA's lack of motivation to start with Pimentel 2006 to treat bloating associated with IBS-D in female patients, let alone modify Pimentel 2006 to achieve the claimed dosing regimen.

[408] Harary Opening Report at ¶ 571.

355. Finally, as discussed, in my opinion, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given, for example, the highly publicized safety issues with COX-2 inhibitors.

**Reasonable Expectation of Success**

356. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1 of the '571 Patent.[409]

357. I disagree. As discussed regarding a motivation to combine Pimentel 2006 and RFIB 2001 Study Protocol, at the time of the invention in 2008, a POSITA would have been aware of the widespread and authoritative critiques of the Pimentel 2006 study. In particular, Dr. Drossman identified "several methodologic issues [in Pimentel 2006] must be addressed before drawing . . . conclusions from the study."[410] He also noted that "the limitations of the study make the findings inconclusive and ***raise questions about the clinical significance of the results***."[411] Dr. Drossman also commented that "the benefit of using antibiotics is not fully proven and must be balanced with potential risks in terms of side effects, high costs (a 10-day course of rifaximin is $250, and a breath test, if ordered, costs an additional $304), and the need for recurrent treatments."[412] In February 2008, Dr. Drossman was one of the world's leading experts on GI disorders, and in my opinion, a POSITA would have carefully considered his views of Pimentel 2006 and found them convincing.

[409] *Id.* at ¶¶ 576-583.
[410] XIFAX_AMN_0887874 at -7874-75 (emphasis added).
[411] *Id.*
[412] XIFAX_AMN_0887874 at -7875.

358. I also find it significant that at the exact time of the invention (February 2008), Dr. Vanner surveyed research by Dr. Pimentel and his colleagues at Cedars-Sinai Hospital and concluded that their research presented an "***unproven hypothesis***."[413]

359. Other experts agreed and also questioned the use of antibiotics to treat IBS. In particular, Dr. Quigley noted a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[414] The British Society of Gastroenterology also cautioned that antibiotic treatment "cannot be recommended until replicated in well-designed studies by others [i.e., doctors outside of Cedars-Sinai]."[415] And Sharara, a publication cited by Dr. Harary, similarly warned "the use of antibiotics in patients with IBS . . . is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[416]

360. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 1 of the '571 Patent.

361. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not have expected a study to achieve its end point merely based on its design, particularly given the low success rate of Phase II trials as discussed above.[417]

---

[413] XIFAX_AMN_1874266 at -4271 (emphasis added).
[414] XIFAX_AMN_1253920 at -3922.
[415] XIFAX_AMN_1874288 at -4306.
[416] XIFAX_AMN_0310894 at -899.
[417] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).

362. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1.

363. Dr. Harary cites 20 additional references to support his reasonable expectation of success opinion – Pimentel 2005, Pimentel Book, Pimentel Conference Call, Muska, Barrett, Cuoco, Scarpellini, Lauritano, Sharara, Yang, Weinstock Email, RFIB 2001 Press Release, Hungin, Salix Pharmaceutical Update, Della Marchina, Pimentel 2011, Weinstock 2011, Jolley 2011, Pimentel Ex. 8, and Pimentel Ex. 9.[418]

364. In my opinion, a POSITA in 2008 would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1 based on these 20 additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.[419]

365. I understand that many of these references are not prior art because they were published after February 26, 2008, including Weinstock 2011, Jolley 2011, and Pimentel 2011. The Weinstock Email was a private email sent to a Salix employee that was not publicly available. The RFIB 2001 Press Release was issued within one year of February 26, 2008 and quotes Bill Forbes, an inventor of the '571 Patent, discussing the results of "our study."[420] Accordingly, a POSITA could not have relied on these references to achieve a reasonable expectation of success in combining Pimentel 2006 and the RFIB 2001 Study Protocol at the time of the invention.

[418] Harary Opening Report at ¶¶ 576-583. Dr. Harary cites to Pimentel Exs. 8 and 9 but fails to provide any description or Bates numbers for those references in this litigation.
[419] Pimentel 2005 is the Abstract for Pimentel 2006 and Pimentel Conference Call describes Pimentel 2006 and therefore neither provides any additional information beyond what is disclosed in Pimentel 2006.
[420] RFIB 2001 Press Release, NORWICH_NJ_INV_000336-338 at -336.

366. Weinstock 2011, Jolley 2011, Barrett, Muska, Yang and Cuoco are retrospective chart reviews, which a POSITA would have considered unreliable because of the multiple types and sources of bias inherent in such reviews, including the small and unrandomized sample, lack of controls, and inevitable reviewer bias. In my opinion, the Weinstock Email, which vaguely recounts the experience of one patient, was too small, uncontrolled and lacked significant data to have been of any value to a POSITA if it had become publicly available. Similarly, the Salix Pharmaceutical Update, a case study discussion of one patient with SIBO, IBS-D and Gastroesophageal Reflux Disease also lacks the methodological and clinical data to be of any value to a POSITA.[421]

367. Hungin is a community survey designed to determine the prevalence of IBS in the US. It does not contain any dosing information or clinical results.

368. Cuoco, Lauritano, Scarpellini, Weinstock 2007, Lin 2006, Infantalino, and Di Stefano involved the treatment of SIBO. As discussed, at the time of the invention, SIBO was not well understood, and leading authorities in the field, such as Drs. Drossman and Vanner, considered the relationship between SIBO and IBS unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have had a reasonable expectation of success in combining combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 1 based on references involving SIBO treatment.

369. Several publications cited by Dr. Harary involve the treatment of other conditions, including Pimentel Book (traveler's diarrhea), Della Marchina (Infectious Diarrhea) and Sharara (bloating and flatulence). As with SIBO, a POSITA would not have had a reasonable expectation

---

[421] XIFAX_AMN_1902923.

of success of combining Pimentel 2006 and RFIB 2001 Study Protocol to achieve the invention in claim 1 based on publications that involve indications other than IBS-D.

370. Other studies cited by Dr. Harary also involved concomitant therapies, including Cuoco (1200 mg/day rifaximin for 14 days followed by 21 days of probiotics), Weinstock 2011 (tegaserod, erythromycin, naltrexone, probiotics), Yang (tegaserod). As discussed, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 and RFIB 2001 Study Protocol to achieve the invention in claim 1 based on publications that involve combination therapy.

371. None of the references cited by Dr. Harary involve the use of 550 mg rifaximin TID for 14 days to treat bloating associated with IBS-D: Pimentel 2005 (400 mg TID for 10 days); Pimentel Book (no dosage or duration); Pimentel Conference Call (400 mg TID for 10 days); Cuoco (1200 mg/day for 14 days); Lauritano (600 mg/day, 800 mg/day or 1200 mg/day for 7 days); Scarpellini (1200 or 1600 mg/day for 7 days); Weinstock 2011 (800-1800 mg/day for 10-14 days); Jolley 2011 (1200-2400 mg/day for 10 days); Muska (400 mg either BID or TID for 10 days); Weinstock Email (1800 mg/day for 14 days); Barrett (400 mg TID for one to five months); Della Marchina (200 mg TID for 7 days); Sharara (400 mg BID for 10 days); Yang (no dosage or duration); Hungin (no dosage or duration); RFIB 2001 Press Release (550 mg BID).

372. Dr. Harary's statement that rifaximin "was a known, safe, and efficacious treatment for SIBO and IBS-D" and citation to SIBO publications likewise fails to support his assertion that a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 and the RFIB 2001 Study Protocol "to optimize the dosage level and time course of administration of

rifaximin and obtain a long-term treatment effect."[422] As noted, I disagree that a POSITA would have been motivated to look to references related to SIBO.

373. At the time of the invention, it was a foundational concept that medicines should be used at the lowest effective dose to achieve the desired therapeutic response. The dose response curve became central both in regulatory guidance and clinical trial design. Antimicrobial stewardship reinforced the minimal dose concept, particularly with antibiotics, to prevent resistance and consequent related harm. Moreover, even assuming rifaximin was known to be safe and efficacious for the treatment of IBS-D, a POSITA would not have had a reasonable expectation of success in modifying the dose in Pimentel 2006 (400 mg TID for 10 days) to achieve the claimed invention. Dr. Harary's asserts that clinicians had treated "IBS symptoms in female patients with rifaximin, 1200-2400 mg per day for 10-14 days or more, in the United States before at least February 2008."[423] But his citation support is a general reference to his entire Section IX.E (Prior Clinical Uses) without specificity as to what he relies on in that section or what dose or duration was used in a particular study. He also cites to the Weinstock Email, which was not publicly available. He further cites the RFIB 2001 Press Release, noting that it disclosed "that administering rifaximin, 550 mg twice per day for 14 days, provided relief of bloating associated with IBS-D in female patients."[424] This amounts to a daily dose of 1,100 mg, which is 33.3% less than the claimed daily dose of 1,650 mg. I disagree that this supports a POSITA would have had a reasonable expectation of success in optimizing the dose in Pimentel 2006. If, as Dr. Harary notes, the RFIB 2001 Press Release reported 1,100 mg daily could provide relief, a POSITA would

[422] Harary Opening Report at ¶¶ 576-577.
[423] *Id.* ¶ 577.
[424] *Id.*

not have been motivated to then increase the dose by 33.3% or had a reasonable expectation of success in increasing the dose and maintaining the same level of safety and efficacy.

374. Dr. Harary also asserts that a "POSA would have reasonably expected combining the known elements of Pimentel 2006 (i.e., administering rifaximin three times per day to female IBS patients) and the RFIB 2001 Study Protocol (i.e, administering a 550 mg unit dose of rifaximin for 14 days to female patients having IBS-D or IBS-A (non-constipation symptoms) would result in the treatment of bloating associated with IBS-D in a female patient)."[425] I disagree.

375. As noted above, Pimentel 2006 found no improvement in diarrhea or abdominal pain: "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[426] In particular, the "VAS scores for abdominal pain (P=0.32), diarrhea (P= 0.67), and constipation (P = 0.069) did not significantly differ."[427] Indeed, even after controlling for abdominal pain, "VAS scores for diarrhea were still not statistically significant over placebo."[428] As such, a POSITA would not have had a reasonable expectation of success in treating bloating associated with IBS-D in females based on the study described in Pimentel 2006. Given the RFIB 2001 Study Protocol is nothing more than a clinical study design with no clinical results, a POSITA likewise would not have had a reasonable expectation of success in treating bloating associated with IBS-D in females based on this protocol.

376. Dr. Harary also relies on various disclosures in the prior art to support his argument that there would have been a reasonable expectation of success.[429] Specifically, he points to references he states describe dosing TID to treat SIBO and IBS, dosing rifaximin for 14 days being

[425] Harary Opening Report at ¶ 579.
[426] XIFAX_AMN_0310652 at -653.
[427] *Id.* at -656.
[428] *Id.*
[429] Harary Opening Report at ¶¶ 579-582.

well-known, and the dosage strength of 550 mg being taught by the RFIB 2001 Study Protocol. I address deficiencies associated with his cited references above and incorporate those arguments herein. Moreover, even if the claimed aspects of the dosing regimen (550 mg, TID, and 14 days) were known in the art, these are found in disparate references. Dr. Harary fails to explain why a POSITA would have optimized the dose amount and duration to achieve the claimed invention and had a reasonable expectation of success in making this combination.

377. In sum, claim 1 of the ’571 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

#### b. Claim 2 of the ’571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol

378. I incorporate by reference my previous discussion of claim 1 of the ’571 Patent.

379. Claim 2 of the ’571 Patent depends from claim one and further recites “the treating of bloating [associated with IBS-D] comprises a reduction of bloating from baseline symptoms established prior to treatment.”[430] Since claim 2 is a dependent claim, this reduction must occur during the 14 day treatment period recited in claim 1.

380. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 2 of the ’571 Patent.[431]

381. I disagree. Pimentel 2006 does not disclose a reduction of bloating associated with IBS-D from baseline symptoms established prior to treatment within a 14-day treatment period.

382. Pimentel 2006 involves the treatment of IBS patients and found no improvement in diarrhea: “[n]o major differences in abdominal pain, diarrhea, or constipation were observed

[430] XIFAX_AMN_0007928 at -7968, col. 46:44-46.
[431] Harary Opening Report at p. 173.

between the [rifaximin and placebo] groups."[432] Accordingly, it does not disclose a reduction of bloating associated with IBS-D as recited in claim 2.

383. Nor does Pimentel 2006 disclose the reduction of bloating associated with IBS-D from baseline symptoms within a 14-day treatment period. Pimentel 2006's "primary end point was global improvement in IBS symptoms ***during follow-up***."[433] Pimentel 2006 "assessed the primary end point (percentage of global improvement) across the 10 weeks of follow-up."[434] However "data was not available for all 10 weeks of follow-up."[435] Pimentel 2006 reports "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[436] Thus, the focus of Pimentel 2006 was the maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[437]

384. Pimentel 2006 nowhere discloses a reduction of bloating associated with IBS-D during a 14-day treatment period. To the contrary, the subjects did not report any changes in symptoms until at least day 17: "[a]fter completing the 10-day course of study medication, patients immediately began another stool diary for 7 days then returned to complete a follow-up questionnaire . . . ."[438].

385. The RFIB 2001 Study Protocol also fails to disclose a reduction in bloating associated with IBS-D from baseline symptoms established prior to treatment within a 14-day treatment period, as recited in claim 2. It discloses a Phase II clinical study design for three dosages

[432] XIFAX_AMN_0310652 at -653.
[433] *Id.* at -654 (emphasis added).
[434] *Id.*
[435] *Id.*
[436] *Id.* at -653.
[437] *Id.* at -657.
[438] *Id.* at -653.

(275 mg BID, 550 mg BID, or 1100 mg BID) over 14 days.[439] It describes the "primary objective" of the RFIB 2001 Study as "evaluat[ing] the efficacy of a 14-day course of oral rifaximin at 550 mg BID versus placebo."[440] It nowhere mentions bloating, let alone describes a reduction in bloating associated with IBS-D from baseline symptoms.

386. The RFIB 2001 Study Protocol only describes a Phase II study design. It does not disclose the clinical results of any of the dosing regimen. Lacking any clinical data, the RFIB 2001 Study Protocol does not describe reduction of bloating associated with IBS-D from baseline symptoms established prior to treatment. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials as discussed above.[441]

**Motivation to Combine**

387. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 2 of the '571 Patent.[442] He incorporates by reference his discussion of the motivation(s) to combine Pimentel 2006 and the RFIB 2001 Study Protocol with respect to claim 1.[443] I incorporate by reference my discussion in claim 1 regarding the lack of motivation to combine. As with claim 1, however, Dr. Harary's analysis ignores the widespread and persuasive criticism of Pimentel 2006 at the time of the invention.

388. As discussed, Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[444] Since

[439] XIFAX_AMN_1882456.
[440] *Id.* at -2458.
[441] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).
[442] Harary Opening Report at ¶¶ 592-597.
[443] *Id.* at ¶ 592.
[444] XIFAX_AMN_0310652 at -653.

Pimentel 2006 reported no statistically significant improvement for diarrhea patients, a POSITA would not have looked to Pimentel 2006 for treating bloating associated with IBS-D to achieve a reduction of bloating from baseline symptoms established prior to treatment, let alone have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve this required reduction in bloating associated with IBS-D from baseline symptoms established prior to treatment.

389. Pimentel 2006 also did not disclose any reduction in bloating associated with IBS-D during a 14-day treatment period as required by claim 2. Given its focus on symptom reduction during the follow-up period and lack of data during the treatment period, a POSITA would not have been motivated to combine it with other references to achieve a reduction in bloating associated with IBS-D from baseline symptoms within 14 days.

390. Moreover, as discussed, many leading experts in the field criticized the methodology of Pimentel 2006. For example, Dr. Drossman highlighted "several methodologic issues" in Pimentel 2006 that "raise questions about the clinical significance of the results."[445] Dr. Vanner and others remarked that Dr. Pimentel's hypothesis remained "unproven."[446]

391. More generally, many thought leaders in the field remained unconvinced that antibiotics should be used to treat IBS-D: a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[447] Even Sharara recognized that "the use of antibiotics in patients with IBS . . . is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[448]

[445] XIFAX_AMN_0887874 at -7874-75 (emphasis added).
[446] XIFAX_AMN_1874266 at -4271 (emphasis added).
[447] XIFAX_AMN_1253920 at -3922.
[448] XIFAX_AMN_0310894 at -899.

392. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol to achieve claim 2's reduction of bloating associated with IBS-D from baseline symptoms established prior to treatment. Since it merely described the design of a Phase II study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the results of those studies. In my opinion, a POSITA would not have believed a study would have a reasonable likelihood of success just because it was initiated, particularly given the low success rate of Phase II trials as discussed above.[449]

393. As a result, a POSITA would not have been motivated to combine the RFIB 2001 Study Protocol with Pimentel 2006 to achieve the invention of claim 2.

394. Given the critiques of Pimentel 2006 and the limitations of both it and the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 2 of the '571 Patent.

395. Dr. Harary also asserts that a "POSA would have been motivated to combine the teachings of Pimentel 2006 and the RFIB 2001 Study Protocol based on the teachings, suggestions, or motivations in the prior art" and that the "prior art teaches that female patients experienced improved and/or reduced IBS symptoms (including the symptom of bloating and across IBS subtypes) compared to baseline following administration of rifaximin."[450] He then cites to six references (without pin cites) to support this assertion. I disagree that any of these references support that a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol. I have discussed these references above and incorporate that discussion herein.

[449] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).
[450] Harary Opening Report at ¶ 593.

396. Moreover, Barrett, Muska, and Cuoco are retrospective chart reviews, which a POSITA would have considered unreliable because of the multiple types and sources of bias inherent in such reviews, including the small and unrandomized sample, lack of controls and inevitable reviewer bias.

397. Cuoco and Weinstock 2007 involved the treatment of SIBO. As discussed, at the time of the invention, SIBO was not well understood, and leading authorities in the field, such as Drs. Drossman and Vanner, considered the relationship between SIBO and IBS unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 2 based on references involving SIBO treatment.

398. Weinstock 2007 involved the treatment of Interstitial Cystitis, not bloating associated with IBS-D. Likewise, Sharara studied patients with bloating and flatulence who did not have to meet the diagnostic criteria for IBS-D. As with SIBO, a POSITA would not have been motivated to rely on publications that involve indications other than IBS-D to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve the invention in claim 2.

399. Cuoco also involved treatment with concomitant therapies, specifically probiotics. Accordingly, since it is unclear whether Cuoco's results were caused by rifaximin or the probiotic treatment, a POSITA would not have relied on it as motivation to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 2.

400. Dr. Harary also asserts that a "POSA would have been motivated to optimize and time course of administration described in Pimentel 2006."[451] I disagree for the reasons described with respect to claim 1 of the '571 Patent, incorporated here. Dr. Harary's arguments rely on

[451] Harary Opening Report at ¶ 594.

additional references to provide motivation. I incorporate my discussion above and in claim 1 of the ’571 Patent of those references.

401. Di Stefano involved the treatment of SIBO. As discussed, at the time of the invention, SIBO was not well understood, and leading authorities in the field, such as Drs. Drossman and Vanner, considered the relationship between SIBO and IBS unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 2 based on references involving SIBO treatment.

402. Ebell studied patients with bloating and flatulence who did not have to meet the diagnostic criteria for IBS-D. As with SIBO, a POSITA would not have been motivated to rely on publications that involve indications other than IBS-D to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve the invention in claim 2.

403. Finally, as discussed, in my opinion, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given, for example, the highly publicized safety issues with COX-2 inhibitors.

**Reasonable Expectation of Success**

404. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 2 of the ’571 Patent.[452] I disagree. Dr. Harary incorporates by reference his discussion regarding reasonable expectation of success in claim 1.[453] I incorporate by reference my discussion above in claim 1 regarding the lack of a reasonable expectation of success.

---

[452] Harary Opening Report at ¶¶ 598-601.
[453] *Id.* at ¶ 598.

405. As discussed, Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[454] Since Pimentel 2006 reported no statistically significant improvement for diarrhea patients, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve a reduction in bloating associated with IBS-D from baseline symptoms established prior to treatment.

406. A POSITA likewise would have had no reasonable expectation of success in relying on Pimentel 2006 because it did not report whether symptoms were reduced during a 14-day treatment period, as required by claim 2.

407. As with claim 1, Dr. Harary ignores the widespread and persuasive criticism of Pimentel 2006 published at the time of the invention. A POSITA would have been aware of the criticisms of the methodology used in Pimentel 2006 and the use of antibiotics to treat IBS discussed above.

408. Given the extensive and authoritative criticism of the methodology and Pimentel 2006's finding that rifaximin made "[n]o major difference[]" in the diarrhea group, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 2 of the '571 Patent.

409. The RFIB 2001 Study Protocol also would not provide a POSITA that reasonable expectation of success because it contains only a Phase II dose ranging design (that did ***not*** include the claimed dosing), not clinical results. A POSITA would not expect a study to achieve its end

---

[454] XIFAX_AMN_0310652 at -653.

point merely based on its design, particularly given the low success rate of Phase II trials as discussed above.[455]

410. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 2.

411. Dr. Harary cites 5 additional references to support his reasonable expectation of success opinion – Sharara, Cuoco, Muska, Barrett and Weinstock 2007.[456]

412. In my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 2 based on these 5 additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

413. Barrett, Muska, and Cuoco are retrospective chart reviews, which a POSITA would have considered unreliable because of the multiple types and sources of bias inherent in such reviews, including the small and unrandomized sample, lack of controls and inevitable reviewer bias.

414. Cuoco and Weinstock 2007 involved the treatment of SIBO. As discussed, at the time of the invention, SIBO was not well understood and the relationship between SIBO and IBS was unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 2 based on references involving SIBO treatment.

---

[455] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).
[456] Harary Opening Report at ¶¶ 598-601.

415. Weinstock 2007 involved the treatment of Interstitial Cystitis, not IBS. Sharara studied patients with bloating and flatulence who did not necessarily meet the diagnostic criteria for IBS. As with SIBO, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 2 based on Weinstock 2007 and Sharara.

416. Cuoco also involved treatment with concomitant therapies, specifically probiotics. Accordingly, since it is unclear whether Cuoco's results were caused by rifaximin or the probiotic treatment, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 2 based on Cuoco.

417. In sum, claim 2 of the '571 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

#### c. Claim 3 of the '571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol

418. I incorporate by reference my previous discussion of the claims 1 and 2 of the '571 Patent.

419. Claim 3 of the '571 Patent depends from claim 2 (which depends from claim 1) and further recites a "the reduction of bloating [associated with IBS-D] is achieved following 7 days after the administration of rifaximin."[457]

420. Dr. Harary opines a POSITA would have understood that the claimed reduction of bloating associated with IBS-D may be achieved following 7 days after the administration of

[457] XIFAX_AMN_0007928 at -7968, col. 46:47-49.

rifaximin "on any day recited in claim 1."[458] He further opines Pimentel 2006 "discloses global improvement in the week following the administration of rifaximin" for 10 days.[459]

421. I disagree. Since claim 3 is a dependent claim, a POSITA would have understood that this reduction must occur during the 14-day treatment period recited in claim 1 and 2.

422. Claim 1 recites a method of treating bloating associated with IBS-D with 550 mg rifaximin TID for 14 days.

423. Claim 2 requires that the "treating" comprises a reduction of bloating associated with IBS-D.

424. Claim 3 requires that the "reduction" is achieved following 7 days after the administration of rifaximin.

425. As a result, at the time of the invention, a POSITA would have understood that the reduction of the bloating associated with IBS-D achieved following 7 days after administration must occur during the 14 day period as required in claims 1 and 2.

426. In addition, in my opinion, a POSITA would understand that this reduction must occur 7 days after the initial dose of rifaximin. Claim 3 recites the reduction of bloating associated with IBS-D "following 7 days after ***the administration***" of rifaximin to the subject.[460] As discussed, the specification of the '571 Patent defines "administration" as "introducing a GI specific antibiotic to a subject to perform their intended function."[461] Because the inventors defined administration as the "introduction" of the antibiotic, a POSITA would understand that administration means the first time the subject received the antibiotic, or the first dose.

---

[458] Harary Opening Report at ¶ 604.
[459] *Id.* at ¶ 608.
[460] XIFAX_AMN_0007928 at -7968, col. 46:47-49.
[461] *Id.* at –7951, col. 12:37-39.

427. The dictionary definition of "following" confirms the reduction must occur 7 days after the initial dose of rifaximin. For example, the 2003 edition of Merriam Webster Collegiate Dictionary defines "following" as "being next in order or time."[462]

428. In addition, the data for the clinical trials shows the inventors were tracking symptom reduction weekly. As indicated in both the Phase II and Phase III Final Reports, the investigators visited clinics at week 1 (Day 7) to check the SGA IBS and Bloating responses as well as the daily symptom reports.[463]

429. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 3 of the '571 Patent.[464] I disagree

430. Since Pimentel 2006 does not disclose the elements of claims 1 and 2 from which claim 3 depends, it likewise does not disclose a reduction of bloating associated with IBS-D achieved following 7 days after the administration of rifaximin within a 14 day treatment period.

431. As discussed, Pimentel 2006 does not disclose the inventive elements of claim 1.

432. In addition, as discussed, the Pimentel 2006 study found no improvement in diarrhea.[465] Accordingly, it does not disclose a reduction of bloating associated with IBS-D as recited in claim 2.

433. Nor does Pimentel 2006 disclose the reduction of bloating associated with IBS-D following 7 days after administration of rifaximin required by claim 3. Pimentel 2006's "primary end point was global improvement in IBS symptoms ***during follow-up***."[466] Pimentel 2006 "assessed the primary end point (percentage of global improvement) across the 10 weeks of

---

[462] "Following, Adj." Merriam-Webster's Collegiate Dictionary, 11th ed., Merriam-Webster, 2003, p. 486
[463] XIFAX_AMN_1900330 at -360, -369 (RFIB 2001); XIFAX_AMN_0058937 at -982-983 (RFIB 3007).
[464] Harary Opening Report at p. 179.
[465] XIFAX_AMN_0310652 at -653.
[466] *Id.* at -654 (emphasis added).

follow-up."[467] However "data was not available for all 10 weeks of follow-up."[468] Pimentel 2006 reports "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[469] Thus, the focus of Pimentel 2006 was the maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[470]

434. Pimentel 2006 does not disclose or suggest reduction of bloating associated with IBS-D "is achieved following 7 days after the administration of rifaximin" as recited in claim 3 of the '571 Patent. In fact, Pimentel 2006 discloses that patients did not conduct a "stool diary" until "***[a]fter*** completing the 10-day course of study medication[.]"[471] Thus, Pimentel 2006 does not disclose changes in symptoms until day 17, because the questionnaire was administered 7 days after the 10-day treatment.

435. In any event, as discussed, Pimentel 2006 does not disclose the reduction of bloating associated with IBS-D following seven days after the administration of rifaximin. To the contrary, Pimentel 2006 reports "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [treatment and placebo] groups."[472]

436. Thus, Pimentel 2006 does not disclose the reduction of bloating associated with IBS-D following 7 days after administration of the rifaximin, as required by claim 3.

437. The RFIB 2001 Study Protocol also does not disclose the limitations of claim 3 of the '571 Patent.

---

[467] *Id.*
[468] *Id.*
[469] *Id.* at -653.
[470] *Id.* at -657.
[471] *Id.* at -653.
[472] *Id.*

438. The RFIB 2001 Study Protocol describes a Phase II study design only and does not include the clinical results of any of the dosing regimen. Lacking any clinical data, the RFIB 2001 Study Protocol does not describe the reduction of bloating associated with IBS-D following 7 days after administration of the rifaximin as required by claim 3. In fact, it does not mention bloating, let alone a reduction of bloating associated with IBS-D. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials as discussed above.[473]

439. Recognizing the deficiency of the RFIB 2001 Study Protocol, Dr. Harary cites to Sharara and Kim to support his opinion.[474] But neither reference discloses reduction of bloating associated with IBS-D following 7 days after administration of the rifaximin as required by claim 3. Sharara involved patients suffering from bloating or flatulence who did not necessarily have IBS-D and whose symptoms were assessed some unspecified time after the 10-day treatment period.[475] Kim studied the effect of a probiotic, not rifaximin, to treat IBS-D.[476]

**Motivation to Combine**

440. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the ’571 Patent.[477] As with claims 1 and 2, however, his analysis ignores the persuasive criticism of Pimentel 2006 at the time of the invention. Dr. Harary incorporates by reference his motivation to combine discussion with respect to claims 1 and 2 of the ’571 Patent.[478] I incorporate herein my discussion as to the lack of motivation in claims 1 and 2 of the ’571 Patent.

---

[473] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).
[474] Harary Opening Report at ¶ 609.
[475] XIFAX_AMN_0310894 at -896.
[476] NORWICH_NJ_INV_000085-94.
[477] Harary Opening Report at ¶¶ 610-614.
[478] *Id.* ¶ 610.

441. As discussed, Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[479] Given these results, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve a reduction in bloating associated with IBS-D following 7 days after the administration of rifaximin.

442. Pimentel 2006 also did not disclose any reduction in bloating associated with IBS-D following 7 days after administration of rifaximin during a 14 day treatment period as required by claim 3. Instead, in Pimentel 2006, results were assessed on day 17. As a result, a POSITA would not have been motivated to combine it with other references to achieve a reduction in bloating associated with IBS-D following 7 days after the administration of rifaximin during this 14-day period.

443. Moreover, key opinion leaders criticized the methodology of Pimentel 2006. For example, Dr. Drossman highlighted "several methodologic issues" in Pimentel 2006 that "raise questions about the clinical significance of the results."[480] Dr. Vanner and others also remarked that Dr. Pimentel's hypothesis remained "unproven."[481]

444. More generally, many thought leaders in the field remained unconvinced that antibiotics should be used to treat IBS-D: a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[482] Even Sharara recognized that "the use of antibiotics in patients with IBS . . . is limited by their potential

[479] *Id*. at -653.
[480] XIFAX_AMN_0887874 at -7874-75 (emphasis added).
[481] XIFAX_AMN_1874266 at -4271 (emphasis added).
[482] XIFAX_AMN_1253920 at -3922.

side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[483]

445. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol to achieve claim 3's reduction of bloating associated with IBS-D following 7 days after the administration of rifaximin. Since it merely described the design of a Phase II study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the results of those studies, including whether the subjects achieved a reduction of bloating associated with IBS-D following 7 days after the administration of rifaximin. As a result, a POSITA would not have been motivated to combine it with Pimentel 2006 to achieve the invention of claim 3.

446. Given the negative critiques of Pimentel 2006 and the limitations of both it and the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3 of the '571 Patent.

447. Dr. Harary cites six additional references to support his opinion that a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve claim 3, including Sharara, Cuoco, Weinstock 2007, Lauritano, Scarpellini and Di Stefano.[484] In my opinion, however, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the '571 Patent based on these additional references.

448. Sharara describes a trial with three 10-day phases for patients with "gas-related symptoms (bloating, abdominal distension, and flatulence)": baseline (phase 1); 400 mg BID rifaximin (800 mg/day) or placebo (phase 2); and post-treatment (phase 3).[485] Not all of the

[483] XIFAX_AMN_0310894 at -899.
[484] Harary Opening Report at ¶¶ 610-614.
[485] XIFAX_AMN_0310894 at -895.

patients satisfied the Rome criteria.[486] The aims of the study included: verifying whether patients suffer SIBO as shown by exaggerated release of hydrogen; examining the effect of rifaximin on gas-related symptoms; and attempting to link symptom improvement with hydrogen excretion.[487] Sharara acknowledged the shortcomings of its study, including the presence of both IBS and non-IBS patients, the short treatment and follow-up duration and the small number of patients with a positive response.[488] Sharara does not disclose the reduction of bloating associated with IBS-D was achieved following 7 days after administration of rifaximin. The subjects reported on their symptoms—i.e., "bloating, abdominal distension, and flatulence in the community regardless of whether these subjects fit the strict and complex criteria used in IBS studies"— at some unspecified time after the 10 day treatment of 400 mg BID rifaximin.[489] As a result, a POSITA would not have relied on Sharara as a motive to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3.

449. As discussed, Cuoco involved the treatment of SIBO.[490] As discussed, at the time of the invention, SIBO was not well understood and the relationship between SIBO and IBS was unproven. Based on the myriad questions about IBS and SIBO, Cuoco would not have motivated a POSITA to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 3. In addition, Cuoco is a retrospective chart review that a POSITA would have considered unreliable because it is highly susceptible to bias and confounding, cannot establish a true cause-and-effect relationship, and rely on pre-existing data that was not collected for research purposes. Cuoco also discloses the use of rifaximin ***in combination*** with confounding variables—probiotics to treat

---

486 *Id.* at -898.
487 *Id.*
488 *Id.* at -900.
489 *Id.* at -896.
490 XIFAX_AMN_0690728.

SIBO: "All these patients were treated with rifaximin (1 200 mg/day for 14 days) ***followed by a twenty-day cycle of probiotics***."[491] Accordingly, based on Cuoco, a POSITA could not have evaluated the efficacy or safety of the rifaximin dosage acting alone. Cuoco also does not disclose achieving a reduction of bloating associated with IBS-D following 7 days after administration. As discussed, patients in the Cuoco study were treated for ***34 days*** (14 days with rifaximin and 20 days with probiotics). Subjects were "advised" to return within 4-5 months after therapy for another glucose breath test, and less than half the patients complied.[492] Finally, a contemporaneous expert, Dr. Stephen Vanner, considered Cuoco's study design "seriously limited" as it lacked a control group, was retrospective, and "did not examine a clearly defined group of patients with IBS."[493] Accordingly, Cuoco would not have motivated a POSITA to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3.

450. Weinstock 2007 involved the treatment of SIBO in patients with Interstitial Cystitis, not IBS-D.[494] As discussed, at the time of the invention, SIBO was not well understood and the relationship between SIBO and IBS was unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 3 based on Weinstock 2007. In addition, following the rifaximin treatment, patients in the Weinstock 2007 study received tegaserod, creating a confounding variable.[495] Finally, because its patients did not suffer from IBS-D, Weinstock 2007 does not disclose or suggest the reduction of bloating associated with IBS-D was achieved following 7 days after the administration of rifaximin. As a result, a POSITA would not have

[491] *Id.* at -731 (emphasis added).
[492] *Id.* at -729, -731.
[493] XIFAX_AMN_1874266 at -4270.
[494] NORWICH_NJ_INV_000519.
[495] *Id.*

relied on Weinstock 2007 as a motive to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3.

451. Lauritano involved the treatment of SIBO, not IBS-D.[496] As discussed, at the time of the invention, SIBO was not well understood and the relationship between SIBO and IBS was unproven. Based on the myriad questions about IBS and SIBO, Lauritano would not have motivated a POSITA to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 3. Lauritano does not discuss the reduction of any symptoms because it was assessing compliance and side effects, not symptom reduction. Lauritano also does not disclose that reduction of bloating associated with IBS-D was achieved following 7 days after administration of rifaximin. To the contrary, its subjects were not reassessed until one month after treatment.[497] As a result, a POSITA would not have relied on Lauritano as a motivation to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3.

452. Scarpellini likewise involved the treatment of SIBO, not IBS-D.[498] As discussed, at the time of the invention, SIBO was not well understood and the relationship between SIBO and IBS was unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 3 based on Scarpellini. Scarpellini also does not disclose the reduction in bloating associated with IBS-D following 7 days after the administration of rifaximin. In Scarpellini, the SIBO patients received either 1600 mg/day or 1200 mg/day for 7 days. The glucose breath test "***was repeated 1 month after the end of the therapy*** in all patients to assess SIBO eradication."[499] Scarpellini does not compare rifaximin to placebo or compare the subjects' breath test results to normal controls.

---

[496] XIFAX_AMN_1677384.
[497] *Id.* at -7385.
[498] NORWICH_NJ_INV_000383-388 (emphasis added).
[499] *Id.* at -385.

As a result, a POSITA would not have relied on Scarpellini as a motive to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3.

453. Di Stefano also involved the treatment of SIBO; its patients did not suffer from any form of IBS.[500] As discussed, at the time of the invention, SIBO was not well understood and the relationship between SIBO and IBS was unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 3 based on references involving SIBO treatment. Di Stefano does not report how many patients remained positive for SIBO according to the criteria used to diagnosis SIBO upon study entry. Instead, it compared a rifaximin group to a chlortetracycline group, and noted that "[t]etracyclines do not have direct activity against anaerobes, may be ineffective against *Bacteroides* and their pharmacokinetics are markedly deranged in patients with malnutrition, which is a common finding in small intestinal bacterial overgrowth."[501] As a result, a POSITA would not have relied on Di Stefano as a motive to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3.

454. Finally, as discussed, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given the highly publicized safety issues with COX-2 inhibitors.

**Reasonable Expectation of Success**

455. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the '571 Patent.[502] He incorporates by reference his discussion of reasonable expectation of

[500] NORWICH_NJ_INV_000028-33.
[501] *Id.* at -32.
[502] Harary Opening Report at ¶¶ 615-617.

success in claims 1 and 2 of the ’571 Patent.[503] For the reasons I discuss above with respect to claims 1 and 2, I disagree that a reasonable expectation of success exists.

456. Since Pimentel 2006 did not involve IBS-D patients and reported “[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups,”[504] a POSITA would not have had a reasonable expectation of success of combining it with RFIB 2001 Study Protocol to achieve a reduction in bloating associated with IBS-D following 7 days after the administration of rifaximin.

457. A POSITA likewise would have no reasonable expectation of success in relying on Pimentel 2006 because it did not disclose a reduction of symptoms during a 14-day treatment period, as required by claim 3. Instead, Pimentel 2006 focused on the follow-up period: “[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients.”[505]

458. As with claims 1 and 2, Dr. Harary ignores the criticism of Pimentel 2006 published at the time of the invention. A POSITA would have been aware of the widespread and authoritative criticisms of the methodology used in Pimentel 2006 and the use of antibiotics to treat IBS discussed above.

459. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the ’571 Patent.

460. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a Phase II study design, not clinical results. A

[503] Harary Opening Report at ¶ 615.
[504] XIFAX_AMN_0310652 at -653.
[505] *Id.*

POSITA would not have expected a study to achieve its end point merely based on its design, particularly given the low success rate of Phase II trials as discussed above.

461. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 3.

462. Dr. Harary cites Sharara and Weinstock 2007 to support his reasonable expectation of success opinion.[506] In my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3 based on these additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

463. Sharara describes a trial with three 10-day phases for patients with "gas-related symptoms (bloating, abdominal distension, and flatulence)": baseline (phase 1); 400 mg BID rifaximin (800 mg/day) or placebo (phase 2); and post-treatment (phase 3).[507] Not all of the patients satisfied the Rome criteria.[508] The aims of the study included: verifying whether patients suffer SIBO as shown by exaggerated release of hydrogen; examining the effect of rifaximin on gas-related symptoms; and attempting to link symptom improvement with hydrogen excretion.[509] Sharara acknowledged the shortcomings of its study, including the presence of both IBS and non-IBS patients, the short treatment and follow-up duration and the small number of patients with a positive response.[510] Sharara does not disclose the reduction of bloating associated with IBS-D was achieved following 7 days after administration of rifaximin. The subjects reported on their

[506] Harary Opening Report at ¶¶ 615-617.
[507] XIFAX_AMN_0310894 at -895.
[508] *Id.* at -898.
[509] *Id.*
[510] *Id.* at -900.

symptom —i.e., "bloating, abdominal distension, and flatulence in the community regardless of whether these subjects fit the strict and complex criteria used in IBS studies"—at some unspecified time after the 10 day treatment of 400 mg BID rifaximin.[511] As a result, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3 based on Sharara.

464. Weinstock 2007 involved the treatment of SIBO in patients with Interstitial Cystitis, not IBS-D.[512] As discussed, at the time of the invention, SIBO was not well understood and the relationship between SIBO and IBS was unproven. Based on the myriad questions about IBS and SIBO, a POSITA would not have been motivated to combine Pimentel 2006 and RFIB 2001 Study Protocol to achieve claim 3 based on Weinstock 2007. In addition, following the rifaximin treatment, patients in the Weinstock 2007 study received tegaserod.[513] Finally, because its patients did not suffer from IBS-D, Weinstock 2007 does not disclose reduction of bloating associated with IBS-D was achieved following 7 days after the administration of rifaximin. As a result, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 3 based on Weinstock 2007.

465. In sum, claim 3 of the '571 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

**d. Claim 4 of the '571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol**

466. I incorporate by reference my previous discussion claims 1-3 of the '571 Patent.

[511] *Id.* at -896.
[512] NORWICH_NJ_INV_000519.
[513] *Id.*

467. Claim 4 of the ’571 Patent depends from claim 2 (which depends from claim 1) and further recites a “the reduction of bloating [associated with IBS-D] comprises an affirmative response from the subject when asked whether they had a reduction in bloating.”[514] Since claim 4 is a dependent claim, a POSITA would have understood that this affirmative response must occur during the 14 day treatment period recited in claim 1.

468. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 4 of the ’571 Patent.[515]

469. I disagree. Pimentel 2006 does not disclose or suggest a reduction of bloating associated with IBS-D comprising an affirmative response from a subject within a 14-day treatment period.

470. Pimentel 2006 involves the treatment of IBS patients and found no improvement in diarrhea.[516] Accordingly, it does not disclose a reduction of bloating associated with IBS-D as recited in claim 4.

471. Nor does Pimentel 2006 disclose the reduction of bloating associated with IBS-D comprising an affirmative response from a subject within the 14-day treatment period. Pimentel 2006’s “primary end point was global improvement in IBS symptoms ***during follow-up***.”[517] Pimentel 2006 “assessed the primary end point (percentage of global improvement) across the 10 weeks of follow-up.”[518] However “data was not available for all 10 weeks of follow-up.”[519] Pimentel 2006 reports “[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo

[514] XIFAX_AMN_0007928 at -7968, col. 46:50-52.
[515] Harary Opening Report at p. 183.
[516] XIFAX_AMN_0310652 at -653.
[517] *Id.* at -654 (emphasis added).
[518] *Id.*
[519] *Id.*

recipients."[520] Thus, the focus of Pimentel 2006 was the maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[521]

472. Pimentel 2006 does not disclose or suggest reduction of bloating associated with IBS-D comprising an affirmative response from a subject within the 14-day treatment period as recited in claim 4 of the '571 Patent. In fact, Pimentel 2006 discloses that patients did not conduct a "stool diary" until "***[a]fter*** completing the 10-day course of study medication[.]"[522] Thus, Pimentel 2006 does not disclose changes in symptoms until day 17, because the questionnaire was administered 7 days after the 10-day treatment.

473. Accordingly, Pimentel 2006 does not disclose reduction of bloating associated with IBS-D comprising an affirmative response from a subject within the 14-day treatment period.

474. Dr. Harary opines Pimentel 2006 "teaches that patients in the trial were asked 'to rate the severity of their symptoms [including the symptom of bloating] on the VAS again 7 days after the completion of rifaximin treatment or placebo.'"[523] Thus, even under Dr. Harary's opinion, Pimentel 2006 does not disclose a reduction of bloating associated with IBS-D within the 14-day treatment period required by claim 4.

475. The RFIB 2001 Study Protocol likewise does not disclose the limitations of claim 4. The RFIB 2001 Study Protocol describes a Phase II study design only. It does not disclose the clinical results of any of the dosing regimen. Lacking any clinical data, the RFIB 2001 Study Protocol does not describe the reduction of bloating associated with IBS-D comprising an

[520] *Id*. at -653.
[521] *Id*. at -657.
[522] *Id*. at -653.
[523] Harary Opening Report at ¶ 621.

affirmative response from a subject as required by claim 4. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated.

476. Apparently recognizing the deficiency of the RFIB 2001 Study Protocol, Dr. Harary cites to Sharara, Jolley 2011 and Yang to support his opinion that the RFIB 2001 Study Protocol reference to "adequate relief" refers to an affirmative response.[524] But neither of these references discloses the reduction of bloating associated with IBS-D comprising an affirmative response from a subject as required by claim 4. Sharara involved patients suffering from bloating or flatulence who did not necessarily have IBS-D and whose symptoms were assessed some unqualified time after the 10-day treatment period.[525] Jolley is a disfavored retrospective chart review published after February 26, 2008. And Yang is another disfavored retrospective chart review involving SIBO patients who also received confounding, concomitant therapy.

**Motivation to Combine**

477. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 4 of the '571 Patent.[526] He incorporates by reference his discussion of motivation to combine in claims 1-3 of the '571 Patent.[527] For the reasons I discuss above with respect to claims 1-3, I disagree that a motivation to combine exists. As with claims 1-3, however, his analysis ignores the widespread criticism of Pimentel 2006 at the time of the invention.

478. As discussed, Pimentel 2006 did not involve IBS-D patients and reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the

[524] *Id.* at ¶ 622.
[525] XIFAX_AMN_0310894 at -896.
[526] Harary Opening Report at ¶¶ 623-625.
[527] *Id.* at ¶ 623.

[rifaximin and placebo] groups."[528] Accordingly, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve a reduction in bloating associated with IBS-D.

479. Pimentel 2006 also did not disclose any reduction in bloating associated with IBS-D comprising an affirmative response from a subject as required by claim 4. Instead, in Pimentel, results were assessed on day 17. As a result, a POSITA would not have been motivated to combine it with other references to achieve a reduction in bloating associated with IBS-D comprising an affirmative response from a subject during this 14-day period.

480. Moreover, key opinion leaders criticized the methodology of Pimentel 2006. For example, Dr. Drossman highlighted "several methodologic issues" in Pimentel 2006 that "raise questions about the clinical significance of the results."[529] Dr. Vanner also was critical of the methodology of Pimentel 2006 and remarked that Dr. Pimentel's hypothesis remained "unproven."[530]

481. More generally, many thought leaders remained unconvinced that antibiotics should be used to treat IBS-D: a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[531] Even Sharara recognized that "the use of antibiotics in patients with IBS . . . is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[532] Based on these negative critiques, a POSITA would not have been motivated to rely on Pimentel 2006 to achieve the invention of claim 4 of the '571 Patent.

[528] *Id.* at -653.
[529] XIFAX_AMN_0887874 at -7874-75 (emphasis added).
[530] XIFAX_AMN_1874266 at -4271 (emphasis added).
[531] XIFAX_AMN_1253920 at -3922.
[532] XIFAX_AMN_0310894 at -899.

482. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol to achieve claim 4's reduction of bloating associated with IBS-D comprising an affirmative response from a subject. Since it merely described the design of a Phase II study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the results of those studies, including whether the subjects achieved a reduction of bloating associated with IBS-D following 7 days after the administration of rifaximin. As a result, a POSITA would not have been motivated to combine it with Pimentel 2006 to achieve the invention of claim 4.

483. Given the critiques of Pimentel 2006 and the limitations of both it and the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 4 of the '571 Patent.

484. Dr. Harary cites to Sharara, Jolley 2011 and Yang to support his opinion that an improvement of symptoms "was often determined through subjects' responses to questionnaires regarding those symptoms or based on affirmative open-ended questions."[533] But these references do not disclose the reduction of bloating associated with IBS-D comprising an affirmative response from a subject as required by claim 4. Sharara involved patients suffering from bloating or flatulence who did not necessarily have IBS-D and whose symptoms were assessed at some unqualified time after the 10 day treatment period.[534] Jolley is a disfavored retrospective chart review published after February 26, 2008. And Yang is a disfavored retrospective chart review involving SIBO patients who also received confounding, concomitant therapy.

485. Finally, as discussed, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given the highly publicized safety issues with COX-2 inhibitors.

---

[533] Harary Opening Report at ¶ 624.
[534] XIFAX_AMN_0310894 at -896.

486. In my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 4 based on Sharara, Jolley 2011 and Yang.

**Reasonable Expectation of Success**

487. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 4 of the '571 Patent.[535] He incorporates by reference his discussion of reasonable expectation of success in claims 1-3 of the '571 Patent.[536] For the reasons I discuss above with respect to claims 1-3, I disagree that a reasonable expectation of success exists.

488. Since Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups,"[537] a POSITA would not have had a reasonable expectation of success of combining it with RFIB 2001 Study Protocol to achieve a reduction in bloating associated with IBS-D comprising an affirmative response from a subject.

489. A POSITA likewise would have had no reasonable expectation of success in relying on Pimentel 2006 because it did not disclose a reduction of symptoms during a 14-day treatment period, as required by claim 4. Instead, Pimentel 2006 focused on the follow-up period: "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[538]

490. As with claims 1-3, Dr. Harary ignores the criticism of Pimentel 2006 published at the time of the invention. A POSITA would have been aware of the widespread and authoritative

[535] Harary Opening Report at ¶¶ 626-627.
[536] *Id.* ¶ 626.
[537] XIFAX_AMN_0310652 at -653.
[538] *Id.*

criticisms of the methodology used in Pimentel 2006 and the use of antibiotics to treat IBS discussed above.

491. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 4 of the ’571 Patent.

492. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a Phase II study design, not clinical results. A POSITA would not expect a dose ranging study to achieve its end point merely based on its design, particularly given the low success rate of Phase II trials as discussed above.

493. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 4.

494. Dr. Harary cites to Sharara, Jolley 2011 and Yang to support his opinion that an improvement of symptoms “was often determined through subjects’ responses to questionnaires regarding those symptoms or based on affirmative open-ended questions.”[539]

495. In my opinion, Sharara, Jolley 2011 and Yang would not have provided a POSITA a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 4, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed. Sharara involved a mix of patients suffering from bloating or flatulence who did not necessarily have IBS-D and whose symptoms were assessed at some unqualified time after the 10 day treatment period.[540] Jolley is a disfavored retrospective chart review published after February 26, 2008 and thus not prior art. And Yang is

[539] Harary Opening Report at ¶¶ 627.
[540] XIFAX_AMN_0310894 at -896.

another disfavored retrospective chart review involving SIBO patients who also received confounding, concomitant therapy.

496. In sum, in my opinion, claim 4 of the ’571 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

**e. Claim 4 of the ’571 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol, in further view of Sharara**

497. I incorporate by reference my previous discussion of the claims of the ’571 Patent.

498. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol, in further view of Sharara, disclose all the limitations of claim 4 of the ’571 Patent.[541]

499. I disagree. As discussed, in my opinion, Pimentel 2006 in combination with the RFIB 2001 Study Protocol do not disclose a reduction of bloating associated with IBS-D comprising an affirmative response from a subject within a 14-day treatment period, as recited in claim 4.

500. Sharara discloses a study with three 10-day phases for patients with “gas-related symptoms (bloating, abdominal distension, and flatulence).”[542] Not all of the patients satisfied the Rome criteria: “[o]ur study is the first of its kind to primarily address the common complaints of bloating, abdominal distension, and flatulence in the community ***regardless of whether these subjects fit the … criteria used in IBS studies***.”[543] The aims of the study include: verifying whether patients suffer SIBO as shown by exaggerated release of hydrogen; examining the effect of rifaximin on gas-related symptoms; and attempting to link symptom improvement with hydrogen excretion.[544]

541 Harary Opening Report at p. 185.
542 XIFAX_AMN_0310894 at -895.
543 *Id*. at -898 (emphasis added).
544 *Id*.

501. Sharara acknowledged the shortcomings of its study, including the presence of both IBS and non-IBS patients, the short treatment and follow-up duration, and the small number of patients with a positive response.[545] The authors noted the "pathophysiology of IBS remains poorly understood, although various mechanisms, including altered gut flora and/or small bowel bacterial overgrowth, have been suggested to play a role in the development of gas-related symptoms."[546] They concluded that "efficacy of long-term or cyclic use of rifaximin, as primary or adjuvant therapy in this patient population deserves further investigation."[547]

502. Sharara does not disclose the reduction of bloating associated with IBS-D comprising an affirmative response from a subject as required by claim 4.

**Motivation to Combine**

503. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol and Sharara to achieve the invention in claim 4 of the '571 Patent.[548] However, he fails to analyze how a POSITA would be motivated to combine these three references and instead relies on his discussion of the motivation to combine only Pimentel 2006 and the RFIB 2001 Study Protocol.[549]

504. As discussed, in my opinion, a POSITA would not be motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention of claim 4 of the '571 Patent.

505. Sharara likewise does not provide a motivation to combine. It does not disclose the reduction of bloating associated with IBS-D comprising an affirmative response from a subject as

---

[545] *Id.* at -900.
[546] *Id.* at -894.
[547] *Id.* at -900.
[548] Harary Opening Report at ¶ 632.
[549] *Id.*

required by claim 4. Instead, it involved a mixed group of patients suffering from bloating or flatulence who did not necessarily have IBS-D and whose symptoms were assessed at some unqualified time after the 10 day treatment period.[550] Moreover, Sharara cautioned that "the use of antibiotics in patients with IBS . . . is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[551]

506. Dr. Harary opines a POSITA would have known it was best practice to ask about a patients' symptoms.[552] Whether a POSITA would have known to ask about symptom relief does not establish a motivation to combine specific references to achieve the invention in claim 4, particularly where, as discussed, Pimentel 2006, the RFIB 2001 Study Protocol or Sharara do not teach all the limitations of claim, including those in claims 1 and 2.

507. Finally, as discussed, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given the highly publicized safety issues with COX-2 inhibitors.

508. Given these limitations and Sharara's concession that antibiotics may not be effective to treat IBS, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol and Sharara to achieve the invention in claim 4.

**Reasonable Expectation of Success**

509. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol and Sharara to achieve the invention in claim 4 of the '571 Patent.[553] As with motivation to combine, Dr. Harary fails to

---

[550] XIFAX_AMN_0310894 at -896.
[551] *Id.*at -899.
[552] Harary Opening Report at ¶ 632.
[553] *Id.* ¶ 633.

Sharara differ substantially from Pimentel 2006 and a POSITA's motivation to combine them with the RFIB 2001 Study Protocol would therefore not be the same

719. As discussed, in my opinion, a POSITA would not have been motivated to combine the Weinstock Email with Pimentel 2006 or the RFIB 2001 Study Protocol to achieve claim 4 of the '571 Patent.

720. Sharara likewise does not disclose the reduction of bloating associated with IBS-D comprising an affirmative response from a subject as required by claim 4. Instead, it involved patients suffering from bloating or flatulence who did not necessarily have IBS-D and whose symptoms were assessed some unspecified time after the 10 day treatment period.[704] Indeed, Sharara recognized that "the use of antibiotics in patients with IBS. . .is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[705]

721. Dr. Harary opines a POSITA would have known it was best practice to ask about a patients' symptoms.[706] Whether a POSITA would have known to ask about symptom relief does not establish a motivation to combine specific references to achieve the invention in claim 4, particularly where, as discussed, the Weinstock Email, Pimentel 2006, the RFIB 2001 Study Protocol or Sharara do not teach all the limitations of the claim, including those in claims 1 and 2.

722. Given these limitations and Sharara's concession that antibiotics may not be effective to treat IBS, a POSITA would not have been motivated to combine the Weinstock Email with Pimentel 2006 or the RFIB 2001 Study Protocol and Sharara to achieve the invention in claim 4.

[704] XIFAX_AMN_0310894 at -896.
[705] *Id.* at -899.
[706] Harary Opening Report at ¶ 723.

**Reasonable Expectation of Success**

723. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Weinstock Email with Pimentel 2006 or the RFIB 2001 Study Protocol and Sharara to achieve the invention in claim 4 of the '571 Patent.[707] As with motivation to combine, Dr. Harary fails to analyze a POSITA's reasonable expectation of success in combining these three references and instead relies on his discussion of only Pimentel 2006 and the RFIB 2001 Study Protocol.[708] I disagree for at least the reasons I discuss as to that combination and with his approach because, at a minimum, the Weinstock Email and Sharara differ substantially from Pimentel 2006, and a POSITA's reasonable expectation of success in combining them with the RFIB 2001 Study Protocol would therefore not be the same.

724. As discussed, in my opinion, a POSITA would not have had a reasonable expectation of success of combining the Weinstock Email with Pimentel 2006 or the RFIB 2001 Study Protocol to achieve claim 4 of the '571 Patent.

725. Sharara does not disclose the reduction of bloating associated with IBS-D comprising an affirmative response from a subject as required by claim 4. Instead, it involved patients suffering from bloating or flatulence who did not necessarily have IBS-D and whose symptoms were assessed some unspecified time after the 10 day treatment period.[709] Indeed, Sharara recognized that "the use of antibiotics in patients with IBS. . .is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[710]

---

[707] Harary Opening Report at ¶ 724.
[708] *Id.*
[709] XIFAX_AMN_0310894 at -896.
[710] *Id.* at -899.

726. Given these limitations and Sharara's concession that antibiotics may not be effective to treat IBS, a POSITA would not have had a reasonable expectation of success in combining the Weinstock Email with Pimentel 2006 or the RFIB 2001 Study Protocol and Sharara to achieve the invention in claim 4 of the '571 Patent.

727. In sum, in my opinion, claim 4 of the '571 Patent would not have been obvious to a POSITA over the Weinstock Email in view of Pimentel 2006 or the RFIB 2001 Study Protocol and Sharara.

### C. The '912 Patent Is Not Obvious

#### 1. Claims 1–7 of the '912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol

728. I incorporate by reference my discussion of the '571 Patent.

##### a. Claim 1 of the '912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol

729. Claim 1 of the '912 Patent recites a "method of treating one or more symptoms of irritable bowel syndrome (IBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the female subject, thereby treating one or more symptoms of IBS in the female subject."[711]

730. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 1 of the '912 Patent.[712] I disagree.

731. Pimentel 2006 describes a study of treating IBS patients with 400 mg rifaximin TID for 10 days.[713] It does not disclose treating patients with 550 mg rifaximin TID for 14 days.

[711] XIFAX_AMN_0006830 at -6870, col. 46:6–11.
[712] Harary Opening Report at p. 88.
[713] XIFAX_AMN_0310652.

732. Pimentel 2006 found no improvement in diarrhea, abdominal pain and constipation, three key IBS symptoms: "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[714] In particular, the "VAS scores for abdominal pain (P=0.32), diarrhea (P=0.67), and constipation (P=0.069) did not significantly differ."[715] Indeed, even after controlling for abdominal pain, "VAS scores for diarrhea were still not statistically significant over placebo."[716]

733. Pimentel 2006's "primary end point was global improvement in IBS symptoms during follow-up."[717] Accordingly, Pimentel 2006 "assessed the primary end point (percentage of global improvement) across the 10 weeks of follow-up[,]" however "data was not available for all 10 weeks of follow-up."[718] Pimentel 2006 reported "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[719] Thus, the focus of Pimentel 2006 was the maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[720]

734. Thus, Pimentel 2006 does not disclose all the limitations of claim 1 of the '912 Patent.

735. The RFIB 2001 Study Protocol likewise does not disclose the limitations of claim 1. It discloses a Phase II clinical study design for three dosages (275 mg BID, 550 mg BID or 1100 mg BID) over 14 days for IBS-D patients.[721] It describes the "primary objective" of the

---

[714] *Id*. at -653.
[715] *Id*. at -656.
[716] *Id*.
[717] *Id*. at -654.
[718] *Id*.
[719] *Id*. at -653.
[720] *Id*. at -657.
[721] XIFAX_AMN_1882456.

RFIB 2001 Study as "evaluat[ing] the efficacy of a 14-day course of oral rifaximin at 550 mg BID versus placebo in providing adequate relief from Diarrhea-associated IBS (DIBS) symptoms."[722] It does not describe treating IBS patients with 550 mg rifaximin TID.

736. The RFIB 2001 Study Protocol describes a study design only. It does not disclose the clinical results of any of the dosing regimen. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials as discussed above.

**Motivation to Combine**

737. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention of claim 1 of the '912 Patent.[723] He includes a footnote that he reserves the right to rely on any motivation discussed with respect to one combination in connection with any other combination discussed herein. To the extent he relies on additional motivations not recited as to a particular combination, I reserve the right to further address this motivation to combine and/or incorporate any discussion I have rebutting that motivation to combine.

738. I disagree. Dr. Harary's analysis ignores the wide criticism of Pimentel 2006 at the time of the invention. As discussed, Dr. Drossman, a leading GI expert at the time, authored an editorial publicly cautioning POSITAs that that "several methodologic issues [in Pimentel 2006] must be addressed before drawing. . .conclusions from the study."[724] He emphasized that "the limitations of the study make the findings inconclusive and ***raise questions about the clinical significance of the results***."[725] In my opinion, given Dr. Drossman's preeminence in the field, a

[722] *Id*. at -458.
[723] Harary Opening Report at ¶¶ 283–300.
[724] XIFAX_AMN_0887874 at -7874–75 (emphasis added).
[725] *Id*.

POSITA would have considered his critique of Pimentel significant, and, as a result, a POSITA would have serious concerns about relying on Pimentel 2006 to achieve the invention of the '912 Patent. In addition, in February 2008, Dr. Vanner concluded that Pimentel's research presented an "intriguing" but ultimately "***unproven hypothesis***."[726]

739. Other experts in the field also questioned the use of antibiotics to treat IBS. As discussed, Dr. Quigley noted a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[727] He also cautioned "[a]ntibiotic dose and duration of therapy have not been established."[728] The British Society of Gastroenterology similarly warned that antibiotic treatment "cannot be recommended until replicated in well-designed studies by others [i.e., doctors outside of Cedars-Sinai]."[729] Sharara, a publication Dr. Harary repeatedly relies on, also warned "the use of antibiotics in patients with IBS. . .is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[730]

740. These critiques would have deterred a POSITA to combine Pimentel 2006 with other references to achieve the invention of claim 1 of the '912 Patent.

741. Dr. Harary also ignores that Pimentel 2006 found no improvement in diarrhea or abdominal pain, two significant symptoms of IBS.

742. Given its widespread criticism and failure to improve these two symptoms, a POSITA would not have been motivated to combine Pimentel 2006 with other references to

[726] XIFAX_AMN_1874266 at -4271 (emphasis added).
[727] XIFAX_AMN_1253920 at -3922.
[728] *Id.*
[729] XIFAX_AMN_1874288 at -4306.
[730] XIFAX_AMN_0310894 at -899.

achieve the invention of treating one or more IBS symptoms, as recited by claim 1 of the ’912 Patent.

743. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol. Since it merely described the design of a Phase II study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the results of those studies. As a result, a POSITA would not have been motivated to combine it with Pimentel 2006 to achieve a method of one more IBS symptoms as required by claim 1 of the ’912 Patent.

744. Given the limitations and criticism of Pimentel 2006 and the lack of data in the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine these references to achieve claim 1.

745. Dr. Harary also asserts that a “POSA would have been motivated to adjust, improve, or optimize the rifaximin dosing regimen taught by Pimentel 2006 (400 mg TID for 10 days) for female IBS patients based on the known dosage range (550-2200 mg per day), known unit dose (550 mg) and known length of therapy (i.e., 14 days) for a female IBS-D or IBS-A (with non-constipation symptoms) patient, as taught by the RFIB 2001 Study Protocol, with a reasonable expectation of success based on teachings, suggesting, or motivations found in the prior art.”[731] He asserts that a “POSA would have been motivated to treat with this dosing regimen bloating associated with IBS-D in female subjects based on teachings, suggestions, or motivations of at least Pimentel 2006 and the RFIB 2001 Study Protocol.”[732]

746. I disagree for multiple reasons.

747. *First*, as noted above, each of Pimentel 2006 and the RFIB 2001 Study Protocol not only fails to disclose the claimed dosage of 550 mg of rifaximin TID for 14 days, but each also

---

[731] Harary Opening Report at ¶ 283.
[732] *Id.*

fails to disclose treating symptoms associated with IBS-D with this dosage. As I discussed, Pimentel 2006 found no improvement in diarrhea or abdominal pain: "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[733] In particular, the "VAS scores for abdominal pain (P=0.32), diarrhea (P=0.67), and constipation (P=0.069) did not significantly differ."[734] Indeed, even after controlling for abdominal pain, "VAS scores for diarrhea were still not statistically significant over placebo."[735]

748. Thus, I disagree that a POSITA would have even looked to Pimentel 2006 for treating symptoms associated with IBS-D, let alone sought to then modify its dosage to arrive at the claimed invention. Indeed, even if a POSITA would have been motivated to modify the dosing regimen of Pimentel 2006, as Dr. Harary asserts, that reference still fails to disclose other requirements of claim 1 of the '571 Patent, i.e., treating symptoms associated with IBS-D.

749. *Second*, even assuming a POSITA would have relied on Pimentel 2006, Dr. Harary fails to explain why a POSITA would have been motivated to modify the Pimentel 2006 dosing regimen given that Pimentel 2006 concluded "the antibiotic rifaximin resulted in statistically greater global improvement in IBS than placebo in our randomized, double-blind study."[736] Although Pimentel 2006 also states "[r]ecent data suggests that the optimal dosage of rifaximin may, in fact, be higher than that used in our study,"[737] I disagree that this would have motivated a POSITA to seek out the claimed 550 mg TID dosage administered over 14 days. At the time of the patent, it was a foundational concept that medicines should be used at the lowest effective dose to achieve the desired therapeutic response. The dose response curve became central both in

[733] XIFAX_AMN_0310652 at -653.
[734] *Id*. at -656.
[735] *Id*.
[736] XIFAX_AMN_1677384.
[737] *Id*.

regulatory guidance and clinical trial design. Antimicrobial stewardship reinforced the minimal dose concept, particularly with antibiotics, to prevent resistance and consequent related harm. In any event, Pimentel 2006 does not suggest or even hint what the "higher" dose might be (the 1,650 mg/day dosage in the Asserted Claims is nearly ***40 percent higher*** than the 1,200 mg/day dosage in Pimentel 2006).[738]

750. Moreover, a POSITA would have known that Pimentel 2006 relies on Lauritano for its assertion "[r]ecent data suggest[ing] that the optimal dosage of rifaximin may, in fact, be higher than that used in our study." As I explained above, however, the highest reported dose used in Lauritano was 1,200 mg of rifaximin—***the same dose used in Pimentel 2006***.[739] Therefore, a POSITA would have understood (i) Lauritano fails to support Pimentel 2006's assertion "that optimal doses of rifaximin may, in fact, be higher than those used in our study" and (ii) thus fails to provide a motivation for a POSITA to experiment with other dosages of rifaximin—let alone provide motivation to select the claimed 550 mg TID for 14 days.

751. *Third*, while Pimentel 2006 discloses administering rifaximin TID, it teaches administering it at a lower dose (400 mg) than the claimed 550 mg dose and for a shorter duration (10 days) than the claimed 14 days. While the RFIB 2001 Study Protocol discloses a 550 mg dose as one of three options (275 mg, 550 mg, or 1100 mg), it only teaches administering this dose ***BID***, not the claimed ***TID***. Dr. Harary nowhere explains why a POSITA would have been motivated to modify the dosing described in Pimentel 2006 to select a 550 mg TID dosage administered over 14 days. Dr. Harary's opinion amounts to impermissible hindsight relying on the claim as a roadmap.

---

738 *Id.*

739 XIFAX_AMN_0690550 at -0553.

752. As noted, I disagree that a POSITA would have been motivated to look to the RFIB 2001 Study Protocol, which is nothing more than a clinical study design with no clinical results, to modify the dosing regimen described in Pimentel 2006. Putting that aside, even if a POSITA looked to the RFIB 2001 Study Protocol, Dr. Harary fails to explain why she would have selected the claimed total dose of 1,650 mg per day (550 mg TID). Even if a POSITA selected the 550 mg dose provided as one option in the RFIB 2001 Protocol, the RFIB 2001 Protocol states it should be administered **BID** for a total daily dose of 1,100 mg. This provides a **lower** daily dose than taught by Pimentel 2006, which describes a 1,200 mg daily dose (400 mg TID), a fact that undercuts Dr. Harary's assertion that a POSITA would have been motivated to modify Pimentel 2006's dose based on the teaching of the RFIB 2001 Protocol. Dr. Harary's piecemeal compilation of snippets from Pimentel 2006 and the RFIB 2001 Study Protocol to arrive at the claimed invention lacks support and improperly relies on the claims as a roadmap to reconstruct the invention.

753. Dr. Harary cites 22 additional references to support his opinion that a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve claim 1, including Cuoco, Lauritano, Scarpellini, Viscomi, Weinstock 2011, Jolley 2011, Weinstock 2007, Muska, Lin 2006, Weinstock Email, Infantalino, Normix Label, Prantera, Gionchetti, Barrett, Della Marchina, Di Stefano, Xifaxan Label, Yang, Pimentel 2005, Salix Business Wire, and the Pimentel Book.[740] I incorporate my discussion above of the deficiencies of those references and why none would have motivated a POSITA to combine Pimentel 2006 with the RFIB 2001 Study Protocol or to modify the dose described in Pimentel 2006 to achieve the claimed invention. In addition, as discussed, a POSITA in 2008 would have been skeptical

[740] Harary Opening Report at ¶¶ 555–575.

about relying on publications as evidence-based medical authority given the highly publicized safety issues with COX-2 inhibitors.

754. For the reasons previously discussed, in my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1 of the ’912 Patent based on these additional references.

**Reasonable Expectation of Success**

755. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1 of the ’912 Patent.[741]

756. I disagree and incorporate my discussion above in claim 1 of the ’571 Patent as to the lack of reasonable expectation of success. As discussed, at the time of the invention, a POSITA would have been aware of the widespread and authoritative criticism of the Pimentel 2006 study. In particular, Dr. Drossman identified “several methodologic issues [in Pimentel 2006] must be addressed before drawing. . .conclusions from the study.”[742] He also noted that “the limitations of the study make the findings inconclusive and ***raise questions about the clinical significance of the results***.”[743] Dr. Drossman also commented that “the benefit of using antibiotics is not fully proven and must be balanced with potential risks in terms of side effects, high costs (a 10-day course of rifaximin is $250, and a breath test, if ordered, costs an additional $304), and the need for recurrent treatments.”[744]

757. Other experts agreed and also questioned the use of antibiotics to treat IBS. In particular, Dr. Quigley noted a “sound rationale for antibiotic therapy has not been established,”

[741] Harary Opening Report at ¶¶ 301–305.
[742] XIFAX_AMN_0887874 at -7874–75 (emphasis added).
[743] *Id.*
[744] *Id.* at -7875.

and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[745] The British Society of Gastroenterology also cautioned that antibiotic treatment "cannot be recommended until replicated in well-designed studies by others [i.e., doctors outside of Cedars-Sinai]."[746] And Sharara, a publication cited by Dr. Harary, similarly warned "the use of antibiotics in patients with IBS. . .is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[747]

758. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 1 of the '912 Patent.

759. A POSITA likewise would not have had a reasonable expectation of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 1 because Pimentel 2006 found no improvement in diarrhea or abdominal pain, two key symptoms of IBS.

760. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not expect a study to achieve its end point merely based on its design, particularly given the low success rate of Phase II trials as discussed above.

761. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1.

762. Dr. Harary cites 18 additional references to support his reasonable expectation of success opinion—Pimentel 2005, Pimentel Book, Pimentel Conference Call, Muska, Barrett,

---

745 XIFAX_AMN_1253920 at -3922.
746 XIFAX_AMN_1874288 at -4306.
747 XIFAX_AMN_0310894 at -899.

Cuoco, Scarpellini, Lauritano, Sharara, Yang, Weinstock Email, Di Stefano, RFIB 2001 Press Release, Hungin, Salix Pharmaceutical Update, Lin ’053 Patent, Lin ’608 Patent, and Lin ’857 Patent.

763. The Lin ’053, ’608 and ’857 Patents all disclose the much criticized hypothesis that SIBO can be used to diagnose irritable bowel syndrome; fibromyalgia; chronic fatigue syndrome; depression; ADHD; and autoimmune diseases, such as multiple sclerosis, lupus erythematosus, and Crohn’s disease—which is referred to as the “universal hypothesis” for SIBO. They also involve the concomitant use of probiotic or prokinetic agents.[748] These patents do not frequencies of administration, dosages, or lengths of administration for rifaximin. Nor do they distinguish IBS subtypes, such as IBS-C, IBS-D, or IBS-A. Finally, these Lin patents rely on a definition of IBS does not comport with the standard definition at the time. In addition, as discussed the Lin ’608 Patent was not available to a POSITA at the time of the invention.

764. For the reasons previously discussed, in my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 1 of the ’912 Patent based on these additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

765. In sum, in my opinion, claim 1 of the ’912 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

**b. Claim 2 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol**

766. I incorporate by reference my previous discussion of the claims of the ’912 Patent.

[748] NORWICH_NJ_INV_000100 at 100–123; NORWICH_NJ_INV_000153 at 153–181; NORWICH_NJ_INV_000182 at 182–210.

767. Claim 2 of the ’912 Patent depends from claim 1 and further recites a “wherein the one or more symptoms are selected from one or more of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and urgency.”[749]

768. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 2 of the ’912 Patent.[750]

769. I disagree. Pimentel 2006 does not disclose the treatment of one or more symptoms of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and urgency, as required by claim 2.

770. To the contrary, Pimentel 2006 found no improvement in diarrhea or abdominal pain, two prominent IBS symptoms identified in claim 2: “[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups.”[751] In particular, the “VAS scores for abdominal pain (P=0.32), diarrhea (P=0.67), and constipation (P=0.069) did not significantly differ.”[752] Indeed, even after controlling for abdominal pain, “VAS scores for diarrhea were still not statistically significant over placebo.”[753]

771. The RFIB 2001 Study Protocol describes a study design only. It does not disclose the clinical results of any of the dosing regimen. As discussed, in my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials as discussed above.

**Motivation to Combine**

[749] XIFAX_AMN_0006830 at -6870, col. 46:12–16.
[750] Harary Opening Report at p. 100.
[751] XIFAX_AMN_0310652 at -653.
[752] *Id.* at -656.
[753] *Id.*

772. Dr. Harary opines a POSITA would have had a motivation to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 2 of the ’912 Patent.[754] I disagree for the reasons I discuss above with respect to claim 1.

773. As discussed, industry leaders widely criticized the methodology and conclusions in Pimentel 2006. They also questioned the effectiveness of using antibiotics to treat IBS. Accordingly, a POSITA would not have been motivated to combine Pimentel 2006 with other references to achieve the invention in claim 2 of the ’912 Patent.

774. A POSITA would be particularly unmotivated to combine Pimentel 2006 with other references to achieve the invention in claim 2 because Pimentel 2006 found no improvement in diarrhea and abdominal pain, two prominent symptoms recited in claim 2.

775. Similarly, a POSITA would not have been motivated to combine the RFIB 2001 Study Protocol with other references because it lacked any safety or efficacy data on the use of rifaximin to treat IBS.

776. Dr. Harary cites to the RFIB 2001 Press Release, Yang, Barrett, Cuoco, Muska, and Weinstock 2007 to support his opinion that a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve claim 2.[755] As discussed, in my opinion, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given, for example, the highly publicized safety issues with COX-2 inhibitors.

777. As discussed, the RFIB 2001 Press Release is not considered prior art because it quotes the inventors’ discussion of the study.

---

[754] Harary Opening Report at ¶¶ 312–315.
[755] *Id.* at ¶¶ 313–315.

frequent stool production, abdominal pain, abdominal discomfort, and urgency, as required by claim 2.

784. As with claim 1, Dr. Harary ignores the criticism of Pimentel 2006 published at the time of the invention. A POSITA would have been aware of the widespread and authoritative critiques of the methodology used in Pimentel 2006 and the use of antibiotics to treat IBS discussed above.

785. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 2 of the ’912 Patent.

786. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not expect a study to achieve its end point merely based on its design, particularly given the low success rate of Phase II trials as discussed above.

787. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 2 of the ’912 Patent.

788. Dr. Harary cites 5 additional references to support his reasonable expectation of success opinion—Cuoco, Weinstock 2007, Barrett, Yang and Muska.[758]

789. For the reasons previously discussed, in my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 2 based on these additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

[758] Harary Opening Report at ¶ 317.

790. In sum, in my opinion, claim 2 of the ’912 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

#### c. Claim 3 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol

791. I incorporate by reference my previous discussion the claims of the ’912 Patent.

792. Claim 3 of the ’912 Patent depends from claim 1 and further recites a “wherein the IBS is diarrhea-predominant IBS.”[759]

793. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 3 of the ’912 Patent.[760] I disagree.

794. Pimentel 2006 does not disclose treating one or more symptoms of IBS-D by administering 550 mg of rifaximin TID for 14 days.

795. Pimentel involves the treatment of IBS patients and found no improvement in diarrhea.[761] Accordingly, it does not disclose treating one or more symptoms of IBS-D as recited in claim 3 of the ’912 Patent.[762]

796. The RFIB 2001 Study Protocol likewise does not disclose the limitations of claim 3. It discloses a Phase II clinical study design for three dosages (275 mg BID, 550 mg BID or 1100 mg BID) over 14 days.[763] It describes the “primary objective” of the RFIB 2001 Study as “evaluat[ing] the efficacy of a 14-day course of oral rifaximin at 550 mg BID versus placebo.”[764] It does not describe treating one or more symptoms of IBS with 550 mg rifaximin TID.

---

[759] XIFAX_AMN_0006830 at -6870, col. 46:17–18.
[760] Harary Opening Report at p. 104.
[761] XIFAX_AMN_0310652 at -653.
[762] Dr. Harary cites to the Pimentel deposition to support his opinion that Pimentel 2006 and the RFIB 2001 Study Protocol disclose each limitation of claim 3. (Harary Opening Report ¶ 322) But a POSITA would not have access to this deposition in 2008. He also states Pimentel 2005 and the Salix Business Wire reported improvements in diarrhea symptoms in the Pimentel 2006 study. (*Id.*) But this contradicts the findings of Pimentel 2006.
[763] XIFAX_AMN_1882456.
[764] *Id*. at -458.

797. The RFIB 2001 Study Protocol describes a study design only. It does not disclose the clinical results of any of the dosing regimen. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials discussed above.

**Motivation to Combine**

798. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the ’912 Patent. But he provides no analysis and merely incorporates his discussion of the motivation to combine those references for claims 1 and 2.[765]

799. I disagree because claim 3 involves a different limitation—treating one or more symptoms of IBS-D.

800. In my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the ’912 Patent.

801. Pimentel 2006 found no improvement in diarrhea, the key symptom of IBS-D.[766] Accordingly, a POSITA would not have been motivated to combine it with the RFIB 2001 Study Protocol to treat one or more symptoms of IBS-D, as recited in claim 3 of the ’912 Patent.

802. As discussed, Pimentel 2006 also had been widely criticized and therefore a POSITA would not have been motivated to combine it with the RFIB 2001 Study Protocol to treat one or more symptoms of IBS-D, as recited in claim 3 of the ’912 Patent.

803. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol. Since it merely described the design of a study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the safety and efficacy of that treatment.

---

[765] Harary Opening Report at ¶¶ 324–325.
[766] XIFAX_AMN_0310653 at -653.

804. Given the limitations and criticism of Pimentel 2006 and the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine them to achieve claim 3 of the ’912 Patent.

**Reasonable Expectation of Success**

805. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the ’912 Patent.[767] He incorporates his discussion of the reasonable expectation of combining those references for claims 1 and 2.[768] I likewise incorporate by reference my analysis of those issues.

806. As discussed, at the time of the invention, a POSITA would have been aware of the widespread and authoritative criticisms of the Pimentel 2006 study.

807. A POSITA also would have been aware that other experts agreed and also questioned the use of antibiotics to treat IBS. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the ’912 Patent.

808. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not expect a study to achieve its end point merely based on its design, particularly given the low success rate of Phase II trials as discussed above.

---

[767] Harary Opening Report at ¶¶ 326–329.
[768] *Id.* at ¶ 326.

809. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 3.

810. Dr. Harary cites 12 additional references to support his reasonable expectation of success opinion—Pimentel Book, Pimentel Conference Call, Barrett, Yang, Muska, Weinstock 2011, Jolley 2011, Pimentel 2011, Cuoco, Lauritano, Sharara and Scarpellini.

811. For the reasons discussed previously, in my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 3 of the ’912 Patent based on those additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

812. In sum, in my opinion, claim 3 of the ’912 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

**d. Claim 4 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol**

813. I incorporate by reference my previous discussion of the claims of the ’912 Patent.

814. Claim 4 of the ’912 Patent depends from claim 1 and further recites a “wherein the IBS is alternating IBS.”[769]

815. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 4 of the ’912 Patent.[770] I disagree.

816. Pimentel 2006 does not disclose treating one or more symptoms of alternating IBS by administering 550 mg of rifaximin TID for 14 days.

[769] XIFAX_AMN_0006830 at -6870, col. 46:19–20.
[770] Harary Opening Report at p. 106.

817. Pimentel involves the treatment of IBS patients and does not state that any of its study participants had alternating IBS.[771] And, as discussed, the Pimentel 2006 study found no improvement in diarrhea.[772] Accordingly, it does not disclose treating one or more symptoms of alternating IBS as recited in claim 4 of the ’912 Patent.

818. The RFIB 2001 Study Protocol likewise does not disclose the limitations of claim 4. The “primary objective” of the RFIB 2001 Study was to “evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg BID versus placebo in providing adequate relief from Diarrhea-associated IBS (DIBS) symptoms.”[773] It does not describe treating one or more symptoms of alternating IBS with 550 mg rifaximin TID. The RFIB 2001 Study Protocol only mentions alternating IBS in its exclusion criteria: “[s]ubject has alternating IBS, but is currently presenting with constipation associated IBS symptoms.”[774]

819. The RFIB 2001 Study Protocol describes a study design only. It does not disclose the clinical results of any of the dosing regimen. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials discussed above.

**Motivation to Combine**

820. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve claim 4 of the ’912 Patent.[775] But he provides no

[771] Recognizing this defect, Dr. Harary cites to Pimentel 2005, which states that subjects who met Rome I criteria (all subgroups) were recruited. Harary Opening Report ¶ 333. However, neither Pimentel 2005 or 2006 state that any alternating IBS patients actually participated in the study.
[772] XIFAX_AMN_0310652 at -653.
[773] XIFAX_AMN_1882456.
[774] *Id*. at -459.
[775] Harary Opening Report at ¶¶ 335–336.

analysis and instead incorporates his discussion of how a POSITA would have been motivated to combine these references to achieve claims 1 and 2 of the ’912 Patent.[776]

821. I disagree because claim 4 involves a different limitation – treating one or more symptoms of alternating IBS.

822. As discussed, neither Pimentel nor the RFIB 2001 Study Protocol disclose the treatment of alternating IBS. A POSITA also would have known about the criticism of Pimentel and its failure to show improvement in diarrhea, a key symptom in alternating IBS.

823. Likewise, a POSITA would not have been motivated to combine the RFIB 2001 Study Protocol with Pimentel 2006 to achieve claim 4 because it lacked safety and efficacy data.

824. As a result, in my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 4 of the ’912 Patent.

**Reasonable Expectation of Success**

825. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 4 of the ’912 Patent.[777]

826. I disagree. As discussed, at the time of the invention, a POSITA would have been aware of the widespread and authoritative criticisms of the Pimentel 2006 study.

827. A POSITA also would have been aware that other experts agreed and also questioned the use of antibiotics to treat IBS.

828. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 4 of the ’912 Patent.

---

[776] *Id.*

[777] Harary Opening Report at ¶¶ 337–339.

829. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not expect a study to achieve its end point merely based on its design particularly given the low success rate of Phase II trials as discussed above.[778]

830. A POSITA likewise would have understood that neither Pimentel 2006 or the RFIB 2001 Study Protocol involved the treatment of alternating IBS, as required by claim 4 of the ’912 Patent.

831. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 4.

832. Dr. Harary cites 12 additional references to support his reasonable expectation of success opinion – RFIB 2001 Press Release, Pimentel Book, Barrett, Yang, Muska, Weinstock 2011, Jolley 2011, Pimentel 2011, Cuoco, Lauritano, Sharara and Scarpellini.

833. For the reasons discussed previously, in my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 4 of the ’912 Patent based on those additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

834. In sum, in my opinion, claim 4 of the ’912 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

---

[778] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428–37, JACC Basic Transl. Sci. (2019).

**e. Claim 5 of the '912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol**

835. I incorporate by reference my previous discussion of the claims of the '912 Patent.

836. Claim 5 of the '912 Patent depends from claim 1 and further recites "wherein the treating [of] one or more symptoms of IBS comprises a reduction of the one or more symptoms from baseline symptoms established prior to treatment."[779] Since claim 5 is a dependent claim, this reduction must occur during the 14 day treatment period recited in claim 1.

837. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 5 of the '912 Patent.[780]

838. Pimentel 2006 does not disclose a reduction of one or more IBS symptoms from baseline symptoms established prior to treatment within a 14 day treatment period.

839. Pimentel 2006 found no improvement in several major symptoms of IBS: "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[781]

840. Nor does Pimentel 2006 disclose the reduction of one or more IBS symptoms from baseline symptoms within a 14-day treatment period. Pimentel 2006's "primary end point was global improvement in IBS symptoms ***during follow-up***."[782] Pimentel 2006 "assessed the primary end point (percentage of global improvement) across the 10 weeks of follow-up."[783] However "data was not available for all 10 weeks of follow-up."[784] Pimentel reports "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and

---

[779] XIFAX_AMN_0006830 at -6870, col. 46:21–24.
[780] Harary Opening Report at p. 109.
[781] XIFAX_AMN_0310652 at -653.
[782] *Id.* at -654 (emphasis added).
[783] *Id.*
[784] *Id.*

less bloating more frequently than the placebo recipients."[785] Thus, the focus of Pimentel 2006 was the maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[786]

841. Pimentel 2006 nowhere discloses a reduction one or more IBS symptoms during a 14 day treatment period. To the contrary, the subjects did not report any changes in symptoms until day 17: "[a]fter completing the 10-day course of study medication, patients immediately began another stool diary for 7 days then returned to complete a follow-up questionnaire. . . ."[787]

842. The RFIB 2001 Study Protocol likewise does not disclose the limitations of claim 5. The RFIB 2001 Study Protocol describes a study design only. It does not disclose the clinical results of any of the dosing regimen. Lacking any clinical data, the RFIB 2001 Study Protocol does not describe the reduction of one or more IBS symptoms from baseline symptoms established prior to treatment, as recited in claim 5. As discussed, in my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials discussed above.

**Motivation to Combine**

843. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 5 of the '912 Patent.[788] As with the other claims, however, his analysis ignores the wide criticism of Pimentel 2006 at the time of the invention.

---

[785] *Id*. at -653.
[786] *Id*. at -657.
[787] *Id*. at -653.
[788] Harary Opening Report at ¶¶ 346–350.

844. As discussed, Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[789] Since it did show improvements in these critical IBS symptoms, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve a reduction in one or more IBS symptoms from baseline symptoms established prior to treatment.

845. Pimentel also did not disclose any reduction in bloating during a 14 day treatment period as required by claim 5. Given its focus on symptom reduction during the follow-up period and lack of data during the treatment period, as POSITA would not have been motivated to combine it with other references to achieve a reduction in one or more IBS symptoms from baseline symptoms within 14 days, as recited by claim 5.

846. Moreover, many leading experts in the field criticized the methodology of Pimentel 2006. For example, Dr. Drossman highlighted "several methodologic issues" in Pimentel 2006 that "raise questions about the clinical significance of the results."[790] Dr. Vanner and others remarked that Dr. Pimentel's hypothesis remained "unproven."[791]

847. More generally, many thought leaders in the field remained unconvinced that antibiotics should be used to treat IBS: a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend. . .empiric antibiotic therapy in IBS."[792] Even Sharara recognized that "the use of antibiotics in patients with IBS. . .is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[793]

---

[789] XIFAX_AMN_0310652 at -653.
[790] XIFAX_AMN_0887874 at -7874–75 (emphasis added).
[791] XIFAX_AMN_1874266 at -4271 (emphasis added).
[792] XIFAX_AMN_1253920 at -3922.
[793] XIFAX_AMN_0310894 at -899.

848. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol to achieve claim 5's reduction of one or more IBS symptoms from baseline symptoms established prior to treatment. Since it merely described the design of a study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the results of those studies. As a result, a POSITA would not have been motivated to combine it with Pimentel 2006 to achieve the invention of claim 5.

849. Given the critiques of Pimentel 2006 and the limitations of both it and the RFIB 2001 Study Protocol, POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 5 of the '912 Patent.

850. Dr. Harary cites 6 additional references to support his opinion that a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve claim 5, including Sharara, Cuoco, Muska, Barrett, Weinstock 2007, and Ebell.[794] As discussed, in my opinion, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given, for example, the highly publicized safety issues with COX-2 inhibitors.

851. For the reasons discussed previously, in my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 5 based on these additional references.

**Reasonable Expectation of Success**

852. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 5 of the '912 Patent.[795] I disagree.

---

[794] Harary Opening Report at ¶¶ 347–349.
[795] *Id.* ¶¶ 351–352.

853. Since Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups,"[796] a POSITA would not have had a reasonable expectation of success of combining it with RFIB 2001 Study Protocol to achieve a reduction in one or more symptoms of IBS from baseline symptoms established prior to treatment.

854. A POSITA likewise would have no reasonable expectation of success in relying on Pimentel 2006 because it did not report whether symptoms were reduced during a 14 day treatment period, as required by claim 5.

855. As with the other claims, Dr. Harary ignores the criticism of Pimentel 2006 published at the time of the invention. A POSITA would have been aware of the widespread and authoritative criticisms of the methodology used in Pimentel 2006 and the use of antibiotics to treat IBS discussed above.

856. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 5 of the '912 Patent.

857. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not expect a study to achieve its end point merely based on its design particularly given the low success rate of Phase II trials as discussed above.[797]

---

[796] XIFAX_AMN_0310652 at -653.

[797] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).

858. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 5.

859. Dr. Harary cites 5 additional references to support his reasonable expectation of success opinion—Sharara, Cuoco, Muska, Barrett and Weinstock 2007.[798]

860. For the reasons discussed previously, in my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 5 based on these additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

861. In sum, in my opinion, claim 5 of the ’912 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

**f. Claim 6 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol**

862. I incorporate by reference my previous discussion of the claims of the ’912 Patent.

863. Claim 6 of the ’912 Patent depends from claim 5 (which depends from claim 1) and further recites “wherein the reduction of the one or more symptoms is achieved following 7 days after the administration of rifaximin.”[799]

864. As discussed, Dr. Harary opines a POSITA would understand that the claimed reduction of bloating associated with IBS-D may be achieved following 7 days after the administration of rifaximin “on any day recited in claim 1.”[800]

[798] Harary Opening Report at ¶ 352.
[799] XIFAX_AMN_0006830 at -6870, col. 46:25–27.
[800] Harary Opening Report at ¶ 356.

865. I disagree. Since claim 6 is a dependent claim, a POSITA would have understood that this reduction must occur during the 14 day treatment period recited in claims 1 and 5.

866. Claim 1 recites a method of treating one or more symptoms of IBS with 550 mg rifaximin TID for 14 days.

867. Claim 5 requires that the "treating" comprises a reduction of one or more of those symptoms of IBS.

868. Claim 6 requires that the "reduction" is achieved following 7 days after the administration of rifaximin.

869. As a result, at the time of the invention, a POSITA would have understood that the reduction of the one or more symptoms of IBS achieved following 7 days after administration must occur during the 14 day period as required in claims 1 and 5.

870. In addition, in my opinion, a POSITA would understand that this reduction must occur 7 days after the initial dose of rifaximin. Claim 6 recites the reduction of one or more symptoms of IBS "following 7 days after ***the administration***" of rifaximin to the subject.[801] As discussed, the specification of the '912 Patent defines "administration" as "introducing a GI specific antibiotic to a subject to perform their intended function."[802] Because the inventors defined administration as the "introduction" of the antibiotic, a POSITA would understand that administration means the first time the subject received the antibiotic, or the first dose.

871. The dictionary definition of "following" confirms the reduction must occur 7 days after the initial dose of rifaximin. For example, the 2003 edition of Merriam Webster Collegiate Diction defines "following" as "being next in order or time."[803]

---

801 XIFAX_AMN_0006830 at -6870, col. 46:25–27.
802 *Id*. at -6853, col. 12:40–42.
803 "Following, Adj." Merriam-Webster's Collegiate Dictionary, 11th ed., Merriam-Webster, 2003, p. 486.

872. In addition, the data for the clinical trials shows the inventors were tracking symptom reduction weekly. As indicated in both the Phase II and Phase III Final Reports, the investigators visited clinics at week 1 (Day 7) to check the SGA IBS and Bloating responses as well as the daily symptom reports.[804]

873. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 6 of the '912 Patent.[805] I disagree.

874. Since Pimentel 2006 does not disclose the elements of claims 1 and 5 from which claim 6 depends, it likewise does not disclose a reduction of bloating associated with IBS-D achieved following 7 days after the administration of rifaximin within a 14 day treatment period.

875. As discussed, Pimentel 2006 does not disclose the inventive elements of claim 1.

876. As discussed, the Pimentel 2006 study found no improvement in abdominal pain, diarrhea or constipation.[806] Accordingly, it does not disclose a reduction of one or more IBS symptoms as recited in claim 5.

877. Nor does Pimentel 2006 disclose the reduction of one or more IBS symptoms following 7 days after administration of rifaximin required by claim 6. Pimentel 2006's "primary end point was global improvement in IBS symptoms ***during follow-up***."[807] Pimentel 2006 "assessed the primary end point (percentage of global improvement) across the 10 weeks of follow-up."[808] However "data was not available for all 10 weeks of follow-up."[809] Pimentel reports "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[810] Thus, the

---

[804] XIFAX_AMN_1900330 at -360, -369 (RFIB 2001); XIFAX_AMN_0058937 at -982–983 (RFIB 3007).
[805] Harary Opening Report at p. 114.
[806] XIFAX_AMN_0310652 at -653.
[807] *Id*. at -654 (emphasis added).
[808] *Id*.
[809] *Id*.
[810] *Id*. at -653.

focus of Pimentel 2006 was the maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[811]

878. Pimentel 2006 does not disclose or suggest reduction one or more IBS symptoms "is achieved following 7 days after the administration of rifaximin" as recited in claim 6 of the '912 Patent. In fact, Pimentel 2006 discloses that patients did not conduct a "stool diary" until "***[a]fter*** completing the 10-day course of study medication[.]"[812] Thus, Pimentel 2006 does not disclose changes in symptoms until day 17, because the questionnaire was administered 7 days after the 10-day treatment.

879. Thus, Pimentel 2006 does not disclose the reduction of one or more IBS symptoms following 7 days after administration of the rifaximin, as required by claim 6.

880. The RFIB 2001 Study Protocol also does not disclose the limitations of claim 6.

881. The RFIB 2001 Study Protocol describes a study design only. It does not disclose the clinical results of any of the dosing regimen. Lacking any clinical data, the RFIB 2001 Study Protocol does not describe the reduction of one or more IBS symptoms following 7 days after administration of the rifaximin as required by claim 6. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials discussed above.

882. Recognizing the deficiency of the RFIB 2001 Study Protocol, Dr. Harary cites to Sharara and Kim to support his opinion.[813] But neither of these references discloses the reduction of one or more IBS symptoms following 7 days after administration of the rifaximin as required

[811] *Id*. at -657.
[812] *Id*. at -653.
[813] Harary Opening Report at ¶ 361.

by claim 6. Sharara involved patients suffering from bloating or flatulence who did not necessarily have IBS and whose symptoms were assessed some unqualified after the 10 day treatment period.[814] Kim studied the effect of a probiotic to treat IBS-D, not rifaximin.[815]

**Motivation to Combine**

883. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 6 of the '912 Patent.[816] As with the other claims, however, his analysis ignores the wide criticism of Pimentel 2006 at the time of the invention.

884. As discussed, Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[817] As result, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve a reduction in one or more IBS symptoms following 7 days after the administration of rifaximin.

885. Pimentel 2006 also did not disclose any reduction in IBS symptoms following 7 days after administration of rifaximin during a 14 day treatment period as required by claim 6. Instead, in Pimentel 2006, results were assessed on day 17. As a result, a POSITA would not have been motivated to combine it with other references to achieve a reduction in one or more IBS symptoms following 7 days after the administration of rifaximin during this 14 day period.

886. Moreover, key opinion leaders criticized the methodology of Pimentel 2006. For example, Dr. Drossman highlighted "several methodologic issues" in Pimentel 2006 that "raise

---

814 XIFAX_AMN_0310894 at -896.
815 NORWICH_NJ_INV_000085.
816 Harary Opening Report at ¶¶ 362–366.
817 XIFAX_AMN_0310652 at -653.

questions about the clinical significance of the results."[818] Dr. Vanner and others remarked that Dr. Pimentel's hypothesis remained "unproven."[819]

887. More generally, many thought leaders in the field remained unconvinced that antibiotics should be used to treat IBS: a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend. . .empiric antibiotic therapy in IBS."[820] Even Sharara recognized that "the use of antibiotics in patients with IBS. . .is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[821]

888. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol to achieve claim 6's reduction of one or more IBS symptoms following 7 days after the administration of rifaximin. Since it merely described the design of a study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the results of those studies, including whether the subjects achieved a reduction in IBS symptoms following 7 days after the administration of rifaximin. As a result, a POSITA would not have been motivated to combine it with Pimentel 2006 to achieve the invention of claim 6.

889. Given the critiques of Pimentel 2006 and the limitations of both it and the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 6 of the '912 Patent.

890. Dr. Harary cites 6 additional references to support his opinion that a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve

[818] XIFAX_AMN_0887874 at -7874–75 (emphasis added).
[819] XIFAX_AMN_1874266 at -4271 (emphasis added).
[820] XIFAX_AMN_1253920 at -3922.
[821] XIFAX_AMN_0310894 at -899.

claim 6, including Sharara, Cuoco, Weinstock 2007, Lauritano, Scarpellini and Di Stefano.[822] As discussed, in my opinion, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given, for example, the highly publicized safety issues with COX-2 inhibitors.

891. For the reasons discussed previously, in my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 6 based on these additional references.

**Reasonable Expectation of Success**

892. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 6 of the ’912 Patent.[823] I disagree.

893. Since Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups,"[824] a POSITA would not have had a reasonable expectation of success of combining it with RFIB 2001 Study Protocol to achieve a reduction in one or more symptoms of IBS following 7 days after the administration of rifaximin.

894. A POSITA likewise would have no reasonable expectation of success in relying on Pimentel 2006 because it did not a reduction of symptoms during a 14 day treatment period, as required by claim 6. Instead, Pimentel 2006 focused on the follow-up period: "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[825]

---

[822] Harary Opening Report at ¶¶ 363–365.
[823] Harary Opening Report at ¶¶ 367–368.
[824] XIFAX_AMN_0310652 at -653.
[825] *Id.*

895. As with all the claims, Dr. Harary ignores the criticism of Pimentel 2006 published at the time of the invention. A POSITA would have been aware of the widespread and authoritative criticisms of the methodology used in Pimentel 2006 and the use of antibiotics to treat IBS discussed above.

896. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 6 of the '912 Patent.

897. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not expect a study to achieve its end point merely based on its design particularly given the low success rate of Phase II trials as discussed above.[826]

898. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 6.

899. Dr. Harary cites Sharara, Weinstock 2007, Scarpellini and Lauritano to support his reasonable expectation of success opinion.[827]

900. For the reasons discussed previously, in my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 6 based on these additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

---

[826] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).

[827] Harary Opening Report at ¶ 368.

901. In sum, in my opinion, claim 6 of the ’912 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

**g. Claim 7 of the ’912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol**

902. I incorporate by reference my previous discussion of the claims of the ’912 Patent.

903. Claim 7 of the ’912 Patent depends from claim 1 and further recites “wherein treating one or more symptoms of IBS comprises a reduction in symptoms defined by an affirmative response from the subject when asked whether they had a reduction in symptoms of IBS.”[828] Since claim 7 is a dependent claim, a POSITA would have understood that this affirmative response must occur during the 14 day treatment period recited in claim 1.

904. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol disclose all the limitations of claim 7 of the ’912 Patent.[829] I disagree.

905. Pimentel 2006 does not disclose a reduction of one or more IBS symptoms comprising an affirmative response from a subject within a 14 day treatment period.

906. Pimentel 2006 found no improvement in abdominal pain, diarrhea or constipation.[830]

907. Nor does Pimentel 2006 disclose the reduction of one or more IBS symptoms comprising an affirmative response from a subject within the 14-day treatment period. Pimentel 2006’s “primary end point was global improvement in IBS symptoms ***during follow-up***.”[831] Pimentel 2006 “assessed the primary end point (percentage of global improvement) across the 10

[828] XIFAX_AMN_0006830 at -6870, col. 46:28–31.
[829] Harary Opening Report at p. 117.
[830] XIFAX_AMN_0310652 at -653.
[831] *Id*. at -654 (emphasis added).

weeks of follow-up."[832] However "data were not available for all 10 weeks of follow-up."[833] Pimentel reports "[o]ver a 10 week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[834] Thus, the focus of Pimentel 2006 was the maintenance of symptom improvement after treatment: "[i]mprovements were sustained through 10 weeks of follow-up despite cessation of therapy after only 10 days."[835]

908. Pimentel 2006 does not disclose or suggest reduction of one or more IBS symptoms comprising an affirmative response from a subject within the 14-day treatment period as recited in claim 7 of the '912 Patent. In fact, Pimentel 2006 discloses that patients did not conduct a "stool diary" until "***[a]fter*** completing the 10-day course of study medication[.]"[836] Thus, Pimentel 2006 does not disclose changes in symptoms until day 17, because the questionnaire was administered 7 days after the 10-day treatment.

909. Thus, Pimentel 2006 does not disclose the reduction of one or more IBS symptoms comprising an affirmative response from a subject within the 14-day treatment period.

910. Dr. Harary opines Pimentel 2006 "teaches that patients in the trial were asked 'to rate the severity of their symptoms on the VAS again 7 days after the completion of rifaximin treatment or placebo.'"[837] Thus, even under Dr. Harary's opinion, Pimentel 2006 does not disclose a reduction of IBS symptoms within the 14-day treatment period required by claim 7.

911. The RFIB 2001 Study Protocol likewise fails to disclose the limitations of claim 7 because it describes a study design only and does not include the clinical results of any of the

---

[832] *Id.*
[833] *Id.*
[834] *Id.* at -653.
[835] *Id.* at -657.
[836] *Id.* at -653.
[837] Harary Opening Report at ¶ 373.

dosing regimen. Lacking any clinical data, the RFIB 2001 Study Protocol does not describe the reduction of one or more IBS symptoms comprising an affirmative response from a subject as required by claim 7. In my opinion, a POSITA would not have believed a study would be successful just because it was initiated, particularly given the low success rate of Phase II trials discussed above.

912. Recognizing the deficiency of the RFIB 2001 Study Protocol, Dr. Harary cites to Sharara, Jolley 2011 and Yang to support his opinion that the RFIB 2001 Study Protocol reference to "adequate relief" refers to an affirmative response.[838] But neither of these references discloses the reduction of IBS symptoms comprising an affirmative response from a subject as required by claim 7. Sharara involved patients suffering from bloating or flatulence who did not necessarily have IBS and whose symptoms were assessed some unqualified after the 10 day treatment period.[839] Jolley is a retrospective chart review published after February 26, 2008. And Yang is a retrospective chart review involving SIBO patients who also received concomitant therapy.

**Motivation to Combine**

913. Dr. Harary opines a POSITA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol to achieve the invention in claim 7 of the '912 Patent.[840] His analysis ignores the widespread criticism of Pimentel 2006 at the time of the invention.

914. As discussed, Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups."[841] As a result, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve a reduction in one or more IBS symptoms.

---

838 *Id*. at ¶ 374.
839 XIFAX_AMN_0310894 at -896.
840 Harary Opening Report at ¶¶ 375-377.
841 XIFAX_AMN_0310652 at -653.

915. Pimentel 2006 also did not disclose any reduction of IBS symptoms as defined by an affirmative response from a subject within the 14-day treatment period, as required by claim 7. Instead, in Pimentel 2006, results were assessed on day 17.[842] As a result, a POSITA would not have been motivated to combine it with other references to achieve a reduction in IBS symptoms comprising an affirmative response from a subject during this 14 day period.

916. Moreover, as discussed, key opinion leaders criticized the methodology of Pimentel 2006. For example, Dr. Drossman highlighted "several methodologic issues" in Pimentel 2006 that "raise questions about the clinical significance of the results."[843] Dr. Vanner and others remarked that Dr. Pimentel's hypothesis remained "unproven."[844]

917. More generally, many thought leaders in the field remained unconvinced that antibiotics should be used to treat IBS: a "sound rationale for antibiotic therapy has not been established," and "one cannot yet recommend . . . empiric antibiotic therapy in IBS."[845] Even Sharara recognized that "the use of antibiotics in patients with IBS . . . is limited by their potential side effects, the risk of development of bacterial resistance, and their untested long-term clinical efficacy."[846] Based on these critiques, a POSITA would not have been motivated to rely on Pimentel 2006 to achieve the invention of claim 7 of the '912 Patent.

918. A POSITA likewise would not have been motivated to rely on the RFIB 2001 Study Protocol to achieve claim 7's reduction of IBS symptoms comprising an affirmative response from a subject. Since it merely described the design of a study of other dosages of rifaximin, the RFIB 2001 Study Protocol lacked any data about the results of those studies, including whether the

---

[842] *Id.*
[843] XIFAX_AMN_0887874 at -7874-75 (emphasis added).
[844] XIFAX_AMN_1874266 at -4271 (emphasis added).
[845] XIFAX_AMN_1253920 at -3922.
[846] XIFAX_AMN_0310894 at -899.

subjects achieved a reduction of IBS symptoms following 7 days after the administration of rifaximin. As a result, a POSITA would not have been motivated to combine it with Pimentel 2006 to achieve the invention of claim 7.

919. Given the critiques of Pimentel 2006 and the limitations of both it and the RFIB 2001 Study Protocol, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve claim 7 of the '912 Patent.

920. Dr. Harary cites to Sharara, Jolley 2011 and Yang to support his opinion that an improvement of symptoms "was often determined through subjects' responses to questionnaires regarding those symptoms or based on affirmative open-ended questions."[847] As discussed, in my opinion, a POSITA in 2008 would have been skeptical about relying on publications as evidence-based medical authority given, for example, the highly publicized safety issues with COX-2 inhibitors.

921. Dr. Harary opines a POSITA would have known it was best practice to ask about a patients' symptoms.[848] Whether a POSITA would have known to ask about symptom relief does not establish a motivation to combine specific references to achieve the invention in claim 7, particularly where, as discussed, Pimentel 2006 or the RFIB 2001 Study Protocol do not teach all the limitations of the claim, including those in claim 1.

922. For the reasons discussed previously, in my opinion, a POSITA would not have been motivated to combine Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 7 based on these additional references.

[847] Harary Opening Report at ¶ 376.
[848] Harary Opening Report at ¶ 377.

**Reasonable Expectation of Success**

923. Dr. Harary opines a POSITA would have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 7 of the '912 Patent.[849]

924. Since Pimentel 2006 reported "[n]o major differences in abdominal pain, diarrhea, or constipation were observed between the [rifaximin and placebo] groups,"[850] a POSITA would not have had a reasonable expectation of success of combining it with RFIB 2001 Study Protocol to achieve a reduction in one or more IBS symptoms comprising an affirmative response from a subject.

925. A POSITA likewise would have no reasonable expectation of success in relying on Pimentel 2006 because it did not disclose a reduction of symptoms during a 14 day treatment period, as required by claim 7. Instead, Pimentel 2006 focused on the follow-up period: "[o]ver a 10-week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients."[851]

926. Once again, Dr. Harary ignores the criticism of Pimentel 2006 published at the time of the invention. A POSITA would have been aware of the widespread and authoritative criticisms of the methodology used in Pimentel 2006 and the use of antibiotics to treat IBS discussed above.

927. Given the extensive criticism of the methodology and findings in Pimentel 2006, a POSITA would not have had a reasonable expectation of success in combining it with the RFIB 2001 Study Protocol to achieve the invention in claim 7 of the '912 Patent.

[849] Harary Opening Report at ¶¶ 378-380.
[850] XIFAX_AMN_0310652 at -653.
[851] *Id.*

928. The RFIB 2001 Study Protocol also would not afford a POSITA that reasonable expectation of success because it contains only a study design, not clinical results. A POSITA would not expect a study to achieve its end point merely based on its design particularly given the low success rate of Phase II trials as discussed above.[852]

929. Accordingly, in my opinion, a POSITA would not have had a reasonable expectation of success of combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 7.

930. Dr. Harary cites to Sharara, Jolley 2011 and Yang to support his opinion that an improvement of symptoms "was often determined through subjects' responses to questionnaires regarding those symptoms or based on affirmative open-ended questions."[853]

931. For the reasons discussed previously, in my opinion, a POSITA would not have had a reasonable expectation of success in combining Pimentel 2006 with the RFIB 2001 Study Protocol to achieve the invention in claim 7 based on these additional references, particularly given, for example, the safety issues identified with COX-2 inhibitors previously discussed.

932. In sum, in my opinion, claim 7 of the '912 Patent would not have been obvious to a POSITA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

**h. Claim 7 of the '912 Patent would not have been obvious to a POSITA as of February 26, 2008 over Pimentel 2006 in view of the RFIB 2001 Study Protocol and Sharara**

933. I incorporate by reference my previous discussion of the claims of the '912 Patent.

934. Dr. Harary opines Pimentel 2006 and the RFIB 2001 Study Protocol, in further view of Sharara disclose all the limitations of claim 7 of the '912 Patent.[854]

---

[852] Van Norman G., *Phase II Trials in Drug Development and Adaptive Trial Design*, 428-37, JACC Basic Transl. Sci. (2019).
[853] Harary Opening Report at ¶ 379.
[854] Harary Opening Report at p. 119.

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
- - - - - - - - - - - - - - - - x
SALIX PHARMACEUTICALS, INC., :
SALIX PHARMACEUTICALS, LTD., :
ALFASIGMA S.P.A. and BAUSCH :
HEALTH IRELAND LTD., :
Plaintiffs, : Case No.:
vs. : 1:24-CV-7140-JFM
NORWICH PHARMACEUTICALS, INC.,:
ALVOGEN PB RESEARCH & :
DEVELOPMENT, LLC, and :
ALVOGEN, INC., :
Defendants. :
- - - - - - - - - - - - - - - - x
(Caption continued on next page)
Videotaped Deposition of DAVID JOHNSON, M.D.
Washington, D.C.
Friday, January 9, 2026
9:10 a.m.

Job No.: 610715
Pages: 1 - 192
Reported By: Karen Young



(Caption continued from previous page)
- - - - - - - - - - - - - - - - x
SALIX PHARMACEUTICALS, INC., :
SALIX PHARMACEUTICALS, LTD., :
ALFASIGMA S.P.A. and BAUSCH :
HEALTH IRELAND LTD., :
Plaintiffs, : Case No.:
vs. : 1:24-CV-04607-JFM
AMNEAL PHARMACEUTICALS OF NEW :
YORK, LLC, AMNEAL EU, LIMITED,:
AMNEAL PHARMACEUTICALS :
PRIVATE LIMITED and :
AMNEAL PHARMACEUTICALS, INC., :
Defendants. :
- - - - - - - - - - - - - - - - x

Videotaped Deposition of DAVID JOHNSON, M.D., held at the offices of:
AXINN VELTROP & HARKRIDER LLP
1901 L Street, Northwest
Washington, D.C. 20036-3006
(202) 912-4700

Pursuant to notice, before Karen Young, Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD. AND THE WITNESS:
MICHAEL J. ABERNATHY, ESQUIRE
MARGARET A. McGREAL, ESQUIRE
MICHAEL T. SIKORA, ESQUIRE (remote)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, Illinois 60606
(312) 324-1000

ON BEHALF OF AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, and AMNEAL EU, LIMITED:
OREN LANGER, ESQUIRE
ROBINS KAPLAN LLP
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
(212) 980-7400



ON BEHALF OF NORWICH PHARMACEUTICALS, INC.:
MATTHEW S. MURPHY, ESQUIRE
AXINN VELTROP & HARKRIDER LLP
90 State House Square, 9th Floor
Hartford, Connecticut 06103
(860) 275-8100

SARA NATOUR, ESQUIRE
AXINN VELTROP & HARKRIDER LLP
1901 L Street, Northwest
Washington, D.C. 20036-3006
(202) 912-4700

ALSO PRESENT:
Mel Andre, Videographer

pharmacy, correct?
A The generic label would always be important to read as it relates to the individual patient. The replication of that label across different companies, I might not be able to see the individual label, but it would be my practice to check at least through the course of a patient interaction what drug they received, and if there was a question, I would go back and look at the individual label to see if there was any variance from what the label had shown from the transition to generic.
Q So you would ask every single patient that you prescribed generic omeprazole to for the treatment of GERD for a copy of their generic drug label obtained from the pharmacy?
A No, I wouldn't ask every patient for a copy of that. I would ask to see the medication if there was a question about response, and in particular, if there was something that was unusual where they were perhaps getting their medications. We had particular pharmacies that we routinely prescribe, and those things were more or less rote for us in the area. The patients would have their preference. That would be part of the



variance perhaps if it was out of the area, but there were pretty strong preferences in the local area for prescription fills.
Q I see, so you wouldn't -- so you would ask for a copy of the specific generic drug label that a company, the omeprazole prescription if an issue arose during the course of treatment or after treatment. Is that fair?
A I would ask where the drug -- what the drug company was, so I would research that. I'm not sure that the patient would ever have access to the prescription label, or I could call the pharmacist and ask that. It was easier to always go to the internet and check if there was a question and download from a specific company if there was a variance in potentially -- or variance that -- that may be accounted for because of whatever the label indication.
I'm not aware of label changes from the prescription to the over-the-counter -- or I'm sorry, the generic in my reflection of when I've seen that transition occur.
Q When you prescribed omeprazole for the treatment of GERD, do you recall the duration of therapy that you would prescribe?



A Do I recall the duration of therapy that I would prescribe for reflux disease? It depends.
Q What would it depend on?
A Depends on the individual patient, depends on what I'm treating, and what the potentials are for -- if I'm not adequately treating.
Q And how would you make the prescription decision in terms of identifying the duration of therapy that you would prescribe? You mention that it might vary amongst patients, so what would be your process for making that determination?
A What would go into my thought of how long I would prescribe omeprazole and what would drive my decision of therapy? Do I understand your question?
Q Yes.
A And this would be prior to 2025?
Q Yes.
A So initially, do what's right for the patient. I know that medications sometimes are part of making you better. Not always. Medication that I would use for frequently at a time of endoscopy, I would discover erosions and irritation in the esophagus. We call that erosive esophagitis. I would put the patient on -- on a



defined dose for that medication, and omeprazole at the time would be 20 milligrams.
Typically I would stop the medication after eight weeks of administration because that's what the label said unless there were other mitigating circumstances in a patient, complex damage to the esophagus perhaps, narrowing, which we would call fibrosis, and terminology being esophageal stricture, or they may have had a complication of Barrett's esophagus, which is a precancerous condition.
Then I would consider keeping them -- after the eight weeks and putting them on a maintenance dose, and a maintenance dose would be a different dose. Typically it was half, and the maintenance dose we would continue typically for six months.
I would evaluate the patient and then reanalyze if I could take the patient off the medication at that time because that is the time that I would stop the medication, and I'd want follow-up closely on that patient to see if there was any relapses or consequence of withdrawing that medication.
Q For the patients that you treated for the

condition of GERD, would you have those patients maintain a symptom diary?

**A I always ask my patients to maintain some form of a symptom diary so I can ascertain what the response would be over time. The problem, if you ask somebody at six months how are you doing, memory tends to be very short-sighted for patients, and they recall what happened yesterday.**

**So it was inordinately helpful for me across many different disease categories that I treated that patients keep a diary. In some circumstances it would be daily. In other circumstances it may be other intervals, but I'd want to have reflection over time that the patient was hopefully responding. Not promising you're going to respond, but hopeful that I was doing the right thing for the patient.**

Q As part of the symptom diary, would you ask that patients score the severity of their symptoms against any scale?

**A It depends on the individual patient as to how I would ask a response. It might be a binary question that would be simple yes or no with targeted words that I would -- for symptoms that I would ask yes or no. In other categories, I may**



**ask for different variances because patients say well, I'm kind of better, or maybe I'm not, and in that case, I would say let's give you a scale, and I'd like you to follow the scale for me.**

**That gives them a more reproducible number that I can ascertain when they come back and see me in follow-up, or if they call and there may be a question or a conversation before I physically see them in the office.**

Q Was this your common practice prior to 2008?

**A It's been my common practice as long as I can remember in medicine.**

Q And you would adhere to that common practice regardless of whether there was any instruction on a drug label to keep a symptom diary?

**A Not sure I understand your question.**

Q Sure, I can rephrase it. That was your common practice regardless of any statement made on a drug label, correct?

**A Best of my knowledge, drug labels would always have some process of instruction to monitor the patient's response. The drug label may vary based on what the drug was or the indication was,**



**but the label would direct and educate the provider, prescriber what had been done previously as it relates to clinical trials when the drug was studied, they would evaluate in the label the results of those clinical trials, and to the best of my knowledge, without checking every drug label, typically if not absolutely uniformly have a process by which that patient was followed in the clinical trials, thereby educating the provider, prescriber, A, that they were followed, B, how they had been followed in previous evaluations in particular clinical trials, which is the reason the drugs ultimately were approved, and that would educate, and it would encourage the provider to provide some form of repetitive analyses and allow the patient to provide the information when they come back or we assess at whatever interval.**

Q Getting back to my question, Dr. Johnson, it was something I think maybe simper, was just saying would you have a patient keep a symptom diary regardless of whether or not the drug label identified a symptom diary or not.

**A I always read the label. I've never prescribed a drug to the best of my knowledge**



**where I have not looked at the label. I'm categoric as to the best of my knowledge, that's -- that's the way I do things. I'm analytic, thoughtful, and I -- and I start with that process.**

**What the label tells me, several things, what the drug is indicated for, what the patient population for that drug indication, what the clinical data that led to the approval of that indication and medication for that specific disease state or syndrome, and how they were assessed, because that's extremely important.**

**Patients sequentially in a study, if they're followed with some process, it's my obligation to do the right thing for my patient. How do I do that? I get education from the label, I understand the label to the best of my understanding, I evaluate the clinical trials that are assessed in -- provided in the label, and I look at the process of what does the label encourage me to do as a provider and educate me that I should be doing or would be doing to mirror as best I could the clinical trial data, and hopefully have a benefit for the patient.**

Q Sorry, I just wanted to make sure you were

done.
A Sorry.
Q When you treat a patient without a prescription drug, do you have the patient maintain a symptom diary?
A It depends on the indication, the type of drug. Presumably you're talking about something over the counter or medicinal, herbal, whatever.
Q We'll say a dietary change.
A A dietary change? Almost a hundred percent for dietary change. That one is my standard practice. Patients see gastroenterologists for lots of reasons. There are innumerable GI symptoms that may be diet related, timing related, modification or formulation related, categoric or specificity between vegetables and fruits, carbohydrates, sugars.
I am maniacal when I talk about diet with my patients, that I want them to record what they do. When I see them back, I need that information because as I said previously, it's very difficult for a patient when they come in to see a physician or provider -- may not even be the physician, to recall everything that had been done in that



interval since they were last seen face to face or by Zoom or by phone call or whatever the -- the interaction was to provide the -- the level of a recommendation.
As such, it's inordinately common that if you just have the patient come back after you've made an intervention, they're going to remember what happened yesterday or what happened this morning. That is a lot of experience and 49 years of being a physician, I can tell you that is something I always wanted to avoid. I want to have a very, as best I can, clear picture so whatever I'm treating, I can assimilate that, I can analyze that, and in doing so, make further recommendation, make a modification, perhaps change therapy.
Q Is it -- withdrawn. I take it that you go through the same level of detail prior to July 1st, 2025 in terms of identifying a patient's symptoms at the point of intake, when you first see a patient; is that correct?
A I don't understand the question.
Q Sure, that you collect information about a patient's symptoms when you first see them in order to compare it to the symptoms as they



improved during the course of therapy, correct?
A Yes, I would always start a -- before they got to me, retrospective view, how they feel now, but also put in perspective the rear-view mirror of how they felt over a time before they got to me, and then I can really start the analysis going forward and look at what I had as a baseline and even before a baseline and use that information as I see the patient sequentially in respect to whatever the intervention was, or the recommendation was.
Q And that's been your practice for 49 years?
A Best of my knowledge, done this for a long time. I've been very pleased. I have enjoyed a wonderful relationship with my patients, but I'm a good listener, and I learn more from the patient sometimes once they start talking. Sometimes it requires me to help with a better question, but the more information I have about that patient, the better interaction the patient value of what I -- time I spent with them, the better way that I can in my mind and in my chart codify what was discussed, have a better reference when questions may arise without having a patient come back, and



then reintroduce to the patient a time frame for the next step and the next visit and have a threshold, or perhaps I have to change that, the time, the location, the strategy, but I have a good baseline that I start from.
Q Prior to 2008, did you treat a medical condition known as irritable bowel syndrome?
A Prior to 2008, I've treated irritable bowel syndrome, as many patients have.
Q And prior to 2008, what was your first-line therapy for the treatment of irritable bowel syndrome?
A It depends. It depends on a lot what the symptoms are.
Q Sorry, I wasn't sure if you were done or not.
A Just --
Q Maybe you could list for me, prior to 2008, what drugs, if any, did you prescribe for the treatment of irritable bowel syndrome?
A Well, there were drugs and there were diets.
Q I asked for drugs, sir.
A Understand. I'm just clarifying, we just came off like a diet discussion. So medications

**for irritable bowel syndrome would depend on what the type of irritable bowel syndrome they had. 2008, we had very clear definition of ascertaining what the primary reflection of that patient was. There was a criterion that was established called the Rome criteria, where the pope lives. He wasn't present for the -- in the region, and it helped the provider identify what the symptoms were and how best to treat, and there were a variety of medications to do so. The problem was they were very limited.**

Q Sorry, I just -- my question's really just directed to just can you list for me the drugs that you prescribed prior to 2008 for the treatment of irritable bowel syndrome.

**A So again, depending on the patient, diarrhea, I would provide an antimotility agent that would be directed on a symptom directed, something like Imodium, Lomotil. I would across most patients with diarrhea strongly look for alternatives in medications, and in 2008, the only other alternative that I had was a drug called alosetron, Lotronex.**

**Now, I was very familiar with that drug. It was released in 2000, and I was actually in a**



**study when that drug was being evaluated, and my patient had a severe complication that I as the investigator had to evaluate and attribute to whether or not it was medication related or not, the timing I attributed related to the medication.**

**Shortly after that, there was a huge bevy of information that emerged that alosetron, Lotronex, had a severe complication of a condition called ischemic colitis. That's exactly what my patient had, required hospitalization, severe diarrhea, bleeding, and as an investigator, I was made aware that that -- there had been three deaths associated with the medication. It was under -- it was under the protocol, so it was before the release in 2000 when I was using this drug, but it was under a protocol.**

**2000, when the drug was released, I was scared to death of that medication, and in fact, they withdrew the medication shortly after the deaths occurred. They reintroduced it in 2002, and to get to your point, in 2008, it was still available. It was available with such restrictive covenants and requirements, in my mind, liabilities, that it was unfathomable for me, having had a severe complication for my patient**



**alone, much less the others that had major life-threatening and in some cases death, that I would ever avail myself of that medication.**

**So it came down to there really were no alternatives beyond things that I might use to stimulate bowel function like a patient that didn't have diarrhea-type irritable bowel syndrome, and there were a variety of medications that had come out that were helpful for constipation-predominant irritable bowel syndrome, and the way that the Rome criteria was very helpful, it was helpful in a couple ways.**

**In looking back, when the Rome criteria was first developed, and they met in '88 and they formulated their decision in '92, but what they started to do was categorize irritable bowel syndrome. It was a syndrome, but it allowed the patients to describe within that syndrome what their symptoms were, it allowed providers to better direct treatment for that, and it also encouraged the unmet need categories for pharmaceutical companies to identify unmet needs and develop product lines or investigate research lines that would be helpful as it relates to the different categories.**



**So when I talk to 2008 prescription medications, alosetron was not an option for me. I might use something like over-the-counter laxatives. I would use Metamucil, I would use antimotility agents like Lomotil, but my hands are very much tied as it relates to that category. There were more options in the IBS-C side because there had been better drug development and drug deliverables in that area.**

Q Well, were the drug --

MR. ABERNATHY: Excuse me, Matt. I'm sorry, I know I'm a little bit early. Could we take a morning break, just --

MR. MURPHY: Give me five more minutes.

MR. ABERNATHY: Sure.

BY MR. MURPHY:

Q You mentioned IBS-C there, right?

**A IBS-C is IBS constipation predominant.**

Q And you mentioned that there was some drugs available for IBS-C?

**A Correct.**

Q What drugs were available for IBS-C as of 2008?

**A In 2008, I'd have to go back and look at the IBS-C category dates for when they were**

**commercially available. We were involved in so many of these trials that it gets fairly muddy for me to give you specific dates because we had a very active clinical research program around virtually all these drugs, we had a -- we had a -- especially the IBS-C category, that we had drugs that we used fairly routinely where it became available versus my memory retrospect scope using it in a clinical trial, I can't give you that information.**

Q So as of 2008, the drug that you prescribed to treat IBS for diarrhea was antimotility agents, correct?

**A Antimotility agents with other things that I might use as relates to Metamucil. There are other components that -- that would be potentially involved in -- in diarrhea as it relates to diet, and those type of things would be part of that.**

Q And other than the antimotility agents and the items you just identified, there were no other drugs, therapies that you would prescribe to patients for IBS with diarrhea as of 2008, correct?

**A There were other drugs available that would treat symptoms that may be potentially part**



**of the irritable bowel syndrome, but those would be things that again would be on a case-by-case basis.**

MR. MURPHY: We can go off the record.

THE VIDEOGRAPHER: We are now off the record, 10:02.

(Recessed at 10:02 a.m.)

(Reconvened at 10:16 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:16.

BY MR. MURPHY:

Q Dr. Johnson, before the break, you had given a response referring to other drugs available that would treat symptoms that may be potentially part of the irritable bowel syndrome. What were those other drugs that were available by name?

**A Other drugs for irritable bowel syndrome what category? I would treat by category as to what I was trying to effect, so drugs for -- predominant symptoms were the ones that I would direct my --**

Q What drugs were available for the treatment of diarrhea, in the irritable bowel syndrome?



**A Diarrhea?**

Q The symptom of diarrhea.

**A Diarrhea? Alosetron, in 2008, and Imodium. Antispasmodics were used, dicyclomine. That was the -- the limit of what I -- what I would familiarize my practice with.**

Q And for the symptom of constipation, what drugs would have been available to treat that symptom?

**A A cathartic of some sort, so a stool softener, a osmotic type of agent for constipation, laxatives of multitude, but treating constipation, specifically the constipation effect. Again, antispasmodics if -- if -- typically abdominal pain is part and parcel for irritable bowel syndrome, even with constipation, it's -- it's cardinal. And then there were a number of prescription drugs, and again, at the time, I'd have to go back and look because I -- I kind of have a fog a bit because we're involved in so many of the trials and when they became specifically available by -- by prescription.**

Q And just to be sure, Dr. Johnson, in your response to my question, you're referring to on-label indication uses of those drugs?



**A The on-line indications were for the symptoms, not specifically perhaps for that diagnosis.**

Q And just to make sure I'm understanding, you're not referring to any off-label indications of any of these drugs, correct?

**A I don't understand your question.**

Q Sorry, that was a poor question. Let me withdraw it. What I'm trying to ask is you are excluding from your answers off-label uses of drugs, correct?

**A Some drugs may be symptom directed and not diagnose -- disease directed. For example, a laxative may not be something that's directed towards IBS-C specifically, but it's directed towards the constipation symptom that comes within the syndrome. So I'd have to look specifically when I talk about indications, I'm talking about treatment of specific symptoms for things that we had very limited access for and options.**

MR. ABERNATHY: Can we go off the record? Sorry, I have -- my screen's frozen again.

MR. MURPHY: That's fine.

MR. ABERNATHY: Please.

THE VIDEOGRAPHER: We're off the record,

10:20.
(Discussion off the record)
THE VIDEOGRAPHER: We are now on the record, 10:20.
BY MR. MURPHY:
Q Prior to your work on this matter, Dr. Johnson, have you ever provided professional services to Salix Pharmaceuticals?
**A I don't recall that, and I'd have to go back and see if I ever did a lecture at a dinner meeting or something. I just don't remember, but not that I recall on a consultant basis.**
Q Would your answer be the same for Valeant Pharmaceuticals?
**A I don't know Valeant at all, so the answer's yes.**
Q What about a company known as Bosch Health?
**A Bosch Health, I just remember Bosch as more of a -- not for GI at the time, and certainly I never had services provided.**
Q Have you yourself ever received research support from Salix Pharmaceuticals?
**A No. I don't know if we had ever received research support in our research institute as part**



**of a multi-center trial, and I just off the top of my head, I can't recall that. We had 20, 25 trials going at any given time, and I don't recall.**
Q And I take it you were never a direct employee of Salix Pharmaceuticals at any time?
**A I was never a direct employee of Salix.**
Q Did you ever serve as an investigator for a clinical study sponsored by Salix Pharmaceuticals?
**A I was never, that I recall, a principal investigator. Whether or not I was an associate investigator somewhere, I don't -- I just don't recall. I don't -- it's certainly not in my mind that I did. Can't say that categorically.**
Q Have you ever had any interaction with a gentleman named William Forbes?
**A I've never had an interaction with William Forbes.**
Q Have you ever had any interaction with a gentleman named Lorin Johnson?
**A That's my daughter-in-law's name, but that's a different Lauren Johnson, so I assume that's not her. I know it's not her.**
MR. ABERNATHY: It may not be a gentleman.



**A Can you speak up a little bit? I do have --**
Q Sure.
**A -- hearing aids, but I -- I really -- I'm still a little bit challenged, so --**
Q So around the office I get in trouble for being too loud.
**A Oh, really?**
Q But then when I'm in these proceedings, sometimes I get in trouble for being too gravelly so --
**A Sure.**
Q I'll speak up.
**A Thank you.**
Q Feel free to let me know if you can't hear me. Have you had any interaction with a gentleman named Enoch Bortey?
**A I've never heard the name.**
Q In connection with preparing your opinions in this case, did you review any deposition testimony that you recall?
**A Yes.**
Q And what deposition testimony did you review?
**A The depositions -- I'd have to -- can I**



**look at my record and see what -- just to make sure that I'm complete?**
Q Sure. Do you -- let me ask, do you know which record you'd want to look at?
**A Ultimately all of them, but which specifically -- I want to see which depositions I reviewed and when, and for -- if I could just see the index, I can be specific.**
MR. MURPHY: Ask the court reporter to mark as Johnson Exhibit 1 an expert report dated September 17th, 2025.
(Deposition Exhibit Number 1 was marked for identification.)
THE WITNESS: Thank you.
MR. ABERNATHY: Brought my own. Good to have more paper.
BY MR. MURPHY:
Q And for the record, Exhibit 1, we removed the copy of Dr. Johnson's C.V., which is available separately if we need it just to try to make some documents a little shorter, but Dr. Johnson, if you have a need for your C.V., just let me know.
MR. ABERNATHY: Matt, could we mark all the reports, because the list of materials considered I think changes by report, so if he's

93

the month following 14 days of treatment, correct?
**A Again, I wasn't part of the FDA decision and the analysis that went into that final decision.**
Q In your experience as a gastroenterologist, patients diagnosed with IBS-D, do they have continuous -- withdrawn. In your experience as a treating gastroenterologist, do patients diagnosed with IBS-D have continuous symptoms on a day-to-day basis?
**A Define for me or clarify for me what you mean by symptoms.**
Q Well, what are the symptoms of IBS-D?
**A Abdominal pain. Depends on when you define it, by Rome III, Rome IV, Rome II, Rome I?**
Q Rome II, as in trials 1 and 2, Rome II.
**A So it would be abdominal pain that is generally relieved with defecation, the implement of the -- the timing of the stool, frequency, the consistency of the stool, and there were associated factors that were supportive of IBS in general as it relates to Rome II criteria, so recognize that there were specifics that were required, and then there were factors that were associated with the -- the disease diagnosis.**

94

Q In your experience, do patients diagnosed with IBS-D have the same severity of symptoms, meaning the same symptoms with the same severity on a day-to-day basis continuously?
MR. ABERNATHY: Objection, form, foundation.
**A I think it would be unfair because every patient's individual.**
Q If you look down on table 6 on page 528 of Johnson Exhibit 7, it refers to adequate relief of IBS symptoms during the month following two weeks of treatment, correct?
**A Rephrase your question?**
Q Sure. The title of table 6 is "Adequate relief of IBS symptoms during the month following two weeks of treatment," correct?
**A Correct.**
Q And the -- in trial 1, rifaximin tablets had a study population of 309 subjects, correct?
**A That's what it says, correct.**
Q And it achieved adequate -- in trial 1, the rifaximin tablet group achieved adequate relief of IBS symptoms, number of subjects were 126, correct?
**A Correct.**

95

Q And that's 41 percent approximately?
**A That's what it says, correct.**
Q And the placebo group had 314 subjects in the trial lot in table 6, correct?
**A Correct.**
Q And 98 subjects in the placebo group achieved adequate relief of IBS symptoms, correct?
**A Correct.**
Q And that's approximately 31 percent, correct?
**A That's what it says.**
Q So is it your understanding that the subjects in the placebo group felt that they had adequate relief of their IBS symptoms for at least two of the four weeks following treatment?
MR. ABERNATHY: Objection, foundation.
BY MR. MURPHY:
Q Fourteen days of treatment?
**A That would be the trial design reporting adequate relief.**
Q So the placebo effect in giving rifaximin 550 milligrams three times a day for 14 days, the placebo effect in the month following treatment on the basis of two of the four weeks of adequate relief, that placebo effect is 31 percent; is that

96

correct?
MR. ABERNATHY: Objection, foundation, beyond the scope.
**A Can you repeat the question?**
Q Sure. I'm trying to -- Dr. Johnson, I'm trying to understand sort of how -- let me withdraw that. Do you have an understanding of placebo effects in IBS studies involving adequate relief of symptoms?
**A By definition, yes. Definition, it is variable on how you define adequate relief.**
Q And in trial 1, the rifaximin tablet group, the inverse of that is 59 percent of study subjects did not obtain adequate relief based on the primary endpoint, correct?
**A That's what happens with medications. We hope they work, but they're not always predictable.**
Q And do you have an understanding of -- do you see the column for -- under trial 1, for treatment difference?
**A I see that.**
Q Do you have an understanding of what is denoted by treatment difference in table 6?
**A I do.**

Q What is your understanding?
**A It's the difference between the two endpoints between and across the two groups.**
Q Is this a treatment effect?
**A It's a difference between endpoints.**
Q I'm trying to understand, if -- if the placebo group, 31 percent of patients attained adequate relief of symptoms in the month following the 14-day course of rifaximin, I'm trying to understand what the ramification of that ten percent difference is between the treatment and the rifaximin group.
MR. ABERNATHY: Objection, foundation, beyond the scope.
**A I don't think we can call it a treatment effect. We can call it a treatment observation. Effect means that there's causality and effect. I don't read that in this report.**
Q So as someone that always reads the drug label before prescribing a prescription drug, how would you use the treatment difference reported in table 6 in your practice of treating patients with IBS-D with rifaximin?
**A The way I would look at this in my practice and my scope of treating my patients, I**



**read this, read this label, and I'd look at the trial results and what was entered for those patients when they go to the trial results. So when we talk about adequate relief, there was a composite of symptoms that they list here that support the diagnosis of irritable bowel, such as bowel movements per week, per day, lumpy stool, hard stool, watery stool, straining, stool passage, incomplete evacuation, passage of mucus, bloating or feeling abdominal distension.**
**So I know that these are being monitored every day because they say they have daily symptoms, and in fact, they use a -- they use an assessment tool that says specifically it's a weekly assessment, but the verbiage says in the past seven days, if you have to be assessing every day in this population that's being studied, and that their accrual of data from day one every seven days through the treatment arm and evaluation.**
Q Where's that accrual of data in trial 1 and 2 results?
**A Well, they tell us their symptoms were being assessed by the subject global assessment, so if I could read that to you, it says, "In**



**regards to your IBS symptoms compared to the way you felt before you started study medication," so starting the medication, in the past seven days, not at -- beginning at 14 days upon completion. It tells me day one, and recall I talked about the look-backs and how important it was for the patients to report what every day was happening, because irritable bowel syndrome is a very disease-unpredictable category.**
Q What do you mean by unpredictable?
**A There's a high placebo rate. Some patients respond to placebo, some people don't respond to medication.**
Q What do you mean by respond to placebo?
**A Well, it depends on what the endpoint is.**
Q I'm asking you. It was your answer. What -- what did you mean in your answer about responding to placebo?
**A It can be adequate relief, could be if I'm assessing that based on composite, or may have something more individual that I may be looking at, and what I know about irritable bowel syndrome, in these studies, it says very clearly what -- in addition to the Rome II criteria what they're assessing.**



Q And Dr. Johnson, I want to be very clear with my question. Other than the adequate relief of IBS signs and symptoms for at least two or four months following the month following 14 days of treatment, what data results from the clinical studies reported in the trial 1 and 2 results, other than that primary endpoint?
**A Well, they said they were going to study Rome II criteria, and they gave the definition of what diagnosis supports.**
Q I understand what you're trying to say -- what you're saying. Don't think that I don't. Understand what you're -- what your opinion is, what your testimony is. What I'm just asking for is is there actual data, a number, data, quantitative data or result for anything other than the two of four weeks during the month following 14 days of treatment.
**A Absolutely.**
Q Where is that? Can you point me to that?
**A Because irritable bowel syndrome has symptoms, and it's not one symptom. It's a composite. By definition, it's a syndrome, and I know that these symptoms are being evaluated because the patient has to refer what are you**

101

**doing from day one to day 14 to day 28. The concept is it's daily assessment, and they're assessing it based on what are problematic symptoms, which include frequency, consistency, the stool passage, mucus, bloating or feeling abdominal distension, it's -- it's -- to me, it's -- it's apparent.**

Q I'm asking again, where is there a reported data point in trials 1 and 2 results section for anything other than the two of four weeks following 14-day course of rifaximin.

**A I don't need to look at that. It's told me what -- what they're monitoring on a daily basis, and patient compliance, or patient end effect here to me is very clear because that's what they were studying, symptoms in a syndrome.**

Q So is it true that there is no data point reported in the trials 1 and 2 results for anything other than the two of four weeks following the 14-day course of treatment?

**A I know it's there because they said that that's what they were going to do, and the patients referred to the seven-day look-back, every seven days on a daily basis. So I know it's there, and I don't -- I don't need it to be**

102

**spelled out because those are composite symptoms that we look at in a patient with irritable bowel especially with IBS-D.**

Q So we agree that it is not spelled out in the trial 1 and 2 results, correct?

**A I don't agree. As I answered my opinion on that, to me, it's intrinsically -- it's intrinsically there, the data, that they're satisfied and they know what they were going to study.**

Q Do you have an understanding -- withdrawn. Have you ever designed a clinical study yourself, Dr. Johnson?

**A I have.**

Q And what's the purpose of a primary clinical endpoint?

**A To define something for primary endpoint that is appropriately reflective of the intervention and the results of the intervention or the -- the association with change from the intervention initiation across a disease state or syndrome. You then develop power calculations around what it takes to look at a particular study and decide what is the element of chance, and the power calculations around that are derivatives of**

103

**how you determine your sample size.**

Q Do you agree that table 6 of Johnson Exhibit 7 does not explicitly report a data point for any time period before the completion of treatment?

**A Table 6 title says adequate relief following two weeks of treatment.**

Q So I think the answer is yes, table 6 does not explicitly report a data point for any time period before the completion of treatment, correct?

**A The title says following two weeks of treatment. What the title means to me is different than what I understand that they were looking at symptoms on a daily basis.**

Q If you turn the page to page ending 529 of Johnson Exhibit 7, it refers to a composite endpoint as well, correct?

**A Can you point me to exactly where you're talking about?**

Q The top of page 529.

**A The trials examine a composite endpoint, correct.**

Q And composite endpoint was IBS-related abdominal pain and stool consistency measures,

104

correct?

**A That's what it says, correct.**

Q And there's a first bullet listed on the page that says experienced a greater than or equal to 30 percent decrease from baseline in abdominal pain for greater than or equal to two weeks during the month following two weeks of treatment; is that correct?

**A That's what it says.**

Q And you understand that that decrease is referring to the two weeks during the month following two weeks of treatment, correct?

**A That's what it says.**

Q And the second bullet says -- refers to had a weekly mean stool score less than four, paren, loose stool for greater than or equal to two weeks during the month following two weeks of treatment, correct?

**A That's what it says.**

Q And that's referring to the month following two weeks of treatment as well, correct?

**A That's what it says.**

Q And table 7 is efficacy responder rates in trial 1 and 2 during the month following two weeks of treatment, correct?

**A That's what the title says.**
Q And table 7 does not explicitly report any data for anything prior to the month following two weeks of treatment, correct?
**A The title says following two weeks of treatment.**
Q And table 7 does not refer to the symptom of bloating, correct?
**A Which table?**
Q Table 7.
**A In this table, it refers to following two weeks of symptoms, but I know that they were assessing composite symptoms include other symptoms, which they said from the start they were going to assess on a daily basis.**
Q Bloating -- sorry to cut you off. Bloating is not reported as an endpoint in table 7, correct?
**A There is no word of bloating in the table presented, but I know that it was part because they're assessing symptoms of patients with irritable bowel syndrome, of which bloating is a prominent part, as well as the abnormal consistency, frequency, and things that they said are supportive of the diagnosis and they're**



**assessing on a daily basis.**
Q Are you giving the opinion that bloating is part of the composite endpoint started at the top of page 529 of Johnson Exhibit 7?
MR. ABERNATHY: Objection, foundation.
**A I wasn't part of the discussion of how that endpoint was arrived, but I know that bloating is a prominent part as well as diarrhea, stool frequency, stool consistency, mucus, abdominal distension or bloating --**
Q You're not --
**A -- are all parts of the -- are all parts of the -- the symptoms of irritable bowel.**
Q You're not giving the opinion that every IBS-D patient has the symptom of bloating, are you?
**A No.**
Q If you turn back to page 528, you referred earlier to the subjective global assessment question; is that correct?
**A Correct.**
Q And above table 6, it says, "Adequate relief of IBS symptoms were experienced by more patients receiving rifaximin tablets than those receiving placebo during the month following two



weeks of treatment, correct?
**A That's what it says.**
Q And it refers specifically in the parenthetical to SGA dash IBS weekly results, correct?
**A It lists that, correct.**
Q And then it has an express reference to table 6, correct?
**A That's what it says.**
Q Other than what's presented -- with respect to trials 1 and 2, other than what's presented in table 6, does the Johnson Exhibit 7 contain any other SGA dash IBS weekly results?
**A Repeat the question please.**
Q Sure. Other than what's presented with respect to trials 1 and 2, other than what's presented in table 6, does Johnson Exhibit 7 contain any other SGA dash IBS weekly results?
**A Well, we know they're being monitored on a daily basis. The diagram above shows that that's the way it's done, the -- the index.**
Q That's the diagram for figure -- that's trial 3 though, correct?
**A I understand.**
Q I'm asking about trials 1 and 2.



**A And we know in trial 1 and 2 that the SGA was a seven-day interval reflection on a daily symptom for the week before.**
Q Is there an SGA-IBS weekly result reported for week 1 in Johnson Exhibit 7?
**A Well, in table 6, it says following two weeks of treatment.**
Q I'm asking anywhere in the trials 1 and 2 results, is there an SGA-IBS weekly result reported for week 1.
**A The data reported is only following two weeks of treatment. I know it's there because that's what they said they were going to do.**
Q On page 529 of Johnson Exhibit 7, there's a section referring to trial 3 results, correct?
**A That's what it says.**
Q And trial 3 was the target 3 study, correct?
**A Correct.**
Q And target 3 included an open label phase, correct?
**A That's what it says.**
Q And then phases for retreatment, correct?
**A That's what it says.**
Q And you understand that the patients

received an initial 14-day -- in the study, received an initial 14-day course of open-label rifaximin tablets followed by four weeks of treatment-free follow-up, correct?
**A That's what it says.**
Q And the endpoint in that follow-up on the open-label rifaximin course was greater than or equal to 30 percent improvement from baseline in weekly average abdominal pain score based on a daily question; is that correct?
**A I'm sorry, you're reading the bullet point?**
Q Yeah, the first bullet point. I'm saying the first bullet point is referring to abdominal pain, correct?
**A I accept it says in the 30 -- greater than 30 percent from baseline weekly average abdominal pain based on a daily question.**
Q And that's the four weeks of treatment-free follow-up where that's being assessed, correct?
**A That's the way I understand.**
Q And the second bullet's referring to at least a 50 percent reduction in the number of days in a week with a daily stool consistency of



Bristol Stool Scale type 6 or 7 compared with baseline, correct?
**A That's what it says.**
Q And that's in the four weeks of follow-up, correct?
**A That's what it says.**
Q In table 8 on page 530 of Johnson Exhibit 7 is entitled "Efficacy responder rates in trial 3 in a given week for at least two weeks during weeks 3 to 6 of the double-blind first repeat treatment phase," correct?
**A That's what it says.**
Q You understand weeks 3 through 6 to be referring to the month following the 14-day course of treatment?
**A That's what I understand.**
Q And table 8 refers to abdominal pain and stool consistency responders, correct?
**A That's what it says.**
Q And the word "bloating" does not appear in table 8, correct?
**A I know it was assessed.**
Q Are you giving the opinion that trial 3 was designed to evaluate bloating?
**A It was evaluating symptoms. They said**



**from day one, they followed symptoms, so on a daily basis, of which we know that bloating is a symptom. So inherent to the data accumulation, it goes back to what they -- we know that they accumulate on a daily basis beginning at day one after the initiation of treatment --**
Q You understand --
**A -- and administration of medication.**
Q Sorry.
**A After administration of the medication.**
Q You understand that trial 3 was conducted under the Rome III criteria; is that correct?
**A I do.**
Q Is bloating a symptom of IBS-D under the Rome III criteria?
**A It's an associated symptom, not diagnostic.**
Q Okay, so the symptom of bloating is not necessary for a diagnosis of IBS-D under Rome III criteria, correct?
**A That's correct.**
Q And do you have an understanding of whether the target 3 study was consistently powered to detect a difference in bloating?
MR. ABERNATHY: Objection, foundation.



**A I'd have to go back and consider that.**
Q Sitting here today, you haven't considered that?
**A I -- again, the symptom is a common symptom. This is not defined as an endpoint perhaps in the power calculations, but was accumulated every day on a daily basis, so we know the information's there.**
Q Prior to July 1st, 2025, when you were -- actually, withdrawn. Prior to July 1st, 2025, you treated patients for irritable bowel syndrome with diarrhea, correct?
**A Correct.**
Q And prior to July 1st, 2025, when you were treating those IBS-D patients, not every patient exhibited the symptom of bloating, correct?
**A Correct.**
Q And you're not giving the opinion in this case that any subject diagnosed with IBS-D would necessarily achieve relief -- withdrawn.
MR. ABERNATHY: Did you say withdrawn, Matt?
MR. MURPHY: Withdrawn, yeah.
MR. ABERNATHY: Okay, thank you.
BY MR. MURPHY:

Q In your clinical experience -- withdrawn. Did you prescribe Xifaxan 550 milligrams three times a day for 14 days to treat IBS-D patients prior to July 1st, 2025?

**A I did.**

Q And is it correct that you had patients diagnosed with IBS-D with the symptom of bloating that did not achieve relief of IBS-D following the course of rifaximin?

**A Define the course of rifaximin.**

Q 550 milligrams three times a day for 14 days.

**A Again, specific numbers I can't tell you, but absolutely. Medicines are not absolute and results. We hope they get better, do our best to improve the patient, but they're not necessarily an absolute cause and effect predictable.**

Q In your clinical practice when you treated IBS-D patients with rifaximin 550 milligrams for 14 days, did you have patients achieve adequate relief of IBS-D symptoms without resolving the symptom of bloating?

**A Not everybody has bloating.**

Q If you go back to page 528, Johnson Exhibit 7, and it refers to the IBS-D -- just



below the figure, Dr. Johnson, there's a statement that says the IBS-D population from the three studies had mean age of 47, range, 18 to 88 years, of which approximately 11 percent of patients were greater than or equal to 65 years old, 72 percent were female, and 88 percent were white, correct?

**A That's what it says.**

Q Do you have an understanding of whether there are any differences in the performance of rifaximin in non-white subjects?

MR. ABERNATHY: Objection, foundation, beyond the scope.

**A I haven't considered that.**

Q And I take it you agree that if 72 percent of the subject studies were female, that approximately 18 percent would have been male?

**A In these -- in these three studies?**

Q Yes.

**A That's what it says.**

Q And you agree that patients that are greater than equal to 65 years old would include both female and male patients?

**A Yes, potentially.**

Q Well, other than male or female, is there anything else that biologically a 65-year-old



could be?

MR. ABERNATHY: Careful.

**A Well, male or female, yes. I thought you said male and female. Sorry, misunderstood.**

Q So your understanding that the patients that were 65 years -- withdrawn. That patients that were greater than equal to 65 years old included males and female patients?

MR. ABERNATHY: Objection, foundation, misstates prior testimony.

**A I would assume, but I don't have the specifics on that age population.**

Q In connection with preparing the opinions in your report, you've not reviewed any clinical study comparing rifaximin 550 milligrams BID for 14 days to rifaximin 550 milligrams TID for 14 days for the treatment of IBS-D, correct?

**A I'd have to go back and look at what I reviewed for the preparations. If that's on the list, I'd be happy to go back and look back at that.**

Q But sitting here right now, you don't recall any head-to-head comparison of the 550 milligram BID to --

**A I wouldn't be comfortable in answering. A**



**lot of documents for this case, and this is not a memory contest for me. I'd be happy to go back and look at the exhibits if you can find it, I'd be happy to discuss it.**

Q Inherent in your answer is assume it exists, but the -- I guess the question is you're not aware as a practicing clinical physician as of July 1st -- before July 1st, 2025 of any such head-to-head study.

**A I haven't considered that.**

Q And I guess have you considered any study, clinical study comparing rifaximin 400 milligrams TID for ten days to rifaximin 550 milligram for 14 days for the treatment of IBS-D?

**A I'd have to again go back and look at the documents and exhibits that were listed of what we considered.**

Q And the target 1 study did not make any such comparison, correct?

**A I don't understand what comparison means.**

Q There's no -- there was no dosing comparison in the target 1 study, correct?

**A Dosing comparison of what?**

Q Of 550 milligrams BID to 550 milligrams TID for 14 days for the treatment of IBS-D.

**A That's correct.**
Q And same question with respect to the target 3 study, there was no dosing comparison of 550 milligrams BID to 550 milligrams TID for 14 days for the treatment of IBS-D, correct?
**A That's correct.**
Q And are you aware of Salix conducting any other study of rifaximin 550 milligram tablets for the treatment of IBS-D other than the target 1, target 2 and target 3 studies?
**A I'd only comment on things that I'm aware on and I've listed in my exhibit of considerations.**
MR. MURPHY: Can we go off the record for a second?
THE VIDEOGRAPHER: Off the record, 12:34.
(Recessed at 12:34 p.m.)
(Reconvened at 1:26 p.m.)
THE VIDEOGRAPHER: On the record, 13:26.
BY MR. MURPHY:
Q Hello, Dr. Johnson. Could you please grab Exhibit 2, which will be your rebuttal expert report. If you could turn for me -- do you have the Exhibit 2?
**A Yes.**



Q If you turn to page 24, specifically paragraph 96 please?
**A Okay.**
Q And looking at paragraph 96, there's -- there's one sentence in paragraph 96, and there's a footnote 74. Do you see that?
**A Sorry, I was trying to prevent -- spill here. I apologize.**
Q Let me withdraw it. I'll ask it again. In paragraph 96, there's one sentence in the paragraph, and at the end of the sentence, it cites to footnote 74.
**A I see that.**
Q And that's a citation to the DuPont rebuttal report, correct?
**A That's what it says.**
Q And I guess my question for you, Dr. Johnson, is are you giving an opinion in paragraph 96, or are you relying on Dr. DuPont's opinion?
**A In paragraph 96, are you speaking about an opinion on the fact that rifaximin is part of the rifamycin family of antibiotics?**
Q I'm just asking, in paragraph 96, what are you relying -- if anything, on Dr. DuPont versus



what your opinion is.
MR. ABERNATHY: Objection as to form.
**A My opinion is as stated.**
Q So your citation to Dr. DuPont is for what purpose?
**A The specifics of what it says here, rifaximin is part of the rifamycin family of antibiotics, which is -- rapidly cause resistance if a bacterial strain develops for rifaximin resistance, becomes resistance to other antibiotics in the same family, investigators had knowledge and identified rifaximin-resistant strains in subjects.**
Q So that's an opinion you're giving in your report?
**A That's an opinion I just stated in my report on that specific issue.**
Q Okay, so you're not relying on Dr. DuPont for that opinion?
**A I cited Dr. DuPont, positive opinion is registered here as what my citation was.**
Q Okay. I'm not -- I wasn't intending to make it a complicated question. I'm just trying to understand, this is an opinion you're giving regardless of what Dr. DuPont gives. Is that



fair?
**A Dr. DuPont rendered an opinion that I -- I cited, and that's part of my -- my report.**
MR. ABERNATHY: Could you ask your question again? I don't think he answered it.
MR. MURPHY: No, I think he did.
MR. ABERNATHY: Okay, it's up to you.
BY MR. MURPHY:
Q And I take it you reviewed Dr. DuPont's report before finalizing and signing your report on September 17th, 2025?
**A I did.**
Q Could you please turn to paragraph 197 of Johnson Exhibit 2?
**A Sorry?**
Q One nine seven.
**A Do you have a page? It would be easier.**
Q Page 60.
**A Thank you, okay.**
Q And in that first sentence of paragraph 197, it refers to the expert report of Dr. Ehrenpreis, correct?
**A That's what it says.**
Q And my -- and then it cites in footnote 231 to a set of paragraphs in the Ehrenpreis

**intervention here was rifaximin, we have no guarantee that it's going to work. We hope it does.**

Q So if the intervention where the rifaximin does not induce a reduction from baseline symptoms, it would still practice claim 5 in your opinion?

MR. ABERNATHY: Objection, beyond the scope.

THE WITNESS: It's --

MR. ABERNATHY: Asking for a legal conclusion.

THE WITNESS: I would defer that that's a legal conclusion. I can give you my inference that the medication may or may not work, and we hope it does. If it works, we can't say it's even causal or temporal. We can say it's -- it's related by -- by sequence. We can't tell its cause and effect. We can say it's associated. Can't predict it.

BY MR. MURPHY:

Q In the next sentence in paragraph 45 states, "While the ANDA labels describe multiple symptomatic improvements relative to baseline assessed in different ways, what matters here is



the ANDA labels repeatedly describes assessing IBS-D symptoms after treatment by comparing them to a reduction in baseline symptoms." Did I read that correctly?

**A That's what it says.**

Q So what's the interplay between the symptomatic improvements identified in that sentence and the reduction in baseline symptoms?

MR. ABERNATHY: Objection, form, foundation, assumes facts not in evidence.

**A My opinion is that the ANDA label describes multiple symptomatic improvements relative to baseline assessed in different ways. What matters is the ANDA label repeatedly describes IBS-D symptoms after treatment, the comparing the reduction in the baseline symptoms.**

Q So it's your understanding that a symptomatic improvement is required in order to achieve a reduction from baseline symptoms?

**A Absolutely not.**

MR. MURPHY: Okay, we can go off the record.

MR. ABERNATHY: Thank you.

THE VIDEOGRAPHER: Off the record, 15:05.

(Recessed at 3:05 p.m.)



(Reconvened at 3:23 p.m.)

THE VIDEOGRAPHER: We're now on the record, 15:23.

BY MR. MURPHY:

Q Dr. Johnson, will you please turn to your rebuttal report, which would be Johnson Exhibit 2?

**A Exhibit 2 is my validity report?**

Q Yes.

**A Okay.**

Q Yeah, if you turn to the list of materials relied on, which are at the end of your report, and Dr. Johnson, the first item listed on materials relied on is the rebuttal expert report of Philip Schoenfeld in the Salix Pharma V Norwich Pharma case, correct?

**A Correct.**

Q And did you consider Dr. Schoenfeld's report before or after you formed opinions in this case?

**A Before.**

Q And you also have a third item on the list of materials relied on, you considered the Salix Pharm V Norwich Pharm court decision dated August 10th, 2022, correct?

**A Correct.**



Q And did you consider that decision before or after you formed the opinions in this case?

**A Before.**

Q And moving down to, there's several sets of -- first, it states plaintiffs' responses to consolidated defendants' invalidity contentions and claim charts. Do you see that?

**A I do.**

Q And did you consider the plaintiffs' responses to consolidated defendants' invalidity contentions and claim charts before or after you formed your opinions in this case?

**A Before.**

Q And then also, there's a second set of plaintiffs' responses, plaintiffs' responses to Defendants Norwich Pharmaceuticals, Alvogen PB Research & Development, LLC, and Alvogen, Inc.'s preliminary invalidity contentions and claim charts. Do you see that?

**A I do.**

Q And did you consider that before or after you formed your opinions in this case?

**A Before.**

Q Did you discuss the subject matter of Dr. Schoenfeld's report with Dr. Schoenfeld at any

173

time?
**A No.**
Q Did reviewing Dr. Schoenfeld's change your opinions on any issue?
MR. ABERNATHY: Objection, misstates prior testimony, foundation.
**A Could you point to where I refer to Dr. Schoenfeld's specific report in my -- in my submission here, I'd be happy to identify that.**
Q In your list of materials relied on, you've identified Dr. Schoenfeld's report.
**A Correct.**
Q Correct? And I'm just trying to understand what if anything you relied on from Dr. Schoenfeld's report if you can recall.
**A I wouldn't recall.**
Q Did you use Dr. Schoenfeld's report in any way to assist you in drafting your expert report?
**A I don't -- I reviewed it. I don't rely on what I did. I don't remember exactly what I did specifically with that.**
Q Same question with respect to the invalidity -- plaintiffs' responses to the invalidity contentions that you reviewed. Did you use those documents to draft your expert report?

174

**A They -- they're in the list of relied on, so they were reviewed.**
Q And beyond reviewing the contentions, did you use them in any way to prepare your expert report?
**A I'd have to go back and look at a specific area that I may have cited them.**
Q Looking at the table of contents for your rebuttal report, which is Johnson Exhibit 2, do you see section XIIA? So section 12 is obviousness in the table of contents, correct?
**A Correct.**
Q And section XIIA refers to references cited by Dr. Harary, correct?
**A Correct.**
Q And did you prepare those summaries of the reference -- withdrawn. Did you prepare the discussion of the references cited by Dr. Harary that appear in section XIIA of your report?
**A As I stated from the beginning that the report was generated in extensive consultation with counsel, thoughtful evaluation, multiple meetings, multiple revisions, and ultimately what was delivered for the report is my opinion.**
Q To your knowledge, are there entries in

175

section XIIA of your rebuttal report that are largely the same as discussions in the plaintiffs' responses to invalidity contentions?
**A I don't understand your question.**
Q Sure. It wasn't a very good question. Withdrawn. To your knowledge, does any of the discussion in section XIIA of your rebuttal report cut and paste information from plaintiffs' responses from -- to the invalidity contentions that you relied on?
**A I don't recall.**
MR. MURPHY: I'll ask the court reporter to mark as Exhibit 15 a document bearing the title "Efficacy of Rifaximin Verse Placebo in Reducing Symptoms in Adults with IBS."
(Deposition Exhibit Number 15 was marked for identification.)
BY MR. MURPHY:
Q Exhibit 15. Dr. Johnson, do you recognize what's been marked as Exhibit Number 15?
**A I recognize the author.**
Q And again, this is a commentary in Medscape entitled "Efficacy of Rifaximin verse Placebo in Reducing Symptoms in Adults with IBS," correct?

176

**A Correct.**
Q And you are the author of what's been marked as Exhibit 15; is that correct?
**A Correct.**
Q And the commentary in Exhibit 15 is concerning an article by Pimentel et al., "The Effect of a Nonabsorbed Oral Antibiotic," paren, "Rifaximin," end paren, "on the Symptoms of Irritable Bowel Syndrome: A Randomized Trial," correct?
**A That's what it says.**
Q And you understand that that -- withdrawn. The Pimentel article was published in the Annals of Internal Medicine in 2006; is that correct?
**A That's what it says.**
Q And you understand that to be the Pimentel 2006 article that's been the subject of your expert report?
**A Yes.**
Q And you published this commentary on Medscape on November 10th, 2006, correct?
**A Yes.**
Q And in the viewpoint section of your commentary, you state, "Rifaximin is currently U.S. Food and Drug Administration approved for the

**A Okay.**
Q And do you see the section entitled "Findings of Fact"?
**A I do.**
Q And in finding of facts number 7, you understand in Norwich 1, the court determined that a person of skill in the art would have a medical degree with training in gastroenterology or have been a practicing physician such as an internist with experience in treating IBS, correct?
**A Point to me where you're speaking at. I don't see -- I'm on page 16.**
Q Page 16, it's paragraph 7 underneath the heading of "Findings of Fact."
**A Oh, okay, I see that.**
Q And I'll read -- I'll ask the question again. In Johnson 16, you understand that the District Court of Delaware determined that a person of ordinary -- of skill in the art would have had a medical degree with training in gastroenterology or been a practicing physician, such as an internist, with experience in treating IBS, correct?
**A That's what it says.**
Q And that's your understanding of what was



determined in the court case?
**A That's what it says.**
Q And in paragraph 9, the court decision states -- you understand the court decision states that the RFIB 2001 protocol and Pimentel 2006 disclosed all the limitations of the IBS-D claims, correct?
**A That's what it says.**
Q In paragraph 10, the Norwich 1 decision, you understand states, "A POSA would have been motivated to combine the RFIB 2001 protocol and Pimentel 2006 with a reasonable expectation of success," correct?
**A That's what it says.**
Q And paragraph 11 it states, "As of the priority date, the prior art disclosed positive results in using the rifaximin to treat IBS-D for a range of doses. The asserted IBS-D claims describe a dosing regimen within the known range," correct?
**A That's what it says.**
Q And if you turn to page -- page 18 --
**A Page 18 on the same --**
Q Yes, Johnson Exhibit 16.
**A Okay.**



Q And in the bottom paragraph, in the middle of the paragraph, there is a statement, and you understand in Norwich 1 the court stated, "Widespread off-label use reflects a motivation to use rifaximin for the treatment of IBS-D with a reasonable expectation of success, correct?
**A I'm sorry, where are we?**
Q On page 18 --
**A Yes.**
Q -- of Johnson Exhibit 16.
**A Okay, and the reference that you're reading to me is what?**
Q In the -- let me withdraw the question and I'll ask it again. You understand in Norwich 1, the court determined that widespread off-label use reflects a motivation to use rifaximin for the treatment of IBS-D with a reasonable expectation of success?
**A Please direct me where you're reading that. We're on the same -- this is the page 18 of the --**
Q Page 18, yeah, the bottom paragraph.
**A Bottom paragraph, okay. Oh, okay. Your type is considerably different than mine.**
Q Oh.



**A That's what it says.**
MR. ABERNATHY: Matt, we'll stipulate the opinion says what it says.
MR. MURPHY: I just want to make sure I -- that I have his understanding, because he considered this and relied on it in his opinions.
MR. ABERNATHY: Right, but you reading it to him, all you're simply doing is saying it says this, right? We'll stipulate it says that, and we'll also stipulate he's read it.
BY MR. MURPHY:
Q I'm just saying if he understands what the court found. We only have a couple more left, so -- and if you could turn to page 20, Dr. Johnson, and do you see the -- sorry, are you there?
**A Okay.**
Q And do you see the star 21 appearing on the left side of the page at the start of the --
**A Yeah.**
Q -- second paragraph? And you understand in that paragraph, the court is considering the article by Dr. Drossman in 2006; is that correct?
**A I understand what's written.**
Q You understand that -- that Dr. Drossman's editorial from 2006 was before the court in

Norwich 1, correct?
**A That it was involved in that, yeah, that -- that appears, apparently.**
Q You also understand that the Quigley article we discussed earlier is also considered by the court in Norwich 1, correct?
**A That's what it appears.**
Q And further down in the same paragraph, you agree that the article written by Vanner was considered by the court in Norwich 1, correct?
**A That's what it appears.**
MR. MURPHY: Can we go off the record?
THE VIDEOGRAPHER: Off the record, 15:55.
(Recessed at 3:55 p.m.)
(Reconvened at 4:07 p.m.)
THE VIDEOGRAPHER: On the record, 16:07.
BY MR. MURPHY:
Q And Dr. Johnson, could you please turn back to Exhibit 14, which is a copy of the '912 patent?
**A Okay.**
Q And please turn to the page ending 858.
**A Okay.**
Q And down in column 22 at line 55, do you see that paragraph, right-hand column, column 22?



**A Yes.**
Q And do you see the reference that's listed in lines 55 to 60 of column 22?
**A Yes.**
Q And you understand that reference to be the Yang reference that is discussed in your rebuttal report that's Exhibit 2?
MR. ABERNATHY: Objection, form.
**A I'd have to go back and look specifically. This is a Yang reference.**
Q Sure, if you turn to Johnson Exhibit 2, which is your rebuttal report, page 63 --
**A Okay.**
Q And do you see the reference in paragraph 204 to Yang?
**A I do.**
Q And that's the same article that's described in column 22 of the '912 patent, correct?
MR. ABERNATHY: Objection, foundation.
**A It's not specifically listed the same, so I can't answer that.**
Q Are you referring to the publication date of May 23rd, 2007?
**A No, page 169, and the reference I see is**



**169, 174.**
Q Right, in Digestive Disease Science, is that correct, the journal?
**A That's what it says.**
Q And it's volume 53; is that correct?
**A That's what it says.**
Q And the starting page is 169; is that correct?
**A That's what it says.**
Q Dr. Johnson, I want to go back to a conversation we had this morning quickly to clarify a question. Have you ever prescribed rifaximin for an off-label use?
**A Not to the best of my knowledge.**
Q Have you ever prescribed any antibiotic for an off-label use?
**A Not to the best of my knowledge.**
Q If you could turn to the materials relied on for your rebuttal report, which is that last -- second to last page I think in your version --
**A I'm there.**
Q When you refer to the expert reports of DuPont, Ehrenpreis and Rao, are you referring to the finalized version of those reports?
**A I'm referring to the reports that I was**



**presented.**
Q Do you know whether you were presented the final versions of those reports?
**A I reviewed the reports that I was presented. I don't know about -- if there were subsequent changes or finalization, I don't know how that description meets what I say here.**
Q Because the -- I'll represent to you the reports that were served on us were dated October 22nd, 2025 for Drs. DuPont, Ehrenpreis and Rao, and you signed your report on October 17th, 2025, correct?
**A Correct.**
Q So are you -- do you recall whether you saw a finalized executed version of Dr. DuPont's report?
**A Repeat the question about the dates?**
Q Sure. Dr. DuPont signed his expert report on October 22nd, 2025.
**A Correct.**
Q You signed your expert report on October 17th, 2025, correct?
**A I -- correct.**
Q And you testified earlier that you had reviewed Dr. DuPont's report, correct?

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., and BAUSCH HEALTH IRELAND LTD.,

Plaintiffs,

v.

AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, AND AMNEAL EU, LIMITED,

Defendants.

Case No.: 1:24-cv-04607-JFM

SALIX PHARMACEUTICALS, INC., et al.,

Plaintiffs,

v.

NORWICH PHARMACEUTICALS, INC.,

Defendant.

Case No.: 1:24-cv-07140

SALIX PHARMACEUTICALS, INC., et al.,

Plaintiffs,

v.

CIPLA USA, INC. AND CIPLA LIMITED,

Defendants.

Case No.: 1:24-cv-10213-JFM

**CONFIDENTIAL**

**OPENING EXPERT REPORT OF**
**ALBERT HARARY, M.D. REGARDING INVALIDITY**

DATED: September 17, 2025

Albert Harary, M.D.

## V. SUMMARY OF OPINIONS

### A. The ’912 Patent

41. As discussed in further detail below, it is my opinion that asserted claims 1-7 of the ’912 patent are invalid as obvious over the prior art and/or lacking written description. More particularly, my opinions regarding the asserted claims of the ’912 patent are summarized as follows and explained further herein:

- As discussed below, asserted claims 1-7 of the ’912 patent would have been obvious to a person of ordinary skill in the art, as of February 2008, over: (1) over Pimentel 2006 in view of the RFIB 2001 Study Protocol; Cuoco 2006 in view of the RFIB 2001 Study Protocol; and the Weinstock Email in view of the RFIB 2001 Study Protocol or Pimentel 2006.
- Alternatively, as discussed below, claim 2 of the ’912 patent would have been obvious to a person of ordinary skill in the art, as of February 2008, over: (1) over Pimentel 2006 in view of the RFIB 2001 Study Protocol, in further view of Sharara; Cuoco 2006 in view of the RFIB 2001 Study Protocol, in further view of Sharara; and the Weinstock Email in view of the RFIB 2001 Study Protocol or Pimentel 2006, in further view of Sharara.
- As discussed below, alternatively, and to the extend it is not invalid as obvious, asserted claim 2 of the ’912 patent is invalid for inadequate written description because a person of ordinary skill in the art would not have understood the inventors to have possessed the claimed method.
- As discussed below, the claims of the ’912 patent are not materially different than claim 2 of the ’569 patent and claim 3 of the ’667 patent.

### B. The ’571 Patent

42. As discussed in further detail below, it is my opinion that asserted claims 1-4 of the ’571 patent are invalid as obvious over the prior art. More particularly, my opinions regarding the asserted claims of the ’571 patent are summarized as follows and explained further herein:

- As discussed below, asserted claims 1-4 of the ’571 patent would have been obvious to a person of ordinary skill in the art, as of February 2008, over: (1) over Pimentel 2006 in view of the RFIB 2001 Study Protocol; Cuoco 2006 in view of the RFIB 2001 Study Protocol; and the Weinstock Email in view of the RFIB 2001 Study Protocol or Pimentel 2006.

- Alternatively, as discussed below, claim 4 of the ’571 patent would have been obvious to a person of ordinary skill in the art, as of February 2008, over: (1) over Pimentel 2006 in view of the RFIB 2001 Study Protocol, in further view of Sharara; Cuoco 2006 in view of the RFIB 2001 Study Protocol, in further view of Sharara; and the Weinstock Email in view of the RFIB 2001 Study Protocol or Pimentel 2006, in further view of Sharara.

- As discussed below, the claims of the ’571 patent are not materially different than claim 2 of the ’569 patent and claim 3 of the ’667 patent.

## VI. **SCIENTIFIC BACKGROUND**

### A. **Irritable Bowel Syndrome**

43. Irritable bowel syndrome (“IBS”) is a condition in which the intestine does not function normally. IBS is a bowel disease characterized by gastrointestinal and extra-intestinal symptoms. Patients with IBS have abdominal pain, cramping, and/or bloating, usually associated with a change in bowel movements (diarrhea, constipation, or both). The discomfort may be relieved by moving the bowels. Other common symptoms include a sensation of incomplete evacuation of stools and mucus in the stools. The symptoms typically have been present for several months or longer, although not necessarily every day.

44. A combination of abnormal processes together cause the symptoms of IBS. These abnormalities may be physical, psychological, or dietary, including abnormal muscular coordination (motility) of the intestine, brain-gut communication problems, abnormal pain sensation, psychological problems and stress, food sensitivity, dysbiosis, small intestinal bacterial overgrowth (“SIBO”), acute gastroenteritis, or genetics.

45. The selection of treatment depends on the abnormality or abnormalities that a clinician suspects to be the cause of the IBS symptoms. For example, a treatment may include one or more of dietary modifications, medication, stress reduction, probiotics, and/or psychological treatments.

46. Antibiotics, including rifaximin among others, have been known for many years to help selected IBS patients with SIBO. Normally, there are very few bacteria living in the small intestine, in contrast to the significant numbers of bacteria in the large intestine. SIBO is an abnormally high number of bacteria in the small intestine. This can cause gas, bloating, diarrhea, weight loss, and nutritional deficiencies. As I further discuss below, research has suggested that SIBO can cause IBS in some patients, and certain antibiotics can help reduce symptoms of IBS.

47. There are several known subtypes of IBS based on the consistency of the stool: (1) diarrhea-predominant IBS ("IBS-D"); (2) constipation-predominant IBS ("IBS-C"); and (3) mixed IBS ("IBS-M"), which was formerly referred to as alternating IBS or IBS-A and in which both diarrhea and constipation occur frequently at different times.

B. **Rifaximin and Xifaxan®**

48. Rifaximin is a well-known non-absorbed, non-systemic antibiotic that has been widely used throughout the world since the mid-1980s to treat a multitude of health conditions. For example, rifaximin has long been approved in Italy under the brand name Normix for use in treating intestinal infections, diarrhea caused by microbial flora, and as a prophylaxis for infections developed due to surgery.

49. Rifaximin is marketed in the United States under the brand name XIFAXAN® and is currently available in two dosage strengths, 200 mg and 550 mg tablets. The 200 mg dosage is

indicated for the treatment of traveler’s diarrhea, and the 550 mg strength is indicated for the treatment of hepatic encephalopathy and the treatment of IBS-D in adults.

## VII. **PERSON OF ORDINARY SKILL IN THE ART (“POSA”)**

50. When analyzing the validity of a patent, I have been informed that it is to be analyzed from the perspective of a person of ordinary skill in the art (“POSA”) at the time of the alleged invention. I have been informed that there are factors to determine the level of ordinary skill in the art. These factors include: (1) the type of problems encountered in the art, (2) the prior art solutions to those problems, (3) the rapidity with which innovations are made, (4) the sophistication of the technology, and (5) the educational level of active workers in the field. The educational level of the inventors may also be considered. No single factor is dispositive or required to be present.

51. I have also been informed that under United States law, the invention date is considered the priority filing date unless an earlier invention date is established by the patentee. I have been informed that Plaintiffs have asserted February 26, 2008 as the date of invention for the ’912 and ’571 patents.

### A. **The Types of Problems Encountered in the Art**

52. IBS is a bowel disease with symptoms such as abdominal pain, bloating, urgency, gas, and changed bowel habits, such as diarrhea, constipation, or the alternating (or mix) of both diarrhea and constipation.

53. One difficulty in treating IBS is that many treatments focus on treating the symptoms and not the underlying condition. For example, if a patient has both diarrhea and constipation, taking medication to improve the diarrhea, such as Immodium, is likely to worsen the patient’s constipation, and vice versa. In addition, even if the symptoms are treated, the

underlying condition, which may be due, for example, to an imbalance in intestinal bacteria, is left untreated.

54. These problems suggest that a POSA would have a medical degree and experience in treating gastrointestinal disorders, particularly IBS.

B. **The Prior Art Solutions to Those Problems**

55. As mentioned above, physicians often treated the symptoms of IBS and not the underlying cause of those IBS symptoms. This led to a chronic cycle of symptom relief while taking medication, but those symptoms would return upon discontinuing the medication.

56. The prior art discloses, however, that antibiotics were being used to address an underlying cause of IBS, which would improve patients' symptoms. In fact, as discussed in more detail below, rifaximin was being used to alter the intestinal bacteria, and physicians had great success in improving and preventing the symptoms of IBS. (*See, e.g.*, Pimentel Book, Lin 2006; Pimentel 2006; RFIB 2001 Study Protocol.)

C. **The Rapidity With Which Innovations Are Made**

57. It is well known that innovations in pharmaceutical science are relatively slow. Although the speed at which new drugs are developed and tested for a particular indication is relatively slow, it was well known prior to 2008 that rifaximin could be used to treat IBS and other gastrointestinal disorders. The slow speed of development suggests that a POSA would have a relatively high level of skill in the art.

D. **The Sophistication of the Technology**

58. The prescription of medication and the treatment of IBS requires a medical degree, suggesting that a POSA would need to have medical training or comparable clinical and research experience. This also suggests that a POSA would have a relatively high level of skill in the art.

results and disclosed that a "subgroup analysis of patients responding to rifaximin *versus* nonresponders in the same group showed a statistically significant drop among responders in correlation with drop in bloating-specific and overall symptom scores (p=0.01 for both) (Figs. 4 and 5)." (Sharara at 329-30.)

365. In addition, a POSA would have been motivated to reduce IBS symptoms following 7 days after the administration of rifaximin because it was known in the art that "IBS is considered to be a serious condition that has a substantial impact on a subject's day-to-day function," such that near-term reduction of symptoms would be desirable. (RFIB 2001 Study Protocol at 4.)

366. Therefore, a POSA would have been motivated to combine the rifaximin dosing taught by Pimentel 2006 in view of the RFIB 2001 Study Protocol (550 mg – 2200 mg per day for 14 days) in order to optimize the effectiveness of rifaximin in reducing IBS symptoms.

iii. *Reasonable expectation of success*

367. In my opinion, a POSA would have had a reasonable expectation of success in combining Pimentel 2006 and the RFIB 2001 I incorporate by reference my discussion above regarding the reasonable expectation of success in combining the teaching of Pimentel 2006 and the RFIB 2001 Study Protocol with respect to claims 1-5 of the '912 patent.

368. A POSA would have had a reasonable expectation of success in doing so at least because IBS patients were known to show significant improvement in IBS symptoms in seven to ten days after rifaximin administration. (*See, e.g.*, Pimentel 2006 at 557; *id*. at 561-62; Sharara at 327; Weinstock 2007 at 1248, Table 1; Scarpellini at 781; Lauritano at 31.)

369. For these reasons, it is my opinion that claim 6 of the '912 patent would have been obvious to a POSA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

### g. Claim 7 of the '912 Patent is Obvious Over Pimentel 2006 in View of the RFIB 2001 Study Protocol

370. In my opinion, claim 7 of the '912 patent would have been obvious to a POSA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

371. Claim 7 of the '912 patent depends from claim 1 and further recites "treating one or more symptoms of IBS comprises a reduction in symptoms defined by an affirmative response from the subject when asked whether they had a reduction in symptoms of IBS." ('912 patent at col. 46, ll. 28-31.)

#### i. *Pimentel 2006 and the RFIB 2001 Study Protocol disclose each limitation of claim 7 of the '912 patent*

372. I incorporate by reference my discussion of Pimentel 2006 and the RFIB 2001 Study Protocol from above, including in regard to claims 1-6 of the '912 patent.

373. In addition, as previously discussed, Pimentel 2006 also teaches that patients in the trial were asked "to rate the severity of their symptoms on the VAS again 7 days after the completion of rifaximin treatment or placebo." (Pimentel 2006 at 559.) Pimentel 2006 further discloses that patients were asked "to provide a percentage of global improvement in their overall IBS symptoms from 0% to 100%." (*Id.*) Thus, Pimentel 2006 teaches a method of assessing the reduction of IBS symptoms by asking a patient about symptom improvement.

374. Furthermore, the RFIB Study Protocol teaches that "[t]he primary objective of [the disclosed] trial is to evaluate the efficacy of a 14-day course of oral rifaximin at 550 mg BID versus placebo in providing *adequate relief* from Diarrhea-associated IBS (DIBS) symptoms." (RFIB Study Protocol at 6 (emphasis added).) A POSA would have understood that "adequate relief" of IBS symptoms was often determined through subjects' responses to questionnaires regarding those symptoms or based on affirmative open-ended questions. (*See generally, e.g.*, Pimentel 2006; Sharara; Jolley; Yang.)

ii. *A POSA would have been motivated to combine Pimentel 2006 and the RFIB 2001 Study Protocol*

375. I incorporate by reference my discussion above regarding the motivation(s) to combine Pimentel 2006 and the RFIB 2001 Study Protocol with respect to claims 1-6 of the ’912 patent.

376. In addition, a POSA would have been motivated to develop a method wherein the reduction of one or more IBS symptoms comprises an affirmative response from the subject when asked whether they had a reduction in symptoms because it was known in the art that an improvement or treatment of IBS symptoms was often determined through subjects’ responses to questionnaires regarding those symptoms or based on affirmative open-ended questions. (*See generally*, *e.g.*, Pimentel 2006; Sharara; Jolley; Yang.)

377. Moreover, based on my experience, it is common practice to schedule a follow-up visit with a patient after prescribing a medication for a chronic disease presenting with symptoms (for example, headaches, IBS, back pain) to assess the benefit. At this follow-up visit, the clinician will ask the patient: “are you feeling better?” and will ask about whether there has been any benefit for a specific symptom(s). For example, in the case of IBS a clinician will ask the patient whether his/her diarrhea is occurring less frequently, is his/her bloating better and by how much, etc.

iii. *Reasonable expectation of success*

378. I incorporate by reference my discussion above regarding the reasonable expectation of success in combining the teaching of Pimentel 2006 and the RFIB 2001 Study Protocol with respect to claims 1-6 of the ’912 patent.

379. In addition, a POSA would have had a reasonable expectation of success in developing a method wherein the reduction of one or more IBS symptoms comprises an

affirmative response from the subject when asked whether they had a reduction in symptoms. As previously discussed, it was well known in the art that the improvement or treatment of IBS symptoms was often determined through subjects' responses to questionnaires regarding those symptoms or based on affirmative open-ended questions. (*See generally, e.g.*, Pimentel 2006; Sharara; Jolley; Yang.) Moreover, a POSA would have had a reasonable expectation of success in developing such a method because affirmative responses from subjects were considered in the prior art to be a reliable measure of improvement in symptoms. (*Id.*)

380. For these reasons, it is my opinion that claim 7 of the '912 patent would have been obvious to a POSA over Pimentel 2006 in view of the RFIB 2001 Study Protocol.

h. **Alternatively, Claim 7 of the '912 Patent is Obvious Over Pimentel 2006 in View of the RFIB 2001 Study Protocol and Sharara**

381. Alternatively, in my opinion, claim 7 of the '912 patent would have been obvious to a POSA over Pimentel 2006 in view of the RFIB 2001 Study Protocol and Sharara.

382. As discussed above, claim 7 of the '912 patent depends from claim 1 and further recites "treating one or more symptoms of IBS comprises a reduction in symptoms defined by an affirmative response from the subject when asked whether they had a reduction in symptoms of IBS." ('912 patent at col. 46, ll. 28-31.)

i. *Pimentel 2006, the RFIB 2001 Study Protocol, and Sharara disclose each limitation of claim 7 of the '912 patent*

383. I incorporate by reference my discussion of Pimentel 2006 and the RFIB 2001 Study Protocol from above, including in regard to Section VIII.A.1.

384. Sharara discloses a study using rifaximin to treat patients with abdominal bloating and flatulence, including a female patient having a diagnosis of IBS. (Sharara at 326.) Sharara further discloses that:

> The study of the main efficacy variable was the subjective feeling of global symptom improvement as reported by the subjects on three occasions, once at the end of each phase in response to the following question: "Do you consider that your symptoms have improved since starting the study drug?"

(*Id.* at 328.)

*385.* Sharara teaches that a patient's "positive reply to the question was considered a positive response." (*Id.*)

ii. *A POSA would have been motivated to combine Pimentel 2006, the RFIB 2001 Study Protocol, and Sharara*

386. I incorporate by reference my discussion above regarding the motivation(s) to combine Pimentel 2006 and the RFIB 2001 Study Protocol with respect to claims 1-7 of the '912 patent.

387. Furthermore, a POSA would have been motivated to combine the teachings of Pimentel 2006, the RFIB 2001 Study Protocol, and Sharara to optimize the administration of rifaximin for the treatment of IBS symptoms in a female patient. Pimentel 2006 reports a global improvement in treating IBS symptoms. The RFIB 2001 Study Protocol involves administering rifaximin to obtain adequate relief of IBS symptoms. Sharara teaches a method of assessing "global [IBS] symptom improvement" by asking a patient whether their "symptoms have improved since starting the study drug[.]" (*Id.* at 328.) A POSA would have further known that a basic practice of medicine involves asking a patient whether she had relief of symptoms of a chronic condition, such as IBS.

388. Thus, a POSA would have been motivated to combine the teachings of Pimentel 2006, the RFIB 2001 Study Protocol, and Sharara to assess methods of obtaining a reduction of one or more IBS symptoms comprises an affirmative response from the subject when asked whether they had a reduction in symptoms.

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., AND BAUSCH HEALTH IRELAND LTD.<br>Plaintiffs,<br>v.<br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, AND AMNEAL EU, LIMITED,<br>Defendants. | Case No.: 1:24-cv-04607-JFM |
| SALIX PHARMACEUTICALS, INC., et al.,<br>Plaintiffs,<br>v.<br>NORWICH PHARMACEUTICALS INC.,<br>Defendant. | Case No.: 1:24-cv-07140-JFM |

**EXPERT REPORT OF ELI D. EHRENPREIS, M.D.**

October 22, 2025

Eli D. Ehrenpreis, M.D.

## VII. PERSON OF ORDINARY SKILL IN THE ART

24. I understand from Plaintiffs' counsel that a POSA is a hypothetical person presumed to have knowledge of all the relevant prior art at the time of the invention. I understand that my analysis in this report is to be conducted from the perspective of a POSA at the time of the inventions.

25. I understand from Plaintiffs' counsel that determining the level of skill a POSA would possess as of the priority date of the invention (here, February 26, 2008) may involve considering various factors including the type of problems encountered in the art, prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field.

26. I understand from counsel that Plaintiffs' expert Dr. David A. Johnson has opined that with respect to the '912 and '571 Patents, the POSA would have had either (i) a Ph.D. in pharmacology, microbiology, or a biological science or (ii) an M.D. with board certification in internal medicine or gastroenterology. I also understand that Dr. Johnson opines that the POSA would have had training in, experience with, or an ability to interpret gastrointestinal ("GI") disease research. I also understand that Dr. Johnson opines that to the extent needed, the POSA would have collaborated with others having ordinary skill in the areas pertinent to the subject matter of the asserted claims in the patents. I agree with Dr. Johnson's definition of a POSA.

27. The opinions I present in this expert report are pertinent to the knowledge and skill a POSA would have had or would have obtained by reviewing research in the field, caring for patients related to that field and collaborating with others in the field. Further, the opinions I present are pertinent to the knowledge that a POSA would have had about SIBO, rifaximin, and IBS or would have obtained by studying the medical literature and collaborating with others.

28. I understand that Dr. Harary has opined that a POSA would have a "medical degree with training in gastroenterology, or would have possessed a medical degree with a practice in family or internal medicine having experience in treatment of irritable bowel syndrome or small intestinal bacterial overgrowth," and would, "[t]o the extent necessary,…collaborate with one or more researchers in the fields of pharmaceutics or statistics."[3] Should the Court adopt Dr. Harary's proposed definition of a POSA, the opinions I offer below would not change.

## VIII. BACKGROUND

### A. IBS

29. Prevalent and disruptive, IBS is considered a "functional gastrointestinal disorder" or disorder of gut-brain interactions marked by alterations in bowel habit or discomfort and recurrent abdominal pain and other gastrointestinal symptoms.[4] No underlying biological marker for IBS exists.[5]

30. A specific clinical test for IBS also does not exist. Instead, the condition, especially as related to clinical trials, is established by meeting specific criteria.[6] Recognizing this issue, the Rome III committee on functional gastrointestinal disorders led by Dr. Douglas Drossman established criteria for the clinical diagnosis of IBS and IBS subtypes in 2006.[7] As of February 2008, the Rome III criteria reflected the consensus in the field for how to diagnose a patient who may have IBS. Using the Rome III criteria, the diagnosis of IBS is made as follows: recurrent abdominal pain or discomfort that onset 6 months prior to diagnosis, has been experienced at least 3 days per month within the last 3 months (12 weeks), and is associated with ≥2 of the following

---

[3] Harary Opening Rpt. at ¶ 61.
[4] XIFAX_AMN_1906263-79.
[5] *Id.*
[6] *Id.*
[7] *Id.*

criteria: (1) improvement with defecation; (2) onset associated with change in stool frequency; and (3) onset associated with change in stool form (appearance); (4) no indication of an underlying structural or biochemical cause for the symptoms.

31. Subtypes of IBS under the Rome III criteria include: (1) IBS with constipation (IBS-C); (2) IBS with diarrhea (IBS-D); (3) mixed IBS (IBS-M) in which patients experience hard or lumpy stools and loose or watery stools in at least 25% of bowel movements, respectively (along with other characteristic symptoms of IBS); and (4) unsubtyped IBS for patients whose stool frequency and consistency do not meet the other criteria.[8]




32. As of 2008, the underlying cause of IBS and particular subtypes of IBS, including IBS-D, was unknown, and those in the field proposed various possibilities.[9] Some suggested that IBS resulted from abnormal gut motility (movement) or disturbed processing and hypersensitivity of the gastrointestinal and central nervous systems.[10] Others suggested it resulted from

[8] *Id.*
[9] *Id.*
[10] XIFAX_AMN_0793571.

inflammation, infection, or alterations in bacteria lining the gut.[11] Dr. Pimentel hypothesized that SIBO was the underlying cause.[12]

**B. SIBO**

33. Although bacteria live in several sections of the digestive tract, the majority of normal intestinal bacteria are in the colon (the large intestine) with a much smaller amount of bacteria normally present in the small intestine.[13] For example, the concentration of bacteria in the normal jejunum (most of the upper small intestine) is up to 100,000 colony forming units (CFUs) per mL, while the colon harbors one hundred billion to 1 trillion bacterial CFUs per mL. Thus, the intestinal bacteria are up 10 million times more concentrated in the large intestine (colon) than most of the small intestine. This significant difference makes the normal small intestine substantially more sterile compared to the colon.

34. Important neuromuscular mechanisms that are involved in intestinal motility keep bacteria from colonizing the small intestine. The nerves and muscles of the small intestine regularly contract about 10 times per minute to move partially digested food and nutrients along the intestine toward the colon. Further, the normal small intestine uses a massive wave of contraction to sweep digested food particles and bacteria remaining in the small intestine to the colon. This contraction throughout the small intestine (known as the migrating motor complex (MMC), or "housekeeping wave") occurs every 1 1/2 to 2 hours. The MMC sweeps remaining particles and bacteria away from and prevents bacteria from growing within the small intestine. The functions of these muscular contractions, which are triggered by impulses in the nervous system of the small intestine, are known collectively as small intestinal motility.

---

[11] *Id.*
[12] XIFAX_AMN_0310640-43; XIFAX_AMN_0310652-59; XIFAX_AMN_0310644-51.
[13] XIFAX_AMN_0310902; XIFAX_AMN_1874266 at -272.

35. SIBO is a condition that occurs when bacteria establish their colonies and grow inside of the small intestine.[14] SIBO can occur from mechanical blockages of the small intestine that allow bacteria to grow in selected portions of the small intestine. Conditions that predispose individuals to SIBO include small intestinal diverticulosis, where pockets in the small intestine can harbor colonies of bacteria. Prior radiation therapy of the abdomen and Crohn's disease can also cause structuring (narrowing) in areas in the small intestine, where normal motility is slower and bacteria are blocked from moving toward the colon. Further, abdominal surgery and radiation therapy can cause fibrous bands (or adhesions) to form along the abdominal wall. When portions of the small intestine are blocked by these adhesions, the neuromuscular mechanisms become ineffective in moving bacteria away from the small intestine to the colon.

36. Some medical conditions can alter the effectiveness of the neuromuscular system of the small intestine, thus predisposing individuals to SIBO. For example, scleroderma, a type of autoimmune disease, can destroy components of the small intestinal muscles and decrease the concentration of intestinal nerves. Diabetes, known to cause peripheral nerve damage of the feet, legs and the eye, can also damage small intestinal nerves. Along with decreased local immunity within the small intestine to destroy small intestinal bacteria, these changes in the local nervous system in patients with longstanding diabetes may also cause SIBO.

37. Symptoms of SIBO are often inconsistent. Many of the signs and symptoms of SIBO occur when bacteria begin growing in the small intestine and compete for nutrients. Nutrients, including fats and carbohydrates, are primarily absorbed in the small intestine. When bacteria compete for nutrients in SIBO, typical signs and symptoms of nutrient malabsorption occur, including moderate to high volume diarrhea. Because of fat malabsorption, stools or fatty

[14] *Id*.

particles may float at the top of the toilet bowl. Weight loss is a common occurrence in malabsorptive conditions such as SIBO.

38. Due to competition for nutrients and interference with the normal complex processes involved with nutrient digestion and absorption that occur in the small intestine, patients with SIBO often develop nutrient deficiencies. These include decreased fat-soluble vitamins such as vitamins A, E, D, and K. Decreased absorption of Vitamin B12 as well as calcium, iron, and other nutrients may occur. Thus, patients with SIBO may exhibit signs and symptoms of vitamin deficiencies and nutrient malabsorption including weight loss, anemia, memory loss, osteoporosis, bone fractures, drying of the skin, hair loss, and many others. In severe cases, muscle wasting may occur.

39. Although early stages or mild cases of SIBO may include certain symptoms that are also found in IBS-D patients (such as diarrhea, bloating, and abdominal discomfort), the conditions are clearly different with different pathophysiology. Indeed, the very nature of SIBO causes a constellation of signs and symptoms, and it is these collective signs and symptoms in patients with the appropriate risk factors for SIBO, (not just the few that may also arise in IBS-D patients) that allow doctors to diagnose SIBO in patients at risk for the condition. Accordingly, as of February 26, 2008, a POSA would have, based on the very nature of SIBO, been skeptical that it could underlie a disorder like IBS. If it did, along with appropriate risk factors for SIBO, the constellation of signs and symptoms of SIBO—not just a few discrete symptoms—would have been associated with IBS.




*Diagram of Human Digestive System*

40. In 2008, to diagnose SIBO, researchers and doctors generally began with a medical history and physical examination to identify risk factors as well as typical signs and symptoms of the condition in a patient. The medical history would focus on the occurrence of conditions predisposing to the development of SIBO including prior abdominal surgery or radiation therapy, and medical conditions such as diabetes and scleroderma. Clinicians would examine patients for medications that decreased the effectiveness of intestinal motility, including the MMC, such as opioids and some antidepressant medications. Physical examination would also focus on discovering predisposing conditions for SIBO, as well as the secondary effects of vitamin deficiencies.

41. Although other tools and techniques were available in 2008, a POSA would generally rely on the occurrence of typical signs and symptoms of SIBO for diagnosis.[15] The proposed gold-standard technique for diagnosing SIBO was small bowel aspiration, in which a doctor collects cultures through a tube lowered into a patient's small intestine, or placed during

[15] XIFAX_AMN_1996672; XIFAX_AMN_1874266-72.

endoscopy.[16] However, in 2008, this was a complex technique that could be difficult to reliably perform outside of specialized centers because of potential contamination of the aspirated specimen from bacteria in the mouth. Furthermore, achieving accurate bacterial counts required special handing techniques to collect and measure anaerobic (non-oxygen consuming) bacteria—which account for as much as 95% of gastrointestinal flora— because they are destroyed when exposed to oxygen.

42. Seeking a less invasive method, some researchers and doctors resorted to breath tests that measured hydrogen gas levels in individuals at various times after consuming an absorbable sugar such as glucose or a nonabsorbable sugar such as lactulose.[17] Because large intestinal bacteria are the main producers of hydrogen gas in the body, in theory, the production of hydrogen gas after consumption of these sugars before their entry into the colon could become an indirect measure of the presence of SIBO.[18] These indirect measures, however, had their own reliability problems (as discussed further below).

43. Notably, Rome III did not recommend these techniques for diagnosing SIBO to identify when patients had IBS, or any particular IBS subtype. Nor did Rome III identify SIBO diagnosis as a criteria or factor that might contribute to an IBS diagnosis.

## IX. AS OF FEBRUARY 26, 2008, A POSA WOULD HAVE CONSIDERED ANY PURPORTED ASSOCIATION BETWEEN SIBO AND IBS UNPROVEN.

44. By 2008, a select few researchers (e.g., Dr. Pimentel and Dr. Ala Sharara) began advocating for antibiotics such as rifaximin as a possible treatment for IBS based upon a supposed

[16] *Id.*
[17] *Id.* I am familiar with these tests, having used them in various studies across my career. I have even taken certain tests myself as part of my efforts to design experimental protocols.
[18] *Id.*

association with SIBO.[19] At the outset, those in the field considered this hypothesis flawed. Even for those who theorized that bacteria may play *some* role in IBS, those bacteria were not thought to be in the small intestine (which, as discussed above, contains substantially less bacteria than the colon).

45. Further, as Dr. Drossman explained in his editorial critiquing Dr. Pimentel's 2006 study, the hypothesis that rifaximin might be "useful for treating IBS [was] based on certain assumptions:" (1) "the vast majority of patients with IBS (about 80%) have bacterial overgrowth as measured by the lactulose $H_2$ breath test;" and (2) rifaximin use could "lead to symptomatic benefit when bacterial overgrowth [was] present."[20] By 2008, experts in the field extensively critiqued each of these assumptions.[21] In my opinion, that extensive criticism from highly respected thought leaders in the field (including Dr. Drossman) demonstrates that a POSA, as of February 26, 2008, would have considered any purported association between SIBO and IBS unproven, and would have been skeptical of rifaximin's usefulness in treating IBS-D based on SIBO studies. Upon reviewing the methodology of the 2000 Pimentel study that purportedly linked IBS and SIBO, a POSA would have recognized multiple and obvious flaws that negated the "findings" of the study. A POSA thus would have questioned the association with SIBO advocated by Dr. Pimentel.

### A. A POSA would have been skeptical that the vast majority of IBS patients have bacterial overgrowth.

46. In my opinion, a POSA as of February 26, 2008 would have been skeptical that the vast majority of IBS patients have bacterial overgrowth. As discussed below, researchers in the

---

[19] XIFAX_AMN_0310640-43; XIFAX_AMN_0310652-59; XIFAX_AMN_0310644-51; AMN-RFXMN_00036997-7004.
[20] XIFAX_AMN_0887874-75.
[21] *Id.*; XIFAX_AMN_1874266-72.

field recognized (1) the initial study suggesting that the vast majority of IBS patients have bacterial overgrowth was methodologically flawed; (2) respected thought leaders widely criticized the accuracy of breath tests for measuring SIBO; and (3) other researchers reported contradictory results. When I initially reviewed Dr. Pimentel's 2006 publication shortly after it was published, I also concluded the study contained questionable statistical analyses that essentially negated the study's supposed findings. Further, a POSA involved with the treatment of patients with SIBO would understand that, by definition, the diagnosis of SIBO was generally a clinical one based on appropriate symptoms occurring in a patient at risk for SIBO as outlined above.

**1. The field recognized that the initial study suggesting that IBS Patients have SIBO had serious design flaws.**

47. The concept that SIBO underlies IBS emerged from a 2000 study by Dr. Pimentel titled "Eradication of Small Intestinal Bacterial Overgrowth Reduces Symptoms of Irritable Bowel Syndrome" ("*Pimentel 2000*").[22] The study assessed bacterial overgrowth and antibiotic treatment in patients meeting the Rome I criteria for IBS through lactulose breath testing.[23] Reporting that "157 (78%)" of patients "had overgrowth," and "[t]wenty-five of 47 follow-up subjects had eradication of small intestinal bacterial overgrowth," Dr. Pimentel concluded that "subjects with IBS appear to have a high prevalence of SIBO" and "eradication of SIBO improves the gastrointestinal symptoms of IBS."[24] Others in the field, however, extensively critiqued and dismissed these conclusions because of serious design flaws in the study.[25]

48. *First*, *Pimentel 2000* only used patients referred to the GI Motility Program at the Cedars-Sinai Medical Center research group specifically for lactulose breath testing, thereby

[22] XIFAX_AMN_0310640-43.
[23] *Id*. at -640.
[24] *Id*. at -640, -642.
[25] XIFAX_AMN_0887874-76; XIFAX_AMN_1874266-72; XIFAX_AMN_1996648; XIFAX_AMN_1874117.

introducing substantial "selection bias" into the study.[26] *Pimentel 2000* never explained why these patients were referred to the medical center.[27] Did doctors already suspect these patients had SIBO? Again, *Pimentel 2000* provided no explanation.[28] Instead, it simply noted "all patients" were referred and "given a questionnaire" that "involved rating Rome I IBS symptoms including bloating, diarrhea, abdominal pain, defecation relief, passage of mucous, sensation of incomplete evacuation, straining, and urgency on a scale ranging from 0 to 5, with 0 representing absence of the symptom."[29] This form of data acquisition from a group of patients referred for lactulose breath testing is "selection bias," and a POSA would understand it shows the study was glaringly flawed. Because the sample population included only those referred to the clinic for lactulose breath testing, it was not representative of the general IBS population.[30] Indeed, others in the field concluded that *Pimentel 2000's* results could not "be generalized to all patients with IBS."[31]

49. This would be especially true as of 2008, when the Rome III criteria—not the Rome I criteria—reflected the consensus view regarding diagnosing IBS and IBS-D patients. A POSA would have understood that not all patients meeting the Rome I criteria would meet the further-refined Rome III criteria. A POSA would have further understood that diagnoses according to the Rome I criteria (which did not sub-type patients), would not necessarily mean that any patient with IBS had IBS-D. Accordingly, a POSA would have understood *Pimentel 2000* would not necessarily apply to IBS patients or IBS-D patients, as those groups were understood as of 2008.

[26] XIFAX_AMN_1996648.
[27] XIFAX_AMN_0310640-43.
[28] *Id*.
[29] *Id*. at -640.
[30] *Id*.
[31] XIFAX_AMN_1996648.

50. Further, a POSA at the time would have understood that *Pimentel 2000* used inappropriately low cutoffs to diagnose SIBO based on the lactulose breath test—cutoffs that were so low they had previously been shown to commonly occur in normal subjects. As a result, the "abnormal" results *Pimentel 2000* reports were actually normal for many subjects within the study's so-called "SIBO" group. As one example, I co-authored a study with the Colorectal Surgery Department at Cleveland Clinic Florida published in 1994 that assessed lactulose breath tests on 42 healthy "control" subjects to study the use of the test to measure motility in patients with constipation.[32] Shown below is an exemplary comparison between the lactulose breath tests in two of these control subjects used as illustrations in the 1994 study and one subject from *Pimentel 2000*. Both healthy control subjects exhibited greater than 20 ppm hydrogen within 90 minutes of lactulose ingestion, which *Pimentel 2000* would have diagnosed as "SIBO" patients.




*Pimentel 2000 SIBO definition: ≥20 ppm hydrogen rise within 90 minutes after lactulose ingestion*

[32] XIFAX_AMN_1996612.

In fact, both healthy control subjects not only reached *Pimentel 2000's* 20 ppm cutoff by 90 minutes, they reached ***twice*** the *Pimentel 2000* cutoff (40 ppm).

51. This example illustrates the unreliability of *Pimentel 2000's* methodology, as well as the reliability problems associated with trying to use a test like lactulose breath testing (which had been developed primarily to measure the motility of the intestine-called the oral cecal transit time) as the sole means to define "SIBO" patients. Using Dr. Pimentel's unreliable lactulose breath testing methodology, the control subjects would have been defined as "SIBO" patients, even though a routine medical history and physical examination would have quickly demonstrated otherwise.

52. *Second*, as Dr. Michael Jones noted in his editorial comment critiquing *Pimentel 2000*, the study "ignored the important caveat that [IBS] 'diagnosis always presumes the absence of a structural or biochemical explanation for the symptoms'" and instead assumed that positive lactulose breath tests meant SIBO caused IBS symptoms in these individuals.[33] By "retrospectively applying a [SIBO] diagnostic template to a group of subjects referred for breath hydrogen testing," Dr. Pimentel "introduc[ed] dangerous bias into the study."[34] According to Dr. Jones, "[t]he application of these same criteria would allow us to conclude that IBS is in turn caused by Crohn's ileitis, giardiasis, celiac sprue, lactose intolerance, and Zollinger-Ellison syndrome, just to name a few applicable disorders."[35] Thus, although the results *could* indicate that "small bowel bacterial overgrowth can present as an IBS-like picture," they could *not* "by the very definition of functional disorders" be the "cause."[36]

---

[33] XIFAX_AMN_1874117.
[34] *Id.*
[35] *Id.*
[36] *Id.*

53. *Third*, *Pimentel 2000* included no placebo control group and did not blind participants as to what drug they received.[37] Because "patients have high expectations for benefit when antibiotics are prescribed," experts recognized that experiments including such drugs are "difficult" to perform and required control groups and adequate blinding before researchers could draw conclusions about the drug's effectiveness.[38] Further, IBS itself "is a common disorder with a recognized high placebo response rate."[39] Thus, since *Pimentel 2000* did not include adequate control groups and blinding, it was impossible to know whether its results were because of the antibiotic or a placebo effect. And a POSA would understand that Pimentel's multiple parsing of groups within the study risked over-interpretation of statistical data analysis.

54. Given *Pimentel 2000's* serious design flaws, a POSA would have been skeptical that the vast majority of IBS patients have SIBO based on this study.

**2. Researchers and doctors as of February 26, 2008 questioned the accuracy of lactulose breath tests for measuring SIBO.**

55. A POSA as of February 26, 2008 would also have been skeptical that the vast majority of IBS patients have bacterial overgrowth because researchers and doctors questioned the accuracy of the lactulose breath tests used to identify SIBO.

56. Although simpler to perform than small bowel aspiration, hydrogen breath tests lacked standardization.[40] As one researcher noted in 2005, "[t]he lack of generally accepted definitions raise[d] a situation where you [could] almost choose the test and definition that best suit[ed] your purpose."[41] Indeed, "[i]t [was] not uncommon to see the same authors change their

[37] XIFAX_AMN_0310640-43.
[38] XIFAX_AMN_0887874 at -875.
[39] XIFAX_AMN_1874266 at -271.
[40] XIFAX_AMN_1996672.
[41] *Id*.

definitions of a positive test in different papers."[42] For example, *Pimentel 2000* defined a positive test as "two distinct peaks (trough after the first peak > 5 [parts per million (ppm)] and some decrease from the peak at two or more points), production of hydrogen in under 90 min from ingestion of lactulose, and an increase in hydrogen concentration of >20 ppm."[43] For this "double-peak" criterion, "[t]he initial peak is thought to result from fermentation of the initial bolus of lactulose in the region of SIBO and the second peak from the arrival of the residual lactulose in the cecum."[44] As written, these criteria indicate meeting any one of these three cutoffs would justify a SIBO diagnosis. The graphs showing average values for the pre- and post-treatment groups shown in the article confirm that *Pimentel 2000* applied them in that manner: no double or dual peak is noted. The fact that three *different* criteria were used individually to make the diagnosis of "SIBO" demonstrates the unreliability of this testing method. Further, other than the dual peak criterion, *Pimentel 2000's* other criteria use cutoffs that include normal subjects and may vary depending on changes in motility. Indeed, clinical experience with lactulose hydrogen breath tests has shown that double peaks are quite rare, further indicating that Dr. Pimentel's use of the other two criteria to define "SIBO" likely captured normal patients.

57. In subsequent studies from Dr. Pimentel, including a 2003 paper titled "Normalization of lactulose breath testing correlates with symptom improvement in irritable bowel syndrome: a double-blind, randomized, placebo-controlled study," ("*Pimentel 2003*"), Pimentel accepted either "a rise in [hydrogen gas] before 90 min (>20 ppm . . .) and/or an absolute rise from baseline of 20 ppm by 180 min" to indicate SIBO.[45] As shown in the graph above, control subjects

---

[42] *Id*.
[43] XIFAX_AMN_1874281-85; XIFAX_AMN_0310640 at -641.
[44] XIFAX_AMN_1874266-72.
[45] *Id*.; XIFAX_AMN_0310644-51.

in my 1994 study met both of these criteria. And in *Pimentel 2006*, Dr. Pimentel and his colleagues never published or presented the results of lactulose breath testing collected on each subject as part of the study.[46] Because of differences in criteria for positive test results in the earlier studies and the complete lack of published results in *Pimentel 2006*, a POSA would even have had difficulty comparing lactulose breath test results across Dr. Pimentel's papers.

58. Moreover, a POSA would have recognized, "transit time" or the time it takes for lactulose to move through an individual's digestive system, further complicated interpretation of lactulose breath tests, especially with variable criteria for SIBO proposed by Pimentel and colleagues."[47] As one researcher noted, the lactulose breath test "was first proposed as a means of diagnosing [mouth to cecum (the beginning of the large intestine)] transit time, using the sharp rise in [hydrogen] levels as an indication that the lactulose had reach the fermenting" bacteria in the cecum.[48] Using small bowel aspiration to confirm their results, researchers found transit time for healthy individuals was "dose dependent" with a "wide range in times, from 25 to 118 min" and a "mean of 72 min."[49] Furthermore, "a number of reviews" at the time noted that "several studies show[ed] that up to 50% of asymptomatic individuals have a rise in [hydrogen] by 90 min."[50] Therefore, using *Pimentel 2003's* criteria for a positive test result, "50% of healthy controls would be expected to suffer from SIBO."[51]

59. Thus, as one researcher noted, "without a clear second peak in the lactulose breath test, it [was] impossible to distinguish SIBO from colonic fermentation, often caused by rapid

---

[46] XIFAX_AMN_0310652-59.
[47] XIFAX_AMN_1874266-72.
[48] *Id*. at -268.
[49] *Id*.
[50] *Id*.
[51] XIFAX_AMN_1996672 at -676.

transit," especially considering "lactulose itself accelerates small bowel transit."[52] As mentioned above, this finding of a double peak, even in subjects who likely have SIBO, is a rare finding on lactulose breath hydrogen testing. But "not even detection of two easily distinguishable hydrogen peaks [was] a safe criterion" because "it ha[d] been shown in transit studies that [lactulose] can reach the caecum, imitating the first peak…yielding false positive lactulose tests."[53] Because of variation in transit times and the difficulties in assessing whether bacteria in the small or large intestine caused a given rise in hydrogen levels, it was "not surprising that the sensitivity and specificity of the lactulose hydrogen breath test in detecting SIBO ha[d] been reported to be only 68% and 44%."[54]

60. The lack of sensitivity and specificity of lactulose breath tests for SIBO even led one researcher to conclude that these tests "cannot reliably be used to assess for eradication of SIBO after treatment with antibiotics, as any reduction in breath hydrogen levels may merely reflect a suppressive effect of the antibiotics" on large intestinal bacteria.[55] As noted above, the bacteria in the large intestine (the colon) are up to 10 million times more concentrated than the majority of the small intestine. Accordingly, a POSA would have understood that decreased hydrogen production after antibiotic administration merely indicates suppression of hydrogen producing bacteria in the colon, and not likely to be suppression in the small intestine. Because of the limited sensitivity and specificity of lactulose breath tests in measuring SIBO and the inherent difficulties in interpreting their results, a POSA as of February 26, 2008 would have been skeptical that the vast majority of IBS patients have bacterial overgrowth as measured by these tests.

---

[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] XIFAX_AMN_1996655.

**3. Even assuming breath tests accurately diagnosed bacterial overgrowth, conflicting results for such overgrowth in IBS patients existed.**

61. Even assuming that lactulose breath tests could measure bacterial overgrowth in IBS individuals, a POSA as of February 26, 2008 would have been skeptical that the vast majority of IBS patients had SIBO because of conflicting results found by others. As stated above, SIBO is generally recognized as a clinical condition occurring in high-risk patients such as those with mechanical or motility causes of bacterial overgrowth.

62. Employing the same breath tests and criteria as *Pimentel 2000* and *Pimentel 2003*, two IBS researchers assessed detection of bacterial overgrowth in thirty-nine IBS and twenty control patients.[56] The "IBS patients were predominately female (64%) and most reported severe symptoms (80%)" with majority of patients having "diarrhea predominant symptoms (63%)."[57] After performing two series of tests, the researchers found "only 10% of patients had a positive lactulose breath test" in the first series and "no differences…between IBS patients and controls" in the second.[58] Given these results, the experts concluded that they "failed to detect a significant association between SIBO and IBS."[59]

63. Further, in 2007, other IBS researchers expanded upon the results previously seen related to IBS and SIBO by directly measuring bacteria in the small intestine through small-bowel aspirates.[60] Collecting small bowel cultures from one-hundred and sixty-two patients with IBS and twenty controls, the researchers found that "[m]ildly increased bacterial counts were more common in patients with IBS" but "no correlation between bacterial alterations and symptom

---

[56] XIFAX_AMN_1874281-85.
[57] *Id*. at -281.
[58] *Id*.
[59] *Id*. at -285.
[60] XIFAX_AMN_1996648.

pattern" existed.[61] They, therefore, concluded that their results did "not support a strong association between IBS and SIBO according to the standard definition."[62]

64. Given the contrary results found by others, the limited accuracy of lactulose breath tests, and the serious design flaws in the initial study purporting a connection between IBS and SIBO, a POSA as of February 26, 2008 would have been skeptical of an association between SIBO and IBS. Indeed, one IBS expert even concluded in 2007 that "it appear[ed] that" such "shortcomings" had "contributed greatly to the overgrowth iceberg in IBS whereas in reality it [was], for the most part, no more than a mirage."[63] Therefore, because of these limitations, a POSA as of February 26, 2008 would have considered any purported association between SIBO and IBS unproven.

**B. A POSA as of February 26, 2008 would have been skeptical that rifaximin could produce symptomatic benefits in IBS patients.**

65. Along with considering any purported association between SIBO and IBS unproven, a POSA as of February 26, 2008 would have been skeptical that rifaximin could lead to symptomatic benefit in IBS patients. Though some had explored the idea that gut flora **(**in the colon) could contribute to the occurrence and pathophysiology of IBS, as of 2008, no studies investigating the long term effects of antibiotic use in IBS patients existed.[64] Moreover, several doctors and researchers found the results supporting antibiotic use in IBS inconclusive and insufficient to overcome the possible dangers of long-term treatment with antibiotics.[65] Because of the lack of long term studies, the inconclusiveness of results purportedly supporting rifaximin use in IBS patients, and the potential risks of long term antibiotic use in a recurring disorder like

[61] *Id.*
[62] *Id.*
[63] XIFAX_AMN_0936198 at -204.
[64] XIFAX_AMN_1874266-72.
[65] *Id.*; XIFAX_AMN_0887874-76; XIFAX_AMN_0936198-211.

IBS, a POSA as of February 26, 2008 would have been skeptical that rifaximin could lead to symptomatic benefit in IBS patients.

**1. As of February 26, 2008, no studies investigated the long-term effects of rifaximin use and results purporting short-term benefits for rifaximin in IBS patients were inconclusive.**

66. The studies by Dr. Pimentel and Dr. Sharara only assessed short term effects, and no long term studies of rifaximin existed as of February 26, 2008.[66] Indeed, as one researcher noted, "the longest study of antibiotic therapy ha[d] not extended beyond 10 weeks."[67] Because any "[t]reatment for IBS is likely to be long-term" given its chronic, relapsing nature, a POSA as of February 26, 2008 would have been cautious of results purporting benefits of rifaximin use in IBS patients absent long-term studies.[68]

67. Moreover, several experts found the results supporting rifaximin use in IBS patients inconclusive and unconvincing.[69] For example, in his editorial comment to *Pimentel 2006*, Dr. Drossman noted many limitations that "mad[e] the [study's] findings inconclusive and raise[d] questions about the clinical significance of the results."[70] *First*, the primary outcome of "the percentage of improvement in IBS global scores of all patients" used to assess effectiveness of rifaximin was "unique in the spectrum of IBS trials in the last decade and ma[de] comparison with other trials difficult."[71] *Second*, "responders [were] not clearly defined a priori in Pimentel and colleagues' analysis," thereby rendering "the clinical significance of the proportion of response…unclear."[72] *Third*, unlike most clinical trials, *Pimentel 2006* provided no "statistical

---

[66] XIFAX_AMN_1874266-72.
[67] XIFAX_AMN_1874262-65.
[68] XFIAX_AMN_1874121.
[69] XIFAX_AMN_0936198-211; XIFAX_AMN_0887874-76.
[70] XIFAX_AMN_0887874-76.
[71] *Id*. at -874.
[72] *Id*.

data on treatment difference between groups by week," and, therefore, "[w]hether the averaged 36.4% response rate [seen was] clinically meaningful relative to the placebo response rate of 21.0% [was] unclear" according to Dr. Drossman.[73] *Fourth*, the "imbalance in baseline pain scores" with "higher baseline scores in the rifaximin group" in *Pimentel 2006* "favor[ed] the reduction in the global measure with rifaximin."[74] *Fifth*, as Dr. Drossman noted, "Pimentel and colleagues' primary analysis (mixed models)" of the study results was "not conventional for a primary determination of effectiveness."[75] While "[u]sually one evaluates the effectiveness of an intervention at a given prespecified time point," *Pimentel 2006's* mixed modeling approach "allow[ed] restructuring of the data set to use several observations for each patient."[76] "[T]his approach," as Dr. Drossman noted, "minimizes the effect of dropouts and differs from a typical intention-to-treat analysis, where the values for the dropouts are usually imputed with a best worse-case scenario, thus providing limits to the effectiveness of the intervention."[77] Therefore, "how the results would have fared in a more standard intention-to-treat analysis with a defined end point and adjustments for dropouts [was] unclear."[78] Because of these limitations, the results were "inconclusive and raise[d] questions about the clinical significance."[79]

68. Importantly, Dr. Drossman had been well-recognized in the field as a foundational leader and pioneer of IBS research and clinical practice. By 2008, Dr Drossman was the founder, chairman of the Functional Brain-Gut Research Group of the American Gastroenterologic Association, Chairman of the Rome Committees (Rome I, II, and III) and President of the Board

---

[73] *Id*.
[74] *Id*.
[75] *Id*.
[76] *Id*.
[77] *Id*.
[78] *Id*. at -876-877.
[79] *Id*. at -875.

of the Rome Foundation. Additionally, as Dr. Quigley noted in his 2007 review titled "Bacteria: A new player in GI Motility Disorders—Infections, Bacterial Overgrowth, and Probiotics," *Pimentel 2006's* "results [were] far less impressive than one was led to expect from the initial studies" and "cast[ed] further doubt on the importance of bacterial overgrowth in IBS."[80] Results by Dr. Sharara supporting *Pimentel 2006's* findings did not assuage Dr. Quigley's doubts as these results were "far from overwhelming and the duration of the study was exceedingly short in a condition that is notoriously chronic and remittent."[81] Like Dr. Drossman and Dr. Quigley, my colleagues and I were skeptical of *Pimentel 2006's* results when it initially published.

69. In addition to the methodological critiques noted above, a POSA would have cause for concern regarding the publication (or lack thereof) of certain data associated with *Pimentel 2006*. The study was not recorded on ClinicalTrials.gov until after it was conducted, which is contrary to best practices. Ordinarily, studies are recorded on ClinicalTrials.gov before they are conducted, such that *post-hoc* changes to a study's intent, protocol, outcome measures, or statistical methods would be readily apparent, and those in the field could consider and account for resulting biases. For the *Pimentel 2006* study, the full title—but not the outcomes—reference SIBO ("Rifaximin in the Treatment of Small Intestinal Bacterial Overgrowth and IBS: Double Blind Randomized Controlled Trial (Multicenter Trial)").[82] Further, despite lactulose breath tests being performed as part of the 2006 study, the data was never presented at a national meeting or published in the study's manuscript. As a result, a POSA would have been concerned that the intention behind *Pimentel 2006's* study and its data analysis may have changed between when the study was originally designed and conducted and when it was ultimately recorded on

[80] XIFAX_AMN_0936198 at -205.
[81] *Id*. at -204.
[82] XIFAX_AMN_1996704.

ClinicalTrials.gov and published. Such *post-hoc* changes to a study's intent and data analysis can introduce problematic biases that negate supposed findings.

70. Further, for many researchers and doctors in the field, the purported benefit of rifaximin use in IBS patients did not outweigh the risks of long-term antibiotic use as of 2008.[83] For example, in a 2008 review titled "The small intestinal bacterial overgrowth. Irritable bowel syndrome hypothesis: implications for treatment," Dr. Vanner noted that "[a]though the favorable short-term safety profile of newer non-absorbable antibiotics, such as rifaximin, may make the use of antibiotics in IBS more attractive, enthusiasm should be tempered by several considerations."[84] Like other experts discussed above, Vanner noted "no long-term studies with antibiotics in IBS" existed, and "less [was] known about the safety of these antibiotics long term."[85] Further, "IBS is a common disorder with a recognized high placebo response rate, and studies show[ed] that the effects of antibiotics on measurable outcomes [were] short lived."[86] Importantly, as Dr. Vanner noted, "[t]here [were] also indirect studies which imply that antibiotics could play a role in the pathogenesis of IBS."[87] Indeed, "[a] study in a general practice setting found that prior antibiotic use strongly correlated with patients having the symptoms of IBS."[88] Moreover, "it ha[d] also been shown that the use of antibiotics is related to increased reporting of functional bowel symptoms," and "[i]n an animal model, the use of non-absorbable antibiotics was shown to induce low level colonic inflammation and visceral hypersensitivity."[89] "[G]iven that antibiotics suppress bacteria in the small and large bowel," these studies," as Dr. Vanner noted, "highlight the potential

[83] XIFAX_AMN_1874266-72.
[84] *Id*. at -271.
[85] *Id*.
[86] *Id*.
[87] *Id*.
[88] *Id*.
[89] *Id*.

for antibiotic use to have detrimental effects, particularly with continuous repeated courses."[90] Therefore, considering "the absence of reasonable proof for the SIBO-IBS hypothesis [as of 2008] and the concerns about antibiotic use, it [was] difficult to recommend antibiotic treatment for IBS" according to Dr. Vanner.[91]

71. Because of the lack of long-term studies, the inconclusive and unconvincing nature of the results purporting benefits for rifaximin use in IBS patients, and the possible dangers of long-term antibiotic use, a POSA as of February 26, 2008 would have been skeptical that rifaximin could lead to symptomatic benefit in IBS patients.

### C. Response to Dr. Harary's References Relating to SIBO

72. Throughout his report, Dr. Harary cites and discusses certain references relating to SIBO, each of which I address below. These references do not change my opinions regarding how a POSA would, as of February 26, 2008, have viewed SIBO as it could potentially relate to IBS or IBS-D. Dr. Quigley's and Dr. Vanner's critiques are illustrative of how, even after additional references relating to SIBO were published, the field remained steadfastly skeptical of Dr. Pimentel's SIBO hypothesis. An important proof of the validity of the *Pimentel 2000* study would be repetition of its results by an independent investigator. To my knowledge, this never occurred.

73. ***Di Stefano***.[92] *Di Stefano* reports results from a study of twenty-six patients diagnosed with SIBO according to one of four alternative criteria, two of which involved glucose breath tests.[93] One of the breath test criterion used ("an increase in breath $H_2$ excretion >12 parts per million in the fasting state") was "positive in only 14 out of 26 patients."[94] This refers to an

---

[90] *Id.*
[91] *Id.*
[92] *See, e.g.*, Harary Opening Rpt. ¶¶ 79-81.
[93] NORWICH_NJ_INV_000028-33 at -29.
[94] *Id.* at -29, -30.

elevated resting breath hydrogen level. However, an elevated fasting breath hydrogen level is also seen in study subjects and may reflect recent ingestion of fiber with ongoing metabolism of these in the colon. *Di Stefano* uses a non-standardized four-level score method to measure symptom severity. There is no mention in *Di Stefano* of any alleged link between SIBO and IBS or IBS-D. *Di Stefano* thus would not be understood by a POSA as supporting any alleged link between SIBO and IBS or IBS-D. If anything, the disconnect between the SIBO diagnosis for almost half of study participants and one of its breath test criterion would indicate to a POSA that breath test methodologies lacked accuracy.

74. ***Lin Patents***.[95] Dr. Harary discusses four United States patents that list Dr. Pimentel and Dr. Henry Lin as co-inventors (Lin '053, Lin '240, Lin '608, and Lin '857). Each of these patents lists a claim for priority back to the patent application that issued as U.S. Patent No. 6,861,053 (Appl. No. 09/374,142, filed on August 11, 1999), and share substantially the same specification. Three of these patents (Lin '857, Lin '240, and Lin '608) issued in November 2008 or later, and thus would not have been available to a POSA as of February 26, 2008. The specification describes the same study population of 202 subjects as *Pimentel 2000,*[96] and a POSA would understand that the scientific work underlying these patents stems from the same flawed study reported in *Pimentel 2000*. Accordingly, a POSA would not find the *Lin Patents* to be materially different or additional support for Dr. Pimentel's SIBO hypothesis.

[95] *See, e.g.*, Harary Opening Rpt. ¶¶ 87-109.
[96] *See, e.g.*, Lin '053 at Example 3 ("The two hundred-two (202) human subjects were assessed for SIBO with LBHT.").

75. Dr. Harary also mentions the Orange Book listings of these patents.[97] All the Orange Book listings he identifies appear to be published well after 2008.[98] Thus, these listings would not have been known or available to a POSA in 2008. Even if they were, Salix's Orange Book listing would not change the fact that the underlying scientific work for those patents was flawed. A POSA therefore would not find the Orange Book listings to provide additional support for Dr. Pimentel's SIBO hypothesis.

76. ***Lin 2006***.[99] *Lin 2006* is a publication of a patent application that lists Dr. Lin as the inventor. It references Dr. Lin's prior work relating to SIBO in an attempt to further connect hydrogen sulfide associated with SIBO to mild cognitive impairment (Example 2) and restless leg syndrome (Example 8).[100] It does not provide new data or support for the original SIBO – IBS hypothesis, and a POSA would not find *Lin 2006* to be different or to give additional support for Dr. Pimentel's SIBO hypothesis. If anything, the fact that *Lin 2006* asserted that hydrogen sulfide associated with SIBO was "relate[d] to or . . . modulated" a long list of diseases and conditions ranging from, for example, "chronic renal failure" to "preeclampsia" to "glaucoma" to "ADHD" to "Down's syndrome" would suggest that Dr. Lin's assertions were not supported by scientific evidence but instead, he was "casting a wide net" of conditions to bolster the value of his patent.[101]

77. ***Cuoco***.[102] *Cuoco* repeats many of the methodological flaws present in *Pimentel*. First, this was a retrospective study analyzing already-collected data, which poses a significant

---

[97] *See, e.g.*¸ Harary Opening Rpt. ¶¶ 89-90, 93, 98.
[98] XIFAX_AMN_0187724-26 at -726 (form for Lin '857 dated August 1, 2017); XIFAX_AMN_0187733-35; XIFAX_AMN_0380638-40; XIFAX_AMN_1889226-33; XIFAX_AMN_0187727-29.
[99] *See, e.g.*, Harary Opening Rpt. ¶¶ 212-215.
[100] *See, e.g.*, AMN-RFXMN_00037203-267 at -229-240.
[101] *See, e.g.*, AMN-RFXMN_00037203 at -214-216.
[102] *See, e.g.*, Harary Opening Rpt. ¶¶ 141-144.

problem when considering conditions like IBS, where diagnostic criteria defining which subjects are experiencing that condition is critical to interpreting results. Although the Rome criteria were standard for drug trials by this point, *Cuoco* did not confirm whether the patients referred for breath tests actually met the Rome criteria for IBS. Rather, "*Cuoco* reports that "the glucose H2 breath test was performed in 96 patients" who had been seen in a single gastroenterology unit and had "a previous diagnosis of IBS formulated on the basis of symptoms"—"not based on Rome II clinical criteria alone."[103] These patients had been diagnosed by their clinicians because they had symptoms of abdominal pain, irregular bowel movements or diarrhea, and/or meteorism (a nonspecific term for intestinal gas).[104] In addition, 21 patients (22%) of the patients with "IBS" had risk factors for SIBO.[105] *Cuoco* does not report IBS-subtype for study subjects. *Cuoco* reports lower SIBO prevalence among these patients than *Pimentel 2000*—"47% with a glucose breath test," which it hypothesizes is due to differences in the testing.[106] Like *Pimentel 2000*, *Cuoco* simply assumes that positive breath tests meant SIBO caused IBS symptoms in these individuals.[107] Furthermore, *Cuoco's* cutoff for abnormal breath (10 ppm higher than baseline) was more liberal than the typical cutoff (12 ppm),[108] suggesting that subjects were over-diagnosed with SIBO. In addition, *Cuoco* used a non-standardized four-level score method to measure symptom severity.[109] Furthermore, *Cuoco* does not separate the "responders" to rifaximin into those with risk factors for SIBO and those without risk factors for IBS. As noted previously, the overall decrease in hydrogen production noted in the study may well reflect a change in hydrogen

[103] XIFAX_AMN_0690728 at -730, -733.
[104] *Id.* at -730.
[105] *Id.* at -731.
[106] *Id.* at -733.
[107] *See id.* at -734.
[108] *Compare id.* at -731, *with* XIFAX_AMN_1996602.
[109] *Id.*

by colonic bacteria not small intestinal bacteria. Finally, in the *Cuoco* study, the subjects' diet was only modified for one day prior to study. Any consumed fiber in the diet from the previous 24-72 hours could influence the occurrence of hydrogen production in the colon.

78. *Cuoco* notes that the symptom overlap is not unique to SIBO and IBS, but rather can be seen "also in patients affected by other clinical disorders such as allergies and food intolerances, or forms of celiac disease with few symptoms)," which it describes as "forming an aspecific picture."[110] *Cuoco* also notes that "[d]iagnosis of IBS is based on the recognition of the positive clinical aspects described in the Rome criteria that represent the most reliable diagnostic instrument for detecting IBS, but also on the meticulous exclusion of many other disorders with similar clinical manifestations."[111] Based on the similar methodological flaws to *Pimentel 2000* and other aforementioned problems with this study, *Cuoco's* confirmation that symptom overlap occurs with a variety disorders, and that the Rome criteria represent "the most reliable diagnostic instrument for detecting IBS," a POSA would not understand *Cuoco* to support, much less establish, any causal link between SIBO and IBS or IBS-D.[112]

79. ***Weinstock 2007***.[113] *Weinstock 2007* also repeats many of the methodological flaws present in *Pimentel 2000*. *Weinstock 2007* is an article by Dr. Lin and two others describing analysis of 21 patients with interstitial cystitis (IC) and gastrointestinal symptoms that had been referred to their gastroenterology practice.[114] *Weinstock 2007* reports an "abnormal LBT result" (lactulose breath test) in 17 of these patients, only fifteen of which received a course of

---

[110] *Id.* at -733.
[111] *Id.* at -730.
[112] *Id.*
[113] *See, e.g.*, Harary Opening Rpt. ¶¶ 157-161.
[114] XIFAX_AMN_0311025-26.

rifaximin.[115] *Weinstock 2007* starts the study in patients with functional bowel symptoms, but does so after the lactulose breath tests were performed. It reports that "17 of 21 patients met Rome II criteria for IBS," 14 of which had "an abnormal LBT result."[116] This retrospective identification to form a "patient group" was likewise used in the flawed *Pimentel 2000* study. Put simply, the study pertains to a group of patients with restless leg syndrome, whose doctors referred for a lactulose breath test, who had a "positive breath test" based on flawed criteria for "positive or abnormal," who then met Rome II criteria for IBS. A POSA would understand that it does not pertain to a group of patients with IBS in the general population.

80. *Weinstock 2007* does not report IBS subtypes for patients, nor does it describe any placebo controls or blinding. Like *Pimentel 2000*, *Weinstock 2007* simply assumes that positive breath tests meant SIBO caused GI symptoms in these individuals, including those with IBS. The defined criteria for an abnormal lactulose hydrogen breath test in this study was "a rise in hydrogen and/or methane concentration of more than 20 ppm above baseline during the 180-min breath test or a flat-line hydrogen profile with a rise of no more than 5 ppm of hydrogen over baseline for 180 min and absence of methane excretion,"[117] which has been shown to occur in many normal individuals (as previously noted).

81. *Weinstock 2007* describes itself as "provid[ing] preliminary data to support the hypothesis that SIBO may be associated with IC."[118] It also states that "[a]s this observational study used open-label treatment and a generalized, non-validated questionnaire, confirmation of these results with a randomized, double-blind, placebo-controlled trial is necessary."[119] Given the

[115] *Id.* at -026-028.
[116] *Id.* at -027.
[117] *Id.* at -026.
[118] *Id.* at -029.
[119] *Id.* at -028.

continuing methodological flaws and these comments, a POSA would understand *Weinstock 2007* as providing, at most, anecdotal evidence similar to that of *Pimentel 2000*. That Dr. Lin—seven years later—continued to refer to the argument as a "hypothesis" and noted the need for further evidence would indicate to a POSA that material support for the SIBO hypothesis had not been developed since the *Pimentel 2000* study.

82. ***GI Expert Forum 2006***.[120] Dr. Harary discusses a presentation in 2006 in which Dr. Glass supposedly presented a case study of a single patient diagnosed with IBS-D and SIBO.[121] A POSA would not understand a case study regarding a single patient to be sufficient data to support any link between IBS-D and SIBO. Further, Dr. Pimentel's portion of the presentation highlights the inconsistent reports in the literature regarding the prevalences of SIBO in IBS based upon breath testing.[122] A POSA would therefore understand, even based on Dr. Pimentel's presentation, that the SIBO hypothesis remained unproved.

83. ***Infantalino***.[123] *Infantalino* is an abstract describing a retrospective chart review that was published in October 2009, and thus would not have been available to or known by a POSA in February 2008. This study does not have a control group, and a POSA would not draw any conclusions regarding a drug effect.[124] *Infantalino* also repeats similar methodological issues, including using initial "lactulose breath testing" to identify SIBO (for which it does not provide any details).[125] *Infantalino* notes improvement in SIBO and IBS symptoms, but it does not assert any causal connection between the two conditions. A POSA would not conclude any causal

---

[120] *See, e.g.*, Harary Opening Rpt. ¶¶ 184-186.
[121] XIFAX_AMN_1903923 at 95-99.
[122] *Id.* at 39.
[123] *See, e.g.*, Harary Opening Rpt. ¶¶ 198-201.
[124] NORWICH_NJ_INV_000077.
[125] *Id.*

connections between SIBO and IBS based on retrospective studies, and certainly not based on *Infantalino*.

84. ***Lauritano***.[126] *Lauritano* makes one mention of irritable bowel syndrome—when referencing a 2003 article by Pimentel et al. using neomycin.[127] It does not describe any alleged association or causal link between SIBO and IBS. A POSA would understand that *Lauritano* does not provide any evidence for such an association or link. Similar to other studies discussed, this study used a problematic approach to selecting a patient population.[128] It starts with a group of patients with a variety of gastrointestinal symptoms that underwent testing for SIBO using the glucose breath test ("Patients underwent GBT for various chronic gastrointestinal symptoms, the most common being bloating, abdominal discomfort and diarrhoea").[129] It then selects only those with abnormal glucose breath testing.[130] *Lauritano* does not discuss how many subjects were tested overall, nor whether the subjects tested had risk factors for SIBO.[131] So, it is impossible to determine the value of the glucose breath test in diagnosing SIBO compared to a standard test. The primary outcome of the study was to determine the optimal dose of rifaximin to normalize the breath test.[132] The study did not involve subjects with IBS, and subjects were not tested for any change in IBS-associated symptoms after treatment.

85. ***Scarpellini***.[133] *Scarpellini* describes a study of SIBO patients, a subset of whom were identified as having IBS under Rome II criteria.[134] It reports the IBS diagnoses as part of the

---

126 *See, e.g.*, Harary Opening Rpt. ¶¶ 229-231.
127 XIFAX_AMN_0690550 at -553.
128 *Id.* at -551-552.
129 *Id.* at -551.
130 *Id.*
131 *Id.*
132 *Id.*
133 *See, e.g.*, Harary Opening Rpt. ¶¶ 232-237.
134 NORWICH_NJ_INV_000383 at -384.

demographic information, but does not track study outcomes in terms of reductions in IBS symptoms.[135] *Scarpellini's* "primary outcome" was glucose breath test normalization rate, and its secondary outcomes were compliance and incidence of side effects.[136] Its discussion of these results does not mention IBS, much less propose any alleged association or causal link between SIBO and IBS. A POSA would not conclude any causal connections between SIBO and IBS exist based on *Scarpellini*.

86. ***Scarpignato***.[137] *Scarpignato* is a 2005 review article that, again, describes Dr. Lin's and Dr. Pimentel's work as putting forth a "hypothesis that SIBO could represent a framework to understand IBS."[138] It does not provide any new data or describe any new study. A POSA would understand that *Scarpignato* does not provide any additional evidence for an association or causal link between SIBO and IBS.

* * *

87. As leading IBS expert Dr. Drossman noted in his editorial comment to *Pimentel 2006*, the concept that rifaximin was "useful for treating IBS [was] based on certain assumptions:" first, that "the vast majority of patients with IBS (about 80%) have bacterial overgrowth as measured by the lactulose H2 breath tests" and, second, that rifaximin use could "lead to symptomatic benefit when bacterial overgrowth [was] present."[139] But, as of February 26, 2008, a POSA would have doubted these underlying assumptions considering the extensive criticism of them by experts in the field.[140]

---

[135] *Id.* at -385.
[136] *Id.*
[137] *See, e.g.*, Harary Opening Rpt. ¶¶ 244-253.
[138] XIFAX_AMN_1075051 at -064.
[139] XIFAX_AMN_0887874 at -875.
[140] *Id.* at -874-875.

88. A POSA would have been aware of the serious design flaws in the initial study purporting a connection between IBS and SIBO.[141]

89. A POSA would have known that lactulose breath tests lacked sensitivity and specificity for measuring SIBO.[142]

90. A POSA would have known that finding a positive test for another condition such as SIBO does not prove that the conditions are the same.

91. A POSA would have known that others in the field found no positive correlation between SIBO and IBS, including when using small bowel aspiration, the gold-standard technique for measuring SIBO at the time.[143] Despite studies such as those Dr. Harary cites, there was no proof of and great controversy regarding a supposed connection between IBS and SIBO.

92. Because of the serious design flaws in the initial study purporting a connection between IBS and SIBO, the lack of accuracy for lactulose breath tests in measuring SIBO, and results from others (including those using a gold-standard technique for assessing SIBO), showing no connection between IBS and SIBO, a POSA would have been skeptical that the vast majority of IBS patients had bacterial overgrowth.

93. Further, a POSA as of February 26, 2008 would have known no long-term studies of rifaximin use in IBS patients existed.[144]

94. A POSA would have known that experts in the field found the results supporting rifaximin use for treating IBS inconclusive and underwhelming.[145]

---

[141] XIFAX_AMN_0310640-43.
[142] XIFAX_AMN_1996672.
[143] XIFAX_AMN_1874281-85; XIFAX_AMN_1996648.
[144] XIFAX_AMN_1874262 at -264.
[145] XIFAX_AMN_1874266-72; XIFAX_AMN_0936198-211.

95. A POSA would have understood the possible dangers of long-term antibiotic use created substantial concerns regarding the usefulness of rifaximin in treating IBS symptoms.[146]

96. Because a POSA as of February 26, 2008 would have doubted that the vast majority of IBS patients had SIBO and that rifaximin could lead to symptomatic benefit in these patients, they would have considered any purported association between SIBO and IBS unproven and would have been skeptical that rifaximin is effective in treating IBS-D.

---

[146] XIFAX_AMN_1874266-72.

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Case No. 1:24-CV-040607-JFM

SALIX PHARMACEUTICALS, INC., et al, :

Plaintiffs, :

vs. :

AMNEAL PHARMACEUTICALS NY LLC, et al, :

Defendants. :

-------------------------------------
DEPOSITION UNDER ORAL EXAMINATION OF:
ELI D. EHRENPREIS, M.D.
January 21, 2026
-----------
REPORTED BY: JENNIFER L. WIELAGE, CCR, RPR, CRR
------------

Everest Job No. 49037

Page 27

because of loss of the ability to produce acid in the stomach. There was pancreatic diseases, hepatic diseases.

There were just a myriad of things going on at that time which we had very little knowledge about. But my specific focus was on intestinal effects of HIV.

Q. Doctor, how would you describe your expertise as it relates to this case?
A. You know, so starting with training, my focus, especially because of my AIDS experience, was on small intestinal diseases. So during that time period, if we're looking up to about 2008, I was continuing to focus on small intestinal diseases. And that continued to be one of the things that was a topic of special interest to me and an area of both clinical study and taking care of patients.
Q. So is it fair to say that your expertise in this case relates to the study and treatment of small intestinal diseases?
Is that accurate?
A. Can you repeat that, please?
Q. Yeah. So I'm -- I'm trying to -- is it fair to say that your expertise as it relates to this case is the study and treatment of small

Page 28

intestinal diseases, based on your previous response?
MR. SIKORA: Objection to form. You can answer.
A. I would say I don't really -- I can't characterize exactly why I was called as an expert. And I wouldn't narrow it down to small intestinal diseases. I would think my experience in clinical pharmacology, my personal experience with patenting and my practice, which is in general gastroenterology, would probably be more of a sum of why I was called as an expert in this case.
Q. Do you -- do you actually state the nature of your expertise as it relates to this case anywhere in your report?
MR. SIKORA: Objection to form. You can answer.
A. I'd have to look at the report, if you want to give me a minute... to me, when I look at this, I think it's a more holistic reason why I was asked to be an expert in this case.
If you look at page 2 where it says, "Qualifications," I think it's more focused on my career, which has included patient care, academic medicine, research, writing, et cetera. I don't -- unless there's somewhere else in here that I can't

Page 29

find, I don't see where I specifically said that I was an expert in small intestinal diseases.
Q. No, and I'm just --
A. I --
Q. Go ahead, finish your answer.
A. No, I was going to say I don't know if there's somewhere else in here where I mentioned it or not.
Q. Yeah, so -- and I'm not trying to -- it's not a trick question. I am trying to figure out, kind of, the nature of your expertise as it relates to this case. And usually it's spelled out, and so I just said my characterization is based on your previous response. But that's all fine.
Have you ever served any funding, support or compensation of any kind from Bausch or Salix during the course of your career, prior to your serving as an expert in this case?
A. No.
Q. You are being compensated for your work in this case, right?
A. Yes, yes.
Q. And can you explain, in general terms, the process by which you drafted, prepared and served your expert report, which is Exhibit 1?

Page 30

MR. SIKORA: And I'm just going to caution the witness that counsel is just asking for general terms. So if you stay at a high level, that's fine. Please don't get into specifics that might be privileged conversations.
THE DEPONENT: Okay, thank you.
A. So this was -- this was my report. This was done as -- it was written, basically, as a team effort, which is not outside of my purview of how I work with my medical residents.
There were drafts that were made -- there were initial interviews with me to obtain my opinion about many things. There were drafts that were made. Those were reviewed extensively by me. I made many additions to the initial drafts. And this kind of went back and forth and we -- we completed the report together.
But this is my report. This is something that I originated and that I studied throughout the iterations of the report until we obtained this final iteration.
Q. Did you personally write the first draft or was that done with the attorneys?
A. I did not personally write the first draft.

Page 31

Q. Did you review any expert reports that were served in the Norwich I case --
A. No, I did not.
Q. -- in the process of drafting this report?
A. No, I did not.
Q. Are you aware -- strike that.
Have you -- do you know Dr. Schoenfeld?
A. I know the name, but that's not somebody I know personally.
Q. That's Dr. Philip Schoenfeld, just for the record.
Have you -- are you aware that Dr. Schoenfeld submitted an expert report in the Norwich I case?
A. No, I'm not.
Q. Do you know whether or not Dr. Schoenfeld -- do you know whether or not Dr. Schoenfeld -- Dr. Schoenfeld's report was used as a draft for your report in this case?
A. I'm unaware of that.
Q. You have not reviewed any expert reports from the Norwich I case; is that right?
A. No, I've not.

Page 32

Q. Other than the actual opinion, which I believe is listed among your materials considered, what, if anything else, did you review from the Norwich I case?
A. I didn't -- I did not review that case.
Q. Let's look at Exhibit B to your report, which is Exhibit 1. And if you look at the second page of Exhibit B -- just let me know when you're there.
A. Yes, I'm here.
Q. So this is in your list of -- list of material considered. Third from the bottom, you see where it says: "Salix versus Norwich No. 20-CV-430."
And it says: "D. Delaware, August 10, 2022."
Do you see that?
A. Yes.
Q. That's the Norwich I decision, correct?
A. Yes.
Q. Yeah. And then under that, it says: "Salix versus Norwich, 98 F 4th 1056, Federal Circuit 2024."
That's the Norwich I appeal decision,

Page 33

correct?
A. Yes.
Q. Okay. Let's go back to your CV, which is Exhibit A to your report, Ehrenpreis Exhibit 1. And if we go to the third page of your CV, there's a company called "GI Pharmaceuticals, Inc." sort of near the top.
Do your see that?
A. Yes.
Q. Is this the device company that you were referring to earlier?
A. This is my company -- my consulting company.
Q. Okay. So what is -- and I shouldn't guess, then.
Why don't you tell me, what is the nature of the business of GI Pharmaceuticals, Inc.?
A. This is a -- it's a corporation, a C corp, where if I do consultation work of a variety of -- in a variety of ways, that's -- it comes through that company.
Q. Okay. Is that the company in which you are acting as an expert for Plaintiffs in this case?
A. Yes. Actually, I'd have to check on

Page 34

that. I don't know if I'm working personally or through the company, but I believe I'm working through the company.
Q. Okay. Other than your work in this case, is there anything about GI Pharmaceuticals, Inc., related to either Salix or Bausch or rifaximin?
A. No.
Q. There's another company listed under that called E2Bio Life Sciences, LLC.
Do you see that?
A. Yes.
Q. And it lists you as the CEO of that company?
A. Correct.
Q. What is the business of E2Bio Life Sciences, LLC?
A. So for the past eight years, E2Bio Life Sciences has been developing a new medical device which is used to enhance the -- the uptake and effectiveness of oral topical medications such as mouthwashes and gels, initially directed specifically to cancer patients who get mouth sores and other problems in their oral mucosa due to damage from chemotherapy and radiation therapy. So our company has developed -- completed the development of this

Page 39

A. Case report is a description of a case that's been encountered in -- within a clinical practice. Generally, it's -- it either describes something knew that hasn't been seen before or it's used as a backdrop to summarize an important concept in -- important medical concept.
Q. And you've listed roughly 20 or so case reports in your CV, correct?
A. I didn't count, but that sounds right.
Q. And then if we go to page 83 of 100 of Ehrenpreis-1, which is page 36 of your CV, do you see here a section entitled: "Presentations at National Meetings"?
A. Yes.
Q. And it says, "Since 2008."
Do you see that?
A. Yes.
Q. Do you know why the cutoff there is 2008?
A. It's arbitrary. At some point, I pruned down my CV only because prior to 2008, there were multiple presentations at multiple national meetings. And I just thought my CV was getting a little too weighty.

Page 40

Q. Did you -- did you prune down your CV as a result of your work in this case, or was that done before you were retained?
A. That was done before I was retained.
Q. All right. I'd like to talk a little bit about your clinical practice.
Particularly as it concerns patients with IBS-D, IBS and SIBO.
Is it true that in your career, you've treated patients suffering from IBS, IBS-D and SIBO?
A. Yes.
MR. SIKORA: Objection to form. You can answer.
A. Yes.
BY MR. LANGER:
Q. IBS was a common condition that you treated in your practice; is that fair?
A. Yes.
Q. And you treated patients with IBS before 2008, correct?
A. Yes.
Q. And that included treating patients with IBS-D, right?
A. Yes.

Page 41

Q. What symptoms did IBS-D patients present in your practice prior to 2008?
A. Could you restate that question, please?
Q. Yeah. What were the -- what were the major symptoms that an IBS-D patient presented with when they -- when they sought treatment from you prior to 2008?
A. Well, by definition, patients with IBS have abdominal pain or discomfort with associated findings. So in -- in a general sense, those would be patients who had abdominal pain or discomfort. And the simplest way to think of it is that it's related to the -- their bowel habits.
So in the case of IBS-D, this would be a patient whose pain would get worse at the time that they were having abnormal bowel habits and/or the pain would be relieved after they had, for example, in this case, diarrhea.
Q. Other than pain and discomfort, did IBS-D patients present with other symptoms?
A. Yes, they can. Yes. To fully make the diagnosis of IBS-D, one would follow the Rome criteria for that time. So depending on when before 2008, the Rome criteria sort of evolved from Rome 1

Page 42

to Rome 2 to Rome 3. And there were variations in the specificity of symptoms that patients would have. You know, so for a classic IBS-D patient, they would have a predominance of diarrhea along with their abdominal discomfort.
Q. Do you agree that bloating was a clinically significant symptom in IBS-D patients prior to 2008?
MR. SIKORA: Objection to form. You can answer.
A. It's a common symptom, yes, of IBS.
BY MR. LANGER:
Q. The types of physicians that would, typically, treat patients suffering from IBS-D prior to 2008 would be an internal medicine doctor or a gastroenterologist.
Is that fair?
A. Yes. Most commonly, yes.
Q. How did you -- excuse me, how did you treat patients suffering from IBS-D in your practice prior to 2008?
A. There's sort of a -- at least the way I practiced medicine, there's a -- a process involved in treating those patients.
So initially, it's confirmation of

the diagnosis that it's IBS. And that would require an evaluation to make sure that the symptoms weren't relative to some organic condition. So thinking of IBS as a functional condition or unknown cause, one would make sure that there weren't other -- other conditions that were mimicking the symptoms of IBS. That's sort of Stage 1. That's the diagnostic side.

You asked me about treatment. Treatment at that time would involve a dietary evaluation and -- and looking for possible dietary causes of symptoms. If the patient had predominant diarrhea, there were antidiarrheal agents would be a common thing that was used. There were antispasmodic drugs that were used.

You know, IBS is complex, so one would look for psychosocial factors that might have been responsible for the symptoms and possibly refer patients relative to that as part of their treatment.

There were some new drugs being developed at that time. And some of those were -- are now off the market, but those were used, as well. That would be a common way to treat IBS.

The first step would be lifestyle management, though: Stress management, exercise, diet. And very important for IBS would be developing



a relationship with the patient and having them return for visits to -- to evaluate the effects of the treatments and also to provide, you know, some psychological support.

Q. Okay. Let's break that down a little bit.

When you see a new patient who presents with potentially an IBS-D or IBS diagnosis, you do a medical history, correct?

You take a medical history?

A. Yes, only -- you're saying that in the present tense. I don't see patients anymore.

Q. Yes. But --

A. I have this injury that's stopped me from seeing patients.

So if you're saying a doctor who is seeing those patients, that's the first thing that they would do, I would say yes. The first thing they would do is take a careful history and perform a physical examination.

Q. I appreciate that. Let me state the question so it's clear for the record.

Prior to 2008, when you saw a patient for the first time who presented with IBS or IBS-D symptoms, you would conduct a medical history,



correct?

A. Yes.

Q. Is there a patient that you see for the first time that you would not conduct a medical history for any ailment?

MR. SIKORA: Objection to form. You can answer.

A. Could you please ask that question again?

Q. Yeah.

A. I'm trying to articulate an answer for you.

Q. It was a bad question.

When you see a new patient, regardless of the ailment that that person is coming to see you about, you conduct a medical history, correct?

A. Yes.

Q. You then conduct a patient examination; is that fair?

MR. SIKORA: Objection to form.

A. I don't know if it would necessarily proceed in that way. Probably, in many of these cases, because many patients are referred and have already seen other doctors, a really important part



of that initial evaluation is to review prior records. So I would say that would probably be the second step.

Q. If you're the first doctor that the patient sees, after conducting a medical history, a next step would be to conduct a physical examination.

Is that fair?

MR. SIKORA: Objection.

A. Yes.

MR. SIKORA: Objection to form.

BY MR. LANGER:

Q. And that is true -- sorry, Mike. I'm having a hard time hearing you. Are we good?

MR. SIKORA: Yeah, I think it's on the record.

BY MR. LANGER:

Q. Okay. And that is true of any ailment that the patient comes to you to treat, correct?

A. Yes.

MR. SIKORA: Objection to form. Scope.

If you could just give me a second, Doctor, so that the court reporter has us not talk over each other.

Page 47

THE DEPONENT: Should I answer again?
MR. SIKORA: I think the record has the answer, but just going forward.
BY MR. LANGER:
Q. If the decision is made to prescribe a medicine, okay, so again, now we're talking about your treating of patients, not just limited to IBS-D and IBS. But if you then decide, okay, the next treatment option is medicine, you've gone through dietary and you've gone through the other things that you've spoken about, but now we're at the point of treating with a prescription medicine; you prescribe the medicine and then you presume the patient's going to take the medicine and then you bring the patient back to see what effect the medicine had on the patient, correct?
MR. SIKORA: Objection to form. Scope.
A. Yes.
BY MR. LANGER:
Q. And again, that would be true of any ailment that you treat if you are prescribing medicine for that ailment, correct?
MR. SIKORA: Objection to form; scope. You can answer.

Page 48

A. Some patients are referred by another doctor, like a primary care doctor. They may follow up with a primary care doctor. So I wouldn't say that absolutely a follow-up -- a follow-up visit would always occur.
Q. But it's fair to say that some physician is going to assess whether or not whatever symptoms -- strike that.
It's fair to say that a physician is going to assess whether or not the medication that the patient was taking, in fact, worked to alleviate the symptoms that that patient was suffering from, correct?
MR. SIKORA: Objection to form; scope.
A. Yes, that's correct.
BY MR. LANGER:
Q. Okay. All right. You talked a little bit about the different medications that you would prescribe. Now, we're going back to IBS-D patients prior to 2008, and you listed antidiarrheal, antispasmodic, some psychotic medications and then new drugs.
Can you give me examples of each of those?

Page 49

And we can do it one at a time.
So what antidiarrheal medications would you prescribe -- or not necessarily prescribe, suggest to treat a patient suffering from IBS-D before 2008?
A. Prior to that, could I -- could I just change the question because you said something about psychotic in there?
Q. Yes, yes.
A. I don't think that antipsychotic medications are used for IBS. So I think the terminology was incorrect there. So I'm not answering your question, but I -- I was wondering why that was in there.
Q. Okay. I'll strike the question and re-ask another question.
What antidiarrheal medications did you tell your patients suffering from IBS-D to take prior to 2008?
A. The most common one would be Loperamide, which is also known as Imodium.
Q. Any others that you can think of, sitting here today?
A. Some -- some antidepressants have antidiarrheal effects. It wouldn't be rare to

Page 50

prescribe an antidepressant that has some -- that also causes some slowing of bowel action.
Q. Any other antidiarrhea medications that you could think of today that you would prescribe or tell your patient to take before 2008 suffering from IBS-D?
A. Yeah, some patients have trouble with diarrhea because their stool needs bulking. So some fibers, such as methylcellulose, would be another treatment.
Q. Then I think you mentioned antispasmodics that you would --
A. Yes.
Q. -- instruct your patients to take who suffer from IBS-D before 2008.
What are some examples of those?
A. There's a tradename Bentyl and a tradename Levsin. Those would be the most common used in 2008.
Q. And then you mentioned new drugs that you would prescribe for patients suffering from IBS-D prior to 2008.
What new drugs are you referring to?
MR. SIKORA: Objection to form. You can answer.

Page 51

A. If you give me a moment, I could think of it. But some of these drugs came and went; and some were for IBS-D, some were for IBS-C. And I would need to refer back to the literature to give you a list of those.
Q. Okay. Did you ever prescribe rifaximin for patients who had IBS-D?
MR. SIKORA: Objection to form. You can answer.
A. Yes, I did.
Q. Okay. And when -- strike that.
Did you prescribe rifaximin to patients suffering from IBS-D before 2008?
A. No.
Q. When did you start to prescribe rifaximin to patients suffering from IBS-D?
A. I'd have to look at the exact date, but I believe it was approved in 2012; so some time after that time.
Q. Were you aware of antibiotics being prescribed to patients suffering from IBS-D prior to 2008?
A. There was some -- there was some literature which suggested that that might be a treatment, and I was aware of the literature.

Page 52

Q. But you personally, in your practice, did not prescribe antibiotics to patients who had IBS-D prior to 2008?
A. No, I did not.
Q. When did you become aware -- strike that.
Did you become aware that rifaximin was being prescribed to patients for IBS-D prior to 2008?
MR. SIKORA: Objection to form. You could answer.
A. I would have to say no. I was aware of it from studies in the literature, but I was not aware of people actually prescribing it at that time for IBS-D.
Q. So you were aware of it, but you didn't know of anyone doing it firsthand.
Is that fair?
A. I would say I was aware of it more in the setting of some of the published literature related to some of the clinical trials that were being performed. I was not aware of patients -- of people using it in the clinical world as a treatment for IBS-D.
Q. When did you become aware of

Page 53

physicians prescribing rifaximin for patients suffering from IBS-D?
MR. SIKORA: Objection to form. You can answer.
A. I'd have to answer that by after the drug was being -- was FDA approved and on the market.
BY MR. LANGER:
Q. So you were not aware of any off-label use of rifaximin for treating IBS-D prior to its approval?
A. No, I -- I didn't use it. My colleagues didn't use it. None of the people in my clinical sphere were using it off-label like that at that time.
Q. But you were aware of its use in the literature that you have been referencing in the last couple of answers, correct?
A. Yes.
Q. You're aware that rifaximin was introduced in Europe in the 1980s, correct?
MR. SIKORA: Objection to form. You can answer.
A. I don't know the date that it was introduced, but I did know that it was introduced in Europe, yes.

Page 54

Q. And you're aware that rifaximin was approved in the United States in the early 2000s, but for other indications, correct?
A. Yes.
Q. You do not address in your report any concerns with rifaximin and bacterial resistance, correct?
A. I have to look at my report to answer that question. If you give me a moment...
Q. Sure.
A. Could you repeat the question again, as well, while I'm checking?
Q. Yeah, you did not address in your report any concerns with rifaximin and bacterial resistance?
A. I believe that topic was addressed in the report in terms of what some of the thought leaders were saying.
Q. Where in your report do you address bacterial resistance?
A. I see that here on page 29.
Do you want me to give you the specific quote?
Q. Yeah, so sorry, where on page 29 do you see -- do you mention anything about bacterial

Page 55

resistance?
A. Well, starting at 70, it says: "The purported benefits of rifaximin in IBS patients do not outweigh the risks of long-term antibiotic use."
Then there's a quote from Dr. Vanner, towards the middle of the page: "Antibiotics in IBS more attractive -- it may make the use of antibiotics in IBS more attractive. Enthusiasm should be tempered by several conditions. Like other experts discuss above, Vanner noted no long-term studies existed, end quote, less known about the safety of these antibiotics long-term."
So my interpretation of that would be development of resistant bacteria as one of the potential safety concerns with long-term use of antibiotics.
Q. Sitting here today, are you aware of any publication evidencing any clinically meaningful bacterial resistance in the 40 years that rifaximin has been available on the market?
MR. SIKORA: Objection to form. You can answer.
A. I've not seen such an article, no.
MR. LANGER: Why don't we take a break?

Page 56

THE DEPONENT: Great idea, thank you.
THE VIDEOGRAPHER: Off the record, 10:23 a.m.
(A brief recess was taken.)
THE VIDEOGRAPHER: Back on the record, 10:37 a.m.
BY MR. LANGER:
Q. Welcome back, Doctor. The last set of questions we talked about was treating IBS-D -- your treatment of IBS-D patients pre-2008.
Would your responses be different if we were talking about just IBS generally -- patients with IBS generally?
MR. SIKORA: Objection to form; foundation; scope. You can answer.
A. In terms of -- in terms of diagnostic approach, that would be very similar. The treatment would depend on the predominance of symptoms. So, for example, some patients with IBS have a predominance of constipation.
So they would -- other medications were used in that case.
BY MR. LANGER:
Q. Right. And that would be patients suffering from IBS-C, right?

Page 57

A. Yeah, I think that's what they would be termed, in general. It's complicated because the patterns can change over time, so the treatments change as the patterns change.
Q. And just so I understand your testimony, the distinction you're making about different treatment options would be as to patients, on the one hand, who present with IBS-D symptoms and patients who present with IBS-C symptoms.
Is that right?
A. Yeah, and there -- there's another group that doesn't fit really nicely into either of those categories, which would be that IBS alternating.
And then there's another group that doesn't quite fit any of those and -- and the treatment is tailored to -- primarily in 2008, it was tailored primarily to their symptoms.
Q. And those symptoms being what we discussed previously -- why don't I just ask you: And what were those symptoms?
MR. SIKORA: Object to form. You can answer.
A. Abdomen -- those symptoms would be abdominal pain or discomfort as the sort of cardinal

Page 58

symptom of IBS; and then with the association of bowel alteration. They have to be connected for it to be called IBS.
Q. And bloating would be a symptom of patients suffering from -- those patients as well, correct?
MR. SIKORA: Objection to form. You can answer.
A. It's a common symptom. It doesn't have to happen. There are other symptoms, too. Some patients have urgency. They have a sense of incomplete evacuation when they go to the bathroom. But those are not -- at least within the Rome criteria, to my knowledge, they're not required to make the diagnosis of IBS.
Q. But was bloating, at some point, part of the Rome criteria for diagnosing IBS?
MR. SIKORA: Objection to form; scope. You can answer if you know.
A. I'd have to look back. Maybe in some of the earlier forms, it may have been something that was mentioned as occurring within the scope of IBS, but I don't think it was mentioned as a cardinal symptom. But I'd have to go back and study that to answer that completely.

Q. Sitting here today, right now, you're not aware whether it was or was not one of the symptoms of the Rome criteria prior to 2008?

MR. SIKORA: Objection to form; asked and answered. You can answer again, if you can.

A. I mean, if you'd like, I could go back and review. You know, there were multiple iterations of the Rome criteria, so I'd have to -- I'd have to say, sitting here today, I'd have to say I don't know. I can't say yes or no.

BY MR. LANGER:

Q. Okay. In your experience, would you see a subset of IBS patients also having SIBO?

MR. SIKORA: Objection to form. You can answer.

A. You know, I didn't really -- and I still do not believe that that -- that that association is relevant for IBS. I view SIBO as a separate organic disorder with very specific risk factors. So I -- I view those as separate entities.

Any condition can coexist with another condition. So it's possible patients may have presented with IBS and have SIBO instead, or they may have IBS and then develop SIBO as a consequence of some other condition.



But I don't really believe in that entity of IBS and SIBO together as a -- as an entity.

Q. Okay. So I just want to make sure we're on -- we're clear here.

You are not aware of patients who can suffer from both IBS and SIBO at the same time?

MR. SIKORA: Objection; form. Mischaracterizes. You can answer.

A. I mean, I -- I don't -- I think any patient can get any condition. I think IBS is a common condition. It's supposed to affect up to 30% of the population. So it would be possible that patients with IBS could develop SIBO, later down the line. It is possible that patients with SIBO could be -- could develop IBS-like symptoms.

But as far as the two conditions coexisting, if a patient who was diagnosed with IBS now has SIBO, one would have to look at what was the cause of the SIBO. I don't believe that -- and one might change the diagnosis of IBS to a different diagnosis.

Q. Yeah, so I'm -- I think I understand. But let me -- let me try it again.

Before we get into causation or relationship, I'm simply asking, you know, can a



patient have IBS and SIBO at the same time; or is it your testimony that you have to have one, then the other?

MR. SIKORA: Objection to form. You can answer.

A. I think you asked me a couple of questions there, but -- could you repeat that, please?

Q. Yes. I'm trying to figure out, very simply, whether a patient can suffer from both IBS and SIBO at the same time.

MR. SIKORA: Objection to form; asked and answered. You can answer.

A. My answer would be a patient could have IBS-like symptoms caused by SIBO, but I -- I don't -- let me take that back.

Yes, a patient could have both at the same time.

Q. Okay. So now let's talk about -- we just -- we talked previously about how you would treat IBS and IBS-D patients. I'd like to now talk about how you would treat SIBO patients prior to 2008.

Do you agree that, typically, a gastroenterologist or an internal medicine doctor



would be the physician that treats patients with SIBO?

A. In general, yes, I would agree with that.

Q. And again, the diagnostic procedures that we laid out before would apply; namely, if it's a patient in the first instance, you would take a history, you would do a physical examination, and then you would assess treatment options.

Is that fair?

MR. SIKORA: Objection to form. You can answer if you know.

A. Generally, patients with SIBO present with a variety of symptoms and signs that there is bacteria growing in their small intestine. So if it's a patient being evaluated and SIBO is considered, laboratory testing is really, really important. I wouldn't just treat, at that point, no.

Q. Yeah, so -- and we're going to get into your treatment, and I want to know that. I'm just talking at a high level first.

If a patient comes to you in the first instance, so not from a referring physician, like you -- like you did with IBS patients, you would conduct a medical history, correct?

the approval. SIBO's a relatively uncommon or rare condition, so it may be stated within what the approval is for those drugs that it could be inferred that it's approved.

But I -- you know, just asking me like that, I would guess that there were no, you know, big, multi-center clinical trials comparing a specific antibiotic versus placebo for treating SIBO.

Q. I don't know that that answered my question. So let me just ask it again.

A. Yeah.

Q. It's straightforward. I just want to make sure we're on the same page.

Do you know whether any antibiotic is FDA approved for treating SIBO?

MR. SIKORA: Objection to form; asked and answered. You can answer again, if you know.

A. In order to answer that fully, I would have to go back and look at the -- what the indications are approved by the FDA or on the -- on the list. Offhand, I would say SIBO is uncommon enough that -- that it might not make the list. They may have gastrointestinal infection or something like that. But as a specific FDA approved indication, offhand, I would say possibly not.



Q. You don't know, sitting here today, whether or not an antibiotic is FDA approved for treating SIBO.

Is that fair?

A. That's fair, yes. That is correct. I do not know, right now.

Q. Do you know whether any clinical trials supporting the approval of rifaximin for IBS-D excluded SIBO patients?

MR. SIKORA: Objection to form; foundation. You can answer if you know.

A. I don't know the answer to that question.

MR. LANGER: We referenced this document earlier. I'll ask the court reporter to mark Tab H, as in Henry, as Exhibit 2, please.

(Exhibit Ehrenpreis-2, Appeal Notification, was marked for Identification by the court reporter.)

BY MR. LANGER:

Q. And Doctor, you need to reload your exhibit share and Exhibit 2 should pop up.

A. I see Ehrenpreis-1, Ehrenpreis-2, the PDF, that one?

Q. Yes, sir.



A. It is sideways.

MR. LANGER: Can we fix that somehow, please?

THE VIDEOGRAPHER: I would have to -- yeah, just a moment. I have to re-save it.

Try refreshing again. Close that one and refresh.

MR. LANGER: I still have it sideways. Should we go off the record?

THE VIDEOGRAPHER: Yeah, let's go off for a second because I'm going to have to delete it.

Off the record, 11:14 a.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: Back on the record, 11:20 a.m.

BY MR. LANGER:

Q. Doctor, you -- so I have marked as Ehrenpreis Exhibit 2, which you should now have available in the exhibit share site, a copy of the opinion that we've been referring to as Norwich I. For the record, it's Salix Pharmaceuticals Limited versus Norwich Pharmaceuticals, Inc., Case No. 20-430-RGA. And it's dated August 10, 2022.

Do you see that?

A. I have the document in front of me,



yes.

Q. And this is the trial court decision from the Norwich I case that you cite in your Exhibit B to your report, which is Exhibit Ehrenpreis-1, right?

A. Yes.

Q. You agree that the court in Norwich I considered the opinions that you express in your report?

MR. SIKORA: Objection; form; mischaracterizes. You can answer.

A. I really don't -- I don't know. I have -- I didn't study exactly what they reviewed in this.

Q. What did you consider when you considered the Norwich I opinion?

A. I -- as I stated before, I really didn't study that document. So I would have to rely on information conveyed to me now.

Q. Okay. Let's look at page 17 of the document. And you should feel free to look at whatever else you need, but I'll start with page 17.

A. Okay. Yeah.

Q. I'm looking at the left-hand column, sort of in the middle, that starts with the words

Page 83

"Salix argues."
Do you see that?
A. Yes, I see that.
Q. "Salix argues that a POSA," do you see that?
A. Yes.
Q. Okay. Read that paragraph to yourself and let me know when you've had a chance to review it.
A. Okay, I have read it.
Q. Would you agree that the Court considers in its opinion some of the same arguments that you raise in your opinion in this case in your report?
MR. SIKORA: Objection; form; mischaracterizes. You can answer if you know.
A. Looking at this, I don't recall the Barrett study. I don't know if that's on our list.
So could you please ask the question again?
Q. Yeah. Would you agree that the opinion in Norwich I considers some of the same opinions that you render in your report in this case?
A. Yes.
MR. SIKORA: Objection; form;

Page 84

mischaracterizes.
Could you please wait for me to object before you answer?
BY MR. LANGER:
Q. Specifically, your opinion is that some of the prior sources are flawed, correct?
A. Yes.
Q. And the Court considers that opinion when it states: "Salix argues that a POSA would consider these prior art sources as flawed."
Do you see that?
MR. SIKORA: Objection; form; mischaracterizes. You can answer if you know.
A. Could you please repeat the question? I'm sorry.
BY MR. LANGER:
Q. Yeah. The Court also considered the argument raised by Salix and Bausch that the prior art sources were flawed, right?
MR. SIKORA: Objection to form.
A. Yes, yes. I'll agree with that.
Q. In your opinion in this case, you say that there is an unproven premise that SIBO contributed to IBS-D, correct?
A. Yes.

Page 85

Q. The Court also, in Norwich I, considered that opinion, correct?
MR. SIKORA: Objection to form; foundation; mischaracterizes. You can answer.
A. Yes.
Q. Sorry. I didn't catch your answer.
A. Oh, I said yes. Sorry.
Q. In your opinions in your report in this case, you say that the methodology used in Pimentel and other references was poor, correct?
MR. SIKORA: Objection to form. You can answer.
A. Yes.
Q. The Court in Norwich I also considered that opinion, correct?
MR. SIKORA: Objection; form; mischaracterizes.
Oren, are you asking about his opinions or an argument? Because you continue to conflate the two. And as you know, Dr. Ehrenpreis is not involved in the Norwich I litigation.
BY MR. LANGER:
Q. I'm standing on my question.
Doctor, can you answer my question, please?

Page 86

A. Can you repeat the question, please?
MR. LANGER: Yes. Can I ask the court reporter to please repeat my last question?
(Designated questions and answers were read back.)
MR. SIKORA: Same objections. You can answer.
A. Yes.
Q. In your opinions in your report in this case, you took issue with reliance on retrospective chart reviews and small patient populations, correct?
A. Yes, but there were many, many other issues that I believe were not previously revealed about the prior literature; possibly because I have opinions about other aspects of the literature other than just retrospective -- its retrospective nature.
Q. Right. But you made it a point in your report in this case about some of the literature being retrospective chart reviews and having small patient populations, correct?
MR. SIKORA: Objection to form. You can answer.
A. Yes, that's one of the things that I did point out.

Q. And the Court in Norwich I also considered that opinion, correct?
MR. SIKORA: Objection; form; mischaracterizes. You can answer if you know.
A. I mean, it states here that they reviewed a study by Barrett and concluded that it was a retrospective chart review and they considered that a flaw of the study.
BY MR. LANGER:
Q. So the Court did consider the fact that it was a -- identified as a retrospective chart review and only had eight patients, right?
MR. SIKORA: Objection to form. You can answer.
A. Yes, they did consider that for that particular study, sure.
Q. Another issue that you opine on in this case relates to Pimentel 2006 not showing clinically meaningful improvements of symptoms of abdominal pain and diarrhea, correct?
A. Let me look at my report, if you don't mind. I just want to make sure that that's how I stated it. Should I go back to the other PDF or --
MR. LANGER: Whatever is more convenient for you, Doctor.



THE DEPONENT: It might be quicker to find it that way. Mike, can you help me with that on the page?
MR. LANGER: Well, I don't know what -- you got to tell me what's happening.
MR. SIKORA: I don't understand either. If you're going to search for something, Doctor, I don't think I can help you search for it.
THE DEPONENT: Okay. Can you please repeat the question?
BY MR. LANGER:
Q. Yeah, let me make it easier for you.
In your report, you rely on the Drossman editorial for critiquing the Pimentel 2006 study, correct?
A. No, that's not correct.
Q. You don't cite to Dr. Drossman's editorial criticizing the methodological issues associated with Pimentel 2006?
A. Yes, I did.
Q. Okay. And that same opinion was considered by the report in the Norwich I opinion in the paragraph we just read, correct?
MR. SIKORA: Objection; form; mischaracterizes. Oren, you keep doing this.



Dr. Ehrenpreis was not testifying at Norwich I. So if you're asking more generally, you need to change your question. But continuing to refer to his opinions as seen at issue in Norwich I is improper.
BY MR. LANGER:
Q. You can answer, Doctor.
A. I'm sorry. Could you please repeat the question?
Q. Yeah. The Court considered Dr. Drossman's critique of Pimentel 2006 in Norwich I, correct?
A. Yes.
Q. And if you look -- can you please read the first sentence of the next paragraph in Norwich I decision, which is Exhibit 2?
You can read that out loud.
A. So is this the first sentence of -- I'm sorry, which paragraph? The one --
Q. The next paragraph, beginning, "I am."
A. (As read): "I am unpersuaded by these arguments. It is fair to critique sources, and a person of ordinary skill in the art would take a source's shortcomings into consideration when



evaluating the evidence. Obviousness does not require perfect" --
Q. We don't need to read the whole paragraph, but you're welcome to if you want to.
Now, you also, in your report, reference several publications by Doctors Drossman, Quigley and Vanner, correct?
A. Yes.
Q. And you raise them as skeptical of -- strike that.
You raise them in support of your opinion that a person of ordinary skill in the art would be skeptical that rifaximin would be used to treat patients having IBS-D, correct?
MR. SIKORA: Objection to form. You can answer.
A. I think my scepticism was more related to the connection between treatment of IBS-D as a treatment for SIBO as being causative to -- for S -- for IBS-D.
BY MR. LANGER:
Q. Let me refer you back to your report to Paragraph 13. We looked at it previously.
A. Let me go back -- I'm going to pull it up on the PDF, and maybe if you could tell me what

Page 91

page you're referring to, that would be easier than me looking for it.
Q. Sure. On the PDF, it's page -- so just so you know what we're looking at, we're looking at Exhibit Ehrenpreis-1, page 3 of your report, page 9 of the PDF, Paragraph 13.
A. I'm sorry, can you repeat the page?
Q. Page 3 of the report, page 9 of the PDF.
A. Paragraph 3, yeah. Paragraph 3?
Q. 13. 13.
A. 13, okay, okay.
Q. Okay. Just to reorient, your opinion is that a person of ordinary skill in the art would have been skeptical that rifaximin is effective in treating IBS-D, right?
MR. SIKORA: Objection to form. You can answer.
A. Well, I think if you read that paragraph, it starts with the purported association of SIBO and IBS. And therefore, they would be skeptical that rifaximin would be a treatment for IBS-D. It's an important qualifier here because of the flaws in the study.
Q. That's fair.

Page 92

And you rely on the Drossman, Vanner and Quigley references, among others, to support that scepticism that you -- that is part of your opinion, correct?
A. I cited those in my report as -- to show that that was discussed in the literature, but I rely on my own opinion about this. And it's actually a more detailed opinion than -- than what's stated in those articles.
Q. Okay. And if we go back to Exhibit 2, which is the Norwich I decision.
A. Okay.
Q. And if we go back -- page 17 -- let me know when you're there.
A. Okay, I'm on page 17 right now.
Q. Okay. On the bottom right, so right column on the bottom where it says, "21".
Do you see that?
A. Yes.
Q. The Norwich I decision says: "Salix also points to scepticism in the literature regarding the connection between SIBO and IBS and whether to use antibiotics to treat IBS-D."
Correct?
A. Yes.

Page 93

Q. So the Court considered the same opinion that you put forth in this case based on Paragraph 13, correct?
MR. SIKORA: Objection; mischaracterizes. Answer if you know.
A. Yes.
Q. And in that paragraph, the Court relies on the Drossman reference, the Quigley reference and the Vanner reference.
Do you see those cited in there?
A. Yes, I do.
Q. And if you turn to the next page, so we're on page 18 of Exhibit 2, the next full paragraph which begins, "Upon review of the evidence."
Do you see that?
A. Yes.
Q. The second sentence in the Norwich I opinion says: "The relationship between IBS and SIBO was actively being explored, provoking a debate within the field. Quigley, Vanner and Drossman do not teach away from using rifaximin to treat IBS, and Salix does not argue that they do. Based on the evidence, I do not think a POSA would elevate these sources above the other prior art available."

Page 94

Do you see that?
A. Yes.
Q. And I read that correctly?
A. Yes.
Q. Now, you make no opinions -- having considered Norwich I, which is Exhibit 2, you do not include anywhere in your report any opinion rebutting the findings in Norwich I, correct?
MR. SIKORA: Objection; form. You can answer to the extent you can.
A. Yes, that's correct.
MR. LANGER: All right. I'm going to put in an exhibit. Let's mark Tab I, please. So Doctor, just give the videographer one second. And it will populate, and we'll refresh.
(Exhibit Ehrenpreis-3, The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome, was marked for Identification by the court reporter.)
THE VIDEOGRAPHER: Doctor, it's in there if you want to refresh.
THE DEPONENT: Okay, thank you.
Okay, I have 3.

Page 95

BY MR. LANGER:
Q. Okay. Doctor, let me mark as Exhibit Ehrenpreis-3 a document entitled: "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome, A Randomized Trial."
The first named author is Mark Pimentel.
Doctor, feel free to review Exhibit 3 and let me know when you're ready for some questions.
Sorry, I don't know if you're waiting on me or I'm waiting on you.
A. You're waiting on me.
Q. Take your time.
A. I think I'm ready. I'm ready.
Q. Okay. Okay.
This is the Pimentel 2006 article that you referenced throughout your report, correct?
A. Yes.
Q. And it was -- it's a clinical trial published in October 2006; is that right?
A. That looks correct, yes.
Q. Okay. And I mentioned the title, but it's -- the title includes -- the title is: "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin)

Page 96

on the Symptoms of IBS."
Correct?
A. That's correct, yes.
Q. And it reports on a double-blind, randomized, placebo-controlled study with 87 patients who met Rome 1 criteria for IBS, correct?
A. Yes.
Q. And those patients were enrolled and treated between December 2003 and March 2005.
Is that right?
A. Let me get to the Method section, please.
Q. And I would also of refer you to the top summary as well, where it says, "Participants."
But you're welcome to look at whatever part you want.
A. Yes, that is correct.
Q. And the objective, which is found on the first page of Exhibit 3, the Pimentel 2006 article, stated as: "To determine whether the nonabsorbed antibiotic rifaximin is more effective than placebo in reducing symptoms in adults with IBS."
Do you see that?
A. I'm sorry, where does it say "the

Page 97

objective"?
Q. It's the first thing that's written in the article is the background.
This is still in that upper summary section.
A. Ah, okay.
Q. And then right after "Background," it says, "Objective."
And then it says: "To determine whether the nonabsorbed antibiotic rifaximin is more effective than placebo in reducing symptoms in adults with IBS."
Do you see that?
A. Yes.
Q. And in this trial, patients received 400 mgs, that's m-g-s, three times a day for ten days, right?
A. The treatment group did, yes.
Q. And the results -- again, in that "Summary" section up top, says: "Over the ten weeks of follow-up, rifaximin resulted in greater improvement in IBS symptoms (P=0.020). In addition, rifaximin recipients had a lower bloating score after treatment."
Did I read that correctly?

Page 98

A. Yes.
Q. Now Pimentel on page 562?
A. Okay.
Q. Left-hand column, second to the bottom paragraph, Pimentel acknowledges some study limitations in his own paper, correct?
A. Yes, that's generally done in publications such as this, yes.
Q. And then he summarizes his paper beginning on the bottom-left column on page 562 by saying: "In summary, the antibiotic rifaximin resulted in statistically greater global improvements in IBS than placebo in our randomized, double-blind study. Improvements were sustained through ten weeks of follow-up despite cessation of therapy after only ten days. Recent data suggests that the optimal dose of rifaximin may, in fact, be higher than that used in our study."
Do you see that?
A. Yes.
Q. I read that correctly, right?
A. Yes.
Q. And just to be clear, he cites to a reference there, 22. And if you look at the next page, the reference that's listed at 22, the first

named author there is Lauritano.
Do you see that?
A. Yes, I do.
Q. Going back to page 562, Pimentel -- or the authors, rather, acknowledge grant support was by Salix Pharmaceuticals.
Do you see that?
A. Yes, I do.
Q. And he also acknowledged potential financial conflicts of interest. And they list Salix Pharmaceuticals there, as well.
Do you see that, for consultancies?
A. That is correct, yes. I'm sorry, yes.
Q. They also list Salix Pharmaceuticals for honoraria.
Do you see that?
A. Yes, I do.
Q. And where it says, "Patents pending," it says: "M. Pimentel (Cedars-Sinai Medical Center). Cedars-Sinai Medical Center has a licensing agreement with Salix Pharmaceuticals."
Do you see that?
A. Yes, I do.
MR. LANGER: You can set Pimentel aside.



And let's populate the exhibit share with the -- what we referred to as the Drossman article, which is Tab B as in bravo, please.
(Exhibit Ehrenpreis-4, Treatment For Bacterial Overgrowth in the Irritable Bowel Syndrome, was marked for Identification by the court reporter.)
THE DEPONENT: Okay. Thank you.
MR. LANGER: Dr. Ehrenpreis, please feel free to review what is Exhibit 4.
In the meantime, I will mark it for identification as Exhibit Ehrenpreis-4. It is an editorial entitled: "Treatment For Bacterial Overgrowth in the Irritable Bowel Syndrome."
And it's written by Douglas A. Drossman, M.D.
BY MR. LANGER:
Q. Let me know when you've had a chance to look at it.
A. Okay, I've looked at it, yes.
Q. This is the Drossman article that you cite throughout your expert report, correct?
A. Yes.
Q. And you rely on the Drossman



editorial in support of your opinion that SIBO and IBS are unrelated, correct?
A. I do cite it. I'm also relying on my own opinions that may be separate from this article.
Q. And you also rely on the Drossman editorial for criticisms of the Pimentel 2006 clinical trial that we just looked at, which was Exhibit 3, right?
A. I cited it in my report, but I also have my own opinions relative to this article that I also rely upon.
Q. Okay. So let's look at Drossman -- looking at the first page, which is 626, two-thirds down in the first paragraph, do you see it says -- Dr. Drossman says: "It is now evident that IBS is not a single disease, but is a well-characterized symptom complex that relates symptoms to a variety of underlying physiologic determinants from gut to brain and back."
Do you see that?
A. Yes.
Q. And in the next paragraph -- I'm not going to read the whole long first sentence, but he says: "The role of the bacterial flora, a new area of research in the clinical expression of IBS, has



developed from several lines of evidence."
If you kind of skip some of the various lines of evidence, one of those lines of evidence cited is: "The evidence for small-bowel bacterial overgrowth in some patients with IBS."
Do you see that?
A. Yes.
Q. And, if you go to the next column -- so on Exhibit 4, column to the right, the first full paragraph states -- Dr. Drossman states: "Demonstrating benefit from a short course of an antibiotic for a sustained period of time in unselected patients with IBS is certainly novel and important."
Do you see that?
A. Yes.
Q. I don't think we said it, but just to be clear, the Drossman editorial was published along with Pimentel 2006; so at the same time, right?
A. Yes.
Q. Dr. Drossman then discusses, and you present in your expert report, six methodologic issues of Pimentel 2006 study, right?
A. I didn't count the number, but it sounds right.

Page 163

Q. Do you know whether any example described in the asserted patents excluded subjects presented with SIBO?
MR. SIKORA: Objection to form. You can answer if you know.
A. I don't know offhand whether they did or not.
BY MR. LANGER:
Q. You didn't consider whether the examples described in the asserted patents excluded patients presenting with SIBO?
MR. SIKORA: Same objection.
A. I didn't consider that when I looked at these patents, no.
BY MR. LANGER:
Q. Okay. We talked a little bit about your clinical practice early on. I just wanted to follow up on some things.
Did you ever treat hepatic encephalopathy? That was fast. I apologize. Hepatic encephalopathy in your clinical practice prior to 2017?
A. Yes.
Q. What drug -- strike that.
Did you treat it using prescription

Page 164

medication?
A. Yes.
Q. What drug did you use to treat hepatic encephalopathy in your clinical practice prior to 2017?
A. Lactulose.
Q. Any others?
A. No. Because most of the places I worked at had liver specialists, so generally I would see patients already in the ICU or hospitalized and it was my job to see them on rounds as coverage for the specialists who were taking care of them. So I didn't make decisions about their drugs, and I don't specifically recall giving rifaximin to any of those patients.
Q. Okay. You guessed my next question.
So you have no recollection of prescribing rifaximin to patients that you were treating for HE, correct?
A. No.
MR. LANGER: Let's take five minutes. I'm going to look at my notes. We may be done on our side.
THE VIDEOGRAPHER: Off the record, 2:29 p.m.

Page 165

(A brief recess was taken.)
THE VIDEOGRAPHER: Back on the record, 2:33 p.m.
BY MR. LANGER:
Q. Dr. Ehrenpreis, what did you do to prepare for your deposition today?
A. I reviewed the literature on this, and I reviewed my report, of course. I had meetings with my team.
Q. And who did you meet with?
A. I met with Mike Sikora and with Meg.
Q. Anybody else?
A. Early on, I met with Michael Abernathy as well.
Q. When you say "early on," when are you referring to?
A. We had an initial discussion to see if I was appropriate for this case, and we discussed some --
MR. SIKORA: So I'm going to instruct you not to get into the substance of the discussions that you had with counsel.
A. Okay. We had discussions.
BY MR. LANGER:
Q. This was in the context of retaining

Page 166

you as an expert; is that fair?
A. Yes.
Q. Yeah, so -- understood.
How much time would you say you spent in its entirety for your work on this case, roughly?
A. I'd say roughly 40 to 50 hours.
Q. Okay. Did you have one meeting with counsel in preparation for your deposition or multiple meetings?
A. Multiple meetings.
Q. Did you talk to anyone from Salix or Bausch internal in preparation for your deposition?
A. No, absolutely not, no.
Q. Did you talk with any other experts retained by plaintiffs in this case in preparation for your deposition?
A. No, I did not.
Q. Did you talk with any other experts retained in this case, or in the Norwich I case, in drafting and preparing your expert report?
A. No, I didn't.
MR. LANGER: Dr. Ehrenpreis, I very much appreciate your time. No further questions at this time.
THE DEPONENT: Thank you. Thank you

very much.
MR. MURPHY: Dr. Ehrenpreis, like Mr. Langer, I thank you for your time and I have no further questions for you today.
THE DEPONENT: Okay, thank you, Matt.
MR. SIKORA: I have a couple of questions, Dr. Ehrenpreis.
EXAMINATION BY MR. SIKORA:
Q. So, first of all, do you recall Mr. Langer's questions earlier today about the Norwich I case and the trial opinion from it?
A. Yes.
Q. Did you testify in the Norwich I case?
A. No, I did not.
Q. Did the judge in the Norwich I case have the benefit of any of your analysis or conclusions?
A. No, he did not.
MR. LANGER: Objection to form.
BY MR. SIKORA:
Q. So if you could please turn to Exhibit 4, please, which is the Drossman editorial. Let me know when you have that up.
MR. MURPHY: And just for the record,


while you're pulling that up, Dr. Ehrenpreis, that I will join Mr. Langer's objections for the sake of trying to avoid talking over each other.
THE DEPONENT: Thank you.
BY MR. SIKORA:
Q. Dr, do you have Ehrenpreis Exhibit 4, the 2006 Drossman editorial?
A. Yes.
Q. And you recall Mr. Langer asking you some questions about this document?
A. Yes.
Q. And if you could go to the second page, on the right-hand column, there's -- there are two concluding paragraphs, the first of which begins: "The clinical challenge begins." Do you see those two paragraphs?
A. Yes.
Q. Do you recall Mr. Langer's questions to you about these paragraphs?
A. I think you'd have to read them back to me to recall them specifically.
Q. Okay. So I think my first question to you is simply: Does Dr. Drossman advocate for any particular antibiotic to be used in treatment?
A. No.


MR. LANGER: Objection; form.
A. He does not.
BY MR. SIKORA:
Q. Does Dr. Drossman advocate for any --
MR. LANGER: I'm sorry. I'm sorry. I missed the answer because I was objecting. Can you repeat what you said, Dr. Ehrenpreis?
THE DEPONENT: I just said no, he does not.
BY MR. SIKORA:
Q. Does Dr. Drossman advocate for any particular dose of antibiotic to be used?
A. No, absolutely not.
MR. LANGER: Objection; form.
BY MR. SIKORA:
Q. Does Dr. Drossman advocate for any particular treatment time frame in this article?
A. No.
MR. LANGER: Objection; form.
BY MR. SIKORA:
Q. And in these paragraphs that Mr. Langer asked you about, what condition do you understand Dr. Drossman to be addressing?
A. The condition I believe he's addressing is SIBO, and if you notice, he says "a


subset of patients with symptoms suggestive of SIBO." So the way I read this is patients who were told they have SIBO or -- excuse me, who were diagnosed with IBS should then potentially have SIBO ruled out.
Q. And so, in your view, would a person skilled-in-the-art understand this paragraph as in any way endorsing the SIBO hypothesis advanced by Dr. Pimentel?
MR. LANGER: Objection; form; objection, leading.
A. No, I think -- no, I think this paragraph is saying that patients who have been -- there's a subset of patients who carry the diagnosis of IBS and potentially have SIBO, and that's the group that needs to be identified as having SIBO.
Q. In your view, is Dr. Drossman discussing or proposing a treatment for IBS in this portion of his editorial?
A. No, absolutely not. I think he's -- I think he is suggesting that if you find a subgroup of these patients with symptoms that are suggestive of SIBO, those patients potentially can be treated.
Q. Okay. Now -- you can set that aside.
If you could turn to Exhibit 5, which I believe is the Quigley article, and let me know

# EXHIBIT J

**CONTAINS INFORMATION MARKED AS**
**HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSEL ONLY**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

SALIX PHARMACEUTICALS, INC.,
SALIX PHARMACEUTICALS, LTD., AND
BAUSCH HEALTH IRELAND LTD.

Plaintiffs,

v.

NORWICH PHARMACEUTICALS INC.,

Defendant.

Case No.: 1:24-cv-7140-JFM

SALIX PHARMACEUTICALS, INC.,
SALIX PHARMACEUTICALS, LTD., AND
BAUSCH HEALTH IRELAND LTD.

Plaintiffs,

v.

AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, and AMNEAL EU, LIMITED,

Defendants.

Case No.: 1:24-cv-04607-ESK-AMD

**REPLY EXPERT INFRINGEMENT REPORT OF DR. DAVID A. JOHNSON**
**REGARDING INFRINGEMENT OF THE ASSERTED IBS-D PATENTS**

I declare under penalty of perjury under the laws of the United States that the following is true and correct. Executed in Norfolk, Virginia on November 12, 2025.

Dr. David A. Johnson

clinical trials.'" (Crespin Rpt. ¶ 47). Again, I disagree with Dr. Crespin's characterization. Like other fields of science, the field of medicine is not static. New advancements and developments are common. To properly serve their patients and provide the best care possible, physicians must stay apprised of new medical evidence and adjust their practice accordingly.

21. Guidance prepared by professional associations like the AGA and ACG are not divorced from clinical practice, as Dr. Crespin suggests. Rather, such associations represent their membership (which include practicing physicians), and focus their publications on topics that are useful to their readership (which, again, include practicing physicians). As discussed in my opening reports and CV, I have served on boards and publication committees for professional associations in this field and can confirm that their goal in publishing guidance is to provide practical information that the readership can apply. Even the titles of the rifaximin guidance reflect this goal. Lacy et al. (2020)'s title is "*ACG* ***Clinical Guideline****: Management of Irritable Bowel Syndrome*," and Lembo et al. (2022)'s title is "*AGA* ***Clinical Practice Guideline*** *on the Pharmacological Management of Irritable Bowel Syndrome With Diarrhea*." (Emphasis added).

22. Dr. Crespin tries to draw distinctions "between clinical practice and clinical research" to support his conclusions that "a clinical trial concerning IBS and/or IBS-D is not illustrative of how IBS and/or IBS-D is treated in clinical practice" and that clinical trial findings only have "value in academic or research settings for evaluating the basis of a regulatory approval." (Crespin Rpt. ¶¶ 49–51). He is incorrect physicians would not find information regarding clinical trials helpful or instructive to their practice. The point of evidence-based medicine is to treat patients according to the best medical evidence available, which typically is obtained from controlled clinical trials. The ACG and AGA recommendations and guidance for rifaximin in clinical practice are illustrative. Both associations base their recommendations and guidance for

rifaximin on the clinical trial findings.[2] Put differently, the ACG and AGA guidance are examples of how practicing physicians would find clinical trial findings helpful and informative to their clinical practice.

23. Additionally, Dr. Crespin does not identify any distinction between clinical trials and clinical practices that appear to matter to the Asserted Claims. For example, Dr. Crespin argues that "clinical practice . . . does not involve formal supervision of the drug intake." (*Id.* ¶ 49). If by "formal" supervision, Dr. Crespin is observing that physicians may use different methods than a clinical trial to monitor patients' drug intake, I agree. But that does not mean that patients are prescribed rifaximin without physician supervision or oversight—physician oversight occurs in both a clinical trial setting and ordinary practice. It is standard for physicians to confirm patient compliance with the prescribed regimen in follow-up visits (*e.g.*, asking the patient to confirm they successfully filled their prescription and were able to take the medication as instructed).

24. As another example, Dr. Crespin argues that "the use of assessment tools like the Rome Criteria (irrespective of the version) and Bristol Stool Scale to characterize IBS and its symptoms is generally limited to clinical trial settings rather than everyday clinical practice" and that "the Rome Criteria are typically not applied rigidly as a guide." (Crespin Rpt. ¶ 49). Again, I disagree with Dr. Crespin's characterization. The Rome Criteria (including its reference to the Bristol Stool Scale) is the well-accepted diagnostic criteria for IBS patients, is well-known to practicing physicians, and is routinely employed in clinical practice. Dr. Crespin is simply wrong that physicians "typically" disregard the accepted Rome diagnostic criteria in diagnosing IBS patients. Tellingly, Dr. Crespin does not identify what alternative criteria physicians supposedly

[2] XIFAX_AMN_1994084 at 85; XIFAX_AMN_1994112 at 113–118.

apply instead of the Rome Criteria. (*See* Crespin Rpt. ¶¶ 49–51). As to my interpretation, he incorrectly suggests that physicians should not use standards of best evidence and best practice recommendations when providing care for patients. (*Id.*).

25. Dr. Crespin is also wrong that physicians "lack the time and incentives" to employ best practices like the Rome Criteria for diagnosing IBS. (Crespin Rpt. ¶ 49). Physicians do not need an "incentive" to apply such well-accepted diagnostic criteria—it is their job to provide the best care possible for patients. In my experience, physicians endeavor to follow these best practices. Physicians also have ample "time" to employ the Rome Criteria. The Rome criteria and Briston Stool Scale are not complicated and are—like industry guidance from professional associations—designed to be useful in everyday clinical practice. The Rome Foundation, for example, even provides a "Diagnostic Pocket Card" for a convenient way to consult the Rome criteria for IBS (including the Bristol Stool Scale).[3] It also provides an exemplary questionnaire that "translates the Rome IV diagnostic criteria into questions that can be understood and reported by patients" and would "assist clinicians in arriving at a provisional diagnosis."[4] That said, physicians practicing in this field are already familiar with the Rome Criteria and experienced at applying them. While physicians may refresh themselves on the Rome Criteria from time-to-time, they typically can apply the Rome Criteria to the patients' reported symptoms without needing to consult resources each and every time.

26. Dr. Crespin further argues that "physicians do not typically collect and track detailed baseline information" and disagrees with me that "as a practical matter, treating IBS-D on an individual patient basis requires identifying that particular patient's baseline symptoms and

---

[3] XIFAX_AMN_1996775–781.
[4] XIFAX_AMN_1996764–765.

periodically evaluating whether treatment is improving those symptoms." (Crespin Rpt. ¶ 50). Again, I disagree. If a physician does not identify a patient's baseline symptoms and the severity of those symptoms, they would have no basis on which to (1) diagnose the patient; (2) design a treatment plan for that patient; or (3) assess how successful the treatment has been in follow-up visits. Although particular physicians may identify and assess baseline symptoms differently than how I do (with daily journals), or how might occur in a clinical trial (*e.g.*, verbal questions instead of formal questionnaires), physicians in every day practice do identify and assess patients' baseline symptoms. Similarly, physicians in everyday practice do monitor and record symptom progression, regardless of whether they do so differently than in a clinical trial (*e.g.*, notes in the patient's chart rather than formal questionnaires).

27. I also disagree with Dr. Crespin that daily patient symptom diaries would be atypical in clinical practice. (*See* Crespin Rpt. ¶ 50). As stated in my opening report, the long-time approach employed in my own gastroenterology practice has been to employ daily symptom diaries. Symptom diaries are helpful because, without them, not all patients can readily recall the progression of their symptoms and the timing of that progression. Such information is quite valuable in assessing and designing treatment plans, especially for chronic conditions with variable symptoms like IBS. Individual physicians will, of course, vary somewhat in how they assess symptoms and monitor reductions in those symptoms. Individual physicians may even adjust their methods to an individual patient's needs. For example, in instances where a patient has presented with symptoms that could correspond to multiple different conditions, I have employed questionnaires (similar to those used in clinical trials) to help make a diagnosis, not just symptom diaries. However, these variances do not mean that using daily symptom diaries is atypical—they

are one of multiple tools commonly used in the field to help clinicians initiate care and assess response to the interventive therapy.

**B. Defendants' ANDA Products**

28. In his "Background" section (Section VIII), Dr. Crespin also describes the proposed ANDA Labels and disagrees with some of my characterizations. (*See* Crespin Rpt. ¶¶ 52-63).

29. Dr. Crespin states that he disagrees with characterizing "Section 14.3 as instructing or encouraging specific conduct," stating that "Neither the 'Indications and Usage' or 'Dosage and Administration' sections of Defendants' Labels cross-reference, direct or instruct a physician or patient to the 'Clinical Studies' section, including Section 14.3." (Crespin Rpt. ¶ 55). Apart from citing his experience, Dr. Crespin provides no reason to support his opinion that one would not consult the ANDA Label as a whole, and instead consult ***only*** Section 1 ("Indications and Usage"), Section 2 ("Dosage and Administration"), and information explicitly cross-referenced therein. These two short questions are only a small part of the "Full Prescribing Information" that, as a whole, instructs physicians and patients on how to use a proposed ANDA product.

30. Dr. Crespin's logic—which relies on the presence or absence of explicit cross references—is flawed. Sections 1 and 2 collectively contain a single cross reference to the "Clinical Pharmacology (12.3)" section. Thus, if one followed Dr. Crespin's flawed logic, they would not only ignore Section 14 ("Clinical Studies"), but also Section 4 ("Contraindications"), Section 5 ("Warnings and Precautions"), Section 6 ("Adverse Reactions"), Section 7 ("Drug Interactions"), and Section 8 ("Use in Specific Populations"). Ignoring these sections would be dangerous. The FDA regulates what types of information must be included on drug labels, and physicians understand that each section provides a certain type of information the FDA deems important, including the Clinical Studies section. Thus, I disagree that physicians and patients would selectively parse the ANDA Label. Rather, they would recognize that the ANDA Label as

a whole (*i.e.*, the "Full Prescribing Information") provides for instructions regarding how to use the proposed ANDA product.

31. Additionally, as a practical matter, information about clinical studies is instructive information one would seek out on a drug label. Section 6.1 makes clear that "Adverse Reaction" information stems from the "Clinical Trials Experience." (Norwich_NJ_RIFA_028517 at 528; AMN-RFXMN_000444755 at 58–59). Section 14 ("Clinical Studies") further provides helpful information about using the proposed ANDA product—instructive examples of patients being treated with 550 mg rifaximin tablets TID for fourteen days that the FDA relied upon in approving the indication. For conditions like IBS, which can present with a variety of differing symptom profiles, such examples would be especially helpful to understanding the label. The criteria used by the supporting clinical trials to identify "IBS-D" patients would clarify the scope of the indication. Similarly, it would be helpful to understand what symptoms associated with IBS-D can be treated with the proposed ANDA product. Section 14 ("Clinical Studies") thus provides helpful information that one would be interested in consulting.

32. As noted above, the AGA and ACG recommendations and guidance regarding rifaximin illustrate the usefulness of clinical trial findings in instructing clinical practice. Similarly, a physician would find the information of Section 14 ("Clinical Studies") instructive regarding how to use the proposed ANDA product.

33. I also disagree with Dr. Crespin's assertion that Section 14 ("Clinical Studies") does not "inform physicians and patients" about assessing symptoms and reliably assessing symptom relief. (*See* Crespin Rpt. ¶ 61). Dr. Crespin, for example, states that "Defendants' Labels nowhere assert the reliability for clinical practice of any component of the cited clinical trials." (*Id.*). I disagree. The clinical trial information provided on the ANDA Labels is medical evidence

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO.: 1:24-cv-04607-JFM

SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD.,

Plaintiffs,

v.

AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, and AMNEAL EU, LIMITED,

Defendants.

\-----------------------------------------------

CASE NO.: 1:24-cv-7140-JFM

SALIX PHARMACEUTICALS, INC., et al.,

Plaintiffs,

v.

NORWICH PHARMACEUTICALS, INC.,

Defendant.

\-----------------------------------------------

DEPOSITION OF ALBERT HARARY, M.D., F.A.C.P.

MONDAY, JANUARY 19, 2026

| | | |
|---|---|---|
| Exhibit 5 | Dr. Drossman's Editorial | 42 |
| Exhibit 9 | Cuoco Reference | 68 |
| Exhibit 3A | Dr. Johnson Rebuttal Report Binder | 79 |
| Exhibit 8 | Vanner Reference | 86 |
| Exhibit 10 | Sharara Reference | 103 |
| Exhibit 12 | Clinical Trial Protocol | 134 |
| Exhibit 13 | Weinstock E-mail | 135 |


(ALL EXHIBITS WERE RETAINED BY COUNSEL.)



(Whereupon, Exhibits 1, 2, and 3 were marked for identification.)

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:37 a.m. EDT on January 19th, 2026. Please note that these microphones are sensitive and may pick up whispering and private conversation. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit one of the video recorded deposition of Albert Harary, M.D. taken by counsel for plaintiff in the matter of Salix Pharmaceuticals, et al. versus Norwich Pharmaceuticals Incorporated, et al. filed in the United States District Court for the District of New Jersey, case No.: 1:24-cv-04607-JFM. The location of this deposition is New York, New York.

My name is Julian Cosma representing Veritext and I'm the videographer. The court reporter is Jomanna DeRosa from the firm Veritext. I am not authorized to administer an oath. I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your



appearance. Counsel and all present, including remotely, please state your appearances and affiliations for the record beginning with the noticing attorney.

MR. ABERNATHY: Mike Abernathy of Morgan Lewis and with me is Margaret McGreal. I also believe participating virtually is Michael Sikora.

MR. MURPHY: Good morning. Matt Murphy of Axinn Veltrop and Harkrider on behalf of Defendant Norwich Pharmaceuticals. Also with me is my colleague Cassie Goodnight.

MR. LANGER: Oren Langer from Robins Kaplan LLP on behalf of the Amneal defendants. If I may just correct, there are two cases in which Dr. Harary is appearing on; Salix versus Amneal, which is the 4607 case, and Salix versus Norwich, which is the 7140 case. Mr. Murphy will be defending the witness and Amneal will join in his objections and if we need to make objections individually, I'll do that. Thank you very much.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.



ALBERT HARARY, M.D., F.A.C.P., office at 225 East 57th Street, New York, New York 10022, having first been duly sworn by the Notary, then testified as follows:

DIRECT EXAMINATION
BY MR. ABERNATHY:

Q. Doctor, please state your full name?
A. Albert Harary.
Q. You're an expert in this litigation?
A. Yes.
Q. We're going to start with some paperwork, an exciting way to start. So I'm going to hand you copies of your expert reports. First, I'm handing you what we've marked as Exhibit 1 your Opening Report regarding invalidity.

I'm also handing you what we've marked as Exhibit 2, your Reply Report regarding invalidity of the asserted patents in this case.

I'm also handing you what we've marked as Exhibit 3, the expert report regarding validity of the asserted patents of Dr. David Johnson.

Do you have those in front of you?
A. Yes.
Q. Focusing now on -- just put this to the

Page 10

side -- we won't need that for a while -- Exhibits 1 and 2. Exhibits 1 and 2 contain all of the opinions you have formed in this litigation. Is that correct?
A. Yes.
Q. And Exhibits 1 and 2 contain the bases for those opinions. Is that correct?
A. Yes.
Q. Do you consider yourself an expert in bloating?
A. An expert in what?
Q. Bloating?
A. Yes.
Q. You agree that bloating can be a symptom of several different conditions?
A. Yes.
Q. Lactose intolerance patients can experience bloating?
A. Yes.
Q. You're familiar with SIBO; aren't you?
A. Yes.
Q. SIBO stands for small intestinal bacterial overgrowth?
A. Yes.
Q. SIBO patients can experience bloating?
A. Yes.

Page 11

Q. I may mispronounce this word, but celiac disease patients can experience bloating?
A. Yes.
Q. Crohn's disease patients can experience bloating?
A. Yes.
Q. Ulcerative colitis patients can experience bloating?
A. Not very frequently, but it's possible.
Q. They can, right?
A. Yes.
Q. And GIRD patients can experience bloating?
A. Not as part of their GIRD, no.
Q. No?
A. No.
Q. Patients suffering from chronic constipation can experience bloating?
A. Yes.
Q. Bloating is more common with IBS-C than IBS-D?
A. Not necessarily, no. I'm -- no.
Q. Let's just make sure we have terminology correct. IBS-C means IBS constipation. Correct?
A. Right, predominant constipation, yes.

Page 12

Q. And IBS-D is IBS diarrhea?
A. Diarrhea predominant, yes.
Q. A patient can have bloating and not IBS?
A. Yes.
Q. A patient can have bloating and not IBS-D?
A. Yes.
Q. Functional bloating is different from bloating associated with IBS-D?
A. Yes. There's a -- there is overlap, though, between them. It's not entirely distinct.
Q. Right. But just so that we're clear, functional bloating is different than bloating associated with IBS-D?
A. Yes.
Q. I may have asked this, but patients with SIBO can experience bloating. Right?
A. Yes.
Q. A patient can have SIBO and not IBS?
A. Yes.
Q. SIBO is a different condition from IBS-D?
A. Not entirely. IBS-D is a syndrome. It's a collection of symptoms.
Q. Right.

Page 13

A. And SIBO is a pathophysiologic process going on in the patient. So they're sort of different levels of nomenclature. They're not in parallel. They're sort of --
Q. Correct. But my question was simply: SIBO is a different condition from IBS-D?
A. Yes, but there's a lot of overlap.
Q. Right. But just so that we're clear, you agree SIBO is a different condition from IBS-D?
MR. MURPHY: Objection. Asked and answered.
THE WITNESS: It's often part and parcel of it, so it's not a different condition, really. It's a different -- you're asking me to compare a syndrome and a mechanism in a patient. They're not exactly at the same level of classification.

BY MR. ABERNATHY:
Q. I asked you: SIBO is a different condition from IBS-D; you answered yes, but there's a lot of overlap. Is that your testimony?
MR. MURPHY: Objection. Argumentative.
THE WITNESS: On one level, yes, but I elaborated that one is a classification regarding a syndrome and one is a classification regarding a

physiologic process in a patient.

BY MR. ABERNATHY:
Q. So I take it from your answer, you agree that IBS-D is a subtype of IBS?
A. Yes.
Q. And IBS-D is sometimes referred to as diarrhea predominant IBS?
A. Yes.
Q. IBS-D patients experience diarrhea?
A. Yes.
Q. Do you consider yourself an expert in IBS?
A. Yes.
Q. Do you consider yourself an expert in IBS-D?
A. Yes.
Q. Diarrhea defines IBS-D?
A. Diarrhea combined with other symptoms.
Q. Diarrhea defines IBS-D. Right?
MR. MURPHY: Objection. Asked and answered.
THE WITNESS: No.

BY MR. ABERNATHY:



Q. Well, it's IBS dominant -- or predominant diarrhea. Right?
A. Not all patients with diarrhea have IBS, so it doesn't define it. It's diarrhea combined with other symptoms that defines IBS.
Q. But to have IBS-D, IBS-D, you have to have diarrhea. Correct?
A. Yes.
Q. In other words, all IBS-D patients experience diarrhea. Correct?
A. Yes.
Q. If you don't have IBS-D, you don't have diarrhea. Right?
MR. MURPHY: Objection to form.
THE WITNESS: No. You can have diarrhea due to other causes besides IBS.

BY MR. ABERNATHY:
Q. Can you have -- can a patient have IBS-D if she doesn't have diarrhea?
A. At a given -- on a given day, possibly. But at some point in the course of the illness, you would need to have diarrhea.
Q. Can you go to your Reply Report, Exhibit 2, and if you go, please, to Paragraph 8.



Paragraph 8, Doctor, is on Pages 3 and 4.
A. Okay. Yeah, I got it. I got it.
Q. Pages 3 and 4?
A. Yes, I have it.
Q. Paragraph 8 of your Reply Report identifies the entirety of the prior art combinations you have asserted against the claims of the '912 Patent. Correct?
MR. MURPHY: Doctor, if you need a moment to review Paragraph 8, please do so.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. Now, if you turn your attention to Paragraph 9, and please review that.
A. Yes, this is a summary of the --
Q. I haven't asked you a question yet, Doctor.
A. Oh, sorry.
Q. Paragraph 9 of your Reply Report identifies the entirety of the prior art combinations you have asserted against the claims of the '571 Patent. Right?
A. Yes.
MR. MURPHY: Objection to form.



BY MR. ABERNATHY:
Q. None of the prior art combinations you have asserted against the '912 and '571 Patents includes the RFIB 2001 Press Release. Correct?
A. Can you repeat the question?
Q. Sure. None of the prior art combinations that you have asserted against the '912 and '571 patents includes the RFIB 2001 Press Release?
MR. MURPHY: Objection to form.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. None of the prior art combinations you have asserted against the '912 and '571 Patents includes Jolly 2011. Correct?
A. Correct.
Q. None of the prior art combinations you have asserted against the '912 and '571 Patents includes Pimentel, P-I-M-E-N-T-E-L, 2011. Right? So for clarity of the record, I'll restate the question.
None of the prior art combinations you have asserted against the '912 and '571 Patents includes Pimentel 2011?

Page 22

A. Yes.
Q. Bearing that person in mind, at the time of the inventions of the asserted patents, one of skill in the art, as you've defined that person, would have been aware of Pimentel's, et al. statement, quote: "No major differences in abdominal pain, diarrhea or constipation were observed between these groups."?
A. Yes.
MR. MURPHY: Objection to form. Mischaracterizes the document.

BY MR. ABERNATHY:
Q. If you turn, please, to Page 18 of your Reply Report?
A. Just hold on one second, please.
Q. You know what? Before we get there, Doctor --
A. Yeah.
Q. Can you turn, please, to, so that we're all on the same page, 561 of the article, of the Pimentel, et al. article?
A. Yes, I have it.
Q. Do you see, under the heading "Secondary Symptoms For Refaximin"?

Page 23

A. Yes.
MR. MURPHY: Doctor, just please be sure you give me a second to make an objection, if I need to.
THE WITNESS: Okay.

BY MR. ABERNATHY:
Q. Do you see where Pimentel wrote:
"The VAS scores" -- capital v capital a, capital s -- "for abdominal pain, P equals 0.32; diarrhea, P equals 0.67; and constipation, P equals 0.069, did not significantly differ."
Do you see that?
A. Yes.
Q. At the time of the inventions of the asserted patents, one of skill in the art would have been aware of those findings. Correct?
A. Yes.
Q. And also, in the next paragraph, do you see where Pimental, et al. wrote:
"After controlling for abdominal pain, our analysis found that bloating remained significantly improved, P greater than -- less than" -- excuse me -- "0.001; although VAS scores for diarrhea were still not significantly significant

Page 24

over placebo."
Do you see that?
A. Yes.
Q. One of skill in the art at the time of the inventions of the asserted patents would have been aware of that finding. Correct?
A. Yes. But again, in reference to your question about major before, this is where statistically significant is important because, if you look at the p-value for the VAS score for diarrhea, although it didn't reach statistical significance of 0.05 or less, the p-value, the p-value is 0.151, which, although it doesn't reach significant levels, still suggests a trend in that direction.
Q. Right. But you're not quibbling or disagreeing with Pimentel's conclusion that the VAS scores for diarrhea were not -- still not statistically significant. Correct?
A. Statistically significant, that's correct.
MR. MURPHY: Objection to form.

BY MR. ABERNATHY:
Q. Now, let's go back to your Reply Report,

Page 25

which I think is Exhibit 2. And if you go, Doctor, to Page 18; do you have Page 18 in front of you?
A. Yes.
Q. Pages 18 and 19 contain, although perhaps not exclusively, your reply; Expert Opinions Concerning Pimentel 2006. Correct?
MR. MURPHY: Objection to form.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. For the -- you write in Paragraph 36:
"For the study to have shown benefit of Refaximin for IBS and/or IBS-D, it is not necessary to have a statistically significant improvement in every possible IBS symptom, only the global improvement or improvement in any one symptom."
Correct?
A. Yes.
Q. But, again, you'll agree with me that Pimental, et al. found that the VAS scores for diarrhea were not statistically significant. Correct?
MR. MURPHY: Objection to form.
THE WITNESS: Yes, as I mentioned before, though, they were possibly, based on the fact

that the global improvement was better and there was a trend in the -- in the data they presented. Possibly, it was an improvement in diarrhea, although it was not statistically significant.

BY MR. ABERNATHY:

Q. You write, in part, the same sentence we talked about: "It is not necessary to have a statistically significant improvement in every possible IBS symptom, only the global improvement or improvement in any one symptom."

I want to focus on any one symptom. Right?

Do you see that?

A. Right.

Q. If one were interested in diarrhea, one would read Pimentel and conclude that Rifaximin, in the dosing used in that study, did not produce statistically significant improvement over placebo for diarrhea. Correct?

A. Yes.

MR. MURPHY: Objection to form. Incomplete hypothetical.

THE WITNESS: I'm sorry, I didn't hear what you said.



MR. MURPHY: Incomplete hypothetical. Sorry, you can answer.

THE WITNESS: Oh, yes.

BY MR. ABERNATHY:

Q. Doctor, if you could turn back to Exhibit 4, the Pimentel reference, please. If you turn to Page 562 of the printed publication, last page, a text?

A. Yes, I have it. I have it.

Q. In the upper right-hand corner, do you see the sentence that says:

"Recent data suggests that the optimal dosage of Rifaximin may in fact be higher than that used in our study."?

A. Yes.

Q. And that refers to Note 22.

Do you see that?

A. Yes.

Q. And Note 22 refers to an article that you discuss in your Opening Report called Lauritano. Correct?

A. Yes.

Q. It's true, isn't it, that the dosage in Lauritano is exactly the same as the dosage in



Pimentel 2006. Correct?

MR. MURPHY: Objection to form.

THE WITNESS: No, it's not correct. There were several doses used in the Lauritano study.

BY MR. ABERNATHY:

Q. The highest dosage in Lauritano was 1200 mgs a day. Correct?

A. Yes.

Q. The highest dosage in the Pimentel reference was 1200 mgs a day. Correct?

A. Yes.

Q. The highest reported dose used in Lauritano was the same dose used in Pimentel 2006?

A. Yes.

MR. MURPHY: Objection to form.

Just for the court reporter, Dr. Harary, just make sure you pause for just a second. Thank you.

THE WITNESS: Sorry.

BY MR. ABERNATHY:

Q. Now, Doctor, you're aware that the PTL issued the '571 Patent after the court in Norwich-1 issued its opinion in that case?



A. Yes.

Q. You're also aware that the '912 Patent issued after the court in Norwich-1 issued its opinion in that case?

A. I would need to check that.

Q. Sure. I think you have the patents in front of you. Oh, we don't have the patents in front of you. Oh, we don't have the patents in front of you. Well, let's -- let's take care of that.

(Whereupon, Exhibit 6, '571 Patent, and Exhibit 7, '912 Patent, were marked for identification.)

BY MR. ABERNATHY:

Q. Doctor, I'm handing you what we have marked as the '571 Patent as Exhibit 6 and I am handing you what we've marked as Exhibit 7 as the '912 Patent.

MR. MURPHY: Mr. Abernathy, just to be clear, we're skipping Exhibit 5 or there's no Exhibit 5 currently?

MR. ABERNATHY: Correct, not yet. Patience is a virtue.

BY MR. ABERNATHY:
Q. So Doctor, do you have Exhibit 6 in front of you?
A. Yes, I'm just trying to find the date that the -- the Norwich-1 trial opinion was actually issued. I don't see it, the date, in my report, but I may be missing it.
Q. Doctor, I think we can help you on that.
A. Okay.
Q. If you turn, please, to Exhibit 6, the '571 Patent. Do you have that in front of you?
A. Yes.
Q. If you turn, please, to the second page, denominated Page 2, and there's a column, References Cited.
Do you see that?
A. Yes.
Q. I'm going to, with counsel's permission, just refer you to it. Do you see the reference to Salix Pharmaceutical Limited, et al.?
A. Yes.
Q. I'm going to just put a checkmark there, to help you.
A. That answers the question, right. It's August 10th, 2022, which is before the date of the



two patents that were filed.
Q. Okay. Doctor, you're aware that Salix cited Pimentel 2006 during the prosecution of the '571 and '912 Patents?
MR. MURPHY: Objection to form.
MR. ABERNATHY: You may answer.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. Doctor, you're aware that Salix cited the IFIB 2001 protocol during the prosecution of the '571 and the '912 Patents?
MR. MURPHY: Objection to form.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. Doctor, you're aware that Salix cited the RFIB 2001 Press Release during the prosecution of the '571 and '912 Patents?
MR. MURPHY: Objection to form.
THE WITNESS: I would have to look through it.
MR. ABERNATHY: Sure, I think we can help you.
Matt, would you mind if I just showed



him a copy of these, just to orient him?
MR. MURPHY: It's not the exhibit. I mean, I think if you maybe -- I don't know which one you're pointing to.

BY MR. ABERNATHY:
Q. Doctor, if you turn to Exhibit 6 where the page is marked as Page 2?
A. Okay, yes.
Q. Got it? And do you see three references from the bottom on the right-hand column?
A. Yes, that's the September 7th press release you're referring to?
Q. Yes.
A. Yes. So the answer is yes.
Q. Let's just make sure we have a clean question and answer. You agree that Salix cited the RFIB 2001 Press Release during the prosecution of the '912 and the '571 Patents?
MR. MURPHY: Objection to form.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. Now, your opinion relies on a reference called, and I may mispronounce this, Cuoco,



C-U-O-C-O?
A. It's one of the -- one of the references that I rely on, yes.
Q. For the past six months, I've been using Cuoco in my head. So, if you don't mind, I'm gonna say that. You're aware that Salix cited Cuoco during the prosecution of the '571 and '912 Patents?
MR. MURPHY: Objection to form.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. And we've looked at this, but, again, just to be clear on the record, you're aware that Salix cited the Norwich-1 trial opinion during the prosecution of the '571 and '912 Patents?
MR. MURPHY: Objection to form.
THE WITNESS: Right, yes.

BY MR. ABERNATHY:
Q. Doctor, one of the references you rely on, and I'm definitely going to butcher this name, is the Sharara, S-H-A-R-A-R-A reference. Salix cited that reference during the prosecution of the '571 and '912 Patents. Right?
MR. MURPHY: Objection to form.

Page 134

(Whereupon, Exhibit 12, Clinical Trial Protocol, was marked for identification.)

BY MR. ABERNATHY:
Q. For the time being, my question simply is: Is this a clinical trial protocol, referred to in Paragraphs 8 and 9?
MR. MURPHY: Objection to form.
THE WITNESS: Yes.

BY MR. ABERNATHY:
Q. And I don't think this is a trick question. I just want to make sure I'm reading this right. The clinical trial protocol nowhere mentions SIBO?
A. I'm reading it now. I mean, the main criteria for inclusion is Irritable Bowel Syndrome with diarrhea predominance.
Q. Right.
A. And I don't see anything about SIBO in the protocol.
Q. Based on your understanding of the clinical trial protocol, the trial protocol did not test whether SIBO contributed to IBS?
A. That's correct.

Page 135

Q. And the clinical trial protocol talks about a study design. It does not reveal study results. Correct?
MR. MURPHY: Objection to form.
THE WITNESS: That's correct.

BY MR. ABERNATHY:
Q. I just wanted to make sure I asked this. The RFIB trial protocol is one of the references you refer to in Paragraphs 8 and 9 of your Reply Report?
A. Yes.
Q. You also refer to something called the Weinstock e-mail?
A. Right.
Q. In Paragraphs 8 and 9. Is that right?
A. Yes.

(Whereupon, Exhibit 13, Weinstock E-mail, was marked for identification.)

MR. ABERNATHY: I'm handing you what we've marked as Exhibit 13.
THE WITNESS: Okay, yes.

Page 136

BY MR. ABERNATHY:
Q. Is Exhibit 13 the Weinstock e-mail referred to in Paragraphs 8 and 9 of your Reply Report?
A. Yes.
Q. Just a couple more questions on this. Exhibit 13 is an e-mail from Mark Pimentel -- I'm sorry. It's an e-mail from Leonard Woodstock?
A. Weinstock. Weinstock.
Q. Weinstock, sure, to Mark Pimentel, copy Tracy Robinson, Bill Forbes, David Taylor. Is that right?
A. Yes.
Q. You're not claiming that this e-mail was publicly available to a PHOSITA at the time of the inventions of the asserted patents?
MR. MURPHY: Objection to form.
THE WITNESS: That's correct. I would like to add to that answer that my -- since this is relevant to my combinations about prior art, that I understand that having a communication of this sort with an inventor is considered a disclosure of prior art.
MR. ABERNATHY: I understand your position in that regard.

Page 137

THE WITNESS: Yeah.
MR. ABERNATHY: You know, if you give me five, ten minutes, we may be done.
MR. MURPHY: Sure. Let's go off the record.
THE VIDEOGRAPHER: We are going off the record at 2:34 p.m.

(Whereupon, a brief recess was taken off the record.)

THE VIDEOGRAPHER: We are back on the record at 2:48 p.m.

BY MR. ABERNATHY:
Q. Doctor, can you turn to Exhibit 1, Paragraph 743?
A. Exhibit 10?
Q. Exhibit 1.
A. One.
Q. It should be on Page 217.
A. Okay. 742, you said?
Q. 743.
A. 743. Okay.
Q. Referring to claims five through seven

Page 138

of the '912 Patent and claims two through four of the '571 Patent, you opine that:

"These claims merely recite an intended result or observation flowing from the method recited in claim one of the '912 Patent and claim one of the '571 Patent."

What do you mean by intended result or observation?

A. Let me run through the -- the claims. It's five through seven and two through four, okay.

Q. And if it helps you to have it at a different place, the claims are set forth in your Reply Report.

A. Yes, I have it in the Initial Report, also.

Q. Yeah, okay.

A. No, it's the same thing in both? I mean.

Q. Yeah, I was simply saying, Doctor, you could have your report here and the claims, like I have, to make it easier for you.

A. Okay, good. So can you ask the question, again?

Q. Sure. Referring to claims five through seven of the '912 Patent and claims two through four

Page 139

of the '571 Patent, you opine that these claims merely recite an intended result or observation. And my question is: What do you mean by intended result or observation?

A. I mean, basically, the -- the method reciting in claim one of each of the two patents is -- is no different from -- from the previous patents that were already adjudicated and found to be obvious and invalid, the claims of those patents, and sections five through seven of the '912 Patent and claims two to four of the '571 Patent have nothing to do with the method. And, basically, the dose is the same, the frequency is the same, the duration is the same, the patient population is the same, the disease that's being treated is the same. So, they're basically the same methods and everything; and these sections that I referred to have nothing to do with the method that's being -- that's being -- the claim that -- the reality of it. These are, for example, a reduction of one or more symptoms. And claim five is almost automatic in any medication, that you would have to assess reduction of -- of a symptom, for example. You would assess that before and after treatment, I'm sorry that's number -- claim six. Claim seven is just the same thing, determining

Page 140

a patient's symptoms, which is intrinsic to any medication in medicine, any disease, any patient. You need to know what the symptoms are before your treatment and afterwards, so it's sort of a basic principle of being a physician to assess these things. There's nothing unique and it doesn't have any material effect on the -- on the actual method that's attempted to be patented. So it's an observation. It's a result of the method, but it's not any change in the actual method.

Q. When you say intended result or observation, do you mean the result is automatic from the method in, for instance, claims one and two of the asserted patents?

MR. MURPHY: Objection to form.

THE WITNESS: I'm not sure what you mean by that.

BY MR. ABERNATHY:

Q. Well, you used "almost automatic". I'm using your language, so I'm trying to understand what you meant?

A. Where is that? Oh, what I said?

Q. Yes.

A. Yeah, what I mean is that it's intrinsic

Page 141

to the practice of medicine to determine this kind of -- the response of the patient's illness, the response of the patient's symptoms to a medication. And there's nothing -- it's -- automatic is the wrong word. It's intrinsic to practicing medicine to determine these things. It has nothing to do with the unique method of the patents or anything else that it's -- any disease that you're treating with any medication, you'd have to determine these particular things; the responsive symptoms, reduction of symptoms, et cetera. So it's, when I say intended result or observation, it's the -- it's the result of treatment, basically, as a consequence --

Q. Is it the inevitable result of treatment? Is that what you're saying?

MR. MURPHY: Objection.

THE WITNESS: No. No, I mean when you treat a patient with a medication, you don't know if they're going to respond. I mean, the reason we use the medication is that we expect that there's a good likelihood or a reasonable chance that the patient will respond, and we bring them back, we assess it. If they responded, you may continue the medication. If the course of medication is finished, we just keep it in reserve if we need it again. And if they don't

get better, you try something else. So it's really the -- I'm referring here to the symptoms and the response to symptoms is not guaranteed, but the reason we prescribe the medication is we expect that there is a good chance that it will help.

BY MR. ABERNATHY:

Q. So look at the '571 Patent claims, please. Do you have that in front of you?

A. Okay, yes. Yes.

Q. And I'm focusing on claim three.

A. Right.

Q. It says: "The method of claim two where the reduction of bloating is achieved following seven days after the administration of Rifaximin."

Do you see that?

A. Yes.

Q. Is it your opinion that that reduction of bloating is intrinsic to the practice of medicine?

A. No. No. I was referring to the other -- the other claims. In this claim, the -- well, what is your question, exactly?

Q. Well, tell me, for claim three of the '571 Patent, what do you mean by intended result or observation as described in Paragraph 743 of your



Opening Report?

A. Well, this has to do more with the inclusion of patients; that the reduction of bloating is -- is a consequence of -- of the treatment. So the symptom is -- is improved, but bloating was available in the prior art from, in most of the references that we've discussed already and many others, bloating is one of the symptoms of diarrhea predominant IBS. And the reduction of bloating as a -- as a goal is -- was already established as prior art.

Q. Well, again, we're talking about intended result or observation, so I -- I want to drill down on this. So claim one talks about treating bloating associated with diarrhea predominant Irritable Bowel Syndrome. Right?

A. Right.

Q. And then, claim two talks about, among other things, the method of claim one --

A. I'm sorry. I was looking at the wrong part of that sentence. I see what's -- the bloating was part of claim one. So in claim three, it has to do with the seven day limitation as far as -- that the result is achieved seven days afterwards.

Q. But just so I understand --



A. I was looking at the wrong part of that claim. So I want to start all over, if you'll let me, please, because I think what I was addressing was the wrong part of the claim when I was answering your question.

Q. Tell me, please, for claim three, what is the intended result or observation as you used that phrase in Paragraph 743 of your Opening Report?

A. The intended result or observation is an improvement in symptoms. And in claim three, the seven day limitation is included in that claim. But what is being assessed at that seven day mark, and we can discuss exactly what that means, and I discuss that in my reports, in my Reply Report, but what is being assessed at seven days is the response of symptoms, which is not intrinsic to the method. It's intrinsic -- it's a result of the method; so it's improvement in symptoms. You take the medication and the patient is assessed whether he gets better. This assessment is, according to the claim, occurs following seven days after the administration of Rifaximin. But what is being assessed is the improvement in the patient's symptoms.

Q. Right. So just so I understand, a method is recited in claim one that involves, among



other things, treating bloating associated with diarrhea predominant Irritable Bowel Syndrome?

A. Right.

Q. There's a dependent claim two that talks about the method of claim one:

"Wherein the treating of bloating, that is bloating associated with diarrhea predominant Irritable Bowel Syndrome, comprises a reduction of bloating from baseline symptoms established prior to treatment."?

MR. MURPHY: Objection to form.

BY MR. ABERNATHY:

Q. And then, claim three says:

"The method of claim two where the reduction of bloating, that is bloating associated with diarrhea predominant Irritable Bowel Syndrome, is achieved following seven days after the administration of Rifaximin."

Doctor, identify for me precisely what is the intended result or observation in claim three?

MR. MURPHY: Objection to form.

THE WITNESS: It's reduction of the symptom of bloating.

BY MR. ABERNATHY:
Q. Associated with IBS-D. Right?
A. Yes.
Q. And according to the claim, as recited, that reduction in that symptom flows from a method recited in claim one and a method recited in claim two. Correct?
MR. MURPHY: Objection to the form.
THE WITNESS: Yeah, but it's not a method. It's an intended result. It's not a method. You're not doing anything different. Stating that, that you have a reduction -- that you're assessing a reduction in bloating following seven days is not any kind of method that can -- that can be patented or anything. It's -- it's a symptom that you're assessing following the treatment. The treatment -- the method is what's outlined in claim one of that.
MR. ABERNATHY: Correct.
THE WITNESS: What's listed in claim three is just a symptom response and that's what I mean by intended result or observation.
MR. ABERNATHY: Right.

BY MR. ABERNATHY:
Q. A symptom response to the method of



claim one and two. Correct?
A. Well, claim two is not a method, either. Claim two is an assessment of whether there's reduction of bloating, but the method is the same.
Q. The method, it's fair to say, includes, among other things, treating bloating associated with diarrhea predominant Irritable Bowel Syndrome as recited in claim one, which, in claim three, reduces or results in the reduction of bloating, which was achieved seven days following the administration of Rifaximin. Right?
MR. MURPHY: Objection to form.
THE WITNESS: Right. That's not a method. That's just an intended result or observation. The method is what's in claim one.

BY MR. ABERNATHY:
Q. What do you mean by intended result or observation?
A. I said before, it's a reduction of symptoms; in this case, bloating.
Q. And you believe that a method that reduces symptoms is a mere intended result or observation?
MR. MURPHY: Objection to the form.



Doctor, please let me make my objection.
THE WITNESS: Okay, I'm sorry.
MR. MURPHY: I'm sure the court reporter will appreciate it. Go ahead.
THE WITNESS: What was the objection? Sorry. It doesn't matter.
MR. MURPHY: If you need the question again, you can ask for that.
THE WITNESS: Ask me again. Yeah, I think it's better, please.

BY MR. ABERNATHY:
Q. You said it's a reduction of symptoms and I asked you believe that a method that reduces symptoms is a mere intended result or observation?
MR. MURPHY: Objection to the form. Mischaracterizes the claims.
THE WITNESS: No, that's not what I said. The method to reduce the symptom of bloating is listed in claim one.
MR. ABERNATHY: Correct.
THE WITNESS: That's the -- that's why you're treating the patient. And deciding which patient to treat is part of the method. So that's not -- that's not a -- maybe we're talking about



semantics here. But in claim three, once you've decided that you're going to treat bloating with Rifaximin, which is claim one, then claim three is just an assessment of the reduction of bloating. It's an intended result or observation, but the method is the same. The method is no different from what's outlined in claim one.

BY MR. ABERNATHY:
Q. The claim of recited in claim -- excuse me.
The method recited in claim one does not necessarily reduce bloating following seven days after administration of Rifaximin. Correct?
MR. MURPHY: Objection to form.
THE WITNESS: It intends to reduce bloating, that's why you're -- that's why you're treat -- that's what the plan is.
MR. ABERNATHY: I'm not talking about intent.
MR. MURPHY: Excuse me. Doctor, are you finished with your response?
THE WITNESS: I'm sorry.
MR. MURPHY: Are you finished with your response?

Page 150

THE WITNESS: Yes.
MR. MURPHY: You guys are talking over each other, it's hard to know.
THE WITNESS: Okay.
MR. MURPHY: Please continue.

BY MR. ABERNATHY:
Q. The method of claim one, assume it leads to the reduction of bloating associated with diarrhea predominant Irritable Bowel Syndrome and that is achieved following seven days after administration. Is it your testimony that the reduction achieved following seven days after administration necessarily happens as a result of the method of claim one?
MR. MURPHY: Objection to the form.
THE WITNESS: It sometimes happens and it sometimes doesn't. Whenever you prescribe a medication, as outlined in claim one, you don't know if it's going to work, but you have an expectation that it may work, and that's why you prescribe it. But the result, which is whether the patient actually gets better or not, is not part of the method.

BY MR. ABERNATHY:
Q. So the intended result or observation,

Page 151

that you think is found in claim three of the '571 Patent, does not necessarily occur if one were to practice the method of claim one.
MR. MURPHY: Objection to form.

BY MR. ABERNATHY:
Q. Correct?
A. It sometimes occurs in an individual patient and it sometimes does not, depending on whether the medication actually ends up working or not.
Q. Can you go back to Exhibit 12, please? 12 is the RFIB clinical trial protocol. Can you show me where in Exhibit 12 there's a disclosure where the reduction of bloating associated with diarrhea predominant Irritable Bowel Syndrome is achieved seven days following, after the administration of Rifaximin?
A. That's not -- this is not a document that purports to show results, so there's no way that it could show achievement of a benefit of the drug.
Q. And the reduction of bloating associated with diarrhea predominant Irritable Bowel Syndrome, as recited in claim three of the '571 Patent, was not a primary outcome measure or a secondary outcome

Page 152

measure for the clinical trial design described in Exhibit 12?
MR. MURPHY: Objection to form.
THE WITNESS: To the extent that bloating is a symptom of Irritable Bowel Syndrome, diarrhea predominant Irritable Bowel Syndrome, which it is, then it would be an intended symptom that could be improved by the treatment. But again, the study does not address results. It only addresses the -- the method.

BY MR. ABERNATHY:
Q. Right. But it does address primary outcome measures; you agree with that?
A. Every study addresses primary outcome measures that you've addressed.
Q. So you agree, it does address primary outcome measures. Right?
MR. MURPHY: Objection to form.
MR. ABERNATHY: Not a trick question.
THE WITNESS: Primary outcome measures or primary outcomes? I'm not sure what you meant, primary outcome measures?

Page 153

BY MR. ABERNATHY:
Q. Do you see where it says on Page 36 -- or 3 of 6, primary outcome measures, Doctor?
A. Yeah.
Q. Outcome measures, primary outcome measures.
Do you see that?
A. Right.
Q. And then, underneath that is secondary outcome measures.
Do you see that?
A. Yes.
Q. There is no primary or secondary outcome measure regarding reduction of bloating associated with diarrhea predominant Irritable Bowel Syndrome which is achieved seven days after the administration of Rifaximin?
MR. MURPHY: Objection to form.
THE WITNESS: I don't agree with you, with what you're stating is what it says there. Because it says: "Adequate relief from diarrhea associated with IBS symptoms, bloating being one of those symptoms."
So it does -- one of the primary outcome measures is adequate relief from bloating, which is

# EXHIBIT L

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - -x
SALIX PHARMACEUTICALS, INC., :
SALIX PHARMACEUTICALS, LTD., : Case No.:
ALFASIGMA S.P.A. and BAUSCH : 1:24-CV-7140-JFM
HEALTH IRELAND LTD., :
Plaintiffs, :
v.

NORWICH PHARMACEUTICALS, INC.,
ALVOGEN PB RESEARCH &
DEVELOPMENT, LLC, and ALVOGEN,
INC.,
Defendants.
- - - - - - - - - - - - - - -x

(Caption continued on next page.)

Videotaped Deposition of HERBERT L. DUPONT, M.D.
CONDUCTED VIRTUALLY
Wednesday, December 10, 2025
10:19 a.m.

Job No.: 610713
Pages: 1 - 97
Reported By: Brooklyn E. Schweitzer, RPR, CRR

2

- - - - - - - - - - - - - -x
SALIX PHARMACEUTICALS, INC.,
SALIX PHARMACEUTICALS, LTD., :
ALFASIGMA S.P.A. and BAUSCH
HEALTH IRELAND LTD., : Case No.:
Plaintiffs, : 1:24-CV-10213-JFM
v.
:
CIPLA USA, INC. and CIPLA
LIMITED, :
Defendants.
-------------------------------

SALIX PHARMACEUTICALS, INC., Case No.:
SALIX PHARMACEUTICALS, LTD.,
ALFASIGMA S.P.A. and BAUSCH 1:24-CV-04607-JFM
HEALTH IRELAND LTD.,
Plaintiffs,
v.

AMNEAL PHARMACEUTICALS OF NEW
YORK, LLC, AMNEAL EU, LIMITED,
AMNEAL PHARMACEUTICALS, LLC,
AMNEAL PHARMACEUTICALS
PRIVATE LIMITED and AMNEAL
PHARMACEUTICALS, INC.,
Defendants.
- - - - - - - - - - - - - -x

3

Videotaped Deposition of HERBERT L. DUPONT, M.D., conducted virtually.

*** ALL PARTIES ATTENDED REMOTELY. ***

Pursuant to Notice, before Brooklyn E. Schweitzer, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the Commonwealth of Pennsylvania.

4

A P P E A R A N C E S

ON BEHALF OF NORWICH PHARMACEUTICALS, INC.:
CASSIE GOODNIGHT, ESQUIRE
MATTHEW S. MURPHY, ESQUIRE
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103

ON BEHALF OF AMNEAL PHARMACEUTICALS:
OREN LANGER, ESQUIRE
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402

ON BEHALF OF SALIX PHARMACEUTICALS:
MIKE SIKORA, ESQUIRE
LIYA LEVIN, ESQUIRE
MORGAN LEWIS & BOCKIUS
2222 Market Street
Philadelphia, PA 19103-3007

Also Present: Raechel Meyerowich, Videographer

**A Right.**
MS. GOODNIGHT: Okay. If I could ask the court reporter to please mark this as Exhibit 5.
(Exhibit 5 was marked for identification and is attached to the transcript.)
BY MS. GOODNIGHT:
Q Dr. DuPont, I'd like to direct your attention now to Page 97. And in the middle of that page, you should see a section titled, due to resistance concerns, a POSA would not have administered rifaximin, especially repeatedly, to a large IBS-D patient population.
Is that correct?
**A Right.**
Q In the paragraph below that, Paragraph 296, begins with, In my opinion, prior to the results in the Salix IBS clinical trials, a POSA would have been concerned with repeated administrations of rifaximin to a large patient population.
Is that correct?
**A Right.**
Q Okay. And then there are 11 more paragraphs after that, Dr. DuPont, on the next few pages, all in that section.



Is that correct?
**A Right.**
Q Okay. And, Doctor, feel free to leave that open, but I will direct you back to Exhibit 1, your 2025 report.
**A Okay.**
Q And to Page 65?
**A Paragraph 65?**
Q Page 65, Doctor.
And there you should see a --
**A Okay.**
Q -- Subsection B.
**A I'm on 65.**
Q Okay. And do you see that section heading titled, Due to resistance concerns, a POSA would not have administered rifaximin, especially repeatedly, to a large IBS-D patient population?
**A Right.**
Q And the paragraph just below that, Number 208, begins, In my opinion, prior to the results in the Salix IBS clinical trials, a POSA would have been concerned with repeated administrations of rifaximin to a large patient population.
Is that correct?
**A That's right.**



Q And then there are 11 paragraphs that follow it before we get to a new section of your report.
Is that right?
**A If you count them. I assume so.**
Q Okay. And these paragraphs are identical between your 2025 -- strike that, please.
**A Should be.**
Q Dr. DuPont, the -- in total 12 paragraphs in this section are substantially the same as the 12 paragraphs in your 2021 report marked Exhibit 5; is that correct?
**A I haven't looked at them word for word, but my assumption is they're the same. I believe they're the same.**
Q And feel free to review them, Doctor.
**A (Inaudible.)**
Q Once you feel ready, just look up.
**A They look the same.**
Q Okay. So, Doctor, with respect to these resistance concerns, you did not provide any opinion in the present case that is different from your 2021 report?
MR. SIKORA: Objection; form, mischaracterizes.



You can answer.
**A On this, the POSA.**
Q Sorry. I don't think I understood that, Dr. DuPont.
**A On -- on this section that we discussed, they are identical. So my opinions were the same, and they still are the same.**
Q And, Doctor, I'm going to do something similar with a few sections of your report just to understand what is the same and what is different.
So is Exhibit 1 still open in front of you? That's your 2025 report.
**A They both are.**
Q Excellent. So we can start with the 2021 report, then.
**A Okay.**
Q On Page 100, there should be a heading called, Salix IBS Clinical Trials.
Is that right?
**A Did you say Page 100?**
Q Yes, Page 100 of Exhibit 5. That's your 2021 report.
**A Exhibit E?**
MR. SIKORA: Number 5.
**A Salix IBS Clinical Trials. Okay.**

Q Okay. And then there are 15 paragraphs that follow.
Is that right?
**A (Inaudible) did you say?**
**Please repeat it.**
Q So I will rephrase, actually, Doctor.
The -- under the heading Salix IBS Clinical Trials, Paragraph 308 begins, Salix's IBS clinical trial Target 1 and Target 2 studied the safety and effectiveness of administering 550 milligrams of rifaximin TID for 14 days to treat symptoms of IBS-D.
Is that right?
**A That's right:**
Q And feel free to take a moment to review the rest of that paragraph and the 15 paragraphs that follow, and then once you feel ready, look up, and we can look at your 2025 report together.
**A Okay.**
**Okay. What page -- or paragraph?**
Q For your 2025 report, and that is Exhibit 1, it begins on Page 68.
**A Got it.**
Q Are the paragraphs that follow this substantively the same as the Salix IBS Clinical



Trials section we just reviewed in your 2021 report marked Exhibit 5?
**A Yes.**
Q So, Dr. DuPont, with respect to Salix's clinical trials, you did not provide any opinion in the present case that is different from your 2021 report?
**A No. They're the same. Same issues in the two reports.**
Q Okay. So with respect to secondary considerations, you did not provide any opinion that is different from your 2021 report?
**A Not on the POSA. It appears the -- to be the same.**
Q Okay, Doctor. Let's go back to Exhibit 5. That is your 2021 report. If you'll turn to Page 13.
**A Page 13? All right.**
Q Okay. Would you please look at the -- near the top of that page, there's a heading titled, IBS Patents.
**A Right.**
Q And would you please review the two paragraphs that follow? And just look up when you're ready.



**A I reviewed it.**
Q Thank you, Doctor. And now we can look at your 2025 report, Exhibit 1, on Page 10.
**A Right.**
Q Okay, Doctor. Does the Summary of Opinions section in your 2025 report substantively match the IBS Patents summary we reviewed in the 2021 report?
MR. SIKORA: Objection to form; calling for a legal conclusion.
You can answer.
**A They -- they are the same. They are -- are the same.**
Q So, Doctor, the two reports address the same issues?
MR. SIKORA: Objection to form.
Q Is that correct?
**A They are the same. They're identical.**
Q Thank you, Doctor. We can set those binders aside for now, if you need to clear some space.
MS. GOODNIGHT: And, Mike, could you grab -- there are manila folders in the box, correct?
MR. SIKORA: Yes, there are.



MS. GOODNIGHT: Okay. Great. Could you just grab some to get ready, Tab F, G, and H?
MR. SIKORA: There's only one paper copy of these, so if you could drop them into the chat as well.
MS. GOODNIGHT: Yeah, we'll drop them into the chat. And then maybe again -- sorry, I was told there would be two folders. So there may be a second folder floating around for you.
MR. SIKORA: Yes. You're right, you're right.
Do you want -- do you intend to mark those in order, just to save time, F, G, and then H?
MS. GOODNIGHT: Yes. So --
MR. SIKORA: 6, 7, 8?
BY MS. GOODNIGHT:
Q Doctor, would you please open Tab F?
**A I have it.**
Q Okay. Do you recognize this as the Cuoco 2006 reference discussed in your rebuttal report?
**A I recognize this paper that I discussed in my report.**
MS. GOODNIGHT: Okay. So I'd ask the court reporter to please mark Cuoco 2006 as

45

Exhibit 6.
(Exhibit 6 was marked for identification and is attached to the transcript.)
MS. GOODNIGHT: I apologize if there's some background noise there.
BY MS. GOODNIGHT:
Q Dr. DuPont, this article was published in 2006, correct?
**A 2006, right.**
Q And looking at the abstract for the paper, just after the italicized results heading, it reads, the breath test showed an SIBO syndrome in 44 out of 96 IBS patients who had hydro general peaks in the expired air higher than 10 PPM over the baseline value.
Is that correct?
**A That's what it says.**
Q And then it says, all these patients were treated with rifaximin, 1200 milligrams a day for 14 days, followed by 20-day cycle of probiotics.
Is that right?
**A Right.**
Q So 44 of the 96 IBS patients in Cuoco were treated with 1200 milligrams of rifaximin for 14 days; is that right?

46

**A Well, I don't know about -- whether these patients had IBS, and then I have problems with the breath test. So we should take them one at a time if I'm going to answer that question.**
**So how did they diagnose IBS? Had we looked at the methods. The methods are in the basis of a study. They're the most important part of a study. So let's look at those and see how they diagnosed IBS.**
**Abdominal pain, irregular bowel movements or diarrhea, meteorism -- now, conversely, all GI disease -- and I don't -- that I study would have abdominal pain and irregular bowel movements. I mean, that's -- you see that with all forms of enteric infection. That isn't IBS.**
**So I have a problem with the diagnosis already. I don't believe they were studying IBS.**
**As for the breath test, that is dependent on gut transit time and whether you have an abnormal test would normal -- without SIBO. So it -- it has some problems conditionally. And the rifaximin will alter the volatility of the gut. So I don't -- I don't find this study valid.**
Q Doctor, are you finished with your response?

47

**A What's that?**
Q Are you finished with your response, Doctor?
**A That's -- that's my response so far. If you'd like to ask some more questions.**
Q I would, thank you.
And, Doctor, 44 patients in the Cuoco study received rifaximin for 14 days, correct?
**A Are we talking about this same study?**
Q The same study. 44 patients received 1200 milligrams of rifaximin for 14 days, correct?
**A It says 40 -- 96 patients. That's --**
Q 44 of the 96?
**A The ones with the positive breath test. The methods are not clear, so I'll go back to the answer. Breath test showed 44 out of 96 had highs and peaks. All these patients were treated with rifaximin.**
Q And, Doctor, I can withdraw that question, and we can go piece by piece.
**A Yes. All these patients would relate to the 44 out of 96. Must have some more... that's my understanding.**
MR. SIKORA: I don't think there's a question pending, so let her ask the next

48

question, then we can go from there.
THE WITNESS: We're waiting for the next question?
MR. SIKORA: Yeah. Let her ask the next question, and we'll go from there.
BY MS. GOODNIGHT:
Q The article identifies the subjects as IBS patients, correct?
**A It did say that.**
Q And the title of the article is Small Intestine Bacterial Overgrowth in Irritable Bowel Syndrome, a Retrospective Study with Rifaximin.
Is that correct?
**A That's correct.**
Q And, Dr. DuPont, a subset of these patients received 1200 milligrams of rifaximin for 14 days; is that right?
**A That's what it says.**
Q Okay. Do you have any reason to doubt the accuracy of what the authors have reported about the patient treatment plan?
MR. SIKORA: Objection to form.
You can answer.
**A I have serious problems with this study. Most importantly is their definition of IBS.**

remains: What does IBS symptoms include?
MR. SIKORA: Objection.
**A Oh, you want me to tell you the Rome criteria, right?**
**I just want to -- want to make sure I don't launch off into something you're not interested in.**
Q Thank you, sir. I'll try to be clearer.
I want to know your understanding of what IBS symptoms includes --
**A Okay.**
Q -- when you referred to adequate relief --
**A I --**
Q -- in 2008?
MR. SIKORA: Hold on. Objection to form; asked and answered.
You can answer.
**A Well, you know, what -- when you asked for global improvement of IBS, it's left up to the patient to define IBS. They know what IBS is. They know what it is to them.**
**And IBS is a syndrome. It's not a specific disease. And it differs in many, many patients. But to meet the definition of IBS as of 2006, it -- it had to be -- meet the**



**criteria -- Rome III criteria, and this was an advance of the disease. It is well-defined by Rome III.**
**But when you are assessing a patient's global improvement, which the FDA wants you to do, there is no definition. It's up to the patient: Is my IBS better? They're interested in real world effects of a drug, and is the patient getting better from what bothers them or not?**
**And they should have to meet the criteria -- objective criteria of IBS to begin with to get into the trial, but when you -- when you evaluate global improvement of the symptom, then it's up to the patient to define their disease.**
**So I cannot define for an individual patient what IBS is. I can define what IBS is by Rome criteria.**
Q Doctor, looking again at that sentence regarding adequate relief of IBS symptoms, did this occur before or after 14 days?
**A It says in the end we should look at the protocol. I don't memorize the protocol, but it says additionally, significantly more patients receiving rifaximin were responders for the**



**composite endpoint of improvement.**
**And so I'm assuming it's after therapy, but I would have to review the protocol to be certain when this was.**
Q Well, Doctor, I'm going to have one more document dropped into the chat for you.
Okay. Doctor, do you see the Tab V appendix document? Just let me know when it's up and ready.
**A I've got Appendix A up.**
Q Okay. Doctor, do you recognize this as Appendix A to your 2025 report?
**A Yeah, I think so.**
Q And Appendix A includes the asserted claims of the asserted patents in the present case; is that correct?
**A Yes.**
MS. GOODNIGHT: Okay. I'll ask the court reporter to please mark this as Exhibit 11.
(Exhibit 11 was marked for identification and is attached to the transcript.)
BY MS. GOODNIGHT:
Q Doctor, you reviewed the claims in the asserted patents in preparation for your rebuttal report, correct?



**A Right.**
Q We'll start reading claim 1 of the '912 patent at the top of the page. It reads, A method of treating one or more symptoms of irritable bowel syndrome in a female subject, said method comprising administering, 550 milligrams of rifaximin TID for 14 days to the female subject, thereby treating one or more symptoms of IBS in the female subject.
Is that correct?
**A Right.**
Q Okay. And claim 1 does not claim two consecutive treatments of rifaximin; is that correct?
MR. SIKORA: Object to form.
You can answer.
**A Claim 1 does not.**
Q And, Doctor, feel free to continue reviewing those pending claims, and I'll ask --
**A What was that?**
Q Please take a moment, if you need it, to review the other claims on this page, and then I will ask: None of these asserted claims require two consecutive treatments of rifaximin, correct?
**A All right. Now I've reviewed.**

Q Doctor, none of these asserted claims require two consecutive treatments of rifaximin, correct?
**A I don't understand the logic, but you're right.**
Q And if you'll flip back to Page 65 of your 2025 report, please. The last sentence of Paragraph 207, you wrote, Similarly, a POSA would have been concerned that bacteria populations in the gut would become less susceptible to rifaximin following repeated use limiting value of the drug, associated with emergence of difficult to treat infections.
Is that right?
**A That's right.**
Q And none of the asserted claims that we just reviewed claim repeated treatments of rifaximin, correct?
MR. SIKORA: Objection to form.
You can answer.
**A I don't know if I follow. You're -- you're saying the patent does not deal with retreatment, and --**
Q My question, Doctor, is the patents do not claim repeated treatments of rifaximin, correct?



MR. SIKORA: Objection to form.
You can answer.
**A And I don't know why that relates to the issue of resistance with repeated dosing. They're unrelated.**
Q Dr. DuPont, have you ever conducted a retrospective study?
**A Have I conducted a retrospective study; is that the question?**
Q That is the question.
**A Yes.**
Q Have you ever conducted a retrospective study concerning an off-use label of a drug in clinical practice?
**A No.**
Q And have you ever published an article concerning a retrospective study that you conducted?
**A Yes.**
Q For what reasons did you publish the article?
**A What was that?**
Q For what reason did you publish the article?
**A To characterize the natural history of**



**gram-negative sepsis in a university hospital.**
Q Who was the intended audience for this article?
**A Anyone who takes care of hospital patients. The paper was cited something like 700 times in the medical literature. It's -- it's a classic.**
Q And, Dr. DuPont, have you ever presented a case study concerning an off-label use of a drug in clinical practice?
**A Off-label use, have I ever done a retrospective study?**
Q A case study, Doctor.
**A Of off-label use -- well, you know, when you do a clinical trial, most of it is off-label. I'd say at least half of the studies I've done have been when the drug was not licensed.**
Q And, Doctor, just to make my question clear, I was asking about off-label uses of a drug in clinical practice.
**A Have I ever used drugs -- treating patients, is the question?**
Q The question is: Have you ever presented a case study or published a case study concerning off-label use in clinical practice?



**A In clinical practice? Not a study. Not a study, right?**
Q A case report, sorry. Better phrasing.
**A Case report. This is a retrospective study of off-label use. I would never do such a study. I would never waste my time on...**
Q Sir, what about a presentation of a case study about individual patients, maybe for educational purposes?
**A We're generalizing here, and there are -- there are studies -- as you call them, off-label case studies that are -- that are important, and there are ones that are not important.**
**And I would have cited an important one, and I'll give you an example, if you wish, of what an important off-label case study like this would look like.**
Q Without jumping into the example, Doctor, have you presented any case studies like this?
**A No.**
Q And we're speaking in the hypotheticals and the examples, for what purpose would one present a case study about off-label use of a drug in clinical practice?
MR. SIKORA: Objection to form.

You can answer.
**A If I'm understanding the question, you're talking about a retrospective study or are you talking about a controlled study?**
Q Apologies, Doctor. I should stop using the word "study." More so a case report or a patient --
**A We've had -- sorry. Go ahead.**
Q No, please.
**A So a retrospective evaluation of off-label use of a drug in a controlled; is that what you're asking?**
Q Doctor, we'll just move on. If you'll return to your 2025 rebuttal report, which has been marked as Exhibit 1.
**A Hit me again, please.**
Q Yep. We're going to go back to your 2025 rebuttal report, which is marked as Exhibit 1.
**A Okay. I've got it.**
Q Great. And it's Paragraph 224, and that's on Page 69.
**A 69. Got it.**
Q That paragraph reads, Based on the results of the Target 1 and Target 2 trials, Salix submitted an efficacy supplement to the New Drug



Application 21-361 seeking approval of 550-milligram rifaximin TID for 14 days for the treatment of non-constipation IBS and IBS-related bloating in patients greater than or equal to 18 years of age.
Is that right?
**A That's right.**
Q It's your understanding that FDA did not approve rifaximin for the treatment of IBS-related bloating in patients greater than or equal to 18 years of age, correct?
MR. SIKORA: Objection to form.
You can answer.
**A At this point, yes.**
Q Doctor, did FDA ever grant approval for rifaximin for the treatment of IBS-related bloating in patients greater than or equal to 18 years old?
**A The last part, it phased out. Did they ever grant approval for...**
Q I'll repeat my question, Doctor.
Did FDA ever approve rifaximin for the treatment of IBS-related bloating in patients 18 years or older?
**A Just like any -- you're not asking did**



**they approve rifaximin for IBS, are you?**
Q No. I'm asking specifically about IBS-related bloating.
**A What's the last word?**
Q Bloating.
**A Bloating. No, they approved it for diarrhea-predominant IBS, is what the approval is for. Bloating is a different disease. It has a completely different number. It's -- it's not IBS.**
MS. GOODNIGHT: Can we go off the record, please?
MR. SIKORA: Sure.
VIDEOGRAPHER: We are going off the record. The time is 14:15.
(A recess was taken.)
VIDEOGRAPHER: We are back on the record. The time is 14:18.
BY MS. GOODNIGHT:
Q Thank you, Dr. DuPont, for your time and patience today. I don't have any other questions for you at this time, so I will direct you to counsel for Amneal, Mr. Langer.
THE WITNESS: Thank you so much.
MR. LANGER: Thank you, Dr. DuPont. No



questions on behalf of Amneal.
THE WITNESS: Thank you.
MR. SIKORA: Dr. DuPont, I just have a couple of quick questions here.
EXAMINATION
BY MR. SIKORA:
Q If you could go to Exhibit 1 in your report from 2015 and turn to Page 10, please. I'm sorry. It's -- if you could please go to the section where it's the summary of your opinions. It should be, I think, Page 10 in your -- yes, 10, Paragraphs 44 to 45.
Are you there?
**A Yes.**
Q Okay. And then at the same time, could you open up Exhibit 5 to Pages 12 and 13, which provides summary of your opinions in your 2025 expert report.
**A Okay.**
Q So do you recall earlier counsel asked you some questions about the summary of opinions sections of your report?
**A Yes.**
Q Now, in the summary of opinions sections in Exhibit 5, your 2021 report, you include

Paragraphs 54 and 55 under the heading HE Patents.
Do you see that?
**A Yeah.**
Q Is there a like and kind section in the summary of opinions you provide for your expert report in this case?
**A Is there what?**
Q A like and kind --
**A No.**
Q -- discussion?
And then if you could please compare Paragraph 44 of your 2025 report to paragraphs -- Paragraph 56 of your 2021 report, and then let me know when you're ready for a question.
Are those paragraphs identical?
**A They're the same.**
Q And when you were preparing your expert report for this case in the district of New Jersey, did you provide additional analysis that wasn't found in your 2021 report?
**A Yes.**
MR. SIKORA: No further questions, and I pass the witness.
RE-EXAMINATION
BY MS. GOODNIGHT:



Q Dr. DuPont, what additional analysis did you provide that was not in your 2021 rebuttal report?
**A What -- what analysis?**
Q Counsel asked if you provided additional analysis that was not found in your 2021 report, and you answered affirmatively. I'm just following up to ask what is that additional analysis?
**A It was a different report, and we put together parts of the new with parts of the old in one report. I don't have the new report separated to provide to you.**
MS. GOODNIGHT: Thank you, Dr. DuPont. I have no further questions for you at this time.
THE WITNESS: Thank you very much.
VIDEOGRAPHER: Are we concluded?
MS. GOODNIGHT: Yep, we can go off the record.
MR. SIKORA: I've got nothing more. Do you have anything more, just to be sure?
MR. LANGER: Thanks, Mike. Nothing for me.
MR. SIKORA: Okay.
VIDEOGRAPHER: This marks the end of the



deposition of Dr. Herbert L. DuPont. We are going off the record at 14:24.
(Off the record at 2:24 p.m.)



ACKNOWLEDGMENT OF DEPONENT

I, DR. HERBERT L. DUPONT, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

_____________ ______________________________
(DATE) (SIGNATURE)

# EXHIBIT M

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., BAUSCH HEALTH IRELAND LTD., ALFASIGMA S.P.A., | ) | |
| Plaintiffs, | ) | C.A. No. 20-430 (RGA) |
| v. | ) | **CONFIDENTIAL** |
| NORWICH PHARMACEUTICALS, INC., | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT REPORT OF PHILIP SCHOENFELD, M.D.**


XIFAX_AMN_1890152

cardiovascular events in patients on Zelnorm compared to placebo.[97] Alosetron (Lotronex®), a selective 5-HT3 receptor antagonist, was FDA approved in February 2000 to treat women IBS-D, then voluntarily withdrawn after reports of ischaemic colitis (interruption of blood flow to the colon) and severe complications of constipation, some of which were fatal.[98] Alosetron was re-approved by the FDA in June 2002 under a restricted access program and with a narrower indication to treat women with *severe* IBS-D.[99]

81. Antidepressants. Low-dose tricyclic antidepressants appear to be effective for IBS symptoms, although this may have been due to improvement in global well-being.[100] Tricyclic antidepressants can also potentiate pain-relievers or alter pain perception.[101]

82. Antibiotics. Sleisenger & Fordtran's states that "[n]onabsorbable antibiotics such as neomycin and rifaximin appear to be superior to placebo in IBS in very short-term treatment studies, but long-term results are unavailable and any benefit of the drug for IBS remains in dispute."[102] I discuss studies of rifaximin for IBS further in sections __ and __.

83. Longstreth 2006 states in its IBS treatment recommendations: "Small bowel bacterial overgrowth, as diagnosed by lactulose hydrogen breath testing is a suggested [citing Lin 2004] but disputed [citing Walters 2005] cause of IBS, and antibiotics provide only transient benefit [citing Pimentel 2003] and risk *Clostridium difficile* infection, allergic reactions, antimicrobial resistance, and chronic functional symptoms."[103]

---

[97] Spiller 2007 at 1788.
[98] Lotronex® 2002 Approval Letter; Longstreth 2006 at 1484; Spiller 2007 at 1788.
[99] Lotronex® 2002 Approval Letter; Spiller 2007 at 1788; Longstreth 2006 at 1484; *see also* Sleisenger & Fordtran's at 2645.
[100] Sleisenger & Fordtran's at 2645; *see also* Longstreth 2006 at 1484; Spiller 2007 at 1787.
[101] Spiller 2007 at 1787; *see also* Longstreth 2006 at 1484.
[102] *See* Sleisenger & Fordtran's at 2642-46.
[103] Longstreth 2006 at 1484.

84. Spiller 2007 states in its IBS treatment guidelines that "recent antibiotic use" is an "alarm feature" for IBS and that "administration of drugs such as antibiotics … may exacerbate symptoms."[104] Spiller 2007 states under "Alternative pharmacological strategies":[105]

> Approximately three quarters of IBS patients have been found to have a positive lactulose hydrogen breath test, defined as a double peak in breath hydrogen, the first occurring less than 90 minutes after ingestion, with a rise of more than 20 parts per million [citing Pimentel 2000]. The significance of this is disputed, as double peaks can be seen once lactulose reaches the colon and do not usually represent fermentation within the small bowel. However, the investigators interpreted this finding as suggestive of the presence of small intestinal bacterial overgrowth [citing Pimentel 2000], providing the rationale for antibiotic treatment. When given a 10 day course of broad spectrum antibiotics (neomycin, ciprofloxacin, metronidazole, or doxycycline), one third of these patients became asymptomatic, at least in the short term [citing Pimentel 2003]. A similar result has been seen in an [randomized controlled trial] of rifaximin which showed benefit lasting up to 10 weeks after treatment [citing Pimentel 2006]. No other group has adopted this treatment, which cannot be recommended until replicated in well designed studies by others.

85. In its "Summary of recommendations for pharmacological treatment of irritable bowel syndrome," Spiller 2007 lists "antibiotics" as having "low" quality of evidence with "[t]rade-offs" for its risk/benefit profile, a "qualified" strength of recommendation because the use of antibiotics for IBS is "[c]ontroversial; needs replicating."[106] Spiller 2007's conclusions were based on and after consideration of the research by Drs. Mark Pimentel and Henry Lin: on (i) the potential association between SIBO and IBS, and (ii) clinical trials of antibiotics for SIBO or IBS, including rifaximin (including Pimentel 2006). I discuss the work by Drs. Mark Pimentel and Henry Lin further below in sections VII.B.3. and VII.B.5.

---

[104] Spiller 2007 at 1780.
[105] Spiller 2007 at 1788.
[106] Spiller 2007 at 1790.

86. ***Psychological treatments.*** "Psychotherapy, hypnotherapy, and cognitive behavioral therapy (CBT) have been proposed to be useful treatments for IBS" although better data was needed.[107] "Based on the available literature, IBS patients with abdominal pain, diarrhea, and psychological distress appear most likely to have a beneficial response to" psychological interventions, especially when those symptoms come and go.[108]

### 3. <u>Small Intestinal Bacterial Overgrowth</u>

87. Normally, the upper small intestine is relatively sterile (low bacterial counts) because gastric acid is antibacterial, and eating triggers peristalsis which propels material through the small intestine and into the large intestine (the colon).[109] Various anatomic abnormalities can lead to stagnation of the contents in the small bowel resulting in bacterial overgrowth.[110] Disorders such as diabetes mellitus and scleroderma[111] can also lead to bacterial overgrowth, as can the use of acid-lowering medications (e.g., proton pump inhibitors) that reduce gastric acid secretion.[112] The table below lists chronic conditions associated with SIBO.[113]

---

[107] Sleisenger & Fordtran's at 2645.
[108] Sleisenger & Fordtran's at 2645-46.
[109] Sleisenger & Fordtran's at 2247.
[110] Sleisenger & Fordtran's at 2247-48.
[111] Scleroderma is an autoimmune disease that leads to an overproduction of collagen.
[112] Sleisenger & Fordtran's at 2247-48.
[113] IBS is not listed as a chronic condition associated with SIBO.

**Table 99–2** Conditions Associated with Bacterial Overgrowth

| Condition(s) | Pathophysiologic Mechanism |
|---|---|
| Blind loop (Billroth II gastrectomy, end-to-side anastomosis)<br>Small intestinal diverticulosis<br>Small intestinal stricture (Crohn's disease) | Disordered anatomy |
| Diabetes<br>Idiopathic intestinal pseudo-obstruction<br>Scleroderma | Disordered motility |
| Acid-lowering medications<br>Atrophic gastritis<br>Vagotomy | Reduced gastric acid secretion |
| Gastrocolic or enterocolic fistula<br>Resection of ileocecal valve | Abnormal connection between colon and proximal bowel |
| Celiac sprue<br>Chronic pancreatitis<br>Chronic renal failure<br>Cirrhosis<br>Old age<br>Rheumatoid arthritis<br>Radiation enteritis | Miscellaneous |

88. "SIBO may be difficult to diagnose, because symptoms associated with the predisposing disorder may predominate. The classic clinical presentation of SIBO is that of a malabsorptive state characterized by steatorrhea and vitamin $B_{12}$ deficiency."[114] Steatorrhea can cause weight loss, diarrhea, abdominal bloating, and abdominal discomfort.[115] Therapy usually consists of a 2-week regimen of a broad-spectrum-antibiotic.[116] "Continuous treatment with a single agent may lead to antibiotic resistance or side effects associated with long-term use," and

[114] Sleisenger & Fordtran's at 2249.
[115] Sleisenger & Fordtran's at 2249.
[116] Sleisenger & Fordtran's at 2252.

where long-term antibiotic treatment is needed, the antibiotic is rotated every 2 weeks or administered cyclically (2 weeks on, 2 weeks off)."[117]

#### a) Diagnostic Testing for SIBO

89. The putative "gold standard test" to diagnosis SIBO was to do a bacterial count in aspirate from the small intestinal.[118] This involves duodenal intubation or an endoscopic procedure to collect fluid from the small intestine, and so it is invasive, time consuming, and could miss bacterial overgrowth at the distal end of the small intestine.[119]

90. Non-invasive breath tests had been developed to diagnosis SIBO and were premised on the ability of bacteria to produce hydrogen or radiolabeled carbon dioxide from substrates such as glucose, lactulose, or xylose.[120]

91. Glucose breath test (GBT, GHBT). Normally, the small intestine absorbs glucose, but if bacteria is present in the small intestine, bacteria will process the glucose into carbon dioxide and hydrogen, which can be measured from exhalation.[121]

92. Lactulose breath test (LBT, LBHT, or LHBT). Bacteria in the proximal colon (nearer to the small intestine) cleave lactulose to form hydrogen producing a "late peak" of hydrogen in exhaled breath, but the LBT is premised on patients with SIBO having an "early peak" due to the presence of bacteria in the small intestine.[122] But this test "may be difficult to

---

[117] Sleisenger & Fordtran's at 2252.
[118] Sleisenger & Fordtran's at 2250.
[119] Sleisenger & Fordtran's at 2250.
[120] Sleisenger & Fordtran's at 2250.
[121] Sleisenger & Fordtran's at 2250-51. Generally, exhaled breath is collected at baseline and every 30 minutes for 2 hours, and an increase in hydrogen by 20 ppm above baseline is commonly considered a positive test. *Id.* at 2251.
[122] Sleisenger & Fordtran's at 2251.

interpret with either slow or fast intestinal transit, and sensitivity and specificity have been disappointing."[123]

93. Xylose breath tests. This test measures labeled carbon (e.g., $^{13}C$ or $^{14}C$) produced when gram-negative bacteria in the small intestine breakdown D-xylose, which is normally absorbed in the small intestine.[124] "The $_{14}C$-D-xylose breath test appears to perform better than the glucose or lactulose hydrogen breath test, but as with these other breath tests, widely differing levels of accuracy have been reported[.]"[125]

94. A person of ordinary skill in the art would have known of the significant debate regarding whether breath testing could reliably and consistently detect SIBO.[126] "[T]he literature on breath tests in SIBO [was] confusing, with wide variations in sensitivity and specificity."[127] Adding to the confusion, there were no established criteria for performing a breath test and for declaring a positive result; and as will be apparent from the paragraphs that follow, multiple different protocols were used. "Abnormal hydrogen breath test results may occur because of transit abnormalities, … and it is unclear how often bacterial overgrowth is documented by quantitative culture in patients with IBS who have abnormal breath tests."[128] Thus, routine

---

[123] Sleisenger & Fordtran's at 2251.
[124] Sleisenger & Fordtran's at 2251.
[125] Sleisenger & Fordtran's at 2251.
[126] *See, e.g.*, Posserud 2007 at 802 ("Opinions regarding the preferred diagnostic test for SIBO are conflicting. Many regard aspiration and direct culture of jejunal contents as the gold standard … Indirect tests such as $^{14}C$-xylose breath test and hydrogen breath tests using lactulose or glucose have been widely used in diagnosing SIBO. The glucose hydrogen breath test (GHBT) and 14C-xylose breath test have been considered as fairly reliable tools, whereas the accuracy of the lactulose hydrogen breath test (LHBT) is questionable, owing to both low sensitivity and specificity in comparison with culture of small-bowel aspirate.")
[127] Sleisenger & Fordtran's at 2250-51.
[128] Sleisenger & Fordtran's at 2640.

hydrogen breath testing to identify SIBO in patients suspected of having IBS had not been endorsed.[129]

95. A 2007 abstract co-authored by Dr. Pimentel, noted "much criticism regarding the diagnostic accuracy of testing" and aimed "to systematically review the validity of diagnostic tests for SIBO."[130] An electronic literature review showed that "[m]any studies had less than 20 subjects and often a mixture of diseases predisposing to SIBO."[131] Additionally, because there was no study that properly validated the $10^5$ cfu/mL threshold for SIBO from the small intestine aspirate culture test, "it was difficult to validate all other testing such as breath test[ing]."[132] The authors suggested what amounts to a trial-and-error approach for management of SIBO: "test, treat, and retest … until more accurate diagnostic testing is available."[133]

96. Dr. Pimentel explained his own view was that "people were not believing that the breath test was predictive of truly elevated bacteria in the small bowel at that time. It was highly controversial, and a lot of articles were published that were combating this theory, because the -- the average doctor and scientist, at that time, was not at all on the same page as us."[134]

**b) The SIBO/IBS Hypothesis**

97. A person of ordinary skill would have known of the significant controversy over whether patients with IBS symptoms were more likely to have SIBO compared to controls (further complicated by the accuracy and reliability issues with breath testing, discussed above). The symptoms of SIBO and IBS overlap, but SIBO is a separate medical disorder. Many organic

[129] Sleisenger & Fordtran's at 2642-46.
[130] Koshini 2007 at S202.
[131] Koshini 2007 at S202.
[132] Koshini 2007 at S202.
[133] Koshini 2007 at S202. Koshini 2007 does not mention IBS.
[134] Pimentel Deposition Transcript at 166:16-168:24.

gastrointestinal disorders (e.g., Celiac disease) masquerade as IBS (a functional gastrointestinal disorder), and so clinicians often considered IBS to be a diagnosis of exclusion – a disorder characterized by the absence of other identifiable and diagnosable medical conditions.[135] By invoking results from trials enrolling SIBO-positive patients, one is saying that those patients have SIBO, not IBS, even if they do have "IBS-like" symptoms.[136] Thus, a person of ordinary skill in the art would not have reasonably derived an association between SIBO and IBS, much less a causal effect.[137] It would have been apparent that although Dr. Pimentel and his colleges at Cedars-Sinai believed in the SIBO/IBS hypothesis, few else in the field did. No one in North America could replicate Dr. Pimentel's results. Even Dr. Pimentel described himself as the "lone voice" in suggesting that SIBO contributed to IBS symptoms.[138]

98. In 2000, Dr. Pimentel's group published "Eradication of Small Intestinal Bowel Overgrowth Reduces Symptoms of Irritable Bowel Syndrome" in *The American Journal of Gastroenterology* (Pimentel 2000). Pimentel 2000 was a retrospective study that "aim[ed] to test the hypotheses that the prevalence of SIBO is high in IBS subjects referred for lactulose hydrogen breath testing and that eradication of SIBO with antibiotic treatment improves the

[135] Sleisenger & Fordtran's at 2641-42.
[136] To illustrate the flaws in this research, take for example a study where the investigators identify patients with IBS-D symptoms and then test all of them for celiac disease with anti-gliadin antibody test (which has quite variable sensitivity and specificity). If patients have positive anti-gliadin antibody test, the investigators then put those patients on a gluten-free diet and assess for improvement. Then, when those patients get better, the investigators would conclude that IBS-D is due to celiac disease and that treatment should be gluten-free diet.
[137] "Many patients with SIBO fulfill the Rome Criteria for IBS, and considerable debate on the relationship between IBS and SIBO has ensued since" Pimentel 2000 was published. Sleisenger & Fordtran's at 2247. "Many patients may have nonspecific symptoms similar to those of IBS." *Id.* at 2252.
[138] Pimentel Deposition Transcript at 100:16-102:6.

gastrointestinal symptoms of IBS."[139] Patients consecutively referred to Cedars-Sinai's GI Motility Program for a lactulose hydrogen breath test were given a questionnaire that the investigators used to identify patients meeting Rome I criteria for IBS.[140] A positive SIBO diagnosis was made based on the LHBT resulting in (1) two distinct peaks representing small intestinal and colonic flora, (2) hydrogen production less than 90 minutes after lactulose ingestion, and (3) an absolute change in hydrogen concentration of more than 20 ppm.[141] Pimentel 2000 reported that of the 202 patients who met Rome I criteria, 157 (78%) had a positive hydrogen breath test "suggesting SIBO."[142] Those 157 patients were given a 10-day course of antibiotics.[143] Of those 157 patients, 47 were referred for a follow-up hydrogen breath test 7 to 10 days after completion of the antibiotic regimen.[144] Of those 47 patients, "25 achieved complete and 22 incomplete eradication of their SIBO."[145] In the 25 patients who achieved complete eradication of SIBO, Pimentel 2000 reported that there were improvements in diarrhea and abdominal pain, and 48% no longer met Rome criteria for IBS.[146] Pimentel 2000 did not do

[139] Pimentel 2000 at 3503.
[140] Pimentel 2000 at 3503-04.
[141] Pimentel 2000 at 3504.
[142] Pimentel 2000 at 3504.
[143] Pimentel 2000 at 3504. "The antibiotics used in the treatment of SIBO in the 47 subjects were neomycin (n = 24), ciprofloxacin (n = 2), flagyl (n = 3), doxycycline (n = 1), and unknown ( n = 17)." *Id.* at 3505. At the time this study was conducted, rifaximin was not available in the U.S. for any indication.
[144] Pimentel 2000 at 3504.
[145] Pimentel 2000 at 3504. Pimentel 2000 does not report statistics for complete versus incomplete eradication.
[146] Pimentel 2000 at 3505. Pimentel 2000 states that "[s]mall intestinal bacterial overgrowth is *associated* with irritable bowel syndrome" and that "subjects with IBS *appear* to have a high prevalence of SIBO as demonstrated by LHBT. Treatment of SIBO with antibiotics *appears* to have a significant improvement in symptoms and converts many IBS patients from Rome criteria positive to negative." *Id.* at 3503, 3505 (emphases added). A person of ordinary skill in the art would not have considered associations and appearances to provide a reasonable scientific basis

an intention-to-treat analysis, which includes patients lost to follow-up in order to ensure the results are not biased.[147] Nor did Pimentel 2000 explain what happened to the 110 patients who did not return after their antibiotic regimen (did they get better? did they get worse? did they stay the same? – a person of ordinary skill would not have been able to answer those questions without speculating).

99. Pimentel 2000 generated significant controversy in the field. In response to Pimentel 2000, Jones 2001 stated that the study "received a great deal of attention in the lay press but may have sent a misguided message. The [Pimentel 2000] authors conclude that 'small intestinal bacterial overgrowth is associated with irritable bowel syndrome.' We feel that this conclusion is not justified."[148] Jones 2001 questioned Pimentel 2000's retrospective diagnosis of IBS and the lactulose hydrogen breath testing used to diagnose SIBO.[149] Jones 2001 concluded: "Should all patients with IBS be tested for small bowel bacterial overgrowth? Not on the basis of a retrospective trolling through a database."[150]

100. Also in response to Pimentel 2000, Riordan 2001 expressed concern with the use of the hydrogen breath test used to both diagnose SIBO and assess whether antibiotic treatment had been effective.[151] "The reliability of the LBHT for diagnosing SIBO has been questioned in studies in which culture of small intestinal aspirate has been taken as the 'gold standard.'"[152]

---

to conclude that SIBO causes IBS, or that antibiotics can successfully treat IBS (much less that 1650 mg (and 550 mg TID) for 14 days would relieve IBS-D symptoms).

[147] *See* Schoenfeld Case Scenario 2005 at 3 (I explain the difference between an intention-to-treat analysis and a per protocol analysis).

[148] Jones 2001 at 3204.

[149] Jones 2001 at 3204.

[150] Jones 2001 at 3204.

[151] Riordan 2001 at 2506.

[152] Riordan 2001 at 2506.

Riordan 2001 stated that the "definitions of an abnormal LBHT used in Pimentel and colleagues' study may result in both false positive and false negative diagnoses of SIBO" and that "the LBHT cannot reliably be used to assess for eradication of SIBO after treatment with antibiotics …."[153]

101. In 2003, Dr. Pimentel's group published "Normalization of Lactulose Breath Testing Correlates With Symptom Improvement in Irritable Bowel Syndrome: A Double-Blind, Randomized, Placebo-Controlled Study" in *The American Journal of Gastroenterology* (Pimentel 2003). The study recruited patients by advertising "in local newspapers, radio, and IBS support groups in the greater Los Angeles area."[154] Patients presented at the Cedars-Sinai GI Motility Lab, completed a questionnaire asking about IBS symptoms and their severity over the previous 7 days, and underwent lactulose breath testing.[155] 111 patients meeting study criteria (Rome I criteria) were randomized to receive neomycin or placebo BID for 10 days.[156] Of those 111 patients, 84% had an abnormal lactulose breath test compared to 20% in healthy controls.[157] Pimentel 2003 found that "[n]eomycin was more likely to result in a true clinical response than placebo."[158] Of the 101 patients with complete data used to analyze breath test results, 84 patients had an abnormal test at the start of the study, and of those 84 patients, 8

[153] Riordan 2001 at 2507. *See also* Mishkin 2001 at 2505 ("From our study and interpretation of Pimentel's data, there *appears* to be a subgroup of IBS patients who have SIBO on indirect testing and would benefit from a course of antibiotics. More patients need to be tested to help define this specific patient population. In the absence of more objective data and lack of a true gold standard test of SIBO, we believe that this will be a dynamic field that *still needs to be explored*.") (emphases added).
[154] Pimentel 2003 at 413.
[155] Pimentel 2003 at 413.
[156] Pimentel 2003 at 413.
[157] Pimentel 2003 at 415.
[158] Pimentel 2003 at 415.

(20%) achieved normalization of the test.[159] In a post-hoc analysis, Pimentel 2003 also reported that the gas produced by the patients with an abnormal lactulose breath could be associated with IBS subtype (hydrogen: IBS-D; methane: IBS-C).[160] Pimentel 2003 acknowledged the criticism of lactulose breath testing, SIBO as an explanation for IBS, and antibiotic use in IBS.[161]

102. Physicians again questioned Pimentel's conclusions. In response to Pimentel 2003, Parisi 2003 noted that "the accuracy of LHBT is questionable for diagnosing SIBO because of low sensitivity."[162] Based on their own study of the prevalence of SIBO in patients with IBS, Parisi 2003 concluded that no patients were SIBO-positive using a glucose breath test (although this was a different breath test – glucose rather than lactulose – which Parisi 2003 stated was more reliable and specific).[163] Parisi 2003 concluded: "Treatment for IBS is likely to be long-term, and the use of antibiotics might be detrimental for intestinal bacteria or might also influence the development of functional bowel syndromes. Therefore, the lack of positive cases for SIBO in our patients when a more sound assessment method was used strongly cautions against antibiotic treatment for IBS patients."[164]

103. Robson 2003 reported that in a study of 33 patients with IBS diagnosed using Rome II criteria, that SIBO was "present in a small subset of patients" (2 patients with IBS-D and 1 patient with alternating symptoms) based on a glucose hydrogen breath test. But "[m]ost symptoms did not correlate with the presence of SIBO."[165]

---

[159] Pimentel 2003 at 415.
[160] Pimentel 2003 at 414, 415-16.
[161] Pimentel 2003 at 416-18.
[162] Parisi 2003 at 2572.
[163] Parisi 2003 at 2572.
[164] Parisi 2003 at 2572.
[165] Robson 2003 at S271.

104. Noting the "[r]ecent studies" from Pimentel's group (Pimentel 2001 and Pimentel 2003), Walters 2005 reported a study that tried to replicate the incidence of SIBO in IBS reported by Pimentel's group.[166] IBS "continues to be an important cause of morbidity for patients suffering with this disorder and consumes a large proportion of health-care resources. The inability to achieve major advances in treatment stems in large part from an incomplete understanding of the pathogenesis of this condition."[167] Walters 2005 noted that "[t]he 'gold standard' for diagnosis of SIBO has been the culture of a jejunal aspirate," but this is "invasive and difficult to perform."[168] The Walters 2005 study used both a lactulose hydrogen breath test and a $^{14}$C-D-xylose breath test, which it described as having "greater specificity than the LHBT, although the sensitivity may be less."[169] Out of 39 patients analyzed, "[o]nly 4 patients (10%) had a positive LHBT"[170] and "only 5 patients (10%) had a positive $^{14}$C-D-xylose breath tests" compared to zero positive $^{14}$C-D-xylose breath tests in healthy volunteers.[171] "Therefore, our results do not support the notion that the LHBT accurately identifies a strong association between SIBO and IBS" and "the $^{14}$C-D-xylose breath test also failed to support the conclusion that a strong association exists between SIBO and IBS."[172]

105. Posserud 2007 studied 162 patients with IBS (Rome II criteria) refractory to treatment to assess the prevalence of SIBO by bacterial cultures of aspirate from the small bowel,

[166] Walters 2005 at 1566-67.
[167] Walters 2005 at 1566.
[168] Walters 2005 at 1566.
[169] Walters 2005 at 1566-67.
[170] Walters 2005 used the same criteria reported in Pimentel 2001 to determine whether the LHBT was positive. Walters 2005 at 1568. Applying the criteria reported in Pimentel 2003, Walters 2005 found that "69% of IBS patients and 75% of controls had a positive test." *Id.* at 1568.
[171] Walters 2005 at 1568.
[172] Walters 2005 at 1568-69.

noting that "[s]o far, no studies have assessed systematically the prevalence of SIBO in IBS using a direct test[.]"[173] IBS "is a common disorder in Western populations, and so far many pathophysiological mechanisms have been considered. Recently, small intestinal bacterial overgrowth (SIBO) has been proposed to be an important factor, with prevalence figures of 38–84% in patients with IBS. However, these results were obtained using hydrogen breath tests, which are indirect tests of SIBO with poor sensitivity and specificity."[174] Further, Dr. Pimentel's studies "have been heavily criticised, mainly because of the weakness of the LHBT and the interpretation of the results, and contradictory results exists."[175] Posserud 2007 found that 7 of 162 IBS patients (4%) had SIBO based on $\geq 10^5$ cfu/mL colonic bacteria from small bowel aspirate.[176] Posserud 2007 provided in Table 2 and Figure 2 (below) compared the prevalence of SIBO in IBS patients versus healthy controls based on glucose and lactulose breath testing with various definitions of a positive result.[177] The authors concluded that their study did not support an important role for SIBO in IBS according to commonly used clinical definitions.[178]

---

[173] Posserud 2007 at 802. Of the 162 patients enrolled, 37 patients were identified as constipation-predominant, 49 patients as diarrhea-predominant, and 76 with alternating-type IBS. *Id.* at 803.
[174] Posserud 2007 at 802.
[175] Posserud 2007 at 802.
[176] Posserud 2007 at 804.
[177] Posserud 2007 at 805.
[178] Posserud 2007 at 802, 805-07.

**Table 2** Jejunal cultures

| Bacteria (cfu/ml) | Patients with IBS, n (%) | Controls, n (%) | p Value |
|---|---|---|---|
| $\geq 10^5$, colonic bacteria | 7 (4%) | 1 (4%) | NS |
| $\geq 10^5$, any bacteria | 10 (6%) | 1 (4%) | NS |
| $\geq 5 \times 10^4$, colonic bacteria | 10 (6%) | 1 (4%) | NS |
| $\geq 5 \times 10^4$, any bacteria | 17 (11%) | 1 (4%) | NS |
| $\geq 10^4$, colonic bacteria | 13 (8%) | 1 (4%) | NS |
| $\geq 10^4$, any bacteria | 39 (24%) | 1 (4%) | $p = 0.02$ |
| $\geq 5 \times 10^3$, colonic bacteria | 17 (11%) | 1 (4%) | NS |
| $\geq 5 \times 10^3$, any bacteria | 70 (43%) | 3 (12%) | $p = 0.002$ |

Proportion of patients with IBS and controls with varying amounts of bacteria, divided into colonic and any bacteria (respiratory tract flora excluded). Mildly increased bacterial counts were more common in patients with IBS than in controls.




**Figure 2** Percentages of subjects with tests indicating altered small-bowel flora according to the different diagnostic methods and definitions used; jejunal culture ($\geq 10^5$ and $\geq 5 \times 10^3$ cfu/ml), glucose hydrogen breath test (GHBT), lactulose hydrogen breath test (LHBT) with two distinct $H_2$ peaks after ingestion of lactulose (LHBT double peak), LHBT with a rise in $H_2$ within 90 min (LHBT 90 min), and LHBT with a rise in $H_2$ within 180 min (LHBT 180 min). IBS, irritable bowel syndrome. $^{**}p<0.01$.

106. In an October 2007 case study, Dr. Quigley reported a 51-year old male patient who presented with a history of intermittent abdominal discomfort and bloating.[179] He had previously had an *Helicobacter pylori* infection for which he received triple antibiotic therapy that resolved the infection, but not his abdominal discomfort and bloating.[180] During his evaluation, he complained of constipation and told his physician that 8 weeks previously, he had received antibiotics for a dental abscess and "for 2 weeks thereafter his symptoms were improved. He read about a relationship between IBS and small intestinal overgrowth (SIBO) on the web and [sought] advice on this issue."[181] Dr. Quigley stated that this case study raised a number of questions:

---

[179] Quigley 2007 Case Study.
[180] Quigley 2007 Case Study at 1140.
[181] Quigley 2007 Case Study at 1140.

107. "Can we predict the presence or absence of SIBO based on clinical presentation?" Dr. Quigley concluded that "[t]here is, at present, therefore, no firm basis on which to predict the likely presence or absence of SIBO in IBS; this first strategy to treat with or without testing would not be supported by evidence."[182]

108. "Can testing confirm SIBO and predict response to therapy?" Dr. Quigley concluded that "[t]he interpretation of this literature is far from straightforward owing to differences in study protocol and in the manner of interpretation of the results and the definition of SIBO; these and other factors may explain the tremendous variations in the prevalence of SIBO reported in various series."[183]

109. "Is an empiric course of antibiotics indicated? If yes, for how long and what antibiotic? What outcome can be expected from a course of antibiotics (whether based on prior testing or not)? What to do after antibiotics? Are there any risks?" Dr. Quigley concluded that "a rush to widespread empiric antibiotic therapy in IBS is premature for the following reasons[:]"[184]

> 1. The improvement in IBS associated with antibiotic therapy has been modest at best, with response rates of 35%–50%, which are comparable with those recorded in placebo arms in various large-scale studies. In the most recent study [Pimentel 2006], using high-dose rifaximin, the response rates were 40% at the end of antibiotic therapy, and 36% 10 weeks later.
>
> 2. A sound rationale for antibiotic therapy has not been established because the issue of SIBO in IBS has not been resolved. It seems very doubtful that proximal SIBO is a real cause of symptoms of IBS; distal SIBO possibly is associated with some element of dysmotility and may be a factor, but the variance in IBS symptoms attributable to distal SIBO has not been established. Thus, it is equally likely that antibiotic effects in IBS are exerted on the colonic flora.

[182] Quigley 2007 Case Study at 1140, 1141.
[183] Quigley 2007 Case Study at 1140, 1141-42.
[184] Quigley 2007 Case Study at 1140, 1142.

3. Antibiotic dose and duration of therapy have not been established. All studies to date have used different doses and antibiotic regimens; the optimal approach needs to be established in a prospective, placebo-controlled, dose-ranging study.

4. Although, to date, antibiotic therapy in IBS has not been associated with significant adverse events, the possibility of repeated courses of antibiotics in this chronic relapsing condition may lead to the development of antibiotic resistance and opportunistic infections. The increasing evidence of resistant *Clostridium difficile* colitis should alert prescribers to the danger of indiscriminate use of enteric antibiotics for such a common condition. The longest study of antibiotic therapy has not extended beyond 10 weeks; more long-term data are needed.

110. Dr. Quigley recommended that "the most prudent option at present" for physicians was: "Do Not Seek or Treat Small Intestinal Bacterial Overgrowth; Manage Symptomatically and Based on Patient Presentation and Associated Features."[185]

111. Shortly before February 26, 2008, Dr. Vanner published an article that examined the SIBO/IBS "hypothesis."[186] Vanner 2008 stated that "[t]he proposal that SIBO accounts for the symptoms of IBS is a novel and interesting hypothesis," but concluded that it "remains an unproven hypothesis."[187]

112. There were issues with the various diagnostic tests used to support the SIBO/IBS hypothesis, including Dr. Pimentel's work using the LHBT, and three recent studies could not replicate a difference in the presence of SIBO in IBS patients versus healthy controls.[188]

---

[185] Quigley 2007 Case Study at 1142 ("Given current uncertainties regarding the status of SIBO in IBS, our inability to select patients who are likely to respond on the basis of symptoms and the apparent unreliability of tests that are widely accessible in making the diagnosis of SIBO, and, above all, the lack of consistent and convincing evidence for efficacy with antibiotic therapy, one cannot yet recommend either testing for SIBO or empiric antibiotic therapy in IBS.").
[186] Vanner 2008 at 1315. The article was published online on February 4, 2008.
[187] Vanner 2008 at 1315, 1320.
[188] Vanner 2008 at 1315-16, 1318 (Fig. 3).

113. Vanner 2008 also pointed out that the mechanism that would predispose IBS patients to SIBO was "a missing link in the SIBO-IBS hypothesis."[189] Because IBS was "known to overlap with a number of other poorly understood chronic conditions" it had recently "been suggested that SIBO may also be a unifying hypothesis between these conditions.[190] But the studies underpinning that "unifying hypothesis" were "undermined by the absence of a proper control group."[191]

114. "The symptom response of patients with IBS to antibiotics has been examined in three relatively small, prospective placebo-controlled studies": Pimentel 2003, Sharara 2006, and Pimentel 2006.[192] Vanner 2008 explained that these studies were not directly comparable due to differences in study design.[193] For example, Sharara 2006 enrolled patients complaining of gas and flatulence and only retrospectively applied Rome II criteria (and even then, only 60% met Rome II criteria), whereas Pimentel 2003 and Pimentel 2006 used Rome I.[194] Vanner 2008 noted that interpretation of the results from other studies "often referenced in support of these prospective studies" (including Pimentel 2000, Cuoco, and Lauritano) were "seriously limited by their study design."[195] Notably, the "[t]he hypothesis that SIBO accounts for the symptoms of IBS is based on the LHBT, but the correlation between the normalization of LHBT following antibiotics and symptom improvement has become less clear" given the data (or lack thereof) reported in Pimentel 2003, Pimentel 2006, and Sharara 2006.[196] Vanner 2008 concluded that

---

[189] Vanner 2008 at 1317.
[190] Vanner 2008 at 1318-19.
[191] Vanner 2008 at 1318-19.
[192] Vanner 2008 at 1318-19.
[193] Vanner 2008 at 1319.
[194] Vanner 2008 at 1319.
[195] Vanner 2008 at 1319.
[196] Vanner 2008 at 1319.

with respect to antibiotics for IBS "[t]here is insufficient evidence to recommend antibiotics for the treatment of irritable bowel syndrome at present."[197]

115. Shortly after February 2008, Dr. Bratten and colleagues published a prospective study that essentially found opposite results to Dr. Pimentel's research about increased frequency of positive breath tests in patients with IBS symptoms.[198] "[E]valuation of a large group of patients with IBS [diagnosed using Rome II] and controls using LBT and previously reported test criteria determined that the majority of patients and controls have abnormal breath tests. Additionally, breath $H_2$ production, $CH_4$ production, and orocecal transit times do not differ between the two groups. We conclude that LBT, in its current form, using the proposed criteria for an abnormal test, does not discriminate patients with IBS from healthy subjects."[199]

116. Finally, a person of ordinary skill would have understood that an association between gut flora and symptoms of irritable bowel syndrome does not necessarily implicate SIBO.[200] In 2007, Dr. Quigley reviewed the role of bacterial flora in irritable bowel syndrome, an issue which he described as "a complex one and contain[ing] several, even contradictory, strands:

> 1. Epidemiological evidence that antibiotic use may predispose to IBS or to exacerbations thereof.
>
> 2. Epidemiological, clinical and experimental evidence for the existence of post-infectious IBS.
>
> 3. Evidence, both experimental and clinical, for a role for low grade inflammation (perhaps triggered by luminal bacteria) in IBS.

---

[197] Vanner 2008 at 1319.
[198] *See generally* Bratten 2008.
[199] Bratten 2008 at 962.
[200] Riordan 2006 at 669-671.

4. The suggestion that IBS may be associated with small intestinal bacterial overgrowth (SIBO), or other changes in the gut flora.

5. Accumulating evidence to indicate that manipulation of the gut flora, by antibiotics or probiotics, may ameliorate symptoms in IBS."[201]

With respect to SIBO, Dr. Quigley concluded that "the likelihood that bacterial overgrowth will prove to be a major factor in IBS now seems remote."[202]

117. "IBS is likely multifactorial in etiology" but "a dysfunctional interaction between the indigenous gut flora and the intestinal mucosa" may contribute.[203] There was "increasing support for the concept that disturbances in the microecology of the gut flora occur in patients with IBS and that such abnormalities may represent one factor promoting IBS-type symptoms" but "[t]he relative importance of disturbed gut flora to symptom pathogenesis, along with the therapeutic potential modulation of gut flora for amelioration of IBS symptoms, however, remains to be fully defined."[204] Relatedly, just because bacteria were implicated in the pathogenesis of IBS, did not mean a person of ordinary skill would have reasonably inferred that antibiotics should be used to relieve IBS symptoms. In fact, a person of ordinary skill in the art would have known that "[g]astrointestinal infection or treatment with antibiotics resulting in alteration of the ecology of the gut flora have each been long recognized to induce or exacerbate IBS."[205] Further, although the short-term safety profile of non-absorbable antibiotics (e.g.,

---

[201] Quigley 2007 Review at 2.
[202] Quigley 2007 Review at 2, 5; *see also* Quigley 2007 Review at 4 (noting Pimentel 2000, Pimentel 2003, and Cuoco, among others that had researched the SIBO/IBS, and discussing three overarching criticisms of that research).
[203] Riordan 2006 at 669.
[204] Riordan 2006 at 672.
[205] Riordan 2006 at 669; *see also* Vanner 2008 at 1320 ("There are also indirect studies which imply that antibiotics could play a role in the pathogenesis of IBS. A study in a general practice

rifaximin) "may make the use of antibiotics in IBS more attractive, enthusiasm should be tempered."[206] "There are no long-term studies with antibiotics in IBS and less is known about the safety of these antibiotics long term. IBS is a common disorder with a recognised high placebo response rate, and studies show that the effects of antibiotics on measurable outcomes are short lived. Hence there is significant potential for committing large numbers of patients to antibiotics" even though studies "highlight the potential for antibiotic use to have detrimental effects, particularly with continuous or repeated courses."[207]

### 4. Rifaximin

118. Rifaximin was first approved for commercial use in 1985 in Italy under the tradename Normix® in a 200 mg unit dose.[208] Normix® 200 mg was indicated for intestinal infections and travelers' diarrhea (one 200 mg tablet every 6 hours), pre- and post-operative prophylaxis of complications in gastroenteric surgery (two 200 mg tablets every 12 hours), and as a coadjuvant in the treatment of hyperammonemia (two 200 mg tablets every 8 hours).[209] "Unless prescribed otherwise, treatment should not exceed 7 days."[210]

119. Rifaximin was approved for commercial use in the United States in 2004 under the tradename Xifaxan®, also in a 200 mg unit dose.[211] Xifaxan® 200 mg was indicated to treat

---

setting found that prior antibiotic use strongly correlated with patients having the symptoms of IBS. It has also been shown that the use of antibiotics is related to increased reporting of functional bowel symptoms.").

[206] Vanner 2008 at 1320.

[207] Vanner 2008 at 1320.

[208] Normix® Label, Section 9.

[209] Normix® Label, Section 4.

[210] Normix® Label, Section 4.

[211] 2004 Xifaxan® Label.

patients 12 years of age or older with travelers' diarrhea caused by noninvasive strains of *E. coli* (one 200 mg tablet three times a day (TID) for 3 days).[212]

120. A 550 mg dosage of Xifaxan® was approved for commercial use in the United States in 2010 to reduce the risk of recurrence of overt hepatic encephalopathy episodes in adults (one 550 mg tablet twice a day (BID)).[213] Xifaxan® 550 mg was not commercially available as of February 26, 2008.

121. Rifaximin is a derivative of rifamycin.[214] Whereas rifamycin given orally reaches the circulatory system, rifaximin given orally is "non-systemic" because there is little absorption of rifaximin from the gastrointestinal tract into the systemic circulation.[215] Rifaximin is classified as an antibiotic, although even today, how rifaximin works to treat IBS-D is not well-understood.[216]

#### 5. References Cited in Dr. Harary's Opening Report

122. In Section VI.B. of his Opening Report, Dr. Harary cites over two dozen references, which he states make up "The Scope and Content of the Prior Art." Although I discuss some references above, I address each reference below.

##### a) Della Marchina

123. Della Marchina, published in 1988, reported a randomized, double-blind, placebo-controlled trial in 121 patients with acute and serious diarrheic syndrome (at least 5 discharges within the last 24 hours).[217] Patients were excluded if they had chronic diarrhea of any

---

212 2004 Xifaxan® Label 2004.
213 2010 Xifaxan® Approval and Label.
214 2004 Xifaxan® Label 2004.
215 2004 Xifaxan® Label 2004.
216 *See e.g.*, Pimentel 2011 at 31.
217 Della Marchina at 336, 337.

etiology.[218] The trial enrolled "aged" patients (average age of about 73 years).[219] Secretory diarrheas are usually self-limiting and disappear within 7 to 10 days, making it often unnecessary to administer antibiotics.[220] But patients in the geriatric ward may have disorders for which severe diarrhea may lead to serious complications.[221]

124. Patients were randomized to receive rifaximin 200 mg TID for 7 days or placebo.[222] Della Marchina reported "a statistically significant improvement in the number of discharges, stool consistency and associated symptoms" starting at day 2 versus day 0, and "complete remission was obtained on the fourth day" in the rifaximin group.[223] Della Marchina reported that the rifaximin group's improvements were statistically significantly greater than the placebo group.[224] There was no report of systemic toxicity and apparently no recorded side effects.[225]

125. The patients in the Della Marchina study had pathogenic diarrhea, not IBS.[226] IBS is a functional gastrointestinal disorder, not a bacterial infection, and antibiotic treatment of GI infections were recognized as *inducing or exacerbating* IBS.[227]

126. When considered in the context of the prior art as of February 2008, a person of ordinary skill in the art would not have reasonably relied on Della Marchina to draw conclusions about the potential safety or efficacy of rifaximin for IBS-D in any population, including an

[218] Della Marchina at 337.
[219] Della Marchina at 337-38.
[220] Della Marchina at 337.
[221] Della Marchina at 337.
[222] Della Marchina at 337.
[223] Della Marchina at 338.
[224] Della Marchina at 338.
[225] Della Marchina at 338-39.
[226] Della Marchina at 337.
[227] See above, paragraphs 116-117-.

"aged" population, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

#### b) Di Stefano

127. Di Stefano, published in 2000, reported a double-blind, randomized controlled study in 21 patients with SIBO.[228] On top of the limitations raised by the investigators themselves,[229] the study was small.

128. SIBO was diagnosed based on (a) malabsorption symptoms, (b) a condition predisposing the patient to SIBO, (c) a positive glucose hydrogen breath test (increase of > 12 ppm over baseline after 2 hours), or (d) increase of > 12 ppm over baseline in the fasted state.[230] It is not entirely clear, but it appeared SIBO was diagnosed if any of the four criteria were met. Patients were randomized to rifaximin 400 mg TID for 7 days or chlortetracycline 333 mg TID for 7 days.[231] At the start of the study, and 3 days after completion, patients recorded their SIBO symptoms – abdominal pain, bloating, diarrhea, borborygmi (stomach growling), lassitude (weariness, fatigue), and anorexia – on a severity scale of 0 to 3.[232]

129. Di Stefano reported that hydrogen excretion (fasting hydrogen, peak hydrogen, and total hydrogen) decreased significantly in the rifaximin group but not in the chlortetracycline group.[233] Di Stefano also found that "[p]eaks of H2 excretion decreased in nine out of 10 patients after rifaximin and in only five out of 11 after chlortetracycline; accordingly the H2 breath test after glucose normalized in seven out of 10 patients (70%) after rifaximin and in three out of 11

---

[228] Di Stefano at 551, 552.
[229] Di Stefano at 555.
[230] Di Stefano at 552-53.
[231] Di Stefano at 552.
[232] Di Stefano at 553.
[233] Di Stefano at 554.

patients (27%) after chlortetracycline (P < 0.01)."[234] However, Di Stefano did not report how many patients in either groups remained positive for SIBO according to the criteria used to diagnosis SIBO upon study entry.

130. Di Stefano found that the "malabsorption symptoms" of diarrhea, borborygmi, and lassitude were significantly reduced in the rifaximin group compared to the chlortetracycline group, and that reduction in overall SIBO symptom score was significantly higher in the rifaximin group.[235] This was not so unexpected according to the authors, however, because the study compared rifaximin to an antibiotic from a class that was known to be suboptimal in SIBO: "[t]etracyclines do not have direct activity against anaerobes, may be ineffective against *Bacteroides* and their pharmacokinetics are markedly deranged in patients with malnutrition, which is a common finding in [SIBO]."[236] The patients in the Di Stefano study did not have IBS.[237]

131. When considered in the context of the prior art as of February 2008, a person of ordinary skill in the art would not have reasonably relied on Di Stefano to draw conclusions about the potential safety or efficacy rifaximin in SIBO or IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**c) Normix® Label**

132. The Normix® Label is drug product label (a "summary of product characteristics") for rifaximin 200 mg tablets, marketed in Italy.[238] The Normix® Label

[234] Di Stefano at 554.
[235] Di Stefano at 554.
[236] Di Stefano at 555.
[237] Di Stefano at 552 (Table 1).
[238] Normix® Label.

described rifaximin as a broad-spectrum antibiotic against various Gram-positive and Gram-negative, aerobic or anaerobic species.[239]

133. The Normix® Label listed the following indications for Normix® 200 mg: [240]

- intestinal infections (200 mg QID);
- travelers' diarrhea (200 mg QID);
- pre- and post-operative prophylaxis of complications in gastroenteric surgery (400 mg BID); and
- as a coadjuvant in the treatment of hyperammonemia (400 mg TID).

Normix® 200 mg was not indicated to treat IBS, nor does the Normix® Label mention IBS.

134. The Normix® Label stated in bold italic text: "***Unless prescribed otherwise, treatment should not exceed 7 days.***"[241]

135. The Normix® Label explained that, consistent with the fact that rifaximin was practically not absorbed from the gastrointestinal tract, it does not interact with systemically absorbed drugs.[242]

136. The Normix® Label noted nausea and urticaria as potential undesirable effects.[243] The Normix® Label stated in the "Overdosage" section that "[e]xperimental studies have shown that there are neither local nor general adverse effects up to a dose of 1600 mg/daily" but the label did not specify the nature of the experimental studies or length of administration.[244] Without more information, a person of ordinary skill in the art would not have reasonably concluded anything more than that an overdose from rifaximin 1600 mg/day for 7 days is

---

[239] Normix® Label at Section 5.1.
[240] Normix® Label at Sections 4.1, 4.2.
[241] Normix® Label at Section 4.2
[242] Normix® Label at Sections 5.1, 5.2
[243] Normix® Label at Section 4.3.
[244] Normix® Label at Section 4.9.

unlikely. It would have been at best speculative to conclude that rifaximin was safe at higher doses, or when taken longer (or both) than noted.[245]

137. When considered in the context of the prior art as of February 2008, a person of ordinary skill in the art would not have reasonably relied on the Normix® Label to draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**d) 2004 Xifaxan® Label**

138. The 2004 Xifaxan® Label is a drug product label for rifaximin 200 mg tablets, marketed in the United States by Salix.[246] Xifaxan® 200 mg was indicated to treat patients 12 years of age or older with travelers' diarrhea caused by noninvasive strains of *E. coli* (200 mg TID for 3 days).[247]

139. The 2004 Xifaxan® Label stated that "*Escherichia coli* has been shown to develop resistance to rifaximin *in vitro*. However, the clinical significance of such an effect has not been studied."[248]

140. Dr. Harary states that the 2004 Xifaxan® Label "teaches that '[t]he duration of diarrhea was significantly shorter in patients treated with rifaximin than in the placebo group.'"[249] If Dr. Harary means to suggest that a person of ordinary skill would have reasonably relied on a diarrhea endpoint in the Xifaxan® 200 mg travelers' diarrhea study to draw

245 The same is true of the 2004 Xifaxan® Label's "Overdose" section.
246 2004 Xifaxan® Label.
247 2004 Xifaxan® Label, Indications and Usage, Dosage and Administration.
248 2004 Xifaxan® Label, Microbiology.
249 Harary Opening Report, paragraph 72.

conclusions about the potential for rifaximin (at any dose) to relieve IBS-D symptoms, I disagree. As noted above, diarrhea caused by pathogenic bacteria and IBS-D are different conditions. And the 2004 Xifaxan® Label explains that Xifaxan® 200 mg "should not be used in patients with diarrhea complicated by fever or blood in the stool or diarrhea due to pathogens other than *Escherichia coli*."[250]

141. When considered in the context of the prior art as of February 2008, a person of ordinary skill in the art would not have reasonably relied on the 2004 Xifaxan® Label to draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**e) Lin '053 Patent**

142. The Lin '053 Patent issued in 2005 to Drs. Henry Lin and Mark Pimentel.[251] The application for the Lin '053 Patent was filed in 1999, before the publication of Pimentel 2000 and 2003 and all of the criticism and skepticism that followed.[252] It is titled "Methods of Diagnosing or Treating Irritable Bowel Syndrome and Other Disorders Caused by Small Intestinal Bacterial Overgrowth."[253] The Abstract contained Drs. Lin and Pimentel's "universal hypothesis" for SIBO.[254] The Lin '053 Patent stated that SIBO can be used to diagnose irritable bowel syndrome; fibromyalgia; chronic fatigue syndrome; depression; ADHD; and autoimmune diseases, such as multiple sclerosis, lupus erythematosus, and Crohn's disease.[255] And it stated

[250] 2004 Xifaxan® Label, Indications and Usage.
[251] Lin '053 Patent at cover page.
[252] Lin '053 Patent at cover page.
[253] Lin '053 Patent at cover page.
[254] Lin '053 Patent at cover page (Abstract).
[255] Lin '053 Patent at cover page (Abstract).

that "at least partially eradicating [] SIBO" with an antimicrobial, probiotic, or prokinetic agent, treats those disorders (e.g., IBS, fibromyalgia, CFS, etc.) "and other disorders caused by SIBO."[256]

143. The Lin '053 Patent stated that "at least partially eradicating the bacterial overgrowth is accomplished by administering an antimicrobial agent," such as neomycin, metronidazole, teicoplanin, doxycycline, tetracycline, ciprofloxacin, augmentin, cephalexin, penicillin, ampicillin, kanamycin, rifamycin, rifaximin, or vancomycin.[257] The Lin '053 Patent did not include dosages, frequencies of administration, or lengths of administration for rifaximin.

144. Examples 1, 2, and 3 in the Lin '053 Patent discussed the same study that is reported in Pimentel 2000.[258] I discussed the Pimentel 2000 study above in paragraph 98. And I discussed above in paragraphs 99-100, the reaction to Pimentel 2000.

145. Examples 4-10 were directed to fibromyalgia, chronic fatigue syndrome, multiple sclerosis, ADHD, depression, Crohn's disease, and hyperalgesia.[259] Example 8 reported a study of phase III interdigestive motility in 15 subjects "having a suspected diagnosis of IBS, as defined by Rome Criteria, corroborated by concomitant SIBO."[260] The Lin '053 Patent reported that 13 subjects (86%) had no detectible phase III interdigestive motility, 1 subject (7%) had motility of less than normal peristaltic amplitude, and 1 subject (7%) had normal phase III interdigestive motility.[261] Example 9 reported two subjects "with recurrent IBS symptoms" received "prokinetic treatment" with erythromycin, explaining that erythromycin is a motilin

[256] Lin '053 Patent at cover page (Abstract).
[257] Lin '053 Patent at column 16, line 61 – column 17, line 3.
[258] Lin '053 Patent at column 22, line 1 – column 23, line 34.
[259] Lin '053 Patent at column 23, line 35 – column 28, line 52.
[260] Lin '053 Patent at column 27, lines 33 – 59.
[261] Lin '053 Patent at column 27, lines 54 – 59.

agonist that can induce phase III of interdigestive motility.[262] The Lin '053 Patent does not distinguish IBS subtypes (i.e., IBS-C, IBS-D, or IBS-A).

146. The Lin '053 patent claims, among other things:

> 1. A method of treating irritable bowel syndrome comprising: detecting the presence of small intestinal bacterial overgrowth in a human subject having at least one symptom associated with a suspected diagnosis of irritable bowel syndrome; and at least partially eradicating the small intestinal bacterial overgrowth to treat the irritable bowel syndrome.
>
> 2. The method of claim 1, wherein at least partially eradicating the small intestinal bacterial overgrowth further comprises administering an antimicrobial agent.
>
> 3. The method of claim 1, wherein at least partially eradicating the small intestinal bacterial overgrowth further comprises administering an antibiotic.

147. When considered in the context of the prior art as of February 2008, the Lin '053 Patent would not have led a person of ordinary skill in the art to depart from the conventional wisdom that IBS/SIBO hypothesis was still that – a hypothesis. Nor when considered in the context of the prior art as of February 2008, would the Lin '053 Patent have allowed a person of ordinary skill to reasonably draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

148. Dr. Harary states that the Lin '053 Patent was exclusively licensed to Salix in 2006.[263] Then, he states that Salix listed the Lin '053 Patent in the 38th Edition of "Approved Drug Products with Therapeutic Equivalence Evaluations," dated 2018 (which he refers to as the

---

[262] Lin '053 Patent at column 28, lines 1-24.
[263] Harary Opening Report, paragraph 74.

FDA's Orange Book), with the use "patent codes" U-1707 and U-1708.[264] The patent use U-1707 is "Treatment of Irritable Bowel Syndrome with Diarrhea (IBS-D) in Adults and Symptoms Thereof." The patent use U-1708 is "Treatment of Irritable Bowel Syndrome with Diarrhea (IBS-D) in Adults. A person of ordinary skill in the art as of February 26, 2008 would not have had this information. It would have been up to the person of ordinary skill to understand the Lin '053 Patent in the context of what was known as of February 26, 2008. Even if the FDA Orange Book had been available, a person of ordinary skill would not substitute the patent use codes for his or her understanding of what the Lin '053 Patent discloses (or does not disclose) in the context of what was known as of February 28, 2009.

**f) Lin '608 Patent**

149. The Lin '608 Patent issued in 2010 to Drs. Henry Lin and Mark Pimentel.[265] The application for the Lin '608 Patent was filed on September 19, 2008 and is related to a series of U.S. applications, including a patent application filed on August 11, 1999, before the publication of Pimentel 2000 and 2003 and all of the criticism and skepticism that followed.[266] The Lin '608 Patent was titled "Methods of Treating A Subject Suffering From Irritable Bowel Syndrome."[267] Columns 1 through 28 (up through Example 9) of the Lin '608 Patent contained the same disclosure as the Lin '053 Patent, which I discussed above in section VII.B.5.e.

150. The Lin '608 Patent contained a new example (Example 10) titled "Treatment of SIBO-related Hyperalgesia." Example 10 had several case studies.[268] In the first, a patient "with

[264] Harary Opening Report, paragraph 74.
[265] Lin '608 Patent at cover page.
[266] Lin '608 Patent at cover page (see Related U.S. Application Data).
[267] Lin '608 Patent at cover page.
[268] Lin '608 Patent at column 28, lines 34-64.

a suspected diagnosis of IBS was found to have SIBO, as detected by LBHT."[269] His rectal hyperalgesia resolved "[a]fter eradication of his SIBO condition with antibiotic treatment."[270] The Lin '608 Patent reported that SIBO was eradicated by antibiotic treatment in a female with IBS, but the patient continued to complain of rectal distention and hyperalgesia.[271] Colpermin (peppermint oil) and Elavil (a tricyclic antidepressant) alleviated her symptoms.[272] Another female patient with a diagnosis of IBS and SIBO detected by LBHT was administered an antibiotic, intestinal lavage, and cisapride (a prokinetic agent).[273] This patient also continued to complain of hyperalgesia, but the Lin '608 Patent reports that Colpermin successfully alleviated the hyperalgesia.[274] Example 10 did not disclose what antibiotic or antibiotics were administered.

151. When considered in the context of the prior art as of February 2008, the Lin '608 Patent would not have led a person of ordinary skill in the art to depart from the conventional wisdom that IBS/SIBO hypothesis was still that – a hypothesis. Nor when considered in the context of the prior art as of February 2008, would the Lin '608 Patent have allowed a person of ordinary skill to reasonably draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

---

[269] Lin '608 Patent at column 28, lines 38-40.
[270] Lin '608 Patent at column 28, lines 42-44.
[271] Lin '608 Patent at column 28, lines 45-50.
[272] Lin '608 Patent at column 28, lines 50-54.
[273] Lin '608 Patent at column 28, lines 55-59.
[274] Lin '608 Patent at column 28, lines 59-64.

152. As he did with the Lin '053 Patent, Dr. Harary states that the Lin '608 Patent is listed in the 2018 FDA's Orange Book, with the use "patent codes" U-1707 and U-1708.[275] Again, a person of ordinary skill in the art as of February 26, 2008 would not have had this information. It would have been up to the person of ordinary skill to understand the Lin '608 Patent in the context of what was known as of February 26, 2008. Even if the FDA Orange Book had been available, a person of ordinary skill would not substitute the patent use codes for his or her understanding of what the Lin '608 Patent discloses (or does not disclose) in the context of what was known as of February 28, 2009.

**g) Pimentel 2005, Salix Business Wire 2005, Salix Development Update, Pimentel 2006**

153. Dr. Harary discusses several references that all relate to a single study from Dr. Pimentel's group at Cedars-Sinai – a double-blind, randomized, controlled clinical trial in 87 patients diagnosed with IBS (according to Rome I, all subtypes) administered either rifaximin 400 mg TID for 10 days or placebo for 10 days, and followed for an additional 10 weeks.

154. ***Pimentel 2005*** is an abstract of the study that was published in September 2005 (Abstract 882) and presented at the 70th Annual Scientific Meeting of the American College of Gastroenterology (ACG) held from October 30 – November 2, 2005.[276]

155. Pimentel 2005 stated that patients kept a stool diary for 7 days, filled out a symptom questionnaire, took a lactulose breath test, and were then randomized to the rifaximin

[275] Harary Opening Report, paragraph 80.
[276] Pimentel 2005 at S324.

patients were administered matching placebo, followed by a 10-week, post-treatment follow-up phase.[287] A sample size of 44 patients in each group was needed for a 90% power to detected a 35% difference in global improvement.[288]

162. The primary end point was the average percent global improvement of IBS symptoms (on a scale from 0 to 100%) during the 10-week follow-up phase, although data were not available for all 10 weeks.[289] Patients in the rifaximin group reported a statistically significantly greater average global improvement in IBS symptoms compared to placebo (36.40% (SD 31.46%) vs. 21.00% (SD 22.08%), p = 0.02).[290] Pimentel 2006 did not include any "clinical responder" analysis, including in the population of "subjects with diarrhea" reported in Pimentel 2005. Given that the "clinical responder" analysis was included in Pimentel 2005 but not in Pimentel 2006, it would have been reasonable for a person of ordinary skill in the art to conclude that the "clinical responder" analysis was criticized or rejected during the peer-review process, or that Dr. Pimentel did not attempt to get it through the peer-review process.

163. Pimentel 2006 did not include any IBS-D, IBS-C, or IBS-A subpopulation analysis, but did report the between-group differences for individual IBS symptoms "using a model similar to that for evaluating global improvement": severity of bloating was statistically better in the rifaximin group (p = 0.01), but severity of abdominal pain, diarrhea, and

[287] Pimentel 2006, at Abstract, 558.
[288] Pimentel 2006, at 559
[289] Pimentel 2006, at 558-59.
[290] Pimentel 2006 at 560-61. The results reported in Pimentel 2006 are slightly different than what was reported in the Pimentel 2005 abstract, reflecting the preliminary nature of abstract results.

constipation in the rifaximin group were not statistically different than placebo (p = 0.32, p = 0.67, p = 0.069, respectively).[291]

164. Pimentel 2006 states that "[r]ecent data suggest that the optimal dose of rifaximin may, in fact, be higher than that used in our study," citing Lauritano. As discussed below in section VII.B.5.n., Lauritano reported a rifaximin "dose-finding study for the treatment of small intestinal bacterial overgrowth." The patients had not been diagnosed with IBS, and patients were not asked about their symptoms. The highest dose used in Lauritano was 1200 mg daily (400 mg TID) – the *same* dose used in Pimentel 2006. Lauritano's results were based exclusively on the glucose hydrogen breath test, again, not symptoms (of SIBO or IBS).[292]

165. Pimentel 2006 contained an "Editors' Notes" box on page 558, reproduced below. In it, the *Annals* editors noted the lack of differences in abdominal pain, diarrhea, and constipation between the rifaximin and placebo groups and included the rather muted conclusion that "[r]ifaximin *may* improve *some* symptoms in *some* patients with IBS."[293]

---

[291] Pimentel 2006 at 561. The Pimentel 2005 abstract's individual symptom results are different, and it would not have been clear to a person of ordinary skill in the art whether that was because the datasets analyzed were different, the results were analyzed differently, Pimentel 2006 reports updated or corrected results, or it was rejecting during the review process. In any event, a person of ordinary skill in the art would have set aside the Pimentel 2005 abstract results in favor of what was reported in Pimentel 2006's final and full analysis.

[292] When asked about the citation to Lauritano in Pimentel 2006, Dr. Pimentel testified that looking at the Lauritano dosages "actually makes it less clear" what he meant by "recent data suggests that the optimal dosage of rifaximin may, in fact, be higher than that used in [his] study" because Lauritano "never went above 1200 [mg],… so I'm not sure in what context that statement makes any sense for that reference …." Pimentel Deposition Transcript, 158:18-159:11.

[293] Pimentel 2006 at 558.

***Context***

Few trials have evaluated the effects of antibiotics on symptoms of the irritable bowel syndrome (IBS).

***Contribution***

In this double-blind trial, 87 patients with IBS were randomly assigned to either rifaximin (400 mg 3 times daily) or placebo for 10 days. Over a 10-week follow-up period, the rifaximin recipients reported global improvements in overall symptoms and less bloating more frequently than the placebo recipients. No major differences in abdominal pain, diarrhea, or constipation were observed between the groups.

***Cautions***

The duration of therapy and follow-up was short.

***Implications***

Rifaximin may improve some symptoms in some patients with IBS.

*—The Editors*

166. Pimentel 2006 stated that an "Editorial comment" followed the article. That editorial was written by Dr. Douglas Drossman (Drossman 2006), who was arguably the world's leading expert on IBS and the founder of the ROME Committee, which set standards for design and treatment of functional gastrointestinal disorders. Dr. Drossman concluded that "[t]he clinical challenged is to identify the subset of patients with IBS who are most likely to have bacterial overgrowth that produces symptoms relative to the many other factors … Unfortunately, no data are available to help us in this decision[.]"[294] "Pimentel and colleagues should be congratulated for their efforts to increase awareness of this important subgroup of patients [likely to have SIBO] with IBS symptoms who need to be identified and treated. However, until better evidence is available, decisions relating to diagnosis and treatment remain within the art of medicine."[295]

[294] Drossman 2006 at 627.
[295] Drossman 2006 at 627.

167. Dr. Drossman noted that "[d]emonstrating benefit from a short course of antibiotic for a sustained period of time in unselected patients with IBS is certainly novel and important. However, several methodologic issues must be addressed before drawing such conclusions from the [Pimentel 2006] study."[296] A person of ordinary skill would have understood this to mean that while Pimentel's group tested the *hypothesis* that a short course of antibiotic could be beneficial in unselected patients with IBS, the study was too flawed to justify adopting it in clinical practice.

168. Dr. Drossman discussed six issues with Pimentel 2006. The first was that the difference in site recruitment (83 participants to Cedars-Sinai versus 3 participants to University of Chicago) "rais[ed] questions about differences in the eligibility or recruitment strategy between sites, given that presumably the same recruitment protocols were used."[297] A person of ordinary skill would have understood this issue to be related to an ill-defined or even biased patient population.

169. Dr. Drossman's second criticism was that the primary endpoint – percent IBS global improvement averaged over the 10-week follow-up period – "is unique in the spectrum of IBS trials in the last decade and makes comparisons with other trials difficult."[298] Pimentel 2006 did not clearly define *a priori* "improvement" and did not provide treatment differences between groups by week.[299] "The more traditional approach [in IBS clinical trials] would be to define a responder on the basis of a binary adequate relief measure or satisfactory relief."[300] Thus, it

[296] Drossman 2006 at 626.
[297] Drossman 2006 at 626.
[298] Drossman 2006 at 626.
[299] Drossman 2006 at 626.
[300] Drossman 2006 at 626.

would have been unclear to a person of ordinary skill "[w]heather the averaged 36.4% response rate [was] clinically meaningful relative to the placebo rate of 21.0%."[301] The primary endpoint had never been used before in an IBS trial and has not be used since.

170. As Dr. Drossman alluded to, one of the problems in clinical research of potential IBS therapies was (and still is) the placebo response, which confounds investigators' ability to determine whether IBS symptom relief is attributable to something other than the actions of the experimental agent.[302] For example, a subject can report IBS symptom improvement, and the improvement may be due to the agent, psychological effects (e.g., a feeling of control over one's health), or external factors such as the natural ebb and flow of symptoms.[303] While the placebo response occurs with varying degree in all clinical trials, "[s]tudies involving patients with irritable bowel syndrome (IBS) have among the highest placebo response rate, with typical rates of approximately 50%."[304] "IBS is characterized by many symptoms with minimal objective evidence of disease, and it is associated strongly with depression and anxiety. Hence, receiving treatment multiple times per day may suggest some form of control, and also reinforces the expectation that the patient is getting treatment."[305]

171. Dr. Drossman's third criticism was that because pain was included in the global measure, the imbalance of baseline pain scores must be considered.[306] A person of ordinary skill

---

[301] Drossman 2006 at 626.
[302] Spiller 2007 at 1786; Pitz 2005 at 237; FGD Trial Design Guidelines at 1541.
[303] Spiller 2007 at 1786; Pitz 2005 at 242-43; FGD Trial Design Guidelines at 1541.
[304] Pitz 2005 at 237; FGD Trial Design Guidelines at 1541.
[305] Pitz 2005 at 242 (finding that the frequency with which a drug is administered is positively correlated to placebo response in IBS clinical trials).
[306] Drossman 2006 at 626.

would have recognized that the higher baseline pain score in the rifaximin group could have accounted for the larger improvement in global symptoms, rather than true treatment effect.[307]

172. Dr. Drossman's fourth criticism was that, as noted above, "none of the secondary end points, which are integral in defining IBS (namely pain, diarrhea, and constipation), improved with treatment, suggesting that rifaximin may be targeted more for bloating."[308] Pimentel 2006 did not distinguish IBS subtypes, but to the extent a person of ordinary skill in the art were to have reasonably drawn conclusions about rifaximin for IBS-D, he or she would have been discouraged by the lack of improvement in the symptoms required by the Rome II and III criteria for an IBS-D diagnosis – abdominal pain and diarrhea.

173. Dr. Drossman's fifth criticism was of the mixed multivariate model used to analyze the primary endpoint.[309] This statistical analysis "allows restructuring of the data set to use several observations for each patient" rather than evaluating efficacy at a prespecified time point (e.g., change from baseline from day 10 to week 10).[310] The mixed model also "minimizes the effect of dropouts and differs from a typical intention-to-treat analysis, where the values for the dropouts are usually imputed with a best worse-case scenario."[311] A "similar model" was used to analyze individual symptoms.[312]

174. Dr. Drossman's final criticism was that although Pimentel 2006 reported that lactulose breath tests were done before and after treatment, Pimentel 2006 did not provide the results (e.g., how many patients had abnormal breath tests at baseline (if any), and how many

---

[307] Drossman 2006 at 626.
[308] Drossman 2006 at 626.
[309] Drossman 2006 at 626-27.
[310] Drossman 2006 at 626.
[311] Drossman 2006 at 626.
[312] Pimentel 2006 at 561.

patients with baseline abnormal breath tests had normalized breath tests after the treatment phase (if any)).[313] Thus, Pimentel 2006 did little to address the SIBO/IBS hypothesis. "The premise that antibiotics are useful for treating IBS is based on [three] assumptions" that had not been resolved at that time (or by February 26, 2008): (1) whether most patients with IBS also have SIBO as measured by lactulose breath test, (2) whether that breath test accurately detects SIBO, and (3) whether antibiotics can lead to symptomatic benefit if SIBO is indeed present.[314]

175. Dr. Quigley echoed the limitations pointed out by Dr. Drossman "which reduce its impact."[315] "These results, in the opinion of this author, are far less impressive than one was led to expect from the initial studies by these same authors [citing Pimentel 2000 and Pimentel 2003] and also cast further doubt on the importance of bacterial overgrowth in IBS. Finally, one must remain reluctant, pending long-term studies, to recommend a prolonged course of antibiotic therapy to any population regardless of the safety profile of a given antibiotic."[316]

176. Considered in the context of the prior art as of February 2008 (especially the criticisms of the SIBO/IBS hypothesis and criticisms of Dr. Pimentel's studies), Dr. Pimentel's study (discussed in Pimentel 2005, Pimentel 2006, and Salix Business Wire) (i) a person of ordinary skill in the art would not have found it worth it to try to adjust, improve, or optimize rifaximin to relieve IBS-D symptoms, and (ii) it would have been *unreasonable* for a person of ordinary skill to *expect* that rifaximin 1650 mg daily (including 550 mg TID) for 14 days would be effective to relieve IBS-D symptoms. Applying Dr. Harary's definition of a person of

---

313 Drossman 2006 at 627.
314 Drossman 2006 at 627.
315 Quigley 2007 Review at 4.
316 Quigley 2007 Review at 4.

ordinary skill in the art, a person of ordinary skill would be inclined *not* to investigate IBS patients for SIBO and would be inclined *not* to treat IBS patients with antibiotics.

**h) Sharara**

177. Sharara, published in 2006, was a randomized, double-blind, placebo-controlled study of rifaximin 400 mg BID for 10 days.[317] Sharara aimed "(i) to verify whether patients complaining of intestinal gas-related symptoms suffer from early exaggerated release of hydrogen during bacterial carbohydrate fermentation suggesting [SIBO]; (ii) to examine the effect of short-term administration of rifaximin on gas-related symptoms (bloating, abdominal distention, and flatulence); (iii) and to attempt to correlate symptom improvement with diminution in hydrogen excretion."[318]

178. Patients were eligible for the trial if the patients reported a greater than 12-week history of bloating and/or excessive flatulence and any of chronic abdominal pain or discomfort, disturbances in bowel movements, or abnormal stool consistency.[319] Patients did not have to satisfy Rome II criteria for IBS diagnosis to enroll. A total of 124 patients made it to the treatment phase of the study (63 patients in the rifaximin group and 61 in the placebo group).[320] Of the 63 patients in the rifaximin group, 37 met Rome II criteria.[321] Of the 61 patients in the placebo group, 33 met Rome II criteria.[322] Sharara reported that in the 71 patients who met Rome II criteria, 20% had IBS-D, 38.3% had IBS-C, and 41.7% suffered from IBS-A, but Sharara did not break this out between rifaximin and placebo group and so a person of ordinary

[317] Sharara at 326; see above, paragraph 114
[318] Sharara at 237.
[319] Sharara at 327.
[320] Sharara at 328.
[321] Sharara at 329.
[322] Sharara at 329.

skill would not have been able to determine if the arms were balanced with respect to any of the three subtypes.[323]

179. Sharara reported a significant decrease in overall symptom severity in 26 of 63 patients in the rifaximin group versus 14 of 61 patients in the placebo (41.3% vs. 22.9%, p = 0.03), which was maintained during a 10-day follow-up phase in 18 of 63 patients in the rifaximin group versus 7 of 61 patients in the placebo group (28.6% vs. 11.5%, p = 0.02).[324] In the subgroup of IBS patients, Sharara reported a significant decrease in overall symptom severity in 15 of 37 patients in the rifaximin group versus 6 of 33 of patients in the placebo group (40.5% vs. 18.2%, p = 0.04), a difference that remained significant by the end of the follow-up phase in 10 of 37 patients in the rifaximin group versus 3 of 33 patients in the placebo group (27% vs 9.1%, p = 0.05).[325] Sharara did not breakdown the results by IBS subtype, and so a person of ordinary skill would not have been able reasonably conclude what effect, if any, rifaximin had on global symptoms in IBS-D, IBS-C, or IBS-A patients.

180. Sharara's overall symptom score was calculated by adding up scores of abdominal pain, distension, number of bowel movements, stool consistency, and feeling of incomplete evacuation.[326] Sharara only reported results for the individual bloating symptom, but not for any other symptom.[327] Thus, a person of ordinary skill in the art would not have been able reasonably conclude what effect, if any, rifaximin had on the IBS-D symptoms of abdominal pain and diarrhea.

---

[323] Sharara at 329.
[324] Sharara at 329.
[325] Sharara at 329.
[326] Sharara at 328.
[327] Sharara at 329.

204. When considered in the context of the prior art as of February 2008, the Pimentel Book would not have led a person of ordinary skill in the art to depart from the conventional wisdom that IBS/SIBO hypothesis was still a hypothesis. Nor when considered in the context of the prior art as of February 2008, would the Pimentel Book have allowed a person of ordinary skill to reasonably draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**m) RFIB2001 Study Protocol**

205. The RFIB2001 Study Protocol was a clinicaltrials.gov archive print out of Salix's phase IIb study of Xifaxan® in IBS-D with the study identifier RFIB2001.[378] The clinicaltrials.gov print out stated that RFIB2001 was to be a multi-center, randomized, double-blind, placebo-controlled study to assess the efficacy and safety of the following rifaximin dosage regimens:[379]

(1) 275 mg BID (550 mg daily) for 2 weeks,

(2) 550 mg BID (1100 mg daily) for 2 weeks (the primary endpoint),

(3) 1100 mg BID (2200 mg daily) for two weeks,

(4) 550 mg BID (1100 mg daily) for four weeks.

---

[378] RFIB2001 Study Protocol at 1. A December 22, 2005 date appears on page 2 before the study information, but I note that the "References" section lists a publication that could not possibly have been available as of that date because the reference was published in 2014. Dr. Harary attaches another version of the RFIB2001 clinicaltrials.gov print-out as Exhibit D. Regardless of which version Dr. Harary intends to rely on, my opinions do not change.
[379] RFIB2001 Study Protocol at 4-5.

206. The clinicaltrials.gov print out stated that treatment responders were to be followed in a post-treatment phase with study visits at 6, 8, 12, and 16 weeks.[380] The study planned to enroll 525 patients 18 years of age or older with IBS diagnosed according to Rome II criteria.[381] Patients with exclusively IBS-C or IBS-A currently presenting with constipation were excluded.[382]

207. As the clinicaltrials.gov print out explained, "[w]hile IBS is one of the most common chronic medical conditions the etiology of IBS is unknown."[383] The clinicaltrials.gov print out did not contain results, nor were the results of RFIB2001 publicly available as of February 26, 2008. Given the challenges in understanding IBS and developing drugs to target its putative causes, a person of ordinary skill in the art would not reasonably have expected that a drug under study in a phase IIb trial would make it through to phase III, or that a drug successful in phase II would demonstrate efficacy in phase III.[384] A person of ordinary skill would have understood that "further major therapeutic advances in the field seem unlikely to occur until the specific biologic basis for symptoms is identified better."[385]

[380] RFIB2001 Study Protocol at 4.
[381] RFIB2001 Study Protocol at 4-5.
[382] RFIB2001 Study Protocol at 5.
[383] RFIB2001 Study Protocol at 4.
[384] For example, Tioga Pharmaceutical's drug asimadoline failed to demonstrate efficacy in a phase III clinical trial, after a phase II clinical trial in IBS-D patients showed that compared to placebo, asimadoline produced significant improvement on total number of months with adequate relief of IBS pain or discomfort, adequate relief of IBS symptoms, pain scores, pain free days, urgency and stool frequency. *See* Mangel 2008. Similarly, AGI Pharmaceutical's drug arverapamil (tradename Rezular) failed to meet its primary endpoint in a phase III clinical trial after an abstract presented at the 2007 ACG Conference stated that it "appear to be effective and well tolerated in the management of patients with non-constipation predominant irritable bowel syndrome." *See* Rezular ARDIS 1 Press Release; Rezular ACG Abstract.
[385] Sleisenger & Fordtran's at 2636.

208. Salix Development Update is a January 11, 2006 Salix press release that announces initiation of clinical trials of Xifaxan®.[386] The press release briefly explains Salix's phase IIb trial of Xifaxan® in IBS-D – the same clinical trial outlined in the Salix Phase IIb Study Protocol, discussed above.[387] The press release mentions the Pimentel 2006 study as "proof-of-concept work [that] provided essential information utilized in the design of [Salix's] development program for IBS."[388] Dr. Harary states that the Pimentel 2006 study and Lauritano would have provided a motivation to *increase* the daily dosage from the Pimentel 2006, but it would have been apparent to a person of ordinary skill that three of the four daily dosages to be studied in RFIB2001 were *less* than the daily dosage studied in Pimentel 2006.

209. When considered in the context of the prior art as of February 2008, a person of ordinary skill in the art would not have reasonably relied on the RFIB2001 Study Protocol to draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**n) Lauritano**

210. Lauritano reported a "dose-finding study for the treatment of small intestinal bacterial overgrowth," and was published in 2005.[389] The study enrolled 90 consecutive patients having SIBO, diagnosed by a glucose breath test (a rise in hydrogen exhalation of > 12 ppm above baseline).[390] 90 patients were randomized to receive rifaximin 600 mg daily (one 200 mg tablet TID), 800 mg daily (two 200 mg tablets at 8AM, and one 200 mg tablet at 2PM and 8PM)

---

[386] Salix Development Update.
[387] Salix Development Update at 1.
[388] Salix Development Update at 3.
[389] Lauritano at 31, 32.
[390] Lauritano at 32.

or 1200 mg daily (two 200 mg tablets TID) for 7 days.[391] A follow-up breath test was performed 1 month after the end of the 7-day period.[392]

211. Breath test normalization rate was significantly higher in the 1200 mg group (60.0%, 18 of 30 patients) compared to the 600 mg group (16.7%, 5 of 30 patients) and 800 mg group (26.7%, 8 of 30 patients).[393] There was no significant difference between the 600 mg and 800 mg groups.[394] The investigators did not compare rifaximin to placebo, nor did they compare their patients' breath tests results to those of normal controls.

212. The patients were not reported as being diagnosed with IBS; patients were not even asked about symptoms (SIBO or IBS).[395] Lauritano only reported hydrogen breath test results, which as discussed in section VII.B.3., were unreliable for accurately diagnosing SIBO and that did not have an established correlation to IBS.[396] And as noted above, interpretation of Lauritano was "seriously limited by [its] study design."[397]

213. When considered in the context of the prior art as of February 2008, Lauritano would not have led a person of ordinary skill in the art to depart from the conventional wisdom that IBS/SIBO hypothesis was still a hypothesis. Nor when considered in the context of the prior

---

[391] Lauritano at 32-33.
[392] Lauritano at 32.
[393] Lauritano at 33.
[394] Lauritano at 33.
[395] Dr. Harary cites to a slide from Pimentel Exhibit 9, discussed further below in section VII.B.5.s., that is titled "Dose-Finding Study of Rifaximin in SIBO Patients with IBS" and showing data from Lauritano. Harary Opening Report, paragraph 143. Based on what is actually disclosed in Lauritano, the title of the slide is incorrect. A person of ordinary skill would not have credited the slide title over Lauritano itself.
[396] Even if a person of ordinary skill in the art were to accept the SIBO/IBS hypothesis, Lauritano notes that another study, Corazza, found that "higher doses of rifaximin did not increase the therapeutic efficacy of the drug." Lauritano at 34. Thus, at best these two dose-finding studies were inconsistent.
[397] Vanner 2008 at 1319.

art as of February 2008, would Lauritano have allowed a person of ordinary skill to reasonably draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**o) Scarpellini**

214. Scarpellini, published in 2007, reported a study of 80 consecutive SIBO patients randomized to receive rifaximin 1600 mg daily or 1200 mg daily for 7 days.[398] Like in Lauritano, patients took a glucose breath test prior to treatment and again 1 month after treatment.[399] The primary outcome was breath test normalization rate, which was statistically significantly higher in the 1600 mg/day group compared to the 1200 mg/day group.[400] Like Lauritano, the Scarpellini study investigators did not compare rifaximin to placebo, nor did they compare their patients' breath tests results to those of normal controls.

215. While Scarpellini reported that 63 patients met Rome II criteria for IBS (with 29 patients subtyped as IBS-D), Scarpellini did not analyze symptoms (of SIBO or IBS) and drew no conclusions regarding rifaximin for IBS.[401] Scarpellini analyzed resolution of SIBO using a glucose breath test, which as discussed in section VII.B.3. is unreliable for that purpose and had largely failed to establish a correlation between SIBO and IBS. Scarpellini notes that the "[t]herapeutic schemes [of rifaximin] used are extremely different as regards for both doses and duration among the various studies."[402]

[398] Scarpellini at 782-83.
[399] Scarpellini at 782-83.
[400] Scarpellini at 783.
[401] Scarpellini at 784.
[402] Scarpellini at 784.

216. When considered in the context of the prior art as of February 2008, Scarpellini would not have led a person of ordinary skill in the art to depart from the conventional wisdom that IBS/SIBO hypothesis was still a hypothesis. Nor when considered in the context of the prior art as of February 2008, would Scarpellini have allowed a person of ordinary skill to reasonably draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**p) Lin 2006**

217. Lin 2006 was an international patent application published on September 28, 2006 under the Patent Cooperation Treaty (WO 2006102536A2).[403] The inventor/application was Dr. Henry Lin, and the title was "Treatment of Disease Conditions Through Modulation of Hydrogen Sulfide Produce by Small Intestinal Bacterial Overgrowth."[404]

218. Lin 2006 stated that "[t]here is therefore a significant need in the art to identify a therapeutic method by which one can modulate the levels of $H_2S$ in the body; particularly insofar as a harmful level of $H_2S$ is based on escape of this gas from the gastrointestinal tract due to SIBO."[405] Lin 2006 described the "Field Of The Invention" as "the treatment of various physiological conditions by modulating the level of hydrogen sulfide ($H_2S$) in the body." IBS was included in a long list of conditions that Lin 2006 stated relate to or were modulated by $H_2S$, and that were "believed to be appropriate to treat in connection with various embodiments of the present invention."[406] Lin 2006 did not focus on any one particular $H_2S$- or SIBO-linked

[403] Lin 2006 at Cover Page.
[404] Lin 2006 at Cover Page.
[405] Lin 2006 at 8.
[406] Lin 2006 at 11-13.

condition, such that a person of ordinary skill would reasonably understand that general disclosures applied to IBS-D specifically (e.g., rifaximin dosage regimens) .

219. Lin 2006 stated that "[t]o achieve the goal of eradication of SIBO, antibiotics may be used. For example, rifaximin is a poorly absorbed antibiotic that requires bile salts for solubility. Its bioavailability is therefore limited to the small intestine with sparing of the colonic flora. This agent is also not associated with pla[s]mid transfer of resistance by targeted microorganisms. Typical dose of rifaximin to achieve about 60-70% efficacy in achieving successful partial eradication of SIBO is about 400 mg three times a day (TID) for about 10 days."[407] Lin stated that chronic fatigue syndrome (CFS) "may be treated by at least partially eradicating bacterial overgrowth" with "[a]bout 400 mg to about 600 mg of rifaximin … administered TID for about 10 days."[408] Lin 2006 did not provide a "typical dose of rifaximin" for IBS, and none of the 14 examples discussed using rifaximin to treat IBS.

220. Lin 2006 was deemed withdrawn in May 2007 after the applicant failed to pay fees or request examination of the patent.[409]

221. When considered in the context of the prior art as of February 2008, Lin 2006 would not have led a person of ordinary skill in the art to depart from the conventional wisdom that IBS/SIBO hypothesis was still a hypothesis. Nor when considered in the context of the prior art as of February 2008, would Lin 2006 have allowed a person of ordinary skill to reasonably draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential

---

407 Lin 2006 at 21.
408 Lin 2006 at 26.
409 Lin 2006 Note of Loss of Rights at 1.

rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

#### q) Viscomi

222. Viscomi was a patent application filed on May 24, 2005 that was published on December 8, 2005 (Pub. No. US 2005/0272754 A1). Giuseppe C. Viscomi was the first inventor named. Viscomi was titled "Polymorphic Forms of Rifaximin, Processes for Their Product and Uses Thereof."[410]

223. The majority of Viscomi discussed polymorphs of rifaximin. Viscomi stated that it provided a "method of treating, preventing, or alleviating bowel related disorders comprising administering to a subject in need thereof an effective amount of one or more of a Form α, Form β, or Form γ polymorph of rifaximin. Bowel related disorders include one or more of irritable bowel syndrome, diarrhea, microbe associated diarrhea, *Clostridium difficile* associated diarrhea, travelers' diarrhea, small intestinal bacterial overgrowth, Crohn's disease, chronic pancreatitis, pancreatic insufficiency, colitis, hepatic encephalopathy, or pouchitis."[411] Viscomi did not discuss IBS subtypes.

224. Viscomi stated that the length of administration "will depend in part on the disorder. For example, travelers' diarrhea may only require treatment duration of 12 to about 72 hours, while Crohn's disease may require treatment durations from about 2 days to 3 months."[412] Viscomi did not provide a length of administration (or range) for IBS.

---

[410] Viscomi at Cover page.
[411] Viscomi at paragraph [0198].
[412] Viscomi at paragraph [0199].

225. Viscomi stated that dosages of rifaximin "will also vary depending on the diseases state."[413] "Actual dosage levels and time course of administration of the active ingredients in the pharmaceutical compositions of the invention may be varied so as to obtain an amount of the active ingredient which is effective to achieve the desired therapeutic response for a particular patient, composition, and mode of administration, without being toxic to the patient. An exemplary dose range is from 100 to 1800 mg per day."[414] "A preferred dose of the rifaximin polymorph for the present invention is the maximum a patient can tolerate and not develop serious side effects."[415] Viscomi did not provide a rifaximin dosage (or range) specific to IBS. Viscomi did not discuss rifaximin dosage frequency (e.g., BID, TID). Viscomi discussed cyclical administration, and repeating administration separate by at least 1 day, 2 days, 3 days, 5 days, 10 days, 15 days, 30 days, 45 days, 2 months, 75 days, 3 months, or at least 6 months.[416]

226. Viscomi stated that efficacy is determined by measuring or monitoring intestinal bacterial overgrowth, but none of Viscomi's examples discussed administration of rifaximin to treat SIBO or IBS.

227. When considered in the context of the prior art as of February 2008, Viscomi would not have led a person of ordinary skill in the art to depart from the conventional wisdom that IBS/SIBO hypothesis was still a hypothesis. Nor when considered in the context of the prior art as of February 2008, would Viscomi have allowed a person of ordinary skill to reasonably draw conclusions about the potential safety or efficacy of rifaximin in IBS-D, or what potential

---

[413] Viscomi at paragraph [0199].
[414] Viscomi at paragraph [0246].
[415] Viscomi at paragraph [0247].
[416] Viscomi at paragraph [0251].

rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.

**r) Pimentel 2011, Weinstock, Jolley**

228. Dr. Harary discusses three references published in 2011 – Pimentel 2011,[417] Weinstock, and Jolley. If Dr. Harary means to conclude that a person of ordinary skill in the art as of February 26, 2008 would have been aware of or had access to these references, I do not see how that could possibly be the case given the references were published in 2011. Each reference discusses a retrospective chart review with at least some patients seen by their physicians prior to February 26, 2008. But I do not understand Dr. Harary to be suggesting that as of February 26, 2008, a person of ordinary skill would have been aware of those visits or aware of what occurred between physician and patient during those visits.

229. Pimentel 2011, Weinstock, and Jolley are retrospective chart reviews, which are hypothesis-generating studies. They are low on the hierarchy of level of evidence, because they lack the rigor a person of ordinary skill in the art would expect of data that he or she would rely on to make reasonable, evidence-based decisions, such as whether rifaximin would be safe and effective in IBS-D, or what potential rifaximin doses, frequencies, or lengths of administration could work to relieve IBS-D symptoms.[418]

230. I understand that Dr. Harary refers to each of Pimentel 2011, Weinstock, and Jolley as evidence of "prior art use." I disagree for the reasons provided in this section. But I do

[417] Dr. Harary also cites to Pimentel Ex. 21, which is a spreadsheet containing raw data for the Pimentel 2011 retrospective chart review. Dr. Harary does not suggest this spreadsheet was ever made public or would have been known to a person of ordinary skill in the art as of February 26, 2008.

[418] See generally Panacek 2007; GRADE Working Group at 1437 (Boxes 2 and 3).

as having IBS-D.[435] The 81 patients with incomplete symptom resolution, received retreatment with rifaximin 2400 mg/day for 10 days.[436] In those 81 patients, there was a mean improvement in global symptoms of 53%, "which was similar to that reported during initial rifaximin 1200 mg/day for 10 days."[437]

234. For the lactulose breath test, 91 patients (56%) were hydrogen positive, 32 (20%) were methane positive, and 9 (6%) were positive for both.[438] Only 2% of patients had a normal lactulose breath test after treatment with rifaximin 1200 mg daily for 10 days, and 9% of patients had a normal breath test after retreatment with rifaximin 2400 mg daily for 10 days[439]

235. It would not have been possible for Dr. Jolley (or others in his practice) to have administered rifaximin in a dosage of 1650 mg (or 550 mg TID) prior to the 2010 approval of Xifaxan® 550 mg.

236. Pimentel 2011 and Jolley were not true IBS-D studies. These were studies of patients that presented with abdominal discomfort with cramping and bloating plus altered bowel habits, *and then* were selected to get a breath test to assess for SIBO, *and* then had a positive breath test for SIBO, *and then* just those patients were treated with rifaximin. Therefore, these retrospective chart reviews were of patients *with SIBO* and the results represented symptom improvement in *SIBO*. The corollary to those studies would be if I identified consecutive

---

435 Jolley at 44.
436 Jolley at 44.
437 Jolley at 45-46. So even if a person of ordinary skill in the art as of February 26, 2008 had been aware of Dr. Jolley's experience, I still disagree with Dr. Harary that there would have been a motivation to increase the dose of rifaximin relative to that used in Pimentel (1200 mg daily) because doubling the dose did not appear to provide greater mean global symptom improvement. In fact, Dr. Jolley states in his 2011 paper that "the optimum dose of rifaximin for IBS remains unknown." *Id.* at 47.
438 Jolley at 44.
439 Jolley at 45, 46.

patients with abdominal bloating, cramping, and diarrhea; then selected a portion of those patients to get a test to look for lactose intolerance; took the smaller group positive breath for lactose intolerance and put them on a dairy-free diet; and then reported symptom improvement in those patients who were on a lactose-free diet. In that hypothetical study, I'm not actually assessing the efficacy of dairy-free diets in IBS-D patients. I'm assessing the improvement of bloating, cramping, and diarrhea in patients with lactose intolerance who go on a dairy-free diet.

**s) Pimentel Deposition Exhibits**

237. ***Pimentel Exhibit 8*** is titled "FD Wire Copyright © 2005 CCBN, Inc. and FDCH e-Media, Inc., November 14, 2005, SALIX PHARMACEUTICALS INC Clinical Update Conference Call – Final." Dr. Harary states that this was a transcript from a conference call that took place in November 2005.[440]

238. The transcript stated that Dr. Forbes introduced Dr. Pimentel to talk about his study of rifaximin 400 mg TID for 10 days in patients with IBS, which I discussed above in section VII.B.5.g. If a person of ordinary skill in the art had been aware of the transcript or trusted is accuracy,[441] he or she would not have credited Dr. Pimentel's remarks over the data

---

[440] Harary Opening Report, paragraph 159.

[441] The document states in all caps on the last page: "THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL[ ]REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE[ ]EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE[ ]MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE[ ]SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL[ ]OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY[ ] RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON[ ]THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT." Considering the document cautions against making investment decisions based on the transcript, it would not have been reasonable for a person of ordinary skill to make medical decisions based on the transcript, such as whether administering rifaximin to IBS-D patients would be safe and effective.

published in 2006 in the *Annals of Internal Medicine* (Pimentel 2006). Pimentel 2006 did not state that patients with IBS-D had improvements in bloating and diarrhea, and in fact reported that patients' diarrhea did not improve compared to placebo. Given the public criticism of the Pimentel 2006 study design, it would have been reasonable to infer that what Dr. Pimentel reportedly stated in November 2005 did not make it through the *Annals'* peer-review process or that Dr. Pimentel did not attempt to get it through the peer-review process. Dr. Pimentel's anecdotal experience or comments on other physicians' practices would not have provided a reasonable basis to depart from the conventional wisdom as of February 2008 that (i) the SIBO/IBS hypothesis was still a hypothesis, and (ii) it was not "prudent" or "recommended" to use antibiotics to treat IBS.[442]

239. ***Pimentel Exhibit 9*** is an October 3, 2006 email to Dr. Pimentel attaching a slide deck for a "presentation for Minneapolis tomorrow night, including cases from Dr. Yoon and Dr. Glass." Dr. Harary discusses two slides, one titled "Cedars-Sinai Treatment Strategy" and one titled "Rifaximin Ongoing Registration Study." The information on these slides is duplicative of information discussed in sections VII.B.5.m. (RFIB2001 Study Protocol); and VII.B.3; VII.B.5.e., VII.B.5.f., VII.B.5.g., VII.B.5.k., VII.B.5.l., and VII.B.5.p. (Cedars-Sinai work).

240. Dr. Harary relies on a "2006 case study" from Dr. Glass, citing to Pimentel Exhibit 9.[443] Dr. Harary does not state that Dr. Glass ever published this case study, or that it would have been available to a person of ordinary skill in the art as of February 26, 2008. Regardless, a person of ordinary skill would not have reasonably relied on one case study from one physician to make predictions about whether rifaximin could be effective to relieve IBS-D

---

[442] See section VII.B.3.
[443] Harary Opening Report, paragraphs 136-138, 205, 240, 262, 296, 319, 343, 363.

symptoms. This is especially true given that Dr. Glass's diagnosis appeared to be based on a positive lactulose breath test and the SIBO/IBS hypothesis, which as discussed above in section VII.B.3., was widely and thoroughly criticized in the published literature.

241. ***Pimentel Exhibit 12***, ***Pimentel Exhibit 13***, and ***Pimentel Exhibit 14*** are also emails attaching slide decks for future presentations. Dr. Harary does not discuss the contents of these documents, and they do not change my opinions.

## C. '569 PATENT, CLAIMS 1 AND 2

### 1. Pimentel 2006 in View of RFIB2001 Study Protocol

#### a) Differences Between the Claims and Pimentel 2006 and RFIB2001 Study Protocol

242. Dr. Harary concludes that Pimentel 2006 and the RFIB2001 Study Protocol disclose each element of claims 1 and 2 of the '569 patent. I disagree. As discussed above, the Pimentel 2006 study administered rifaximin 400 mg TID for 10 days to IBS patients, which failed to improve diarrhea and abdominal pain. And while the RFIB2001 Study Protocol was investigating four rifaximin dosage regimens – 275 mg BID for 14 days, 550 mg BID for 14 days, 1100 mg BID for 14 days, and 550 mg BID for 28 days – it was unknown whether any of those regimens provided adequate relief or for how long. If all aspects of each regimen were considered as independent components, which is how Dr. Harary seems to view them in his analysis of Pimentel 2006 and the RFIB2001 Study Protocol, there would have been numerous potential combinations.

#### b) No Motivation to Combine Pimentel 2006 and RFIB2001 Study Protocol

243. I disagree that a person of ordinary skill in the art would have been motivated to use rifaximin to "alter, or partially eradicate, the bacteria in the small intestine" in order to treat

IBS-D.[444] The Pimentel 2006 study was based on three assumptions: (i) breath testing could diagnose SIBO, (ii) breath testing had shown that SIBO was an (if not the) underlying cause of IBS, and (iii) that eradicating SIBO with an antibiotic could treat IBS. A person of ordinary skill in the art would have known that the mainstream medical community had heavily criticized, if not outright rejected all three assumptions.[445]

244. I disagree that a person of ordinary skill would have been motivated to "adjust, improve, or optimize" the dosage regimen of Pimentel 2006 based on the dosage regimens being investigated in the RFIB2001 study.[446] The Pimentel 2006 dosage regimen – 400 mg TID (1200 mg daily) for 10 days in patients with IBS of unspecified subtype – failed to adequately relieve diarrhea and abdominal pain, the hallmark IBS-D symptoms.[447] Pimentel 2006 was thoroughly criticized.[448] No data was available regarding the efficacy, if any, of the doses in the RFIB2001 Study Protocol.[449] A person of ordinary skill in the art would not have been motivated to start with a dosage regimen that did not work to treat the IBS-D symptoms of abdominal pain and diarrhea, and "adjust, improve, or optimize" that dosage regimen based on dosage regimens for which there was no data.

245. Similarly, I disagree that a person of ordinary skill in the art would have been motivated to administer a higher dosage of rifaximin relative to that administered in the Pimentel 2006 study (1200 mg daily), based on Cuoco, Lauritano, Scarpellini, and the Normix® Label.[450]

---

[444] Harary Opening Report, paragraph 193.
[445] See sections V.II.B.3. (discussion of SIBO) and V.II.B.5.g. (discussion of Pimentel 2006).
[446] Harary Opening Report, paragraph 191.
[447] Pimentel 2006 at 561; Drossman 2006 at 626.
[448] See section VII.B.5.g (discussion of Pimentel 2006).
[449] See generally RFIB2001 Study Protocol; see section VII.B.5.m (discussion of RFIB2001 Study Protocol).
[450] Harary Opening Report, paragraphs 192, 196-197.

Cuoco's "seriously limited … study design" would not have allowed a person of ordinary skill in the art to reasonably attribute symptom relief to rifaximin based.[451] Lauritano and Scarpellini studied patients with SIBO diagnosed based on breath testing, not IBS. Lauritano and Scarpelini did not analyze the effect of rifaximin on symptoms (SIBO or IBS), and thus those studies would not have provided useful information on whether increasing the dose of rifaximin would provide greater symptom relief without sacrificing safety or leading to antibiotic-resistant enteric bacteria.[452] Further, Dr. Harary does not explain why, if a person of ordinary skill in the art were motivated to administer a rifaximin dose higher than 1200 mg/day, he or she would have rejected the higher dose disclosed in the RFIB2001 Study Protocol (2200 mg daily),[453] Viscomi (1800 mg daily), Lin 2006 (1800 mg daily), Weinstock (1800 mg/day) in favor of a dose in the middle (1650 mg daily). Finally, the Normix® Label would not have provided reasonable assurances to a person of ordinary skill in the art that higher rifaximin dosages for longer lengths of time compared to the label's "Overdosage" section would be safe.[454]

246. I disagree that a person of ordinary skill in the art would have been motivated to "routinely optimize" the dosage of rifaximin "within a known therapeutic range" based on Lauritano, Scarpellini, and the RFIB2001 Study Protocol.[455] There was no "known therapeutic range" for rifaximin in IBS-D. "Antibiotic dose and duration of therapy have not been established. All studies to date have used different doses and antibiotic regimens; the optimal

---

[451] See sections VII.B.5.i. (discussion of Cuoco); Vanner 2008 at 1319.
[452] See sections VII.B.5.n. (discussion of Lauritano) and VII.B.5.o. (discussion of Scarpellini); paragraph 49.
[453] Dr. Harary's belief that the Pimentel 2006 study and Lauritano provided a motivation to *increase* the rifaximin 1200 mg daily dosage is not consistent with the fact that three out of the four daily rifaximin doses under investigation in RFIB2001 were *less* than 1200 mg.
[454] See section VII.B.5.c. (discussion of Normix® Label).
[455] Harary Opening Report, paragraphs 194-195.

Executed on: September 27, 2021

By: Philip Schoenfeld, MD
Philip Schoenfeld, M.D.

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SALIX PHARMACEUTICALS, INC., )
SALIX PHARMACEUTICALS, LTD., )
ALFASIGMA S.P.A. and BAUSCH )
HEALTH IRELAND, LTD., )
Plaintiffs, ) Case No.
v. ) 1:24-cv-04607-JFM
AMNEAL PHARMACEUTICALS OF )
NEW YORK, LLC, and AMNEAL EU, )
LIMITED, )
Defendants. )
______________________________ )

*** HIGHLY CONFIDENTIAL ***

The videotaped deposition of LEONARD CHYALL, PH.D., called by the Defendants for examination, at Morgan, Lewis & Bockius LLP, 110 North Wacker Drive, Chicago, Illinois, Chicago, Illinois, reported stenographically by Cynthia Conforti, CSR, CRR, commencing at the hour of 9:12 a.m. on the 12th day of December, 2025.
Everest Job No. 47938

Page 5

THE VIDEOGRAPHER: Good morning. We are now on the record. Today's date is December 12th, 2025, and the time is approximately 9:12 a.m.

This is the video-recorded deposition of Leonard Chyall, PH.D., in the matter of Salix Pharmaceuticals, Inc., et al., vs. Amneal Pharmaceuticals New York, LLC, et al., Case 1:24-cv-04607. This is in the U.S. District Court for the District of New Jersey.

This deposition is being held at 110 North Wacker Drive, Chicago, Illinois.

My name is Scot Ziarko. I'm the videographer for Everest Court Reporting, and the court reporter, Cynthia Conforti, who is also from Everest Court Reporting.

Will counsel please identify themselves for the record, and will the court reporter please swear in the witness.

MR. LaROQUE: Sam LaRoque, Robins Kaplan, LLP, on behalf of the Amneal defendants. And with me is Oren Langer, also of Robins Kaplan.

MS. LO: Shon Lo from Morgan Lewis, here on behalf of plaintiffs and the witness.

Page 6

(Witness sworn.)

LEONARD CHYALL, PH.D.,

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. LaROQUE:

Q Good morning.
A Good morning, Mr. LaRoque.
Q Would you please state your full name for the record?
A Leonard Jesse Chyall.
Q All right. Dr. Chyall, are you currently employed?
A Yes.
Q Who is your employer?
A Chyall Pharma.
Q Have you been deposed before, Dr. Chyall?
A Yes.
Q About -- and do you know how many times you've been deposed?
A Several dozen.
Q Several dozen. So on the order of 30 to 40, you would think?
A I think more like on the order of 75 or so.

Page 7

Q All right. So you -- sounds like you understand how this works. But all the same, I'll go over just a few ground rules.

First, if you don't understand a question that I ask you today, please let me know, and I will try to rephrase it. Is that all right?
A Yes.
Q Unless you tell me otherwise, I will assume that you did understand my question. Is that okay?
A Yes.
Q Your answers will be recorded by the court reporter. So please try to speak up and give verbal answers so that the court reporter can hear you clearly. All right?
A Sure.
Q And you understand that you are testifying under oath today under penalty of perjury, do you?
A I do.
Q Dr. Chyall, are you taking any medications or suffering from any illness that might prevent you from understanding my questions or answering them fully?
A No.
Q And is there anything else preventing you

Page 8

from you from giving truthful answers to my questions today?
A No.
Q I will try to take a break about every hour. If you would like a break more often, feel free to ask. But if there's a question pending, I would ask that you finish answering the question before asking for a break. Do you understand?
A Yes.
Q Dr. Chyall, did you do anything to prepare for your deposition today?
A Yes.
Q What did you do to prepare?
A I met with counsel at Morgan Lewis, and I reviewed some documents.
Q When did you meet with counsel for -- at Morgan Lewis?
A Yesterday and the day before.
Q About how many hours total did you spend meeting with counsel?
A We -- we met off and on over that two-day period, but I was here full days for both days.
Q And who was present at those meetings?
A Ms. Lo and Ms. Maria Doukas.
Q You said that you reviewed documents at

Page 9

those meetings?
MS. LO: I'm going to object, and to the extent you're asking about specific documents, I'll object to that as privileged.
But, Dr. Chyall, you can describe generally any documents that you reviewed.
THE WITNESS: Essentially those would be the reports that I signed and reserved as part of this litigation, as well as some reports that Amneal's experts had submitted, and some of the documents that underlie those opinions and those reports.
BY MR. LaROQUE:
Q Dr. Chyall, do you understand that the plaintiffs in this case are Salix Pharmaceuticals, Inc., Salix Pharmaceuticals, Limited, Alfasigma, S.P.A., and Bausch Health Ireland, Limited?
A Yes.
Q If I use the term "Salix" today, unless I specify otherwise, is it all right -- will you understand that I will be referring to any and all of those plaintiffs?
A Okay.
Q Very good.
So with that in mind, Dr. Chyall, did you

Page 10

speak to anyone at Salix when you were preparing for your deposition?
A No.
Q Did you speak with any other experts or consultants retained by Salix in this case in preparing for your deposition?
A No.
Q Did you speak with any other expert or consultant returned -- retained by Salix in the Norwich I case in preparing for your deposition?
A No.
Q And when I say Norwich I, Dr. Chyall, do you understand what I'm referring to?
A I -- my understanding is that there was a previous litigation that concerned different patents, and Norwich was a defendant in that litigation.
Q Okay.
MR. LaROQUE: I'm going to start by marking some exhibits here.
Can you mark that as Exhibit 1?
THE REPORTER: Chyall 1?
MR. LaROQUE: Chyall 1, yes. Thank you.
(Exhibit Chyall 1 is introduced for the record.)

Page 11

BY MR. LaROQUE:
Q And, Dr. Chyall, do you recognize Exhibit 1?
A Yes.
MR. LaROQUE: And for the record, Exhibit 1, Chyall Exhibit 1 is a certified copy of U.S. Patent No. 8,193,196, and the first page bears Bates number XIFAX_AMN_0009054.
MS. LO: I'll just note for the record that I believe there's an additional Certificate of Correction to the '196 patent that is not reflected in Exhibit 1, but I don't think it's particularly pertinent for the deposition today.
MR. LaROQUE: Thank you.
BY MR. LaROQUE:
Q And so, Dr. Chyall, you recognize this as the -- the patent that is at issue in this case?
A Yes.
Q And if I refer to this as the '196 patent, you'll know what I'm talking about?
A I will.
Q Dr. Chyall, if you would turn to the second to last page of this document, do you see that this page includes certain patent claims?
A I do.

Page 12

Q And I'd like to direct your attention to Claims 7, 8, and 9 in column 9.
A Okay.
Q Do you see those?
A I do.
Q And do you understand that those are the three claims that are at issue in this case?
A Yes.
Q So if you look at Claim 7, do you see that it recites: "A solid pharmaceutical composition comprising a therapeutically effective amount of rifaximin delta, rifaximin epsilon, or a combination thereof, and a pharmaceutically acceptable excipient, together disposed in a formulation for oral administration."
Do you see that?
A Yes.
Q And then the claim goes on to recite certain X-ray powder diffraction pattern peaks for rifaximin delta.
Do you see that?
A Yes.
Q And it further recites certain X-ray powder diffraction peaks for rifaximin epsilon.
Do you see that?

Page 65

A This would relate to the -- to the sample that underlie the specimen for the MLB001B that we have been discussing.
Q And MLB001B is one specimen of Amneal's ANDA product that Dr. Gozzo tested?
A Yes.
Q Out of nine total specimens, correct?
A Right. But in 104, I go on to say that there are other samples tested that show peak characteristics of delta. But for the purposes of identifying the peaks, I called out that one sample in paragraph 104.
Q And it's your opinion that only that one sample shows evidence of all four recited peaks, 5.7, 10.8, 12.1, and 17.0 from Claim 7 of the '196 patent?
MS. LO: Objection to form.
THE WITNESS: No, I don't see it that way.
If there's a sound scientific basis for concluding that delta is present because of the diffraction of the form, all the peaks have to be present.
It's not possible for a delta form to diffract only a subset of peaks. All the peaks will diffract by virtue of the packing of the

Page 66

molecules within the lattice.
So there -- there could be reasons why peaks are not uniquely attributable to delta.
For example, the 17.0 peak that we have just been discussing, there's a coincidental overlap with alpha. There could be other reasons. Overlap with excipients. Perhaps the signal to noise isn't high enough for you to detect it.
But if you have strong scientific evidence that delta is present, then all those peaks must necessarily be present.
BY MR. LaROQUE:
Q I just want to focus, though, in what you say in paragraph 104. You say:
One out of three samples of Amneal's ANDA product tested contains rifaximin delta having XRPD peaks at -- and you list the four peaks recited in Claim 7.
And you said -- you go on to cite Appendices C and D, MLB001, right?
A That's correct.
Q So that's the -- one of the three samples that you're referring to?
A With respect to that sentence and the pincite, I believe that's correct.

Page 67

Q Now, you go on to say:
In the other two samples tested, peaks characteristic of rifaximin delta are visible in the 2-theta region between 5.4 degrees and 7.5 degrees where they are more easily distinguished between rifaximin alpha and placebo.
But you don't describe here any peaks characteristic of rifaximin delta at higher angles in those other two samples, correct?
A No, not -- not in this paragraph.
Q Now, you say in paragraph 104, you list in the first sentence these four peaks. You say that: "One out of three samples of Amneal's ANDA product tested contains rifaximin delta having these four peaks."
And you include the peak at 17.0 degrees plus or minus .2, correct?
A Yes.
Q But at paragraph 100, you said that that peak was not distinguishable from peaks in the patterns of rifaximin alpha and the placebo, right?
A That's right. And if you look at paragraph 102, I lay out this issue. And it's consistent with the testimony I gave about

Page 68

consistent -- excuse me, coincidental overlap with the 17.0 peak attributable to rifaximin alpha form.
Q But you did not positively identify the peak at 17 -- a peak at 17.0 degrees in any of Dr Gozzo's data, correct?
MS. LO: Objection to form.
THE WITNESS: I did. In Figure 5, I have a little arrow with the 17.0. You can see there's a peak there. And then I explained that that's peak for delta as well as alpha.
BY MR. LaROQUE:
Q Well, you say that the rifaximin peak at 17.0 degrees is obscured by a rifaximin alpha peak in paragraph 102, right?
A Yes. It's there, though. It has to be, based on delta being present.
Q Give me just a moment. Let's switch gears just for a moment.
If you would go back to Exhibit 1, which is the '196 patent, and I want you to look again at Claim 7 on that second-to-last page.
And do you see it says: A solid pharmaceutical composition compromising a therapeutically effective amount of rifaximin

Page 69

delta or rifaximin epsilon or a combination thereof?
A Yes.
Q So Claim 7 recites rifaximin form delta and/or epsilon present in a therapeutically effective amount?
MS. LO: Objection to form.
THE WITNESS: I don't believe that that's what it says here.
BY MR. LaROQUE:
Q What's -- what do you believe it says?
A Just what's written, that the composition comprises a therapeutically effective amount of rifaximin delta epsilon or a combination thereof.
Q You agree that the claim specifies a therapeutically effective amount of rifaximin delta or rifaximin epsilon or a combination thereof?
A Yes.
Q It doesn't just say any amount of rifaximin delta or rifaximin epsilon or a combination thereof?
MS. LO: Objection to form.
THE WITNESS: We know that the rifaximin is therapeutically effective, so -- and I believe

Page 70

it does say any amount because of the activity that rifaximin has toward bacteria.
BY MR. LaROQUE:
Q So you understand Claim 7 to recite any amount of rifaximin delta, rifaximin epsilon, or a combination thereof?
MS. LO: Objection to form.
THE WITNESS: Those specific words are not listed in the claim, but it's my opinion that a skilled person would understand, based on the teachings of this patent, that rifaximin, when dissolved of course, is going to be effective in an antibacterial formulation.
BY MR. LaROQUE:
Q So you said rifaximin, but the claim recites rifaximin delta, rifaximin epsilon, or a combination thereof, right? It doesn't just recite rifaximin.
A The pharmaceutical composition, the focus on -- on the formulations and the composition is solids. So it makes sense that you would have a solid form of the active material.
But skilled persons understand that the solid has to dissolve to have a therapeutical -- a ther- -- excuse me, a therapeutic effect.

Page 71

Q Yeah, but you agree that the claim is specific to particular polymorphs, polymorphic forms of rifaximin, right?
MS. LO: Objection to form.
BY MR. LaROQUE:
Q That is, it specifically recites rifaximin delta, rifaximin epsilon, or a combination thereof, where delta and epsilon are two different polymorphic forms?
MS. LO: Objection to form.
THE WITNESS: I don't believe that the claim would exclude other crystalline forms of rifaximin, if that's what you're getting at.
BY MR. LaROQUE:
Q No. I'm -- I'm just asking whether Claim 7 itself is directed to or limited to -- I'm sorry, strike that.
I'm just asking whether Claim 7 itself, that recites two particular polymers of rifaximin, right, rifaximin delta and rifaximin epsilon?
MS. LO: I'll object to form.
THE WITNESS: I would say the claim requires some of those forms, either of those forms be present in the composition.

Page 72

BY MR. LaROQUE:
Q And the claim specifically recites a therapeutically effective amount of rifaximin delta, right?
A Among other things.
Q I'd like you to go to Chyall Exhibit 2 now, your opening report. If you would look at paragraph 81. And you see at paragraph 81, you say:
'The specification discloses" -- you're referring to the '196 patent here -- "that rifaximin delta and epsilon show "significant differences" in bioavailability.'
Do you see that?
A Yes.
Q And then you say:
"In a bioavailability study carried out in female beagles, rifaximin epsilon was negligent -- excuse me -- negligibly absorbed, while rifaximin delta was absorbed more than 40 times more based on measure at Cmax."
A Yes.
Q So based on that statement, do you agree that the polymorphic form of rifaximin affects its bioavailability?

Page 73

A Well, some -- some crystalline forms will be more bioavailable than others because of the stability of the crystal. And they -- solubility can be different, and the dissolution properties can be different.
So this is -- this system here, the delta and the epsilon system, I believe, are illustrative of what's generally true.
Q So in view of what you just explained, the polymorphic form of rifaximin can have an impact on its bioavailability, fair?
A They're all bioavailable. They all -- because of the chemical composition, they're all -- all rifaximin forms, once dissolved, are going to kill the bacteria to some extent. But the bioavailability is indeed related to the polymorph.
Q If you would go in Chyall Exhibit 2 to the next paragraph, paragraph 82, and do you see you say:
'The specification states' -- again, the specification of the '196 patent -- "that it is possible to use rifaximin delta and epsilon to "modulate the level of systemic absorption" to the extent of -- and you're selectively quoting

Page 74

here -- "almost 100 fold[s] in the range from .001 to .3 micrograms per ml in blood."
Do you see that?
A That's what I wrote, but I want to say that the quotes I provided are consistent with the teachings of the patent here.
Q And you go on to say, again, in -- you go on to say:
"In particular," and then you quote the '196 patent specification where you say:
"Rifaximin delta, which is mildly absorbed, can find an advantageous use against systemic microorganisms, able to hide themselves and to partially elude the action of the topical antibiotics."
Do you see that?
A Yes.
Q So do you agree that the '196 patent is teaching here that the polymorphic form of rifaximin can impact the effectiveness of different treatments?
MS. LO: Objection to form.
THE WITNESS: I believe the inventors here want to convey to the skilled person that in certain cases, it's advantageous to have

Page 75

formulations with different dissolution profiles. And as such, that may be overall more effective in treatment of the patients because of those differences.
BY MR. LaROQUE:
Q And when you say "different dissolution profiles," you're referring to different polymorphic forms of rifaximin as having different dissolution profiles?
A Yes.
Q As part of your infringement report, talking about Chyall Exhibit 2 and Chyall Exhibit 3, you did not analyze how much of any particular polymorph of rifaximin should be included in a pharmaceutical composition such that it has therapeutic effect, did you?
A I believe I did. I believe if the delta is present, it will have a therapeutic effect by virtue of rifaximin being an active ingredient, active toward bacteria.
Q And when you say "if delta is present," you mean if any amount of delta is present?
A Yes.
Q You did not perform, in your infringement reports, any quantitative analysis as to how much

Page 76

rifaximin delta is in Amneal's ANDA product, did you?
A I did not do that analysis.
Q Do you have any opinion about whether Amneal's ANDA product is predominantly comprised of rifaximin alpha or of a different polymorph of rifaximin?
A In my opening report, I -- I mentioned that Amneal product contains rifaximin alpha and also rifaximin delta. But as I said in a previous response, I didn't quantitate that ratio.
MR. LaROQUE: We've been going another hour. Good time for a break?
MS. LO: Yes.
THE VIDEOGRAPHER: Time is now 11:29 a.m. This the end of Media 2. We are off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time is now 11:44 a.m. This is the beginning of Media 3. We are back on the record.
BY MR. LaROQUE:
Q Welcome back, Dr. Chyall.
If you would turn in Chyall Exhibit 2, your opening report, to paragraph 90. It's at page 34.

Page 89
for example, in Claim 8, but those classes of excipients would be starting materials.
BY MR. LaROQUE:
Q These claims don't recite any particular starting material for manufacturing the polymorphs recited, do they?
MS. LO: Objection to form.
THE WITNESS: I believe any synthetic scheme that provided rifaximin delta or epsilon would be okay with respect to the requirements of the claim.
BY MR. LaROQUE:
Q So the claims are not limited to any specific starting material; is that fair?
MS. LO: Objection to form.
BY MR. LaROQUE:
Q Let me rephrase that.
The claims do not recite any specific starting material for obtaining the rifaximin delta or rifaximin epsilon; is that fair?
MS. LO: Objection to form.
THE WITNESS: If starting material, if -- just so we're on the same page, if you mean the synthetic scheme to manufacture rifaximin, and I know there are multiple ways to manufacture

Page 90
rifaximin using different starting materials, then I think that's fine with respect to what this claim inquired.
BY MR. LaROQUE:
Q And these claims don't recite any particular water content for the rifaximin polymorphs, delta or epsilon, do they?
A Well, from the teachings of the patent, the skilled person understands that there are ranges of water content for delta and epsilon.
So that's a property that's part of rifaximin delta. But there isn't any particular calling out numerical value in the claim with respect to, for example, the water content of delta.
Q These claims don't recite any limitations on the purity of the rifaximin polymorphs delta or epsilon, do they?
A There's no -- there's no particular purity, like in terms of chemical assaying, no.
And with respect to solid form purity, there's no requirement that -- as I mentioned earlier, there's no requirement that the rifaximin delta be the exclusive form in the composition.
Q You can set Exhibit 1 aside for a moment,

Page 91
and I'm actually going to go back to Chyall Exhibit 2.
So we're back to your opening report, and I wanted to direct you to paragraph 56 of Chyall Exhibit 2, which is at page 18.
A Okay.
Q And you see the very first sentence here, you say:
"There are several analytical techniques that can be used to identify and characterize a crystal form of a compound. One of the most useful and reliable techniques is XRPD."
A That's what I wrote.
Q And XRPD is X-ray powder diffraction, correct?
A Yes.
Q So you say that XRPD is one of the most useful and reliable techniques for identifying and characterizing crystal form of a compound?
A Yes.
Q Do you know, sitting here, when X-ray powder diffraction was first developed as a technology for identifying and characterizing the crystal form of a compound?
A Very long time ago. I think Bragg won the

Page 92
Nobel Prize in the early 1900s.
Q So it's been around on the order of a hundred years?
A With respect to identifying crystalline forms with polymorphs, that technology developed later on.
Early on, X-ray diffraction was used as a way to just analyze materials without really a good understanding of molecular bonding.
But with respect to characterizing polymorphs of, say, organic compounds, that type of technology has been around for quite some time. Since the 1970s or so.
Q Fair to say that X-ray powder diffraction was a routine method for identifying and characterizing the crystal form of compounds as of March 2005?
A Yes, yes. And just to follow-up on something -- yeah, 2005, yes.
Q And go on -- well, let me back up.
Dr. Chyall, do you have experience with X-ray powder diffraction testing of organic compounds?
A Yes.
Q So have you performed X-ray powder

Page 149

BY MR. LaROQUE:
Q And when you say -- so you said, in the New Zealand application, when you follow this process, you will have this form, correct? Referring to polymorphous form data?
A I believe that this process, as described in the New Zealand application, would form the form beta. Maybe not every single time, but certainly this is what the inventors in the New Zealand application obtained.
Q And when you say "this process," you mean all the steps up through where it says "which shows water content equal to 5.6 percent"?
A Yes.
Q Which are the same steps in the left-hand column for the '196 patent, right?
A This is the same general teaching.
Q So if it's the same general teaching in both examples, then the '196 patent example should likewise result in a diffractogram corresponding to the polymorphous form beta?
A Up to that step, and then under certain circumstances, yes. The drying -- the drying condition -- the drying is important for these forms.

Page 150

So in the New Zealand application, the things that they do provide the form beta. It is made possible to do a vacuum drying and get 5.6 percent water and maybe you would get a different form.
But my -- I would say that the '196 patent, when followed, would, you know, at certain times give you beta, but not every -- not necessarily every single occasion.
Q So you see that the New Zealand application says:
"And a diffractogram corresponding to the polymorphous form beta," and then goes on to say:
"The product by further drying under vacuum until constant weight gives 62.2 grams of dried raw rifaximin, having a water content equal to 2.2 percent."
Do you see that?
A Yes.
Q And it says: "Whose diffractogram corresponds to the polymorphous form alpha."
Do you see that?
A Right.
Q Okay. And then looking at the '196 example, after "shows the water content equal

Page 151

to 5.6 percent," it says: "The product by further drying under vacuum until the weight of 62.2 grams of dried raw rifaximin having a water content equal to 3.3 percent."
Do you see that?
A Yes.
Q Okay. So both examples say that after you achieve that water content equal to 5.6 percent, you perform further drying under vacuum, right?
A Yes.
Q In the New Zealand application, you dry under vacuum until constant weight gives 62.2 grams of dried raw rifaximin, right?
A I think the product was dried to a constant weight. And that constant weight gave 62.2 grams. I don't -- I don't know if it's -- it's very solid, but I don't know if the 64.4 to 62.2, I'm not sure from this teaching what's absolutely critical, whether it's the weight or the water content.
I would suggest that the constant weight is what the inventors had their eye on, and then that the 6.2 -- 62.2 was a measurement after they dried to constant weight. And then the water content was subsequently measured from that.

Page 152

Q And you agree that the New Zealand application teaches a water content equal to 2.2 percent following that, achieving that constant weight?
A Yes.
Q And you agree that the '196 patent teaches a water content equal to 3.3 percent following achieving that constant weight?
MS. LO: Objection to form.
THE WITNESS: No, not a constant weight. That's the difference, you see.
In the '196 patent, they teach that they dry to a weight of 62.2 grams, but that weight had a higher water content, and so that in and of itself shows that these are not identical procedures.
BY MR. LaROQUE:
Q So the water content in the '196 patent example is a water content of 3.3 percent, right?
A Right.
Q And that's the higher water content than the 2.2 percent?
A Yes.
Q Okay. Okay. You agree, though, that the methods are identical up through the step where it

Page 153

says "shows a water content equal to 5.6 percent," and you agree that the '196 patent example may result in a diffractogram -- in a substance with a diffractogram corresponding to polymorphous form beta?
A At the point prior to further drying, yes.
Q And then following that, the only difference between the two examples is the water content to which each is dried?
MS. LO: Objection to form.
THE WITNESS: No, there's more than that.
There's a discussion of constant weight in the New Zealand application. And then there is the disclosure of the form delta diffraction peaks.
BY MR. LaROQUE:
Q But the constant weight is related to the water content, correct? If you have a lower -- let me put that differently.
If you have a lower water content, you have -- you -- strike that.
If you dry to a lower water content, you will have a lower weight, correct?
A You're speaking of some sort of relative comparison. I don't understand. So "lower," I'm

Page 154

not sure. Relative to what?
Q Well, let me put it a little bit differently.
The constant weight that is disclosed in the New Zealand application; that is, that constant weight is determined by the drying time, isn't it?
MS. LO: Objection to form.
THE WITNESS: It's determined by quite a few variables. The temperature, the time, the magnitude of the vacuum, also the attributes of the sample itself. It would be determined also by the -- just very subtle things, such as the type of containers that used to hold the solids while they're being dried.
So when I -- as an organic chemist, when I read that something was dried under vacuum until a constant weight, typically once that -- that's done is the material is put in a vacuum chamber, and then it's weighed periodically.
And then when the weight remains constant, then you have reached that constant weight.
And then what follows, then, would be an analysis of the water content. So the water content of 2.2 percent, it reflects, in part, the

Page 155

drying conditions.
BY MR. LaROQUE:
Q So those things that you -- that you just mentioned, you mentioned as affecting that constant weight. You mentioned -- you mentioned temperature, you mentioned vacuum, you mentioned the types of containers used.
None of those are recited in -- or, excuse me.
None of those are described in this passage from the '196 patent that you've reproduced here, correct?
A No, these are very -- these are very -- what's the word?
This is just the practical details of being an organic chemist. I mean, not every single little detail is put into an experimental procedure.
So the skilled person would be able to figure this stuff out, and I think the skilled person, for example, dry to a constant weight but found that the water content was way off, then they could adjust their drying conditions.
Q You didn't describe any of the specific temperatures, containers, vacuum in -- that you

Page 156

were just talking about in your reports, correct?
A I don't know. I'm just answering your questions here.
Q But you don't recall, sitting here, whether you provided any description of those factors in your reports when you were describing '196 patent, Example 1?
A I don't know if I addressed any of that in my rebuttal report or not. I think that would have been the place, responsive to Dr. Schinzer's report.
That's Exhibit 6. That's right in front of me.
Q That's right.
A It looks like in my report, with respect to this table, I was focused on highlighting the differences, and in particular, the water content differences, which is an important factor in determining the outcome of these experiments.
One experiment you get delta, and the other experiment you were going to get alpha.
Q Okay. And that's the only difference between these two examples that you highlighted, correct? Is -- is the water content and the diffractogram, which polymorphous form the

Page 157

diffractogram corresponds to?
MS. LO: Objection to form.
THE WITNESS: The differences are highlighted in the bold and underlined in the red.
So in an earlier response, I think you pointed out how I identified the differences.
BY MR. LaROQUE:
Q You described earlier that -- these drying conditions as relating to the water content.
Do you remember that?
A Yes.
Q Fair to say that the only differences between these examples that you identify is the drying conditions and the subsequent polymorphous forms obtained?
MS. LO: Objection to form.
THE WITNESS: The Example 1 in the '620 patent teaches that you'll have a diffractogram corresponding to the form beta. That teaching is not present in Example 1 of the '196 patent.
BY MR. LaROQUE:
Q But you agree that Example 1 in the '196 patent may give you a diffractogram corresponding to polymorphous form data before you perform the further drying under vacuum that's described?

Page 158

A Yes.
Q Okay. So once we're past that step of the diffractogram corresponding to the polymorphous -- strike that.
Once we dry further from the diffractogram corresponding to the polymorphous form beta, the only difference that you identified between these two examples is -- I should say, the only other difference you identified between these two examples is the drying conditions and the subsequent X-ray powder diffractograms, correct?
MS. LO: Objection, form.
THE WITNESS: The drying conditions are the important determinative factor from the rifaximin beta or the rifaximin from the '196 patent.
So it's a difference, yes. How you dry it and to what weight, that determines the outcome.
And then the diffraction pattern then defines the result of these two syntheses, and they're different.
There's no diffraction data in the New Zealand application, Example 1. But they just say it is polymorphous form alpha, which will have a different pattern than delta form.

Page 159

BY MR. LaROQUE:
Q So that polymorphous form alpha would have some set of peaks, would have an X-ray powder diffractogram having some set of peaks, and that's different from the set of peaks for polymorphous form delta, correct?
A The overall patterns for beta -- excuse me, for alpha -- the overall patents for alpha and delta are different.
Skilled persons could look at a pattern of delta and identify it as such and then distinguish that from the alpha form with -- with the benefit of the '196 patent.
There will be some peaks that coincidentally overlap, like the 17.0 peak that we were speaking about earlier.
But the presence, and also the absence of the peaks in a pattern allow skilled persons to identify particular crystalline forms in a very general sense.
Q Because those patterns are inherent properties of the particular polymorphic forms?
MS. LO: Objection to form.
THE WITNESS: The diffraction peaks may arise from the packing of the molecules. So I

Page 160

don't really think of -- an analytical result has an inherent property.
And it's just for clarification. You know, for example, when Dr. Gozzo analyzes these forms with the different wavelength of radiation, she gets different peaks, and that's to do to the difference of radiation.
But all of these peaks, all of these peaks relate back to the structure, relate back to the packing of the molecules in the crystal lattice.
BY MR. LaROQUE:
Q So these peaks are -- are -- are fundamental properties of the polymorphic forms?
MS. LO: Objection to form.
THE WITNESS: No. I just don't see it that way. I mean, because this is -- this is how -- this is how the substance interacts with a certain wavelength of radiation of X-rays.
So there aren't -- there aren't any peak values, you know, built into the substance. I mean, it's an analytical result.
You know, the inherent properties of the form delta are the spacial arrangement of the molecules in the crystal lattice.

Page 161

BY MR. LaROQUE:
Q Let me ask you a related question.
Would you turn to -- still in Chyall Exhibit 6, turn to paragraph 104, and that is at page 31.
And do you see you say there:
"Dr. Schinzer notes that the 'XRPD pattern for a given crystalline form acts as a 'fingerprint' to identify the unique crystal packing arrangement of the form,' such that the XRPD pattern 'is an inherent property of the crystal form.'"
Do you see that?
A Yes.
Q And then you go on to say:
"I agree with this general statement, to the extent that Dr. Schinzer is saying that the diffraction properties of a crystalline form are related to the crystal structure."
Do you see that?
A Yes.
Q Do you agree that the XRPD pattern for a crystalline form acts as a fingerprint to identify the crystal packing arrangement of the form?
A "Fingerprints" in this -- air quotes, yes.

Page 162

I mean that's how we kind describe it in lay terms to people, and that different forms will have different patterns. And when the patterns match, just like in a fingerprint analysis, in some sort of forensic test, you know, with the same form.
But when I -- and I -- and this paragraph just summarized very nicely my testimony earlier on, and that I consider the diffraction properties as being something that's related to the crystal structure. But the crystal packing is -- would be the inherent property of a form delta, for example.
Q So the crystal packing is the inherent property of the polymorphic form, and then -- but that crystal packing arrangement will give you distinct patterns of peaks depending on the wavelengths of the X-rays used in the XRPD analysis.
Is that a fair statement?
A Yeah, yes.
Q And those distinct patterns are signatures of the different polymorphous forms, fair?
A Dr. Schinzer uses "fingerprint." You want to use "signature." I -- I don't know. I just feel like we're just redefining things

Page 163

unnecessarily. I haven't used the word "signature" in my vernacular.
Q Look in Chyall Exhibit 3, which is your reply expert report.
And go to paragraph 68, so page 32.
Do you see there, you say: "I previously explained that rifaximin delta present in Amneal's ANDA product will necessarily possess all of the XRPD peaks that would be visible in a pattern of pure rifaximin delta?
A Yes.
Q And is that consistent with what we have been discussing, that for a given wavelength of X-rays used in the XRPD analysis, you will get characteristic XRPD patterns for a given polymorph?
A The diffraction experiments, when run in the ways that have been run throughout this entire litigation, you know, Amneal's data, Salix's data, Dr Gozzo's data, it's a pattern. It's a pattern of peaks.
So that pattern of peaks can be used to identify which crystalline form is present. Yes, that's true.
Q If you look at the next sentence in

Page 164

paragraph 68, you say:
"Dr. Kahr does not appear to disagree with the premise that XRPD peaks are inherent characteristics of a crystalline form."
Do you see that?
A Yes.
Q What do you mean there by "inherent characteristics of a crystalline form"?
A Just back to the fact that the Bragg equation, which relates to the packing of the molecules in the space, that the molecules of the compound occupy, that determines where those peaks fall on the diffraction pattern when analyzed with a certain wavelength of light.
So this whole business of indexing, which, you know, where I made some assignments to what those peaks correspondence to, and I think it was Figure 4. All of those peaks, they relate to the structure. And that's -- what I'm speaking about is peaks being inherent characteristics, maybe not very elegantly stated in this particular paragraph, but the inherent property of a delta form is the manner that those molecules of rifaximin and water pack in three-dimensional space.

Page 165

Q Go back to Chyall Exhibit 6, your rebuttal report, which we were looking at. If you go back to your table at paragraph 184, page 58.
A Okay.
Q And you testified earlier that the Example 1 of the '196 patent, up through the step we discussed which shows a water content equal to 5.6 percent, could give you at that point a diffractogram corresponding to the polymorphous form beta, right?
A Yes.
Q Okay. In the New Zealand application example, and on the right-hand side, where it says:
"The product by further drying under vacuum until constant weight gives 62.2 grams of dried raw rifaximin having a water content equal to 2.2 percent, a diffractogram that corresponds to the polymorphous form alpha."
In drying to that water content equal to 2.2 percent, you agree that at some point you would pass through a water content equal to 3.3 percent?
A Yes. And this is a very important point. I have to elaborate.

Page 166

You do not pass through delta form. You do indeed pass through that numerical value of 3.3 percent, but you do not pass through the delta form.
Q And can you explain why you don't pass through the delta form in the New Zealand application example?
A Because further drying of delta will generate the epsilon form. There's no mechanism by which the delta form can go to the alpha form.
Q And how do you know that there's no mechanism by which the delta form can to go to alpha form?
A Well, the whole body of evidence, I mean, in this very extensively studied system.
I believe I referred to some work done by at least some of the inventors, Viscomi. The patent itself, the '196 patent teaches that delta is dried further to get to the epsilon form.
So delta -- the beta, depending on how you dry beta, you can either go to the delta form or you can go to the alpha form.
But there is no pathway for the beta to go to delta and then to alpha. The alpha form is meta stable with respect to delta.

Page 167

Q So you said depending on how you dry beta, you can either go to the delta form or you can go to the alpha form. What do you mean by "depending on how you dry beta"?
A The drying conditions, the temperature, the time, and the water content, of course, that's determinative of the outcome of the crystalline form.
So for the -- in order to get the delta, you have to have a 3.3 percent, around there or so.
I think the '196 patent teaches -- you know, it teaches a range, but the manner by which you're drying is going to be important.
MR. LaROQUE: All right. Can we take another break?
THE VIDEOGRAPHER: Time is 4:00 p.m. This is the end of Media 7. We are off the record.
(Recess taken.)
THE VIDEOGRAPHER: Time is now 4:15 p.m. This is the beginning of Media 8. We are back on the record.
BY MR. LaROQUE:
Q Dr. Chyall, just before the break we were discussing how the drying of rifaximin form beta

Page 168

can give you either rifaximin form delta or rifaximin form alpha, and you said that which one you get depends on the manner by which you're drying.
Do you remember that?
A Yes.
Q So what did you mean by "the manner by which you're drying"?
A The conditions of the temperature and the time and the vacuum, quality of the vacuum, the extent of the vacuum, if you use it.
Just time, right? The Amneal product over time perhaps. I believe I've said some things like that in my opening report with the stability studies.
Q So those conditions that you're describing, where are those disclosed in the '196 patent?
A So these -- these conditions here: "The product by further drying under vacuum until the weight of 62.2 grams of dried raw rifaximin having a water content equal to 3.3 percent."
So here, in Example 1, this Example 1 is directed toward the delta phase. And it teaches the skilled person to dry the material and

Page 169

provides a weight value and under vacuum.
So with that, the skilled person would have to figure out precisely in their hands, in their system, with their vacuum pump, and their -- their little dish or whatever they use, the -- just a little -- little minor experimental details, you know. Nothing -- nothing undue in terms of the quality of experimentation, but those are the little lab type things that would need to be figured out by the skilled person, which they could do quite capably.
Q Both '196 patent Example 1 and New Zealand application Example 1 teach the product by further drying under vacuum, correct?
A Yes. And the details of the vacuum and then the water content of the product, that's going to be important, as well as the temperature, which is silent.
Q And the details of the vacuum are not expressly described here either, correct?
A Right, yeah. That's one of those minor details that the skilled person could figure out.
Q You agree, though, that that both the '196 patent Example 1, and the New Zealand application Example 1, following the 5.6 percent in the New

Page 170

Zealand application, the diffractogram corresponding to polymorphous form beta, they just say "the product by further drying under vacuum," right?
MS. LO: Objection to form.
BY MR. LaROQUE:
Q They don't specify any temperature details, correct?
A Right. I mean, in both -- in both of these, the skilled person is going to have to just do a little bit of work in order to optimize the conditions required to get either the alpha or the delta, depending on what they seek to prepare. And the temperature and the time and the magnitude of the vacuum and the manner that you put the material into the vacuum chamber, whether you heat it or not, these things matter. These things affect the outcome. And then ultimately, of course, you've got to keep an eye on the water content.
So these -- there are differences. That's my point. There are differences in these experiments.
Q These things that you said matter, temperature, time, magnitude of the vacuum, manner

Page 171

that you put the material into the vacuum chamber, you agree that those are not expressly disclosed in the '196 patent example, correct?
A They're not expressly disclosed, but as I said before, a skilled person could figure those out.
Q Let's turn in your rebuttal report, which is Chyall Exhibit 6, to paragraph 132, page 40 of the document.
See you say: "I disagree that a skilled person would have been motivated to further characterize rifaximin made by processes described in the '620 patent in the New Zealand application."
And then you say: "The patents already explain the three polymorphic forms that are generated by these processes, including providing XRPD data, such that there would have been no motivation for a skilled person to further characterize them by XRPD, much less be motivated to search for new polymorphs."
Do you see that?
A Yes.
Q So it's your position that a person of ordinary skill in the art, having read the '620

Page 172

patent and New Zealand application, would not be motivated to search for new polymorphs because those patents already explain three polymorphic forms?
A It's got nothing to do with the numbers. It's -- it's related to how the '196 patent describes the system, and it describes the interplay between alpha and beta. And there's many examples in the '196 patent that talk about how beta can be dried to alpha, and then alpha can be hydrated back to beta.
A skilled person would understand that -- from that -- from those teachings, that that's how this system behaves, and wouldn't think for a minute that there's other forms lurking around with variable water contents within -- within this range that's already covered by alpha and beta.
Q Does the '196 patent have any disclosure of rifaximin alpha?
A I'm sorry. I misspoke in that answer.
I was -- I didn't mean to say the '196 patent. I was referring to the '620 patent. I messed up that response.
The '620 patent is the patent that concerns alpha and beta and gamma.

Q Now, the '620 patent or equivalently the New Zealand application, right -- they don't, themselves, say anything about not characterizing more polymorphs; is that fair?

A I have an issue with this word "characterization," because that suggests that these other polymorphs already exist, and they don't.

So there's the process of discovering polymorphs, identifying them through screening. And in that discovery process, characterization of your materials naturally follows. But you have to find them before you characterize them.

Q Well, I can rephrase it.

They -- neither the New Zealand application, nor the '620 patents, says don't search for any additional polymorphs beyond the three that are identified in those disclosures; is that fair?

MS. LO: Objection to form.

THE WITNESS: I think the '620 patent would inform the skilled person that the landscape of hydrates has been established with the alpha and the beta phase.

I think the '620 patent would suggest to a



skilled person that those are the forms with -- with water contents that vary from high to low. And, as a result, if a skilled person had any motivation to be searching for new forms, they wouldn't be covering that experimental space, so to speak.

BY MR. LaROQUE:

Q Let me, let me ask a very specific question, which is:

The New Zealand application and '620 patent, neither of those has any express teaching that says, having found the polymorphs alpha, beta and gamma, you should not seek to find additional polymorphs; is that fair?

MS. LO: Objection to form.

THE WITNESS: I just don't follow that. I mean, I've never seen a patent that would instruct a skilled person to not do something.

I told you my response was -- is that the skilled person understands how alpha and beta exists in this range of water contents.

And because of that, my opinion is a skilled person wouldn't expect that the other forms are lurking out there with substantially overlapping water contents, such as a delta in



epsilon forms.

BY MR. LaROQUE:

Q So your understanding as of the -- the -- as of the priority dates of the '620 patent and New Zealand application, the inventors had characterized -- had discovered and characterized three polymorphic forms, right? Alpha, beta and gamma? Which are the three polymorphic forms disclosed in the '620 patent and New Zealand application?

MS. LO: Objection to form.

THE WITNESS: I believe from my -- from my memory, alpha, beta and gamma were the forms disclosed. I don't remember if amorphous form was disclosed or not, but I'm sorry. I just kind of forgot. What's the pending question?

BY MR. LaROQUE:

Q Yeah.

So the question was that -- was: As of the priority dates of the '620 patent and New Zealand application, the inventors had charac- -- had discovered and characterized at least those three polymorphic forms, alpha, beta and gamma, right?

A Oh, I don't know. Viscomi, I think put in



a declaration that identifies the date that he identified the delta phase, and I don't remember how that date compared to the priority dates for these earlier patents. That's -- I think that's the nature of your question, right?

Q Well, actually, my -- my question is a simpler one.

As of the priority date of the '620 patent and New Zealand application, the inventors had characterized at least those three polymorphic forms, alpha, beta and gamma; is that fair?

MS. LO: Objection to form.

THE WITNESS: I guess I don't understand what the priority dates are. There's a filing date. I am not even sure, I don't think I've done that analysis, so I don't know.

BY MR. LaROQUE:

Q Well, I'll put it a different way.

Do you understand that the '620 patent and the New Zealand application have an earlier priority date than the '196 patent?

A I know that there's some kind of -- and I spoke about this in my report.

There's a dispute as to whether these patents are actually prior art, the '620 patent

Page 177

and the New Zealand application.
And I've offered an opinion that it's not clear that they are. I'll leave it up to the attorneys to sort that out.
For the purposes of my analysis and in order to provide a fulsome response to Dr. Schinzer, I've assumed that they are prior art, but I'm not -- I'm not necessarily agreeing that they are.
Q Let me ask -- let me ask a slightly different question.
Do you agree that the inventors -- that certain inventors of the '620 patent characterized forms alpha, beta and gamma, and subsequently characterized two additional forms, delta and epsilon?
MS. LO: Objection to form.
THE WITNESS: I -- I believe that the '196 patent has overlapping inventors with the '620 patent. And I believe that relates to the section in my report where we discussed who was doing what with respect to crystal form identification and characterization.
BY MR. LaROQUE:
Q So fair to say that the inventors of the

Page 178

'196 patent did not stop at polymorphic forms alpha, beta and gamma, but went on to characterize additional polymorphic forms?
MS. LO: Objection to form.
THE WITNESS: No, I don't -- I don't agree with that.
BY MR. LaROQUE:
Q So what don't you -- what don't you agree with?
A There was a discovery process. I believe that the delta and the epsilon forms were discovered and identified later on from -- from experiments.
I don't believe that there was a deliberate methodical effort to explore the experimental space in anymore detail after the alpha and beta were identified.
I believe there was -- there was a little bit of serendipity involved in discovering the delta phase and the epsilon phase.
Q Did you describe that serendipity in your report?
A I believe, with respect to the Viscomi declaration that comes out, I believe I did [indicating] reference the Viscomi declaration.

Page 179

MR. LaROQUE: I'm going to mark Chyall Exhibit 14.
(Exhibit Chyall 14 is introduced for the record.)
MR. LaROQUE: And Chyall Exhibit 14 is a document with the title "Declaration under 37 C.F.R. Section 1.132," that was filed in the U.S. Patent and Trademark Office, and the front page bears the Bates No. AMN-RFXMN_00037099.
BY MR. LaROQUE:
Q Do you recognize Chyall Exhibit 14, Dr. Chyall?
A Yes.
Q Is this the Viscomi declaration that you were just describing?
A Yes.
Q And you described a moment of serendipity in which you reference the Viscomi declaration here.
What is that serendipity that you were describing?
A There are these batches of rifaximin that they had manufactured early on and then just were left stored in someone's specified condition.
And then some of these batches correspond

Page 180

to the delta and epsilon form, either as mixtures or as pure phases.
In here, I mean, in -- I think it was paragraph -- paragraph 10 is where they were finally able to figure out, okay, this is -- this is a new phase. They assign these peaks to the delta phase.
So this, to me, doesn't strike me as some deliberate polymorph screening effort. I mean, these are just batches of material that were manufactured and stored. And then, as a result, these new forms were identified.
And which, in turn, led to the research that allowed them to be able to come up with methods of preparation for these forms.
Q So you said that these batches of material were manufactured and stored.
They were manufactured according to the methods taught in the Cannata and Marchi patents, correct?
MS. LO: Objection to form.
THE WITNESS: I'm not sure. I don't believe so. I don't -- I mean, Marchi and Cannata are not commercial manufacturing processes. They're -- they're lab procedures. So these

Page 181

are -- these are different.
BY MR. LaROQUE:
Q Sorry, when you say, "these are different," what's the "these" that you're referring to?
A These sample of batches manufactured in 2000, 2001. I don't -- I don't necessarily believe that these are -- I mean, these are representative of Marchi and Cannata -- Cannata because they've been -- even if they were followed -- prepared following the same procedure, there was this storage under unspecified times and temperatures, conditions. Those storage conditions aren't taught in the '866 or the '785 patent.
Q The '866 and the '785 patent do teach methods for preparing rifaximin though, correct?
A Yes.
Q And do you see on page -- this is page 2 at the bottom. It's the page ending in Bates number 100.
You see paragraph 7 there?
A Yes.
Q It says: "Rifaximin prepared according to the old patents U.S. '866 and U.S. '785."

Page 182

Do you see that?
A Yes.
Q You understand that U.S. '866 and U.S. '785 are the Cannata and Marchi patents?
A Yes.
Q So the inventor, Mr. Viscomi, in this declaration is describing batches prepared according to the old patents, Cannata and Marchi in this declaration?
MS. LO: Objection to form.
THE WITNESS: I'm not sure if that's true or not. It doesn't necessarily follow because there's manufacturing batches.
I mean, paragraph 7 might be one fact that anything made according to the old patents was never tested for polymorph.
And then moving on, there are manufactured batches. I don't -- I don't necessarily know for certain whether Viscomi attributes the manufactured batches to the '866 and '785 process.
But even if he did, my point is, is that there was more than just the '866 and '785 teachings that went into these samples because of the long-term storage conditions.

Page 183

BY MR. LaROQUE:
Q And following storage, as further explained in paragraph 7, the inventor Viscomi describes one batch that turned out to be entirely composed of delta polymorph, right? That's that subparagraph little i?
A Correct.
That was measured in 2002, but then Viscomi later on says that they didn't recognize it to be form delta until November 7, 2003.
Q That batch described in paragraph 7, little i, it says it was manufactured in 2001, correct?
A Yes.
Q And that's -- and then it was measured by X-ray diffraction in 2000, correct?
A Yes.
Q So those dates, 2001 and 2002, those predate the filing of the '196 patent, fair?
A Yes.
Q And in the next subparagraph, it says: "A batch manufactured in 2001, later analyzed in 2002, consisted exclusively of the epsilon form."
Do you see that?
A Yes.

Page 184

Q All right. And those dates, 2001 and 2002, those predate the filing of the '196 patent?
A Yes.
Q So do you have any opinion about what process was made for manufacturing rifaximin here as described in paragraph 7, if it wasn't the process taught in Cannata and Marchi?
MS. LO: Objection to form.
THE WITNESS: I haven't considered that, except I believe that the early -- earlier processes, I recall reading somewhere that those earlier processes for the product were processes that provided the alpha phase.
BY MR. LaROQUE:
Q You say the "earlier processes." What do you mean by the "earlier processes"?
A Maybe not earlier processes, but -- it's my understanding, for example, that the -- that the product -- the Normix label product has the alpha phase, as well as -- as -- yes.
I think I recall reading that somewhere. But that's -- that's the extent of my knowledge from memory.
Q You don't recall where you read that, though?

Page 185

A No. I mean, it's pretty late in the day, and I'm not up for hazarding any guesses.
Q All right. Fair to say, though, that there's no disclosure in paragraph 7 of any methods for preparing rifaximin, apart from the citation here to the old patents, Cannata and Marchi?
MS. LO: Objection to form.
THE WITNESS: I'd say that the only -- the citation to any particular procedures would be the '866 and the '785 patent, again, but I don't -- I don't recall if there's testimony from Viscomi about how these samples were actually manufactured.
I would just rely on what -- whatever Dr. Viscomi said in addition to this declaration as being what's -- what happened.
BY MR. LaROQUE:
Q But you don't have a particular cite in mind when you say "what Dr. Viscomi said"?
MS. LO: Objection to form.
THE WITNESS: I believe he was -- he testified, at least under deposition and in the Norwich I litigation, and I don't recall whether his testimony included any further discussion of

Page 186

what's in paragraph 7. But if it did, I believe that that's going to be more reliable than my memory.
BY MR. LaROQUE:
Q But -- okay. But you agree that paragraph 7, which is in a declaration prepared and signed by Mr. Viscomi -- Dr. Viscomi rather, only describes Cannata and Marchi as -- as sources of methods for preparing rifaximin?
MS. LO: Objection to form.
THE WITNESS: I don't know. I mean, I don't think it's necessarily limited. I think the batches manufactured afterwards could relate to a different process.
BY MR. LaROQUE:
Q But that process is not described in paragraph 7, correct?
A That is correct.
Q If you'll pull up Chyall Exhibit 6, which is your rebuttal report in this case. And I'd like you to turn in Chyall Exhibit 6 to Exhibit A at the very end, and actually the very last page of Chyall Exhibit 6.
And we discussed earlier that Exhibit A lists documents that you considered in preparing

Page 187

this report. Do you remember that?
A Yes.
Q And if you look at the last two entries in Exhibit A, on page 2, do you see two references to a Salix Pharmaceuticals Limited versus Norwich Pharmaceuticals, Inc.? It's a trial decision and an appeal decision?
A Yes.
Q Okay. And do you know that that case, Salix Pharmaceuticals Limited vs. Norwich Pharmaceuticals, this particular one is Norwich I, what we described earlier as Norwich I?
A Yes.
Q Okay. So you reviewed the trial decision in that case as part of preparing this report?
A Yes.
Q You do not have in any of your reports any opinions on the issue of collateral estoppel in this case in view of Norwich I, correct?
A That's true. I'd be hard-pressed to tell you what collateral estoppel is.
Q So are you aware that the district court in that trial decision in Norwich I issued findings of fact concluding that the claims of two patents directed to rifaximin forms alpha, beta,

Page 188

and gamma were obvious in view of the Cannata patent combined with the common knowledge?
A I believe that was part of the decision, yes.
Q You didn't address the court's ruling in any of your reports, correct?
A No. I mean, we have a different patent here. We have different polymorphs.
Q So you have no opinions in any of your reports relating to the Court's findings in Norwich I?
MS. LO: Objection to form.
THE WITNESS: I'm not exactly sure how I cited these opinions in the body of my rebuttal report. I do remember receiving them and reading them.
My conclusion as a scientist was, well, those -- that earlier case concerned different polymorphs, different -- different claims, you know, different crystalline forms, and that the plaintiff issue here concerned the delta and the epsilon form.
BY MR. LaROQUE:
Q So the Cannata patent is not specific to any particular polymorph of rifaximin, correct?

Page 189

A That, if I remember -- let me look at the Cannata patent again. That was from, I believe, the '80s, right?
Q Yes, it was.
A So these -- these are the patents that just teach the skilled person how to make rifaximin.
Right. This is the one with these examples have residue, and then they're crystallized under some unspecified conditions. They specify a little bit but not a lot of details.
Yeah, so these are the synthetic steams that an organic chemist could use to make crystalline rifaximin, but they don't address polymorphic forms.
Q So are you aware that in Norwich I, Cannata was raised as prior art, like in this case. It was considered by the Court, and it formed the basis for the judge's invalidity finding in that case?
MS. LO: Objection to form.
THE WITNESS: I don't remember that detail.

Page 190

BY MR. LaROQUE:
Q Same question for Marchi.
Do you recall that Marchi was raised as prior art in Norwich I, just like in this case, considered by the Court and forms the basis of the judge's invalidity finding in that case?
MS. LO: Objection to form.
THE WITNESS: I don't remember.
BY MR. LaROQUE:
Q Same question for the FDA guidance.
Do you recall that the FDA guidance was raised as prior art like in this case? It was considered by the Court and formed the basis for the judge's invalidity finding in that case?
MS. LO: Objection to form.
THE WITNESS: I don't remember the particular documents that went into the judge's opinion.
BY MR. LaROQUE:
Q Do you recall whether the Normix label went into the judge's opinion?
A Not offhand, no.
Q All right. So you agreed earlier in describing the Cannata patent that it's not specific to any particular polymorph of rifaximin,

Page 191

right?
MS. LO: Objection, asked and answered.
THE WITNESS: I believe that the Cannata examples -- if I remember, that there -- there was some issue about -- and this actually relates to a document that concerns whether you would necessarily and inevitably get a particular form by following a particular example. And I guess my point about Cannata and Marchi is that there's nothing in these patents that defines a crystalline -- a particular crystalline form as the outcome of the experiment.
Certainly the inventors got crystalline material, but the patent's kind of silent as to what that crystalline material is. And it likely varies, depending on how the experiments -- which example is run, and how that particular example was run in the lab.
BY MR. LaROQUE:
Q So neither Cannata nor Marchi teach how to obtain any particular polymorph of rifaximin?
A Certainly not in a pure phase, no, and not with the necessary data that would be required to characterize the form, such as powder diffraction peaks. These are synthetic procedures.

Page 192

Q So going back to Norwich I, do you recall the Court finding in its findings of fact that -- that the methods described in the Viscomi declaration that we looked at earlier resulted in the creation of delta and epsilon based on the Marchi and Cannata patents?
MS. LO: Objection, mischaracterizes.
THE WITNESS: I don't recall that, no.
BY MR. LaROQUE:
Q Let's look at Chyall Exhibit 3, which is your reply report in this case. And if you turn to paragraph 49, Chyall Exhibit 3.
A 49 you said?
Q Paragraph 49, which is at page 21.
A Okay.
Q And you see you say: "With respect to the crowded regions of the rifaximin, it bears having a closer look at the diffraction data"?
A Okay.
Q And then on the next page, 22, you provide two different plots, correct?
A Yes.
Q And you generated these plots yourself?
A Yes.
Q And these are simulated XRPD patterns for

# EXHIBIT O

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD.,<br>Plaintiffs,<br>v.<br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC and AMNEAL EU, LIMITED,<br>Defendants. | Civil Action No. 3:24-cv-04607-JFM |
| SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD.,<br>Plaintiffs,<br>v.<br>CIPLA LIMITED and CIPLA USA INC.,<br>Defendants. | Civil Action No. 1:24-cv-10213-JFM |

**OPENING EXPERT REPORT OF WILLIAM C. SCHINZER, PH.D., REGARDING THE INVALIDITY OF THE ASSERTED POLYMORPH PATENTS: U.S. PATENT NOS. 8,193,196; 8,518,949; 8,741,904; 9,271,968; AND 10,703,763**

Dated: September 17, 2025

William C. Schinzer, Ph.D.

asserted claims are further invalid for one or more of lacking written description, and/or lacking enablement. My opinions are summarized as follows and further expressed elsewhere in my declaration:

**A. ’196 Patent**

98. Claims 7-9 of the ’196 patent are invalid as anticipated and/or rendered obvious by U.S. Patent No. 7,045,620 (the "’620 patent") or New Zealand Patent Application Publication No. NZ531622A ("New Zealand Application").

99. Claims 7-9 of the ’196 patent are invalid as obvious over U.S. Patent No. 4,557,866 ("Cannata") in view of Normix Italian Label (2000) ("Normix Label") and/or U.S. Patent No. 4,341,785 ("Marchi") and the common knowledge of a POSA.

100. To the extent claims 7-9 of the ’196 patent are found not invalid as anticipated and/or rendered obvious, then they are invalid for lack of enablement and/or lack of written description under 35 U.S.C. § 112.

**B. ’949 Patent**

101. Claims 12-14 of the ’949 patent are invalid as anticipated and/or rendered obvious by the ’620 Patent and the New Zealand Application.

102. Claims 12-14 of the ’949 patent are also invalid as obvious over Cannata in view of the Normix Label and/or Marchi and the common knowledge of a POSA.

103. To the extent claims 12-14 of the ’949 patent are found not invalid as anticipated and/or rendered obvious, then they are invalid for lack of enablement and lack of written description under 35 U.S.C. § 112.

**C. ’904 Patent**

104. Claims 1-5, 9, 11-13, 19-21, and 24-30 of the ’904 patent are invalid as anticipated and/or rendered obvious by the ’620 Patent and the New Zealand Application.

**B. U.S. Patent No. 4,557,866 ("Cannata")[1] (AMN-RFXMN_00036990-96)**

137. U.S. Patent No. 4,557,866 ("Cannata") is titled "Process for the Synthesis of Pyrido-Imidazo Rifamycins" and issued on December 10, 1985, well before the priority date of the Polymorph Patents. I understand that Cannata is prior art.

138. Cannata discloses processes that it calls "a remarkable improvement in comparison with the prior art method" based on the use of rifamycin O, which is an "easily obtainable" starting substrate. (Cannata at col. 3, ll. 17-28.) It also explains that "The compounds of formula I are endowed with outstanding antibacterial properties both in vitro and in vivo. Because of their poor absorption by animal organs and tissues when administered by oral route, they have proved to be particularly useful in combatting the microbial infections of the gastro-intestinal tract." (*Id.* at col. 3, ll. 10-16.)

139. Cannata also discloses crystallization of the product, either from the reaction mixture, or as a means of purification "by crystallization from suitable solvents or solvent systems." (*Id.* at col. 5, ll. 21-37.)

140. Cannata provides several exemplary syntheses for rifaximin, which I reproduce below. Each of these examples disclose crystalline rifaximin prepared by starting with rifamycin O and 2-amino-4-methyl-pyridine:

**<u>Example 1</u>**

> 7.54 Grams (0.01 moles) of rifamycin O and 3.24 g (0.03 moles) of 2-amino-4-methyl-pyridine were dissolved in 40 ml of methylene chloride and the so obtained solution was kept at room temperature for 48 hours. After washing the reaction mixture first with 60 ml of an aqueous 1N solution of hydrochloric acid and then with water, and drying the organic phase over sodium sulfate, the methylene chloride was eliminated by evaporation under vacuum.

[1] I understand that European Patent EP 0161534 (the "EP '534 Patent") claims priority to the same Italian patent application as Cannata. (i.e., IT 346384) and makes substantively identical disclosures.

antidiarrheal treatment; dosage of 400 mg BID for pre- and post-operative treatment; dosage of 400 mg TID for hyperammonemia).)

**D. NZ 531622A ("New Zealand Application") (AMN-RFXMN_00037310-36)**

145. New Zealand patent application publication No. NZ531622A ("New Zealand Application") is titled "Polymorphous forms of rifaximin, processes for their production and use thereof in medicinal preparations" and names Giuseppe Viscomi et al. as inventors. The New Zealand Application published on October 29, 2004. I understand that New Zealand is prior art.

146. The New Zealand application discloses methods for synthesizing rifaximin forms α, β, and γ. (*See* New Zealand Application at pp. 1a–2 (AMN-RFXMN_00037311-312).) It explains that the formation of the polymorphs "depends on the conditions of time and temperature at which both the crystallization and the drying are carried out." (*Id.* at 1a (AMN-RFXMN_00037311).) It explains that the polymorph produced depends on "the presence of water within the crystallization solvent, on the temperature at which the product is crystallized and on the amount of water present into the product at the end of the drying phase." (*Id.* at 3 (AMN-RFXMN_00037313).) It goes on to explain that "the production of rifaximin α or of rifaximin β during drying depends on the amount of water remaining at the end, higher or lower than 4.5%, and not from the experimental conditions of pressure and temperature at which this critical limit of water percentage is achieved." (*Id.* at 7 (AMN-RFXMN_00037317).) It also explains that rifaximin can convert between forms while remaining in the soli state. (*Id.* at 4 (AMN-RFXMN_00037314).)

147. Example 1 discloses a method for preparing rifaximin forms α and β. (*See id.* at 12–13 (AMN-RFXMN_00037322-323).) As I explain below, the method is nearly identical to the method that the Asserted Patents disclose for preparing rifaximin forms δ and ε. (*See* § X.A.)

## X. CLAIMS 7-9 OF THE ’196 PATENT ARE INVALID

### A. The ’620 Patent and the New Zealand Application Each Anticipate and/or Render Obvious Claims 7–9 of the ’196 Patent

170. In my opinion, the ’620 patent and the New Zealand Application anticipate or render obvious claims 7–9 of the ’196 patent because they disclose a process for preparing rifaximin forms α, β, and γ that is nearly identical to the process for preparing rifaximin forms δ and ε identified in the ’196 patent.

171. The ’620 patent and the New Zealand Application claim priority to the same Italian patent application (No. MI2003A2144) and include the same disclosures relating to processes for preparing rifaximin forms α, β, and γ (and pharmaceutical compositions containing the same). The ’620 patent and New Zealand Application anticipate or render obvious claims 7–9 of the ’196 patent for the same reasons. Any mention of or citation to either reference below is also intended to include the corresponding disclosures of the other publication.

#### 1. The ’620 Patent and New Zealand Application Disclose a Process That Produces Rifaximin Forms δ and ε

172. Claim 1 of the ’196 patent recites a “process for the production of the rifaximin polymorphic forms δ and ε.” Claim 6 of the prior art ’620 patent and New Zealand Application recite a “process for the production of rifaximins α, β and γ.” While I have not been asked to opine on the validity of ’196 patent claim 1, the similarities between the claims are instructive:

| ’196 Patent Claim 1 | ’620 Patent Claim 6 |
|---|---|
| 1. A process for the production of the rifaximin polymorphic forms δ and ε, wherein: | 6. A process for the production of rifaximins α, β and γ, comprising: |
| reacting a molar equivalent of rifamycin o with an excess of 2-amino-4-methylpyridine in a first solvent mixture, comprising water and ethyl alcohol in volumetric ratios between 1:1 and 2:1, for between 2 and 8 hours at a temperature between 40° C. and 60° C., to obtain a first reaction mixture | reacting a molar equivalent of rifamycin O with an excess of 2-amino-4-methylpyridine in a solvent mixture of water and ethyl alcohol in a volumetric ratio between 1:1 and 2:1, for a period of time between 2 and 8 hours, at a temperature between 40° C. and 60° C., |

| ’196 Patent Claim 1 | ’620 Patent Claim 6 |
|---|---|
| treating the first reaction mixture at room temperature with a solution of ascorbic acid in a mixture of water, ethyl alcohol and concentrated aqueous hydrochloric acid to obtain a second reaction mixture; | treating the reaction mass at room temperature with a solution of ascorbic acid in a mixture of water, ethyl alcohol and concentrated aqueous hydrochloric acid, |
| adding concentrated aqueous solution of hydrochloric acid to the second reaction mixture to bring the pH to 2.0 thereby obtaining a first suspension; | adjusting the pH of the reaction mass to pH 2.0 with a concentrated aqueous solution of hydrochloric acid, |
| filtering the first suspension to obtain a first solid; washing the first solid with the first solvent mixture to obtain raw rifaximin; | filtering the suspension, washing any resulting solid with the water/ethyl alcohol solvent mixture to obtain raw rifaximin, |
| dissolving the raw rifaximin in ethyl alcohol at a temperature between 45° C. and 65° C.; forming a precipitate by adding water and lowering the temperature of the mixture to between 50° C. and 0° C. while stirring for between 4 and 36 hours to obtain a second suspension; | purifying the raw rifaximin by dissolving it in ethyl alcohol at a temperature between 45° C. and 65° C., precipitating the raw rifaximin by adding water and by lowering the temperature of the suspension to between 0° C. to 50° C. under stirring for a period of time between 4 and 36 hours, |
| filtering the second suspension to obtain a second solid; washing the second solid with water and drying it under vacuum or under normal pressure, with or without a drying agent, at a temperature between room temperature and 105° C., for between 2 and 72 hours, | filtering the suspension, washing the resulting solid with water, and drying it under vacuum or under conditions of normal pressure, with or without a drying agent, at a temperature between room temperature and 105° C., for a period of time between 2 and 72 hours to the water content required to form rifaximin α, β or γ. |
| wherein the rifaximin polymorphic form δ is free from other polymorphic forms of rifaximin and has x-ray powder diffraction pattern peaks at about 5.7°±0.2, 10.8°±0.2, 12.1°±0.2, and 17.0°±0.2 2-θ, and<br>wherein the rifaximin polymorphic form ε is free from other polymorphic forms of rifaximin and has x-ray powder diffraction pattern peaks at about 8.2°±0.2, 12.4°±0.2, and 16.3°±0.2 2-θ. | |

173. The examples in the specifications of the ’620 patent and New Zealand Application, when compared to the examples in the ’196 patent, also demonstrate that the same process makes rifaximin forms α, β, δ, and ε:

| ’196 Patent Examples 1 & 2 | ’620 Patent Example 1 |
|---|---|
| Example 1<br>Preparation of Raw Rifaximin and of Dried Raw Rifaximin<br><br>In a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, 120 ml of demineralised water, 96 ml of ethyl alcohol, 63.5 g of rifamycin o and 27.2 g of 2-amino-4-methylpyridine are loaded in succession at room temperature. After the loading, the mass is heated at 47±3° C., is kept under stirring at this temperature for 5 hours, then is cooled to 20±3° C. and, during 30 minutes, is added with a mixture, prepared separately, made of 9 ml of demineralised water, 12.6 ml of ethyl alcohol, 1.68 g of ascorbic acid and 9.28 g of aqueous concentrated hydrochloric acid. At the end of the addition, the mass is kept under stirring for 30 minutes at an interior temperature of 20±3° C. and then, at the same temperature, 7.72 g of concentrated hydrochloric acid are dripped until a pH equal to 2.0.<br><br>At the end of the addition, the mass is kept under stirring, always at an interior temperature equal to 20° C., for 30 minutes, then the precipitate is filtered and washed by means of a mixture made of 32 ml of demineralised water and of 25 ml of ethyl alcohol. The so obtained “raw rifaximin” (89.2 g) is dried under vacuum at room temperature for 12 hours obtaining 64.4 g of “dried raw rifaximin” which shows a water content equal to 5.6%. The product by further drying under vacuum until the weight of 62.2 g of dried raw rifaximin having a water content equal to 3.3%, whose diffractogram corresponds to the polymorphous form δ characterized from a powder X-ray diffractogram showing peaks at values of angles 2θ of 5.7°±0.2, 6.7°±0.2, 7.1°±0.2, 8.0°±0.2, 8.7°±0.2, 10.4°±0.2, 10.8°±0.2, 11.3°±0.2, 12.1°±0.2, 17.0°±0.2, 17.3°±0.2, 17.5°±0.2, | Example 1<br>Preparation of Raw Rifaximin and of Dried Raw Rifaximin<br><br>In a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, 120 ml of demineralized water, 96 ml of ethyl alcohol, 63.5 g of rifamycin O and 27.2 g of 2-amino-4-methylpyridine are loaded in succession at room temperature. After the loading, the mass is heated at 47±3° C., is kept under stirring at this temperature for 5 hours, then is cooled to 20±3° C. and, during 30 minutes, is added with a mixture, prepared separately, made of 9 ml of demineralized water, 12.6 ml of ethyl alcohol, 1.68 g of ascorbic acid and 9.28 g of aqueous concentrated hydrochloric acid. At the end of the addition, the mass is kept under stirring for 30 minutes at an interior temperature of 20±3° C. and then, at the same temperature, 7.72 g of concentrated hydrochloric acid are dripped until a pH equal to 2.0.<br><br>At the end of the addition, the mass is kept under stirring, always at an interior temperature equal to 20° C., for 30 minutes, then the precipitate is filtered and washed by means of a mixture made of 32 ml of demineralized water and of 25 ml of ethyl alcohol. The so obtained “raw rifaximin” (89.2 g) is dried under vacuum at room temperature for 12 hours obtaining 64.4 g of “dried raw rifaximin” which shows a water content equal to 5.6% and a diffractogram corresponding to the polymorphous form β. The product by further drying under vacuum until constant weight gives 62.2 g of dried raw rifaximin having a water content equal to 2.2%, whose diffractogram corresponds to the polymorphous form α.<br><br>’620 Patent, 7:5-37; *see also* New Zealand Application at 12:6-12:28. |

| ’196 Patent Examples 1 & 2 | ’620 Patent Example 1 |
|---|---|
| 18.5°±0.2, 18.8°±0.2, 19.1°±0.2, 21.0°±0.2, 21.5°±0.2. The product is hygroscopic.<br><br>Example 2<br>Preparation of Rifaximin ε<br><br>Example 1 is repeated and after having obtained the δ form, the solid powder is further dried under vacuum for 24 hours at the temperature of 65° C. The product obtained is rifaximin s characterized from a powder X-ray diffractogram showing peaks at values of angles 2θ of 7.0°±0.2, 7.3°±0.2, 8.2°±0.2, 8.7°±0.2, 10.3°±0.2, 11.1°±0.2, 11.7°±0.2, 12.4°±0.2, 14.5°±0.2, 16.3°±0.2, 17.2°±0.2, 18.0°±0.2, 19.4°±0.2.<br><br>’196 Patent at 7:20-8:2. | |

174. As shown above, the same process disclosed in the ’620 patent and New Zealand Application produces rifaximin forms α, β, δ and ε. The only substantive difference between the processes above is that the ’620 patent (and New Zealand Application) discloses drying the solid “for a period of time between 2 and 72 hours to the water content required to form rifaximin α, β or γ,” while the ’196 patent process involves drying the solid for the same period of time (and under the same conditions) until it exhibits the characteristic peaks of rifaximin forms δ and/or ε.

175. Therefore, the same process produces α, β, δ and ε when the washed solid is dried under vacuum at a temperature between room temperature and 105° C., for between 2 and 72 hours. The only difference is how long the rifaximin is dried within that window, *e.g.*, the final water content of the dried solid. *See, e.g.*, ’620 patent at 4:16-17 (“[t]he step of drying plays an important part in obtaining the α and β polymorphous forms . . . . the production of rifaximin α and or of rifaximin β during drying depends on the amount of water remaining at the end, higher

or lower than 4.5% . . . . the two polymorphous forms, with higher or lower water content, can be obtained by drying under vacuum or at atmospheric pressure . . . provided that the drying is conducted for the amount of time necessary so that the water percent characteristic for each polymorphous form is achieved."); New Zealand Application 6:27-7:12; '196 patent at 5:20-25 ("the obtaining of the rifaximin δ during the drying in fact depends on the end remaining amount of water . . . and not from the experimental conditions of pressure and temperature at which this critical limit of water percent is achieved.").

176. The water content dictates the form of rifaximin produced using the common process of the '620 patent, '196 patent, and New Zealand Application. The water content of each specific crystal form of rifaximin is an inherent property of that form, as seen in the disclosures of the '620 and '196 patents. *See, e.g.*, '620 patent at 4:16-17; New Zealand Application 6:27-7:3; '196 patent at 5:20–25. Testing for water content is a routine practice, typically accomplished with Karl Fischer (KF) titration or thermogravimetric analysis (TGA).

177. The water content for forms α, β, γ, δ and ε are identified below:

| **Form** | **Water Content** |
|---|---|
| β | higher than 4.5%, preferably between 5.0% and 6.0%<br><br>'620 patent at 5:66–6:1. |
| δ | 2.5% (w/w) to 6% (w/w), more preferably between 3% and 4.5%<br><br>'196 patent at 5:20–25. |
| α | lower than 4.5%, preferably between 2.0% and 3.0%<br><br>'620 patent at 5:60–63. |
| γ | 1.0% to 2.0%<br><br>'620 patent at 4:4–6. |

| | |
|---|---|
| ε | "in order to obtain the poorly absorbed rifaximin ε form it has to start from the δ form and it has to be continued the drying under vacuum or at atmospheric pressure . . . provided that the drying is prolonged for the time necessary so that the conversion in form ε is achieved"<br><br>'196 patent at 5:25–31. |

178. As shown above, the water content of form δ (3% to 4.5%) is actually between the water contents for β (5.0% to 6.0%) and α (2.0% to 3.0%). The '620 patent and New Zealand Application teach producing rifaximin form α by drying form β until it reaches a water content between 2.0–3.0%. *See* '620 patent at 4:34–45; *see also* New Zealand Application at 7:13–21. Example 9 discloses:

**<u>EXAMPLE 9</u>**

> Preparation of Rifaximin α Starting from Rifaximin β
> 5 Grams of rifaximin β having a water content equal to 5.0% are dried under vacuum at +30° C. during 8 hours obtaining 4.85 g of rifaximin α having a water content equal to 2.3%.

'620 patent at 9:40–46.

179. Form δ is made by the same process when the water content reaches 3% to 4.5%. The process of drying form β, as taught by the '620 patent, would necessarily produce rifaximin form δ as the water content reached between 3 and 4.5%, on its way to the final 2-3% water content of form α.

180. G.C. Viscomi et al., *Crystal Forms of Rifaximin and Their Effect on Pharmaceutical Properties*, 10 Crystal Eng. Comm. 1074-1081 (2008) ("Viscomi 2008") confirms that the same process made rifaximin forms α, β, δ, and ε, depending on how long the material was dried. I understand that Viscomi 2008 published after the priority date and, therefore, is not prior art to the '196 patent. I have been informed, however, that it may be considered to show what was

191. As I explained above, the ’620 patent, New Zealand Application, and ’196 patent describe nearly identical procedures for preparing rifaximin forms α, β, γ (’620 patent/New Zealand Application) and rifaximin forms δ and ε. *See* Section X.A; *see also* ’196 Patent at 7:20–8:2; ’620 Patent at 7:5–37; New Zealand Application at 12:6–12:28. The crystallization procedures are identical, down to the drying time and temperature ranges. The only difference is the water content between forms:

| Form | Water Content |
|---|---|
| β | higher than 4.5%, preferably between 5.0% and 6.0%<br><br>’620 patent at 5:66–6:1. |
| δ | 2.5% (w/w) to 6% (w/w), more preferably between 3% and 4.5%<br><br>’196 patent at 5:20–25. |
| α | lower than 4.5%, preferably between 2.0% and 3.0%<br><br>’620 patent at 5:60–63. |

192. The ’620 patent and New Zealand Application each teach that form β is obtained by drying “raw rifaximin” under vacuum at room temperature for 12 hours to obtain rifaximin with “a water content equal to 5.6% and a diffractogram corresponding to the polymorphous form β” and that form α is obtained “by further drying under vacuum until constant weight gives 62.2 g of dried raw rifaximin having a water content equal to 2.2%, whose diffractogram corresponds to the polymorphous form α.” ’620 patent at 7:25–37 (Example 1); *see also id.* at 4:34–40; New Zealand Application at 12:6–12:28 (Example 1); *id.* at 7:13–21. The ’196 patent likewise discloses drying “raw rifaximin” under vacuum at room temperature for 12 hours to obtain rifaximin with “a water content equal to 5.6%,” then obtaining form δ “by further drying under vacuum until the weight

of 62.2 g of dried raw rifaximin having a water content equal to 3.3%, whose diffractogram corresponds to the polymorphous form δ . . . .” ’196 patent at 7:42–54 (Example 1).

193. In my opinion, following the procedure disclosed in the ’620 patent or New Zealand Application for producing form α would necessarily produce form δ. Specifically, both forms α and δ are produced by drying rifaximin with a starting water content of 5.6%. Form α is produced by drying the rifaximin to a water content of 2.2%. As the rifaximin transitioned from the 5.6% starting water content to the 2.2% water content of form α, it would necessarily cross through the 3% to 4.5% water content inherent to rifaximin form δ. According to the ’196 patent, the rifaximin is form δ when it reaches 3–4.5% water content. *See* ’196 patent at 7:42–54 (Example 1). The process of drying form β, as taught by the ’620 patent, would necessarily produce rifaximin form δ as the water content reached between 3 and 4.5%, on its way to the final 2-3% water content of form α. As I explained above, the claimed XRPD values are inherent properties of rifaximin form δ.

194. Additionally, the ’196 patent indicates that rifaximin form ε is also formed when the rifaximin is dried for between 2 and 72 hours. *See* ’196 patent, claim 1. The ’620 patent process teaches drying for the same period of time. ’620 Patent at 3:54–57; New Zealand Application at 6:5–8. Therefore, following the ’620 patent process would likewise result in rifaximin form ε.

195. The table below identifies each element of claims 7–9 and the corresponding disclosures of the ’620 patent and New Zealand Application:

| ’196 Patent | ’620 Patent / New Zealand Application |
|---|---|
| 7. A solid pharmaceutical composition comprising a therapeutically effective amount of rifaximin δ, rifaximin ε, or a combination thereof, | The ’620 patent and New Zealand Application each disclose a solid pharmaceutical composition.<br>• “All the solid preparations administrable by oral route can be used in the ambit of the present invention, for instance coated and uncoated |

| | |
|---|---|
| | tablets, capsules made of soft and hard gelatin, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packets." '620 patent at 6:44–48; New Zealand Application at 11:15–18.<br><br>As explained above, the '620 patent and New Zealand Application each disclose rifaximin δ or rifaximin ε.<br><br>The '620 patent and New Zealand Application each disclose compositions that have an antibiotic activity at a range of dosages. A POSA would have understood that the "preparations having antibiotic activity" would contain a therapeutically effective amount of rifaximin.<br>• "The forms α, β and γ can be advantageously used in the production of medicinal preparations having antibiotic activity, containing rifaximin, for both oral and topical use. The dosage is generally between 10 mg to 10 g, preferably 20 mg to 5 g per day per adult." '620 Patent at 6:25–28; New Zealand Application at 10:28–11:3.<br><br>As explained above, a POSA would have recognized that any form of rifaximin prepared according to the '620 patent or New Zealand Application could be used to prepare "medicinal preparations having antibiotic activity." |
| and a pharmaceutically acceptable excipient, together disposed in a formulation for oral administration, | The '620 patent and New Zealand Application each disclose the oral formulation may include a pharmaceutically acceptable excipient disclosed together with rifaximin.<br>• "The medicinal preparations for oral use contain rifaximin α or β or γ together with the usual excipients as diluting agents like mannitol, lactose and sorbitol; binding agents like starchs, gelatines, sugars, cellulose derivatives, natural gums and |

| | |
|---|---|
| | polyvinylpyrrolidone; lubricating agents like talc, stearates, hydrogenated vegetable oils, polyethylenglycol and colloidal silicon dioxide; disintegrating agents like starchs, celluloses, alginates, gums and reticulated polymers; coloring, flavoring and sweetening agents." '620 patent at 6:35–43; New Zealand Application at 11:19–26.<br><br>As explained above, a POSA would have recognized that any form of rifaximin prepared according to the '620 patent or New Zealand Application could be used. |
| wherein the rifaximin δ has x-ray powder diffraction pattern peaks at about 5.7°±0.2, 10.8°±0.2, 12.1°±0.2, and 17.0°±0.2, 2-θ, and<br><br>wherein the rifaximin ε has x-ray powder diffraction pattern peaks at about 8.2°±0.2, 12.4°±0.2, and 16.3°±0.2 2-θ. | As explained above, the '620 patent and New Zealand Application each disclose a process for preparing crystalline rifaximin that necessarily produces rifaximin forms δ and ε. *See* '620 Patent at 7:5–37; New Zealand Application at 12:6–28.<br><br>The XRPD peaks recited in claim 7 are inherent properties of the rifaximin forms δ and ε that are produced by following the procedures of the '620 patent or New Zealand Application.<br><br>Therefore, the '620 patent and New Zealand Application each inherently disclose this limitation. |
| 8. The pharmaceutical composition of claim 7, wherein the excipient is selected from the group consisting of diluting, binding, lubricating, disintegrating, coloring, flavoring, and sweetening agents. | The '620 patent and New Zealand Application each disclose the pharmaceutical composition may contain an excipient selected from the group consisting of diluting, binding, lubricating, disintegrating, coloring, flavoring, and sweetening agents.<br>• "The medicinal preparations for oral use contain rifaximin α or β or γ together with the usual excipients as diluting agents like mannitol, lactose and sorbitol; binding agents like starchs, gelatines, sugars, cellulose derivatives, natural gums and |

| | |
|---|---|
| | polyvinylpyrrolidone; lubricating agents like talc, stearates, hydrogenated vegetable oils, polyethylenglycol and colloidal silicon dioxide; disintegrating agents like starchs, celluloses, alginates, gums and reticulated polymers; coloring, flavoring and sweetening agents." '620 patent at 6:35–43; New Zealand Application at 11:19–26. |
| 9. The pharmaceutical composition of claim 7, wherein the formulation for oral administration is selected from the group consisting of coated or uncoated tablet, hard or soft gelatin capsule, sugar-coated pill, lozenge, wafer sheet, pellet, and powder in sealed packet. | The '620 patent and New Zealand Application each disclose a pharmaceutical composition, wherein the formulation for oral administration is selected from the group consisting of coated or uncoated tablet, hard or soft gelatin capsule, sugar-coated pill, lozenge, wafer sheet, pellet, and powder in sealed packet.<br>• "All the solid preparations administrable by oral route can be used in the ambit of the present invention, for instance coated and uncoated tablets, capsules made of soft and hard gelatin, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packets." '620 patent at 6:44–48; New Zealand Application at 11:15–18. |

196. Therefore, it is my opinion that the '620 patent and New Zealand Application each anticipate claims 7–9 of the '196 patent.

### 3. Claims 7-9 of the '196 Patent Would Have Been Obvious Because a POSA Would Have Been Motivated to Characterize the Forms of Rifaximin Produced by the Process Disclosed in the '620 Patent and New Zealand Application

197. If claims 7–9 of the '196 patent are not found to be anticipated, they would have been obvious over the '620 patent or the New Zealand Application because a POSA would have

been motivated to characterize the forms of rifaximin produced by the ’620 patent process[3], including forms δ and ε.

198. The ’620 patent and New Zealand Application explicitly disclose rifaximin forms α, β, and γ. *See* ’620 patent at 3:14–18; New Zealand Application at 5:2–5. However, as explained above, the ’620 patent process also produces rifaximin forms δ and ε.

199. The ’620 patent or New Zealand Application themselves would motivate a POSA to characterize all forms of rifaximin produced by the ’620 patent process, including forms δ and ε. The common specification states that “[t]he identification and characterization of these polymorphous forms . . . is very important for a compound endowed with pharmacological activity which, like rifaximin, is marketed as a medicinal preparation both for human and veterinary use.” ’620 patent at 1:45–50 (emphasis added); *see also* New Zealand Application at 2:7–11. It explains that polymorphism can affect “bioavailability, solubility, stability, colour, compressibility, flowability and workability with consequent modification of the profiles of toxicological safety, clinical effectiveness and productive efficiency.” ’620 patent at 1:53–57; *see also* New Zealand Application at 2:14–17.

200. The common specification states that control over polymorphism is particularly important because regulatory authorities “require that the manufacturing methods of the active principles are standardized and controlled in such a way that they give homogeneous and sound results in terms of polymorphism . . . .” ’620 patent at 1:59–2:4; New Zealand Application at 2:18–26. It teaches that polymorphic standardization is particularly important in the field of rifamycin antibiotics. *See* ’620 patent at 2:4–13; *see also* New Zealand Application at 2:27–3:6.

[3] For simplicity, I refer to the common process taught by the ’620 patent and the New Zealand Application as the “’620 patent process.” All references to the ’620 patent process are also intended to refer to the same process taught by the New Zealand Application.

201. The specifications' emphasis on the importance of identifying and characterizing polymorphic forms of rifaximin would have motivated a POSA to characterize each of the rifaximin forms produced by the '620 patent process, including forms δ and ε.

202. Common knowledge also would have motivated a POSA to characterize the forms of rifaximin made with the '620 patent process. For example, FDA guidelines recognized that the polymorphic form may "profoundly affect dissolution and bioavailability" from solid dosage forms. 1987 FDA Guidance at 31. The FDA required drug substance manufacturers to establish whether different solid-state forms occurred and, if so, whether they affected dissolution and bioavailability. *Id.* It recommended using XRPD, among other analytical tools, to determine whether polymorphism occurred. *Id.* at 34.

203. The ultimate goal of any drug development project is to eventually treat patients with a safe and effective product. To reach that goal, the drug must meet the requirements needed for regulatory approval. A POSA practicing the '620 patent process would have been motivated to test and characterize the polymorphs made by the process to comply with regulatory requirements.

204. It was also common knowledge that polymorphism could affect important pharmaceutical properties, such as bioavailability and dissolution. *See, e.g.*, Byrn 1995 at 948 (stating that an "important question lies in the properties that differ among polymorphs and whether those properties affect the dosage form performance (i.e., quality or bioavailability)."); 1987 FDA Guidance at 31 (teaching that polymorphic form "may profoundly affect dissolution and bioavailability from solid dosage forms or suspension drug products.").

205. Byrn 1995 recommends that "it is advisable to investigate the drug substance for the existence of polymorphs and hydrates." Byrn 1995 at 946. The first step in the Byrn 1995 decision tree is to test for polymorphs using XRPD. *See id.*, Fig. 1.

206. The POSA's understanding that polymorphism may affect important pharmaceutical properties, along with the recommendations of FDA and Byrn 1995 to investigate the polymorphism of a drug substance, would have motivated a POSA to characterize any and all rifaximin forms produced by the '620 patent process.

207. A POSA would have first and foremost characterized those forms through XRPD analysis, which was among the most common and straightforward means of characterizing crystal forms as of the priority date. *See* Byrn 1995 at 946 ("The solids produced are analyzed using X-ray diffraction and at least one of the other methods."); Brittain at 235 ("the technique of x-ray powder diffraction (XRPD) is the predominant tool for the study of polycrystalline materials and is eminently suited for the routine characterization of polymorphs. . . ."); Remington at 710 ("Powder X-ray diffraction is the most powerful method for detecting polymorphs."); 1987 FDA Guidance at 34 (identifying XRPD as an analytical procedure for identifying whether polymorphism occurs). A POSA would have had a reasonable expectation of success characterizing rifaximin forms δ and ε because XRPD analysis is a routine procedure.

208. A POSA would have identified rifaximin forms δ and ε using XRPD analysis during routine monitoring of the crystal forms created by practicing the '620 patent process. For example, form δ would likely be identified during routine in-process testing as the wet rifaximin is dried to rifaximin form α, as taught by the '620 patent and New Zealand Application.

209. Moreover, it is apparent that rifaximin equilibrates between forms α, β, δ, and ε, depending on the moisture content. The common specification states that "the polymorphous form α, kept in an ambient environment with a relative humidity higher than 50% for a period of time between 12 and 48 hours, turns into the polymorphous form β." '620 patent at 4:45–51; New Zealand Application at 7:22–26. A POSA that prepared rifaximin form α according to the '620

patent process would have subjected the rifaximin to stability testing as a part of routine formulation, which would include exposure to conditions of elevated humidity. *See* Remington at 702 ("most APIs are usually in contact with moisture-bearing excipients and are stress-tested at elevated temperatures and humidity."). In the course of stability testing, a POSA would have detected rifaximin form δ as the rifaximin equilibrated between forms α, δ and ε.

210. Therefore, in my opinion rifaximin forms δ and ε would have been obvious over the '620 patent or the New Zealand Application because a POSA would have been motivated to characterize each of the forms produced by the '620 patent process, including rifaximin forms δ and ε, using XRPD analysis with a reasonable expectation of success. A POSA would have detected rifaximin form δ through routine monitoring of the rifaximin forms α and β disclosed in the '620 patent and New Zealand Application. The specific XRPD peaks associated with rifaximin forms δ and ε are inherent characteristics of the crystal forms.

**a. Claims 7-9 Would Have Been Obvious Over the '620 Patent**

211. As discussed above, claim 7 recites a pharmaceutical composition containing rifaximin forms δ and/or ε. Claims 8 and 9 recite characteristics of the composition.

212. As I explained above, the '620 patent and New Zealand Application each disclose every element of the claims 7–9. If the Court finds that the '620 patent or the New Zealand Application do not anticipate claims 7–9 of the '196 patent, these claims are obvious. In my opinion, a POSA would have been motivated to prepare pharmaceutical compositions with each of the forms of rifaximin produced by the '620 patent process because the '620 patent and New Zealand Application teach that rifaximin "is marketed as a medicinal preparation" and that "the polymorphism of a compound that can be used as an active principle in a medicinal preparation can influence the pharmaco-toxicologic properties of the drug." '620 patent at 1:45-54; New

Zealand Application at 2:7-17. A POSA that identified rifaximin forms δ and ε through routine screening would have been motivated to prepare pharmaceutical preparations with those forms to test their effects on pharmaco-toxicologic properties of the drug. *See, e.g.*, Remington at 719 ("*In vitro* and *in vivo* metabolism studies, bioavailability studies in different animals, as well as possible selective toxicological studies cane be used to determine the best analog."); 1987 FDA Guidance at 31 ("certain solid-state properties of the drug substance (e.g., polymorphic form or amorphism, solvation or hydration, various types of inclusion complexes, and particle size or surface area) may profoundly affect dissolution and bioavailability from solid dosage forms or suspension drug products.").

213. Other prior art references would have motivated a POSA to prepare a pharmaceutical composition containing rifaximin forms δ and/or ε as the active ingredient. For example, rifaximin tablets had been approved under the trade name Normix. *See* Normix Label at § 2. A POSA looking to prepare a pharmaceutical composition using rifaximin made with the '620 patent process would have looked to approved products like the one disclosed in the Normix Label for formulation details because they would understand that those formulations were demonstrated to be safe and effective.

214. The Normix Label discloses that rifaximin possesses a "broad activity spectrum and exhibits bactericidal action against various bacterial species of Gram-positive and Gram-negative either aerobic or anaerobic." *Id.* at § 5.1. It discloses that Normix is a 200 mg coated tablet containing glycolate sodium starch, palmito-stearic ester of glycerol, silica precipitate, talc, microgranular cellulose, hydroxypropylmethylcellulose, titanium dioxide E171, disodium edetate, propylene glycol, and red iron oxide E172. (*Id.* at § 6.1.)

215. The only difference between the claimed formulations and Normix tablets is that claims 7–9 specify the rifaximin is in form δ and/or ε. In my opinion, the Normix Label would motivate a POSA to prepare a tablet using the rifaximin forms δ and/or ε made with the ’620 patent process because it shows that rifaximin compositions are safe and effective.

216. A POSA would have had a reasonable expectation of success preparing a composition with rifaximin forms δ and/or ε because the ’620 patent and New Zealand Application disclose pharmaceutical preparations using other forms, and because the Normix Label shows that rifaximin tablets are safe and effective. *See* Normix Label at § 4.1. A POSA would reasonably expect to prepare similar compositions using rifaximin forms δ and/or ε.

217. As shown below, claims 7–9 of the ’196 patent would have been obvious over the ’620 patent or New Zealand Application alone or in combination with the Normix Label:

| ’196 Patent | Prior Art |
| --- | --- |
| 7. A solid pharmaceutical composition comprising a therapeutically effective amount of rifaximin δ, rifaximin ε, or a combination thereof, | The ’620 patent and New Zealand Application each disclose a solid pharmaceutical composition.<br>• “All the solid preparations administrable by oral route can be used in the ambit of the present invention, for instance coated and uncoated tablets, capsules made of soft and hard gelatin, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packets.” ’620 patent at 6:44–48; New Zealand Application at 11:15–18.<br><br>As explained above, the ’620 patent and New Zealand Application each disclose rifaximin δ or rifaximin ε.<br><br>The ’620 patent and New Zealand Application each disclose compositions that have an antibiotic activity at a range of dosages. A POSA would have understood that the “preparations having antibiotic activity” would |

| | |
|---|---|
| | contain a therapeutically effective amount of rifaximin. A POSA would have been motivated to include a "therapeutically effective amount" of rifaximin in the composition to take advantage of its antibiotic properties.<br><br>• "The forms α, β and γ can be advantageously used in the production of medicinal preparations having antibiotic activity, containing rifaximin, for both oral and topical use. The dosage is generally between 10 mg to 10 g, preferably 20 mg to 5 g per day per adult." '620 Patent at 6:25–28; New Zealand Application at 10:28–11:3.<br><br>As explained above, a POSA would have recognized that any form of rifaximin prepared according to the '620 patent or New Zealand Application could be used to prepare "medicinal preparations having antibiotic activity."<br><br>The Normix Label also discloses a solid pharmaceutical composition with a therapeutically effective amount of rifaximin. *See* Normix Label at § 2 (disclosing 200 mg tablets). |
| and a pharmaceutically acceptable excipient, together disposed in a formulation for oral administration, | The '620 patent and New Zealand Application each disclose the oral formulation may include a pharmaceutically acceptable excipient disclosed together with rifaximin.<br>• "The medicinal preparations for oral use contain rifaximin α or β or γ together with the usual excipients as diluting agents like mannitol, lactose and sorbitol; binding agents like starchs, gelatines, sugars, cellulose derivatives, natural gums and polyvinylpyrrolidone; lubricating agents like talc, stearates, hydrogenated vegetable oils, polyethylenglycol and colloidal silicon |

| | |
|---|---|
| | dioxide; disintegrating agents like starchs, celluloses, alginates, gums and reticulated polymers; coloring, flavoring and sweetening agents." '620 patent at 6:35–43; New Zealand Application at 11:19–26.<br><br>As explained above, a POSA would have recognized that any form of rifaximin prepared according to the '620 patent or New Zealand Application could be used.<br><br>The Normix Label also discloses rifaximin in combination with pharmaceutically acceptable excipients in a dosage form for oral administration. *See* Normix Label at § 6.1 (disclosing the excipients glycolate sodium starch, palmito-stearic ester of glycerol, silica precipitate, talc, microgranular cellulose, hydroxypropylmethylcellulose, titanium dioxide E171, disodium edetate, propylene glycol, and red iron oxide E172.) |
| wherein the rifaximin δ has x-ray powder diffraction pattern peaks at about 5.7°±0.2, 10.8°±0.2, 12.1°±0.2, and 17.0°±0.2, 2-θ, and<br><br>wherein the rifaximin ε has x-ray powder diffraction pattern peaks at about 8.2°±0.2, 12.4°±0.2, and 16.3°±0.2 2-θ. | As explained above, a POSA would have been motivated to characterize each of the forms produced by the '620 patent process with XRPD, including rifaximin forms δ and ε, with a reasonable expectation of success.<br><br>A POSA would have recognized that any form of rifaximin made according to the '620 patent or New Zealand Application could be used to prepare "medicinal preparations having antibiotic activity."<br><br>Other references, such as the Normix Label, also would have motivated a POSA to prepare pharmaceutical compositions using rifaximin forms δ and/or ε because it teaches that rifaximin is effective for treating intestinal bacterial infections. *See* Normix Label at § 4.1.<br><br>Therefore, claim 7 would have been obvious over the '620 patent or the New Zealand Application, alone or in combination with the Normix Label. |

| | |
|---|---|
| 8. The pharmaceutical composition of claim 7, wherein the excipient is selected from the group consisting of diluting, binding, lubricating, disintegrating, coloring, flavoring, and sweetening agents. | The ’620 patent and New Zealand Application each disclose the pharmaceutical composition may contain an excipient selected from the group consisting of diluting, binding, lubricating, disintegrating, coloring, flavoring, and sweetening agents.<br>• “The medicinal preparations for oral use contain rifaximin α or β or γ together with the usual excipients as diluting agents like mannitol, lactose and sorbitol; binding agents like starchs, gelatines, sugars, cellulose derivatives, natural gums and polyvinylpyrrolidone; lubricating agents like talc, stearates, hydrogenated vegetable oils, polyethylenglycol and colloidal silicon dioxide; disintegrating agents like starchs, celluloses, alginates, gums and reticulated polymers; coloring, flavoring and sweetening agents.” ’620 patent at 6:35–43; New Zealand Application at 11:19–26.<br><br>The Normix Label also discloses a composition containing these excipients. *See* Normix Label at § 6.1 (disclosing excipients such as palmitostearic ester of glycerol (a lubricant), glycolate sodium starch (a disintegrating agent)).<br><br>A POSA would have been motivated to use the same excipients in a pharmaceutical composition containing rifaximin forms δ and/or ε. |
| 9. The pharmaceutical composition of claim 7, wherein the formulation for oral administration is selected from the group consisting of coated or uncoated tablet, hard or soft gelatin capsule, sugar-coated pill, lozenge, wafer sheet, pellet, and powder in sealed packet. | The ’620 patent and New Zealand Application each disclose a pharmaceutical composition, wherein the formulation for oral administration is selected from the group consisting of coated or uncoated tablet, hard or soft gelatin capsule, sugar-coated pill, lozenge, wafer sheet, pellet, and powder in sealed packet.<br>“All the solid preparations administrable by oral route can be used |

| | |
|---|---|
| | in the ambit of the present invention, for instance coated and uncoated tablets, capsules made of soft and hard gelatin, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packets." '620 patent at 6:44–48; New Zealand Application at 11:15–18.<br><br>The Normix Label also discloses a coated rifaximin tablet. Normix Label at § 2.<br><br>A POSA would have been motivated to prepare the same dosage forms containing rifaximin forms δ and/or ε. |

### B. Claims 7-9 of the '196 Patent Are Also Invalid as Obvious over Cannata in view of the Normix Label and/or Marchi and Common Knowledge

218. In my opinion, claims 7-9 of the '196 patent are further invalid as obvious over Cannata in view of Marchi or the Normix Label and common knowledge.

219. Cannata discloses a process for preparing crystalline rifaximin that produces rifaximin forms δ and ε, as the patentee admitted during prosecution of the '620 patent. It also discloses that rifaximin is "endowed with outstanding antibacterial properties." Cannata at 3:10-16.

220. It was common knowledge that polymorphism in pharmaceutical solids could affect important characteristics like solubility and bioavailability. The 1987 FDA Guidance recommended characterizing polymorphic forms of drug substances, including with XRPD analysis. Based on the FDA's guidance and common knowledge, a POSA would have been motivated to characterize the polymorphic forms of rifaximin made by the Cannata process. A POSA would have detected and characterized rifaximin forms δ and ε through routine in-process and stability screening.

221. As discussed above, the Normix Label discloses an approved rifaximin formulation for treating various conditions associated with gastrointestinal bacterial infections, such as traveler's diarrhea. Marchi similarly discloses pharmaceutical compositions with rifaximin. The only difference between these compositions and claims 7-9 of the '196 patent is that the '196 patent specifies that the composition contains rifaximin forms δ and/or ε.

222. A POSA would have been motivated to combine Cannata with the Normix Label, and/or Marchi for several reasons. Cannata discloses that rifaximin has "outstanding antibacterial properties . . . . useful in combatting the microbial infections of the gastro-intestinal tract." Cannata at 3:10-16. A POSA seeking to treat microbial infections in patients using the rifaximin from Cannata would have looked to common knowledge, as reflected in, for example, the 1987 FDA Guidance, to determine requirements for demonstrating the drug substance was safe and effective.

223. Additionally, Cannata discloses rifaximin is useful for treating microbial infections but does not provide details regarding the pharmaceutical compositions that would be used to treat such infections. A POSA would have looked to other rifaximin pharmaceutical compositions, such as the Normix Label and/or Marchi, for information on the types of excipients and dosage forms used in those compositions. A POSA would have had a reasonable expectation of success preparing the claimed formulations because it was known that rifaximin was safe and effective to treat gastrointestinal infections.

**1. The Cannata Process Makes Rifaximin Forms δ and ε, which is Confirmed by the Viscomi Declaration**

224. Cannata discloses a process for preparing crystalline rifaximin that results in rifaximin forms δ and ε.

225. Cannata discloses a process for preparing pyrido-imidazo-rifamycins (including rifaximin) in which "rifamycin O is reacted under mild conditions with a selected 2-aminopyridine

of formula III, in a suitable solvent or solvent system from which, by means of techniques known to a man skilled in the art, the desired end products are recovered . . . .” Cannata at 3:29–37. It discloses that rifaximin “can be purified, if necessary, by crystallization from suitable solvents or solvent systems.” *Id.* at 5:34–36.

226. Examples 1, 4, 6, 7, 8, 9, 10, 11, 12, 13, and 14 each disclose the preparation of rifaximin. *See* Cannata at 5:55–6:35 (Example 1), 7:40–59 (Example 4), 8:28–44 (Example 6), 8:45–61 (Example 7), 8:62–9:5 (Example 8), 9:5–19 (Example 9), 9:20–29 (Example 10), 9:30–39 (Example 11), 9:40–55 (Example 12), 9:56–68 (Example 13), 10:1–10 (Example 14).

227. Examples 1, 6, 7, and 9 describe preparing crystalline rifaximin using the same crystalline solvent system of ethanol and water. *See* Cannata at Exs. 1, 6, 7, and 9. Examples 1, 6, and 7 describe crystallizing rifaximin using 7:3 (v/v) mixture of ethanol and water. *See* Cannata at 6:1–2 (“a residue was obtained which was crystallized by ethanol and water 7:3 (v/v).”); *id.* at 8:31–34 (same); *id.* at 8:55–58 (same).

228. Examples 1, 6, 7, and 9 disclose crystallization methods that may be used to produce crystalline rifaximin. Example 6 discloses drying the crystals after crystallization. *Id.* at 8:39–41 (“The end product crystallized which, after filtration and drying, weighted 2.35 g (65% of theoretical).”). Examples 9 and 13 disclose washing the solid obtained from the reaction mixture then drying it under vacuum. *See id.* at 9:14–19; *id.* at 9:64–67. Example 12 also discloses that the solid obtained from reaction mixture as “washed with a 1:1 (v/v) mixture of ethanol/water and dried . . . .” *Id.* at 9:49–54.

229. Examples 1, 6, 7, and 9 are reproduced below as representative examples:

| **Example No.** | **Cannata** |
|---|---|
| **Example 1** | 7.54 Grams (0.01 moles) of rifamycin O and 3.24 g (0.03 moles) of 2-amino-4-methyl-pyridine were dissolved in 40 ml of |

| | |
|---|---|
| | methylene chloride and the so obtained solution was kept at room temperature for 48 hours. After washing the reaction mixture first with 60 ml of an aqueous 1N solution of hydrochloric acid and then with water, and drying the organic phase over sodium sulfate, the methylene chloride was eliminated by evaporation under vacuum.<br><br>A residue was obtained which was crystallized by ethanol and water 7:3 (v/v). Yield 6.13 g (78% of theoretical). M.p. 200°-205° C. (decomposition).<br><br>Cannata at 5:55–6:35. |
| **Example 6** | 3.47 Grams (0.0046 moles) of rifamycin 0, 1.49 g (0.0138 moles) of 2-amino-4-methyl-pyridine and 0.28 g (0.0011 moles) of iodine were dissolved in 15 ml of a 7/3 (v/v) mixture of ethanol/water. The resulting solution was stirred for 18 hours at room temperature, then 0.28 g of iodine were added and stirring was continued for further 2 hours. The reaction mixture was added with 0.53 g (0.003 moles) of ascorbic acid and left standing for 2 days at a temperature of about 5° C. The end product crystallized which, after filtration and drying, weighted 2.35 g (65% of theoretical). The compound has the same chemico-physical characteristics as that obtained in Example 1.<br><br>*Id.* at 8:28–44. |
| **Example 7** | 200 Grams (0.265 moles) of rifamycin O and 65.5 g (0.607 moles) of 2-amino-4-methyl-pyridine were dissolved in 1000 ml of methylene chloride and were kept at room temperature for 40 hours. The reaction mixture was washed with 900 ml of an aqueous 1N solution of hydrochloric acid and then with water to neutrality. The washing liquors were cast off, the organic layer was dried over sodium sulfate and, after evaporating the solvent under vacuum, a residue was obtained which was crystallized from a 7/3 (v/v) mixture of ethanol/water. Yield 177 g (85% of theoretical). The compound has the same chemico-physical characteristics as that obtained in Example 1.<br><br>*Id.* at 8:45–61. |
| **Example 9** | 100 Grams (0.132 moles) of rifamycin O and 57.1 g (0.528 moles) of 2-amino-4-methyl-pyridine were stirred in 400 ml of a 1:1 (v/v) mixture of ethanol/water at room temperature for 20 hours. The obtained solid was washed with a 1:1 (v/v) mixture of ethanol/water and then dried under vacuum, thus obtaining 86 g of pure product having the same chemico-physical characteristics as that obtained in Example 1, with a yield of 82% of theoretical. |

| | |
|---|---|
| | *Id.* at 9:5–19. |

230. Cannata discloses characterizing rifaximin using ultraviolet, infrared, H-NMR and C-NMR spectroscopy. *See, e.g.*, Cannata at 6:5–35. Cannata does not disclose testing for polymorphic form using XRPD. However, I understand that during prosecution of the ’620 patent, Giuseppe Viscomi, named inventor on both the ’196 and ’620 patents, submitted a declaration in which he told the patent office that rifaximin prepared by the Cannata process and later tested for polymorphism was consistent with forms δ and ε (the “Viscomi Declaration”).

231. The patentee submitted the Viscomi Declaration after pending claims of the ’620 patent were rejected as anticipated by Cannata. *See* Viscomi Declaration at ¶4.

232. The Viscomi Declaration states that “Rifaximin prepared according the old patents US ’866 [Cannata] and US ’785 [Marchi] was never tested for polymorph. Samples of batches manufactured in 2000-2001, presently re-tested, are composed of mixture of polymorph (alpha and beta, and in some cases alpha and epsilon) or different polymorphs.” *Id*. at ¶ 7. The declaration continues that “<u>it was possible at that time</u> to obtain rifaximin polymorphs α and frequently also different polymorphs or mixtures of them.” *Id.* (emphasis added). It reports the following examples from different batches made according to the prior art process:

> (i) A batch manufactured in 2001 and measured by X-ray diffractogram in 2002, turned out to be entirely composed of a polymorph subsequently defined “delta polymorph” (see Figure 1).
>
> (ii) A batch manufactured in 2001, later analysed in 2002, consisted exclusively of the epsilon form (see Figure 2).
>
> (iii) Another batch manufactured in 2001, instead, turned out to be a mixture of the alpha and epsilon form (see Figure 3).
>
> (iv) A batch manufactured in 2004 (batch no. 2000 0827) and retested in 2005 was a mixture of the alpha and delta forms (see Figure 4).

Viscomi Declaration at ¶ 7.

233. Figures 1–4 submitted with the Viscomi Declaration are reproduced below:




*"Figure 1 – Diffractogram of delta rifaximin"*




*"Figure 2 – Diffractogram of epsilon rifaximin manufactured in 2001"*




*"Figure 3 – Diffractogram of rifaximin – mixture of alpha and epsilon form manufactured in 2001"*




*"Figure 4 – Diffractogram of mixture of alpha and delta rifaximin (the arrows indicate the peaks attributable to the delta form)"*

234. The Viscomi Declaration also states that Alfa Wasserman demonstrated that "crystalline forms are susceptible (before proceeding according to he [sic] present application) to transition from one form to another" and showed that, when retested during storage, the same sample shifted from (1) a mixture of α and β, to (2) a mixture of α and ε, and finally (3) a mixture

of ε and β. *See* Viscomi Declaration at ¶ 8. Figures 6 and 7 of the Viscomi Declaration point out the specific peaks corresponding to rifaximin form ε.

235. The Viscomi Declaration acknowledges that the Cannata process "frequently [results in] different polymorphs or mixtures of them" including rifaximin forms δ and ε. *See* Viscomi Declaration at ¶ 7. It appears that Dr. Viscomi believed the invention of the '620 patent was a "process in order to obtain pure polymorphs and not mixture of polymorphs . . . in order to obtain polymorph with definite pharmacological characteristics." Viscomi Declaration at ¶ 9. I note that none of the Asserted Claims requires pure rifaximin δ and/or ε.

236. Each of the four batches referenced in Paragraph 7 of the Viscomi Declaration included either rifaximin form δ or ε, sometimes in their pure form. Paragraph 8 shows that rifaximin converted to form ε over time. Thus, the Viscomi Declaration makes clear that the Cannata process produces rifaximin forms δ and ε, and that identifying the polymorphs would be a matter of simply testing batches of rifaximin produced by the Cannata process for polymorphism.

237. As explained below, a POSA would have been motivated to perform such routine XRPD testing as a matter of course. In doing so, they would have detected rifaximin forms δ and/or ε.

### 2. Common Knowledge Would Have Motivated a POSA to Identify Characteristics of Rifaximin Made by the Cannata Process Using XRPD

238. Common knowledge of a POSA, as reflected by the 1987 FDA Guidance, among other references, would have motivated a POSA to characterize the rifaximin made by the Cannata process using routine methods, including testing for polymorphism using XRPD.

239. The priority date for the '196 patent is March 3, 2005, nearly 20 years after the Cannata patent was filed on April 26, 1985. By March 2005, the impact of polymorphism on the

performance of pharmaceutical solids was known and XRPD characterization was a routine aspect of drug development and manufacturing.

240. The 1987 FDA Guidance, which published a few years after Cannata, states that "[c]ertain solid-state properties of the drug substance (e.g., polymorphic form or amorphism, solvation or hydration, various types of inclusion complexes, and particle size or surface area) may profoundly affect dissolution and bioavailability from solid dosage forms or suspension drug products." 1987 FDA Guidance at 31. The relationship between polymorphism and dissolution and bioavailability would have also been within the knowledge of a POSA. *See, e.g.*, Byrn 1995 at 948 (stating that an "important question lies in the properties that differ among polymorphs and whether those properties affect the dosage form performance (i.e., quality or bioavailability)."); *see also* Haleblian 1969 at 911 ("[d]ifferent polymorphs of a given compound are, in general, as different in structure and properties as the crystals of two different compounds. Solubility, melting point, density, hardness, crystal shape, optical and electrical properties, vapor pressure, *etc.*, all vary with the polymorphic form.").

241. The 1987 FDA Guidance recommends that "[b]y the time of an NDA submission, the applicant should have established whether (or not) the drug substance exists in multiple solid-state forms, whether these affect the dissolution and bioavailability of the drug product, and whether particle size is important for dissolution and bioavailability of the drug product." 1987 FDA Guidance at 31. It further recommends determining whether "different forms occur but do not result in a bioavailability problem" and if "polymorphism . . . has an important effect on bioavailability." *See id.* at 33.

242. The 1987 FDA Guidance continues that "[a]ppropriate analytical procedures should be used to determine whether (or not) polymorphism occurs" including XRPD. *See id.* at

34; *see also* Haleblian 1969 at 929 ("it is time that pharmaceutical companies, as part of their preformulation studies, identify and study the stability of different polymorphs of each potential new drug ….").

243. XRPD was also among the most common techniques for identifying polymorphism. *See* Byrn 1995 at 946 ("The solids produced are analyzed using X-ray diffraction and at least one of the other methods."); Brittain at 235 ("the technique of x-ray powder diffraction (XRPD) is the predominant tool for the study of polycrystalline materials and is eminently suited for the routine characterization of polymorphs. . . ."); Remington at 710 ("Powder X-ray diffraction is the most powerful method for detecting polymorphs."); 1987 FDA Guidance at 34 (identifying XRPD as an analytical procedure for identifying whether polymorphism occurs); Haleblian 1969 at 918 ("X-ray diffraction is one of the most widely used techniques after optical microscopy.").

244. The FDA guidelines set out the requirements for "complying with regulations pertaining to the submission of adequate information on the production and control of new drug substances." 1987 FDA Guidance at 1. A POSA seeking to prepare a pharmaceutical composition of rifaximin would have sought to comply with the FDA's guidelines for drug substances so that those compositions could be marketed to treat patients. A POSA following the 1987 FDA Guidance, and other common knowledge sources related to pharmaceutical polymorphism, would have been motivated to characterize the forms of rifaximin produced by the Cannata process with a reasonable expectation of success.

### 3. A POSA Motivated to Test Rifaximin Made by the Cannata Process for Polymorphism Would Have Identified Rifaximin Forms δ and/or ε

245. A POSA would have been motivated to characterize the crystalline rifaximin from the Cannata process because regulatory agencies strongly encouraged, if not required, that solid

forms of a drug substance be well-characterized during drug development. This characterization includes, for example, analysis of solubility, stability, and bioavailability.

246. The 1987 FDA guidance recommends both determining whether or not polymorphism occurs and determining whether a change in solid state form occurs when the drug substance is manufactured and stored according to the NDA directions. *See* 1987 FDA Guidance at 33, 34. It also states that the applicant must show that the specifications are suitable for control of the solid-state form of the drug. *Id.* at 34. A POSA following the Cannata process would have tested the polymorphic form at each of the stages of development – they would have initially sampled several batches made by the Cannata process to determine whether or not polymorphism occurred. Then again during routine stability testing, to determine whether or not the polymorphic character changed during storage. And finally, subsequent batches would be tested for conformance to the drug substance specification.

247. A POSA would also have been motivated to characterize crystalline rifaximin produced using the Cannata process using XRPD, which was a common method of characterizing crystalline materials. Typically, XRPD would first be performed during the drug development to detect and characterize potential polymorphs, during stability testing to determine whether there was a change in polymorphic form over time, and during manufacturing to confirm that the drug released is within specification. A POSA would have been motivated to perform such testing and would have detected rifaximin forms δ and/or ε.

248. The Viscomi Declaration states that the Cannata process produced mixtures of polymorphs, including forms δ and ε. *See* Viscomi Declaration at ¶¶ 7–9. It states that, when those samples are stored, several resulted in δ or ε, alone or as mixtures with other polymorphs. *Id.* at ¶

7. During storage, a single sample converted from a mixture of forms α and β, to mixtures containing rifaximin form ε, due to changes in humidity. *Id.* at ¶ 8.

249. Exposure to varied degrees of humidity is a routine aspect of stability testing. *See, e.g.*, Remington at 702 ("[M]ost APIs are usually in contact with moisture-bearing excipients and are stress-tested at elevated temperatures and humidity."). A POSA likely would have detected rifaximin forms δ and/or ε during routine stability testing of the rifaximin produced by the Cannata process.

250. The Viscomi Declaration discloses testing five batches made by the Cannata process, each of which contained either δ or ε. A POSA following the FDA's guidance to identify polymorphic forms, and to monitor for changes in polymorphic form over time, would have detected rifaximin forms δ and ε as a matter of routine testing.

251. Additionally, the 1987 FDA Guidance discloses that hydration may also affect dissolution and bioavailability and that "[c]onditions used in the manufacture and/or storage of the drug substance may result in the isolation or formation of an isolated or hydrated drug product." 1987 FDA Guidance at 35. It was also common knowledge to test for hydrate formation in a drug substance using common methods such as XRPD and thermogravimetric analysis ("TGA") and/or KF. *See, e.g.*, Byrn 1995 at 949, Fig. 6 (flow chart for solvates or hydrates); 1987 FDA Guidance at 35; Remington at 486, 548. The 1987 FDA Guidance further notes if hydration "affects bioavailability, appropriate manufacturing and control procedures should be established." 1987 FDA Guidance at 35.

252. Cannata discloses crystalizing rifaximin using a mixture of water and ethanol. *See, e.g.*, Cannata at 6:1–3. A POSA would have recognized that using water in the crystallization solvent could result in the formation of hydrates, and would have been motivated to analyze the

effect of water on the crystalline form using routine testing such as TGA, Karl Fischer titration, and XRPD. *See, e.g.*, Byrn 1995 at 949, Fig. 6 (flow chart for solvates or hydrates); 1987 FDA Guidance at 35 ("This is most directly assessed by testing for loss on drying (LOD) or by Karl Fischer titration (for hydrates). Information from other methods (e.g., TGA) may be necessary, because some solvates are known to be stable at temperatures above the boiling point of the solvent."); Remington at 486 ("A more specific and convenient procedure for determining water in many substances is the Karl Fischer titrimetric method."); *id.* at 548 (explaining that TGA may be used to determine moisture content of hydrated substances). As disclosed in Viscomi 2008 the different forms of rifaximin are "obtained by altering the drying conditions or omitting washing." Viscomi 2008 at 1076; *see also id.* at 1074–1075. It demonstrates that rifaximin equilibrates between forms α, β, δ, and ε with changing water content.

253. Therefore, a POSA practicing the Cannata process would have recognized the potential for hydrate formation and would have been motivated to characterize the hydrates produced by the Cannata process through routine testing. They would have been further motivated to monitor for changes to the hydrated form during drying and during storage. A POSA doing so would have detected rifaximin forms δ and/or ε, as demonstrated by the Viscomi Declaration.

254. As I explained above, the XRPD peaks corresponding to rifaximin forms δ and ε recited in claim 7 are inherent properties of the crystalline form that would have been detected in through routine XRPD testing.

### 4. A POSA Would Have Been Motivated to Prepare Pharmaceutical Compositions Containing Rifaximin Forms δ and/or ε

255. Having detected rifaximin forms δ and/or ε through routine analysis of the rifaximin produced by the Cannata process, as described above, a POSA would have been motivated to prepare a pharmaceutical composition comprising rifaximin forms δ and/or ε.

256. Cannata discloses that rifaximin is "endowed with outstanding antibacterial properties both in vitro and in vivo. Because of [its] poor absorption by animal organs and tissues when administered by oral route, they have proved to be particularly useful in combatting the microbial infections of the gastro-intestinal tract." Cannata at 3:10–16; *see also* Normix Label at § 5.1 ("Investigations carried out on the antibacterial activity of Rifaximin have shown that this new antibiotic, rifamycin derivative, possesses same broad activity spectrum and exhibits bactericidal action against various bacterial species of Gram-positive and Gram-negative either aerobic or anaerobic."). Thus, a POSA would have been motivated to prepare a pharmaceutical composition comprising the rifaximin disclosed by Cannata, including forms δ and ε, given the strong antibacterial properties.

257. Cannata discloses oral administration of rifaximin, which a POSA would understand would include conventional solid oral dosage forms, such as tablets or capsules, which contain excipients. Cannata at 3:10-16.

258. A POSA would have particularly looked to approved rifaximin drug products, such as the one disclosed in the Normix Label. The Normix Label discloses that Normix is a 200 mg film-coated tablet containing glycolate sodium starch, palmito-stearic ester of glycerol, silica precipitate, talc, microgranular cellulose, hydroxypropylmethylcellulose, titanium dioxide E171, disodium edetate, propylene glycol, and red iron oxide E172. Normix Label at § 6.1. A POSA would have understood that the Normix product described in the Normix Label would have included a "therapeutically effective amount" of rifaximin to treat the labelled indications.

259. A POSA would also have been motivated to look at other rifaximin formulations known in the art. Marchi discloses that rifaximin possesses a "remarkable in vitro activity both against Gram positive (as an example, various *Staph. aureus* strains) and Gram negative bacteria,

some of them from clinical isolation, which can be found in the intestinal bacterial flora in pathologic conditions." Marchi at 4:27–33. It also discloses "incorporation [of rifaximin] into pharmaceutical compositions," and "[t]he substances are embodied into conventional pharmaceutical dosage forms." Marchi at 6:6–10, 6:15–17. It discloses that the "formulations contain, in admixture with the active ingredient, the usual additives such as, for instance, sweetening, flavoring, coloring, coating and preservative agents, inert diluents such as, for instance, calcium or sodium carbonate, lactose and talc, binding agents, e.g. starch, gelatin and polyvinylpyrrolidone, suspending agents, e.g. methyl cellulose or hydroxyethylcellulose, and wetting agents such as, for instance, lecithin, polyoxyethylene stearates and polyoxymethylene sorbitan monooleate." Marchi at 6:17–26. A POSA would have understood that Marchi teaches that rifaximin may be used with "conventional pharmaceutical dosage forms," which a POSA would have understood could include tablets.

260. A POSA would have had a reasonable expectation of success because the only difference between the claimed formulations and those disclosed in the Normix Label and Marchi is that claims 7–9 specify the rifaximin is in form δ and/or ε. A POSA would reasonably have expected success in combining Cannata and the Normix Label or Marchi because the combination merely substitutes one form of rifaximin for another in a known composition to achieve predictable results.

261. As shown below, claims 7–9 of the '196 patent would have been obvious over Cannata alone or in combination with the 1987 FDA Guidance, the Normix Label and/or Marchi.

| '196 Patent | Prior Art |
|---|---|
| 7. A solid pharmaceutical composition comprising a therapeutically effective amount of rifaximin δ, rifaximin ε, or a combination thereof, | Cannata discloses that rifaximin is "endowed with outstanding antibacterial properties" and has "proved to be particularly useful in combatting the microbial infections of the gastro-intestinal tract." Cannata at 3:10–16. |

| | |
|---|---|
| | Thus, a POSA would have been motivated to prepare a pharmaceutical composition comprising a therapeutically effective amount of the rifaximin disclosed by Cannata, including forms δ and ε to combat microbial infections of the gastrointestinal tract.<br><br>Additionally, the Normix Label and Marchi disclose pharmaceutical compositions containing a therapeutically effective amount of rifaximin.<br><br>The Normix Label discloses coated tablets containing 200 mg of rifaximin. Normix Label at § 2. A POSA would understand this to be a "therapeutically effective amount" of rifaximin to treat the indications recited in Section 4.1 of the Normix Label.<br><br>Marchi at 6:13–17 ("The compounds of the invention can therefore be administered by several routes, as an example by oral, topic or intramuscular route. For such administrations, the substances are embodied into conventional pharmaceutical dosage formulations.").<br><br>*See also id.* at claim 13 ("the method of treating antibacterial diseases, which comprises administering to mammals suffering from said disease an antibacterial effective amount of a compound as defined in claim 1."). |
| and a pharmaceutically acceptable excipient, together disposed in a formulation for oral administration, | The Normix Label discloses rifaximin in combination with pharmaceutically acceptable excipients in a dosage form for oral administration. *See* Normix Label at § 6.1 (disclosing the excipients glycolate sodium starch, palmito-stearic ester of glycerol, silica precipitate, talc, microgranular cellulose, hydroxypropylmethylcellulose, titanium dioxide E171, disodium edetate, propylene glycol, and red iron oxide E172.) |

| | |
|---|---|
| | Marchi discloses the same. *See* Marchi at 6:17–26 ("[F]ormulations contain, in admixture with the active ingredient, the usual additives such as, for instance, sweetening, flavoring, coloring, coating and preservative agents, inert diluents . . . binding agents . . . suspending agents. . . and wetting agents . . . ."). <br><br> *See also* Cannata at 3:10–16 ("Because of their poor absorption by animal organs and tissues when administered by oral route, they have proved to be particularly useful in combatting the microbial infections of the gastro-intestinal tract."). |
| wherein the rifaximin δ has x-ray powder diffraction pattern peaks at about 5.7°±0.2, 10.8°±0.2, 12.1°±0.2, and 17.0°±0.2, 2-θ, and <br><br> wherein the rifaximin ε has x-ray powder diffraction pattern peaks at about 8.2°±0.2, 12.4°±0.2, and 16.3°±0.2 2-θ. | As explained above, a POSA would have been motivated to characterize the forms of rifaximin produced by the Cannata process. *See, e.g.*, 1987 FDA Guidance at 31 (recommending the applicant determine "whether (or not) the drug substance exists in multiple solid-state forms" and "whether these affect the dissolution and bioavailability of the drug product"); *id.* at 34 (recommending the use of XRPD to test for polymorphism). <br><br> The Viscomi Declaration confirms that the Cannata process frequently produces rifaximin forms δ and ε. *See* Viscomi Declaration at ¶ 7. <br><br> A POSA would have detected rifaximin forms δ and ε through routine testing, as explained in the preceding sections of my report. <br><br> The claimed XRPD values are merely inherent characteristics of the crystalline form. <br><br> A POSA would have had a reasonable expectation of success characterizing rifaximin forms δ and ε with using XRPD analysis because XRPD was a common technique that would have been routine to a POSA. *See, e.g.*, 1987 FDA Guidance at 34. |

| | |
|---|---|
| | *See also*, *e.g.*, Byrn 1995 at 946 ("The solids produced are analyzed using X-ray diffraction and at least one of the other methods.");<br><br>Brittain at 235 ("[T]he technique of x-ray powder diffraction (XRPD) is the predominant tool for the study of polycrystalline materials and is eminently suited for the routine characterization of polymorphs ...."); <br><br>Remington at 710 ("Powder X-ray diffraction is the most powerful method for detecting polymorphs.").<br><br>Therefore, a POSA would have been motivated to prepare the claimed pharmaceutical composition with a reasonable expectation of success. |
| 8. The pharmaceutical composition of claim 7, wherein the excipient is selected from the group consisting of diluting, binding, lubricating, disintegrating, coloring, flavoring, and sweetening agents. | The Normix Label also discloses a composition containing these excipients. *See* Normix Label at § 6.1 (disclosing excipients such as palmitostearic ester of glycerol (a lubricant), glycolate sodium starch (a disintegrating agent)).<br><br>Marchi discloses the same. *See* Marchi at 6:17–26 ("[F]ormulations contain, in admixture with the active ingredient, the usual additives such as, for instance, sweetening, flavoring, coloring, coating and preservative agents, inert diluents ... binding agents ... suspending agents ... and wetting agents ....").<br><br>A POSA would have been motivated to use the same excipients in a pharmaceutical composition containing rifaximin forms δ and/or ε and had a reasonable expectation of success because rifaximin formulations with excipients, such as lubricants, disintegrating agents, etc. were known in the art to be safe and effective. |
| 9. The pharmaceutical composition of claim 7, wherein the formulation for oral administration is selected from the group | The Normix Label discloses a coated rifaximin tablet. Normix Label at § 2. |

| | |
|---|---|
| consisting of coated or uncoated tablet, hard or soft gelatin capsule, sugar-coated pill, lozenge, wafer sheet, pellet, and powder in sealed packet. | Marchi discloses that the "substances are embodied into conventional pharmaceutical dosage formulations." Marchi at 6:15–16.<br><br>A POSA would have been motivated to prepare the same dosage forms containing rifaximin forms δ and/or ε and had a reasonable expectation of success because rifaximin formulations, such as tablets, were known in the art to be safe and effective. Further prior art taught that conventional pharmaceutical dosage forms could be employed for rifaximin. |

### C. Alternatively, Claims 7-9 of the '196 Patent Are Invalid for Lack of Enablement as to their Full Scope and for Lack of Written Description

262. I have been informed that a patent claim is invalid for lack of enablement if the specification fails to provide enough information for a POSA to make and use the full scope of the invention without undue experimentation. I understand that assessing undue experimentation involves a variety of factors including: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

263. In my opinion, if the claims are not invalid as anticipated or obvious for the reasons discussed above in Sections X.A and X.B, then they are invalid for lack of enablement and written description for the reasons discussed below.

### 1. If the ’620 Patent and New Zealand Application Do Not Anticipate or Render Claims 7-9 Obvious Then the Claims Are Not Enabled Because the ’196 Patent Specification Discloses No More Information on How To Make Forms δ and ε Than Those Publications

264. As discussed above in Section X.A, the ’620 patent and the New Zealand Application disclose a method for preparing rifaximin forms α and β that is identical to the only method disclosed in the ’196 patent for preparing the claimed rifaximin forms δ and ε.

265. To the extent that Plaintiffs argue that the ’620 patent or New Zealand Application do not adequately describe how to make or use the δ or ε forms, then the ’196 patent is invalid for lack of enablement for the same reasons. The ’196 patent does not disclose any more information on how to make crystalline rifaximin than the ’620 patent or the New Zealand Application.

266. Example 1 of the ’196 patent and Example 1 of the New Zealand Application are reproduced below. Example 1 of the ’620 patent is the same as Example 1 of the New Zealand Application.

| **’196 Patent Example 1** | **New Zealand Application Example 1** |
|---|---|
| Example 1<br>Preparation of Raw Rifaximin and of Dried Raw Rifaximin<br><br>In a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, 120 ml of demineralised water, 96 ml of ethyl alcohol, 63.5 g of rifamycin o and 27.2 g of 2-amino-4-methylpyridine are loaded in succession at room temperature.<br><br>After the loading, the mass is heated at 47±3° C., is kept under stirring at this temperature for 5 hours, then is cooled to 20±3° C. and, during 30 minutes, is added with a mixture, prepared separately, made of 9 ml of demineralised water, 12.6 ml of ethyl alcohol, 1.68 g of ascorbic acid and 9.28 g of aqueous concentrated hydrochloric acid. | Example 1<br>Preparation of Raw Rifaximin and of Dried Raw Rifaximin<br><br>In a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, 120 ml of demineralized water, 96 ml of ethyl alcohol, 63.5 g of rifamycin O and 27.2 g of 2-amino-4-methylpyridine are loaded in succession at room temperature.<br><br>After the loading, the mass is heated at 47±3° C., is kept under stirring at this temperature for 5 hours, then is cooled to 20±3° C. and, during 30 minutes, is added with a mixture, prepared separately, made of 9 ml of demineralized water, 12.6 ml of ethyl alcohol, 1.68 g of ascorbic acid and 9.28 g of aqueous concentrated hydrochloric acid. |

| ’196 Patent Example 1 | New Zealand Application Example 1 |
| --- | --- |
| At the end of the addition, the mass is kept under stirring for 30 minutes at an interior temperature of 20±3° C. and then, at the same temperature, 7.72 g of concentrated hydrochloric acid are dripped until a pH equal to 2.0.<br><br>At the end of the addition, the mass is kept under stirring, always at an interior temperature equal to 20° C., for 30 minutes, then the precipitate is filtered and washed by means of a mixture made of 32 ml of demineralised water and of 25 ml of ethyl alcohol.<br><br>The so obtained “raw rifaximin” (89.2 g) is dried under vacuum at room temperature for 12 hours obtaining 64.4 g of “dried raw rifaximin” which shows a water content equal to 5.6%. The product by further drying under vacuum until the weight of 62.2 g of dried raw rifaximin having a water content equal to 3.3%, whose diffractogram corresponds to the polymorphous form δ characterized from a powder X-ray diffractogram showing peaks at values of angles 2θ of 5.7°±0.2, 6.7°±0.2, 7.1°±0.2, 8.0°±0.2, 8.7°±0.2, 10.4°±0.2, 10.8°±0.2, 11.3°±0.2, 12.1°±0.2, 17.0°±0.2, 17.3°±0.2, 17.5°±0.2, 18.5°±0.2, 18.8°±0.2, 19.1°±0.2, 21.0°±0.2, 21.5°±0.2. The product is hygroscopic.<br><br>’196 Patent at 7:20–57. | At the end of the addition, the mass is kept under stirring for 30 minutes at an interior temperature of 20±3° C. and then, at the same temperature, 7.72 g of concentrated hydrochloric acid are dripped until a pH equal to 2.0.<br><br>At the end of the addition, the mass is kept under stirring, always at an interior temperature equal to 20° C., for 30 minutes, then the precipitate is filtered and washed by means of a mixture made of 32 ml of demineralized water and of 25 ml of ethyl alcohol.<br><br>The so obtained “raw rifaximin” (89.2 g) is dried under vacuum at room temperature for 12 hours obtaining 64.4 g of “dried raw rifaximin” which shows a water content equal to 5.6% and a diffractogram corresponding to the polymorphous form β. The product by further drying under vacuum until constant weight gives 62.2 g of dried raw rifaximin having a water content equal to 2.2%, whose diffractogram corresponds to the polymorphous form α.<br><br>New Zealand Application at 12:6–12:28; *see also* ’620 Patent at 7:5–37. |

267. The same procedure produces either rifaximin form δ or form α, and the ’196 patent provides no information on how to control for the production of the claimed form δ as opposed to other forms. As I explained above, in my opinion it would have been routine to characterize each of the forms made by process disclosed in the ’620 patent or New Zealand Application. In doing so, a POSA would have detected and characterized rifaximin forms δ and ε.

# EXHIBIT P

US007045620B2

(12) **United States Patent**
**Viscomi et al.**

(10) **Patent No.: US 7,045,620 B2**
(45) **Date of Patent: May 16, 2006**

(54) **POLYMORPHOUS FORMS OF RIFAXIMIN, PROCESSES FOR THEIR PRODUCTION AND USE THEREOF IN MEDICINAL PREPARATIONS**

(75) Inventors: **Giuseppe C. Viscomi**, Bologna (IT); **Manuela Campana**, Bologna (IT); **Dario Braga**, Bologna (IT); **Donatella Confortini**, Bologna (IT); **Vincenzo Cannata**, Bologna (IT); **Denis Severini**, Bologna (IT); **Paolo Righi**, Bologna (IT); **Goffredo Rosini**, Bologna (IT)

(73) Assignee: **Alfa Wassermann, S.p.A.**, Alanno (IT)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 197 days.

(21) Appl. No.: **10/728,090**

(22) Filed: **Dec. 5, 2003**

(65) **Prior Publication Data**

US 2005/0101598 A1 May 12, 2005

(30) **Foreign Application Priority Data**

Nov. 7, 2003 (IT) .......................... MI2003A2144

(51) **Int. Cl.**
***C07D 498/22*** (2006.01)

(52) **U.S. Cl.** ...................................................... **540/456**

(58) **Field of Classification Search** ................ 540/456; 514/393

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,341,785 A * 7/1982 Marchi et al. .............. 514/338
4,557,866 A 12/1985 Cannata

FOREIGN PATENT DOCUMENTS

EP 0 161 534 A2 11/1985

* cited by examiner

*Primary Examiner*—Bruck Kifle
(74) *Attorney, Agent, or Firm*—Rothwell, Figg, Ernst & Manbeck, P.C.

(57) **ABSTRACT**

Crystalline polymorphous forms of the rifaximin (INN) antibiotic named rifaximin α and rifaximin β, and a poorly crystalline form named rifaximin γ have been discovered. These forms are useful in the production of medicinal preparations for oral and topical use and can be obtained by means of a crystallization process carried out by hot-dissolving the raw rifaximin in ethyl alcohol and by causing the crystallization of the product by the addition of water at a determinate temperature and for a determinate period of time. The crystallization is followed by drying carried out under controlled conditions until a specific water content is reached in the end product.

**20 Claims, 3 Drawing Sheets**




FIGURE 1




FIGURE 2




FIGURE 3

# POLYMORPHOUS FORMS OF RIFAXIMIN, PROCESSES FOR THEIR PRODUCTION AND USE THEREOF IN MEDICINAL PREPARATIONS

## BACKGROUND OF THE INVENTION

Rifaximin (INN; see The Merck Index, XIII Ed., 8304) is an antibiotic pertaining to the rifamycin class, specifically it is a pyrido-imidazo rifamycin which is described and claimed in the Italian Patent IT 1154655. European Patent EP 0161534 describes and claims a process for its production starting from rifamycin O (The Merck Index, XIII Ed., 8301).

Both of these patents describe the purification of rifaximin in a generic way stating that the crystallization can be carried out in suitable solvents or solvent systems and summarily showing in some examples that the product coming from the reaction can be crystallized from the 7:3 mixture of ethyl alcohol/water and can be dried both under atmospheric pressure and under vacuum. Neither of these patents disclose the experimental conditions of crystallization and drying, nor any distinctive crystallographic characteristic of the resulting product.

The presence of different polymorphs was previously unknown and therefore the experimental conditions described in both patents had been developed to produce a homogeneous product having a suitable purity from the chemical point of view, apart from the crystallographic aspects of the product itself.

It has now been found, unexpectedly, that some polymorphous forms exist whose formation, in addition to the solvent, depends on the conditions of time and temperature at which both the crystallization and the drying are carried out.

These orderly polymorphous forms are identified as rifaximin α (FIG. **1**) and rifaximin β (FIG. **2**) on the basis of their respective specific diffractograms, while the poorly crystalline form with a high content of amorphous component is be identified as rifaximin γ (FIG. **3**) in the present application.

The polymorphous forms of rifaximin have been characterized using powder X-ray diffraction.

The identification and characterization of these polymorphous forms and, contemporarily, the definition of the experimental conditions for obtaining them is very important for a compound endowed with pharmacological activity which, like rifaximin, is marketed as a medicinal preparation both for human and veterinary use. It is known that the polymorphism of a compound that can be used as an active principle in a medicinal preparation can influence the pharmaco-toxicologic properties of the drug. Different polymorphous forms of an active principle can have different bioavailability, solubility, stability, colour, compressibility, flowability and workability with consequent modification of the profiles of toxicological safety, clinical effectiveness and productive efficiency.

The significance of different polymorphous forms is confirmed by the fact that the authorities which regulate the grant of authorization for the marketing of drugs require that the manufacturing methods of the active principles are standardized and controlled in such a way that they give homogeneous and sound results in terms of polymorphism of the production batches (CPMP/QWP/96, 2003—Note for Guidance on Chemistry of new Active Substance; CPMP/ICH/367/96—Note for guidance specifications: test procedures and acceptance criteria for new drug substances and new drug products: chemical substances; Date for coming into operation: May 2000).



The need for the above-mentioned standardization has been further strengthened, just in the field of rifamycin antibiotics, by Henwood S. Q., de Villiers M. M., Liebenberg W. and Lötter A. P., Drug Development and Industrial Pharmacy, 26 (4), 403–408, (2000), who have ascertained that different production batches of rifampicin (INN) made by different manufacturers show different polymorphous characteristics, and as a consequence they show different profiles of dissolution together with consequent alteration of the respective pharmacological properties.

By applying the processes of crystallization and drying generically disclosed in the previous patents IT 1154655 and EP 0161534 it has been found that under some experimental conditions the poorly crystalline form of rifaximin is obtained while under other experimental conditions the other crystalline polymorphous forms of rifaximin are obtained. Moreover it has been found that some parameters, which are not disclosed in the above-mentioned patents (e.g. the conditions of preservation and the relative humidity of the ambient) have a surprising effect on the form of the polymorph.

The polymorphous forms of rifaximin of the present patent application were not previously seen or hypothesized. The general thought at the time was that a sole homogeneous product would always be obtained regardless of which method was chosen within the range of the described conditions, irrespective of the conditions used for crystallizing, drying and preserving.

It has now been found that the formation of the α, β and γ forms depends on the presence of water within the crystallization solvent, on the temperature at which the product is crystallized and on the amount of water present into the product at the end of the drying phase.

The form α, the form β and the form γ of rifaximin have then been synthesised and they are the object of the present invention.

Moreover it has been found that the presence of water in rifaximin in the solid state is reversible, so that absorption and/or cession of water can take place under suitable ambient conditions. Consequently, rifaximin is susceptible to transition from one form to another, also remaining in the solid state, without the need to be dissolved and recrystallized. For example, the polymorph α, by adding water by hydration until a content higher than 4.5% is reached, turns into the polymorph β, which in its turn, loosing water by drying until a content lower than 4.5% is reached, turns into the polymorph α.

These results have a remarkable importance as they determine the conditions of industrial manufacturing of some steps which would previously not have been considered critical for the determination of the polymorphism of a product, like for instance the washing of a crystallized product, or the conditions of preservation of the end product, or the characteristics of the container in which the product is preserved.

The above-mentioned α, β and γ forms can be advantageously used as pure and homogeneous products in the manufacture of medicinal preparations containing rifaximin.

As previously indicated, the process for manufacturing rifaximin from rifamycin O disclosed and claimed in EP 0161534 is deficient from the point of view of the purification and identification of the product obtained. It shows some limits also from the synthetic point of view as regards, for instance, the very long reaction times, from 16 to 72

hours, which is unsuitable for industrial use and moreover because it does not provide for the in situ reduction of the oxidized rifaximin that may be formed within the reaction mixture.

Therefore, a further object of the present invention is an improved process for the industrial manufacturing of the α, β and γ forms of rifaximin, herein claimed as products and usable as defined and homogeneous active principles in the manufacture of the medicinal preparations containing such active principle.

## DESCRIPTION OF THE INVENTION

As stated above, the form α, the form β and the form γ of the antibiotic known as rifaximin (INN), processes for their production and the use thereof in the manufacture of medicinal preparations for oral or topical administration, are the object of the present invention.

One embodiment of the present invention comprises reacting one molar equivalent of rifamycin O with an excess of 2-amino-4-methylpyridine, preferably from 2.0 to 3.5 molar equivalents, in a solvent mixture made of water and ethyl alcohol in volumetric ratios between 1:1 and 2:1, for a period of time between 2 and 8 hours at a temperature between 40° C. and 60° C.

At the end of the reaction the reaction mass is cooled to room temperature and is added with a solution of ascorbic acid in a mixture of water, ethyl alcohol and aqueous concentrated hydrochloric acid, under strong stirring, in order to reduce the small amount of oxidized rifaximin that forms during the reaction. Finally the pH is brought to about 2.0 by means of a further addition of a concentrated aqueous solution of hydrochloric acid, in order to better remove the excess of 2-amino-4-methylpyridine used in the reaction. The suspension is filtered and the obtained solid is washed with the same solvent mixture water/ethyl alcohol used in the reaction. Such semifinished product is called "raw rifaximin".

The raw rifaximin can be directly submitted to the subsequent step of purification. Alternatively, if the semifinished product is to be preserved for a long time, the raw rifaximin can be dried under vacuum at a temperature lower than 65° C. for a period of time between 6 and 24 hours, such semifinished product is called "dried raw rifaximin".

The so obtained raw rifaximin and/or dried raw rifaximin are purified by dissolving them in ethyl alcohol at a temperature between 45° C. and 65° C. and by crystallizing them by addition of water, preferably in weight amounts between 15% and 70% in respect of the amount by weight of the ethyl alcohol used for the dissolution, and by keeping the obtained suspension at a temperature between 50° C. and 0° C. under stirring during a period of time between 4 and 36 hours.

The suspension is filtered and the obtained solid is washed with water and dried under vacuum or under normal pressure, with or without a drying agent, at a temperature between room temperature and 105° C. for a period of time between 2 and 72 hours.

The achievement of the α, β and γ forms depends on the conditions chosen for the crystallization. In particular, the composition of the solvent mixture from which the crystallization is carried out, the temperature at which the reaction mixture is kept after the crystallization and the period of time at which that temperature is kept, have proven to be critical.

More precisely, the rifaximin γ is obtained when the solution is brought to a temperature between 28° C. and 32° C. in order to cause the beginning of precipitation and the obtained suspension is further cooled to 0° C. and kept at this temperature for a period of time between 6 and 24 hours.

The suspension is filtered, the solid is washed with demineralized water and is dried until a water content between 1.0% and 2.0% is reached.

The α and β rifaximins are obtained when the temperature is first brought to a value between 28° C. and 32° C. in order to cause the beginning of the crystallization, then the suspension is brought to a temperature between 40° C. and 50° C. and kept at this value for a period of time between 6 and 24 hours, then the suspension is quickly cooled to 0° C., in a period of time between 15 minutes and one hour, is filtered, the solid is washed with water and then dried.

The step of drying plays an important part in obtaining the α and β polymorphous forms of the rifaximin and has to be checked by means of a suitable method for determining the water content, like for instance the Karl Fisher method, in order to check the amount of remaining water present in the product after drying.

The production of rifaximin α or of rifaximin β during drying depends on the amount of water remaining at the end, higher or lower than 4.5%, and not from the experimental conditions of pressure and temperature at which this critical limit of water percentage is achieved. In fact, the two polymorphous forms, with higher or lower water content, can be obtained by drying under vacuum or at atmospheric pressure, at room temperature or at high temperatures, in the presence or in the absence of drying agents, provided that the drying is conducted for the amount of time necessary so that the water percent characteristic for each polymorphous form is achieved.

The polymorphous form β is obtained when the drying of the product, crystallized and washed with water, is stopped at values of water higher than 4.5%, as measured by means of the Karl Fisher method, preferably between 5.0% and 6.0%. The polymorphous form α is obtained by continuing the drying until values lower than 4.5%, preferably between 2.0% and 3.0% are reached. Both the form γ and the forms α and β of rifaximin are hygroscopic, they absorb water in a reversible way in the presence of suitable conditions of pressure and humidity in the ambient environment and are susceptible of transformation from one form to another.

The polymorphous form α, kept in an ambient environment with a relative humidity higher than 50% for a period of time between 12 and 48 hours, turns into the polymorphous form β, which in turn, by drying until an amount of water lower than 4.5% is reached, preferably comprised between 2.0% and 3.0%, turns into the polymorphous form α.

Another type of transition happens between the form γ and the forms α and β. It takes place dependent upon the temperatures kept during the precipitation of rifaximin.

In particular the form γ turns into the forms α or β by keeping a suspension of the form γ of the rifaximin in a solvent mixture of ethyl alcohol/water 7:3 (V/V) at a temperature between 38° C. and 50° C. with strong stirring for a prolonged period of time, preferably between 6 and 36 hours.

Filtration and washing with demineralized water, then drying until a content of water higher than 4.5% is reached, preferably between 5.0% and 6.0%, results in the polymorphous form β, while carrying on the drying until a content of water lower than 4.5% is reached, preferably between 2.0% and 3.0%, gives the form α.

The rifaximins α and β can turn into rifaximin γ by dissolving them in ethyl alcohol and then treating the resulting solution as previously described for the preparation of the form γ.

These transitions from one form to another are very important in the ambit of the present invention, because they can be an alternative manufacturing method for obtaining the form desired for the production of the medicinal preparations. Therefore, the process that allows the conversion of rifaximin γ into rifaximin α or β in a valid industrial manner, the process that allows the conversion of rifaximin α or β into rifaximin γ in a valid industrial manner, the process that allows the conversion of rifaximin α into rifaximin β in a valid industrial manner or rifaximin β into rifaximin α, are important parts of the present invention.

The process concerning the transformation of rifaximin γ into rifaximin α or rifaximin β comprises suspending rifaximin γ in a solvent mixture made of ethyl alcohol/water in the volumetric ratio 7:3, warming the suspension until a temperature between 38° C. and 50° C. is reached and keeping it at this temperature under strong stirring for a period of time between 6 and 36 hours. The suspension is then filtered, the solid is washed with water and dried resulting in the polymorphous form β when the drying is carried on until a water percent between 5.0% and 6.0% as measured with the Karl Fisher method is reached, and the polymorphous form α when the drying is continued until a water percent between 2.0% and 3.0% is reached.

The process for getting the form γ starting from rifaximin α or β comprises dissolving the α or β form in ethyl alcohol with stirring, at a temperature between 50° C. and 60° C., adding demineralized water until an ethyl alcohol/water volumetric ratio of 7:3 is reached, cooling the solution under strong stirring to 30° C., cooling the plentiful precipitate to 0° C. and keeping the suspension under stirring at 0° C. for a period of time between 6 and 24 hours. The suspension is then filtered, the solid is washed with water and dried until a water percent lower than 2.0% is reached, thereby obtaining rifaximin γ.

The process concerning the transformation of the form α into the form β consists of keeping the rifaximin α, in the powder form, in an ambient environment having a rate of relative humidity higher than 50% for a period of time necessary, generally between 12 and 48 hours, in order to get a water content in the powder higher than 4.5%.

The process concerning the transformation of the form β into the form α consists of submitting the powder of rifaximin β to a process of drying under vacuum or under conditions of normal pressure, with or without a drying agent, at a temperature between room temperature and 105° C., for a period of time between 2 and 72 hours, in order to get the water content in the powder lower than 4.5%, preferably between 2.0% and 3.0%.

From the above discussion, it is clear that during the phase of preservation of the product particular care has to be taken so that the ambient conditions do not change the water content of the product. This can be achieved by preserving the product in ambients having controlled humidity or in closed containers that do not allow a significant exchange of water with the exterior ambient environment.

The polymorph called rifaximin α is characterised by a water content lower than 4.5%, preferably between 2.0% and 3.0% and from a powder X-ray diffractogram (reported in FIG. **1**) which shows peaks at the values of the diffraction angles 2θ of 6.6°; 7.4°; 7.9°; 8.8°; 10.5°; 11.1°; 11.8°; 12.9°; 17.6°; 18.5°; 19.7°; 21.0°; 21.4°; 22.1°. The polymorph called rifaximin β is characterized by a water content higher than 4.5%, preferably between 5.0% and 6.0%, and from a powder X-ray diffractogram (reported in FIG. **2**) which shows peaks at the values of the diffraction angles 2θ of 5.4°; 6.4°; 7.0°; 7.8°; 9.0°; 10.4°; 13.1°; 14.4°; 17.1°; 17.9°; 18.3°; 20.9°.

The polymorph called rifaximin γ is characterized by a much poorer powder X-ray diffractogram because of the poor crystallinity; the significant peaks are at the values of the diffraction angles 2θ of 5.0°; 7.1°; 8.4° as reported in FIG. **3**.

The diffractograms have been carried out by means of the Philips X'Pert instrument endowed with Bragg-Brentano geometry and under the following working conditions:

X-ray tube: Copper

Radiation used: K (α**1**), K (α**2**)

Tension and current of the generator: KV 40, mA 40

Monocromator: Graphite

Step size: 0.02

Time per step: 1.25 seconds

Starting and final angular 2θ value: 3.0°÷30.0°

The evaluation of the content of water present in the analyzed samples has always been carried out by means of the Karl Fisher method.

The forms α, β and γ can be advantageously used in the production of medicinal preparations having antibiotic activity, containing rifaximin, for both oral and topical use. The dosage is generally between 10 mg to 10 g, preferably 20 mg to 5 g per day per adult. If rifaximins α, β or γ are combined with other known antibiotics such as erythromycin, fluoroquinolones, vancomycin, tetracyclines, trimetoprim, fusidic acid, isoniazid, fosfomycin, clofazmin, dapsone, or aminoside, the dosage of rifaximin can be suitably adjusted.

The medicinal preparations for oral use contain rifaximin α or β or γ together with the usual excipients as diluting agents like mannitol, lactose and sorbitol; binding agents like starchs, gelatines, sugars, cellulose derivatives, natural gums and polyvinylpyrrolidone; lubricating agents like talc, stearates, hydrogenated vegetable oils, polyethylenglycol and colloidal silicon dioxide; disintegrating agents like starchs, celluloses, alginates, gums and reticulated polymers; coloring, flavoring and sweetening agents.

All the solid preparations administrable by oral route can be used in the ambit of the present invention, for instance coated and uncoated tablets, capsules made of soft and hard gelatin, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packets.

The medicinal preparations for topical use contain rifaximin α or β or γ together with the usual excipients like white petrolatum, white wax, lanolin and derivatives thereof, stearylic alcohol, propylenglycol, sodium lauryl sulfate, ethers of the fatty polyoxyethylene alcohols, esters of the fatty polyoxyethylene acids, sorbitan monostearate, glyceryl monostearate, propylene glycol monostearate, polyethylene glycols, methylcellulose, hydroxymethylpropylcellulose, sodium carboxymethylcellulose, colloidal aluminium and magnesium silicate, sodium alginate.

All the topical preparations can be used in the ambit of the present invention, for instance the ointments, the pomades, the creams, the gels and the lotions.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a diffractogram of polymorph alpha.

FIG. **2** shows a diffractogram of polymorph beta.

FIG. **3** shows a diffractogram of polymorph gamma.

The invention is hereinbelow illustrated by some examples which are not intended to limit the invention. The results show that the forms α, β and γ can be obtained by manipulating the above mentioned conditions of crystallization and drying.

EXAMPLE 1

Preparation of Raw Rifaximin and of Dried Raw Rifaximin

In a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, 120 ml of demineralized water, 96 ml of ethyl alcohol, 63.5 g of rifamycin O and 27.2 g of 2-amino-4-methylpyridine are loaded in succession at room temperature. After the loading, the mass is heated at 47±3° C., is kept under stirring at this temperature for 5 hours, then is cooled to 20±3° C. and, during 30 minutes, is added with a mixture, prepared separately, made of 9 ml of demineralized water, 12.6 ml of ethyl alcohol, 1.68 g of ascorbic acid and 9.28 g of aqueous concentrated hydrochloric acid. At the end of the addition, the mass is kept under stirring for 30 minutes at an interior temperature of 20±3° C. and then, at the same temperature, 7.72 g of concentrated hydrochloric acid are dripped until a pH equal to 2.0.

At the end of the addition, the mass is kept under stirring, always at an interior temperature equal to 20° C., for 30 minutes, then the precipitate is filtered and washed by means of a mixture made of 32 ml of demineralized water and of 25 ml of ethyl alcohol. The so obtained "raw rifaximin" (89.2 g) is dried under vacuum at room temperature for 12 hours obtaining 64.4 g of "dried raw rifaximin" which shows a water content equal to 5.6% and a diffractogram corresponding to the polymorphous form β. The product by further drying under vacuum until constant weight gives 62.2 g of dried raw rifaximin having a water content equal to 2.2%, whose diffractogram corresponds to the polymorphous form α.

The product is hygroscopic and the obtained polymorphous form is reversible: the polymorphous form α absorbs water from the atmospheric humidity until to reach, dependent upon the relative humidity and the time of exposure, a water content higher than 4.5% and to turn into the polymorphous form β which in its turn, by drying loses part of the water turning into the polymorphous form α with a water content between 2.0% and 3.0%.

EXAMPLE 2

Preparation of Rifaximin γ

163 Ml of ethyl alcohol and 62.2 g of dried raw rifaximin are loaded at room temperature into a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser. The suspension is heated at 57±3° C. under stirring until complete dissolution of the solid and at this temperature 70 ml of demineralized water are added in 30 minutes. After the end of the addition the temperature is brought to 30° C. in 40 minutes and is kept at this value until plentiful crystallization, then the temperature is further lowered to 0° C. during 2 hours and kept at this value for 6 hours. The suspension is then filtered and the solid is washed with 180 g of demineralized water.

After drying under vacuum at room temperature until constant weight, 52.7 g of pure rifaximin γ are obtained showing a water content equal to 1.5%.

The form γ is characterized from a powder X-ray diffractogram showing significant peaks at diffraction angles 2θ of 5.0°; 7.1°; 8.4°.

EXAMPLE 3

Preparation of Rifaximin α

62.2 Grams of dried raw rifaximin and 163 ml of ethyl alcohol are loaded at room temperature into a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser. The suspension is heated at 57±3° C. until complete dissolution of the solid and then 70 ml of demineralized water are added at this temperature during 30 minutes. After the end of the addition the temperature is brought to 30° C. during 40 minutes and is kept at this value until plentiful crystallization. The temperature of the suspension is then brought to about 40° C. and kept at this value during 20 hours under stirring; then the temperature is brought at 0° C. during 30 minutes and the suspension is immediately filtered. The solid is washed with 180 ml of demineralized water and dried under vacuum at room temperature until constant weight obtaining 51.9 g of rifaximin form ox with a water content equal to 2.5% and a powder X-ray diffractogram showing peaks at values of angles 2θ of 6.6°; 7.4°; 7.9°; 8.8°; 10.5°; 11.1°; 11.8°; 12.9°; 17.6°; 18.5°; 19.7°; 21.0°; 21.4°; 22.1°.

EXAMPLE 4

Preparation of Rifaximin α

89.2 Grams of raw rifaximin and 170 ml of ethyl alcohol are loaded at room temperature into a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, then the suspension is heated at 57±3° C. until complete dissolution of the solid. The temperature is brought to 50° C. and then 51.7 ml of demineralized water are added at this temperature during 30 minutes. After the end of the addition the temperature is brought to 30° C. in one hour and the suspension is kept for 30 minutes at this temperature obtaining a plentiful crystallization. The temperature of the suspension is brought to 40° C. and kept at this value during 20 hours under stirring and then further lowered to 0° C. during 30 minutes after which the suspension is immediately filtered. The solid is washed with 240 ml of demineralized water and dried under vacuum at 65° C. until constant weight obtaining 46.7 g of rifaximin α with a water content equal to 2.5%.

EXAMPLE 5

Preparation of Rifaximin α

Example 3 is repeated by increasing at 50° C. the temperature at which the suspension is kept and lowering to 7 hours the time in which the suspension is kept at this temperature. The product obtained is equal to that of example 3.

EXAMPLE 6

Preparation of Rifaximin β

The crystallization of the dried raw rifaximin is carried out according to the method described in example 3. The drying under vacuum at room temperature is checked by means of the Karl Fisher method and is stopped when the water content reaches 5.0%: 52.6 g of rifaximin β are obtained characterized from a powder X-ray diffractogram showing peaks at values of angles 2θ of 5.4°; 6.4°; 7.0°; 7.8°; 9.0°; 10.4°; 13.1°, 14.4°; 17.1°; 17.9°; 18.3°; 20.9°.

EXAMPLE 7

Preparation of Rifaximin α Starting from Rifaximin γ

5 Grams of rifaximin γ are suspended in a mixture made of 13 ml of ethyl alcohol and 5.6 ml of water and the suspension is heated at 40° C. during 24 hours under stirring in a 50 ml flask equipped with condenser, thermometer and mechanic stirrer. The suspension is then filtered and the solid is washed with water and then dried under vacuum at room temperature until constant weight. 4 Grams of rifaximin are obtained showing a powder X-ray diffractogram corresponding to that of the polymorphous form α and a water content equal to 2.6%.

EXAMPLE 8

Preparation of Rifaximin γ Starting from Rifaximin α

15 Grams of rifaximin form α and 52.4 ml of ethyl alcohol are loaded into a 250 ml three-necked flask equipped with reflux condenser, thermometer and mechanical stirrer; the suspension is heated under stirring at the temperature of 50° C. until complete dissolution of the solid.

The limpid solution is added with 22.5 ml of water during 30 minutes under stirring, cooled to 30° C. and kept at this temperature during 30 minutes. The formed suspension is cooled to 0° C. under strong stirring and kept at this temperature during 6 hours. A part of the suspension is taken after this period of time, filtered, washed with demineralized water and dried under vacuum at 30° C. until constant weight.

The so obtained product, 3.7 g, shows a diffractogram consistent with that of the form γ and a water content equal to 1.7%.

The remaining part of the suspension is kept at 0° C. for further 18 hours under strong stirring and then is filtered, washed with demineralized water and dried at 30° C. under vacuum until constant weight. 9 Grams of product showing a diffractogram consistent with that of the form γ and a water content equal to 1.6% are obtained.

EXAMPLE 9

Preparation of Rifaximin α Starting from Rifaximin β

5 Grams of rifaximin β having a water content equal to 5.0% are dried under vacuum at +30° C. during 8 hours obtaining 4.85 g of rifaximin α having a water content equal to 2.3%.

EXAMPLE 10

Preparation of Rifaximin β Starting from Rifaximin α

5 Grams of rifaximin α having a water content equal to 2.5% are kept during 40 hours in an atmosphere containing a relative humidity equal to 56% made by means of a saturated aqueous solution of calcium nitrate tetrahydrate. 5.17 Grams of rifaximin β with a water content equal to 5.9% are obtained after this time.

The invention claimed is:

**1**. A purified rifaximin α, a polymorph of the antibiotic rifaximin, wherein said rifaximin α has a water content of 3% or less, and produces a powder X-ray diffractogram showing peaks at values of the diffraction angles 2θ of 6.6°; 7.4°; 7.9°; 8.8°; 10.5°; 11.1°; 11.8°; 12.9°; 17.6°; 18.5°; 19.7°; 21.0°; 21.4°; 22.1°.

**2**. The rifaximin α according to claim **1**, wherein said water content is between 2.0% and 3.0%.

**3**. A purified rifaximin β, a polymorph of the antibiotic rifaximin wherein said rifaximin β has a water content higher than 4.5% and produces a powder X-ray diffractogram showing peaks at values of the diffraction angles 2θ of 5.4°; 6.4°; 7.0°; 7.8°; 9.0°; 10.4°; 13.1°, 14.4°; 17.1°; 17.9°; 18.3°; 20.9°.

**4**. The rifaximin β according to claim **3**, wherein said water content is between 5.0% and 6.0%.

**5**. A purified rifaximin γ, a polymorph of the antibiotic rifaximin wherein said rifaximin γ has a water content between 1.0% and 2.0% and produces a powder X-ray diffractogram showing a mainly amorphous profile and few significant peaks at values of diffraction angles 2θ of 5.0°; 7.1°; 8.4°.

**6**. A process for the production of rifaximins α, β and γ, comprising:

reacting a molar equivalent of rifamycin O with an excess of 2-amino-4-methylpyridine in a solvent mixture of water and ethyl alcohol in a volumetric ratio between 1:1 and 2:1, for a period of time between 2 and 8 hours, at a temperature between 40° C. and 60° C.,

treating the reaction mass at room temperature with a solution of ascorbic acid in a mixture of water, ethyl alcohol and concentrated aqueous hydrochloric acid,

adjusting the pH of the reaction mass to pH 2.0 with a concentrated aqueous solution of hydrochloric acid,

filtering the suspension,

washing any resulting solid with the water/ethyl alcohol solvent mixture to obtain raw rifaximin,

purifying the raw rifaximin by dissolving it in ethyl alcohol at a temperature between 45° C. and 65° C.,

precipitating the raw rifaximin by adding water and by lowering the temperature of the suspension to between 0° C. to 50° C. under stirring for a period of time between 4 and 36 hours,

filtering the suspension,

washing the resulting solid with water, and

drying it under vacuum or under conditions of normal pressure, with or without a drying agent, at a temperature between room temperature and 105° C., for a period of time between 2 and 72 hours to the water content required to form rifaximin α, β or γ.

**7**. The process according to claim **6**, wherein said 2-amino-4-methylpyridine is from 2.0 to 3.5 molar equivalents.

**8**. The process according to claim **6**, wherein said water added to precipitate the raw rifaximin is in a weight amount between 15% and 70% with respect to the weight amount of ethyl alcohol used for the dissolution.

**9**. The process according to claim **6** for the production of rifaximin α, wherein after the addition of water to the raw rifaximin, the temperature is lowered to a value between 28° C. and 32° C. in order to cause the beginning of the crystallization,

stirring the resulting suspension at a temperature between 40° C. and 50° C. for a period of time between 6 and 24 hours,

cooling the suspension to 0° C. for a period of time between 15 minutes and one hour,

filtering the suspension, washing the resulting solid with water, and

drying the washed solid until a water content lower than 4.5% is reached.

**10**. The process according to claim **9**, wherein said water content is between 2.0% and 3.0%.

**11**. The process according to claim **6** for the production of rifaximin β,

wherein after the addition of water to the raw rifaximin, the temperature is lowered to a value between 28° C. and 32° C. in order to cause the beginning of the crystallization,

stirring the resulting suspension at a temperature between 40° C. and 50° C. for a period of time between 6 and 24 hours,

cooling the suspension to 0° C. for a period of time between 15 minutes and one hour,

filtering the suspension, washing the resulting solid with water, and drying the washed solid until a water content higher than 4.5% is reached.

**12**. The process according to claim **11**, wherein said water content is between 5.0% and 6.0%.

**13**. The process according to claim **6** for the production of rifaximin γ, wherein after the addition of water to the raw rifaximin, the temperature is lowered to a value between 28° C. and 32° C. in order to cause the beginning of the crystallization,

cooling the suspension to 0° C. for a period of time between 6 and 24 hours,

filtering the suspension, washing the resulting solid with water and

drying the washed solid until a water content between 1.0% and 2.0% is reached.

**14**. A process for the production of rifaximin α, comprising suspending rifaximin γ in a solvent mixture of ethyl alcohol/water in a volumetric ratio of 7:3,

heating the suspension at a temperature between 38° C. and 50° C., under stirring, for a period of time between 6 and 36 hours,

filtering the suspension,

washing the resulting solid with water, and

drying the washed solid until a water content lower than 4.5% is reached.

**15**. The process according to claim **14**, wherein said water content is between 2.0% and 3.0%.

**16**. A process for the production of rifaximin β, comprising

suspending rifaximin γ in a solvent mixture of ethyl alcohol/water in a volumetric ratio of 7:3,

heating the suspension at a temperature between 38° C. and 50° C., under stirring, for a period of time between 6 and 36 hours,

filtering the suspension,

washing the resulting solid with water, and

drying the washed solid until a water content higher than 4.5% is reached.

**17**. The process according to claim **16**, wherein said water content is between 5.0% and 6.0%.

**18**. A process for the production of rifaximin γ, comprising

dissolving rifaximin α or β in ethyl alcohol at a temperature between 50° C. and 60° C.,

adding demineralized water until an ethyl alcohol/water volumetric ratio equal to 7:3 is reached,

cooling the solution to 30° C. under strong stirring,

further cooling the resulting suspension to 0° C. for a period of time between 6 and 24 hours,

filtering said suspension,

washing the resulting solid with water, and

drying the solid until a water content lower than 2.0% is reached.

**19**. A process for the production of rifaximin β, comprising keeping rifaximin α in an ambient environment having a relative humidity higher than 50% for a period of time between 12 and 48 hours until said rifaximin α is converted into rifaximin β.

**20**. A process for the production of rifaximin α, comprising drying rifaximin β under atmospheric pressure, or under vacuum, or in the presence of a drying agent, at a temperature between the room temperature and 105° C., for a period of time between 2 and 72 hours until said rifaximin β is converted into rifaximin α.

* * * * *

# EXHIBIT Q

(19) INTELLECTUAL PROPERTY OFFICE

(11) Publication number: **NZ 531622 A**

(41) Publication date: **29.10.2004**

(51) Int. Cl: **C07D491/22; A61K31/44;**

(12) Patent Application

(21) Application number: **NZ20040531622**

(22) Date of filing: **09.03.2004**

(30) Priority: **2003MI02144 IT 07.11.2003**

(71) Applicant(s): **ALFA WASSERMANN S**

(72) Inventor(s): **VISCOMI GIUSEPPE C**
**CAMPANA MANUELA**
**BRAGA DARIO**
**CONFORTINI DONATELLA**
**CANNATA VINCENZO**
**SEVERINI DENIS**
**RIGHI PAOLO**
**ROSINI GOGGREDO**

(54) **Title:**
**Polymorphous forms of rifaximin, processes for their production and use thereof in medicinal preparations**

(57) **Abstract:**
Disclosed herein are a, b and g polymorphous forms of rifaximin, wherein the formation of the a, b and g forms depends on the presence of water within the crystallisation solvent, on the temperature at which the product is crystallised and the amount of water present into the product at the end of the drying phase. Processes for the production of a, b and g polymorphs of rifaximin and their pharmaceutical compositions are also disclosed.

Disclosed herein are , and polymorphous forms of rifaximin, wherein the formation of the , and forms depends on the presence of water within the crystallisation solvent, on the temperature at which the product is crystallised and the amount of water present into the product at the end of the drying phase. Processes for the production of , and polymorphs of rifaximin and their pharmaceutical compositions are also disclosed.

531622

NEW ZEALAND

PATENTS ACT, 1953

INTELLECTUAL PROPERTY OFFICE OF N.Z
- 9 MAR 2004
RECEIVED

No:

Date:

**COMPLETE SPECIFICATION**

POLYMORPHOUS FORMS OF RIFAXIMIN, PROCESSES FOR THEIR PRODUCTION AND USE THEREOF IN MEDICINAL PREPARATIONS

We, ALFA WASSERMANN S.P.A., an Italian company of Contrada S. Emidio, Alanno, Italy, do hereby declare the invention for which we pray that a patent may be granted to us, and the method by which it is to be performed, to be particularly described in and by the following statement:



(followed by page 1 a)

# POLYMORPHOUS FORMS OF RIFAXIMIN, PROCESSES FOR THEIR PRODUCTION AND USE THEREOF IN MEDICINAL PREPARATIONS

**Background of the invention**

Rifaximin (INN; see The Merck Index, XIII Ed., 8304) is an antibiotic pertaining to the rifamycin class, specifically it is a pyrido-imidazo rifamycin which is described and claimed in the Italian Patent IT 1154655. European Patent EP 0161534 describes and claims a process for its production starting from rifamycin O (The Merck Index, XIII Ed., 8301).

Both of these patents describe the purification of rifaximin in a generic way stating that the crystallization can be carried out in suitable solvents or solvent systems and summarily showing in some examples that the product coming from the reaction can be crystallized from the 7:3 mixture of ethyl alcohol/water and can be dried both under atmospheric pressure and under vacuum. Neither of these patents disclose the experimental conditions of crystallization and drying, nor any distinctive crystallographic characteristic of the resulting product.

The presence of different polymorphs was previously unknown and therefore the experimental conditions described in both patents had been developed to produce a homogeneous product having a suitable purity from the chemical point of view, apart from the crystallographic aspects of the product itself.

It has now been found, unexpectedly, that some polymorphous forms exist whose formation, in addition to the solvent, depends on the conditions of time and temperature at which both the crystallization and the drying are carried out.

These orderly polymorphous forms are identified as rifaximin α (figure

1) and rifaximin β (figure 2) on the basis of their respective specific diffractograms, while the poorly crystalline form with a high content of amorphous component is be identified as rifaximin γ (figure 3) in the present application.

The polymorphous forms of rifaximin have been characterized using powder X-ray diffraction.

The identification and characterization of these polymorphous forms and, contemporarily, the definition of the experimental conditions for obtaining them is very important for a compound endowed with pharmacological activity which, like rifaximin, is marketed as a medicinal preparation both for human and veterinary use. It is known that the polymorphism of a compound that can be used as an active principle in a medicinal preparation can influence the pharmaco-toxicologic properties of the drug. Different polymorphous forms of an active principle can have different bioavailability, solubility, stability, colour, compressibility, flowability and workability with consequent modification of the profiles of toxicological safety, clinical effectiveness and productive efficiency.

The significance of different polymorphous forms is confirmed by the fact that the authorities which regulate the grant of authorization for the marketing of drugs require that the manufacturing methods of the active principles are standardized and controlled in such a way that they give homogeneous and sound results in terms of polymorphism of the production batches (CPMP/QWP/96, 2003 - Note for Guidance on Chemistry of new Active Substance; CPMP/ICH/367/96 - Note for guidance specifications: test procedures and acceptance criteria for new drug substances and new drug products: chemical substances; Date for coming into operation: May 2000).

The need for the above-mentioned standardization has been further strengthened, just in the field of rifamycin antibiotics, by Henwood S.Q., de

Villiers M.M., Liebenberg W. and Lötter A.P., Drug Development and Industrial Pharmacy, 26 (4), 403-408, (2000), who have ascertained that different production batches of rifampicin (INN) made by different manufacturers show different polymorphous characteristics, and as a consequence they show different profiles of dissolution together with consequent alteration of the respective pharmacological properties.

By applying the processes of crystallization and drying generically disclosed in the previous patents IT 1154655 and EP 0161534 it has been found that under some experimental conditions the poorly crystalline form of rifaximin is obtained while under other experimental conditions the other crystalline polymorphous forms of rifaximin are obtained. Moreover it has been found that some parameters, which are not disclosed in the above-mentioned patents (e.g. the conditions of preservation and the relative humidity of the ambient) have a surprising effect on the form of the polymorph.

The polymorphous forms of rifaximin of the present patent application were not previously seen or hypothesized. The general thought at the time was that a sole homogeneous product would always be obtained regardless of which method was chosen within the range of the described conditions, irrespective of the conditions used for crystallizing, drying and preserving.

It has now been found that the formation of the $\alpha$, $\beta$ and $\gamma$ forms depends on the presence of water within the crystallization solvent, on the temperature at which the product is crystallized and on the amount of water present into the product at the end of the drying phase.

The form $\alpha$, the form $\beta$ and the form $\gamma$ of rifaximin have then been synthesised and they are the object of the present invention.

Moreover it has been found that the presence of water in rifaximin in the solid state is reversible, so that absorption and/or cession of water can take

place under suitable ambient conditions. Consequently, rifaximin is susceptible to transition from one form to another, also remaining in the solid state, without the need to be dissolved and recrystallized. For example, the polymorph α, by adding water by hydration until a content higher than 4.5% is reached, turns into the polymorph β, which in its turn, loosing water by drying until a content lower than 4.5% is reached, turns into the polymorph α.

These results have a remarkable importance as they determine the conditions of industrial manufacturing of some steps which would previously not have been considered critical for the determination of the polymorphism of a product, like for instance the washing of a crystallized product, or the conditions of preservation of the end product, or the characteristics of the container in which the product is preserved.

The above-mentioned α, β and γ forms can be advantageously used as pure and homogeneous products in the manufacture of medicinal preparations containing rifaximin.

As previously indicated, the process for manufacturing rifaximin from rifamycin O disclosed and claimed in EP 0161534 is deficient from the point of view of the purification and identification of the product obtained. It shows some limits also from the synthetic point of view as regards, for instance, the very long reaction times, from 16 to 72 hours, which is unsuitable for industrial use and moreover because it does not provide for the in situ reduction of the oxidized rifaximin that may be formed within the reaction mixture.

Therefore, a further object of the present invention is an improved process for the industrial manufacturing of the α, β and γ forms of rifaximin, herein claimed as products and usable as defined and homogeneous active principles in the manufacture of the medicinal preparations containing such active principle.

**Description of the invention**

As stated above, the form α, the form β and the form γ of the antibiotic known as rifaximin (INN), processes for their production and the use thereof in the manufacture of medicinal preparations for oral or topical administration, are the object of the present invention.

One embodiment of the present invention comprises reacting one molar equivalent of rifamycin O with an excess of 2-amino-4-methylpyridine, preferably from 2.0 to 3.5 molar equivalents, in a solvent mixture made of water and ethyl alcohol in volumetric ratios between 1:1 and 2:1, for a period of time between 2 and 8 hours at a temperature between 40°C and 60°C.

At the end of the reaction the reaction mass is cooled to room temperature and is added with a solution of ascorbic acid in a mixture of water, ethyl alcohol and aqueous concentrated hydrochloric acid, under strong stirring, in order to reduce the small amount of oxidized rifaximin that forms during the reaction. Finally the pH is brought to about 2.0 by means of a further addition of a concentrated aqueous solution of hydrochloric acid, in order to better remove the excess of 2-amino-4-methylpyridine used in the reaction. The suspension is filtered and the obtained solid is washed with the same solvent mixture water/ethyl alcohol used in the reaction. Such semifinished product is called "raw rifaximin".

The raw rifaximin can be directly submitted to the subsequent step of purification. Alternatively, if the semifinished product is to be preserved for a long time, the raw rifaximin can be dried under vacuum at a temperature lower than 65°C for a period of time between 6 and 24 hours, such semifinished product is called "dried raw rifaximin".

The so obtained raw rifaximin and/or dried raw rifaximin are purified by dissolving them in ethyl alcohol at a temperature between 45°C and 65°C and by crystallizing them by addition of water, preferably in weight amounts

between 15% and 70% in respect of the amount by weight of the ethyl alcohol used for the dissolution, and by keeping the obtained suspension at a temperature between 50°C and 0°C under stirring during a period of time between 4 and 36 hours.

The suspension is filtered and the obtained solid is washed with water and dried under vacuum or under normal pressure, with or without a drying agent, at a temperature between room temperature and 105°C for a period of time between 2 and 72 hours.

The achievement of the α, β and γ forms depends on the conditions chosen for the crystallization. In particular, the composition of the solvent mixture from which the crystallization is carried out, the temperature at which the reaction mixture is kept after the crystallization and the period of time at which that temperature is kept, have proven to be critical.

More precisely, the rifaximin γ is obtained when the solution is brought to a temperature between 28°C and 32°C in order to cause the beginning of precipitation and the obtained suspension is further cooled to 0°C and kept at this temperature for a period of time between 6 and 24 hours.

The suspension is filtered, the solid is washed with demineralized water and is dried until a water content between 1.0% and 2.0% is reached.

The α and β rifaximins are obtained when the temperature is first brought to a value between 28°C and 32°C in order to cause the beginning of the crystallization, then the suspension is brought to a temperature between 40°C and 50°C and kept at this value for a period of time between 6 and 24 hours, then the suspension is quickly cooled to 0°C, in a period of time between 15 minutes and one hour, is filtered, the solid is washed with water and then dried.

The step of drying plays an important part in obtaining the α and β polymorphous forms of the rifaximin and has to be checked by means of a

suitable method for determining the water content, like for instance the Karl Fisher method, in order to check the amount of remaining water present in the product after drying.

The production of rifaximin α or of rifaximin β during drying depends on the amount of water remaining at the end, higher or lower than 4.5%, and not from the experimental conditions of pressure and temperature at which this critical limit of water percentage is achieved. In fact, the two polymorphous forms, with higher or lower water content, can be obtained by drying under vacuum or at atmospheric pressure, at room temperature or at high temperatures, in the presence or in the absence of drying agents, provided that the drying is conducted for the amount of time necessary so that the water percent characteristic for each polymorphous form is achieved.

The polymorphous form β is obtained when the drying of the product, crystallized and washed with water, is stopped at values of water higher than 4.5%, as measured by means of the Karl Fisher method, preferably between 5.0% and 6.0%. The polymorphous form α is obtained by continuing the drying until values lower than 4.5%, preferably between 2.0% and 3.0% are reached. Both the form γ and the forms α and β of rifaximin are hygroscopic, they absorb water in a reversible way in the presence of suitable conditions of pressure and humidity in the ambient environment and are susceptible of transformation from one form to another.

The polymorphous form α, kept in an ambient environment with a relative humidity higher than 50% for a period of time between 12 and 48 hours, turns into the polymorphous form β, which in turn, by drying until an amount of water lower than 4.5% is reached, preferably comprised between 2.0% and 3.0%, turns into the polymorphous form α.

Another type of transition happens between the form γ and the forms α and β. It takes place dependent upon the temperatures kept during the

precipitation of rifaximin.

In particular the form γ turns into the forms α or β by keeping a suspension of the form γ of the rifaximin in a solvent mixture of ethyl alcohol/water 7:3 (V/V) at a temperature between 38°C and 50°C with strong stirring for a prolonged period of time, preferably between 6 and 36 hours.

Filtration and washing with demineralized water, then drying until a content of water higher than 4.5% is reached, preferably between 5.0% and 6.0%, results in the polymorphous form β, while carrying on the drying until a content of water lower than 4.5% is reached, preferably between 2.0% and 3.0%, gives the form α.

The rifaximins α and β can turn into rifaximin γ by dissolving them in ethyl alcohol and then treating the resulting solution as previously described for the preparation of the form γ.

These transitions from one form to another are very important in the ambit of the present invention, because they can be an alternative manufacturing method for obtaining the form desired for the production of the medicinal preparations. Therefore, the process that allows the conversion of rifaximin γ into rifaximin α or β in a valid industrial manner, the process that allows the conversion of rifaximin α or β into rifaximin γ in a valid industrial manner, the process that allows the conversion of rifaximin α into rifaximin β in a valid industrial manner or rifaximin β into rifaximin α, are important parts of the present invention.

The process concerning the transformation of rifaximin γ into rifaximin α or rifaximin β comprises suspending rifaximin γ in a solvent mixture made of ethyl alcohol/water in the volumetric ratio 7:3, warming the suspension until a temperature between 38°C and 50°C is reached and keeping it at this temperature under strong stirring for a period of time between 6 and 36 hours. The suspension is then filtered, the solid is washed with water and dried

resulting in the polymorphous form β when the drying is carried on until a water percent between 5.0% and 6.0% as measured with the Karl Fisher method is reached, and the polymorphous form α when the drying is continued until a water percent between 2.0% and 3.0% is reached.

The process for getting the form γ starting from rifaximin α or β comprises dissolving the α or β form in ethyl alcohol with stirring, at a temperature between 50°C and 60°C, adding demineralized water until an ethyl alcohol/water volumetric ratio of 7:3 is reached, cooling the solution under strong stirring to 30°C, cooling the plentiful precipitate to 0°C and keeping the suspension under stirring at 0°C for a period of time between 6 and 24 hours. The suspension is then filtered, the solid is washed with water and dried until a water percent lower than 2.0% is reached, thereby obtaining rifaximin γ.

The process concerning the transformation of the form α into the form β consists of keeping the rifaximin α, in the powder form, in an ambient environment having a rate of relative humidity higher than 50% for a period of time necessary, generally between 12 and 48 hours, in order to get a water content in the powder higher than 4.5%.

The process concerning the transformation of the form β into the form α consists of submitting the powder of rifaximin β to a process of drying under vacuum or under conditions of normal pressure, with or without a drying agent, at a temperature between room temperature and 105°C, for a period of time between 2 and 72 hours, in order to get the water content in the powder lower than 4.5%, preferably between 2.0% and 3.0%.

From the above discussion, it is clear that during the phase of preservation of the product particular care has to be taken so that the ambient conditions do not change the water content of the product. This can be achieved by preserving the product in ambients having controlled humidity or

in closed containers that do not allow a significant exchange of water with the exterior ambient environment.

The polymorph called rifaximin α is characterised by a water content lower than 4.5%, preferably between 2.0% and 3.0% and from a powder X-ray diffractogram (reported in figure 1) which shows peaks at the values of the diffraction angles 2θ of 6.6°; 7.4°; 7.9°; 8.8°; 10.5°; 11.1°; 11.8°; 12.9°; 17.6°; 18.5°; 19.7°; 21.0°; 21.4°; 22.1°. The polymorph called rifaximin β is characterized by a water content higher than 4.5%, preferably between 5.0% and 6.0%, and from a powder X-ray diffractogram (reported in figure 2) which shows peaks at the values of the diffraction angles 2θ of 5.4°; 6.4°; 7.0°; 7.8°; 9.0°; 10.4°; 13.1°; 14.4°; 17.1°; 17.9°; 18.3°; 20.9°.

The polymorph called rifaximin γ is characterized by a much poorer powder X-ray diffractogram because of the poor crystallinity; the significant peaks are at the values of the diffraction angles 2θ of 5.0°; 7.1°; 8.4° as reported in figure 3.

The diffractograms have been carried out by means of the Philips X'Pert instrument endowed with Bragg-Brentano geometry and under the following working conditions:

X-ray tube: **Copper**

Radiation used: **K (α1), K (α2)**

Tension and current of the generator: **KV 40, mA 40**

Monocromator: **Graphite**

Step size: **0.02**

Time per step: **1.25 seconds**

Starting and final angular 2θ value: **3.0°÷30.0°**

The evaluation of the content of water present in the analyzed samples has always been carried out by means of the Karl Fisher method.

The forms α, β and γ can be advantageously used in the production of

medicinal preparations having antibiotic activity, containing rifaximin, for both oral and topical use. The dosage is generally between 10 mg to 10 g, preferably 20 mg to 5 g per day per adult. If rifaximins α, β or γ are combined with other known antibiotics such as erythromycin, fluoroquinolones, vancomycin, tetracyclines, trimetoprim, fusidic acid, isoniazid, fosfomycin, clofazmin, dapsone, or aminoside, the dosage of rifaximin can be suitably adjusted.

The medicinal preparations for oral use contain rifaximin α or β or γ together with the usual excipients as diluting agents like mannitol, lactose and sorbitol; binding agents like starchs, gelatines, sugars, cellulose derivatives, natural gums and polyvinylpyrrolidone; lubricating agents like talc, stearates, hydrogenated vegetable oils, polyethylenglycol and colloidal silicon dioxide; disintegrating agents like starchs, celluloses, alginates, gums and reticulated polymers; coloring, flavoring and sweetening agents.

All the solid preparations administrable by oral route can be used in the ambit of the present invention, for instance coated and uncoated tablets, capsules made of soft and hard gelatin, sugar-coated pills, lozenges, wafer sheets, pellets and powders in sealed packets.

The medicinal preparations for topical use contain rifaximin α or β or γ together with the usual excipients like white petrolatum, white wax, lanolin and derivatives thereof, stearylic alcohol, propylenglycol, sodium lauryl sulfate, ethers of the fatty polyoxyethylene alcohols, esters of the fatty polyoxyethylene acids, sorbitan monostearate, glyceryl monostearate, propylene glycol monostearate, polyethylene glycols, methylcellulose, hydroxymethylpropylcellulose, sodium carboxymethylcellulose, colloidal aluminium and magnesium silicate, sodium alginate.

All the topical preparations can be used in the ambit of the present invention, for instance the ointments, the pomades, the creams, the gels and

the lotions.

The invention is hereinbelow illustrated by some examples which are not intended to limit the invention. The results show that the forms α, β and γ can be obtained by manipulating the above mentioned conditions of crystallization and drying.

**Example 1**

**Preparation of raw rifaximin and of dried raw rifaximin**

In a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, 120 ml of demineralized water, 96 ml of ethyl alcohol, 63.5 g of rifamycin O and 27.2 g of 2-amino-4-methylpyridine are loaded in succession at room temperature. After the loading, the mass is heated at 47 ± 3°C, is kept under stirring at this temperature for 5 hours, then is cooled to 20 ± 3°C and, during 30 minutes, is added with a mixture, prepared separately, made of 9 ml of demineralized water, 12.6 ml of ethyl alcohol, 1.68 g of ascorbic acid and 9.28 g of aqueous concentrated hydrochloric acid. At the end of the addition, the mass is kept under stirring for 30 minutes at an interior temperature of 20 ± 3°C and then, at the same temperature, 7.72 g of concentrated hydrochloric acid are dripped until a pH equal to 2.0.

At the end of the addition, the mass is kept under stirring, always at an interior temperature equal to 20°C, for 30 minutes, then the precipitate is filtered and washed by means of a mixture made of 32 ml of demineralized water and of 25 ml of ethyl alcohol. The so obtained “raw rifaximin” (89.2 g) is dried under vacuum at room temperature for 12 hours obtaining 64.4 g of “dried raw rifaximin” which shows a water content equal to 5.6% and a diffractogram corresponding to the polymorphous form β. The product by further drying under vacuum until constant weight gives 62.2 g of dried raw rifaximin having a water content equal to 2.2%, whose diffractogram corresponds to the polymorphous form α.

The product is hygroscopic and the obtained polymorphous form is reversible: the polymorphous form α absorbs water from the atmospheric humidity until to reach, dependent upon the relative humidity and the time of exposure, a water content higher than 4.5% and to turn into the polymorphous form β which in its turn, by drying loses part of the water turning into the polymorphous form α with a water content between 2.0% and 3.0%.

**Example 2**

**<u>Preparation of rifaximin γ</u>**

163 ml of ethyl alcohol and 62.2 g of dried raw rifaximin are loaded at room temperature into a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser. The suspension is heated at 57 ± 3°C under stirring until complete dissolution of the solid and at this temperature 70 ml of demineralized water are added in 30 minutes. After the end of the addition the temperature is brought to 30°C in 40 minutes and is kept at this value until plentiful crystallization, then the temperature is further lowered to 0°C during 2 hours and kept at this value for 6 hours. The suspension is then filtered and the solid is washed with 180 g of demineralized water.

After drying under vacuum at room temperature until constant weight, 52.7 g of pure rifaximin γ are obtained showing a water content equal to 1.5%.

The form γ is characterized from a powder X-ray diffractogram showing significant peaks at diffraction angles 2θ of 5.0°; 7.1°; 8.4°.

**Example 3**

**<u>Preparation of rifaximin α</u>**

62.2 Grams of dried raw rifaximin and 163 ml of ethyl alcohol are loaded at room temperature into a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser. The suspension is heated at 57 ± 3°C until complete dissolution of the solid and then 70 ml of demineralized water are added at this temperature during 30 minutes. After the

end of the addition the temperature is brought to 30°C during 40 minutes and is kept at this value until plentiful crystallization. The temperature of the suspension is then brought to about 40°C and kept at this value during 20 hours under stirring; then the temperature is brought at 0°C during 30 minutes and the suspension is immediately filtered. The solid is washed with 180 ml of demineralized water and dried under vacuum at room temperature until constant weight obtaining 51.9 g of rifaximin form α with a water content equal to 2.5% and a powder X-ray diffractogram showing peaks at values of angles 2θ of 6.6°; 7.4°; 7.9°; 8.8°; 10.5°; 11.1°; 11.8°; 12.9°; 17.6°; 18.5°; 19.7°; 21.0°; 21.4°; 22.1°.

**Example 4**

**<u>Preparation of rifaximin α</u>**

89.2 Grams of raw rifaximin and 170 ml of ethyl alcohol are loaded at room temperature into a three-necked flask equipped with mechanic stirrer, thermometer and reflux condenser, then the suspension is heated at 57 ± 3°C until complete dissolution of the solid. The temperature is brought to 50°C and then 51.7 ml of demineralized water are added at this temperature during 30 minutes. After the end of the addition the temperature is brought to 30°C in one hour and the suspension is kept for 30 minutes at this temperature obtaining a plentiful crystallization. The temperature of the suspension is brought to 40°C and kept at this value during 20 hours under stirring and then further lowered to 0°C during 30 minutes after which the suspension is immediately filtered. The solid is washed with 240 ml of demineralized water and dried under vacuum at 65°C until constant weight obtaining 46.7 g of rifaximin α with a water content equal to 2.5%.

**Example 5**

**<u>Preparation of rifaximin α</u>**

Example 3 is repeated by increasing at 50°C the temperature at which

the suspension is kept and lowering to 7 hours the time in which the suspension is kept at this temperature. The product obtained is equal to that of example 3.

**Example 6**

**Preparation of rifaximin β**

The crystallization of the dried raw rifaximin is carried out according to the method described in example 3. The drying under vacuum at room temperature is checked by means of the Karl Fisher method and is stopped when the water content reaches 5.0%: 52.6 g of rifaximin β are obtained characterized from a powder X-ray diffractogram showing peaks at values of angles 2θ of 5.4°; 6.4°; 7.0°; 7.8°; 9.0°; 10.4°; 13.1°, 14.4°; 17.1°; 17.9°; 18.3°; 20.9°.

**Example 7**

**Preparation of rifaximin α starting from rifaximin γ**

5 Grams of rifaximin γ are suspended in a mixture made of 13 ml of ethyl alcohol and 5.6 ml of water and the suspension is heated at 40°C during 24 hours under stirring in a 50 ml flask equipped with condenser, thermometer and mechanic stirrer. The suspension is then filtered and the solid is washed with water and then dried under vacuum at room temperature until constant weight. 4 Grams of rifaximin are obtained showing a powder X-ray diffractogram corresponding to that of the polymorphous form α and a water content equal to 2.6%.

**Example 8**

**Preparation of rifaximin γ starting from rifaximin α**

15 Grams of rifaximin form α and 52.4 ml of ethyl alcohol are loaded into a 250 ml three-necked flask equipped with reflux condenser, thermometer and mechanical stirrer; the suspension is heated under stirring at the temperature of 50°C until complete dissolution of the solid.

The limpid solution is added with 22.5 ml of water during 30 minutes under stirring, cooled to 30°C and kept at this temperature during 30 minutes. The formed suspension is cooled to 0°C under strong stirring and kept at this temperature during 6 hours. A part of the suspension is taken after this period of time, filtered, washed with demineralized water and dried under vacuum at 30°C until constant weight.

The so obtained product, 3.7 g, shows a diffractogram consistent with that of the form γ and a water content equal to 1.7%.

The remaining part of the suspension is kept at 0°C for further 18 hours under strong stirring and then is filtered, washed with demineralized water and dried at 30°C under vacuum until constant weight. 9 Grams of product showing a diffractogram consistent with that of the form γ and a water content equal to 1.6% are obtained.

**Example 9**

**Preparation of rifaximin α starting from rifaximin β**

5 Grams of rifaximin β having a water content equal to 5.0% are dried under vacuum at +30°C during 8 hours obtaining 4.85 g of rifaximin α having a water content equal to 2.3%.

**Example 10**

**Preparation of rifaximin β starting from rifaximin α**

5 Grams of rifaximin α having a water content equal to 2.5% are kept during 40 hours in an atmosphere containing a relative humidity equal to 56% made by means of a saturated aqueous solution of calcium nitrate tetrahydrate. 5.17 Grams of rifaximin β with a water content equal to 5.9% are obtained after this time.

**WHAT WE CLAIM IS:**

1. A purified rifaximin α, a polymorph of the antibiotic rifaximin, wherein said rifaximin α has a water content lower than 4.5% and a powder X-ray diffractogram showing peaks at values of the diffraction angles 2θ of 6.6°; 7.4°; 7.9°; 8.8°; 10.5°; 11.1°; 11.8°; 12.9°; 17.6°; 18.5°; 19.7°; 21.0°; 21.4°; 22.1°.

2. The rifaximin α according to claim 1, wherein said water content is between 2.0% and 3.0%.

3. A purified rifaximin β, a polymorph of the antibiotic rifaximin, wherein said rifaximin β has a water content higher than 4.5% and a powder X-ray diffractogram showing peaks at values of the diffraction angles 2θ of 5.4°; 6.4°; 7.0°; 7.8°; 9.0°; 10.4°; 13.1°, 14.4°; 17.1°; 17.9°; 18.3°; 20.9°.

4. The rifaximin β according to claim 3, wherein said water content is between 5.0% and 6.0%.

5. A purified rifaximin γ, a polymorph of the antibiotic rifaximin, wherein said rifaximin γ has a water content between 1.0% and 2.0% and a powder X-ray diffractogram showing a mainly amorphous profile and few significant peaks at values of diffraction angles 2θ of 5.0°; 7.1°; 8.4°.

6. A process for the production of rifaximins α, β and γ, comprising:

reacting a molar equivalent of rifamycin O with an excess of 2-amino-4-methylpyridine in a solvent mixture of water and ethyl alcohol in a volumetric ratio between 1:1 and 2:1, for a period of time between 2 and 8 hours, at a temperature between 40°C and 60°C,

treating the reaction mass at room temperature with a solution of ascorbic acid in a mixture of water, ethyl alcohol and concentrated aqueous hydrochloric acid,

adjusting the pH of the reaction mass to pH 2.0 with a concentrated

aqueous solution of hydrochloric acid,

filtering the suspension,

washing any resulting solid with the water/ethyl alcohol solvent mixture to obtain raw rifaximin,

purifying the raw rifaximin by dissolving it in ethyl alcohol at a temperature between 45°C and 65°C,

precipitating the raw rifaximin by adding water and by lowering the temperature of the suspension to between 0°C to 50°C under stirring for a period of time between 4 and 36 hours,

filtering the suspension,

washing the resulting solid with water, and

drying it under vacuum or under conditions of normal pressure, with or without a drying agent, at a temperature between room temperature and 105°C, for a period of time between 2 and 72 hours.

7. The process according to claim 6, wherein said 2-amino-4-methylpyridine is from 2.0 to 3.5 molar equivalents.

8. The process according to claim 6, wherein said water added to precipitate the raw rifaximin is in a weight amount between 15% and 70% with respect to the weight amount of ethyl alcohol used for the dissolution.

9. The process according to claim 6 for the production of rifaximin α, wherein after the addition of water to the raw rifaximin, the temperature is lowered to a value between 28°C and 32°C in order to cause the beginning of the crystallization,

stirring the resulting suspension at a temperature between 40°C and 50°C for a period of time between 6 and 24 hours,

cooling the suspension to 0°C for a period of time between 15 minutes and one hour,

filtering the suspension, washing the resulting solid with water, and

drying the washed solid until a water content lower than 4.5% is reached.

10. The process according to claim 9, wherein said water content is between 2.0% and 3.0%.

11. The process according to claim 6 for the production of rifaximin β, wherein after the addition of water to the raw rifaximin, the temperature is lowered to a value between 28°C and 32°C in order to cause the beginning of the crystallization,

stirring the resulting suspension at a temperature between 40°C and 50°C for a period of time between 6 and 24 hours,

cooling the suspension to 0°C for a period of time between 15 minutes and one hour,

filtering the suspension, washing the resulting solid with water, and

drying the washed solid until a water content higher than 4.5% is reached.

12. The process according to claim 11, wherein said water content is between 5.0% and 6.0%.

13. The process according to claim 6 for the production of rifaximin γ, wherein after the addition of water to the raw rifaximin, the temperature is lowered to a value between 28°C and 32°C in order to cause the beginning of the crystallization,

cooling the suspension to 0°C for a period of time between 6 and 24 hours,

filtering the suspension, washing the resulting solid with water and

drying the washed solid until a water content between 1.0% and 2.0% is reached.

14. A process for the production of rifaximin α, comprising:

suspending rifaximin γ in a solvent mixture of ethyl alcohol/water in a volumetric ratio of 7:3,

heating the suspension at a temperature between 38°C and 50°C, under stirring, for a period of time between 6 and 36 hours,

filtering the suspension,

washing the resulting solid with water, and

drying the washed solid until a water content lower than 4.5% is reached.

15. The process according to claim 14, wherein said water content is between 2.0% and 3.0%.

16. A process for the production of rifaximin β, comprising:

suspending rifaximin γ in a solvent mixture of ethyl alcohol/water in a volumetric ratio of 7:3,

heating the suspension at a temperature between 38°C and 50°C, under stirring, for a period of time between 6 and 36 hours,

filtering the suspension,

washing the resulting solid with water, and

drying the washed solid until a water content higher than 4.5% is reached.

17. The process according to claim 16, wherein said water content is between 5.0% and 6.0%.

18. A process for the production of rifaximin γ, comprising:

dissolving rifaximin α or β in ethyl alcohol at a temperature between 50°C and 60°C,

adding demineralized water until an ethyl alcohol/water volumetric ratio equal to 7:3 is reached,

cooling the solution to 30°C under strong stirring,

further cooling the resulting suspension to 0°C for a period of time between 6 and 24 hours,

filtering said suspension,

washing the resulting solid with water, and

drying the solid until a water content lower than 2.0% is reached.

19. A process for the production of rifaximin β, comprising keeping rifaximin α in an ambient environment having a relative humidity higher than 50% for a period of time between 12 and 48 hours until said rifaximin α is converted into rifaximin β.

20. A process for the production of rifaximin α, comprising drying rifaximin β under atmospheric pressure, or under vacuum, or in the presence of a drying agent, at a temperature between the room temperature and 105°C, for a period of time between 2 and 72 hours until said rifaximin β is converted into rifaximin α.

21. A composition comprising a predetermined amount of rifaximin α, rifaximin β or rifaximin γ in combination with excipients suitable for oral administration.

22. The composition according to claim 21, wherein said excipients are suitable for the production of coated and uncoated tablets, hard and soft gelatin capsules, sugar-coated pills, lozenges, wafer sheets, pellets or powders.

23. A composition comprising a predetermined amount of rifaximin α, rifaximin β or rifaximin γ in combination with excipients suitable for topical administration.

24. The composition according to claim 23, wherein said excipients are suitable for the production of ointments, pomades, creams, gels or lotions.

25. A composition comprising predetermined amounts of rifaximin α, rifaximin β, or rifaximin γ or any combination thereof, in combination with pharmaceutically acceptable excipients.

26. A composition comprising the rifaximin α according to claim 1 in combination with pharmaceutically acceptable excipients.

27. A composition comprising the rifaximin β according to claim 3 in combination with pharmaceutically acceptable excipients.

28. A composition comprising the rifaximin γ according to claim 5 in combination with pharmaceutically acceptable excipients.

ALFA WASSERMANN S.P.A.
By the authorised agents
AJ PARK
Per [signature]

**END OF CLAIMS**

INTELLECTUAL PROPERTY OFFICE OF N.Z
- 9 MAR 2004
RECEIVED




FIGURE 1




FIGURE 2




FIGURE 3

# END

# EXHIBIT R

# RESERVED

# EXHIBIT S

# RESERVED

# EXHIBIT T

## REMARKS

### I. Status of the Claims

No claim is amended or cancelled herein. Claims 37 and 41-43 remain pending.

### II. Rejection Under 35 U.S.C. § 103

Claims 37 and 41-43 have been rejected under 35 U.S.C. § 103 for allegedly being unpatentable over Sharara (Am J Gastroenterol, 101:326-333, 2006) in view of Scarpignato (Chemotherapy, 51(suppl 1):36-66, 2005), and Marchina (Chemioterapia, 7(5):336-40, 1988). See Office Action at 3-7. In short, the Examiner's position is that although the prior does not explicitly teach Applicant's dosage of 550 mg of rifaximin TID for 14 days as claimed, absent more, a prima facie case of obviousness exists in instances where a claimed dosages range is generically encompassed by the prior art. See id at 5. Applicant disagrees.

Where there is a reason to modify or combine the prior art to achieve the claimed invention, the claims may be rejected as *prima facie* obvious <u>provided there is also a reasonable expectation of success</u>. *See MPEP § 2143.02(I)*, emphasis added. That is, a reasonable expectation of success is required to support an obviousness conclusion. Here, the cited references do not support such a conclusion.

Sharara is cited for allegedly teaching the use of 400 mg of rifaximin BID to treat IBS in both male and female subjects. *See Office Action at 4*. Because, however, Sharara does not teach the claimed dosage of 550 mg of rifaximin TID for 14 days, Scarpignato and Marchina are relied upon. According to the Office Action, both of these references allegedly teach safe dosages of rifaximin up to 1800 mg/day for 14 days. *See id.*

Turning first to Scarpignato, the dosages relied upon in the present Office Action relate to suggested dosages for the treatment of Inflammatory Bowel Disease (IBD), such as Crohn's disease and Ulcerative Colitis, not dIBS. *See e.g., Scarpignato at page 47*. IBD is a clinical condition which is distinct from dIBS. A person of ordinary skill in the art understands that dosages required to treat one condition (e.g., IBD) do not necessarily correlate to dosing required to treat other conditions (e.g., dIBS). Nor would a person of ordinary skill in the art expect them to

## III. Double Patenting

Claims 37 and 41-43 have been rejected on the judicially created ground of obviousness-type double patenting over Claims 1-4 of U.S. Patent No. 11,564,912, Claims 1-15 of U.S. Patent No. 10,765,667, Claims 1-15 of U.S. Patent No. 10,456,384, Claims 1-9 of U.S. Patent No. 9,931,325, and Claims 1-10 of U.S. Patent No. 9,566,270. *See Office Action at 7-10*. To facilitate prosecution, Applicant submits herewith a Terminal Disclaimer over the above-reference patents. Reconsideration and withdrawal of the present double patenting rejection is respectfully requested.

## IV. Final Comments

Favorable reconsideration of this case and timely allowance of the pending claims is respectfully requested. Please charge any deficiency in the fees filed herewith to our Deposit Account No. 50-4876, under Docket No. 119557-04013, from which the undersigned is authorized to draw.

Dated: June 14, 2023

Respectfully submitted,

Electronic signature: / Michael DeGrazia, Ph.D /
Michael DeGrazia, Ph.D.
Registration No.: 68,901
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6575
(617) 607-9200 (Fax)
Attorney/Agent For Applicant

# EXHIBIT U

## REMARKS

### I. Status of the Claims

No claim is cancelled or amended herein. Claims 37-43 remain pending.

### II. Rejection Under 35 U.S.C. § 103

Claims 37 to 43 have been rejected under 35 U.S.C. § 103 for allegedly being unpatentable over Sharara (Am J Gastroenterol, 101:326-333, 2006) in view of Scarpignato (Chemotherapy, 51(suppl 1):36-66, 2005), and Marchina (Chemioterapia, 7(5):336-40, 1988). *See Office Action at 3-7*. In short, the Examiner's position is that although the prior does not explicitly teach Applicant's claimed dosage of 550 mg of rifaximin TID for 14 days, absent more, a *prima facie* case of obviousness exists in instances where a claimed dosages range is generically encompassed by the prior art. *See id at 5*. Applicant disagrees.

Where there is a reason to modify or combine the prior art to achieve the claimed invention, the claims may be rejected as *prima facie* obvious provided there is also a reasonable expectation of success. *See MPEP § 2143.02(I)*, emphasis added. That is, a reasonable expectation of success is required to support an obviousness conclusion. Here, the facts do not support such a conclusion.

Sharara is cited for allegedly teaching the use of 400 mg of rifaximin BID to treat IBS in both male and female subjects. *See Office Action at 4*. Because, however, Sharara does not teach the claimed dosage of 550 mg of rifaximin TID for 14 days, Scarpignato and Marchina are relied upon. According to the Office Action, both of these reference allegedly to teach safe dosages of rifaximin up to 1800 mg/day for 14 days. *See id.*

Turning first to Scarpignato, the dosages relied upon in the present Office Action relate to suggested dosages for the treatment of Inflammatory Bowel Disease (IBD), such as Crohn's disease and Ulcerative Colitis, not IBS. *See e.g., Scarpignato at page 47*. IBD is a clinical condition which is distinct from IBS. A person of ordinary skill in the art understands that dosages required to treat one condition (e.g., IBD) do not necessarily correlate to dosing required to treat other conditions (e.g., IBS). Nor would a person of ordinary skill in the art expect them to be similar. As such, the combination of Sharara and Scarpignato do not provide establish a reasonable

expectation of success in using the claimed dosage to treat one or more symptoms of IBS.

Turning to Marchina, this reference is directed to the use of 200 mg of rifaximin TID for 7 days to treat discharges and symptoms related to infectious diarrhea. *See Marchina at Summary*. Marchina, however does not teach or associate the diarrhea symptoms with IBS. Like, Scarpignato, there is again no expectation that the claimed dosage would be useful in treating symptoms of **IBS**. In addition, Marchina makes clear that it is "unnecessary" to use rifaximin for longer than 10 days because the risk of developing resistant bacteria or severely altering the intestinal microbiota. *See Marchina at page 337, first paragraph*. Therefore, Marchina also teaches away from the presently claimed administration period of for 14 days.

For at least these reasons, a person of ordinary skill in the art would not have been led to the claimed method based on the combination of Sharara, Scarpignato, and Marchina. Nor is there an expectation of success in doing so. Accordingly, a prima facie cases of obviousness does not flow from these references.

Notwithstanding the above, Applicant directs the Examiner to the data in Table 21 of the application as filed, which shows that a higher percentage of female subjects (69.4% vs 42.5%) had adequate relief of IBS symptoms when administered 550 mg of rifaximin TID. This result could not have been predicted and further establishes the nonobviousness of the present claims. *See e.g., MPEP § 716.02(a)*, supporting that unexpected results is a factor to establish nonobviousness.

Reconsideration and withdrawal of the present § 103 rejection is respectfully requested.

## III. Double Patenting

Claims 37-43 have been rejected on the judicially created ground of obviousness-type double patenting over Claims 1-15 of U.S. Patent No. 10,765,667, Claims 1-15 of U.S. Patent No. 10,456,384, Claims 1-9 of U.S. Patent No. 9,931,325, and Claims 1-10 of U.S. Patent No. 9,566,270. *See Office Action at 7-10*. To facilitate prosecution, Applicant submits herewith a Terminal Disclaimer over the above application and reference patents. Reconsideration and withdrawal of the present double patenting rejection is respectfully requested.

# EXHIBIT V

**Doc Code: DIST.E.FILE**
**Document Description: Electronic Terminal Disclaimer - Filed**

PTO/SB/26
U.S. Patent and Trademark Office
Department of Commerce

| | |
|---|---|
| Electronic Petition Request | **TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT** |
| Application Number | 17197561 |
| Filing Date | 10-Mar-2021 |
| First Named Inventor | William Forbes |
| Attorney Docket Number | 119557-04013 |
| Title of Invention | METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS) |

☒ Filing of terminal disclaimer does not obviate requirement for response under 37 CFR 1.111 to outstanding Office Action

☒ This electronic Terminal Disclaimer is not being used for a Joint Research Agreement.

| Owner | Percent Interest |
|---|---|
| SALIX PHARMACEUTICALS, INC. | 100% |

The owner(s) with percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of prior patent number(s)

11564912

10765667

10456384

9931325

9566270

as the term of said prior patent is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later:
- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

(●) Terminal disclaimer fee under 37 CFR 1.20(d) is included with Electronic Terminal Disclaimer request.

( ) I certify, in accordance with 37 CFR 1.4(d)(4), that the terminal disclaimer fee under 37 CFR 1.20(d) required for this terminal disclaimer has already been paid in the above-identified application.

Applicant claims the following fee status:

( ) Small Entity

( ) Micro Entity

(●) Regular Undiscounted

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

THIS PORTION MUST BE COMPLETED BY THE SIGNATORY OR SIGNATORIES

I certify, in accordance with 37 CFR 1.4(d)(4) that I am:

(●) An attorney or agent registered to practice before the Patent and Trademark Office who is of record in this application

Registration Number 68901

( ) A sole inventor

( ) A joint inventor; I certify that I am authorized to sign this submission on behalf of all of the inventors as evidenced by the power of attorney in the application

( ) A joint inventor; all of whom are signing this request

| | |
|---|---|
| Signature | /MICHAEL J. DEGRAZIA/ |
| Name | MICHAEL J. DEGRAZIA |

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

# EXHIBIT W

**Doc Code: DIST.E.FILE**
**Document Description: Electronic Terminal Disclaimer - Filed**

PTO/SB/26
U.S. Patent and Trademark Office
Department of Commerce

| | |
|---|---|
| Electronic Petition Request | **TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT** |
| Application Number | 17892982 |
| Filing Date | 22-Aug-2022 |
| First Named Inventor | William Forbes |
| Attorney Docket Number | 119557-04014 |
| Title of Invention | METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS) |

☒ Filing of terminal disclaimer does not obviate requirement for response under 37 CFR 1.111 to outstanding Office Action

☒ This electronic Terminal Disclaimer is not being used for a Joint Research Agreement.

| Owner | Percent Interest |
|---|---|
| Salix Pharmaceuticals, Inc. | 100% |

The owner(s) with percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of prior patent number(s)

10765667

10456384

9931325

9566270

as the term of said prior patent is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later:
- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

◉ Terminal disclaimer fee under 37 CFR 1.20(d) is included with Electronic Terminal Disclaimer request.

○ I certify, in accordance with 37 CFR 1.4(d)(4), that the terminal disclaimer fee under 37 CFR 1.20(d) required for this terminal disclaimer has already been paid in the above-identified application.

Applicant claims the following fee status:

○ Small Entity

○ Micro Entity

◉ Regular Undiscounted

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

THIS PORTION MUST BE COMPLETED BY THE SIGNATORY OR SIGNATORIES

I certify, in accordance with 37 CFR 1.4(d)(4) that I am:

◉ An attorney or agent registered to practice before the Patent and Trademark Office who is of record in this application

Registration Number 68901

○ A sole inventor

○ A joint inventor; I certify that I am authorized to sign this submission on behalf of all of the inventors as evidenced by the power of attorney in the application

○ A joint inventor; all of whom are signing this request

| | |
|---|---|
| Signature | /Michael J. DeGrazia, Ph.D./ |
| Name | Michael J. DeGrazia, Ph.D. |

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

# EXHIBIT X

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------x
SALIX PHARMACEUTICALS, INC., et al.,
Plaintiffs,
Case No.
vs. 1:24-cv-04607-JFM

NORWICH PHARMACEUTICALS INC., et al.
Defendants.
-----------------------------------------x
SALIX PHARMACEUTICALS, INC., et al.,
Plaintiffs,
vs. Case No.
1:24-cv-7140-JFM

AMNEAL PHARMACEUTICALS, et al.,

Defendants.
---------------------------------------x

*** HIGHLY CONFIDENTIAL ***

Remote videotaped deposition of JEFFREY CRESPIN, MD, taken via Zoom, on Tuesday, January 6, 2026, beginning at approximately 9:30 a.m., before Maureen E. Broderick, Registered Professional Reporter and Notary Public in and of the Commonwealth of Pennsylvania.

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC DIVISION

applied throughout your analysis, correct?
A Correct.
Q Applying that understanding, can you please look at, it's the third page of the PDF in Exhibit 3 at page ending '519 according to the Bates numbers. It's the Highlights of Prescribing Information. Let me know when you're there.
A Okay.
Q So you see here the Highlights of Prescribing Information page for the proposed ANDA labels, correct?
A Yes.
Q And Amneal's look substantively the same, right?
A Right.
Q And the ANDA labels include an indications and usage and dosage administration section, correct?
A Right.
Q And the indication is for the treatment of irritable bowel syndrome with diarrhea, IBS-D, in adults, correct?
A Correct.
Q Applying your understanding of encouragement, do the ANDA labels encourage treating



IBS-D in adults?
A No.
Q And applying your understanding of encouragement, do the ANDA labels encourage treating adults with the recommended oral dosage stated on the labels?
A No. As a prescriber, one has a choice. They're not encouraged -- so as a prescriber, they're not encouraged by this to do this. The prescriber has a choice.
Q So in your view, the ANDA labels do not instruct any doctor or patient to administer 550 milligrams three times a day for 14 days as stated in the dosage administration section?
MS. CLEGG: Objection; misstates. Vague.
THE WITNESS: They don't instruct. There's an instruction, but they do not instruct. There's an instruction. The instruction is rifaximin 550 milligrams three times a day for 14 days, patients -- so that's the instruction, but they don't instruct.
BY MR. SIKORA:
Q Let me rephrase it then.
In your view the ANDA labels don't encourage administering 550 milligrams three times a



day for 14 days as stated in the dosage and administration section?
A Yes. It does not encourage.
Q You would agree that the ANDA labels do not carve out any particular IBS-D symptoms from the stated indication, correct?
A Correct.
MS. CLEGG: Objection; calls for a legal conclusion. Vague.
BY MR. SIKORA:
Q The ANDA label does not contraindicate, for example, IBS patients who are experiencing bloating associated with their IBS-D, correct?
A Correct. But lots of people have bloating without IBS-D. So, I mean, there are umpteen, you know, diabetic gastroparesis, Crohn's, ulcerative colitis, those labels don't say, you know, treat the bloating for, for whatever.
Q Right. But, for example, the ANDA label does not state that the recommended oral dosage is unsuitable for treating bloating that is associated with IBS, correct?
A No label would say that. No label for any drug would say it's unsuitable for treating, you know, cancer, or on the drug would say it is



unsuitable for bloating. No label would say --
(Reporter clarification.)
THE WITNESS: No label would say unsuitable for treating for bloating. There is no label that, or that would say unsuitable for treating for bloating.
BY MR. SIKORA:
Q But taking a step back, don't labels include contraindications or carve-outs for a variety of reasons?
A They do.
MS. CLEGG: Objection; outside the scope.
THE WITNESS: Yeah.
BY MR. SIKORA:
Q So my question here is just simply, there is no carve-out stated on this label saying that the recommended oral dosage is unsuitable for treating bloating associated with IBS-D, right?
A I'm saying that I, there's no label that I know of that has a carve-out saying unsuitable for bloating for any products.
Q Including the proposed ANDA labels, correct?
A Including them.
Q In fact, the proposed ANDA labels don't

include any sort of carve-out stating that the recommended oral dosage is unsuitable for treating any particular IBS-D symptom, correct?
MS. CLEGG: Objection; form. Outside the scope.
THE WITNESS: Again, we're talking IBS and diarrhea, so that's the, specifically what we're treating.
BY MR. SIKORA:
Q Right. That's my point. To the extent there's IBS-D symptoms, the ANDA labels do not state that the recommended oral dosage is suitable for some IBS-D symptoms but not others, correct?
A That is correct. As I said, most messages will not say, have a carve-out for X symptom. You know, it won't say for Nexium "not suitable for bloating" on a Nexium label.
Q Understood.
But I just want to be crystal clear. The proposed ANDA labels themselves do not carve out any particular IBS-D symptoms as being unsuitable for treatment with the recommended oral dosage, correct?
MS. CLEGG: Objection; outside the scope.
THE WITNESS: (No response.)



BY MR. SIKORA:
Q I'm sorry. Can you repeat your answer, I didn't hear it.
A Yeah, so I'm saying, I don't say carve-out, but most drugs do not have carve-outs to that, to the extent of individual symptoms.
Q Right. Okay.
MS. CLEGG: We've been going for about an hour, so if it's a good time to take a break soon for everybody.
MR. SIKORA: Yep. Let's take a break.
VIDEO OPERATOR: The time is now 10:53 a.m. We are going off the video record. This ends media unit 1.
(Brief recess.)
VIDEO OPERATOR: The time is now 11:05 a.m. We are back on the video record. This begins media unit 2.
BY MR. SIKORA:
Q Dr. Crespin, you understand you're still under oath?
A I understand I'm still under oath.
Q And on the break, did you discuss your testimony with anybody else?
A No. Just said, how am I doing? I feel



good. That's, like, what [indecipherable], in the bathroom, say how am I doing? I feel good.
Q All good. All good.
A couple points of clarifications. I understand you're in the same room as Ms. Clegg. Is there anybody else in the room with you in the deposition?
A No. But, I mean, that audio guy is, he is not here now, but once in a while that audio guy came in to adjust stuff, but he is not here now.
MS. CLEGG: That was before the deposition started.
THE WITNESS: Right.
BY MR. SIKORA:
Q Yeah, so just to be clear, since your testimony began today, has anybody else other than Ms. Clegg been in the room with you?
A No.
Q Earlier we were discussing some of your professional experience. Is it true that you yourself don't have any patents?
A That is true. I have no patents.
Q You've never filed an application for a patent?
A Considered a patent, but I, I considered a



patent for a weight-loss thing, I met with a lawyer and thought that it would be prohibitive to do it. So I have no patients.
Q You've never filed an application seeking a patent?
A Never. Never filed.
Q And then none of your work relating to clinical trials has resulted in you being named a co-inventor on a patent?
A That is correct.
Q If you could go back to your report, I'm looking at that same page we were looking at before, paragraph 19, where it provides the -- I'm sorry, strike that.
If you can go to your report, paragraph 18, where it describes the claims with the '912 patent, please.
So as we discussed earlier, you did offer opinions disputing that the ANDA labels encourage one to practice Claims 4 through 7 of the '912 patent, right?
A Correct.
Q I just want to look at those claims real quickly here. Do you see that, as we talked about earlier, Claim 1 is the independent claim, right?

Page 58

A Correct.
Q And then Claims 4 through 7 are all dependent claims, right?
A (No response.)
Q I'm sorry, I think we missed your answer. Claims 4 through 7 are all dependent claims, correct?
A I believe so.
Q So if you look at Claim 5, for example, Claim 5 requires: Wherein the treating one or more symptoms of IBS comprises a reduction of the one or more symptoms from baseline symptoms established prior to treatment.
Correct?
A Correct.
Q Do you agree that not all patients treated according to the method of Claim 1 are going to experience the symptom reduction recited in Claim 5?
A Do I agree that all patients?
Q That not all patients.
A Right.
Q Let me ask it again.
Do you agree that not all patients who are treated according to the method of Claim 1 will experience the symptom reduction recited in

Page 59

Claim 5?
A Yes. Some patients may experience a reduction of symptoms.
Q So treating a patient according to Claim 1 isn't necessarily going to result in a reduction of the one or more symptoms from baseline symptoms established prior to treatment, right?
MS. CLEGG: Objection to form. Outside the scope.
THE WITNESS: The patient may not respond to treatment.
BY MR. SIKORA:
Q So then looking to Claim 6, it requires that the reduction of the one or more symptoms is achieved following seven days after the administration of rifaximin. Do you see that?
A I see that.
Q Would you likewise agree that not all patients who do experience the symptom reduction from being treated according to Claim 1 will ultimately experience that reduction at the time period recited by Claim 6?
MS. CLEGG: Objection; form.
THE WITNESS: Not -- you know, different patients respond differently. Some patients

Page 60

respond first day, some patients respond day 15, some patients respond day 22.
BY MR. SIKORA:
Q That's been your experience in prescribing XIFAXAN to patients?
A My experience is that different patients respond differently, yes.
Q Now, looking at Claim 7, Claim 7 requires: Wherein treating one or more symptoms of IBS comprises a reduction in symptoms defined by an affirmative response from the subject when asked whether they had a reduction in symptoms of IBS.
Do you see that?
A Yes.
Q And would you also agree that not all patients treated according to Claim 1 are going to experience the symptom reduction of Claim 7 defined by that affirmative response?
MS. CLEGG: Objection; outside the scope.
THE WITNESS: Yes. I agree that, again, not all patients will respond.
BY MR. SIKORA:
Q So treating a patient according Claim 1 isn't necessarily going to result in the reduction of one or more symptoms as defined by affirmative

Page 61

response from the subject as recited in Claim 7, right?
MS. CLEGG: Same objection.
THE WITNESS: Yes.
BY MR. SIKORA:
Q Now, as we talked about earlier, you do offer opinions addressing Claims 1 through 7 of the '912 patent when it comes to the direct infringement prong; is that right?
A That is correct.
Q So if you could go down to that page, paragraph 96 in your report, which I believe you said was at page 36, which I think is PDF page 39.
A Getting there.
Q Let me know when you're at paragraph 96.
A Got it.
Q So in paragraph 96, looking at the last two sentences, you provide one opinion relating to physicians and another opinion relating to patients, correct?
A Correct.
Q So you opine here that physicians will not directly infringe any claim of the '912 patent, right?
A Correct.

Q And you also offer the opinion that patients will not infringe Claims 4 through 7 of the '912 patent, correct?
A Correct.
Q But you don't offer any opinion disputing that patients would directly infringe Claims 1 through 3 of the '912 patent, correct?
A Correct.
Q Now, if you could go down to paragraph 144, which is at PDF pages 57 to 58, or pages 54 to 55 numerically at the bottom. Let me know when you're there.
A I'm sorry. Where are we looking at?
Q Paragraph 144.
A Yes. Got it.
Q Do you see this section of your report now relates to the '571 patent?
A Right.
Q And this section that we're looking at in particular contains your rebuttal opinions regarding the direct infringement prong for the '571 patent, right?
A Right.
Q So looking down towards the bottom of paragraph 144, your direct infringement opinions for



the '571 are also different depending on whether it's physicians or patients. Do you see that?
A Yes.
Q So for physicians you opine that physicians will not infringe any claim of the '571 patent, correct?
A I'm sorry. Can you speak a little bit louder.
Q Let me speak up.
For physicians, you offer an opinion that they will not directly infringe any claim of the '571 patent, correct?
A Correct.
Q And for patients, you offer an opinion that they will not directly infringe Claims 2 through 4 of the '571 patent, correct?
A Correct.
Q But you do not offer any opinions disputing that patients would directly infringe Claim 1 of the '571 patent, correct?
A Correct.
Q So if you could go back up in your report to page 5, paragraph 19. It's at PDF page 8 if that's faster for you.
A Got it.



Q So paragraph 19 of your report lists the four claims of the '571 patent, right?
A Yes.
Q And, again, Claim 1 is the independent claim?
A Correct.
Q And Claims 2 through 4 are the dependent claims, correct?
A Correct.
Q Now, Claim 1 of the '571 patent recites: A method of treating bloating associated with diarrhea-predominant irritable bowel syndrome (dIBS) in a female subject, said method comprising administering 550 milligrams of rifaximin TID for 14 days to the female subject, thereby treating bloating associated with dIBS in the female subject.
Do you see that?
A Yes.
Q Looking at Claim 2, it requires that the treating of bloating comprises a reduction of bloating from baseline symptoms established prior to treatment, correct?
A Correct.
Q Similar to before, do you agree that not all patients according to Claim 1 -- strike that.



Do you agree that not all patients treated according to Claim 1 of the '571 patent would necessarily experience the bloating reduction of Claim 2?
MS. CLEGG: Objection; outside the scope.
THE WITNESS: Some patients, you know, who would receive a drug would have [indecipherable] --
(Reporter clarification.)
THE WITNESS: So some patients who receive the drug may experience improvement in bloating, but some patients who receive Prilosec may experience an improvement in bloating. So it's not a hundred percent response rate.
There are some patients whose bloating will improve and there's some who will not. This is with any medication. Like Prilosec, some patients -- some bloating will improve and some will not.
BY MR. SIKORA:
Q Using the treatment method of Claim 1 is not necessarily going to give you the reduction in bloating symptoms recited in Claim 2, correct?
MS. CLEGG: Same objection.

Page 66

THE WITNESS: Yeah. So, I mean, we're using a medicine to treat IBS-D, not necessarily to treat bloating. But we're using a medicine to treat IBS-D. So it may be as a side benefit the bloating may improve, but the bloating also might not improve.
BY MR. SIKORA:
Q Right. I'm just focused on Claim 1 here. Claim 1 requires treating bloating associated with dIBS or -- hold on, strike that.
When it says "diarrhea-predominant irritable bowel syndrome, or dIBS," you understand that to be referring to IBS-D, correct?
A I did. I do.
Q If a patient is being treated for IBS-D according to Claim 1, you'd agree that that may or may not result in the reduction of bloating recited in Claim 2, right?
A Yes.
MS. CLEGG: Objection; outside the scope.
BY MR. SIKORA:
Q And then for Claim 3, that requires that the reduction in bloating is achieved following seven days after the administration of rifaximin, correct?

Page 67

A Correct. But the bloating could respond at any time. You could put a patient on a placebo and the [indecipherable] could get better tomorrow or it could get better in a month.
Q Right. So my question is exactly that, you would agree that treating a patient according to Claim 1 is not necessarily going to result in a bloating reduction at the time frame required by Claim 3, correct?
MS. CLEGG: Objection; outside the scope.
THE WITNESS: Correct.
BY MR. SIKORA:
Q And Claim 4 requires the reduction of bloating to comprise an affirmative response from the subject when asked whether or not they had a reduction in bloating. Do you see that?
A I see that.
Q Would you agree that not all patients treated according to Claim 1 of the '571 patent would experience the bloating reduction of Claim 4 comprising that affirmative response?
MS. CLEGG: Objection; outside the scope.
THE WITNESS: I would agree that as with any condition, not -- no drug has a hundred percent response rate; so that some will have a

Page 68

reduction in bloating and some will not.
BY MR. SIKORA:
Q You can set that aside for the moment.
Or actually, can you go down in your report to paragraph 42, which is on PDF page 13, or according to the pagination page 10.
A Yes.
Q This section of your report, starting at paragraph 42, provides your background regarding the state of the art, right?
A Correct.
Q And just making sure we're on the same page here, you agree that the exact cause of IBS is unknown, right?
A Agree.
Q And that includes the exact cause of IBS-D is still unknown today, correct?
A Correct.
Q You agree that IBS-D patients require symptom-focused diagnosis and treatment, correct?
MS. CLEGG: Objection; form.
THE WITNESS: Because it is a syndrome and not a disease, it does seem to be more symptom focused.
BY MR. SIKORA:

Page 69

Q You agree that IBS-D patients can present with a variety of different symptoms including abdominal pain, constipation, and diarrhea, right?
A Yes.
Q I'm sorry, strike that.
Would you agree that -- I think my question, I misspoke.
A Go ahead.
Q You agree that IBS patients can present with a variety of different symptoms, including abdominal pain, constipation, and diarrhea, correct?
A Yes.
Q Can you describe for me what are the associated symptoms one would commonly observe for IBS-D?
A Typically abdominal pain, diarrhea, sometimes mucus, sometimes change of bowel habits, and having these symptoms over several months and more than once a month.
Q You've seen IBS-D patients with associated bloating, too, correct?
A I have. I've also seen people with GERD with bloating as well, yes.
Q So I believe you agree with Dr. Johnson that bloating can occur with IBS-D or independent of

IBS-D, correct?
MS. CLEGG: Objection; misstates testimony and the report.
THE WITNESS: Bloating can occur with or without IBS-D. It can also be seen with SIBO.
(Reporter clarification.)
THE WITNESS: That is an acronym for small intestinal bacteria overgrowth.
BY MR. SIKORA:
Q Now, do you have the report up in a PDF viewer?
A Yes, I do.
Q Can you use the search function in your PDF viewer?
A I will try.
Q Can you search for "SIBO," please.
A Let's try this.
Q Just to be clear, when you searched for "SIBO" just then, nothing came up in your report, did it?
A I think small intestinal --
(Reporter clarification.)
THE WITNESS: Yes. If you look on number 40, I put "overgrowth." So, yes, so it's right there on 40. That's why I told the



court reporter SIBO is an acronym for small intestinal bacteria overgrowth.
BY MR. SIKORA:
Q So the only instance where SIBO was mentioned in your report is in paragraph 40, correct?
A That is the only time that I see it.
Q Just to be clear, where your report recites small intestine bacterial overgrowth in paragraph 40, that is part of the definition of a person of ordinary skill in the art that you've adopted for purposes of your analysis, correct?
A Correct.
Q You don't provide any sort of technical overview or background regarding SIBO in your report, correct?
A Correct.
Q You don't analyze SIBO as part of your infringement analysis, correct?
A Correct.
Q So just to be clear, I don't intend to ask you any questions about SIBO throughout the rest of today. So I just want to make that clear cut here. Do you understand?
A I understand. But it's on my report, but



I understand.
Q Understood.
If you go back down to paragraph 42. I'm sorry, if you could go down one more to paragraph 43.
A Okay.
Q This is under the subheading Treating IBS and/or IBS-D. Do you see that?
A One second.
Yes.
Q Now, in your experience, physicians consult with patients that are exhibiting symptoms associated with IBS or IBS-D, correct?
A Correct.
Q And you view your clinical experience as typical for the field; is that right?
A Correct.
Q And you understand your practice as in diagnosing and treating IBS-D patients to be commonplace among physicians; is that right?
A Correct.
Q So a physician consultation with an IBS-D patient, that would involve identifying what IBS-D associated symptoms the patient is experiencing, correct?



A Correct.
Q So it would be common for physicians to solicit symptom information from IBS-D patients verbally, correct?
A So verbally or electronically, which we do both.
(Reporter clarification.)
THE WITNESS: I said we could elicit symptoms either electronically or verbally or both. We do both.
BY MR. SIKORA:
Q And electronically, you're referring to it being common for physicians to solicit symptom information from IBS-D patients in writing, correct?
A No. Well, I mean, when a person goes on a Phreesia tablet, or puts their intake, I mean, they are -- I mean, do you consider that writing? I mean, certainly we have both. Do you have -- so for an older person, we do have a review systems intake, which is they write down their symptoms. So we do both.
Q Let me actually take a step back.
So just breaking it down into pieces. It's very common among physicians to solicit symptom information from patients either verbally,

Page 114

IBS-D encircling type 6.
Q So even though the express label says that IBS-D includes 6 and 7 --
A Right.
Q -- you're pointing out that the shaded box only encompasses type 7?
A Correct.
Q But you would agree that physicians review figures with their associated legends, correct?
A They try.
Q Now, going back to your paragraph 44 of your report, which is on the numerical page 11 or PDF page 14. Let me know when you're there.
A Enlarge it. Yes.
Q In paragraph 44, you identify what characteristics are indicative of each IBS subtype, correct?
A Correct.
Q And, for example, as you explain here, abnormal frequency of hard and/or lumpy stool that is difficult to pass is typically associated with IBS-C, correct?
A Correct.
Q And abnormal frequency of mushy and/or watery stool is typically associated with IBS-D,

Page 115

correct?
A Correct.
Q Now, you don't cite any source in paragraph 44 for your characterization of each IBS subtype, correct?
A Correct.
Q But the labels you use for each of the four distinct subtypes of IBS are the exact same labels we just saw in the Rome IV Diagnostic Criteria, correct?
A Say that again.
Q The four labels you use for IBS subtypes are identical to the labels used in the Rome IV Diagnostic Criteria we were just looking at, correct?
A Correct.
Q And in your description here, both you and the Rome IV Criteria point to abnormal frequencies of hard or lumpy stool as being associated with IBS-C, correct?
MS. CLEGG: Objection to form.
THE WITNESS: Correct.
BY MR. SIKORA:
Q And both you and the Rome IV Criteria point to abnormal frequency of hard and/or lumpy

Page 116

stool that is -- I'm sorry, strike that.
Both you and the Rome IV Criteria point to an abnormal frequency of mushy and/or watery stool as being typically associated with IBS-D, correct?
MS. CLEGG: Objection to form.
THE WITNESS: But there are other criteria that can classify.
MR. SIKORA: I'm going to move to strike that as nonresponsive.
BY MR. SIKORA:
Q My question was, both you and the Rome IV Criteria point to an abnormal frequency of mushy and/or watery stool as being typically associated with IBS-D, correct?
MS. CLEGG: Objection to form.
THE WITNESS: Correct.
BY MR. SIKORA:
Q I'd like you to go back to the exhibit that included your medical website for IBS, for treating IBS specifically, which I believe was Exhibit 7, but let me just doublecheck that.
Yes, if you could turn back to Exhibit 7.
A Okay.

Page 117

Q Going down to page 2 of Exhibit 7. You explain that one of the ways to relieve IBS symptoms is through medications, correct?
A Correct.
Q And you inform patients which medications -- I'm sorry, strike that.
You inform patient -- strike that.
You inform IBS patients which medicines, if any, are right for them, correct?
MS. CLEGG: Objection; vague.
THE WITNESS: It does not state what medicines, but does say which medicines.
BY MR. SIKORA:
Q Right. So your website states: Dr. Crespin lets you know which medicines, if any, are right for you.
Correct?
A Correct.
Q And that accurately reflects your practice when it comes to IBS patients, correct?
A Correct.
Q And you prescribe medicines to IBS patients to relieve a variety of IBS associated symptoms, correct?
A Correct.

MS. CLEGG: Objection to the extent it's misstating the report. If you'd like to point him to where you're referring to, that might be --
BY MR. SIKORA:
Q Why don't we do this. Why don't you just go down to paragraph 49, which is the next page. If you look at the, one, two, three, fourth, midway through the fourth line, starting, "Clinical practice."
Do you see that?
A Where, what point?
Q Paragraph 49, it's about midway through the fourth line. It says: Clinical practice for...
A Yes.
Q Taking a step back, your opinion is that clinical practice does not involve formal supervision of drug intake at particular time intervals, correct?
A That is correct.
Q Do you agree it's not unusual for physicians to ask patients about compliance with a prescribed treatment regimen in a follow-up visit?
A No, it's not unusual. In clinical trials we will have patients bring in blister packs to make


sure that they really have completed their course. But in practice, we don't have patients bring in their unused blister packs.
Q And clinical practice physicians do care about compliance with the treatment regimen, correct?
A Yes, they do care about compliance.
Q And you yourself have asked patients about compliance with prescribed treatment regimens in follow-up visits, correct?
A Yes. But we cannot ensure compliance. We can ask about it, but we cannot ensure compliance.
Q Now, going down to paragraph 50, there's a, beginning in the middle of the fourth line, do you see the sentence that begins "In my experience"?
A Yes.
Q So you've offered the opinion that physicians do not typically collect and track detailed baseline information about symptoms, correct?
A Correct.
Q But you don't dispute that physicians collect and track some baseline symptom information when evaluating patients, correct?
A We do that for all diseases, correct.


Q As we discussed earlier, you've collected baseline symptom information for IBS-D patients using a written questionnaire, your electronic form, and through verbal questions at visits, correct?
MS. CLEGG: Objection to the form to the extent it's, and also to the extent it is misstating testimony.
THE WITNESS: Yeah, at initial consultation we would direct electronic questionnaire, but not for subsequent visits.
BY MR. SIKORA:
Q I think you mentioned the electronic form and written questionnaire are typically used in your practice for initial consultations, right?
A Right.
Q So in your practice when you're evaluating potential IBS-D patients at an initial consultation, the way you'll collect baseline information will be through either the written questionnaire, the electronic questionnaire, or just verbal questions in the visit, correct?
A Correct.
Q You mentioned earlier it's not typical to use symptom diaries, correct?
A Correct.


Q Have you ever asked a patient to use a symptom diary or other questionnaire?
A I did previous to 2015, but unless I -- I have stopped doing it because of patients not bringing their diaries. I can't even get my kids to do a diary of their vacations these days. Younger people seem much more reluctant and not as conscientious about bringing in diaries and things.
So, yes, for clinical trials I have, and previous to 2015 I did have people do occasional food diaries, but not in the past ten years.
Q Just to be clear, you agree that some physicians do ask patients to use daily symptom diaries, correct?
A And dieticians as well, some.
Q I think we already addressed this earlier, but just to confirm it --
A I think the majority don't. The majority of physicians do not do questionnaires. When I say "questionnaire," I mean, like a daily food diary type questionnaire.
Q So taking a step back, we discussed earlier that it's standard practice for physicians to record symptom information in the charts, right?
A Correct.

(Deposition concluded at 3:09 p.m.)



C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA :
:
COUNTY OF PHILADELPHIA :

I, MAUREEN BRODERICK, Registered Professional Reporter - Notary Public, within and for the Commonwealth of Pennsylvania, do hereby certify that the proceedings, evidence, and objections noted are contained fully and accurately in the notes taken by me of the preceding deposition, and that this copy is a correct transcript of the same.

______________________

MAUREEN BRODERICK

Registered Professional

Reporter - Notary Public



ERRATA SHEET

Attach to Deposition of: Jeffrey Crespin, MD
Taken on: January 6, 2026
In the matter of: Salix, et al., vs. Amneal, et al.

| PAGE | LINE NO. | CHANGE | REASON |
|---|---|---|---|
| | | | |



SIGNATURE PAGE

- - -

I hereby acknowledge that I have read the aforegoing transcript, dated January 6, 2026, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

- - -

SIGNATURE: ______________________
JEFFREY CRESPIN, MD
DATE: ____________________
WITNESSED BY: ______________________

# EXHIBIT Y

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, AND AMNEAL EU, LIMITED,<br><br>Defendants. | Case No.: 1:24-cv-04607-JFM |
| SALIX PHARMACEUTICALS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NORWICH PHARMACEUTICALS, INC.,<br><br>Defendant. | Case No.: 1:24-cv-07140-JFM<br><br>**HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSEL EYES ONLY** |

**REBUTTAL EXPERT REPORT OF JEFFREY CRESPIN, M.D. REGARDING**
**<u>NONINFRINGEMENT OF U.S. PATENT NOS. 11,564,912 AND 11,779,571</u>**

DATED: October 22, 2025

Jeffrey Crespin, M.D.

39. I also understand that Dr. Johnson would require a POSA to "have had training in, experience with, or an ability to interpret GI disease research[.]" It is unclear whether a practicing clinician having medical training in gastroenterology would satisfy this requirement set forth by Dr. Johnson. If such a person, based on his or her training, would not satisfy this aspect of Dr. Johnson's definition of a POSA, I disagree with Dr. Johnson on this additional ground. The subject matter of the Asserted Patents' claims invokes a clinical setting (i.e., the treatment of a patient having a disorder) rather than a research setting.

40. For purposes of my analysis, I have defined a POSA as a person having a medical degree with training in gastroenterology, or a medical degree with a practice in family or internal medicine having experience in treatment of irritable bowel syndrome or small intestinal bacterial overgrowth. To the extent necessary, a medical doctor may collaborate with one or more researchers in the fields of pharmaceutics or statistics.

41. If the Court were to adopt Dr. Johnson's definition of a POSA, I would still qualify as a POSA, and my opinions would remain the same.

## VIII. BACKGROUND

### A. Irritable Bowel Syndrome ("IBS") and Methods of Treating IBS

42. Irritable bowel syndrome with diarrhea is a disorder of myriad causes and which can be treated by different means. To this end, I agree with Dr. Johnson's statement that a "symptom-focused diagnosis and treatment of IBS is important because the exact cause of IBS is unknown." (*See* Norwich Johnson Report, ¶ 53 (cleaned up); Amneal Johnson Report ¶ 49 (cleaned up).) I also agree that "IBS patients may present with a variety of different symptoms, including abdominal pain, constipation, and diarrhea." (*Id.*) Nevertheless, as further explained below, I disagree with Dr. Johnson's characterization of the procedures for ascertaining and treating patients' symptoms.

**1. Treating IBS and/or IBS-D**

43. In my clinical experience, physicians consult with patients exhibiting symptoms associated with irritable bowel syndrome (IBS) and/or irritable bowel syndrome with diarrhea (IBS-D) and walk the patients through the various treatment options. During a consultation, the physician and patient typically discuss the patient's symptoms, the potential factors giving rise to the symptoms (e.g., diet or stress), and the treatment options. Treatment options may include but are not necessarily limited to medications. When a patient presents with symptoms consistent with IBS and/or IBS-D, the treatment plan will typically focus on improving the patient's symptoms.

44. There are four distinct subtypes of IBS: IBS-D, irritable bowel syndrome with constipation (IBS-C), IBS with mixed bowel habits (IBS-M) (also referred to as alternating IBS, or IBS-A), and unsubtyped or unclassified IBS (IBS-U). Characterization of subtype largely considers a patient's predominant bowel habit, particularly during the times that the patient is experiencing abnormal bowel movements. For example, abnormal frequency of hard and/or lumpy stool that is difficult to pass is typically associated with IBS-C, while an abnormal frequency of mushy and/or watery stool is typically associated with IBS-D. Both extremes of abnormal stool may appear at varying times in IBS-M patients. IBS-U refers to the absence of a subtype. The presence of bloating is not necessary for diagnosis of IBS or any subtype thereof.

45. In my clinical experience, alleviation of IBS-D and its symptoms does not necessarily require prescription medication. For example, a recommended treatment plan might involve an over-the-counter anti-diarrheal like loperamide (sold under the trade name Imodium®). If consultation with the patient regarding various treatment options results in a decision to treat the patient with a prescription medication—rather than an over-the-counter

product—the physician will write a prescription for the medication. The patient has the choice of whether to fill a prescription and whether and how to take the drug.

46. If prescription medication is chosen for treatment, the physician writes a prescription to permit access to the medication. The treating physician also provides guidance (i.e., a recommendation) to the patient regarding use of the medication, and the patient has no obligation to adhere to the same.

47. For rendering a recommendation to the patient, an approved prescription drug label – if available – is a principal source for determining the appropriate dosing of a prescription drug for an approved method of treatment in my experience. For example, when writing a prescription, I will look to a drug label to determine how many times per day the drug must be taken and for how many days, as well as other information relevant to treatment like whether the drug can be taken with or without food. I will also consider whether the patient's insurance is likely to cover the costs of filling the prescription. I disagree with Dr. Johnson's statement that physicians follow "evidence-based recommendations provided by national guidelines and other evidential studies on 'best practices'" to the extent that it calls for physicians to rigidly apply such guidance. (*See* Norwich Johnson Report, ¶ 56; Amneal Johnson Report, ¶ 52.) I further disagree with Dr. Johnson's statement that physicians would "consider and follow treatment methods for drugs that have been evidentiarily supported through clinical trials" (*id.*), as it is my opinion that clinical trials do not demonstrate a method of treating patients in clinical practice, and the "evidence" from clinical trials—if any—would not be directed to the efficacy of the clinical study's mechanics.

48. A physician does not oversee or closely monitor the administration to a patient of a non-absorbable antibiotic like rifaximin to treat a disorder like IBS-D. Absent a negative or

adverse reaction, there is no active monitoring the patient's use of the drug. This contrasts with, for example, a hospital setting where a nurse or other healthcare professional might monitor drug administration. Moreover, rifaximin is not a toxic drug (e.g., chemotherapy) requiring increased supervision of the patient's used or a controlled substance (e.g., an opioid) having a narrow therapeutic index.

### 2. Differences Between Clinical Practice and Clinical Research

49. An internal medicine or gastroenterologist physician does not treat patients in the same way he or she would conduct a clinical trial. There are distinct differences between clinical practice and clinical research (i.e., trials or studies). For example, unlike in clinical research directed to a drug's safety or efficacy, clinical practice for non-absorbable antibiotics like rifaximin does not involve formal supervision of the drug intake at particular time intervals. Moreover, the use of assessment tools like the Rome Criteria (irrespective of the version) and Bristol Stool Scale to characterize IBS and its symptoms is generally limited to clinical trial settings rather than everyday clinical practice where such tools are far less pragmatic. Physicians in clinical practice lack the time and incentives to use such tools, as these are not exacting and require repeated assessment. I therefore disagree with Dr. Johnson's opinion that "[t]he standard of care for treating IBS patients has historically used the Rome criteria[.]" (*See* Norwich Johnson Report, ¶ 47; Amneal Johnson Report, ¶ 43.) Given that the Rome Criteria are typically not applied rigidly as a guide in clinical practice, I need not address differences among iterations of the Rome Criteria (e.g., between Rome III Criteria and Rome IV Criteria). Further evidencing the fact that the Rome Criteria are not the standard of care for treating patients with IBS and IBS-D symptoms, I note that the current Rome IV Criteria nowhere appear in Defendants' Labels, or on the Xifaxan® Label for that matter. *See supra* Section VIII.B. It is my opinion that the Rome Criteria (across iterations) do not define the standard of care for making a diagnosis and

treatment plan for a patient exhibiting symptoms consistent with IBS and/or IBS-D. (*See* Norwich Johnson Report, ¶¶ 47-50, 61; Amneal Johnson Report ¶¶ 43-46, 57; *contra* Norwich Johnson Report, ¶ 54 (stating that inquiring into patients' symptoms in an initial consultation "allows [physicians] to *classify the patients according to the Rome criteria* and build a treatment strategy around mitigating the particular symptoms associated with their disease state") (emphasis added); Amneal Johnson Report, ¶ 50 (same).)[2]

50. I further disagree with Dr. Johnson's statement that "as a practical matter, treating IBS-D on an individual patient basis requires identifying that particular patient's baseline symptoms and periodically evaluating whether treatment is improving those symptoms." (Norwich Johnson Report, ¶ 53; Amneal Johnson Report ¶ 49.) In my experience, physicians do not typically collect and track detailed baseline information, nor would physicians ask patients to maintain a daily symptom or stool diary, nor would physicians or patients set pre-defined criteria for measuring the success of a treatment. To that end, I disagree with Dr. Johnson's contention that it would be typical in clinical practice to "have [ ] patients track their condition in a daily journal and immediately report aberrant symptoms that may require additional intervention." (Norwich Johnson Report, ¶ 55; Amneal Johnson Report, ¶ 51; *see also* Norwich Johnson Report, ¶ 57 ("I have patients track their condition in a daily journal and at a follow-up visit roughly 2-4 weeks later, I inquire about their symptoms and evaluate reductions relative to the baseline symptoms I previously identified."); Amneal Johnson Report, ¶ 53 (same).) While these

[2] Dr. Johnson opines that "under the Rome III criteria, a POSITA would have considered bloating associated with diarrhea-predominant irritable bowel syndrome to be distinct from irritable bowel syndrome." (Norwich Johnson Report, ¶ 49; Amneal Johnson Report, ¶ 45; *see also* Johnson Declaration, ¶ 33.) In addition to its reliance on Rome III Criteria, this analysis is flawed for its incomprehensible juxtaposition of "bloating associated with diarrhea-predominant irritable bowel syndrome"—a symptom—to "irritable bowel syndrome"—a disorder. Should Dr. Johnson be permitted to supplement his report to state a cognizable comparison between "bloating associated with diarrhea-predominant irritable syndrome" and the *symptoms* of irritable bowel syndrome, I reserve my right to respond to the same.

exercises might be features of a clinical study, they are not part of everyday clinical practice in my experience.

51. Ultimately, clinical research and clinical practice serve different ends. The overarching goal of clinical practice is to improve the patient's well-being. Meanwhile, a clinical trial is conducted according to a protocol under controlled conditions (e.g., eligibility criteria, points of measurement, and pre-defined endpoints). A clinical trial seeks to show a drug's "efficacy" against a pre-determined endpoint, wherein such endpoint is usually established by the drug sponsor and a regulatory body for the purpose of regulatory approval to market the drug. While clinical trial findings may be of value in academic or research settings for evaluating the basis of a regulatory approval, physicians do not rely on the various tools, controls, assessments, or features of clinical research when treating patients in clinical practice. Consequently, a clinical trial concerning IBS and/or IBS-D is not illustrative of how IBS and/or IBS-D is treated in clinical practice.

**B. Defendants' ANDA Products**

52. Dr. Johnson discusses the history of Norwich's ANDA No. 214369. (*See* Norwich Johnson Report, ¶¶ 35, 36, 39.) Nevertheless, I have been informed by counsel and understand that ANDA No. 214369 is not at issue in this litigation.

53. As explained above, the ANDA Products are rifaximin 550 mg tablets for the treatment of IBS-D in adults. Rifaximin is a non-absorbable antibiotic. As Defendants' Labels explain, rifaximin inhibits the growth of bacteria by "binding to the beta-subunit of bacterial DNA-dependent RNA polymerase blocking one of the steps in transcription . . . [which] results in inhibition of bacterial protein synthesis." (Norwich_NJ_RIFAX_028517 at 526; AMN-RFXMN_00044755 at 764.) Defendants' Labels further explain that "[r]ifaximin has been shown to be active against most isolates" of microorganisms including aerobic bacteria and

comprises a reduction of the one or more symptoms from baseline symptoms established prior to treatment." (*See* '912 patent, col. 46, ll. 21-24.) It is my opinion that Defendants' Labels do not encourage, recommend, or promote to physicians and/or patients the method of claim 5.

74. Dr. Johnson opines that each of Defendants' Labels "encourages, recommends, and promotes that physicians and patients should follow the method of claim 5 to treat one or more symptoms of IBS in female subject(s)." (Norwich Johnson Report, ¶ 77; Amneal Johnson Report, ¶ 73.) To support this opinion, Dr. Johnson claims that: (1) "identifying baseline symptoms before treatment and treating to reduce those symptoms is standard practice when treating IBS" (Norwich Johnson Report, ¶ 78; Amneal Johnson Report, ¶ 74); (2) Section 14.3 of Defendants' Labels "provides physicians and patients a list of 'Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome[]'" (*id.*); (3) Defendants' Labels "inform[] physicians and patients that adequate relief may reliably be determined through a Subject Global Assessment (SGA) question that asks patients (including female patients) to compare their IBS symptoms to the way they felt before they started treatment" (*id.* (cleaned up)); and (4) Defendants' Labels' "repeatedly describe[] assessing IBS-D symptoms after treatment by comparing them to a reduction in the 'baseline' symptoms" (Norwich Johnson Report, ¶ 79; Amneal Johnson Report, ¶ 75). Notably, all points but the first rely on the clinical study information cited in § 14.3 of Defendants' Labels.

75. I disagree with Dr. Johnson's claim that establishing pre-treatment baseline symptoms and evaluating a treatment effect as a function of improvement from such baseline is "is standard practice when treating IBS." (*See* Norwich Johnson Report, ¶ 78; Amneal Johnson Report, ¶ 74.) As explained above, in my clinical experience, physicians typically do not have the time or incentive to track patients' baseline symptoms and reductions therefrom. *See supra*

Section VIII.A. Moreover, even if Dr. Johnson's characterization of typical IBS treatment practice were accurate, Dr. Johnson fails to show how Defendants' Labels supposedly instruct, encourage, or promote that physicians and/or patients administer rifaximin to reduce one or more IBS symptoms from baseline symptoms established prior to treatment. Defendants' Labels do not so instruct, encourage, or promote.

76. In addition, Dr. Johnson fails to explain the relevance of the "Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome" enumerated in § 14.3 of Defendants' Labels to any instruction or encouragement to reduce pre-treatment baseline symptoms. It is likewise unclear and unarticulated whether Dr. Johnson believes the significance of this paragraph of Section 14.3 lies in a putative acknowledgement of certain IBS symptoms, the relation of the same to a diagnosis, or the relation of a diagnosis to a treatment regimen.[4]

77. In my opinion, the paragraph titled "Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome" does not support the notion that Defendants' Labels contemplate a pre-treatment baseline measure, let alone instruct, encourage, or promote physicians and/or patients to establish pre-treatment baseline symptoms. Moreover, as Dr. Johnson elsewhere acknowledges, the paragraph titled "Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome" is merely excerpted from the Rome II criteria. (Norwich Johnson Report, ¶ 105, n.13 ("The ANDA Label's list of 'Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome' is the same list that the Rome Foundation included alongside the Rome II criteria for reference. But this list was removed for the Rome III guidance and the Rome IV criteria."); Amneal Johnson Report, ¶ 101 n.11 (same).)

[4] Should Dr. Johnson be permitted to supplement his report to state a cognizable infringement theory premised on Defendants' Labels' paragraph titled "Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome[,]" I reserve my right to respond to the same.

and treating to reduce those symptoms is standard practice when treating IBS" (Norwich Johnson Report, ¶ 112; Amneal Johnson Report, ¶ 108); (2) Defendants' Labels disclose that "adequate relief may be reliably determined" though an SGA question "that asks patients (including female patients) to compare their IBS to the way they felt before they started treatment" (*id.* (cleaned up)); and (3) Defendants' Labels "repeatedly describe[] assessing IBS-D symptoms after treatment by comparing them to reduction in the 'baseline' symptoms" (Norwich Johnson Report, ¶ 113; Amneal Johnson Report, ¶ 109).

127. As previously stated, a physician's "standard practice" does not answer the question of whether Defendants' Labels recommend, encourage, or promote infringing conduct. *See, e.g.*, *supra* Section X.A.1. Moreover, the portions of Section 14.3 of Defendants' Labels upon which Johnson relies do not disclose a "reduction of bloating" from a pre-treatment baseline. For example, the "Subject Global Assessment (SGA) question" asked: "In regards to your IBS symptoms, compared to the way you felt before you started study medication, have you, in the past 7 days, had adequate relied of your IBS symptoms? [Yes/No]." (Norwich_NJ_RIFAX_028517 at 528; AMN-RFXMN_00044755 at 767.) The symptom of bloating is not necessary to a diagnosis of IBS-D. The SGA question therefore does not query whether clinical study subjects experienced a specific reduction of bloating—let alone "bloating associated with [IBS-D], which Dr. Johnson characterizes as being distinct from IBS symptoms—compared to a pre-treatment baseline. Likewise, Defendants' Labels do not describe any assessment of bloating symptoms relative to a "baseline." Rather, the abdominal pain and daily stool consistency endpoints that Dr. Johnson opines describe "assessing IBS-D symptoms after treatment by comparing them to a reduction in the 'baseline' symptoms" (*see* Norwich Johnson Report, ¶ 113; Amneal Johnson Report, ¶ 109) do not involve a reduction of

bloating or the treatment of "bloating associated with [IBS-D]" required by all claims of the '571 patent. (Norwich_NJ_RIFAX_028517 at 528-29; AMN-RFXMN_00044755 at 767-768.) At best, Dr. Johnson relies on reports of "positive clinical responses" for IBS "symptoms" generally, but has not identified any disclosure on the Defendants' Labels showing treatment of bloating particularly.

128. It is thus my opinion that Defendants' Labels do not recommend, encourage, or promote the administration of rifaximin to bloating associated with IBS-D "wherein the treating of bloating comprises a reduction of bloating from baseline symptoms established prior to treatment[,]" as required by claim 2 of the '571 patent.

### 3. Claim 3

129. As stated above, claim 3 of the '571 patent incorporates via dependency all requirements claim 2 (and also, therefore, all requirements of claim 1) and further requires that "the reduction of bloating is achieved following 7 days after the administration of rifaximin." (*See* '571 patent, col. 46, ll. 47-49.) It is my opinion that Defendants' Labels do not encourage, recommend, or promote to physicians and/or patients the method of claim 3.

130. I incorporate by reference my discussion of the recitation "achieved following 7 days after the administration of rifaximin" concerning claim 6 of the '912 patent.

131. Dr. Johnson opines that each of Defendants' Labels "instructs, recommends, encourages, and promotes that physicians and patients should follow the method of claim 3 to treat bloating in female subject(s)." (Norwich Johnson Report, ¶ 115; Amneal Johnson Report, ¶ 111.) To support this opinion, Dr. Johnson claims that: (1) Defendants' Labels' "Clinical Studies" section "advises physicians and patients to assess reduction of bloating in IBS-D patients following 7 days after the administration of rifaximin" (Norwich Johnson Report, ¶ 116; Amneal Johnson Report, ¶ 112); and (2) the "daily question" of Trial 3, weekly SGA question of

# EXHIBIT Z

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., AND BAUSCH HEALTH IRELAND LTD.<br>Plaintiffs,<br>v.<br>NORWICH PHARMACEUTICALS INC.,<br>Defendant. | Case No.: 1:24-cv-7140-JFM |

**EXPERT INFRINGEMENT REPORT OF DR. DAVID A. JOHNSON**
**REGARDING INFRINGEMENT OF THE ASSERTED IBS-D PATENTS**

I declare under penalty of perjury under the laws of the United States that the following is true and correct. Executed in Norfolk, VA on September 17, 2025

Dr. David A. Johnson

at 529, 530 (assessing patients for "a 50% reduction in the number of days in a week with a daily stool consistency of Bristol Stool Scale type 6 or 7 compared ***with baseline***," "≥50% reduction ***from baseline*** in days/week with loose or watery stools" and "a 50% or greater reduction in the number of days in a week with stool consistency of type 6 or 7 ***compared with baseline***") (emphasis added)).

**D. Treating Patients with Irritable Bowel Syndrome**

47. "Irritable bowel syndrome (IBS) is a chronic, often debilitating, and highly prevalent disorder." (Lacy et al. (2020) at 17).[2] "In clinical practice, IBS is characterized by symptoms of recurrent abdominal pain and disordered defecation." (*Id.*). The standard of care for treating IBS patients has historically used the Rome criteria, a standard diagnostic guideline for classifying functional gastrointestinal disorders developed by the Rome Foundation. (*Id.*; *see also* Aziz et al. (2018) at 1017).[3] The Rome guidelines "recommend the use of symptom-based criteria to aid clinicians towards making a positive diagnosis of IBS without the need to perform extensive investigations." (Aziz et al. (2018) at 1017). An international panel of experts periodically updates the Rome guidelines. (*Id.* at 1017–1018).

48. As discussed in my declaration of August 4, 2025 (ECF 121-2), as of the priority date of the '912 and '571 Patents, a POSITA would have been aware of and consulted the Rome III criteria, the standard diagnostic guideline for classifying functional gastrointestinal disorders developed by the Rome Foundation at that time. (ECF 121-1, ¶33). The current guidelines are the Rome IV Diagnostic Criteria for Disorders of Gut-Brain Interaction (DGBI) (May 2016) ("Rome

[2] Lacy, B.E., et. al, *ACG Clinical Guideline: Management of Irritable Bowel Syndrome*, Am. J. Gastroenterol. 116:17–44 (published online December 14, 2020).
[3] Aziz, I., et al., *How the Change in IBS Criteria From Rome III to Rome IV Impacts on Clinical Characteristics and Key Pathophysiological Factors*, Am. J. Gastroenterol. 113:1017–1025 (published online June 8, 2018).

IV Criteria" or "Rome IV"). The predominant changes from the Rome III Criteria to Rome IV Criteria relating to IBS were (1) removing the term "abdominal discomfort"; and (2) increasing symptom frequency from "at least 3 days/month to at least 1 day/week":

**Table 1 The Rome III and Rome IV diagnostic criteria for IBS [8, 9]**

| Rome III | Rome IV |
|---|---|
| Recurrent abdominal pain or discomfort at least 3 days/month in the last 3 months associated with two or more of the following criteria: | Recurrent abdominal pain on average at least 1 day/week in the last 3 months, associated with two or more of the following criteria: |
| 1. Improvement with defecation | 1. Related to defecation |
| 2. Onset associated with a change in frequency of stool | 2. Associated with a change in frequency of stool |
| 3. Onset associated with a change in form (appearance) of stool | 3. Associated with a change in form (appearance) of stool |
| Note: criteria fulfilled for the last 3 months with symptom onset at least 6 months prior to diagnosis | |

(Aziz et al. (2018) at 1018).

49. As I explained in my declaration, (ECF 121-2, ¶33), under the Rome III criteria, a POSITA would have considered bloating associated with diarrhea-predominant irritable bowel syndrome to be distinct from irritable bowel syndrome. (*See* Drossman, D. et al., *The Functional Gastrointestinal Disorders and the Rome III Process*, *Gastroenterology*, vol. 130, No. 5, 1379 (2006) (Under Rome III, "IBS (C1) is more specifically defined as pain associated with change in bowel habit, and this is distinct from functional diarrhea (C4) characterized by loose stools and no pain, or functional bloating (C2) when there is no change in bowel habit. Each condition also has

***different diagnostic and treatment approaches***.") (emphasis added)[4]; Drossman, D. et al., Rome III The Functional Gastrointestinal Disorders, at 5–7 (3d Ed. 2006) (same)).[5] Rome III recognizes that a patient suffering from bloating would not necessarily have IBS or diarrhea-predominant IBS, even though bloating can be a symptom of IBS or diarrhea-predominant IBS. Rome IV is consistent with Rome III in this regard, and even includes a figure illustrating this principle:




Rome IV at 7. As indicated with the light gray box, bloating occurs in patients without IBS (*e.g.*, with functional constipation, or functional diarrhea) and without IBS-D (*e.g.* with IBS-C), but it can also be a symptom associated with IBS-D.

50. Overall, research indicates that the update from Rome III to Rome IV "will not have major implications in diagnostic coding in Western Gastroenterology clinics," as approximately "85% of subjects with Rome III defined IBS fulfill criteria for Rome IV IBS." (Aziz et al. (2018) at 1024). Aziz et al. (2018) reported a "greater proportion of females" under Rome IV as compared

[4] Drossman, D., *The Functional Gastrointestinal Disorders and the Rome III Process*, *Gastroenterology*, vol. 130, No. 5, 1379 (2006).
[5] Drossman, D., *Rome III The Functional Gastrointestinal Disorders*, at 5–7 (3d Ed. 2006).

to Rome III patients, but did not report any statistically significant differences in the prevalence of IBS Subtypes under Rome IV as compared to Rome III. (*Id.* at 1020–21). "[I]n general," studies "suggest that the removal of discomfort and infrequent abdominal pain from the current iteration of IBS criteria identifies a subset with more severe disease activity." (*Id.* at 1022). Accordingly, the differences between the Rome III and Rome IV Criteria are not significant to my infringement analysis below.

51. In the United States, the standard of care for treating IBS patients also follows evidence-backed recommendations and guidance provided by the American College of Gastroenterology (ACG) and American Gastroenterological Association (AGA). While President of the American College of Gastroenterology, I helped implement the ACG's still-ongoing practice of rating the strength of recommendation and quality of supporting evidence. The ACG and AGA's guidances are prepared by panels of experts after reviewing the scientific evidence for treatments, including clinical trial data. In my experience, physicians who follow an evidence-based approach (which includes most gastroenterologists) would consider these guidances in their practice and typically follow them.

52. The ACG and AGA have each issued guidance regarding using rifaximin to treat IBS symptoms specifically. (*See* Lacy et al. (2020) at 17, 19, 21, 34–35, tbls. 2–3; Lembo et al. (2022) at 137–139, 142–145).[6] In 2020, the ACG published guidance in which it "recommend[s] the use of rifaximin to treat global IBS-D symptoms." (Lacy et al. (2020) at 34 (noting this is a "Strong recommendation" made from a "moderate level of evidence")). In 2014, the AGA began recommending "using rifaximin in patients with IBS-D," and in 2022 additionally recommended

[6] Lembo, A. et al., *AGA Clinical Practice Guideline on the Pharmacological Management of Irritable Bowel Syndrome With Diarrhea*, Gastroenterology 163:137–151 (2022).

"retreatment with rifaximin" for "patients with IBS-D with an initial response to rifaximin who develop recurrent symptoms." (Lembo et al. (2022) at 144 (describing these as "Conditional recommendation[s]" made with "moderate certainty")).

53. In general, symptom-focused diagnosis and treatment of IBS is important because "The exact cause of IBS is unknown[.]" (Aziz et al. (2018) at 1017). Irritable bowel syndrome is "defined by no identifiable structural or biochemical abnormality to explain the symptoms on routine clinical tests." (*Id.*) IBS patients may present with a variety of different symptoms, including abdominal pain, constipation, and diarrhea. (*See*, *e.g.*, Rome IV Criteria at 6–7). Therefore, as a practical matter, treating IBS-D on an individual patient basis requires identifying that particular patient's baseline symptoms and periodically evaluating whether treatment is improving those symptoms. (*See also id.* at 6 (explaining that "IBS subtypes related to bowel habit abnormalities," such as "IBS-D," "can only be confidently established when the patients is evaluated off medications used to treat bowel habit abnormalities")).

54. As noted above, I have long been a Professor of Medicine and Chief of Gastroenterology at Eastern Virginia Medical School at Old Dominion University. In my own gastroenterology practice since the priority date, I treat potential IBS patients using the following approach, which comports with the expert consensus of the Rome criteria, as well as United States national gastroenterology guidelines. When visited by patients with potential IBS, I first inquire regarding what types of symptoms they are experiencing, the duration and frequency of those symptoms, and the severity of those symptoms (*e.g.*, how they interfere with the patient's daily quality of life). This allows me to classify the patients according to the Rome criteria and build a treatment strategy around mitigating the particular symptoms associated with their disease state.

55. As part of the treatment strategies I use for IBS patients, I have them return for follow-up visits within 2–4 weeks of their initial appointment. In the interim, I have my patients track their condition in a daily journal and immediately report aberrant symptoms that may require additional intervention. The daily journal serves as a helpful tool in follow-up visits for assessing how and when symptoms have changed. In the follow-up visits, I begin by asking the patient whether they feel better (a global assessment) and when they started to feel better. I then inquire why the patient does or does not feel better. This allows me to determine whether (and how much) the symptoms associated with their disease state have reduced and whether there are any new factors to consider (*e.g.*, altered sleep patterns or new symptoms). I use this information to refine the treatment strategy, if necessary.

56. I follow an evidence-based approach to building treatment strategies for my patients. I generally follow the current evidence-based recommendations provided by national guidelines and other evidential studies on "best practices." I also generally consider and follow the treatment methods for drugs that have been evidentiarily supported through clinical trials, particularly the treatment methods and studies described on approved drug labels. I generally do not experiment with alternative dosing regimens beyond those described on drug labels, as doing so would require departing from evidence-based practice.

57. In my own practice, I have prescribed Xifaxan® 550 mg to patients for IBS-D and hepatic encephalopathy since the FDA approved it for each of those indications. Consistent with my general practice, I prescribe Xifaxan® 550 mg to patients after first identifying baseline symptoms that support an IBS diagnosis and diarrheal predominance. When I do so, I follow the labeled treatment regimen and have 550 mg of rifaximin administered to the patient three times daily for 14 days. As described above, I have patients track their condition in a daily journal and,

at a follow-up visit roughly 2–4 weeks later, I inquire about their symptoms and evaluate reductions relative to the baseline symptoms I previously identified. Over the years, I have treated female IBS-D patients in this manner. Through affirmative responses, my patients have reported experiencing reductions in symptoms at various points throughout their course of treatment (*e.g.*, including experiencing relief almost immediately, relief after one week of administration, and experiencing relief only after the 14 days of administration).

## X. INFRINGEMENT OF THE ’912 PATENT

### A. Norwich’s Label Would Encourage Physicians’ and Patients’ Direct Infringement

58. In my opinion, the ANDA Label encourages, recommends, and promotes that physicians and patients should administer 550 mg rifaximin tablets according to the claimed methods of claims 1–7 of the ’912 Patent.

#### 1. Claim 1 – A method of treating one or more symptoms of irritable bowel syndrome (IBS) in a female subject, said method comprising administering, 550 mg of rifaximin, TID for 14 days to the female subject, thereby treating one or more symptoms of IBS in the female subject.

59. In my opinion, the ANDA Label encourages, recommends, and promotes that physicians and patients should follow the method of claim 1 to treat one or more symptoms of IBS in female subject(s).

60. As discussed above, (*supra* Section **Error! Reference source not found.** (“Background”)), the “Indications and Usage” sections instructs physicians and patients that the generic 550 mg rifaximin tablets should be administered for the “Treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults”:

-----------------------------INDICATIONS AND USAGE-----------------------------

Rifaximin tablets are a rifamycin antibacterial indicated for:

- Treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults. (1.3)

(Norwich_NJ_RIFAX_028517 at 519; *see also id.* at 520 ("Rifaximin tablets are indicated for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.")). Claim 3 requires that "the IBS is diarrhea-predominant IBS," which makes clear that treating IBS-D symptoms falls within the scope of claim 1. *See* '912 Patent, cl. 3. And, as discussed above, (*supra* Section **Error! Reference source not found.** ("Background")), because the exact cause of IBS is not known, the standard of care in treating IBS-D requires a symptom-focused approach. Thus, the ANDA Label encourages "treating one or more symptoms of irritable bowel syndrome (IBS)," as claimed.

61. The ANDA Label also specifically encourages treating IBS-D symptoms in female patients. That the indication is for "Adults" IBS-D means that it includes female IBS-D patients. IBS generally "shows a female preponderance," and that preponderance even appears to skew more towards female patients under the more recent Rome IV guidelines. (Aziz et al. (2018) at 1020 (reporting that "Rome IV-positive IBS subjects had a greater proportion of females compared to their Rome IV-negative counterparts"); *see also id.* at 1018 (describing a prior study reporting that those with "Rome IV positive IBS . . . (compared to Rome IV-negative) . . . were more often female[.]")).

62. The ANDA Label also makes clear that its instructions apply to treating female IBS-D patients. Multiple sections of the ANDA Label confirm that the instructions apply to female IBS-D patients. In Sections 6.1 and 14.3, the ANDA Label explains that, across three placebo-controlled clinical studies examining the efficacy of rifaximin for the treatment of IBS-D, a combined 72% of the adult patients were female. (Norwich_NJ_RIFAX_028517at 521; *see also*

Rome III criteria, including their reference to the claimed "pain," "abdominal pain," and "abdominal discomfort" symptoms. (Norwich_NJ_RIFAX_028517 at 527–528). The ANDA Label describes how patients receiving the claimed regimen were more likely to experience a "≥30% reduction in abdominal pain" across Trials 1, 2, and 3. (*Id.* at 529–530).

70. The ANDA Label also identifies "diarrhea," "frequent stool production," "watery stool," and "urgency" as IBS symptoms. (*Id.* at 527 (noting that "diarrhea-predominant IBS" is "IBS-D"); *id.* (noting that "Abnormal stool frequency" can include having "greater than 3 bowel movements per day"); *id.* (listing "loose/watery stool" as a form of "Abnormal stool form"); *id.* (listing "urgency" as a form of "Abnormal stool passage")). It explains that patients in Trials 1 and 2 in the treatment group (who received "rifaximin tablets 550 mg three times a day . . . for 14 days," as claimed) were more likely to experience "Adequate relief of IBS symptoms" generally. (*Id.* at 527–528, tbl. 6). And it explains that patients receiving the claimed regimen were also more likely to experience a "≥50% reduction from baseline in days/week with loose or watery stools." (*Id.* at 529–530, tbls. 7, 8).

71. For these reasons, the ANDA Label encourages physicians and patients to use the treatment method of claim 1, "wherein the one or more symptoms are selected from one or more of cramping, pain, diarrhea, constipation, lumpy stool, watery stool, frequent stool production, abdominal pain, abdominal discomfort, and urgency," as claimed.

**3. Claim 3 – The method of claim 1, wherein the IBS is diarrhea-predominant IBS.**

72. Claim 3 depends from claim 1. It additionally requires that the "the IBS is diarrhea-predominant IBS." In my opinion, the ANDA Label encourages, recommends, and promotes that physicians and patients should follow the method of claim 3 to treat one or more symptoms of IBS-D in female subject(s).

73. The "Indications and Usage" sections instruct physicians and patients that the generic 550 mg rifaximin tablets should be administered for the "Treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults." (Norwich_NJ_RIFAX_028517 at 519; *see also id.* at 520 ("Rifaximin tablets are indicated for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.")). Similarly, the "Dosage and Administration" sections recommend a particular dosage regimen for the "Condition" "IBS-D." (*Id.* at 519). Section 14.3 confirms that IBS-D is referring to the IBS "subtype[]" "diarrhea-predominant IBS (IBS-D)." (*Id.* at 527). Thus, the ANDA Label encourages physicians and patients to use the treatment method of claim 1, "wherein the IBS is diarrhea-predominant IBS," as claimed.

**4. Claim 4 – The method of claim 1, wherein the IBS is alternating IBS.**

74. Claim 4 depends from claim 1. It additionally requires that "the IBS is alternating IBS." In my opinion, the ANDA Label encourages, recommends, and promotes that physicians and patients should follow the method of claim 4 to treat one or more symptoms of alternating IBS (IBS-A) in female subject(s).

75. The ANDA Label states the generic rifaximin tablets are indicated for the "Treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults." (Norwich_NJ_RIFAX_028517 at 519). But it is not contraindicated for other subtypes of IBS. (*Id.* at 519-520). Rather, the ANDA Label explains that "Patients with "alternating IBS" have "bowel habits alternating between diarrhea and constipation" and that the Trial 1 and Trial 2 results were obtained, in part, in "Patients with . . . alternating IBS." (*Id.* at 527 ("Patients with both IBS-D and alternating IBS were included in Trials 1 and 2.")). As discussed above, these trials showed statistically significant improvements in "Adequate Relief of IBS Symptoms," "Abdominal Pain," and "Stool Consistency." (*Id.* at 527-529, tbls. 6, 7).

76. Given that the ANDA Label describes (1) IBS-A patients has having, at least part of the time, "diarrhea" like symptoms; and (2) those patients being included in the successful Trial 1 and Trial 2 results, in my opinion the ANDA Label as a whole encourages physicians and patients to use the treatment method of claim 1, "wherein the IBS is alternating IBS," as claimed.

**5. Claim 5 – The method of claim 1, wherein the treating one or more symptoms of IBS comprises a reduction of the one or more symptoms of IBS from baseline symptoms established prior to treatment.**

77. Claim 5 depends from claim 1. It additionally requires that "the treating one or more symptoms of IBS comprises a reduction of the one or more symptoms of IBS from baseline symptoms established prior to treatment." In my opinion, the ANDA Label encourages, recommends, and promotes that physicians and patients should follow the method of claim 5 to treat one or more symptoms of IBS in female subject(s).

78. As discussed above, (*supra* Section **Error! Reference source not found.** ("Background")), identifying baseline symptoms before treatment and treating to reduce those symptoms is standard practice when treating IBS. The ANDA Label describes and reaffirms this practice in connection with administering the generic rifaximin. Section 14.3 provides physicians and patients a list of "Symptoms that Cumulatively Support the Diagnosis of Irritable Bowel Syndrome." (Norwich_NJ_RIFAX_028517 at 527). The ANDA Label informs physicians and patients that "adequate relief" may reliably be determined through a "Subject Global Assessment (SGA) question" that asks patients (including female patients) to compare their "IBS symptoms" to "the way [they] felt before [they] started" treatment:

> The primary endpoint for both trials was the proportion of patients who achieved adequate relief of IBS signs and symptoms for at least 2 of 4 weeks during the month following 14 days of treatment. Adequate relief was defined as a response of "yes" to the following weekly Subject Global Assessment (SGA) question: *"In regards to your IBS symptoms, compared to the way you felt before you started study medication, have you, in the past 7 days, had adequate relief of your IBS symptoms? [Yes/No]."*

(*Id.* at 528). SGA is a global measure that includes overall wellbeing, abdominal pain/discomfort, and bowel function.

79. The ANDA Label also repeatedly describes assessing IBS-D symptoms after treatment by comparing them to a reduction in the "baseline" symptoms. (*See, e.g.*, Norwich_NJ_RIFAX_028517 at 529, 530 (assessing patients for "a >30% ***decrease from baseline*** in abdominal pain," a ">30% improvement ***from baseline*** in the weekly average abdominal pain score based on [a] daily question," and "a 30% or greater improvement ***from baseline*** in the weekly average abdominal pain score") (emphasis added); *id.* at 529, 530 (assessing patients for "a 50% reduction in the number of days in a week with a daily stool consistency of Bristol Stool Scale type 6 or 7 compared ***with baseline***," "≥50% ***reduction from baseline*** in days/week with loose or watery stools" and "a 50% or greater reduction in the number of days in a week with stool consistency of type 6 or 7 ***compared with baseline***") (emphasis added)).

80. Given that the ANDA Label describes reducing symptoms from baseline symptoms after rifaximin treatment, in my opinion the ANDA Label as a whole encourages physicians and patients to use the treatment method of claim 1, wherein "the treating one or more symptoms of IBS comprises a reduction of the one or more symptoms of IBS from baseline symptoms established prior to treatment," as claimed.

**6. Claim 6 – The method of claim 5, wherein the reduction of the one or more symptoms is achieved following 7 days after the administration of rifaximin.**

81. Claim 6 depends from claim 5. It additionally requires that "the reduction of the one or more symptoms is achieved following 7 days after the administration of rifaximin." As explained in my prior declaration, this requirement (the "7 days limitation") relates to the amount of time before the reduction of the IBS symptoms is achieved. (ECF 121-2, Johnson Decl. ¶¶ 20–

25). Because claim 1 recites a treatment period of 14 days, a POSITA would understand that the 7 days limitation must occur during this 14 day treatment. In my opinion, the ANDA Label encourages, recommends, and promotes that physicians and patients should follow the method of claim 6 to treat one or more symptoms of IBS in female subject(s).

82. In Section 14.3, the "Clinical Studies" for "Irritable Bowel Syndrome with Diarrhea," the ANDA Label informs physicians and patients that patients' symptoms should be assessed during administration of rifaximin using a "Symptom Diary":

**Figure 4: Trial 3 Study Design**




(Norwich_NJ_RIFAX_028517 at 528). The ANDA Label also recommends that patient symptoms be assessed on a daily and weekly basis. The "Symptom Diary" used throughout the treatment phases of Trial 3 provided "Daily/Weekly" tracking of symptoms. (*Id.*).

83. The ANDA Label provides additional examples of assessing symptom improvements on a "daily" and "weekly" basis. For Trial 3, the ANDA Label describes a "daily question" for assessing "improvement from baseline in the weekly average abdominal pain score." (*Id.* at 529). It also describes assessing certain symptom improvements on a "weekly" basis in each of Trials 1, 2, and 3. (*Id.* at 528 (describing the "weekly Subject Global Assessment (SGA)

# EXHIBIT AA

**CONTAINS INFORMATION MARKED AS CONFIDENTIAL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., AND BAUSCH HEALTH IRELAND LTD.<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, AND AMNEAL EU, LIMITED,<br><br>Defendants. | Case No.: 1:24-CV-04607-JFM |
| SALIX PHARMACEUTICALS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NORWICH PHARMACEUTICALS INC.,<br><br>Defendant. | Case No.: 1:24-CV-07140-JFM |

**<u>REBUTTAL EXPERT REPORT OF HERBERT L. DUPONT, M.D.</u>**

**DATED**: October 22, 2025

Herbert L. DuPont, M.D.

60. Retrospective studies are conducted because they are useful for providing a historical perspective on disease progression. It is well known, however, that the presence of hindsight bias in these studies makes them unreliable for forecasting the safety and efficacy of therapeutic drugs. The data used to form retrospective studies cannot accurately predict drug effects, which ultimately limits the utility of these studies in drug-therapy research, where predicative accuracy is paramount.

61. In fact, it is a common practice amongst academic and professional boards to, because of these aforementioned biases, reject retrospective studies that claim to draw predictive conclusions about the effects of therapeutic drugs. Throughout my career, I have served on various academic and professional boards that consider whether to accept references for publication and/or presentation. It is well-accepted on these boards that retrospective studies do not have predictive value regarding the therapeutic effects drugs may provide, and it is commonplace to reject them for presentation and publication on that basis. On multiple instances, I have served on boards that explicitly inform members that the board will, as a general rule, refuse to approve retrospective studies that examine drug efficacy and attempt to draw such predictive conclusions.

**C. Expert opinion and narratives.**

62. Expert opinions and narratives are the weakest form of evidence.[26] Expert opinions and narratives are often biased by the expert's experience or opinions and there is little to no control of confounding factors.

[26] Zlowodzki 2006, XIFAX_AMN_1873844 at -845.

162. The low bioavailability of rifaximin in the aqueous environment of the colon can be illustrated, for example, by placing rifaximin in a full glass of water. On June 29, 2006, I placed two-200 mg tablets in a full glass of water and allowed them to dissolve overnight. Nearly eight hours later or longer, as shown below, the rifaximin was fully submerged, yet undissolved and still intact as tablets at the bottom of the glass. Because our body is an aqueous environment, the gut bacteria live in the saturated part of the gut, and not where the drug is concentrated.



(Rifaximin Dissolution Image, 2009-06-29).

would not necessarily have worked in another because the minimum effective dose will be different for different pathogenic bacteria.

173. Further, to ascertain an effective dose, it would have been necessary to conduct research studies involving a sufficient number of subjects because of the different makeup of the intestinal microbiota and variations in hypersensitivity to various drugs unique to specific populations and diseases.

## XI. RIFAXIMIN RESISTANCE CONCERNS – IRRITABLE BOWEL SYNDROME

174. In his report on IBS, Dr. Harary cites several references that discuss the risk with rifaximin of bacterial resistance—Sharara, Cuoco, Barrett, Yang, Pimentel Book, Prantera 2006, Scarpignato—the implication being that a POSA would not have been concerned about or would not have expected rifaximin resistance in IBS.[186] I disagree.

175. I address each reference individually below. A POSA would have the perspective I describe above and below, regardless of the teachings of the references Dr. Harary cites. Generally speaking, these references provide anecdotal reports that are not tied to the course of administration described in the asserted claims. Further, the development of antibiotic resistance is a fundamental part of treating patients with antibiotics. All antibiotics result in antibiotic resistance, and by 2008 rifaximin was well-established to be no exception. A POSA would understand that the teachings about the anecdotal studies Dr. Harary cites would not negate the instances of antibiotic resistance observed by others in response to courses of treatment administering rifaximin for less time and/or in lesser amounts.

176. It is also worth noting that concerns about (and, as a result, continued study of) antibiotic resistance in response to rifaximin have continued through 2008 and well-beyond.

---

[186] Dr. Harary's Opening Expert Report at ¶¶ 127, 137, 142, 150–151, 155, 243, 252.

Researchers have identified strains of *C. difficile* that are resistance to rifaximin.[187] Recently it was discovered that rifaximin causes cross-resistance to daptomycin, a drug considered the last resort for treatment of highly resistant bacterial strains, classified as a "vital" drug.[188] And in a study published in 2013, we identified rifaximin-resistant *Escherichia coli* strains in patients with ulcerative colitis who have received prolonged rifamycin as therapy.[189] The fact that investigation into antibiotic resistance caused by rifaximin continues after 2008 further illustrates how, in 2008 timeframe and before, antibiotic resistance to rifaximin was a material concern to those in the field, and that the contrary conclusion Dr. Harary draws does not reflect the true state of the art at that time.

### A. Responses to references on which Dr. Harary relies

#### 1. Pimentel Book 2006

177. The Pimentel Book 2006 did not disclose that rifaximin could be safely and effectively used to treat IBS-D. Instead it emphasized the complexity and uncertainty in IBS research. And it explains that rifaximin's efficacy to treat IBS-D was still unknown as of 2006.

178. Dr. Harary states that the Pimentel Book 2006 teaches that "neither drug [neomycin or rifaximin] is likely to affect bacteria in other areas of the body, thereby avoiding the problem of bacterial resistance, which is a major reason that so many other drugs, over time, lose their resistance."[190] However, as explained above, resistance is a concern regardless of whether antibiotics "affect bacteria in other areas of the body" (*i.e.* absorbed antibiotics) or remains in the gut (*i.e.* non-absorbed antibiotics).

---

[187] O'Connor 2008.
[188] Turner 2024.
[189] Kothary 2013.
[190] *Id.* at ¶ 127.

However, a POSA would not have relied on this study to ascertain the safety and efficacy of treating symptoms of IBS-D.

182. A POSA would have recognized that Cuoco 2006 was examining the effect of rifaximin on treating SIBO, not IBS-D. By 2008, many of the available studies examined the effect of rifaximin to treat SIBO. SIBO is traditionally diagnosed in patients through lactulose hydrogen breath tests and is a different gastrointestinal disorder than IBS-D. Many studies that were supposedly proposed as evaluations of the effect of rifaximin in IBS-D patients performed lactulose hydrogen breath test to identify subjects for enrollment. Thus, these studies were studying SIBO, not IBS. Some of these studies concluded that rifaximin could effectively treat certain symptoms of SIBO. However, a POSA would not have relied on these studies to assess the efficacy and safety of using rifaximin to treat IBS-D, which is not invariably complicated by SIBO.

183. A POSA would have recognized that SIBO and IBS-D were two different disorders and conclusions about rifaximin's safety and efficacy to treat SIBO could not be used determine rifaximin's safety and efficacy to treat symptoms of IBS-D. Some in the field thought that SIBO caused IBS-D, but these theories were controversial and unverified. SIBO is found in a broad number of disorders of adults associated with intestinal failure and dysfunction, including short bowel resection, dysmotility disorders and inflammatory bowel disease. Unlike, IBS, SIBO is more common in the elderly. Notably, SIBO was not part of the Rome III criteria diagnosis of IBS, which demonstrates that the consensus of international functional bowel disease was that SIBO should not be used to diagnose IBS. Therefore, a POSA would not have relied on Cuoco 2006 to ascertain the safety and efficacy of administering rifaximin to treat symptoms of IBS-D.

**5. Barrett 2006**

195. Barrett 2006 is available only in abstract form and cannot be relied on for conclusions about the safety and efficacy of a treatment.[209] By retrospectively reviewing charts, investigators identified eight patients with IBS that had been administered probiotics and rifaximin 400 mg three times a day for 1 to 5 months. Clinical improvement was reported. But the study was uncontrolled, retrospective, poorly-designed, failed to identify an outcome parameter before the study was performed, and too small to be of value to a POSA. And the clinical outcome of this therapy in the five IBS-D patients is not clear. It is also unclear rifaximin can be administer alone without probiotics. The results of this study would not have been usable to a POSA.

**6. Prantera 2006**

196. Prantera 2006 describes a study evaluating rifaximin in the treatment of active Crohn's Disease (CD) for 83 subjects who reported mild-to-moderate CD (Crohn's Disease Activity Index (CDAI )) 200–400.[210] None of the 83 subjects were diagnosed with having IBS-D nor symptoms associated with IBS-D. Subjects were administered either placebo or 800 mg of rifaximin twice a day for a 12-week period.[211]

197. A POSA would have recognized that Prantera 2006 was examining the effect of rifaximin on treating CD, not IBS-D. A POSA would understand that CD is a different disease with different symptom profiles and different cause than IBS-D. A POSA therefore would not consider Prantera 2006's study or its results indicative of how safe or efficacious administering rifaximin to IBS-D patients may be. Rather, a POSA would understand that Prantera 2006 lacked any meaningful information on the safety and efficacy of treating IBS-D using rifaximin.

---

209 Barrett 2006 at NORWICH_NJ_INV_000001.
210 Prantera 2006 at Norwich_NJ_INV_000327.
211 *Id.*

198. Dr. Harary states that Prantera 2006 teaches "no serious drug-related side effects were observed during the study, confirming the good safety profile of this antibiotic," and thus "seems to confirm that antibiotic resistance during the study was not a concern."[212] I disagree that a POSA would find this teaching applicable to IBS-D patients and/or the course of treatment described in the asserted claims, which require administering more rifaximin daily (1650 mg). As explained above, resistance is a concern regardless of whether antibiotics affect bacteria in other areas of the body or remain in the gut. Further, a POSA would understand that whether and how rifaximin affects the microbiome may differ between CD patients and IBS-D patients, such that what may be safe and efficacious for one type of patients may not be safe and efficacious for the other.

199. Prantera 2006 acknowledges its own limitations, and states that "the results of this exploratory study need to be confirmed by a larger, randomized placebo-controlled trial." A POSA therefore would, even for CD, have reason to doubt the results of this study due to the small sample size, and a POSA certainly would not have relied on Prantera 2006's study to establish the safety and efficacy of rifaximin to treat IBS-D symptoms.

**7. Scarpignato**

200. Scarpignato does not disclose that rifaximin could be safely and effectively used to treat IBS-D, but rather confirms the complexity and uncertainty of IBS research. Scarpignato does not report a new study—it is a review article discussing prior rifaximin literature. Unlike other indications for rifaximin it characterizes as "Established Indications," Scarpignato lists "IBS" as only a "Potential" indication for rifaximin.[213]

---

[212] Dr. Harary's Opening Expert Report at ¶¶ 243, 292.
[213] Scarpignato at NORWICH_NJ_INV_00402, tbl. 7.

201. Scarpignato suggests that the etiology of IBS is unknown and discusses "the hypothesis that SIBO could represent a framework to understand IBS."[214] The authors specifically note there is only a "possibility that SIBO may explain bloating, which is present in 92% of patients with IBS[,]" and further clarify that "[a] randomized, placebo-controlled, double-blind trial on the effect of rifaximin on SIBO and symptom relief of IBS is ongoing in the U.S."[215] As discussed above, a POSA would have recognized that SIBO and IBS-D were two different disorders and conclusions about rifaximin's safety and efficacy to treat SIBO could not be used determine rifaximin's safety and efficacy to treat symptoms of IBS-D. Some in the field thought that SIBO caused IBS-D, but these theories were controversial and unverified.

202. As for antibiotic resistance, Scarpignato explains that "antibiotic resistance continues to increase" and that "Antibiotic resistance. . .has been recognized to be an important clinical problem" that "has great clinical, economic, political and environmental implications worldwide."[216] It notes the need for "Strict adherence" to "ongoing measures of infection control, education and antibiotic policy"—*e.g.*, the need to avoid over-prescribing and inappropriately prescribing antibiotics.[217] Scarpignato further notes that "Antimicrobial resistance to rifamycins"—the family of antibiotics to which rifaximin belongs—"develops rapidly both in vitro and in vivo," and that "structurally related, rifaximin could share this potential."[218]

203. Scarpignato also identifies multiple instances where antibiotic resistance to rifaximin were reported in the literature. This includes "all five strains" of tested *H. pylori* becoming resistant after exposure *in vitro* to "subinhibitory concentrations" of rifaximin.[219] It also

---

[214] *Id.* at NORWICH_NJ_INV_00402.
[215] *Id.* at NORWICH_NJ_INV_00403.
[216] *Id.* at NORWICH_NJ_INV_00394.
[217] *Id.*
[218] *Id.* at NORWICH_NJ_INV_00396.
[219] *Id.*

includes *in vivo* reports of antibiotic resistance to rifaximin "rang[ing] between 30 and 90% after short-term (5 days) antibiotic (800 mg daily) treatment" and a "similar pattern" in hepatic encephalopathy patients receiving "rifaximin 1,200 mg/day for 5 days."[220] Scarpignato would therefore confirm to a POSA their concern that administration of higher amounts rifaximin to IBS-D to patients for a longer period of time could product antibiotic resistance.

* * *

204. A fundamental issue in recommending antibiotics for a condition is knowledge of dose and duration of treatment to treat the condition while preventing development of adverse reactions, superinfections, and antibiotic resistance.[221]

205. However, at the time of the inventions, investigators were using rifaximin at various doses for different lengths of time. And none of these studies were reliable, randomized and well-controlled enough for a POSA to have reasonably relied on them to determine the right dosing regimen. And at the time of the inventions, none of these studies looked at the safety and efficacy of administering 550 mg of rifaximin TID for 14 days, particularly since this dose of the drug was not available.

206. As I explained above, when an antibiotic is first administered, within the first few days, there is a reduction of the overall population of bacteria that is susceptible to the antibiotic and the resistant strains proliferate. If the host is removed from the antibiotic treatment after a short period of time (after a few days), the selective pressure for the resistant bacteria is minimized and their growth tends to be suppressed by return of the pre-treatment drug-susceptible bacteria. And eventually, the overall population of bacteria in the host will likely become susceptible again to the antibiotic. However, at the same time, a POSA would have known that

---

[220] *Id.*
[221] *See* Ruberg 1995 at 1.

# EXHIBIT BB

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE DCO**

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A., and BAUSCH HEALTH IRELAND LTD.,

Plaintiffs,

v.

AMNEAL PHARMACEUTICALS OF NEW YORK, LLC and AMNEAL EU, LIMITED,

Defendants.

Case No. 1:24-CV-04607-JFM

# REBUTTAL EXPERT REPORT OF LEONARD CHYALL, PH.D. REGARDING VALIDITY OF U.S. PATENT NO. 8,193,196

October 22, 2025

Leonard J. Chyall

Leonard J. Chyall, Ph.D.

to provide specific crystallization and drying conditions to provide the form δ polymorph. Notably the product is dried to a water content of 3.3% to provide rifaximin form δ.

58. There are many differences between working examples provided in Cannata and Example 1 of the '196 Patent. As just one example, the crystalline rifaximin obtained according to Example 1 of the '196 Patent is crystallized by lowering the pH of the solvent mixture, while Cannata teaches the skilled person to recrystallize the product from a neutral solution of 70% ethanol/30% water.

59. In Cannata, Example 6 uses 70% ethanol/30% water as the solvent with iodine and ascorbic acid as reagents, and rifamycin O and 2-amino-4-methyl-pyridine as starting materials. Cananta at 8:27-44. *Id*. In contrast, the '196 Patent uses a different ethanol/water mixture and, in the '196 Patent, crystallization occurs by bringing the second reaction mixture to a pH of 2.0 with hydrochloric acid. '196 Patent at 7:40-41.

60. Cannata Example 9 uses a 1:1 ethanol/water mixture to achieve crystalline rifamycin, but the pH of the solution is not controlled prior to crystallization. Cannata at Example 9. This contrasts with the '196 Patent, which brings the reaction mixture to pH 2.0 and marks an important difference between the two processes.

61. Finally, as discussed above, Applicants provided evidence during prosecution of the '196 Patent that Examples 7 and 9 of Cannata did not produce polymorphic form δ or ε. XIFAX_AMN_0008044 at 8931-8944, 8984.

### C. Normix Italian Label (2000) ("Normix Label") (AMN-RFXMN_00036885-88)

62. The Normix Label was published in January 2000 and appears on the face of the '196 Patent. I understand Normix is a rifaximin product that has been marketed by by AlfaSigma since the late 1980s, and that it uses rifaximin form α as the active ingredient. *See* Confortini Tr.

at 26-27; C. Blandizzi et al., *Impact of crystal polymorphism on the systemic bioavailability of rifaximin, an antibiotic acting locally in the gastrointestinal tract, in healthy volunteers*, Drug Design, Dev. and Therapy 9:1-11 (2015) ("Blandizzi") (XIFAX_AMN_1869209) at 2.

63. The Normix Label describes a coated tablet comprising 200 mg rifaximin. AMN-RFXMN_000036885. It identifies the following "Therapeutic indications":

> 4.1 **Therapeutic indications**
> - Acute and chronic intestinal infections sustained by Gram-positive and Gram-negative bacteria; diarrhoeic syndrome.
> - Diarrhoea caused by an altered equilibrium in the intestinal microbial flora (summer diarrhoea, traveller's diarrhoea, enterocholitis).
> - Pre- and postoperative prophylaxis of infective complications in surgery of the gastroenteric region.
> - Coadjuvant in the treatment of hyperammonemia

*Id*.

64. The Normix Label is silent as to rifaximin being polymorphic, let alone as to the rifaximin being form δ or form ε. The Normix Label does not provide any XRPD data for the rifaximin drug substance or any testing of the water content of rifaximin. It provides no information about testing rifaximin for the presence of polymorphs.

**D. New Zealand Patent Application Publication No. NZ 531622A ("New Zealand Application") (AMN-RFXMN_00037310-36)**

65. New Zealand patent application publication No. NZ 531622A ("the New Zealand Application") bears a "RECEIVED" date of March 9, 2004 on the cover page but does not otherwise have any identifying dates for when it was published. AMN-RFXMN_00037310. Dr. Schinzer states that the application published on October 29, 2004 but provides no citation support for this statement. Schinzer Rep. ¶ 145.

66. The New Zealand application describes the α, β and γ forms of rifaximin, as well as parameters for obtaining those forms, but says nothing about the existence of δ or ε form, let

alone the conditions needed to obtain these specific forms. AMN-RFXMN_00037313 at 3:21-24; AMN-RFXMN_00037316 at 6:14-26; AMN-RFXMN_00037317 at 7:4-8:13.

**E. U.S. Patent No. 7,045,620 ("the '620 Patent") (XIFAX_AMN_0812015-24)**

67. U.S. Patent No. 7,045,620 ("the '620 Patent") was filed on December 5, 2003 and issued on May 16, 2006. The '620 Patent names overlapping inventors Giuseppe C. Viscomi, Manuela Campana, Dario Braga, and Donatella Confortini with the '196 Patent. I also understand that the '620 Patent is assigned to the same entity (Alfasigma S.p.A.) as the '196 Patent. XIFAX_AMN_0008007 (assignment record).

68. Dr. Schinzer states that the '620 Patent was filed on December 5, 2003 and that he understands that it is prior art but he says nothing further. Schinzer Rep. ¶ 148. I understand that the '620 Patent is only considered prior art under pre-AIA 35 U.S.C. § 102(e). I understand from counsel that under 35 U.S.C. § 102(e), a reference is considered prior art if it was filed in the United States before the invention and filed "by another." I understand the '620 Patent shares some inventors in common with the '196 Patent and also lists some different inventors. I understand from counsel that even if the named inventors only partially overlap across both disclosures that alone does not mean that the earlier application was filed by "another" to necessarily qualify as prior art under 35 U.S.C. § 102(e). Instead, I understand from counsel that what is significant is not only the differences in the listed inventors between the two patents, but also whether the portions of the '620 Patent that are relied on as prior art, and the subject matter of the claims in question, represent the work of a common inventive entity.

69. I have reviewed deposition testimony of the late Dr. Viscomi and have also reviewed deposition testimony of Donatella Confortini who are co-inventors on both the '620 Patent and the '196 Patent. In my opinion, the portions of the '620 Patent that Dr. Schinzer relies

on describe the work of the named inventors of the ’196 Patent. Accordingly, I understand that those disclosures are not “by another.”

70. I understand from the testimony of Dr. Viscomi that rifaximin form ε was initially referred to as “form 2” or “polymorph 2”, and rifaximin δ was initially referred to as “form 4” or “polymorph 4”. Viscomi Tr. at 178. I have reviewed a report dated March 11, 2004 from the University of Bologna concerning XRPD analysis of rifaximin samples. XIFAX_AMN_0798517 and XIFAX_AMN_1996754 (certified translation). This report identifies a new polymorph as “form 4” and describes how form 4 may be obtained by exposing form α to low humidity conditions for an extended period of time, and how form 2 may be obtained by drying form 4. *Id.* at -525 (reproduced below).







71. The March 11, 2004 report also states that the powder diffraction pattern obtained for form 4 solids was initially disclosed in an October 23, 2003 report. *Id.* at -518; *see also* XIFAX_AMN_0798441 and XIFAX_AMN_1996357 (cetified translation). Thus, in my opinion, the inventors invented rifaximin ε and rifaximin δ no later than October 23, 2003, which was when they first recognized and appreciated that the XRPD pattern of a sample of rifaximin indicated the creation of a new polymorphic form of rifaximin, which was subsequently named form 4 and then form δ.

72. The ’620 Patent names the same inventors as the ’196 Patent as well as additional individuals: Vincenzo Cannata, Denis Severini, Paolo Righi and Goffredo Rosini. Dr. Cannata co-invented processes for synthesizing rifaximin. *See, e.g.,* U.S. 4,557,866 (Cannata). Dr. Viscomi testified that Messrs. Cannata, Severini and Rosini were not involved in the identification of the polymorphic forms of rifaximin described by the ’620 Patent. Viscomi Tr. at 28, 32. Rather, they were involved in developing the manufacturing processes. *Id.* at 32. Dr. Confortini testified that Messrs. Severini, Righi, and Rosini were researchers at the University of Bologna’s industrial chemistry department and focused on developing large-scale manufacturing processes for rifaximin. Confortini Tr. at 33-34.

73. Dr. Schinzer relies on the process for preparing rifaximin α, β, and γ disclosed in the ’620 Patent, and more specifically, Examples 1 and 9 for his anticipation opinions. Schinzer Report ¶¶ 170-196. I understand that Dr. Confortini carried out the examples in the ’620 Patent and the ’196 Patent, Dr. Viscomi and Dr. Campana were also involved, and Dr. Braga generated the XRPD patterns. Confortini Tr. at 24-25, 29-30, 41-42, 49-50. I reviewed Dr. Confortini’s laboratory notebook documenting the experiments underlying the ’620 Patent and ’196 Patent examples. *See* XIFAX_AMN_1837657 (lab notebook); XIFAX_AMN_1872228 (certified translation of entries for experiments RFX-BR-01 through RFX-BR-12); XIFAX_AMN_1996376 (certified translation of entries for experiments RFX-BR-13 through RFX-BR-16; XIFAX_AMN_1837657 at 663-665, 683 (entries for experiments RFX-BR-01 and RFX-BR-12, underlying Examples 1 and 9 in the ’620 patent) and XIFAX_AMN_1872228 at 234-236, 254 (certified translation of those experiments). Therefore, the disclosures that Dr. Schinzer relies on from the ‘620 Patent were the work of the same inventors as those named on the ’196 Patent, and not that of Messrs. Severini, Righi, and Rosini.

containing the same)" and that "[a]ny mention or citation to either reference below is also intended to include the corresponding disclosures of the other publication." Schinzer Rep. ¶ 171.

88. As I note above, I understand that Dr. Schinzer has not provided evidence to support his assertion that the New Zealand application published in October 2004 qualifies as prior art. I also understand, based on my discussion above, that the contents of the ’620 Patent that Dr. Schinzer relies on for his invalidity opinion is not "by another" such that the ’620 Patent is also not prior art.

89. Regardless of whether the New Zealand application and/or the ’620 Patent is prior art under the correct application of the law, I address the scientific merits of the substance of Dr. Schinzer's opinions. It is my opinion that, even if one or both of the New Zealand Application and the ’620 Patent is found to be prior art, neither of these references anticipates and/or renders claims 7-9 of the ’196 Patent obvious.

#### 1. The ’620 Patent and the New Zealand Application Do Not Disclose a Process that Produces Rifaximin Forms δ or ε

90. Dr. Schinzer first asserts that the ’620 Patent and the New Zealand Application disclose a process that produces rifaximin forms δ and ε. Schinzer Rep. ¶¶ 172-183. I disagree.

91. To support his assertion, Dr. Schinzer first provides a table comparing the "process for the production of the rifaximin polymorphic forms δ and ε" of claim 1 of the ’196 Patent to the "process for the production of rifaximins α, β and γ" in claim 6 of the ’620 Patent. Schinzer Rep. ¶ 172. Dr. Schinzer asserts the "similarities between the claims are instructive." *Id*. I note that Dr. Schinzer conducted no laboratory experiments of his own to support his contention that rifaximin forms δ and ε are disclosed in ’620 Patent and the New Zealand Application.

92. Notably, as even Dr. Schinzer's analysis concedes, the processes between claim 1 of the ’196 Patent and claim 6 of the ’620 Patent are **<u>not identical</u>**. Indeed, as seen in his own

table (Schinzer Rep. ¶ 172), claim 6 of the ’620 Patent includes an additional aspect to the drying step whereby the drying must continue until “the water content required for form rifaximin α, β or γ” is achieved. ’620 Patent at claim 6. In contrast, claim 1 of the ’196 Patent does not recite this step or that the water content for forms α, β and γ should be achieved. Instead claim 1 of the ’196 Patent requires the process to be undertaken until the “rifaximin polymorphic form δ is free from other polymorphic forms of rifaximin and has” specifically claimed XRPD peaks characteristic of δ and the “rifaximin polymorphic form ε is free from other polymorphic forms of rifaximin and has” specifically claimed XRPD peaks characteristic of ε. ’196 Patent at claim 1. The processes for these patents are thus not identical, and Dr. Schinzer ignores the importance of requiring XRPD peaks characteristic of δ and ε on the one hand and requiring a specific water content for α, β and γ on the other hand.

93. Dr. Schnizer also points to Examples 1 and 2 in the ’196 Patent and compares them to Example 1 in the ’620 Patent (and New Zealand application) to argue that these examples “also demonstrate that the same process makes rifaximin forms α, β, δ and ε.” Schinzer Rep. ¶ 173. I disagree.

94. As even Dr. Schinzer’s own highlighting shows, the processes in the examples are **not identical**. While Example 1 of the ’196 Patent requires drying the sample to a water content **of 3.3%** with **specific XRPD peaks for rifaximin δ** and Example 2 of the ’196 Patent requires further **drying the δ form until specific XRPD peaks for ε** are obtained, Example 1 in the ’620 Patent (and New Zealand Application) notes that the water content should be 5.6% with a diffractogram corresponding to form β and then further requires drying to a water content of 2.2% with a diffractogram corresponding to form α. *Compare* Examples 1 and 2 of the ’196 Patent *with* Example 1 of the ’620 Patent (and New Zealand Application).

95. Dr. Schinzer also states that the "only substantive difference between the processes" is that the '620 Patent (and New Zealand Application) "discloses drying the solid 'for a period of time between 2 and 72 hours to the water content required to form rifaximin α, β and γ,' while the '196 patent process involves drying the solid for the same period of time (and under the same conditions) until it exhibits the characteristic peaks of rifaximin forms δ and/or ε." Schinzer Rep. ¶ 174. But Dr. Schinzer ignores a critical portion of the examples that, in the '196 Patent, a specific water content of 3.3% should be achieved for δ and then the sample should be further dried to obtain ε. Example 1 in the '620 Patent (and New Zealand Application) describes drying to entirely different water contents (5.6% for β and 2.2% for α).

96. While Dr. Schinzer in the next paragraphs of his report acknowledges the differences that exist in water content between the various polymorphic forms of rifaximin, he appears to dismiss the importance of this by stating the water content is an inherent property of each form and testing for water content is a routine practice. Schinzer Rep. ¶¶ 175-177. But this is putting the cart before the horse. A POSA would have to first obtain the δ form in order to measure its water content.

97. Regardless of whether water content is an inherent property, the '620 Patent and New Zealand Application do not identify rifaximin forms δ or ε in their disclosures nor do they identify (i) what specific water content is "inherent" to these particular forms or (ii) XRPD peaks characteristic of these particular forms. Instead, the '620 Patent and New Zealand Application each discloses the α, β and γ forms only, as well as the experimental procedures for obtaining only those forms. *See, e.g.,* '620 Patent at 1:36-42, 2:37-39.

98. A skilled person would have understood from the '620 Patent or the New Zealand Application that rifaximin exists in non-stoichiometric hydrate forms. *See, e.g.,* '620 Patent at

2:40-50. Because these forms are non-stoichiometric hydrates, a skilled person would have understood that the water content of a sample of a particular polymorph could vary depending on the environmental conditions without a change in crystalline form. Indeed, Dr. Viscomi's testimony reflects the idiosyncrasies of non-stoichiometric hydrates. Dr. Viscomi testified that both water content and drying conditions affect the form produced.[6] *See* Viscomi Tr. at 55-56, 58, 62-64.

99. Dr. Schinzer also provides a table of water content values for the various polymorphic forms and notes that "the water content of form δ (3% to 4.5%) is actually between the water contents for β (5.0% to 6.0%) and α (2.0% to 3.0%)." Schinzer Rep. ¶¶ 177-178. Dr. Schinzer then states that the "process of drying form β, as taught by the '620 patent, would necessarily produce rifaximin form δ as the water content reached between 3 and 4.5%, on its way to the final 2-3% water content of form α." Schinzer Rep. ¶ 179.

100. But the '620 Patent and the New Zealand Application do not disclose this water content for form δ or that additional polymorphs even existed, let alone the water content that would be required to obtain forms δ (or ε). On its face, the '620 Patent teaches the skilled person that forms α and β may be interconverted in the solid state. "For example, the polymorph α, by adding water by hydration until a content higher than 4.5% is reached, turns into the polymorph β, which in its turn, loosing water by drying until a content lower than 4.5% is reached, turns into the polymorph α." '620 Patent at 2:46-50. The inventors implicitly described this interconversion as being limited to the α and β polymorphs that undergo a phase transformation as a function of water content. The '620 Patent also describes how form α may be made from the largely amorphous form γ and vice versa. *Id.* at Examples 7-8 and Fig. 3.

[6] Dr. Schinzer does not list any deposition transcripts in his list of materials considered.

101. Dr. Schinzer also points to Viscomi 2008 as confirming that the same process made rifaximin forms α, β, δ, and ε depending on how long the material was dried. Schinzer Rep. ¶ 180. I note that Viscomi 2008 is not prior art, which Dr. Schinzer acknowledges. Schinzer Rep. ¶ 180. I also note that Dr. Schinzer's invalidity arguments relying on the '620 Patent and the New Zealand Application are that each reference either anticipates the claims or renders them obvious independently, but not in conjunction with the disclosures in Viscomi 2008.

102. Dr. Schinzer's argument again ignores that a critical part of the process to obtain the various polymorphic forms of rifaximin is the water content that must be achieved for each form. Dr. Schinzer notes that the procedure described "for the 'preparation of wet rifaximin' in the Materials and Methods section of Viscomi 2008 mirrors the process described in Example 1 of the '620 patent and New Zealand Application." Schinzer Rep. ¶ 180. But the critical part of the process is the water content that is required for the various polymorphic forms. While the non-prior art reference Viscomi 2008 describes the δ and ε forms and their associated water content and XRPD peaks, neither the '620 Patent nor the New Zealand Application provides this information or even discloses that either form δ or form ε exist.

103. Dr. Schinzer also fails to consider certain aspects of Viscomi 2008 in his reliance on this publication to support his opinions. His inherent anticipation opinion appears to rely on rifaximin form β converting to form δ then converting to form α when further dried. Schinzer Rep. ¶¶ 179. He contends that Viscomi 2008 "confirms" these conversions occur. Schinzer Rep. ¶ 181. However, Viscomi 2008 discloses that rifaximin form δ does **not** convert to form α, and that form β converts directly into form α (or form δ). Viscomi 2008 at Fig. 4. This was confirmed by the inventors' testimony, which Dr. Schinzer did not consider. *See* Viscomi Tr. at 58; Confortini Tr. at 66. Dr. Schinzer also misunderstands a statement from Viscomi 2008 that "the α- and δ-forms

can be obtained by drying the β-form under the conditions reported above." Schinzer Rep. ¶ 181. As the totality of the article reflects, this is a statement that forms α and δ can **separately** be obtained by drying the β form under different conditions. *See* Viscomi 2008 at Fig. 4; *see also* D. Braga et al., *The structure-property relationship of four crystal forms of rifaximin*, CrystEngComm 14:6404-6411 (2012) ("Braga") at 6404 ("The ε-form can only be obtained by drying the δ-form while this last process never results in the formation of the α-form."). Thus, Viscomi 2008 **disproves** Dr. Schinzer's theory of inherent anticipation by the '620 Patent and the New Zealand Application.

104. Finally, Dr. Schinzer notes that the "XRPD pattern for a given crystalline form acts as a 'fingerprint' to identify the unique crystal packing arrangement of the form" such that the XRPD pattern "is an inherent property of the crystal form." Schinzer Rep. ¶ 182. I agree with this general statement, to the extent that Dr. Schinzer is stating that the diffraction properties of a crystalline form are related to the crystal structure. However, Dr. Schinzer ignores that the XRPD patterns for forms δ and ε are nowhere disclosed in the '620 Patent or the New Zealand Application. To the contrary, these patents only provide the XRPD patterns for α, β and γ, not the claimed δ or ε.

105. Because of the above reasons, I disagree with Dr. Schinzer that the '620 Patent and the New Zealand Application disclose a process that produces rifaximin forms δ and ε or provides a skilled person with a reasonable expectation of obtaining these forms from the disclosed process. The data and information in the literature contradict Dr. Schinzer's hypothesis, and Dr. Schinzer has not generated any data himself to support his own hypothesis.

### 2. Neither the '620 Patent Nor the New Zealand Application Anticipates Claims 7-9 of the '196 Patent

may not be available as prior art references, as discussed above. Nevertheless, for the sake of argument I assume that they are, and I disagree with Dr. Schinzer. In the section below, my opinions concerning the ’620 Patent apply equally to the New Zealand Application even if I do not expressly reference the latter because their disclosures are substantially identical, as Dr. Schinzer agrees. Schinzer Rep. ¶ 171.

117. First, Dr. Schinzer’s obviousness opinions are based on the premise that the ’620 Patent processes produces the δ and ε forms. *See* Schinzer Rep. ¶¶ 198-199. As I have noted above and contrary to Dr. Schinzer’s speculation, Viscomi 2008 and inventor testimony show that the ’620 Patent process does **<u>not</u>** itself produce forms δ or ε. The formation of δ or ε requires different processes and the water content of the product to yield form δ, which is then required as a precursor to form ε. Further, the ’620 Patent would not have motivated a skilled person to characterize the forms of rifaximin produced by the ’620 Patent processes because the patent already teaches the polymorphic forms of rifaximin produced by those processes (α, β, γ). Dr. Schinzer’s obviousness argument fails for this reason alone.

118. Second, Dr. Schinzer appears to assume that a skilled person would believe that other forms would be accessible by experimenting with the drying conditions disclosed in the ’620 Patent for making the α, β, or γforms. There is no basis for Dr. Schinzer’s opinion in this regard. The ’620 Patent already describes the inventors’ exploration of a range of water contents both higher and lower than those at which δ is preferred or may be formed, and reports that the α and β forms are present. A skilled person would recognize that that ’620 Patent describes an interconversion of forms α and β that relates to a threshold water content of about 4.5%. ’620 Patent at 2:46-50. As such the skilled person would have no expectation that additional forms with

similar water content would exist, and they could be obtained by following the procedures disclosed in the ’620 Patent.

119. I also disagree that a skilled person would have an expectation of obtaining new forms generally, or the claimed δ and ε forms in particular, from following the ’620 Patent processes. At no point does the ’620 Patent disclose that an intermediate level of drying or water content would yield δ, or that more extensive drying of the undisclosed δ form would yield the ε form. Dr. Schinzer’s argument relies on impermissible hindsight by looking at the claims as a roadmap to obtain the claimed invention.

120. Dr. Schinzer does not articulate any reason why a skilled person would have been motivated to conduct modifications of the described processes with an eye toward a particular water content, as would be required to obtain the claimed δ and ε forms, much less how such a skilled person could have a reasonable expectation of obtaining them.

121. Dr. Schinzer also points to sections in the ’620 Patent and New Zealand Application specification discussing the importance of identifying and characterizing polymorphic forms of rifaximin. Schinzer Rep. ¶¶ 199-200. But, if anything, this further supports my assertion that a skilled person would not have been motivated based on these references to create and characterize additional polymorphic forms to arrive at the claimed δ or ε forms of rifaximin. A skilled person reading these statements would have concluded that the inventors (i) understood the importance of identifying polymorphic forms of rifaximin, (ii) explored how polymorphic forms of rifaximin could be obtained by drying crystalline solids to a particular water content, and then (iii) identified three polymorphic forms from their research. Thus, the ’620 Patent would **discourage** a skilled person from screening for new polymorphic forms. Particularly in view of the statements in the ’620 Patent specification concerning the importance of identifying and characterizing polymorphic

forms a rifaximin, a skilled person would believe the ’620 Patent describes all of the polymorphic forms implicated in the manufacture of the commercially available Normix product. Given this, a skilled person would not have been motivated to go out and seek to create even more polymorphic forms, and specifically by further modifying the drying conditions used to prepare the known polymorphs.

122. Dr. Schinzer also argues that “[c]ommon knowledge also would have motivated a POSA to characterize the forms of rifaximin made with the ’620 patent process.” Schinzer Rep. ¶ 202. Again, a skilled person would not have needed to characterize the forms made by these processes because the patent already teaches them how to prepare and characterize the forms that the inventors made: forms α, β, and γ.

123. For the same reason, Dr. Schinzer’s discussion of the 1987 FDA Guidance and Byrn 1995 misses the point. Neither these references nor “common knowledge” would have motivated a skilled person to characterize the forms of rifaximin made with the ’620 Patent processes because the patent provides the characterization data. To the extent Dr. Schinzer is arguing that “common knowledge” would motivate a skilled person to attempt to create new forms of rifaximin, I disagree.

124. Dr. Schinzer first points to the 1987 FDA Guidance. Schinzer Rep. ¶ 202. He fails to explain why a skilled person would have been motivated to look to the 1987 FDA Guidance in the first place when assessing what the ’620 Patent and New Zealand Application disclose. Not only does the 1987 FDA Guidance predate these references by over a decade, but it also has nothing to do with rifaximin, which is the focus of the ’620 Patent and New Zealand Application.

125. While the 1987 FDA Guidance may discuss how polymorphic forms can impact dissolution and bioavailability and recommends using XRPD as an analytical technique to identify

polymorphic forms, the ’620 Patent already addresses rifaximin polymorphism by identifying α, β, and γ forms and their specific XRPD patterns. The ’620 Patent already acknowledges that different polymorphic forms “can have different bioavailability, solubility, stability, [color], compressibility, flowability and workability with consequent modification of the profiles of toxicological safety, clinical effectiveness and productive efficiency” in the Background of the Invention section. The inventors then proceed to identify and characterize three polymorphic forms of rifaximin, including the α form used in Normix, and the humidity-stable β form. ’620 Patent at 1:53-58.

126. A skilled person would not have been motivated by anything in the 1987 FDA Guidance to create additional polymorphic forms of rifaximin beyond those disclosed in the ’620 Patent (and New Zealand Application). The 1987 FDA Guidance is directed to API and drug product manufacturers. It recommends determining whether or not polymorphism occurs for a drug substance, and if it does, characterizing and controlling the forms that are present and, only if the polymorphic form affects bioavailability, to control the solid-state form of the drug substance. 1987 FDA Guidance at RIFAXDEFS000305, 307-308. It is not a directive for such manufacturers to exhaustively search for potential polymorphic forms beyond those that arise in the drug substance, drug product, or their respective manufacture. Besides, the skilled person would have expected this work to have already been done by the inventors in view of the ’620 Patent and the Normix Label.

127. Dr. Schinzer also asserts that a “POSA practicing the ’620 patent process would have been motivated to test and characterize the polymorphs made by the process to comply with regulatory requirements” but the ’620 Patent already provides this characterization and satisfies this motivation. Schinzer Rep. ¶ 203; ’620 Patent at 1:45-2:24. Indeed, not only does the ’620

Patent describe three different polymorphs, and characterizes those forms by XRPD, it also explains (as Dr. Schinzer admits) that each of these forms can be used in a medicinal preparation. Dr. Schinzer fails to explain why, given this, a skilled person would believe there are additional polymorphic forms of rifaximin and then be motivated to create and characterize them.

128. Dr. Schinzer points to no limitation in the ’620 Patent that would suggest to a skilled person that additional polymorph screening of rifaximin is warranted. Indeed, the ’620 Patent teaches the skilled person that the disclosed polymorphs are suitable for use as a pharmaceutical product. Simply put, Dr. Schinzer does not provide any scientific problem to solve or some technical barrier to further development of the disclosed forms that would motivate a skilled person to identify crystalline forms of rifaximin with the properties of forms δ and ε.

129. Dr. Schinzer also points to Byrn 1995 for support that it was “common knowledge that polymorphism could affect important pharmaceutical properties, such as bioavailability and dissolution.” Schinzer Rep. ¶ 204. I note that Dr. Schinzer does not explain why a skilled person would have been motivated to look to Byrn 1995 when assessing the disclosures of the ’620 Patent or the New Zealand Application.

130. Again, as noted above, the ’620 Patent already acknowledged this in its Background of the Invention section and then proceeded to identify and characterize three separate polymorphic forms of rifaximin, including the humidity-stable stable β form. While Byrn 1995 may suggest that one “‘investigate the drug substance for the existence of polymorphs and hydrates,’” Schinzer Rep. ¶ 205 (citing Byrn 1995 at 946), the ’620 Patent already does this and effectively identifies three such polymorphic forms. Byrn 1995 does not suggest an exhaustive search for new polymorphs for compounds that have already been investigated, only that those existing polymorphs should be characterized. Byrn 1995 at 946. Nor does Byrn 1995 suggest varying

drying conditions as a way to discover new polymorphs. *Id.*; *see also* A.M. Rouhi, *The Right Stuff*, Chem. & Eng'g News 81:32-35 (Feb. 24, 2003) ("Rouhi") (XIFAX_AMN_1874512) at 33 (the "drying stage" is "one of the last places people look").

131. Dr. Schinzer also argues that a "POSA would have first and foremost characterized those forms [of rifaximin] through XRPD analysis, which was among the most common and straightforward means of characterizing crystal forms as of the priority date." Schinzer Rep. ¶ 207. He then cites to a number of references, including Byrn 1995, Brittain, Remington, and 1987 FDA Guidance to support this proposition. I agree that XRPD analysis was a common technique for characterizing crystalline forms. However, Dr. Schinzer fails to explain how these references teach or suggest: (i) rifaximin is polymorphic; (ii) exists in more than three polymorphic forms; or (iii) new forms may be created by varying drying conditions. Nor does Dr. Schinzer explain why a skilled person would have been motivated to seek out any of these references as common knowledge references or would have been motivated to search for additional rifaximin polymorphs.

132. Regardless, as I have explained, I disagree that a skilled person would have been motivated to further characterize rifaximin made by processes described in the '620 Patent and the New Zealand Application. The patents already explain the three polymorphic forms that are generated by these processes, including providing XRPD data, such that there would have been no motivation for a skilled person to further characterize them by XRPD, much less be motivated to search for new polymorphs, or have a reasonable expectation of successfully obtaining the δ or ε forms.

133. Dr. Schinzer also argues that a skilled person would have had a reasonable expectation of success in characterizing forms δ or ε "because XRPD analysis is a routine

procedure." Schinzer Rep. ¶ 207. While I agree that XRPD is a routine procedure, and that a skilled person could readily analyze a sample of rifaximin by XRPD, I disagree that a skilled person would have had the motivation or a reasonable expectation of success in obtaining the claimed δ or ε forms of rifaximin in the first place.

134. A skilled person would have understood that the existence of polymorphism and extent of polymorphism, including for rifaximin was unpredictable. While there have been some advances our ability to predict existence of polymorphs through computational chemistry (*see generally* A.J. Cruz-Cabeza, *Open questions in organic crystal polymorphism*, Communications Chemistry 3(142):1-4 (2020)), it was true in 2005 and remains true today that a skilled person cannot predict the existence of polymorphs, *see, e.g.*, G.P. Stahly, *Diversity in Single-and Multiple-Component Crystals. The Search for and Prevalence of Polymorphs and Cocrystals*, Crystal Growth & Design, 7(6):1007-1026 (2007) ("Stahly 2007") (XIFAX_AMN_1874404); D. Braga et al., *The growing world of crystal forms*, Chem. Commun. 46:6232-6242 (2010) ("Braga 2010") (XIFAX_AMN_1874536); Rouhi; M.L. Peterson et al., *Expanding the Scope of Crystal Form Evaluation in Pharmaceutical Science*, J. Pharm. & Pharm. Sci. 9(3):317-326 (2006) ("Peterson"), at 318; Vippagunta 2001 at 18 ("Predicting the formation of solvates or hydrates of a compound… is complex and difficult). "There is presently no way of knowing whether a molecule will crystallize, let alone in how many forms or if any of those forms will be useful for ultimately delivering the drug from the dosage form to its site of action." S.L. Price, *The potential of computed crystal energy landscapes to aid solid-form development*, Drug Discovery Today 21(6):912-923 (2016) ("Price") at 913.

135. Because it would not have been possible for a skilled person to predict the existence of δ polymorph with the specifically claimed X-ray diffraction peaks in advance of

discovering and characterizing it, a skilled person would not have had a reasonable expectation of success in obtaining the specifically claimed δ form with the required X-ray diffraction peaks. Even though a skilled person would be aware of technologies used to screen for polymorphs, it cannot be said that they would have had a reasonable expectation of success of obtaining the claimed δ form of rifaximin if they don't know it exists in the first place.

136. I also disagree that a skilled person would have been motivated to search for new forms of rifaximin. But even if I assume they were motivated to modify the teachings of the '620 Patent to prepare potential new forms of rifaximin and then to characterize them by XRPD, I disagree that a skilled person would have had a reasonable expectation of success in identifying δ or ε with the claimed XRPD peaks. Not only is the existence of polymorphic forms unpredictable, a skilled person would also not have had a reasonable expectation of success of knowing that the claimed δ polymorph could be prepared. This is particularly so since the described processes in the '620 Patent are identified as yielding other polymorphic forms.

137. Instead, a skilled person would have understood that discovering an unknown polymorph, such as the claimed δ or ε forms, involves an unpredictable process of trial and error with no reasonable expectation of success of arriving at the claimed forms with the required XRPD peaks. A skilled person would have understood that to discover a new polymorph, experimental parameters would need to be investigated by conducting broad screens that vary the conditions of crystallization, most typically crystallization solvent, temperature, concentration, and pH. *See, e.g.*, Byrn 1995 at 946. Indeed, that the processes described in the '620 Patent are similar to the processes ultimately described in the '196 Patent to obtain δ form, and that the water content associated with the δ form is roughly between that for α and β further supports the lack of a reasonable expectation of success in characterizing rifaximin to identify the claimed δ (or ε) forms

and their associated XRPD peaks. Even if a skilled person were motivated to identify new forms of rifaximin, they would not be motivated to further investigate drying conditions of known procedures to make other forms as that area had been extensively covered by the inventors of the ’620 Patent.

138. Dr. Schinzer’s assertion that “form δ would likely be identified during routine in-process testing as the wet rifaximin is dried to rifaximin form α, as taught by the ’620 patent and New Zealand Application,” ignores that neither patent actually described form δ to support the assertion that it “likely would have been identified.” Schinzer Rep. ¶ 208. Indeed, Dr. Schinzer’s assertion that forms δ and ε would be readily identified by a skilled person by following processes in the ’620 Patent is merely speculation tainted by hindsight with the knowledge that the claimed forms δ and ε actually exist.

139. Dr. Schinzer also states that it “is apparent that rifaximin equilibrates between forms α, β, δ, and ε, depending on the moisture content” but he provides no citation support for this assertion. Schinzer Rep. ¶ 209. While the ’620 Patent describes the conversion from α to β (and γ) forms, it says nothing about the interplay of these two forms and δ or ε.

140. Dr. Schinzer also asserts that a “POSA that prepared rifaximin form α according to the ’620 patent process would have subjected the rifaximin to stability testing as a part of routine formulation, which would include exposure to conditions of elevated humidity” and, in the course of this testing, “a POSA would have detected rifaximin form δ as the rifaximin equilibrated between forms α, δ and ε.” Schinzer Rep. ¶ 209.

141. But again, Dr. Schinzer cites to nothing in the prior art noting the existence of δ or ε let alone their interplay with α or β. Moreover, while Dr. Schinzer cites to Remington to support his assertion, not only does he fail to explain why a skilled person would have been motivated to

look to this reference as alleged common knowledge, but it also fails to support his argument. Schinzer Rep. ¶ 209. Simply because Remington states "most" APIs are "stress-tested at elevated temperatures and humidity" does not mean that a skilled person would have been motivated to stress-test the rifaximin produced by the processes described in the ’620 Patent or that, even if stress-tested, that a skilled person would have identified form δ (or ε) of rifaximin. Dr. Schinzer does not cite to any discussion in Remington about the elevated temperatures and humidity that would be applied. Schinzer Rep. ¶ 209 (citing Remington at 702)).

142. The skilled person would view temperature and humidity stress conditions as already explored by the inventors of the ’620 patent, which describe the methods to interconvert forms α and β. ’620 patent at 4:45-51, 5:40-53. As such, the skilled person would not be motivated to explore an area that already had been investigated. Therefore, I disagree with Dr. Schinzer that "rifaximin forms δ and ε would have been obvious over the ’620 patent or the New Zealand Application." Schinzer Rep. ¶ 210.

143. In addressing whether claims 7-9 of the ’196 Patent are obvious, Dr. Schinzer includes additional arguments that a "POSA that identified rifaximin forms δ and ε through routine screening would have been motivated to prepare pharmaceutical preparations with those forms to test their effects on pharmaco-toxicologic properties of the drug." Schinzer Rep. ¶ 212. As I discuss above, I disagree that a skilled person would have been motivated or had a reasonable expectation of success to identify and characterize forms δ or ε of rifaximin based on the ’620 Patent or the New Zealand Application or routine screening and thus claims 7-9 of the ’196 Patent are not obvious.

144. I also disagree that a skilled person would necessarily have been motivated, even if they did identify forms δ or ε, to prepare pharmaceutical preparations with them as Dr. Schinzer

contends. The properties and characteristics of new polymorphs are unpredictable and may be undesirable for a pharmaceutical product. Dr. Schinzer fails to explain, given this understanding in the art about unpredictability and potentially undesirable attributes of a different polymorph why a skilled person would have been motivated to use the δ or ε forms in a pharmaceutical composition without further characterization.

145. Dr. Schinzer points to Remington and the 1987 FDA Guidance for support for his assertion. Schinzer Rep. ¶ 213. As I discuss above, he fails to explain why a skilled person would have been motivated to look to either of these references. He also points to the Normix Label as motivating a skilled person to prepare a pharmaceutical composition containing rifaximin δ or ε as the active ingredient. Schinzer Rep. ¶ 213. I disagree.

146. The Normix Label describes coated tablets of rifaximin but says nothing about it being polymorphic, let alone that δ or ε forms exist. A skilled person would not have looked to the Normix Label and been motivated to create a pharmaceutical composition comprising rifaximin form δ or ε when the Normix Label is entirely silent as to the existence of polymorphs. If anything, the Normix label teaches away from using rifaximin δ or ε because a skilled person would believe that Normix contains either the α or β forms described in the '620 Patent.[7] It makes no sense that a skilled person would seek to develop additional crystalline forms of a crystalline drug substance used in a successful commercial product, and Dr. Schinzer points to nothing in the Normix product described in the Normix label or otherwise that would suggest to the skilled person that Normix was somehow deficient due to the crystalline form of the rifaximin API.

[7] Dr. Confortini confirmed that the rifaximin in Normix is the α form. Confortini Tr. at 26-27; *see also* Blandizzi at 2.

147. Given that the ’620 Patent describes various polymorphic forms that can be prepared as medicinal preparations, a skilled person would not have been motivated to create a pharmaceutical composition using another yet undiscovered form. Even if the Normix Label shows that “rifaximin compositions are safe and effective,” as Dr. Schinzer states, if anything, this would have motivated a skilled person to use one of the three polymorphic forms actually identified in the ’620 Patent in the composition, one of which presumably was the form used in Normix, and not to seek out and characterize entirely different undisclosed forms with unknown properties. Schinzer Rep. ¶ 215.

148. The Normix Label also fails to provide a reasonable expectation of success that is deficient for the reasons I discuss above. Again, the Normix Label says nothing about rifaximin being polymorphic. But even if the skilled person were to understand that the rifaximin API present in the Normix product could exist in other crystalline forms, they would have no expectation that any other forms could be prepared in advance of doing trial and error experiments.

149. Accordingly, in my opinion, claims 7-9 of the ’196 Patent are not invalid as obvious over the ’620 Patent or the New Zealand Application, even if either is combined with the Normix Label.

### B. Claims 7-9 of the ’196 Patent are Not Invalid as Obvious Over Cannata in View of the Normix Label and/or Marchi and Common Knowledge

150. Dr. Schinzer asserts that claims 7-9 of the ’196 Patent are invalid as obvious over Cannata in view of Marchi or the Normix Label and common knowledge. Schinzer Rep. ¶ 218. I disagree. I also note the heading that Dr. Schinzer provides for this section does not match his statement of his asserted combination. While the heading states Cannata in view of the Normix Label and/or Marchi and Common Knowledge, his assertion in paragraph 218 is his reliance on Cannata in view of Marchi or the Normix Label and common knowledge.

151. Dr. Schinzer first asserts that "Cannata discloses a process for preparing crystalline rifaximin that produces rifaximin forms δ and ε, as the patentee admitted during prosecution of the '620 patent" but fails to provide any citation support for this assertion. Schinzer Rep. ¶ 219. I note that, despite this assertion, Dr. Schinzer did not argue that Cannata anticipates the '196 Patent. As Cannata does not disclose that rifaximin is polymorphic, let alone the polymorphic forms δ and ε, I disagree with his unsupported assertion. Further, Cannata discloses multiple different processes for preparing rifaximin. *See* Schinzer Rep. ¶ 229 (discussing Examples 1, 6, 7, and 9 of Cannata). Dr. Schinzer does not point to any one of those procedures that produces form δ.

152. Dr. Schinzer argues that it was "common knowledge that polymorphism in pharmaceutical solids could affect important characteristics like solubility and bioavailability." Schinzer Rep. ¶ 220. He continues, stating that "[b]ased on the FDA's guidance and common knowledge, a skilled person would have been motivated to characterize the polymorphic forms of rifaximin made by the Cannata process" and "would have detected and characterized rifaximin forms δ and ε through routine in-process and stability screening." *Id.*

153. I note that Dr. Schinzer does not identify any FDA Guidance as part of his stated combination, let alone explain why a skilled person would have been motivated to look to this unidentified document. He also references "common knowledge" but fails to identify specific alleged common knowledge sources or specific citations to any common knowledge sources to support his argument. I also disagree with his assertions.

154. In my opinion, a skilled person would not have been motivated to characterize the rifaximin produced by the Cannata processes with a reasonable expectation of successfully identifying δ or ε forms with the claimed XRPD peaks. As I have discussed above, and incorporate here, none of Cannata, Marchi, or the Normix Label disclose (i) that rifaximin is polymorphic; (ii)

that rifaximin exists in polymorphic form δ or ε; (iii) the XRPD pattern of any crystalline form of rifaximin, let alone the various claimed peaks; or (iv) the water content of any crystalline forms of rifaximin. None of these references describe investigating rifaximin for the existence of polymorphs, water content, or analyzing rifaximin by XRPD.

155. While Cannata teaches that the rifaximin was purified by crystallization, a skilled person would have understood that crystallizing rifaximin by the methods in Cannata would not have provided a consistent rifaximin product, let alone a specific polymorphic form of rifaximin, each time. Instead, a skilled person would have recognized that because Cannata is light on the experimental details concerning crystallization of the product, there are broad ranges of variables that could be used to prepare the product. A skilled person would have also understood that nothing in Cannata teaches that following the processes for preparing rifaximin outlined in, for example Examples 1, 4, and 6-14, would result in forms δ or ε. Moreover, nothing in those references describes forms δ or ε as polymorphic forms of rifaximin. Nor has Dr. Schinzer generated any data himself to support that any of the Cannata examples produces δ or ε. And he ignores the Applicant's arguments during prosecution of the '196 Patent, which were supported by data, that the Cannata reference does not disclose forms δ and ε either expressly or inherently. *See* XIFAX_AMN_00008044 at -8931-944, -8984-985.

156. Additionally, if the '620 Patent and/or the New Zealand Application are prior art, as Dr. Schinzer contends, then given that these references disclose rifaximin is polymorphic and identify and characterize three polymorphic forms of rifaximin, a skilled person would not have been motivated based on this knowledge in the art to seek out and characterize and identify additional polymorphic forms of rifaximin, particularly if a skilled person determined the α form was used in Normix.

157. Dr. Schinzer also argues that a "POSA would have been motivated to combine Cannata with the Normix Label, and/or Marchi for several reasons" but then does not offer any reasons why a skilled person would have been motivated to combine these references specifically. Schinzer Rep. ¶ 222. Instead, he refers to other references, such as the 1987 FDA Guidance. I understand from counsel that in order to show the claims are obvious, one requirement is to explain why a skilled person would have been motivated to combine the proposed references together. Dr. Schinzer fails to do so.

158. Dr. Schinzer also asserts that "Cannata discloses a process for preparing crystalline rifaximin that results in rifaximin forms δ and ε." Schinzer Rep. ¶ 224. But Cannata is silent as to rifaximin made by its examples being polymorphic, let alone that the forms δ or ε are produced. Dr. Schinzer points to no other experiments to show that the Cannata processes necessarily provide forms δ or ε and ignores the evidence that they do not.

159. To support his argument, Dr. Schinzer points to a declaration submitted by Dr. Viscomi in 2006 during prosecution of the '620 Patent. Schinzer Rep. ¶ 230. I understand that the Viscomi Declaration is not prior art and Dr. Schinzer does not suggest otherwise.

160. I disagree that the Viscomi Declaration supports that the Cannata processes necessarily produce rifaximin δ and ε, or a mixture thereof, as Dr. Schinzer asserts. As a preliminary matter, there is no "Cannata process" because Cannata describes multiple processes for preparing rifaximin, and the Viscomi Declaration only states that rifaximin was "prepared according [to] the old patents US '866 **and** US '785."[8] Viscomi Dec. ¶ 7. Dr. Viscomi further states that rifaximin prepared according to those old patents "was never tested for polymorph." *Id.* While Dr. Viscomi also states that "[s]amples of batches manufactured in 2000-2001, presently

[8] US '866 refers to Cannata while US '785 refers to Marchi. Viscomi Dec. ¶ 4.

re-tested, are composed either of mixture of polymorph (alpha and beta, and in some case alpha and epsilon) or different polymorphs," he does not explain whether these batches that were tested were made by the processes in Cannata or Marchi or which process corresponded to which tested batch. Dr. Viscomi's deposition testimony, which Dr. Schinzer did not consider, indicates that the batches were not prepared according to a particular example from the prior art. Viscomi Tr. at 126-127

161. None of this supports Dr. Schinzer's assertion that "the Cannata process 'frequently [results in] different polymorphs or mixtures of them' including rifaximin forms δ and ε." Schinzer Rep. ¶ 235. As the Viscomi Declaration also states, the rifaximin batches tested did not contain δ or ε polymorphic form in all instances. Viscomi Dec. ¶¶ 7-8. Further, data submitted to the Patent Office during prosecution of the '196 Patent reflects that at least Cannata Examples 7 and 9 do not produce δ or ε. XIFAX_AMN_00008044 at -8931-944, -8984-985.

162. Even assuming that the batches described in the Viscomi Declaration were made by one of the processes disclosed in Cannata or Marchi, the conditions under which these batches were stored before being tested are not described. The Viscomi Declaration does not disclose how the rifaximin samples were stored between their original manufacture and the testing dates. A skilled person would have understood, given the importance of water content as discussed in the '620 Patent and New Zealand Application, that exposure to humid conditions could impact what polymorphic forms of rifaximin are present. Thus, the Viscomi Declaration does not show that following Cannata (or Marchi) would yield either δ or ε immediately, or years later.

163. Dr. Schinzer also asserts that "[c]ommon knowledge of a POSA, as reflected by the 1987 FDA Guidance, among other references, would have motivated a POSA to characterize the rifaximin made by the Cannata process using routine methods, including testing for polymorphism

# EXHIBIT CC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------x
SALIX PHARMACEUTICALS, INC., et al.,
Plaintiffs,
Case No.
vs. 1:24-cv-04607-JFM
ZYDUS PHARMACEUTICALS (USA) INC., and ZYDUS LIFESCIENCES LIMITED,
Defendants.
-----------------------------------------x

*** HIGHLY CONFIDENTIAL ***

Remote videotaped deposition of WILLIAM C. SCHINZER, Ph.D., taken via Zoom, on Tuesday, December 9, 2025, beginning at approximately 10:00 a.m., before Maureen E. Broderick, Registered Professional Reporter and Notary Public in and of the Commonwealth of Pennsylvania.

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC DIVISION

Q You mentioned storage conditions. So if you have a drug product, could the way that it's stored impact sort of the polymorphic form that may be present in the drug substance in that drug product?
A Yes. And I wanted to emphasize, too, not just polymorphs, but pseudopolymorphs and mostly --
COURT REPORTER: Say it again.
THE WITNESS: Pseudopolymorphs that do not have the same, let's say, elemental analysis; they have something different. And that something different is usually stoichiometric or not stoichiometric amounts of water in the crystal structure.
BY MS. DOUKAS:
Q So is it fair to say that if a drug product is tested and determined -- strike that. Let me start over.
Is it fair to say that if the API in a drug product has a certain polymorphic form, that how that drug product is stored could result in a different polymorphic form showing up later on if it's tested again?
MR. LaROQUE: Objection. Outside the scope. Incomplete hypothetical.



THE WITNESS: So the question I think I heard is can the storage conditions themselves, temperature and humidity, affect the solid form of the drug in the drug product?
BY MS. DOUKAS:
Q Yes.
A Okay. The answer is, at least theoretically, yes.
Q Could storage conditions such as humidity, temperature, affect the polymorphic form of the drug substance?
MR. LaROQUE: Same objections.
THE WITNESS: Yes. Of course, this all depends on the packaging. If you have an absolutely impervious package, then relative humidity won't make any difference; temperature still can.
BY MS. DOUKAS:
Q Now, as part of your work, have you done screens for various polymorphic forms of a given drug substance?
A Yes, I have.
Q Can you just walk me through that process?
A So there's two types of people that I see, and I'm of one type. There's the type that wants to



screen the universe and will never be done, and this ridiculous pressure of the development team to make a decision after three months is awful. I should be given two years. Those people don't survive very long.
There's other people like me that are more, I don't know why in the world I'd screen trifluoroethanol, you know, in a polymorph screen because I'm never going to use it in a manufacturing environment.
So I tend to start with, well, what are solvents that this drug could possibly agree with, maybe it's very nonpolar and only dissolves in things like methylene chloride and chloroform. So I'd go there. And then if it hates water, well, we can use that as an antisolvent. So I'm very pragmatic. I don't do just five things, but I don't do an infinite number of things either.
So what you do is you start with whatever you're given, you know, as far as API, it could be amorphous, and you expose it to different conditions -- could be just, you know, elevated humidity and temperature -- and see if it does anything. You can dissolve it and try to recrystallize it and get something new.



So that's how you do it. It's just a lot of solution and/or suspension attempts to convert from where you started to something else. And that doesn't include salt screens. Let's say it's a neutral molecule. I just want to study the possible polymorphs of that.
Q You mentioned "solvents." Does the type of solvent that's used impact the crystalline form that will be produced?
A It certainly can.
MR. LaROQUE: Objection. Outside the scope.
THE WITNESS: Yeah, it certainly can. And, like, to give you an example, if I use water in a process, I'm going to have to worry about introducing hydrates; if I don't use water, then I don't worry about that so much.
BY MS. DOUKAS:
Q When you say "introducing hydrates," can you just explain what that means and the relevance of introducing hydrates?
A Yeah. So those are pseudopolymorphs, they're not polymorphs, but they're very closely related. And so, you know, if you go ahead and find yourself isolating hydrates of various, let's say,

Q Can you give me an example of some of those additional factors that could affect that?
A So, you know, let's say you're trying to isolate an anhydrous form and you're using methanol, well, maybe the methanol isn't anhydrous and you're going to get a little bit of hydrate.
The other thing is of course temperature. The temperature of the solvent that you're using as you try to filter off the drug, that can be a factor.
Q Would the pH of the solvents be a factor that could impact what you end up with in terms of polymorphic form of a drug substance?
MR. LaROQUE: Objection. Outside the scope.
THE WITNESS: Number one, it depends on is there any ionizable group within a relevant -- you know, decent pH range, and the answer may be no. So it wouldn't matter. Certainly if you're not trying to isolate a salt, you've got to be careful the pH is within a given range. That's normally independent of the polymorph.
(Reporter clarification.)
THE WITNESS: Of the polymorph.
BY MS. DOUKAS:



Q You said it depends on is there any ionizable group. What does that mean?
A So like an amine drug or a carboxylic acid drug. If you have an amine and you lower the pH below the pKa, you pronate it and it's going to be a whole different animal. It's now very cold, right.
So if you have a carboxylic acid, it's the other way around. If you drop the pH you're forcing the proton in there and you're going to get, you know, carboxylate, COOH. So if you alter the pH and you alter the identity of the species, you're certainly going to isolate different things.
And of course, if it's ionizable, you can form a salt and you can't do that with species that are not ionizable within a relevant, you know, pH range.
Q Is it fair to say that identifying polymorphic forms of a given drug substance is unpredictable?
MR. LaROQUE: Objection. Form. Vague. Outside the scope.
THE WITNESS: I don't believe so. And the reason I say that is that there are very well-known ways to screen for polymorphs and I



think a lot of people, Steve Byrne principal among them, believe there are polymorphs of every drug, you just have to keep searching to find them.
I think that, you know, because of the -- I mean, we're a long time down the road since polymorphism. Let's say if you thought the FDA guidance of 1987 was the origin of serious, you know, thinking about polymorphs, that's a long time ago. Techniques have matured, people have gotten used to this. Project teams that you work with expect you to do a polymorph search. So it's very routine.
Now, can I predict exactly what we're going to get and how many of those we're going to get? Not necessarily. Although that seems to be changing, too. Unpredictable in terms of number and exact identity; predictable in terms of I think I'm probably going to find someone that know how to do it.
BY MS. DOUKAS:
Q And would your opinions be the same if we're talking about in the 2005, 2006 time frame, that it would be predictable to screen and identify --



A Yeah, I think the screening would be straightforward.
Q When you're running the screen for various polymorphic forms, is there a certain threshold you hit where you stop screening?
A No.
MR. LaROQUE: Objection. Form. Outside the scope.
THE WITNESS: If I can just add one little comment. I think that you want to make sure you exert a significant effort that you can report on. The FDA asks did you look for solid forms? Yes, I did and I tried hard.
If you didn't find anything -- and I've actually been there at least once -- it seems frustrating, but we tried a lot of experiments and we never found anything, other than let's say an amorphous form and the form we started with, okay. But you don't want to do a little work and say, No, we never found any significant polymorph [indecipherable].
BY MS. DOUKAS:
Q If a person skilled in the art did identify polymorphic forms, would there be an expectation that they would continue screening to

Q In the table of contents you have a section 9. This would be page 3 of the PDF. Scope and Content of the Prior Art. Do you see that?
A Yes, I do.
Q You agree that none of the references listed in the Scope and Content of the Prior Art describe delta or epsilon Rifaximin, correct?
MR. LaROQUE: Object to form.
(Reporter clarification.)
MS. DOUKAS: Epsilon.
THE WITNESS: That's true. But I feel like I have to add a comment. Of course it's true. The common knowledge, you know, articles, they're very general and they describe an approach you might take or facts you might need to know; don't forget, you know, to look for, say, variable hydrates.
So none of the prior art, you know, common knowledge articles are going to say anything about Rifaximin, delta or epsilon.
I think the patents, the '785, '866, Normmix Label, the New Zealand, '620, '534, I don't believe they mention delta or epsilon. They're not explicit.
MS. DOUKAS: Let's mark as Exhibit 3



tab 5.
(Exhibit Schinzer-3 was marked for identification.)
BY MS. DOUKAS:
Q This will be U.S. Patent Number 4,341,785, Marchi. Give it a minute to load. It should be up.
A I guess I'll refresh it.
Q You see Exhibit 3, what's U.S. 4,341,785, inventor Marchi. And there's a Bates number at the bottom, AMN-RFXMN_00037064. Do you see that document?
A I do.
Q And if I refer to Exhibit 3 as "Marchi," hopefully I'm pronouncing that name correctly, will you understand I'm referring to Exhibit 3?
A Yes.
Q Now, Marchi was one of the references you considered in forming your invalidity opinion, correct?
A Yes.
Q And in particular, you looked at Example 6 in Marchi as providing a process for the synthesis of Rifaximin; is that correct?
A You say "in particular." I don't know if that's true. But they're certainly well aware of



Marchi and the synthesis and isolation of Rifaximin, crystalline Rifaximin. But yeah.
Q If you can look at Exhibit 6 in Marchi, at column 9, starting at line 25. It says that 1 gram, and (0.00127 mole) of the compound of Example 1 was dissolved in 50 milliliters, and then continues on.
Example 6 -- feel free to look back at Example 1 -- starts with rifamycin S; is that correct?
MR. LaROQUE: Object to form.
THE WITNESS: Hang on a second.
Now, Example 1, if I'm not incorrect, is the synthesis of rifamycin S, right? Because we're taking the bromo species. The Example 1, the subsequent line usually tells you what they're synthesizing, but I'm not sure that's true here.
It says "the title compound separated," and the title compound seems to be rifamycin S. Maybe we better refocus. Do you have a question outstanding?
BY MS. DOUKAS:
Q Yeah. I guess, is there a difference between rifamycin S and rifamycin O?
A Yes, I believe there is.



MR. LaROQUE: Object to form.
BY MS. DOUKAS:
Q Does the starting material when synthesizing a drug substance impact the polymorphic form that may develop?
A Generally not, and it doesn't appear so for the Rifaximin because -- I say that because the patent doesn't specify that you have to use, you know, rifamycin to crystalize from, you know, sourcing from S to O. It just says, you know, dissolve it in ethanol, add water [indecipherable] --
(Reporter clarification.)
THE WITNESS: Ethanol.
COURT REPORTER: And you said something else, Doctor?
THE WITNESS: And add water. And it doesn't specify the starting material that the Rifaximin came from.
COURT REPORTER: Forgive the interruptions, Doctor. You are going to have to keep protruding your voice. I'm sorry.
BY MS. DOUKAS:
Q When you say "the patent doesn't specify," what patent are you referring to; Marchi?

Page 46

A Well, Marchi certainly starts with S and Cannata starts with O. And subsequent patents, and I'll say in particular '196, do not indicate you have to start with one or the other. It just says take Rifaximin and crystallize it.
Q Let's mark -- sorry to shift, but let's mark Exhibit 4, what I have as tab 14.
(Exhibit Schinzer-4 was marked for identification.)
BY MS. DOUKAS:
Q This is the '196 patent. If you can let me know when you have it up.
A Okay. I have it.
Q So if you can look at column 7 of the '196 patent, about halfway down the page, do you see Example 1?
A Yes.
Q Do you understand Example 1 describes a process to obtain Rifaximin polymorphic form delta?
A Yes, I do.
Q If you look at the beginning of Example 1, we can -- it starts at line 28 in column 7, and in particular I want to direct your attention to line 30, maybe 29, the numbers are kind of -- it says: 63.5 grams of rifamycin O.

Page 47

Do you see that?
A I do.
Q So the patent does specify starting with rifamycin O, correct?
A Yes. Yes. But I believe that there are certainly many other examples where it's not specified. And, in fact, I believe it doesn't matter.
Q So your opinion is there's no difference between starting with rifamycin S and rifamycin O; is that right?
A That's my belief.
Q If we go back to Marchi, which was Exhibit 3, you would agree that Marchi does not teach Rifaximin can exist in different polymorphic forms; is that right?
A How about instead of me answering yes or no, because you said "is that right," I'd say Marchi is silent about polymorphs, but he does acknowledge that he crystalizes the product. And subsequent analysis of -- I don't recall if -- I think you'll know what I mean when I talk about the Viscomi declaration.
I believe he said that he took batches made using the processes of Marchi or

Page 48

Cannata, but I don't think it's more specific than that, and he finds delta/epsilon mixtures thereof. So that's the basis of my thinking.
Q So Marchi itself, though -- strike that. Let me start over.
Marchi itself is silent as to the presence of polymorphic forms of Rifaximin?
A I think the correct conclusion is he doesn't mention other of polymorphic forms than what he isolated. So he's got crystals. That's -- if you want to think that's polymorph number one, and then he does not mention any other forms. And he doesn't characterize the form.
Q When you say "he doesn't characterize," you agree he doesn't do any XRPD studies, correct?
A I believe that's true.
Q And Marchi does not determine the water content of the Rifaximin formed as part of Example 6; is that correct?
A So he doesn't state that he did that, but on the other hand, he couldn't report a yield without knowing how much of what I weighed is Rifaximin. So I sort of believe he did determine at a minimum water and solvent content, maybe by a loss on drying experiment. I think that would be

Page 49

required to report a yield. So nonetheless, he doesn't state what any water content was of his crystals.
Q And Marchi does not state the existence of delta or epsilon forms of Rifaximin, correct?
A I believe that's true. Not explicitly.
MR. LaROQUE: Counsel, we've been going over an hour. If we can get a break soon, that would be appreciated.
MS. DOUKAS: Yeah. Why don't we take a break now.
VIDEO OPERATOR: The time is now 11:11 a.m. We're going off the video record and this ends media 1.
(Brief recess.)
VIDEO OPERATOR: The time is now 11:22 a.m. We are back on the video record and this begins media unit 2.
BY MS. DOUKAS:
Q Dr. Schinzer, during the break, did you discuss your testimony with counsel at all?
A We did not.
Q When we broke, we were talking about Marchi. Do you recall that?
A I do.

in paragraph 7, correct; that's your assumption as to how to read this paragraph?

A I don't think it's a very big assumption. I think it's fairly direct, that if he mentions the two patents and says those processes were never tested for polymorph, let me now inform you that both processes were tested. But there's no one-to-one correlation of this Marchi batch and that Cannata batch.

So I don't think I'm reading anything funny or extra into that paragraph. I think that he's saying both of those processes are characterized by these results.

Q You agree that the testing was done after a period of time where the sample had to have been stored, correct?

MR. LaROQUE: Object to form.

THE WITNESS: And I believe he's fairly good at mentioning that. So, for instance, in that little letter (i) subline there to 7, it says a batch manufactured in 2001 and, however, x-ray data for that batch recorded in 2002 was a polymorph delta.

Now, he doesn't say that it changed during that time. He doesn't say either that this is



what, you know, the initial was. We don't know. So my reading of this is that the powder x-ray indicated that it was the delta polymorph.

BY MS. DOUKAS:

Q I think, as you just said, there's no statement in here that when it was manufactured in 2001, that it was delta polymorph, correct?

A That's correct. But I think either way you wanted it to look, it's speculation, right. So I could say I believe it's representative of what was isolated and you could say I think it changed during storage, and neither of us would have any support. We'd just say we have what we have. And the results are variable.

I would note that the, the time frame isn't terrible. It's, in general, about a year. So, you know, if it was five years, you might think harder about that, but it was just one year, maybe not even a year.

Q He doesn't state in this paragraph how the samples were stored in that year, does he?

A No. But I presume that they're stored in reasonable containers. It, it wouldn't make sense to think that they just had this loose on the bench



or anything like that. You know, you don't want contamination from other, you know, species. So, you know, I would imagine that they put the samples in reasonable containers.

Q That's an assumption, correct?

A Pretty good assumption, I think.

Q If you scroll to paragraph 8 of his declaration, he mentions testing of another batch, number 2000 0827. And if you look at the bottom of paragraph 8, he talks about the humidity content of the sample due to repeated opening of the container and collection time of the samples under noncontrolled humidity conditions had increased from the initial value of 1.3 percent to the final value of 4.5 percent which was enough to change one form to another.

Do you see that?

A I do. And there are limits to that that we know. So, for instance, some forms do not react to humidity and change, right. The beta, you know, form, for instance, you can humidify it and it won't change. So that paragraph has a limitation to it.

I might add that's a lot of water. And, again, speculating how big was the bottle, how much headspace was in there, how much drug was in



the bottle. We don't know. But, you know, that's a big change in water content from 1.3 to 4.5.

Q So with paragraph 7 where he tested samples after a year, we don't know how those samples were stored and whether the same water content variability may have occurred between the --

A [Indecipherable.]

Q -- production and the testing, correct?

(Reporter clarification.)

BY MS. DOUKAS:

Q The production and the testing.

A Again, there are limitations on that. For instance, if I go from beta to delta or epsilon, I can't gain water. So with the humidity and repeated entry into the bottle, that's the wrong way. And that happens, right.

So it's kind of a catch-22; either the batch was, let's say in that first line, (i), it was all the delta polymorph from the beginning or it easily transferred to it in that container within a year and it has to -- I mean, water content coming in is the wrong way around. That would be not what you'd think would be required to get the delta.

So the statement down in 8 there about the relative humidity and, you know, he knew

Page 66

that the water content had gone up significantly, you know, it's odd because he -- I'm not sure, and I don't know if you feel like you're sure, that that little paragraph that says "in the meantime the humidity content of the sample," which sample? The results are -- I guess, it's all that batch, isn't it? The 0827.

So it says it was stored in a small conventional screw cap glass container. See, that would be a pretty good package. And they recorded -- I'm not able to get that data on the same page all at once.

So this is a 2000 batch, I don't know if "0827" means August 27th or not. No, it can't. Because the June 2000 pattern said alpha with a little bit of beta. Then in -- wait.

Okay, so almost a year later, mixture of alpha and epsilon. I guess, this means of the same exact container. Then in February of 2002, little more than half a year later, mixture of epsilon and beta.

So I think, yeah, in this particular section 8, let's call it, they see that water content is driving changes. It's odd that you could get epsilon, let's say -- well, a mixture of epsilon

Page 67

and beta to be as high as four and a half percent water. In particular the May entry, alpha is typically 2, 3 percent water and epsilon, I think, is supposed to be similar. So maybe it wasn't 4.5 percent at that point.

But clearly that batch, that sample, had variability that's being correlated with the water content.

Q Going back to paragraph 7, and I think we talked about this earlier, storage conditions can impact the polymorphic form of a drug substance, correct?

MR. LaROQUE: Object to form.

THE WITNESS: I'd say yes. And what would follow is we don't necessarily know the container here. And I would be hesitant to speculate or assume that it was a rotten container.

As a matter of fact, it was against my better judgment that, you know, that -- I think we should give the alpha people credit that they stored things in reasonably tight containers.

So I think it's particularly striking that the batch -- so the first entry there, the

Page 68

batch manufacturer in 2001 later subjected to power x-ray determination, it's entirely delta.

You know, again, it would be speculative to say, well, that's probably due to the container and multiple entries. We just don't know that. It honestly could be representative of what the batch was isolated as.

And by the way, that wouldn't be like totally against your better judgment. The Cannata process, the Marchi process, it doesn't say to go to a given water content. So if they dried to a certain extent and quit, I don't see why they wouldn't get the delta point.

BY MS. DOUKAS:

Q The Viscomi declaration doesn't say anywhere that he followed either the Cannata or Marchi process and then --

A It's one of the two, right?

Q -- [indecipherable].

A It's one of the two.

COURT REPORTER: I didn't hear the end of the question.

BY MS. DOUKAS:

Q The Viscomi declaration does not say that they followed either the Cannata or the Marchi

Page 69

process and then characterized the Rifaximin formed through that process to determine it would produce delta, correct?

MR. LaROQUE: Object to form.

THE WITNESS: I don't agree with that. And the reason is that the beginning of that section 7 says that Rifaximin prepared, according to the old patents, samples of batches. So, I mean, it just doesn't make any sense to mention those old patents if they're not the source of what you're testing in that paragraph 7.

Again, we don't know which batch was manufactured according to which, you know, Marchi or Cannata process, but I believe that this data is supposed to represent what they got out of Marchi and/or Cannata.

BY MS. DOUKAS:

Q But the data in paragraph 7 tells us the polymorphic form identified about a year after the Rifaximin was first produced, right?

A That's correct. But I don't think that they put a pile of Rifaximin on the lab bench and a year later and came back and scooped some up. That would be -- you might speculate that humidity

Page 70

changes caused the transformation. I think that it's reasonable to assume that they put these samples in little bottles with screw caps and that they shouldn't have a lot of moisture transfer.

So, again, I think we speculate one way or the other, and that's all it would be is speculation. But I do believe that in this declaration, Dr. Viscomi is trying to represent to the patent office that Cannata and Marchi, they produce mixtures, they produce things other than what we desire, and that's what he reported.

Q Cannata has multiple example processes to produce Rifaximin, right?

A Let me look at that. So, yeah, Cannata's Exhibit 5.

Q Yes.

A You know, I would say -- you know, I'm looking at the examples. There's little differences; kind of doing a lot of the same thing. In the claims, there are process comments.

Can you ask your question again? I got off the Cannata to check things.

Q Yeah. I just wanted to -- and I can ask a different -- is it fair to say Cannata has different examples described in the production of Rifaximin?

Page 71

A Yes. There are different examples. They're not hugely different, I wouldn't say.

Q Do they involve different processes that are not identical between the examples?

A If "identical" means word for word verbatim, there are differences. But there's a theme, let's put it that way, a central theme of reacting the rifamycin O with 2-amino-4-methylpyridine, you know, with or without --

(Reporter clarification.)

THE WITNESS: 2-amino-4-methylpyridine, and there's variations in the Muller ratio. You know, they do it in organic solvent evaporate and come back with ethanol water.

So to give you a feeling for why do I say that the processes aren't hugely different, the single most important thing would be the final solvent. And I observed before, and I think I mentioned it to my fellow counsel here, there's a lot of 7/3 ethanol water in these examples.

So Example 6 there, they use 7/3 volume ratio ethanol water. Four, Example 4, 7/3. Nine, I think, is something we cite as well. That's a one -- well, yeah, that's a 1/1

Page 72

mixture of ethanol water. So there's a big theme there, right, that the solvent doesn't change its character; it's ethanol water. And that would be very important.

The reaction yield, you know, the addition of iodine or ascorbic acid, the time and the temperature, it's all very -- to get the same product. And then the handling of that product at the end, you know, the important part is the solvent, and it's always ethanol water, if I'm not mistaken.

BY MS. DOUKAS:

Q You said that would be "very important." Are you referring to the use of ethanol water in that ratio that you mentioned, the 7/3?

A The ratio is -- it's striking how many times they use 7/3, but they also use 1/1. The single, I think, point there is lots of water present so we can make a hydrate. And, of course, as we know, that's going to become a pretty important point as we go along.

Q Can you explain --

A Example 2 also uses the 7/3 ethanol water ratio.

Q You said the "point there is lots of water

Page 73

present so we can make a hydrate." Can you just explain sort of the significance of lots of water present?

A Yeah. If we had a synthesis that was in methylene chloride and at the end, you know, we reduced the volume and shillet and we isolate solids. I'm not particularly worried about any hydrates. Now maybe I have to worry about hydroscopicity subsequently, but initially I'm not worried about a hydrate at all.

When you use, you know, ethanol water mixtures where the water is a significant contributor to the content of the final solvent, so 1/1, you know, is a little worse than 7/3 because it's ethanol to water, I'm going to think about a hydrate or worry about hydration because there's a lot of water. There's way more than we need for, let's say, a dihydrate or a trihydrate. So, you know, I'm going to be cautious about that. I think that's something that Steve Byrne says in his writing.

Now, having said that, when you isolate things, and I believe I used the example of methylene chloride, I have seen methylene chloride solvates. Now, those are unacceptable for

THE WITNESS: Okay.
VIDEO OPERATOR: The time is now 12:10 p.m. We're going off the video record. This ends media unit 2.
(Brief recess.)
VIDEO OPERATOR: The time is now 12:15 p.m. We're back on the video record. This begins media unit 3.
BY MS. DOUKAS:
Q Dr. Schinzer, during the break, did you talk to counsel about your testimony at all?
A I didn't talk to him at all. You know, something's different about the view. I thought I was okay. It did change. Okay. I'm back.
Q When we broke, we were talking about your Exhibit 1, the list of materials considered. And I just want to be clear, in forming your opinions, you did consider the file history of the '196 patent, correct?
A Correct.
Q And if we go back to that file history excerpt we had up before, it's Exhibit 7, still on Bates ending '8984, you see in the fourth paragraph, it says in the second sentence: In addition, the methods disclosed in the '534 application are not



directed at nor do they result in Rifaximin products having consistent polymorphic forms.
Do you see that sentence?
A Oh, I was on 84 and it's really 85, right.
Q Sorry. No, I believe it's 84.
A Well, it starts there, but your text is on 85, right, the rejections?
Q I am looking -- there are more discussion in 85, but I was looking at 84.
A All right. I'm with you.
Q And, again, the '534 application is referring to the same disclosure that we seen the Cannata reference that you discuss in your report, correct?
A Yes. The footnote.
Q And then if you look at the next paragraph on this '834 [sic], do you see reference to a report by Zach, trademark Zambon Chemicals, submitted with the IDS dated January 13, 2011?
A Oh, I certainly recall -- there it is, yeah.
Q Did you review that report in forming your opinions, if you recall?
A I just remember the name because it's so odd, Zach Zambon you call it. I don't recall



reading the report.
Q Let's mark that report.
MS. DOUKAS: This is my tab 16 in my folder. This will be Exhibit 8, I believe.
(Exhibit Schinzer-8 was marked for identification.)
BY MS. DOUKAS:
Q I've marked as Exhibit 8 a document ending in Bates XIFAX_AMN_0008931 and it goes to Bates ending '8944. I'll represent this is excerpted out of the '196 file history. Do you see the document?
A I do.
Q Do you recall reviewing this document as part of your analysis in forming your opinions?
A I don't recall it. Like I said, I certainly recall the name strongly because it was odd.
Q If we look at the first page of Exhibit 8 at the bottom, you see there's a box that has a summary and it says: The document describes preparation of Rifaximin according to Examples 7 and 9 of European Patent EP 0161534 by adapting those process parameters not described. For each experiment, yield, water content (measured by the



Karl Fischer method, KF) in crystalline form by XRPD are reported.
Do you see that?
A I do.
Q And we agree the Example 7 and 9 of the European patent is the same as the Examples 7 and 9 in Cannata, correct?
A I'd like to see those. I don't recall the specific examples at all.
MR. LaROQUE: Counsel, before you continue, I'm going to have a standing objection to this document as Dr. Schinzer has said that he did not review it, he has not seen it. So standing foundation objection and maintaining my scope objection as well.
BY MS. DOUKAS:
Q Dr. Schinzer, you reviewed the file history of the '196 patent in forming your opinions? I think we've established that.
A Yes.
Q So if this was part of the file history of the '196 patent, then you would have reviewed it if you reviewed the file history?
A You know, I -- like I say, I remember distinctly this Zach Zambon business. I don't

recall this report. And, you know, I don't know what to tell you as far as, you know, answering questions. If I didn't review it, if I don't recall it, then, you know, I'm not sure how to answer any questions that you might ask about it.
Q Let's try out -- go to the next page of this document, Bates ending '8932. Do you see there is a table underneath the title Summary of The Results.
MR. LaROQUE: And just maintaining my standing foundation objection. He says he doesn't recall it, and as outside the scope of the opinions in his report.
BY MS. DOUKAS:
Q Do you see the table, Summary of The Results?
A Yes, I do.
Q You see in the left-hand column it says Patent Example and lists 7 or 9 in the various rows?
A Yes, I do.
Q Then in the far-right column it says: Solid state analysis, XRPD.
Do you see that?
A Yes, I do.
Q You'd agree that none of those rows in the



summary of --
(Zoom freeze.)
THE WITNESS: You'll have to go back. You froze on that question.
BY MS. DOUKAS:
Q Would you agree that in the table that we're looking at, Summary of The Results, that none of the rows indicates that polymorphic form delta or epsilon were formed?
MR. LaROQUE: Object to form.
THE WITNESS: The first thing I'd like to do is go back and look at Examples 7 and 9 because I don't know if they're even relevant. I hope they are.
BY MS. DOUKAS:
Q Give me -- I can put those up as an exhibit. But just so that we're on the same page again, just going back to your opening report, Exhibit 1, that footnote we looked at, footnote 1, it is on page 20 of your opening report and the page that starts with paragraph 137.
You had said: I understand that European Patent EP 0161534, the EP '534 patent, claims priority to the same [indecipherable reading] --



COURT REPORTER: Counsel, I can't get it when you read like that. Please.
MS. DOUKAS: I'm sorry. I'll start over.
BY MS. DOUKAS:
Q Do you see the -- I'll just shortcut it. Do you see the footnote, Dr. Schinzer?
A I do.
Q And do you understand that you stated that this EP 0161534, or shorthanded the EP '534 patent, makes substantively identical disclosures as Cannata?
A I do.
Q With that understanding, do you understand that -- hate to jump back -- that Zach report we were looking at that is referencing Examples 7 and 9 is the same Examples 7 and 9 as in Cannata?
A And that's what I'd like to look at.
Q Okay. Let me drop an exhibit. Hang on.
A Did I understand that you were going to add the '534 to the exhibits?
Q Yeah. I'm just dropping it into Exhibit Share.
MS. DOUKAS: I think it should be there now if we can mark as Exhibit 9 what I've just dropped into my private folder as tab 19.



(Exhibit Schinzer-9 was marked for identification.)
THE WITNESS: Nothing yet.
BY MS. DOUKAS:
Q Take your time if you want to review this Exhibit 9, and just for the record I'll note Exhibit 9 is EP Patent 0161534.
A I'm just looking at Examples 7 and 9 right now.
Q Take your time.
A Okay.
Q You agree that Examples 7 and 9 in EP '534 are the same as Examples 7 and 9 in the Cannata reference you rely on?
A I'm going to check that. Shoot. Well, let's see if I can remember. Methylene chloride, [witness indecipherably reading] --
(Reporter clarification.)
THE WITNESS: It's not really a statement to anybody. It's like musings.
COURT REPORTER: Anything you say, I have to catch. If you want to read to yourself or read out loud.
THE WITNESS: I'll restate it. Let's see if I can remember from one or the other.

Page 90

Q And the Normix Label is one of the references that you cite in your expert report, correct?
A Yes.
Q The Normix Label is silent as to Rifaximin being polymorphic, correct?
A If I understood your question correctly, the Normix Label is silent with respect to the solid form of the Rifaximin used.
Q Yes. Let me rephrase.
The Normix Label is silent as to the Rifaximin drug substance existing in a polymorphic form, correct?
A I believe that's true.
Q The Normix Label does not disclose delta or epsilon polymorphic form of Rifaximin, correct?
A I believe that's correct.
Q And the Normix Label does not teach the Rifaximin drug substance would have a specific water content, correct?
A That's true. It discloses plenty of other things, but not anything about the solid form or water content of the API.
Q And the Normix Label does not disclose anything about XRPD peak values for Rifaximin,

Page 91

correct?
A That's correct. I might add I've never seen a commercial label ever attempt to do so. Not very unique at all.
MS. DOUKAS: Let's mark as Exhibit 11 the New Zealand application which is tab 3 in my private folder.
(Exhibit Schinzer-11 was marked for identification.)
BY MS. DOUKAS:
Q So I marked as Exhibit 11 Publication Number NZ '531622 and the Bates at the bottom of the first page is AMN-RFXMN_00051606. Do you see that?
A I do.
Q And I believe you refer to this document as the New Zealand Application in your expert report; is that correct?
A Yes.
Q And if I refer to "the New Zealand Application," you'll understand I mean Exhibit 11; is that fair?
A Yes.
Q And, again, the New Zealand Application is one of the references you cite in your expert report, correct?

Page 92

A That's correct.
Q And if we look at the New Zealand Application, it describes polymorphic forms of Rifaximin, and specifically alpha, beta, and gamma, correct?
A I believe that's correct.
Q And the New Zealand Application is silent as to the existence of either delta or epsilon polymorphic forms of Rifaximin, correct?
MR. LaROQUE: Object to form.
THE WITNESS: I believe that's true.
BY MS. DOUKAS:
Q Look at Exhibit 11, the New Zealand Application, Bates ending '611, page 3 of the document itself. If you go to line 21, it says: It has now been found that the formation of the alpha, beta, and gamma forms depends on the presence of water within the crystallization solvent, on the temperature at which the product is crystalized, and on the amount of water present into the product at the end of the drying phase.
Do you see that?
A Yes.
Q So you agree that New Zealand Application teaches that water content at the end of the drying

Page 93

phase matters to what polymorphic form of Rifaximin you get, correct?
MR. LaROQUE: Object to form.
THE WITNESS: That's the claim they make here at that point, that's true.
BY MS. DOUKAS:
Q Do you agree with that statement?
A Well, if we didn't have any water in the crystallization solvent, there wouldn't be any hydrate, there wouldn't be any question. So that part is certainly true.
The temperature, I think there's a fairly broad range of temperatures that give you the various forms. But I think it's accurate to say that, again, depending on the drying, if you stop at a certain point, you will be at a certain form, and that can change if you continue drying. So I guess I agree with most of that particular paragraph.
Q The New Zealand Application teaches processes to get to form alpha, beta, and gamma only, correct?
MR. LaROQUE: Object to form.
THE WITNESS: Yes, I think the subject matter of this patent application is all about alpha, beta, and gamma Rifaximin.

BY MS. DOUKAS:
Q Strike that. Start over.
The New Zealand Application is silent as to what water content a person of skill in the art would need to stop at in order to obtain different polymorphic forms besides alpha, beta, and gamma, correct?
A I believe that's so.
MS. DOUKAS: Let's mark as Exhibit 12 the '620 patent, which is my tab 8, please.
(Exhibit Schinzer-12 was marked for identification.)
BY MS. DOUKAS:
Q So Exhibit 12 is U.S. Patent Number 7,045,620, which I'll refer to sometimes as "the '620 patent."
A You said 7,045,620?
Q Yes.
A Okay.
Q The Bates number on this Exhibit 12 on the first page is XIFAX_AMN_0812015. Will you understand if I say "the '620 patent," that I'm referring to Exhibit 12?
A Yes.
Q Now, the '620 patent is another reference



that you cite to in your expert report, correct?
A That's correct.
Q And I think we can agree the New Zealand Application that we just looked at as Exhibit 11 and the '620 patent, which is Exhibit 12, have substantially the same disclosures; is that fair?
A I believe that's fair to say.
Q And throughout your report, is it fair that disclosures or cites you referenced in the '620 patent -- strike that. Start over.
Would it be fair to say your testimony as to the New Zealand Application would apply equally to the '620 patent and vice versa?
A I believe that's generally true. There could be some specific difference. I don't know. But I believe the review I undertook revealed that '620 is essentially the same as the New Zealand Application.
Q And the '620 patent, like the New Zealand Application, describes the production of Rifaximin alpha, beta, and gamma, correct?
MR. LaROQUE: Object to form.
THE WITNESS: I believe that's correct.
BY MS. DOUKAS:
Q You would agree that the '620 patent is



silent as to the existence of either Rifaximin form delta or Rifaximin form epsilon, correct?
A Yes. There's no explicit mention of those two forms. There's no explicit listing of powder x-ray patterns.
Q If you could turn to your opening report again, and that's Exhibit 1, go to paragraph 170.
A I'm going to use the hard copy.
Okay.
Q You say: In my opinion, the '620 patent and the New Zealand Application anticipate or render obvious Claims 7 to 9 of the '196 patent because they disclose a process for preparing Rifaximin forms alpha, beta, and gamma that is nearly identical to the process for preparing Rifaximin forms delta and epsilon identified in the '196 patent.
Do you see that?
A I do.
Q And just for clarity, is your opinion that each of the '620 patents and the New Zealand Application on its own either anticipates or renders obvious Claims 7 to 9 of the '196 patent?
A Yes.
Q Then for your obviousness opinion as to



either of these references, you're relying on a single-reference obviousness argument; is that correct?
A I don't believe that's true.
Q Why don't you believe that's true?
A Well, the legal team and I discussed this. And my understanding was that for obviousness, you needed a combination of elements that were related to, you know, the subject matter, but different elements of it; the motivation to combine those and then a reasonable chance, a reasonable expectation of success.
And so that's what I was told, is that obviousness requires a combination of elements to establish those, those elements of obviousness claim or opinion.
Q So your obviousness opinion as noted in paragraph 170 of your opening report, what other reference are you combining with either the New Zealand Application or the '620 patent?
A So in terms of a reasonable expectation of success, perhaps you can bring in the Normix Label. Again, the claims have to do with the pharmaceutical composition. And certainly the Normix Label talks all about a nice starting point for a Rifaximin drug

product.
Or let's say you ask, well, what's my motivation to do anything in this regard? Certainly the FDA guidance and just general knowledge reading Byrne and Haleblian and McCrone.
Those elements would play in that they would say this is why I'd be motivated to look for different forms that may not be explicitly disclosed ahead of time.
COURT REPORTER: I need that one name, "Haleblian"?
THE WITNESS: Yeah.
COURT REPORTER: With an "H"?
THE WITNESS: "Eb," then L-I-A-N.
BY MS. DOUKAS:
Q So is it your opinion that the '620 patent on its own does not render Claims 7 to 9 of the '196 patent obvious?
MR. LaROQUE: Object to form.
THE WITNESS: You know, my opinion here, I'm sitting on page 37, and it's section 10A, it states that the '620 patent and the New Zealand Application each anticipate and/or render obvious Claims 7 through 9 of the '196 patent.



So my belief is that as far as anticipation, I think the New Zealand and the '620 patents inherently disclose delta and epsilon, and that's all I need. If you say, well, I don't believe so, then you might say, well, look, you know, I have a reasonable expectation of success as indicated by the Norwich [sic] Label and, I guess, you could say the Viscomi declaration, I would be motivated to combine elements here because of the FDA guidance and I know from the get-go that I need to study.
You know, my short form for what am I going to do if I try to, let's say, just reproduce the patents, I'm going to focus on hydrates. I've already been told by the patents that variable states, you know, different powder patterns, different forms are generated by variable water content.
And it just makes sense to look at variable water content by powder x-ray, by Karl Fischer, by TGA, and to look at, you know, the real estate around where the patent lies.
And as indicated by Dr. Viscomi in his declaration, and again, you know, we can



speculate a little bit about the rationale of how it came about, he states that delta and epsilon can result from Marchi and Cannata, which, you know, are just more general forms of the New Zealand and '620 patents. They have less specificity.
BY MS. DOUKAS:
Q Just focusing on that section that you just referenced in Exhibit 1 where you say, I lost -- each of -- "the '620 patent and the New Zealand Application each anticipate and/or render obvious Claims 7 to 9 of the '196 patent," I want to focus on that last part, "render obvious."
A Okay.
Q Is it your opinion that the '620 patent on its own renders obvious Claims 7 to 9 of the '196 patent?
MR. LaROQUE: Object to form.
THE WITNESS: You know, I think my answer is pretty easy. That's what I stated in this written report.
BY MS. DOUKAS:
Q And the same thing for the New Zealand Application, is your opinion that the New Zealand Application on its own can render obvious Claims 7



to 9 of the '196 patent?
A On its own --
MR. LaROQUE: Object to form.
THE WITNESS: -- I think is anticipation combined with other things like the FDA guidance. I think that's more toward the argument of obviousness.
BY MS. DOUKAS:
Q Does your obviousness argument as it relates to either the '620 patent and the New Zealand Application require either of -- strike that. Let me just do one at a time.
Does your obviousness opinion as it relates to the '620 patent require the '620 patent to be combined with another reference such as the FDA guidance that you just mentioned?
A Well, let's see about what the report says. I'm thumbing through a load of anticipation information. So I'm on page 50 of that opening report at paragraph '196.
Q Okay.
A And I think that section lays out the argument that I would make that I can get something, alpha, beta, gamma, maybe other things, out of the '620 patent and the New Zealand and then I'm going

to need a motivation to look around and that's going to be the FDA 1987 guidance. And I'm going to have a reasonable expectation of success based on the Normix Label.
And I guess, you know, I don't know how to -- I know it's not prior art, but it's certainly a piece of information we have, the Viscomi declaration, that, you know, using older patents I can get delta and epsilon out of these processes using ethanol and water, variable drying.
Q You said "I'm going to need a motivation to look around and there's going to be the FDA 1987 guidance." What do you mean by "look around"?
A So we have the 1987 FDA guidance that says I want you in your application for approval to have a section that shows me that you looked around, you scouted the area for polymorphic or pseudopolymorphic potential problems for your API.
So, my golly, you know, you've told me up through the patents, up through New Zealand and '620, that water content matters a lot. We're coming out of a substantially aqueous solvent system that looks like it does a good job, and I am aware of, you know, the hydrate issue, the variable hydrate.


So I can get alpha, beta, gamma, if I'm not careful, you know, due to variations in that isolation at the end. So there is where I need to look around. Is there anything else I need to know? Are there anhydrous polymorphs? Are there other hydrates? And that's where I think the motivation comes to not just stop with what the patent says and to reproduce that and decide if you're satisfied or not, but to look around.
At the end of the day, if you want to produce this material reproducibly, put it reproducibly in a drug product, you're going to study, you know, the drying and you're going to set specification for moisture, and then you're going to worry can I hit that specification all the time and what if I don't. And I believe that is where we're going to discover other forms that aren't explicitly mentioned in '620 or New Zealand. So there's the motivation.
You can say, Well, is that is? No. There's Byrne and Haleblian and Remington. There's a number of folks that would tell you, you know, don't stop at what you read, keep looking around and be able to present that in your NDA or ANDA.
Q Can you look at your opening report,


paragraph 199. You say: The '620 patent and New Zealand Application themselves would motivate a POSA to characterize all forms of Rifaximin produced by the '620 patent process, including forms delta and epsilon.
Then you continue, you say: The common specification states that, quote, the identification and characterization of these polymorphous forms is very important for a compound endowed with pharmacological activity which like Rifaximin is marketed as a medicinal preparation both for human and veterinary use.
Do you see that?
A Yes.
Q The '620 patent and New Zealand Application already state that it's important to understand polymorphic forms of Rifaximin, correct?
A That's correct. That's consistent with the other references I mentioned in the 1987 FDA guidance.
Q And those other references you mentioned say the same thing as the '620 patent, New Zealand Application about the importance of characterizing the forms of Rifaximin, correct?
A That's right. In our case in particular,


the various hydrated states that we already know can generate different solid forms characterized by different powder x-ray patterns.
(Reporter clarification.)
THE WITNESS: Different powder x-ray patterns.
BY MS. DOUKAS:
Q The '620 patent and New Zealand Application undertook the step of characterizing Rifaximin polymorphic forms and identified alpha, beta, and gamma, right?
MR. LaROQUE: Object to form.
THE WITNESS: That's my understanding.
BY MS. DOUKAS:
Q And as we see in what you quoted from the '620 patent or New Zealand Application in your paragraph 199, the inventors understood at the time the importance of characterization, yet didn't characterize delta or epsilon, correct?
MR. LaROQUE: Object to form.
THE WITNESS: Yes. I think that's reasonable from the perspective of what they were coming from to where they stood that day. Because, you know, they already had found mixtures, right, and I think their '620 or New

Page 114

Yeah, they're verbatim the same. So the answer, I think, to the question was yes, the '620 and New Zealand Application have identical descriptions for Example 1.

Q And you'd agree, based on your table that you have here, the process described in Example 1 of the '196 patent is not identical to the process described in Example 1 of the '620 patent or Example 1 of the New Zealand Application?

A I didn't follow that very well. Can you ask it again slowly.

Q Would you agree that the process described in Example 1 of the '196 patent is not identical to the process described in Example 1 of the '620 patent?

A It's identical for a long way until you get to drying, right. I mean, it's shocking to me -- I was very, very, very surprised the weights and times are the same until you get down to the very end where the highlighted different colors are. So there's the difference.

So everything the same, I mean, 20 degrees C for 30 minutes, 20 degrees C for 30 minutes, [indecipherable reading] --

COURT REPORTER: Doctor, read it so I can understand it, please.

Page 115

THE WITNESS: My point is that these are all the same, the recovered amount is the same. It's as if they did the same exact experiment and then took a Y in the road at the very end at the drying stage.

So, wow, I'd said this is incredibly identical until you get to the drying stage. There, we're directed to get the delta form by stopping short and we can get the alpha form by drying a little bit more. So those are very similar processes with a little bit different direction of drying.

So you said are they identical? No. Are they incredibly similar down to the end? Oh, yes, they are.

BY MS. DOUKAS:

Q But you agree the difference is the '196 patent tells you to dry to a water content of 3.3 percent while the '620 patent tells you to dry to a water content of 2.2 percent, correct?

A Right. So to get alpha, you drive by delta.

Q But the '620 patent doesn't tell you what water content you would need to stop at to get delta, does it?

Page 116

A I'm saying the reality is from what we know here, this is exactly the same, right. And the difference is I keep going and I get alpha. So in other words, I drove past delta. I didn't say that I knew delta existed or anything about it, but when we did that to procedure on the right-hand side of '620, it drove right through delta.

I don't think there's any other conclusion a rational person could reach. Exactly the same conditions, just keep going and you get alpha. We had to go through delta.

Q You understand that delta polymorphic form of Rifaximin does not convert to alpha polymorphic form Rifaximin, correct?

MR. LaROQUE: Object to form.

THE WITNESS: You know, it would be wonderful if I looked back at the Viscomi article, but, you know, we could do that, I guess. Do we have that available already, the Viscomi article of 2008 or not?

BY MS. DOUKAS:

Q Yes. You got to where I was going to go. Let's mark that. F?

MS. DOUKAS: Let's see. I don't know what exhibit we're on, but it would be in my private folder, the one that doesn't have a number before it. It says Viscomi, cited in '196 prosecution.

Page 117

MR. LaROQUE: Looks like we're on 13.

MS. DOUKAS: Thank you.

(Exhibit Schinzer-13 was marked for identification.)

BY MS. DOUKAS:

Q So if we go to Exhibit 13, this is a 2008 publication with first author Viscomi and it ends -- did not put the Bates number version, but the title is Crystal Forms of Rifaximin and Their Effect on Pharmaceutical Properties.

Is this the Viscomi publication you were just referencing?

A Yes. This is the, yeah, 2008, yep. That's right.

Q If you go ahead to page 6 of the PDF, figure 4. There it says, figure 4 -- the caption is: The relationship between the various crystal forms of Rifaximin.

Do you see that figure?

A I do.

Q And you see that delta does not convert to

Page 122

skill in the art would look at those comparisons and say, I drove right through delta; is that correct?
A And I don't -- and like I say, I thought about this, is there something I'm missing and I don't think there is. I think that there's no other conclusion than to say we had to go through delta to get alpha.
Q The -- strike that.
You don't cite to any prior art references, though, that disclose the existence of delta polymorphic form of Rifaximin, do you?
A I would say that's kind of an incomplete question. No offense. But if I'm a POSA and I get any interest in Rifaximin, I'm not going to read patents and quit. I'm going to combine sources and knowledge and I'm going to act according.
So, again, if I see alpha, beta, and gamma, I think I'm going to quickly dismiss gamma because it's not very crystal and just has a lot of undesirable features. But I can focus on alpha and beta and start wondering from there, given common inputs like Byrne and the FDA guidance, and I'm going to go back and look back at the sequence of drying. And I think it's pretty clear that I'm going to find that I drove right through the delta

Page 123

species.
So that didn't need any prior art other than the, let's say, New Zealand Application, right. I'm just looking -- I've been told about beta being transitioned to alpha and then I'm supposed to scout around in that real estate right there according to all the other, you know, FDA guidance, you know, Byrne, Remington, Haleblian.
I honestly believe that there's about three different ways I would trip across delta, one of which is just funny little quick screens with no packaging and variable humidity.
You know, so I think delta's going to easily be found with those motivations, and it's supported in a number of ways.
Q What are those number of ways that it's supported?
A You know, the Viscomi declaration that delta can result from Cannata and Marchi processes. They're even less informed than '620 and New Zealand patents.
Q Your motivation for a person of skill in the art to continue to -- actually, strike that. I'll ask a different question.
Sitting here, you can't cite to

Page 124

anything in the '620 patent, the New Zealand Application, or any other prior art references you rely on that say a specific water -- that teach the specific water content needed to get to the delta form of Rifaximin; is that fair?
A So there's no explicit language. And I think that if you look at New Zealand and '620, I think it's more inherent that, like I say, if you look at this, you can be as careful as you want, you can be as tough as you want on your reading and say, You know, these patents direct you to park next to delta in the parking lot.
And then if you say, Well, is it obvious? I think your direction from the FDA and others and, you know, a lot of conversations with other people in the industry, you're going to look around that parking lot and say, Oh, my God, I'm parked next to something different.
And then, like I say, it's not prior art, but it's certainly informative and confirmatory that one of the inventors himself comes along and says, using prior art I got samples that are pure delta, pure epsilon mixtures and other sorts of results. And I'd say looking at the balance of things, that's not particularly surprising.

Page 125

Q You mentioned if you look at New Zealand and the '620 patent "I think it's more inherent." What's your understanding of inherency?
A Well, let's just look it up in my report. I think we define it.
Yes, so I guess what I'd like to go to, being at my house here, is page 6 in my opening report, paragraph 27. So it's explaining about anticipation. The last sentence is: I understand that a prior art reference anticipates a claimed invention if it expressly describes a claimed invention or if the claimed invention is necessarily inherent in the reference.
So to me, we were just looking at that comparison and that table of the '196 Examples 1 and 2 and the '620 Example 1. Oh, wow, like I say, you couldn't get closer to disclosing the delta without explicitly naming it than to provide the process and it's just a little short of further drying that you would get this delta from.
I don't mind that you don't even know delta exists, but it's certainly striking to me that you have a process described in New Zealand or '620 that would be absolutely useful to make delta and all you have to do is stop a little short on the

drying.
You might say, Why would you do that? And I'd say, Because we need to look around and see what lies near our desired product. So you might say, Well, is your desired product alpha? Sure, we can start with alpha and we can look around. We can start with beta and see how susceptible it is to various challenges, and one of those might be getting a little dry.
So we're just tracking all over delta. And I think you would essentially take the process that's described in New Zealand or '620 and you can immediately adapt it to make delta without question.
Q But the '620 -- sorry, the '620 patent and the New Zealand Application don't actually describe how you would modify Example 1 to --
A And that's --
(Reporter clarification.)
THE WITNESS: And that's, I'd say, where you might be looking for something explicit. And this is more inherent that the process used there with a very small reasonable change, I'm going to stop drying a little bit ahead of time, you might say I could encounter this



incredibly simply by just setting up an in-process control, an IPC -- and by the way, this is going to be challenging, you've got let's say a big reactor, might have an agitated discharge and mixing assembly.
When you take a sample, it needs to be representative of the whole batch, right, and you need to stop at, let's say, 3.3 percent or if you're going to alpha, 2.2. I don't want to try to guess where it is; I'm going to test it, let's say, by Karl Fischer.
So as I get close, I might take a Karl Fischer sample and if I study, you know, is there anything funny going on, might take a powder x-ray as I go.
And, wow, that little -- just trying to put together an IPC for drying so that the manufacturing folks know when to really stop, it seems to me incredibly likely, very reasonable expectation, of hitting delta while you're just trying to set up an in-process control.
Because I don't know what you do if you want to make a species like alpha, it's the same thing. How do I know when I get to 2.2?



I don't want to overdry it, do I? Again, you'd study that. If I dry alpha further, is there any issue?
So, you know, there's going to be studies that are done for various reasons. And, like I say, we're parked next to delta in the parking lot from the get-go.
BY MS. DOUKAS:
Q But in order to actually get delta, the process described in Example 1 of the '620 patent would require modification, correct?
A Yes and no.
MR. LaROQUE: Object to form.
THE WITNESS: Yes and no. Am I using exactly the same, you know, quantities, salt composition, drying conditions, times, temperatures, yes. And when I get to the final drying, I think I've got to be careful. I don't want to overshoot it or undershoot it. So I've got an idea. Let's install an in-process control and check it as we come down near, let's say, 2.2 percent.
Well, I need to check it before I get there so I know where I am. I don't want to overshoot it. So I'm literally going to take



out of that reactor, at any scale, a sample that's delta. I'm going to measure it by Karl Fischer. If I do anything like take a powder x-ray diffractogram, I'm going to notify my friends and say, Hey, you know, this is kind of strange, I'm not getting alpha, not getting beta. There's discussion about that.
BY MS. DOUKAS:
Q But Example 1 and the '620 patent generally doesn't describe the process you just articulated, correct?
A Well, I'd say generally it does. And then specifically at the very end, we need to make a small adaptation if you want to target delta. I think that that ability to target it, if you decided -- you know, when we get all done -- let's say for the purposes of argument, we know all about alpha, beta, gamma, delta -- I'm sorry, alpha, beta, delta, epsilon.
Now we have to make a decision, you know, what should we use. And we're going to do that same little set of experiments. Well, who can -- all this water, who stays the same? Who changes very quickly? Does any of this change irreversibly? What's the best target here? And now

Page 130

we've got an active discussion. We can get, you know, these four forms, let's study those further to see which one we want to use.
Q Just yes or no, a person of skill in the art need to modify Example 1 of the '620 patent in order to get to delta?
A In a very small reasonable way, yes.
Q In terms of the epsilon form, you agree that the epsilon form of Rifaximin can only be obtained after starting with delta and drying that, correct?
A You know, I've been around the block with these things. You publish what you know and you don't know what you don't know. From what I've seen, Viscomi and others believe that. It's not absolutely clear to me that's the only thing you could do.
Q Turn to paragraph 176 of your opening report.
A 176?
Q Yes.
A Okay.
Q And you say: The water content dictates the form of Rifaximin produced using the common process of the '620 patent, '196 patent, and New

Page 131

Zealand Application.
Do you see that?
A I do.
Q So you'd agree that the water content is an important feature in order to obtain a specific polymorphic form of Rifaximin?
A Yes.
Q If we go back to the table we were looking at on page 39, left-hand column we talked about has the '196 patent Examples 1 and 2?
A Yes.
Q Example 1 tells you precisely what water content you would need to have in order to achieve Rifaximin delta, correct?
A Yes. There's a range specified in other documents, but this one says 3.3.
Q So a person of skill in the art could look at Example 1, follow the process outlined there and be able to obtain Rifaximin delta given the information provided in the '196 patent, correct?
A Should be. People don't always have success reproducing things and they get interested in that. But, you know, I think we have to take Viscomi and the group at face value. And if you execute that process, you should get the delta form.

Page 132

Q And then if you look in your table underneath Example 1, you have Example 2 and it says: Preparation of Rifaximin epsilon.
Do you see that?
A Yes, I do.
Q And you'd agree that a person of skill in the art could follow Example 2 and the further drying to obtain the epsilon form of Rifaximin, correct?
A That's correct. So that's good. That's explicitly telling me what to do. That's how I would envision that. Explicitly tells me what to do.
Q If a person of skill in the art followed the process in the '620 patent in Example 1 exactly as it's laid out, including water content that's in Example 1 of the '620 patent, would they necessarily achieve Rifaximin delta?
A So my understanding is that if you did nothing except reproduce that column and you ignore everything and go to a water content of, I guess, it's 2.2 percent, then you're going to presumably get the alpha form. If you're the slightest bit cautious, and I certainly would be, I would take Karl Fischer measurements as I went and it might

Page 133

well be the case that I want to take powder x-ray of those samples as well. I think the consequences of doing that are obvious.
Q If you just, if a person of skill in the art just took Example 1 of the '620 patent at face value, replicated it down to the water content listed, they would expect that they would get Rifaximin alpha; is that fair?
A It is fair. And I'd say that a person of ordinary skill wouldn't just go right there and say I did what I was told to do and I'm going home. I think they would do auxillary experiments around getting that done. If they don't do it right away, they're going to get to it. And part of that, I think, in particular is cautious drying and looking at Karl Fischer and powder x-ray, let's say you can get to delta form but you might debate me about the epsilon.
The epsilon is going to come when I study -- you know, if I do a study where I'm mildly stressing things, just with relative humidity, maybe a 40 degrees C or room temperature, if I try to dry delta at room temperature just with a saturated salt solution or with a desiccate, going to drive right into epsilon. So I can foresee an easy path to a

Page 138

and time that those ranges provide for not only delta but epsilon as well.
BY MS. DOUKAS:
Q To be clear, the '620 patent does not give you the information as to the water content that is required to get to delta or epsilon, correct?
A That's correct. And what I am saying in my opinion is that this document, I've centered on the New Zealand Application, doesn't really matter if it's '620, but it gives you all the tools you need, right. It describes, you know, taking rifamycin O and 2-amino-4-methylpyridine, reacting it, cleaning it up, and then crystalizing and drying it.
And like I say, I like the analogy of we're in a parking lot and we're parked next to delta and the spot next to delta is epsilon. We are right on top of where you might want to go. It's true that you don't know it exists just yet, but in terms of, you know, what a POSA would do, I think they're going to study the drying and the landscape, the real estate around whatever their target is at that point, and it might be that we don't know the target.
Let's say we provisionally thought it

Page 139

could be beta or alpha, so we studied the drying process to see if there's anything unusual. And I think that that's where the fun would begin.
Q The inventors in the New Zealand Application or the '620 patents didn't do this, though, did they?
MR. LaROQUE: Object to form.
THE WITNESS: I contend that they certainly unwittingly produced delta and didn't know it apparently at that time using this process. Let me say that differently.
They didn't isolate delta, but they had their reactor full of it at some point.
BY MS. DOUKAS:
Q Just to be clear, what are you basing your assumption that they had a reactor full of delta at some point?
A So, so that process that I just described, with the large ranges, you know, room temperature drying up to 105, that's about the gamut of drying conditions I've ever heard of as far as temperature. And the times, 4 to 36 hours. Well, maybe the 4 was for a small reactor and 36 is for, you know, a hundred kilos.
But the bottom line is that, again, I

Page 140

cannot read the '620 or New Zealand Application against '196 and say that whatever I was doing at the end there, if I was trying to get to alpha, at some point in time my reactor was full of delta. And if I don't choose to check it, I can just keep drying. If I don't choose to do anything but Karl Fischer, I won't know it for a while, and I can get down to alpha. And that's when I start studying the landscape nearby and, you know, try to -- even in terms of trying to define the process, might want to put an in-process control in there and study -- there's nothing funny going on, right. We'll pass specs if we end up in this range. And net delta is not a specific number in other documents, it's a range. I think that's in my report here.
If we check that range, we're going to be surprised that we don't have beta or alpha. It's not gamma either. So that's what I mean when I say that their reactor was full of delta. I cannot reconcile what I read in New Zealand and '620 and then the '196 patent and say, Wow, at some point in time during that process all we had was delta and we just keep going to get alpha.
Q You understand that in order to show obviousness of a claim there would need to be a

Page 141

motivation for a person of skill in the art to modify a reference, so in this case modify the '620 patent or New Zealand Application's process, correct?
A Yes. If we're claiming obviousness.
Q And if you could look at paragraph 199 of your opening report.
A Hang on a second.
Okay.
Q You say: The '620 patent or New Zealand Application themselves would motivate a POSA to characterize all forms of Rifaximin produced by the '620 patent process including forms delta and epsilon.
Do you see that?
A I do.
Q In your opinion, the actual '620 publication is telling a person of skill in the art you should characterize the various polymorphic forms of Rifaximin that exist; is that fair?
A Well, how about if I say this, that message is consistent with Byrne, Haleblian, Remington, and the FDA guidance, that you should look around and understand the territory so that you can make what you want to make reproducible.

say: A POSA would have had a reasonable expectation of success preparing a composition with Rifaximin forms delta and/or epsilon because the '620 patent and New Zealand Application disclosed pharmaceutical preparations using other forms and because the Normix Label shows that Rifaximin tablets are safe and effective.
Do you see that?
A I do.
Q I think we've established this, but nothing in the prior art actually says that delta or epsilon polymorphic forms of Rifaximin existed, correct?
MR. LaROQUE: Object to form.
THE WITNESS: Through '620 and New Zealand, I believe that's correct. I guess, again, nobody explicitly mentions them, nobody explicitly characterizes them.
BY MS. DOUKAS:
Q So your opinion is that there would be a reasonable expectation of success in getting to delta and epsilon because other forms were identified as part of the New Zealand Application's process; am I understanding that?
A Yes. And, like I say, you can lead me to


water and I will drink it. The patents, the New Zealand and '620, talk about essentially variable hydration states. So I've already been told that water matters, I can get different powder x-ray patterns depending on the water content, and I get from beta that alpha by just drying. So I have a good starting point.
I'm listening to the FDA and everybody else saying look around, so I'm going to do things. I'm motivated by those folks to, you know, look around at that real estate and I believe I have a reasonable expectation of success with other information like the Normix Label.
You know, you say, Well, what is it telling me? It's telling me all about -- sorry about that. I don't how to stop that.
I run into this situation where you have a polymorph and you can prepare a trial formulation, maybe it's not optimized or anything, but you then discover other crystal form, and we always start right with that formulation because we put in the effort to identify it for whatever reasons.
So a POSA starting with the information from New Zealand, let's say, I've got an


excellent starting point, I've got a reasonable chance of success of combining, you know, what I think I'm going to discover with the '620, New Zealand patents as far a the API with the Normix Label telling me how much and what excipients I might want to use.
Q I think you say this in your report, but we can agree that the New Zealand Application discloses Rifaximin polymorphic forms alpha and beta, correct?
A And gamma.
Q And gamma. Sorry. Yes. It discloses alpha, beta, and gamma, correct?
A Yes.
Q And the delta form of Rifaximin has a water content that falls somewhere between the alpha form and the beta form; is that correct?
A You know, I want to define this little table. I've got a table and I think it's in my opening report where we address exactly that.
Q For example, maybe paragraph 191, there's a table underneath there.
A You saved me a lot of time. Yes, that's exactly the table I was looking for.
So these are ranges that we've


abstracted, you know. It's not like 3.3, 2.2; it's ranges that we're given and the source of the information. So beta is, you know, the highest water content, 5 and 6 percent; delta, 3 and four and a half; alpha is 2 and 3. So wettest, intermediate, and dryest, in that order.
Q The inventors of the New Zealand Application already looked at the real estate of water content that encompasses delta, didn't they, by characterizing on beta?
A Alpha and beta, but nothing lesser. Nothing finer.
Q But when they were characterizing Rifaximin, they identified alpha and beta which do encompass the delta water content somewhere in that range?
A Well --
MR. LaROQUE: Object to form.
THE WITNESS: You know, I've done a lot of Karl Fischer testing in my life. That's one of the techniques I'm most familiar with here. Those numbers are different. The ranges, you know, are touching each other almost.
So, you know, these are a little bit low differences. But the patents disclose, you

Page 162

between 2.0 percent and 3.0 percent and then a powder x-ray diffractogram and extra information there.
Q Lower than 4.5 percent is overlapping with the water content we see for delta, which is 2.5 percent to 6 percent, correct?
A No. 4.5 doesn't overlap. If you're over here, you're delta; if you're over here, you're alpha. They don't overlap, but they touch.
Q If you look at your table again, the delta you cite --
A Oh, [indecipherable] --
COURT REPORTER: I'm sorry. One at a time. Say it again, please.
BY MS. DOUKAS:
Q If we look at the table again, and this is in paragraph 191 of the opening report, the rule for delta says 2.5 percent to 6 percent, more preferably between 3 percent and 4.5 percent.
A And I misspoke about the big range. The small range delta can go as low as 3, but that's the highest alpha can be. When I read these, I look at the "preferably," but what it really says is that delta can be between two and a half and 6.
Now, that's a huge range and seems

Page 163

like it would be a problem for overlap. You know, if I had two and a half percent and delta, I would be in alpha land there. So that's not good.
But what I really, you know, believe when I read patents is when they say "preferably," that's where I go. And in that case, alpha and delta touch but don't overlap. The 3 percent is a break point between delta. It's the low point for delta and it's high point for alpha. So they don't overlap, but they touch.
Q It does say, in what you've quoted in your table from the '196 patent, that delta could be 2.5 percent to 6 percent, right?
A And that's not my writing. It's surprising to me to see that. But like I say, when somebody says "preferably," I emphasize that more than the initial statement. And that does make sense to me. Those don't overlap.
Q So your opinion is that there's no overlap in water content between delta and alpha?
MR. LaROQUE: Object to form.
THE WITNESS: That's not what the patent says. You know, the patent says like for beta, higher than four and a half. So I guess 40 is higher than four and half. For delta, up to 6.

Page 164

Now, that, you know, seems like it's right up against beta. Again, I didn't write this.
If you restrict yourself to "preferably" or "more preferably," it's a better outcome. It's understandable.
BY MS. DOUKAS:
Q Going back to paragraph 216 of your report and your discussion of reasonable expectation of success, as we read earlier you also reference: The Normix Label shows that Rifaximin tablets are safe and effective.
Do you see that?
A Yeah, I'm trying to get my copy to align.
Yes, I see that.
Q Just to be clear, the Normix Label didn't mention anything in the label about Rifaximin being polymorphic, right?
A Being polymorph what?
Q Being polymorphic.
A I guess that's true.
Q I just want to jump ahead to paragraph 218 of your opening report. First, let's look at the heading above that, heading B, it says: Claims 7 to 9 of the '196 patent are also invalid as obvious over Cannata in view of the Normix Label and/or

Page 165

Marchi and Common Knowledge.
But then if you look at paragraph 218, the "and/or" has disappeared between Normix Label and Marchi. So I just want to be clear, what is your opinion as to the invalidity relying on these references you've cited?
A You know, when people ask me questions like that, I usually say the text, not the heading. Because the heading, you know, is sort of probably added later. But I don't think it's particularly important.
I think that the bottom line is that, you know, Marchi has a different starting point. He talks about medicinal preparations and common excipients; so does Cannata. There's not a lot of distance between them. There's some differences. And they both provide crystal and Rifaximin as a result of the API, you know, processes that are given.
But certainly for the obvious, the obviousness, we're going to need to combine, you know, what the outcome is from, let's say, the API prepared according to Cannata or Marchi, and then common knowledge and guidance from the FDA and so forth to provide that motivation to do something

Page 166

besides live with the output that you might get from Cannata or Marchi.
Q Then your paragraph 219, it says: Cannata discloses a process for preparing crystalline Rifaximin that produces Rifaximin forms delta and epsilon as the patentee admitted during prosecution of the '620 patent.
Do you see that?
A I do.
Q So does your obviousness opinion in this section rely on the assumption that Cannata's process produces Rifaximin formed delta and epsilon?
A [Indecipherable.]
(Reporter clarification.)
MR. LaROQUE: Object to form.
THE WITNESS: You better ask the question again. There was some confusion there.
BY MS. DOUKAS:
Q Does your obviousness opinion in this section rely on the assumption that the Cannata process produces Rifaximin form delta or epsilon?
MR. LaROQUE: Object to form.
THE WITNESS: I think what you mean is because of the Viscomi declaration, and I'd say no, not because of the Viscomi declaration.

Page 167

Viscomi confirms what you might think by comparing the processes which couldn't be more identical until you get to the stopping point of drying.
So my belief is that -- again, it's confirmed by Viscomi -- that we're going to run into delta and epsilon using those processes. Then, you know, it's a result of being motivated to look around and the Normix Label, other information, is going to give us a reasonable expectation of success, that there's a therapeutic effective amount, it's a wonderful antibiotic for the gut, and here's excipients that I can lay out that are good to use through an oral formulation of Rifaximin.
BY MS. DOUKAS:
Q I don't think that was exactly my question. My question is, does your opinion that Claims 7 to 9 of the '196 patent are obvious over Cannata in view of Marchi or the Normix Label and common knowledge rely first on the assumption that Cannata's process produces Rifaximin in forms delta/epsilon?
MR. LaROQUE: Object to form.
THE WITNESS: I'm not sure how to answer.

Page 168

And the reason is, you know, to me, it's clear that we're going to find delta and epsilon and we can get it from Cannata's process. And then Viscomi confirms that for us so we don't have to do experiments apparently. Then, you know, what's my motivation, how did I get there? It's common knowledge, the FDA guidance, and Byrne and so forth.
And finally, I do have a reasonable chance of success? I would say yes, the Normix Label provides that; shows me where to go from the API onward.
So if your question says is it an important element that I believe, my opinion is that Cannata's process can make delta and epsilon, that's true.
BY MS. DOUKAS:
Q Your belief that the Cannata process can make delta or epsilon is based on the discussion in the Viscomi declaration, right?
A But also, you know, from a knowledge that, you know, I'd say it's really important in my report, those columns where we're comparing '196, Examples 1 and 2, and '620, I think it's Example 1, and we come down there and it couldn't be more

Page 169

verbatim.
You know, I'm used to seeing, well, 30 grams here and 35 over there. Those numbers were the same. Every number was the same. Every weight, every time, every temperature, all the solvent composition, the same. So then you come down and say if you dry it to this level you get delta; if you continue exactly with the same conditions, you get alpha. We drove right through delta.
Again, with the motivation of the FDA and Byrne and so forth to look around that local area that was targeted by '620 or New Zealand, I believe it's going to be easy to figure out delta. I also think we're going to find out that there's epsilon in short order after finding delta.
If we do a little stability study of delta, because we might want to consider that for further development, we put it out in a little desiccator with, you know, a centrate solution of lithium salt, I forget which one, and we dry that little guy out at room temperature and it makes epsilon. Now we got another form to consider for further development.
Q It seems like you veered into discussion of the '620 patent and New Zealand Application. I

want to make sure I understand your testimony. Is it your testimony that by relying on the '620 patent or the New Zealand Application and it's similarities to the '196 patent, that you would -- a person of skill in the art would understand Cannata can give you delta or epsilon?
A As confirmed by Viscomi, right.
Q So are you relying on the discussion in the '196 patent as to the formation of delta and epsilon to form your obviousness opinions?
A No. Like I say, it's informing. It's confirming. But if you just look at the process in '620 or New Zealand, wow, it could hardly be closer in almost every respect to '196. So we're in the parking lot parked next to delta and epsilon is one car down and we're supposed to look at the area around where we target. So maybe we're targeting alpha. And I think that there's the motivation.
We add the Normix Label to say can we further push this to a drug product that might be stable. I think the Normix Label gives us a great start.
Q We agreed that the Normix Label -- I'm sorry. Strike that.
We agreed from your understanding


that Normix uses alpha, right?
A That's recent knowledge, you know, thanks to Dr. Chyall. But I think what would actually happen is you try to execute the patent, whichever one you pick, maybe New Zealand, and you find that you get beta, you can push down with drying to alpha, and you say, Well, we can use beta, we can use alpha, and then I'm supposed to look at the real estate nearby.
I think you can see the progression there. So, you know, it seems very natural to me. Very natural for sure.
Q When you say "the real estate nearby," do you mean the water content of delta being near the water content of beta and alpha?
A Yeah. And there's a number of studies that we're going to need to do, drying study, to show if we overdo it, can we recover back, can we humidify dry to get -- if we wanted to target beta and we overdried it to alpha, can we go back? You would probably find the answer is yes.
And then, you know, what happens in between. If we go between alpha and beta, where do we land? Is halfway half of beta and half of alpha? What's going on, you know? The other thing is


having made delta, you know, let's try to just dry it with, you know, low temperature processes and that's going to certainly form epsilon.
So there's a number of studies that are going to make it clear to us that there's more action than alpha and beta and then we're going to have to decide what are we going to do about this, both in terms of spec setting and the methods that we employ, the IPC, the in-process control, how are we going to apply that and execute it.
At the end of the day, what can we keep in a reasonable container that can be pushed onto a drug product in a reproducible fashion.
Q I just want to go back to, I think, you made a few references to this, the identical or nearly identical process between the '196 patent and '620 patent. As we've established earlier, the processes are not, in fact, identical; they require different water contents at the end, right?
A Well, I think what I concluded anyway, and I hope I answered about that earlier, they're identical, and I mean really identical, what, 95 percent reading down until we get to the drying, which by the way is under identical conditions, and where we stop is the difference. That's incredibly


close.
So is it identical? Not absolutely identical. Is it way closer than I've ever seen two processes like that? Oh, gosh, yes.
Q The water content, at the end of the day, is determinant of what polymorphic form of Rifaximin you're going to obtain, right?
A And that's what's said in the patents, the '620 and New Zealand.
Q So it's not an insignificant difference between the two processes in the '620 patent and the '196 patent, right?
MR. LaROQUE: Object to form.
THE WITNESS: We've been led by both sets of patents, the New Zealand/'620 and the '196 take us down the same ladder, right, way to the end, just before we isolate the final API after drying.
And drying to -- you know, let's say a starting point is beta but we don't want that, I guess, so we're going to dry it on down to either 2 or 3 percent. I just can't imagine not studying that more closely. Those are two pretty close water contents.
And, again, if I look at how I'm going to

work with the manufacturing folks, the process engineer, we've got to study that more in detail.

So, again, these processes are very, very close and there is an important detail at the end, but I feel like I'm going to be almost forced to study that point because of the FDA and so forth, and just internal needs.

BY MS. DOUKAS:

Q And the processes you're comparing that you're saying are very close are the process in the actual patents at issue, the '196, and the prior art process, '620 patent, correct?

A And the New Zealand, that's right.

Q So you need the '196 patent's disclosure to tell you how close these processes are to each other, right?

A No. Because you said before, well, I don't even know delta exists, right. So what we do know is from the '620 patent and New Zealand, that there are two forms. And, you know, if you execute the process with water ethanol and you dry it at the temperatures from the times that they say, you can get to the beta form, and then they say if you'd like you can dry that down to alpha.



And so you might say, I'm going to get both. I'm going to study both. And, you know, you don't need a very big piece of real estate. I'd go to, let's say, 1 percent water or a little less to study is alpha going to hold together, and I'd study a little above beta. You know, if you just get beta it's got a water content a little more than what is specified, and then I'd certainly study in between. Because that's the question, is, well, if I dry in between alpha and beta, do I just get a mixture of alpha and beta, is that the outcome, and what's my spec, right?

If that were the case, I might tend toward a mixed spec of X percent alpha and Y percent or some, you know, spec like that. A mixed spec. If I figure out that it's one or the other, well, then I'm going to target one powder x-ray pattern and say no more than 10 percent of the other, let's say, however I engineer that, but I've got to study it.

One of the big properties that we're going to want to look at, if we don't know any better than to start with alpha or beta or the thing that we're probably going to hit is delta, well, then we have to study it with different relative



humidities and different storage conditions. Eventually you're going to say, Can I make it every time? Is it going to be, you know, manufacturable?

So there's going to be a number of studies that are well defined that I just think are going to make us trip right over delta and epsilon.

Q At the end of the day, the inventors of the '620 patent did not trip over delta or identify delta in the patent, correct?

A I don't --

MR. LaROQUE: Object to form.

THE WITNESS: I don't want to be too critical of them.

BY MS. DOUKAS:

Q Sorry. I didn't get your answer.

A You said that these, you know, smart guys that had an approved patent at '620 and New Zealand didn't do something that they maybe should have done, and I said I didn't want to be too critical.

Q You would agree, though, at the end of the day, the '620 patent and New Zealand Application say nothing about delta; despite the overlap of real estate you've mentioned, they did not identify delta or epsilon as a characteristic form -- sorry, as a form of Rifaximin?



A I believe that's true.

Q If we go back to your report, paragraph 218 in your opening report, your obviousness combination relying on Cannata as the primary reference, you don't include the '620 patent or the New Zealand Application as part of this combination, correct?

A Well, there's this comment about the Viscomi declaration that was, I guess, filed during the prosecution of the '620, but that's, you know, informative and confirming.

Yeah, I believe that, you know, Cannata and Marchi both made comments about the outstanding antibacterial properties. They talk about formulations. They talk about crystalline Rifaximin. And, you know, I believe we can make a combination of Cannata and/or Marchi, and then the motivation that we've talked about with the FDA guidance and then probability of success with the Normix Label.

Q Is your opinion relying on Cannata in view of Marchi or the Normix Label and common knowledge, if you look again in paragraph 219, assumes that Cannata discloses a process for preparing crystalline Rifaximin that produces Rifaximin form

delta and epsilon; is that fair?
MR. LaROQUE: Object to form.
THE WITNESS: That's absolutely what it says in that opinion right there or that text. You know, I know you kind of don't like the idea of me relying on that Viscomi declaration. If it didn't exist, we might well have undertaken to do what you asked me before, let's find a lab that can prepare these things and see what we get.
That also, that information wouldn't be prior art and we'd certainly think it was important and we'd consider it strongly.
So the same, I think, is true from the Viscomi declaration, is he himself had discovered that delta and epsilon somehow are produced by the Cannata and/or Marchi processes.
BY MS. DOUKAS:
Q Just to be clear, we covered this earlier, the Viscomi declaration didn't actually say that, right; it said that he tested Rifaximin produced about a year later, correct?
MR. LaROQUE: Object to form.
THE WITNESS: Yes. But then, you know, it



seems to want speculation, which I guess we really shouldn't go for. So did the stuff that he had convert in the bottle, that's speculation; or was it absolutely representative of what that process produced in their hands at that time? You know, I don't know that either.
So I say we have to take the evidence at face value that I use the Cannata and/or Marchi processes, and I believe maybe both were represented there in that Viscomi declaration, and what did they get when they did powder x-ray, pure delta, pure epsilon, mixtures.
You know, so I think I have to take that at face value and not try to lean one way or the other with assumptions that may or may not be true.
BY MS. DOUKAS:
Q But your assumption is that the Rifaximin that was initially produced was stored suitably such that the polymorphic form didn't convert from its initial production to when it was tested about a year later, right?
MR. LaROQUE: Object to form.
THE WITNESS: You know, it doesn't make



any sense for me to otherwise assume. A nice drug company like alpha, nice people like Dr. Viscomi and others there in Italy, they make Rifaximin, it's nice, pure, meets specs, and they, I think, would store it in a reasonable container that they had studied and decided was a reasonable container to retain the properties of the drug as it was tested for release for future use. That seems the most reasonable assumption about the storage.
BY MS. DOUKAS:
Q Again, that's your assumption; it's not actually stated in Viscomi's declaration?
A But I also -- I mean, the other assumption you can make is they dumped it out on the counter and every now and then they went by with a spoon and took some out. That's a terrible assumption. Nobody would do that. Is it possible that they stored it? They don't make a comment about going into and out of the bottles that contain the samples, but you and I both know that it's okay to lose water to form certain things on dry conditions but it's okay to gain water to let's say go from alpha to beta and again we're speculating whether they opened it a lot in the winter or opened it a



lot in the summer in Italy. I just don't know where we go with that.
I think the safest course is to say they stored it in a reasonable container and the information that we get eventually is that the material produced from Cannata or Marchi's process can be pure delta or pure epsilon.
Q You didn't review Dr. Viscomi's deposition transcript as part of your analysis in forming your opinions, did you?
A No, I did not.
Q Would you think that Dr. Viscomi would lie under oath in his deposition?
MR. LaROQUE: Object to form.
THE WITNESS: I wouldn't think so. I hope not.
BY MS. DOUKAS:
Q I didn't see it in your list of materials considered, just to confirm, you didn't review Dr. Confortini's deposition transcript?
A I recognize that name, but I did not review that transcript either.
Q C-O-N-F-O-R-T-I-N-I.
MS. DOUKAS: Can we take a short five-minute break, please. Want to check my

MR. LaROQUE: Fine with us.
MS. DOUKAS: Same here.
VIDEO OPERATOR: In terms of video orders, Ms. Doukas, do you need a copy of the video.
MS. DOUKAS: If that's what we've ordered, let's do that, please.
VIDEO OPERATOR: Mr. LaRoque.
MR. LaROQUE: Same thing, we'll go with what whatever we ordered.
(Witness excused.)
(Deposition concluded at 4:24 p.m.)



C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA :
:
COUNTY OF PHILADELPHIA :

I, MAUREEN BRODERICK, Registered Professional Reporter - Notary Public, within and for the Commonwealth of Pennsylvania, do hereby certify that the proceedings, evidence, and objections noted are contained fully and accurately in the notes taken by me of the preceding deposition, and that this copy is a correct transcript of the same.



______________________
MAUREEN BRODERICK
Registered Professional
Reporter - Notary Public



ERRATA SHEET

Attach to Deposition of: William Schinzer, Ph.D.
Taken on: December 9, 2025
In the matter of: Salix vs. Zydus

| PAGE | LINE NO. | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |



SIGNATURE PAGE

- - -

I hereby acknowledge that I have read the aforegoing transcript, dated December 9, 2025, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

- - -

SIGNATURE: ______________________
WILLIAM SCHINZER, Ph.D.
DATE: ______________________
WITNESSED BY: ______________________

# EXHIBIT DD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-----------------------------------x
SALIX PHARMACEUTICALS, INC., SALIX :
PHARMACEUTICALS, LTD., ALFASIGMA :
S.P.A. and BAUSCH HEALTH IRELAND : Case No.:
LTD., : 1:24-CV-7140-JFM
Plaintiffs, :
v. :
NORWICH PHARMACEUTICALS, INC., :
ALVOGEN PB RESEARCH & :
DEVELOPMENT, LLC, and ALVOGEN, :
INC., :
Defendants. :
-----------------------------------x

(Caption continued on next page.)

VIDEOTAPED VIDEO-TELECONFERENCE DEPOSITION OF
ENOCH BORTEY, Ph.D.
Wednesday, September 10, 2025
9:39 a.m. EDT

Job No.: 599087
Pages: 1 - 103
Reported Stenographically by:
Cassidy Western, RPR, CRR, CA CSR #14722, WA CCR



----------------------------------x
SALIX PHARMACEUTICALS, INC., SALIX :
PHARMACEUTICALS, LTD., ALFASIGMA :
S.P.A. and BAUSCH HEALTH IRELAND : Case No.:
LTD., : 1:24-CV-10213-JFM
Plaintiffs, :
v. :
CIPLA USA, INC. and CIPLA LIMITED, :
Defendants. :
----------------------------------x
SALIX PHARMACEUTICALS, INC., SALIX :
PHARMACEUTICALS, LTD., ALFASIGMA :
S.P.A. and BAUSCH HEALTH IRELAND : Case No.:
LTD., : 1:24-CV-04607-JFM
Plaintiffs, :
v. :
AMNEAL PHARMACEUTICALS OF NEW :
YORK, LLC, AMNEAL EU, LIMITED, :
AMNEAL PHARMACEUTICALS, LLC, :
AMNEAL PHARMACEUTICALS :
PRIVATE LIMITED and AMNEAL :
PHARMACEUTICALS, INC., :
Defendants. :
----------------------------------x

Videotaped Deposition of ENOCH BORTEY, Ph.D., conducted virtually.

Pursuant to notice, before Cassidy Western, Registered Professional Reporter, Certified Realtime Reporter, California Certified Shorthand Reporter #14722.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. AND BAUSCH HEALTH IRELAND LTD.:
MICHAEL J. ABERNATHY, ESQUIRE
MARGARET A. McGREAL, ESQUIRE
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1000

ON BEHALF OF DEFENDANT NORWICH PHARMACEUTICALS:
MATTHEW S. MURPHY, ESQUIRE
AXINN VELTROP & HARKRIDER LLP
90 State House Square, 9th Floor
Hartford, CT 06103
(860) 275-8100



A P P E A R A N C E S (continued)

ON BEHALF OF DEFENDANTS AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, and AMNEAL EU, LIMITED:
OREN D. LANGER, ESQUIRE
ROBINS KAPLAN LLP
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
(212) 980-7400

ON BEHALF OF DEFENDANTS CIPLA USA, INC. and CIPLA LIMITED:
JENNA BRUCE, ESQUIRE
K&L GATES LLP
925 4th Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

ALSO PRESENT:
Ervin Farkas, Videographer

25

**A Yes.**
Q And if we scroll down to the top of Column 39, the second half of --
**A Hold on one second.**
Q Sure.
**A I'm having some difficulties with this. Okay. Go ahead.**
Q If we go to the top of Column 39 in the '571 patent, you know, Table 21 is continued, and there's entries for the female gender. Correct?
**A That's correct.**
Q And the adequate relief of IBS symptoms and the adequate relief of IBS symptom of bloating, what's being reported, again, with the endnotes 2 and 3 are for the weeks three through six. Correct?
**A That's correct.**
Q And Table 22 of the '571 patent, that is evaluating the subgroup analysis, adequate relief of IBS symptoms and IBS symptom of bloating by treatment group and age. And -- correct?
**A That's correct.**
Q And there when we see what's being reported for adequate relief of IBS symptoms, that's also referring to data from weeks three

26

through six. Correct?
**A That's correct.**
Q And the adequate relief of IBS symptom of bloating is also referring for both the over 65 and under age 65 to weeks three through six. Correct?
**A That's correct.**
Q And then with respect to the data that's being reported in Table 23, which is directed to the subgroup analysis, adequate relief of IBS symptoms and IBS symptom of bloating by treatment group and race, there, also the data being reported for both the adequate relief of IBS symptoms and adequate relief of IBS symptom of bloating is referring specifically to weeks three through six. Correct?
**A That's correct.**
Q And then the subgroup analysis, scrolling down to Table 24, for adequate relief of IBS symptoms and IBS symptom of bloating by treatment group and IBS subtype, IBS subtype: Diarrhea predominant, what's appearing -- the data appearing in Table 24 for both adequate relief of IBS symptoms and adequate relief of IBS symptom of bloating is specifically from weeks three through

27

six as well. Correct?
**A That's correct.**
Q And then turning to Example 6, Dr. Bortey, it refers to analysis of two studies after three months. Correct?
**A Where is Example 6?**
Q Under the top of Column 42.
**A Oh, that's Example 6. I got it.**
Q And I guess if we start with Table 25A, which appears in Column 42 of the '571 patent, is it your understanding that the data reported in Table 25A is also from weeks three through six?
**A Yes, that's right. It's stated, yeah.**
Q And looking at Table 25B, there's a reference to end -- well, Table 25B refers to endpoints for abdominal pain (change from baseline in median). Correct?
**A That's correct.**
Q And on the left-hand column, there's a series of endpoints directed to abdominal pain. Correct?
**A That's correct.**
Q Do you recall how those endpoints were selected?
**A I don't recall.**

28

Q Do you recall who would have been responsible for developing those endpoints?
**A I don't know.**
Q But I take it your team would have been responsible for evaluating the data against those endpoints?
**A That's correct.**
Q And is it correct that the endpoints being reported in Table 25B are directed to weeks three through six as well?
**A That's correct.**
Q Could you scroll up for me to the '571 patent, it's going to be PDF page 18, Figure 13.
**A I'm there now.**
Q Dr. Bortey, is Figure 13 something that your group would have been responsible for preparing?
**A Yes.**
Q Do you have an understanding of what information is being depicted in Figure 13?
**A Yes.**
Q Could you explain your understanding, please?
**A It's change from baseline in the daily SGA IBS symptoms from, you know, weeks one through**

**weeks 12.**
Q And do you have an understanding of how a daily subjective -- withdrawn.
Do you understand SGA to refer to "subjective global assessment"?
**A Yes.**
Q Do you have an understanding of how a daily subjective global assessment score was converted to a weekly data point as depicted in Figure 13?
**A Yes. Yes.**
Q What is that understanding?
**A So on a daily basis, subjects answer the question scored from zero to four. So zero is no deficit, four is extreme deficit with respect to the symptoms. So you take the average of the subject level on a weekly basis, and that's how you get a score for the subjects. So we do this at baseline and post-baseline, and you do the subtraction to get the change from baseline.**
Q So is what's being depicted, for example, in week one in Figure 13, would that be the average of the daily SGA scores for days 1 through 7?
**A Yes. At the subject level, this -- like**



**I said, you first find the average value for the subjects at baseline, and then at the post-baseline. The subtraction is what is depicted in the figure, it's the change from baseline.**
Q Okay. So -- and I'm not trying to belabor this, Doctor, but I just want to make sure that I understand correctly.
So for each subject in the study, their daily SGA IBS symptom score is averaged over the week period. Correct?
**A That's correct.**
Q And then the average is taken across all subjects. Is that correct? For the -- like, for each of those -- so each subject's -- withdrawn.
Each subject's average score of days 1 through 7 would then be averaged as part of the group. Is that correct?
**A Yeah. It's a -- yeah, it's part -- by treatment group, yeah.**
Q So week -- what's being reported for week two, that would be days 8 through 14? Is that correct?
**A Yeah. Change from baseline.**
Q Sure. But I guess -- I guess the --



the -- the -- the SGA symptom score would be based on the average of days 8 to 14, and then that would be compared to the baseline obtained prior to the administration of -- or randomization. Correct?
**A That's correct, yeah.**
Q Do you have an understanding or recollection whether what's being report in Figure 13 is combined data from the Target 1 and Target 2 studies?
**A This -- this is one study. Because if it's from both studies, it would say pooled data. This doesn't say pooled data. So this is from one study.**
Q Do you have an understanding of who -- who selected the study that would be included in the patent?
MR. ABERNATHY: Objection; foundation.
Matt, can you -- or could someone please read the question back?
(Record read.)
BY MR. MURPHY:
Q And I can clarify that, Dr. Bortey.
MR. MURPHY: Thank you, Cassidy.



BY MR. MURPHY:
Q Do you have an understanding of who selected the study that would be included in Figure 13 of the '571 patent?
MR. ABERNATHY: Objection; foundation.
THE WITNESS: I don't recall.
BY MR. MURPHY:
Q Dr. Bortey, earlier we were discussing several tables that referred to subgroup analyses. Do you recall those tables?
**A Yes.**
Q Do you have a recollection of when those subgroup analyses would have first been prepared?
MR. ABERNATHY: Objection as to form.
Matt, can you clarify what you mean by "when"?
BY MR. MURPHY:
Q Dr. Bortey, the question is: Do you have a recollection of when the subgroup analyses would have first been prepared?
**A So yeah. Typically, we do this before we write a clean study report. But the exact date, I don't recall.**
Q Is it fair to say that the subgroup analysis would have taken place between the

101

minutes or so, 10 minutes to confer with my counsel for co-defendants, we can confirm that and wrap up.

MR. ABERNATHY: All right. Matt, I propose we come back in 10 minutes.

MR. MURPHY: Okay. Sounds good.

MR. ABERNATHY: Thanks.

THE VIDEOGRAPHER: We are going off the record. The time is 1:53 p.m.

(Break held off the record from p.m. to 2:03 p.m.)

THE VIDEOGRAPHER: We're going back on the record at 2:03 p.m. Please continue.

MR. MURPHY: Dr. Bortey, I appreciate your patience and thank you for your time. I have no further questions for you at this time.

THE WITNESS: Thank you.

MR. MURPHY: And I'll just add I don't believe either of my co-defendants have questions at this time, either.

MR. ABERNATHY: Matt, we have no questions.

So thank you very much for your professionalism and courtesies. We'll see everyone later.

Thank you, Dr. Bortey.

102

THE WITNESS: Thank you.

MR. MURPHY: Thank you, Michael. Thank you, Dr. Bortey.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Anything else for the record?

This concludes the deposition. We're going off the record. The time is 2:04 p.m.

(Off the record at 2:04 p.m.)

103

REPORTER'S CERTIFICATE

I, CASSIDY WESTERN, RPR, CRR, CA CSR #14722, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of September, 2025.

______________________________

Cassidy Western, RPR, CRR, CA CSR

# EXHIBIT EE

Docket No.: 119557-04013
(PATENT)

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Utility Application of:
William Forbes et al.

Application No.: 17/197,561 | Confirmation No.: 4033

Filed: March 10, 2021 | Art Unit: 1629

For: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS) | Examiner: Not Yet Assigned

MS Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**INFORMATION DISCLOSURE STATEMENT (IDS)**

Dear Sir:

Pursuant to 37 C.F.R. §§ 1.56, 1.97, and 1.98, the attention of the United States Patent and Trademark Office is hereby directed to the references listed on the attached PTO/SB/08. It is respectfully requested that the information be expressly considered during the prosecution of the above-identified application, and that the references be made of record therein and appear among the "References Cited" on any patent to issue therefrom.

This Information Disclosure Statement is filed before the mailing date of a first Office Action on the merits as far as is known to the undersigned (37 C.F.R. § 1.97(b)(3)).

In accordance with 37 C.F.R. § 1.98(a)(2)(ii), Applicant has not submitted copies of U.S. patents and U.S. patent applications.

In accordance with 37 C.F.R. § 1.98(d)(1), the following references cited on the PTO/SB/08 forms filed herewith are not supplied because they were previously cited by or submitted to the Office in prior application numbers 16/944956 filed July 31, 2020, 16/738392 filed January 9, 2020,

16/575769 filed September 19, 2019, 15/902179 filed February 22, 2018, 15/398283 filed January 4, 2017, 13/755578 filed January 31, 2013, 12/880739 filed September 13, 2010, and 12/393979 filed February 26, 2009 and relied on in the above-identified application for an earlier effective filing date under 35 U.S.C. § 120.

In accordance with 37 C.F.R. § 1.97(g), the filing of this Information Disclosure Statement shall not be construed as a representation that a search has been made. In accordance with 37 C.F.R. § 1.97(h), the filing of this Information Disclosure Statement shall not be construed to be an admission that the information cited in this Information Disclosure Statement is, or is considered to be, material to patentability as defined in 37 C.F.R. § 1.56(b).

It is submitted that the Information Disclosure Statement is in compliance with 37 C.F.R. § 1.98, and the Examiner is respectfully requested to consider the listed references.

Dated: October 22, 2021

Respectfully submitted,
Electronic signature: /Michael J. DeGrazia, Ph.D./

Michael J. DeGrazia, Ph.D.
Registration No.: 68,901
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6585
(617) 607-9200 (Fax)
Attorney/Agent For Applicant

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 4341785 | | 1982-07-27 | Marchi et al. | |
| | 2 | 4557866 | | 1985-12-10 | Cannata et al. | |
| | 3 | 7045620 | B2 | 2006-05-16 | Viscomi et al. | |
| | 4 | 7612199 | B2 | 2009-11-03 | Viscomi et al. | |
| | 5 | 7902206 | B2 | 2011-03-08 | Viscomi et al. | |
| | 6 | 7906542 | B2 | 2011-03-15 | Viscomi et al. | |
| | 7 | 7915275 | B2 | 2011-03-29 | Viscomi et al. | |
| | 8 | 7928115 | B2 | 2011-04-19 | Forbes et al. | |

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( **Not for submission under 37 CFR 1.99**)

| | |
|---|---|
| Application Number | 17197561 |
| Filing Date | 2021-03-10 |
| First Named Inventor | William Forbes |
| Art Unit | 1629 |
| Examiner Name | Not Yet Assigned |
| Attorney Docket Number | 119557-04013 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 9 | 8158644 | B2 | 2012-04-17 | Viscomi et al. | |
| | 10 | 8158781 | B2 | 2012-04-17 | Viscomi et al. | |
| | 11 | 8193196 | B2 | 2012-06-05 | Viscomi et al. | |
| | 12 | 8309569 | | 2012-11-13 | Forbes et al. | |
| | 13 | 8518949 | B2 | 2013-08-27 | Viscomi et al. | |
| | 14 | 8741904 | B2 | 2014-06-03 | Viscomi et al. | |
| | 15 | 8835452 | B2 | 2014-09-16 | Viscomi et al. | |
| | 16 | 8853231 | B2 | 2014-10-07 | Viscomi et al. | |
| | 17 | 9271968 | B2 | 2016-03-01 | Viscomi et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

## U.S.PATENT APPLICATION PUBLICATIONS
Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 20050272754 | A1 | 2005-12-08 | Viscomi et al. | |
| | 2 | 20060029550 | | 2006-02-09 | Lin et al. | |
| | 3 | 20070259906 | A1 | 2007-11-08 | Caras | |
| | 4 | 20080132530 | A1 | 2008-06-05 | Viscomi et al. | |
| | 5 | 20090012113 | | 2009-01-08 | Lin et al. | |
| | 6 | 20090028940 | A1 | 2009-01-29 | Jahagirdar et al. | |
| | 7 | 20090192083 | | 2009-07-30 | Currie | |
| | 8 | 20100136125 | A1 | 2010-06-03 | Jacobus et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

FOREIGN PATENT DOCUMENTS Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | 100137810 | KR | | 1998-02-12 | Yuhan Co., Ltd. | | |

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 17197561 |
|---|---|---|
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2 | 531,622 | NZ | A | 2004-10-29 | Alfa Wassermann S | | |
| | 3 | 2006/094737 | WO | A2 | 2006-09-14 | Alfa Wassermann Spa | | |
| | 4 | 2007/064964 | WO | A2 | 2007-06-07 | Prometheus Lab Inc et al. | | |
| | 5 | 2009/108814 | WO | A1 | 2009-09-03 | Salix Pharmaceuticals, Ltd | | |
| | 6 | 2011/032085 | WO | A1 | 2011-03-17 | Salix Pharmaceuticals, Ltd | | |
| | 7 | 2009/108730 | WO | A2 | 2009-09-03 | Salix Pharmaceuticals, Ltd | | |
| | 8 | 2009/047801 | WO | A1 | 2009-04-16 | Lupin Ltd | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | "Abstracts of the AGA Institute," Gastroenterology, Elsevier, Philadelphia, PA., Vol. 130, No. 4, April 1, 2006, pages A1-A26, Abstract 134, XP005643844 | |
| | 2 | "Rifaximin Demonstrates Statistically Significant Improvement in Co-Primary Endpoints in Treatment of Diarrhea-Associated Irritable Bowel Syndrome in Phase 11b Study," URL:http://www.drugs.com/ clinical_trials/rifaximin-demonstrates-statistically-significant-improvement-co-primary-endpoints-diarrhea-1851.html, September, 2007, XP002718618 | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 3 | Adachi, J.A., "Rifaximin: A Novel Nonabsorbed Rifamycin for Gastrointestinal Disorders," Reviews of Anti-Infective Agents, 42, pp. 541-547, 2006 | |
| | 4 | Amendment from U.S. Application No. 12/478,638 (U.S. Patent No. 7,612,199), filed on September 3, 2009 (14 pages). | |
| | 5 | Bacchi et al. Polymorphism-structure relationships of rifamexil, an antibiotic rifamycin derivative. Mol. Pharma. 47: 611-623 (1995). | |
| | 6 | Bass, N.M., "Review Article: The Current Pharmacological Therapies for Hepatic Encephalopathy," Aliment Pharmacol Ther., 25 (Suppl. 1), 23-31, 2006 | |
| | 7 | Bavin, Polymorphism in process development. Chemistry & Industry. 16:527-529 (1989). | |
| | 8 | Boulware, Travel medicine for the extreme traveler. Dis. Mon. 52:309-325 (2006). | |
| | 9 | Brigidi et al., "Effects of rifaximin administration on the intestinal microbiota in patients with ulcerative colitis," Journal of Chemotherapy. 14(3): 290-5 (2002). | |
| | 10 | Byrn et al. Pharmaceutical solids: a strategic approach to regulatory considerations. Pharm. Res. 12(7): 945-954 (1995). | |
| | 11 | Byrn et al., Chapter 11: Hydrates and solvates. Solid-State Chemistry of Drugs. Second Edition. SSCI, Inc. West Lafayette, Indiana. 233-247 (1999). | |
| | 12 | Castelli et al., Epidemiology of travelers' diarrhea. J. Travel. Med. 8(Suppl. 2): S26-S30 (2001). b | |
| | 13 | CHARI et al. "Treatment of Hepatic Failure with ex Vivo Pig-Liver Perfusion Followed by Liver Transplantation"; 28 July 1994 (28.07.1994) The New England Journal of Medicine vol 331, n 4; page 235, col 1, para 1, col 2, para 1; page 236, col 2, para 1. | |

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 14 | Cheng et al., Update on traveler's diarrhea. Current Infectious Disease Reports. 4:70-77 (2002). | |
| | 15 | ClinicalTrials.gov, NCT00098384. Rifaximin versus placebo in the prevention of travelers' diarrhea. Posted: December 8, 2004, Updated: May 9, 2006, Accessed: December 18, 2019. (6 pages). | |
| | 16 | ClinicalTrials.gov, NCT00292344. Rifaximin, loperamide and the combination to treat travelers' diarrhea. Posted: February 15, 2006, Updated: April 20, 2009, Accessed: December 18, 2019. (6 pages). | |
| | 17 | Crum et al., New issues in infectious diarrhea. Rev. Gastroenterol. Disord.5(suppl. 3): S16-S25 (2005). | |
| | 18 | Datta et al., Crystal structures of drugs: advances in determination, prediction and engineering. Nature. 3: 42-57 (2004) | |
| | 19 | de Melo, R.T., et al., "Rifaximin for the Treatment of Hepatic Encephalopathy," Am J Health-Syst Pharm, Vol. 65, pp. 818-822, 2008 | |
| | 20 | DuPont et al. "Rifaximin: A Nonabsorbed Antimicrobial in the Therapy of Traveler's Diarrhea" Digestion. vol. 59, Issue 6, pp. 708-714 especially abstract, Nov. 1998. cited by other. | |
| | 21 | DuPont et al., A randomized, double-blind, placebo-controlled trial of rifaximin to prevent travelers' diarrhea. Ann. Intern. Med. 142(10): 805-812 (2005). | |
| | 22 | DuPont et al., Rifaximin versus ciprofloxacin for the treatment of traveler's diarrhea: a randomized, double-blind clinicial trial. Clinical Infectious Diseases. 33: 1807-1815 (2001). | |
| | 23 | DUPONT et al., Treatment of travelers' diarrhea: randomized trial comparing rifaximin, rifaximin plus loperamide, and loperamide alone. Clin Gastroenterol Hepatol. 2007 Apr;5(4):451-6. | |
| | 24 | DuPont, Treatment of travelers' diarrhea. J. Travel. Med. 8(Suppl. 2):S31-33 (2001). | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 25 | Ericsson, Rifaximin: a new approach to the treatment of travelers' diarrhea. J. Travel Med. 8(Suppl. 2): S25, S40 (2001). | |
| | 26 | European Medicines Agency. ICH Topic Q 6 A. Specifications: test procedures and acceptance criteria for new drug substances and new drug products: chemical substances. 1-32. (May 2000). | |
| | 27 | FDA Guideline. Guildine for submitting supporting documentation in drug applications for the manufacture of drug substances. Center for Drug Evaluation and Research. February 1987. (47 pages). | |
| | 28 | Fiorucci et al., Inhibition of intestinal bacterial translocation with rifaximin modulates Lamina propria monocytic cells reactivity and protects against inflammation in a rodent model of colitis. Digestion. 66: 246-256 (2002). | |
| | 29 | Frissora, C.L., et al., "Review Article: The Role of Antibiotics vs. Conventional Pharmacotherapy in Treating Symptoms of Irritable Bowel Syndrome," Alimentary Pharmacology & Therapeutics, Vol. 25, No. 11, June 1, 2007, pages 1271-1281. | |
| | 30 | Frissora, Christine, "Premenstrual Syndrome Exacerbates Irritable Bowel Syndrome (PMS-IBS): Can the Nonsystemic Antibiotic Rifaximin Alleviate Cyclical Symptoms of Bloating, Abdominal Discomfort, and Diarrhea in Women?" American Journal of Gastroenterology, Vol. 103, No. Suppl. S, September 2008, pages S463-S464, XP002688387 | |
| | 31 | GERARD et al., Rifaximin: a nonabsorbable rifamycin antibiotic for use in nonsystemic gastrointestinal infections. Expert Rev Anti Infect Ther. 2005 Apr;3(2):201-11. | |
| | 32 | Ghoshal et al., Models for prediction of mortality from cirrhosis with special reference to artificial neural network: a critical review. Hepatol. Int. 2: 31-38 (2008). | |
| | 33 | GILLIS et al., Rifaximin. A review of its antibacterial activity, pharmacokinetic properties and therapeutic potential in conditions mediated by gastrointestinal bacteria. Drugs. 1995 Mar;49(3):467-84. | |
| | 34 | Gionchetti et al., Rifaximin in patients with moderate or severe ulcerative colitis refractory to steroid-treatment: a double-blind, placebo-controlled trial. Digestive Diseases and Sciences. 44(6): 1220-1221 (1999). | |
| | 35 | GIONCHETTI et. al. "Antibiotic treatment in inflammatory bowel disease; rifaximin a new possible approach"; European Review for Medical and Pharmacological Sciences; 1999; vol. 3; pg 27-30.; p 29, col 1, para 1. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 36 | Gordon, S., et al., "Validation of Irritable Bowel Syndrome Global Improvement Scale: An Integrated Symptom End Point for Assessing Treatment Efficacy" Dig. Dis. Sci., 2003; 48(7), p. 1317-23 PMID: 12870789 (Abstract Only) | |
| | 37 | Guillory, 5: Generation of polymorphs, hydrates, solvates, and amorphous solids. The University of Iowa. Iowa City, Iowa. 183-226 (1999). | |
| | 38 | Huang et al., Rifaximin - a novel antimicrobial for enteric infections. J. Infect. 5: 97-106 (2005). | |
| | 39 | Infante et al., Enteroaggregative Escherichia coli diarrhea in travelers: response to rifaximin therapy. Clin Gastroenterol Hepatol. 2(2):135-8 (2004). | |
| | 40 | Jozwiakowski, 15: Alteration of the sollid state of the drug substance: polymorphs, solvates, and amorphous forms. 3M Pharmaceuticals. St. Paul, Minnesota. 525-568. (2000). | |
| | 41 | Khankari et al., Pharmaceutical hydrates. Thermochimica Acta. 248: 61-79 (1995). | |
| | 42 | Koo et al., Current and future developments in travelers' diarrhea therapy. Expert Rev Anti Infect Ther. 4(3):417-27 (2006). | |
| | 43 | Koo et al., The role of rifaximin in the treatment and chemoprophylaxis of travelers' diarrhea. Ther Clin Risk Manag. 5:841-8 (2009). | |
| | 44 | Lauritano et al. "Association between Hypothyroidism and Small Intentinal Bacterial Overgrowth" The journal of Clinical Endrocrinology & Metabolism. vol. 92, Issue 11, pp. 4180-4184 especially p. 4181. Nov. 2007. cited by other. | |
| | 45 | Lawrence, K.R., et al., "Rifaximin for the Treatment of Hepatic Encephalopathy," Pharmacotherapy, 28(8), pp. 1019-1032, 2008 | |
| | 46 | Malamud et al., Treatment of gastrointestinal infections. Curr Opin Gastroenterol. 16(1):51-5, (13 pages), (2000). | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 47 | Marchina, M., "Infectious Diarrhea in the Aged: Controlled Clinical Trial of Rifaximin" Chemioterapta, Vol. 7, No. 5, pages 336-340, 1988 | |
| | 48 | MAS et al., Comparison of rifaximin and lactitol in the treatment of acute hepatic encephalopathy: results of a randomized, double-blind, double-dummy, controlled clinical trial. J Hepatol. 2003 Jan;38(1):51-8. | |
| | 49 | Miglio, F., et al., "Rifaximin, A Non-Absorbable Rifamycin, for the Treatment of Hepatic Encephalopathy. A Double-Blind, Randomised Trial" Curr. Med. Res. Opin., 1997; 13(10), p. 593-601, PMID: 9327194 (Abstract Only) | |
| | 50 | Miglioli et al., Effects of daily oral administration of rifaximin and neomycin on faecal aerobic flora in rats. Pharmacol Res. 44(5):373-5 (2001). | |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17197561 |
|---|---|---|
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Michael J. DeGrazia, Ph.D./ | Date (YYYY-MM-DD) | 2021-10-22 |
|---|---|---|---|
| Name/Print | Michael J. DeGrazia, Ph.D. | Registration Number | 68,901 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

**U.S.PATENTS** Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

**U.S.PATENT APPLICATION PUBLICATIONS** Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

**FOREIGN PATENT DOCUMENTS** Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 1 | Mintz, et al., Ocular Manifestations of Inflammatory Bowel Disease, Inflammatory Bowel Diseases, Vol. 20, Issue 2, pp.13-139, March, 24. | |
| | 2 | NEFF et al., Analysis of hospitalizations comparing rifaximin versus lactulose in the management of hepatic encephalopathy. Transplant Proc. 2006 Dec;38(10):3552-5. | |
| | 3 | Newman et al., 1: Form selection of pharmaceutical compounds. Handbook of Pharmaceutical Analysis. eds. Ohannesian and Streeter. Marcel Dekker, Inc. New York, NY. 61 pages. (2002). | |
| | 4 | PAIK et al., Comparison of Rifaximin and Lactulose for the Treatment of Hepatic Encephalopathy: A Prospective Randomized Study. Yonsei Med J. 2005 Jun;46(3):399-407. | |
| | 5 | Pakyz, Rifaximin: a new treatment for travelers' diarrhea. Ann Pharmacother. 39(2):284-9 (2005). | |
| | 6 | Pawlowski et al., Diagnosis and treatment of acute of persistent diarrhea. Gastroenterology. 136(6):1874-86 (2009). | |
| | 7 | Pelizza et al., Polymorphism of rifaximin. Il Farmaco. 32(7):471- 481 (1977). | |
| | 8 | Pigott, Foodborne illness. Emerg. Med. Clin. N. Am. 26: 475-497 (2008). | |
| | 9 | Pimental, Mark, "Review of Rifaximin as Treatment for SIBO and IBS," Expert Opinion on Investigational Drugs, Vol. 18, No. 3, March 1, 2009, pages 349-358, XP055046239 | |
| | 10 | Pimental, Mark, et al., "A 10-day Course of Rifaximin, A Non-Absorbable Antibiotic, Produces a Durable Improvement in All Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study," Gastroenterology, Vol. 130, No. 4, Suppl. 2, April, 2006, Page A26, XP002718616 | |
| | 11 | Pimentel et al. "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome" Annals of InternalMedicine. vol. 145, Issue 8, p. 557-563, Oct. 17, 2006, entire document. cited by other. | |

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 12 | Preidis et al., Targeting the human microbiome with antibiotics, probiotics, and prebiotics: gastroenterology enters the metagenomics era. Gastroenterology. 136(6):2015-31 (2009). | |
| | 13 | Prescribing Information For Rifaximin, United States, May, 2004 (13 pages). | |
| | 14 | Rifaximin Tablet Label, July, 2006 (16 pages). | |
| | 15 | Salix Pharmaceuticals "Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome" Dec. 6, 2007, <http://clinicaltrials.gov/ct2/show/NCT00269412>, p. 1,para 1. cited by other. | |
| | 16 | Scarpellini, E., et al., "High Dosage Rifaximin for the Treatment of Small Intestinal Bacterial Overgrowth" Aliment Pharmacol Ther., April 1, 2007; 25(7), p. 781-786 | |
| | 17 | Scarpignato et al., Prevention and treatment of traveler's diarrhea: a clinical pharmacological approach. Chemotherapy. 41 Suppl 1:48-81 (1995). | |
| | 18 | SCARPIGNATO et al., Rifaximin, a poorly absorbed antibiotic: pharmacology and clinical potential. Chemotherapy. 2005;51 Suppl 1:36-66. | |
| | 19 | Shahara et al. "Randomized Double-Blind Placebo-Controlled Trial of Rifaximin in Patients with Abdominal Bloating and Flatulence" American Journal of Gastroenterology. vol. 101, Issue 2, p. 326-333, Feb. 2006. cited by other. | |
| | 20 | Steffen et al., Therapy of travelers' diarrhea with rifaximin on various continents. Am J Gastroenterol. 98(5):1073-8 (2003). | |
| | 21 | Steffen, Rifaximin: a nonabsorbed antimicrobial as a new tool for treatment of travelers' diarrhea. J Travel Med. 8 (Suppl 2):S34-9 (2001). | |
| | 22 | Su et al., Utility of nonabsorbed (<0.4%) antibiotic rifaximin in gastroenterology and hepatology. Gastroenterol Hepatol (N Y). 2(3):186-197 (2006). | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 23 | TAYLOR et al., A randomized, double-blind, multicenter study of rifaximin compared with placebo and with ciprofloxacin in the treatment of travelers' diarrhea. Am J Trop Med Hyg. 2006 Jun;74(6):1060-6. | |
| | 24 | TAYLOR et al., Systemic pharmacokinetics of rifaximin in volunteers with shigellosis. Antimicrob Agents Chemother. 2008 Mar;52(3):1179-81. | |
| | 25 | Tillisch, et al., "Characterization of the Alternating Bowel Habit Subtype in Patients with Irritable Bowel Syndrome," The American Journal of Gastroenterology, Vol. 100, No. 4, April 1, 2005, pages 896-904 (XP055175635) | |
| | 26 | Trinh et al., Diarrheal diseases in the elderly.Clin Geriatr Med. 23(4):833-56 (2007). | |
| | 27 | Vaira et al., "Rifaximin suspension for the eradication of helicobacter pylori." Current Therapeutic Research. 58(5): 300-8 (1997). | |
| | 28 | VIGNALI et. al. "TIPS with Expanded Polytetrafluoroethylene-Covered Stent: Results of an Italian Multicenter Study"; August 2005 (08.2005) American Roentgen Ray Society, 185;472-480; table 1, figure 5, abstract; page 474, col 1, para 2; page 478, col 3, para 1. | |
| | 29 | Vippagunta et al., Crystalline solids. Adv Drug Deliv Rev. 48(1):3-26 (2001). | |
| | 30 | Viscomi Declaration under 37 C.F.R. 1.132 filed in U.S. Application No. 10/728,090. Dated January 10, 2006 (12 pages). | |
| | 31 | WILLIAMS et al., Evaluation of the efficacy and safety of rifaximin in the treatment of hepatic encephalopathy: a double-blind, randomized, dose-finding multi-centre study. Eur J Gastroenterol Hepatol. 2000 Feb;12(2):203-8. | |
| | 32 | Williams et al., Rifaximin, a nonabsorbed oral antibiotic, in the treatment of hepatic encephalopathy: antimicrobial activity, efficacy, and safety. Antibiotics for Hepatic Encephalopathy. 5(Suppl. 1):S10-S18 (2005). | |
| | 33 | Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (45 pages). | |

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | |
|---|---|---|
| | 34 | Transcript of Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (14 pages). |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Michael J. DeGrazia, Ph.D./ | Date (YYYY-MM-DD) | 2021-10-22 |
|---|---|---|---|
| Name/Print | Michael J. DeGrazia, Ph.D. | Registration Number | 68,901 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

**U.S.PATENTS** Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 7718608 | B2 | 2010-05-18 | Lin et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

**U.S.PATENT APPLICATION PUBLICATIONS** Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

**FOREIGN PATENT DOCUMENTS** Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2006/102536 | WO | A2 | 2006-09-28 | Univ Southern California | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 17197561 |
|---|---|---|
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 1 | BARRETT et al., Benefits of the Antibiotic Rifaximin as Empiric Therapy in Patients with Irritable Bowel Syndrome. The American Journal of Gastroenterology. 2006 Sept;101(9):S479-S480. Abstract 1238. | |
| | 2 | ClinicalTrials.gov, NCT00269412, Randomized, Double Blind, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Different Doses of Rifaximin Administered BID Either Two or Four Weeks in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome. NIH, U.S. National Library of Medicine. 9 pages, November 21, 2019. | |
| | 3 | CUOCO et al., Small intestine bacterial overgrowth in irritable bowel syndrome: a retrospective study with rifaximin. Minerva Gastroenterol Dietol. 2006 Mar;52(1):89-95. | |
| | 4 | DERBYSHIRE, Securities and Exchange Commission, Form 8-K. Salix Pharmaceuticals, Ltd., 6 pages, September 5, 2007. | |
| | 5 | LAURITANO et al., Rifaximin dose-finding study for the treatment of small intestinal bacterial overgrowth. Aliment Pharmacol Ther. 2005 Jul 1;22(1):31-5. | |
| | 6 | PIMENTEL et al., A 10-day Course of Rifaximin, A Non-Absorbable Antibiotic, Produces a Durable Improvement in All Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study. Gastroenterology. 2006 Apr;130(4):349-58. | |
| | 7 | Salix Pharmaceuticals, Ltd., et al., v. Norwich Pharmaceuticals, Inc., Trial Opinion, Case 1:20-cv-00430-RGA, Civil Action No. 20-430-RGA. 46 pages, August 10, 2022. | |
| | 8 | YANG et al., Rifaximin versus other antibiotics in the primary treatment and retreatment of bacterial overgrowth in IBS. Dig Dis Sci. 2008 Jan;53(1):169-74. | |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Thomas F. Foley/ | Date (YYYY-MM-DD) | 2022-12-28 |
|---|---|---|---|
| Name/Print | Thomas F. Foley | Registration Number | 76,384 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

I hereby certify that this paper (along with any paper referred to as being attached or enclosed) is being transmitted via the Office electronic filing system in accordance with 37 C.F.R. § 1.6(a)(4).

Dated: December 28, 2022
Electronic Signature for Thomas F. Foley: /Thomas F. Foley/

Docket No.: 119557-04013
(PATENT)

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Utility Application of:
William Forbes et al.

Application No.: 17/197,561

Confirmation No.: 4033

Filed: March 10, 2021

Art Unit: N/A

For: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

Examiner: Not Yet Assigned

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT (IDS)**

In accordance with 37 CFR 1.97, Applicant hereby makes of record the following additional documents. A PTO Form SB/08 and a full copy of each of the documents required under 37 CFR 1.98(a)(2) accompany this statement.

This Information Disclosure Statement is filed before the mailing date of a first Office Action on the merits as far as is known to the undersigned (37 C.F.R. § 1.97(b)(3)).

In accordance with 37 C.F.R. § 1.98(a)(2)(ii), Applicant has not submitted a copy of the cited U.S. patent. Applicant submits herewith copies of foreign patents and non-patent literature in accordance with 37 C.F.R. § 1.98(a)(2).

The Examiner is advised that the following applications contain subject matter that may be related to the present application:

| U.S. Application | Filing Date | Publication No. / Patent No. | Status | Atty. Docket No. |
|---|---|---|---|---|
| 12/880,739 | September 13, 2010 | 2011-0065741 | Abandoned | 119557-04005 |
| 13/755,578 | January 31, 2013 | 9,566,270 | Issued | 119557-04007 |
| 15/398,283 | January 4, 2017 | 9,931,325 | Issued | 119557-04008 |
| 15/902,179 | February 22, 2018 | 10,456,384 | Issued | 119557-04009 |
| 16/575,769 | September 19, 2019 | 2020-0121653 | Abandoned | 119557-04010 |
| 16/738,392 | January 9, 2020 | 10,765,667 | Issued | 119557-04011 |
| 16/944,956 | July 31, 2020 | | Abandoned | 119557-04012 |
| 17/892,982 | August 22, 2022 | | Allowed | 119557-04014 |

In accordance with 37 C.F.R. § 1.97(g), the filing of this Information Disclosure Statement shall not be construed as a representation that a search has been made. In accordance with 37 C.F.R. § 1.97(h), the filing of this Information Disclosure Statement shall not be construed to be an admission that the information cited in this Information Disclosure Statement is, or is considered to be, material to patentability as defined in 37 C.F.R. § 1.56(b).

It is submitted that the Information Disclosure Statement is in compliance with 37 C.F.R. § 1.98, and the Examiner is respectfully requested to consider the listed references.

Applicant believes no fee is due with this response.

Dated: December 28, 2022

Respectfully submitted,

Electronic signature: /Thomas F. Foley/
Thomas F. Foley
Registration No.: 76,384
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6575
(617) 607-9200 (Fax)
Attorney For Applicant

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 47285096 |
| **Application Number:** | 17197561 |
| **International Application Number:** | |
| **Confirmation Number:** | 4033 |
| **Title of Invention:** | METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS) |
| **First Named Inventor/Applicant Name:** | William Forbes |
| **Customer Number:** | 75093 |
| **Filer:** | Thomas F. Foley |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | 119557-04013 |
| **Receipt Date:** | 28-DEC-2022 |
| **Filing Date:** | 10-MAR-2021 |
| **Time Stamp:** | 13:49:14 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Foreign Reference | WO2006102536.PDF | 11001065<br>78a4f14058bc50f65bd8fd8908d9b8b03a4e56b2 | no | 65 |

**Warnings:**

| | | | | | |
|---|---|---|---|---|---|
| **Information:** | | | | | |
| 2 | Non Patent Literature | Barrett_Amer_J_Gastroenterol_101_Abstract_1238_2006.PDF | 6301318<br>bd1975ac4cc1a73529c8999502cc253281376ae6 | no | 5 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Non Patent Literature | ClinicalTrials_NCT00269412.PDF | 247364<br>2dac7ef22f58593d8ca3a73022b1eb078736fc51 | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Non Patent Literature | Cuoco_Minerva_Gastroenterol_Dietol_52_89_2006.PDF | 1549870<br>f839dfe80c8012c0632c44c1f45c20fdc81ffc07 | no | 7 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Non Patent Literature | Derbyshire_Salix_Pharm_6pages_9-5-2007.PDF | 192242<br>b44dec3272cb63e885d33543b71d8a2e2fb7540a | no | 6 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | Non Patent Literature | Lauritano_Aliment_Pharmacol_Ther_22_31_2005.PDF | 829849<br>8ccf648527ab1eb359836c136bc5079b12cc4b41 | no | 5 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 7 | Non Patent Literature | 21743EP_D1.PDF | 114644<br>6eb9f615ea15802d748a553420675e0ede814840 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 8 | Non Patent Literature | Salix-v-Norwich_1-20-cv-00430-RGA_46pages_8-10-2022.PDF | 2023635<br>c6bc1503cbae447de232f4c20e13b485db1c3d49 | no | 46 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 9 | Non Patent Literature | Yang_Dig_Dis_Sci_53_169_2008.PDF | 1191556<br>b688340d1ab2c18f2190c0683ed365f089f14893 | no | 6 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 10 | Information Disclosure Statement (IDS) Form (SB08) | 119557-04013_-_Information_Disclosure_Statement_Fillable_PDF.pdf | 1264333<br>6fc34ba0e812797c1cac885d03b8a7673f9afdd8 | no | 4 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 11 | Transmittal Letter | Information_Disclosure_Statement.pdf | 25922<br>1b5c82824c3b226d900ceb66d2332fdf368058eb | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 24741798 | | |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

# EXHIBIT FF

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 7718608 | B2 | 2010-05-18 | Lin et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

## U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

## FOREIGN PATENT DOCUMENTS

Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2006/102536 | WO | A2 | 2006-09-28 | Univ Southern California | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

## NON-PATENT LITERATURE DOCUMENTS

Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/ JA0694

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | 17197561 |
| | Filing Date | | 2021-03-10 |
| | First Named Inventor | William Forbes | |
| | Art Unit | | N/A |
| | Examiner Name | Not Yet Assigned | |
| | Attorney Docket Number | | 119557-04013 |

| | | |
|---|---|---|
| | 1 | BARRETT et al., Benefits of the Antibiotic Rifaximin as Empiric Therapy in Patients with Irritable Bowel Syndrome. The American Journal of Gastroenterology. 2006 Sept;101(9):S479-S480. Abstract 1238. |
| | 2 | ClinicalTrials.gov, NCT00269412, Randomized, Double Blind, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Different Doses of Rifaximin Administered BID Either Two or Four Weeks in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome. NIH, U.S. National Library of Medicine. 9 pages, November 21, 2019. |
| | 3 | CUOCO et al., Small intestine bacterial overgrowth in irritable bowel syndrome: a retrospective study with rifaximin. Minerva Gastroenterol Dietol. 2006 Mar;52(1):89-95. |
| | 4 | DERBYSHIRE, Securities and Exchange Commission, Form 8-K. Salix Pharmaceuticals, Ltd., 6 pages, September 5, 2007. |
| | 5 | LAURITANO et al., Rifaximin dose-finding study for the treatment of small intestinal bacterial overgrowth. Aliment Pharmacol Ther. 2005 Jul 1;22(1):31-5. |
| | 6 | PIMENTEL et al., A 10-day Course of Rifaximin, A Non-Absorbable Antibiotic, Produces a Durable Improvement in All Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study. Gastroenterology. 2006 Apr;130(4):349-58. |
| | 7 | Salix Pharmaceuticals, Ltd., et al., v. Norwich Pharmaceuticals, Inc., Trial Opinion, Case 1:20-cv-00430-RGA, Civil Action No. 20-430-RGA. 46 pages, August 10, 2022. |
| | 8 | YANG et al., Rifaximin versus other antibiotics in the primary treatment and retreatment of bacterial overgrowth in IBS. Dig Dis Sci. 2008 Jan;53(1):169-74. |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| | | | |
|---|---|---|---|
| Examiner Signature | /MICHAEL J SCHMITT/ | Date Considered | 03/20/2023 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17197561 |
|---|---|---|
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Thomas F. Foley/ | Date (YYYY-MM-DD) | 2022-12-28 |
|---|---|---|---|
| Name/Print | Thomas F. Foley | Registration Number | 76,384 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( **Not for submission under 37 CFR 1.99**)

| | |
|---|---|
| Application Number | 17197561 |
| Filing Date | 2021-03-10 |
| First Named Inventor | William Forbes |
| Art Unit | 1629 |
| Examiner Name | Not Yet Assigned |
| Attorney Docket Number | 119557-04013 |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

## U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

## FOREIGN PATENT DOCUMENTS

Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

## NON-PATENT LITERATURE DOCUMENTS

Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 1 | Mintz, et al., Ocular Manifestations of Inflammatory Bowel Disease, Inflammatory Bowel Diseases, Vol. 20, Issue 2, pp.13-139, March, 24. | |
| | 2 | NEFF et al., Analysis of hospitalizations comparing rifaximin versus lactulose in the management of hepatic encephalopathy. Transplant Proc. 2006 Dec;38(10):3552-5. | |
| | 3 | Newman et al., 1: Form selection of pharmaceutical compounds. Handbook of Pharmaceutical Analysis. eds. Ohannesian and Streeter. Marcel Dekker, Inc. New York, NY. 61 pages. (2002). | |
| | 4 | PAIK et al., Comparison of Rifaximin and Lactulose for the Treatment of Hepatic Encephalopathy: A Prospective Randomized Study. Yonsei Med J. 2005 Jun;46(3):399-407. | |
| | 5 | Pakyz, Rifaximin: a new treatment for travelers' diarrhea. Ann Pharmacother. 39(2):284-9 (2005). | |
| | 6 | Pawlowski et al., Diagnosis and treatment of acute of persistent diarrhea. Gastroenterology. 136(6):1874-86 (2009). | |
| | 7 | Pelizza et al., Polymorphism of rifaximin. Il Farmaco. 32(7):471- 481 (1977). | |
| | 8 | Pigott, Foodborne illness. Emerg. Med. Clin. N. Am. 26: 475-497 (2008). | |
| | 9 | Pimental, Mark, "Review of Rifaximin as Treatment for SIBO and IBS," Expert Opinion on Investigational Drugs, Vol. 18, No. 3, March 1, 2009, pages 349-358, XP055046239 | |
| | 10 | Pimental, Mark, et al., "A 10-day Course of Rifaximin, A Non-Absorbable Antibiotic, Produces a Durable Improvement in All Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study," Gastroenterology, Vol. 130, No. 4, Suppl. 2, April, 2006, Page A26, XP002718616 | |
| | 11 | Pimentel et al. "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome" Annals of InternalMedicine. vol. 145, Issue 8, p. 557-563, Oct. 17, 2006, entire document. cited by other. | |

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 12 | Preidis et al., Targeting the human microbiome with antibiotics, probiotics, and prebiotics: gastroenterology enters the metagenomics era. Gastroenterology. 136(6):2015-31 (2009). | |
| | 13 | Prescribing Information For Rifaximin, United States, May, 2004 (13 pages). | |
| | 14 | Rifaximin Tablet Label, July, 2006 (16 pages). | |
| | 15 | Salix Pharmaceuticals "Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome" Dec. 6, 2007, <http://clinicaltrials.gov/ct2/show/NCT00269412>, p. 1,para 1. cited by other. | |
| | 16 | Scarpellini, E., et al., "High Dosage Rifaximin for the Treatment of Small Intestinal Bacterial Overgrowth" Aliment Pharmacol Ther., April 1, 2007; 25(7), p. 781-786 | |
| | 17 | Scarpignato et al., Prevention and treatment of traveler's diarrhea: a clinical pharmacological approach. Chemotherapy. 41 Suppl 1:48-81 (1995). | |
| | 18 | SCARPIGNATO et al., Rifaximin, a poorly absorbed antibiotic: pharmacology and clinical potential. Chemotherapy. 2005;51 Suppl 1:36-66. | |
| | 19 | Shahara et al. "Randomized Double-Blind Placebo-Controlled Trial of Rifaximin in Patients with Abdominal Bloating and Flatulence" American Journal of Gastroenterology. vol. 101, Issue 2, p. 326-333, Feb. 2006. cited by other. | |
| | 20 | Steffen et al., Therapy of travelers' diarrhea with rifaximin on various continents. Am J Gastroenterol. 98(5):1073-8 (2003). | |
| | 21 | Steffen, Rifaximin: a nonabsorbed antimicrobial as a new tool for treatment of travelers' diarrhea. J Travel Med. 8 (Suppl 2):S34-9 (2001). | |
| | 22 | Su et al., Utility of nonabsorbed (<0.4%) antibiotic rifaximin in gastroenterology and hepatology. Gastroenterol Hepatol (N Y). 2(3):186-197 (2006). | |



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number: 17197561 |
| | Filing Date: 2021-03-10 |
| | First Named Inventor: William Forbes |
| | Art Unit: 1629 |
| | Examiner Name: Not Yet Assigned |
| | Attorney Docket Number: 119557-04013 |

| | | | |
|---|---|---|---|
| | 23 | TAYLOR et al., A randomized, double-blind, multicenter study of rifaximin compared with placebo and with ciprofloxacin in the treatment of travelers' diarrhea. Am J Trop Med Hyg. 2006 Jun;74(6):1060-6. | |
| | 24 | TAYLOR et al., Systemic pharmacokinetics of rifaximin in volunteers with shigellosis. Antimicrob Agents Chemother. 2008 Mar;52(3):1179-81. | |
| | 25 | Tillisch, et al., "Characterization of the Alternating Bowel Habit Subtype in Patients with Irritable Bowel Syndrome," The American Journal of Gastroenterology, Vol. 100, No. 4, April 1, 2005, pages 896-904 (XP055175635) | |
| | 26 | Trinh et al., Diarrheal diseases in the elderly.Clin Geriatr Med. 23(4):833-56 (2007). | |
| | 27 | Vaira et al., "Rifaximin suspension for the eradication of helicobacter pylori." Current Therapeutic Research. 58(5): 300-8 (1997). | |
| | 28 | VIGNALI et. al. "TIPS with Expanded Polytetrafluoroethylene-Covered Stent: Results of an Italian Multicenter Study"; August 2005 (08.2005) American Roentgen Ray Society, 185;472-480; table 1, figure 5, abstract; page 474, col 1, para 2; page 478, col 3, para 1. | |
| | 29 | Vippagunta et al., Crystalline solids. Adv Drug Deliv Rev. 48(1):3-26 (2001). | |
| | 30 | Viscomi Declaration under 37 C.F.R. 1.132 filed in U.S. Application No. 10/728,090. Dated January 10, 2006 (12 pages). | |
| | 31 | WILLIAMS et al., Evaluation of the efficacy and safety of rifaximin in the treatment of hepatic encephalopathy: a double-blind, randomized, dose-finding multi-centre study. Eur J Gastroenterol Hepatol. 2000 Feb;12(2):203-8. | |
| | 32 | Williams et al., Rifaximin, a nonabsorbed oral antibiotic, in the treatment of hepatic encephalopathy: antimicrobial activity, efficacy, and safety. Antibiotics for Hepatic Encephalopathy. 5(Suppl. 1):S10-S18 (2005). | |
| | 33 | Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (45 pages). | |



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04013 |

| | | |
|---|---|---|
| | 34 | Transcript of Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (14 pages). |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | /MICHAEL J SCHMITT/ | Date Considered | 03/20/2023 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

# EXHIBIT GG

Docket No.: 119557-04013
(PATENT)

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Utility Application of:
William Forbes et al.

Application No.: 17/197,561 | Confirmation No.: 4033

Filed: March 10, 2021 | Art Unit: 1629

For: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS) | Examiner: M. J. Schmitt

**INFORMATION DISCLOSURE STATEMENT (IDS)**

MS Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Madam:

In accordance with 37 CFR 1.97, Applicant hereby makes of record the following additional documents. A PTO Form SB/08 and a full copy of each of the documents required under 37 CFR 1.98(a)(2) accompany this statement.

This Information Disclosure Statement is filed more than three months after the U.S. filing date, and after the mailing date of the first Office Action on the merits, but before the mailing date of any of a Final Office Action, a Notice of Allowance (37 C.F.R. § 1.97(c)) or an action that otherwise closes prosecution in the application.

Applicant submits herewith copies of non-patent literature in accordance with 37 C.F.R. § 1.98(a)(2).

In accordance with 37 C.F.R. § 1.97(g), the filing of this Information Disclosure Statement shall not be construed as a representation that a search has been made. In accordance with

37 C.F.R. § 1.97(h), the filing of this Information Disclosure Statement shall not be construed to be an admission that the information cited in this Information Disclosure Statement is, or is considered to be, material to patentability as defined in 37 C.F.R. § 1.56(b).

It is submitted that the Information Disclosure Statement is in compliance with 37 C.F.R. § 1.98, and the Examiner is respectfully requested to consider the listed references.

Please charge our Deposit Account No. 50-4876 in the amount of $260.00 covering the fee set forth in 37 C.F.R. § 1.17(p).

Dated: June 14, 2023

Respectfully submitted,
Electronic signature: /Michael J. DeGrazia, Ph.D./

Michael J. DeGrazia, Ph.D.
Registration No.: 68,901
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6585
(617) 607-9200 (Fax)
Attorney/Agent For Applicant

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04013 |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

## U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

## FOREIGN PATENT DOCUMENTS

Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

## NON-PATENT LITERATURE DOCUMENTS

Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 1 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 66 pages, March 22, 2022. | |
| | 2 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 32 pages, March 24, 2022. | |
| | 3 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 65 pages, March 23, 2022. | |
| | 4 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 17 pages, March 25, 2022. | |
| | 5 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 83 pages, March 21, 2022. | |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04013 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Michael J. DeGrazia, Ph.D./ | Date (YYYY-MM-DD) | 2023-06-14 |
|---|---|---|---|
| Name/Print | Michael J. DeGrazia, Ph.D. | Registration Number | 68,901 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# EXHIBIT HH

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | |
|---|---|---|
| | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04013 |

**U.S.PATENTS** Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

**U.S.PATENT APPLICATION PUBLICATIONS** Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

**FOREIGN PATENT DOCUMENTS** Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 17197561 |
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04013 |

| | | | |
|---|---|---|---|
| | 1 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 66 pages, March 22, 2022. | |
| | 2 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 32 pages, March 24, 2022. | |
| | 3 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 65 pages, March 23, 2022. | |
| | 4 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 17 pages, March 25, 2022. | |
| | 5 | Salix Pharmaceuticals, Ltd. et al. v. Norwich Pharmaceuticals, Inc., C.A. No. 20-430-RGA, Proceedings. 83 pages, March 21, 2022. | |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| | | | |
|---|---|---|---|
| Examiner Signature | /MICHAEL J SCHMITT/ | Date Considered | 08/11/2023 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | 17197561 |
|---|---|---|
| | Filing Date | 2021-03-10 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04013 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Michael J. DeGrazia, Ph.D./ | Date (YYYY-MM-DD) | 2023-06-14 |
|---|---|---|---|
| Name/Print | Michael J. DeGrazia, Ph.D. | Registration Number | 68,901 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

# EXHIBIT II

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

75093 7590 08/24/2023
McCarter & English, LLP / Salix Pharmaceuticals
265 Franklin St.
Boston, MA 02110

| EXAMINER | |
|---|---|
| SCHMITT, MICHAEL J | |
| ART UNIT | PAPER NUMBER |
| 1629 | |

DATE MAILED: 08/24/2023

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/197,561 | 03/10/2021 | William Forbes | 119557-04013 | 4033 |

TITLE OF INVENTION: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 11/24/2023 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 40% the amount of undiscounted fees, and micro entity fees are 20% the amount of undiscounted fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

# PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to: Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

By fax, send to: (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications. **Because electronic patent issuance may occur shortly after issue fee payment, any desired continuing application should preferably be filed prior to payment of this issue fee in order not to jeopardize copendency.**

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

75093 7590 08/24/2023

McCarter & English, LLP / Salix Pharmaceuticals
265 Franklin St.
Boston, MA 02110

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

(Typed or printed name)

(Signature)

(Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/197,561 | 03/10/2021 | William Forbes | 119557-04013 | 4033 |

TITLE OF INVENTION: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 11/24/2023 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SCHMITT, MICHAEL J | 1629 | 514-279000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

❑ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

❑ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 ____________
2 ____________
3 ____________

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ❑ Individual ❑ Corporation or other private group entity ❑ Government

4a. Fees submitted: ❑ Issue Fee ❑ Publication Fee (if required)

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

❑ Electronic Payment via Patent Center or EFS-Web ❑ Enclosed check ❑ Non-electronic payment by credit card (Attach form PTO-2038)

❑ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. __________

5. **Change in Entity Status** (from status indicated above)

❑ Applicant certifying micro entity status. See 37 CFR 1.29

<u>NOTE:</u> Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

❑ Applicant asserting small entity status. See 37 CFR 1.27

<u>NOTE:</u> If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

❑ Applicant changing to regular undiscounted fee status.

<u>NOTE:</u> Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature ____________ Date ____________

Typed or printed name ____________ Registration No. ____________

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/197,561 | 03/10/2021 | William Forbes | 119557-04013 | 4033 |

75093 7590 08/24/2023
McCarter & English, LLP / Salix Pharmaceuticals
265 Franklin St.
Boston, MA 02110

| EXAMINER | |
|---|---|
| SCHMITT, MICHAEL J | |
| ART UNIT | PAPER NUMBER |
| 1629 | |

DATE MAILED: 08/24/2023

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | **Application No.**<br>17/197,561 | **Applicant(s)**<br>Forbes et al. | |
|---|---|---|---|
| | **Examiner**<br>MICHAEL J SCHMITT | **Art Unit**<br>1629 | **AIA (FITF) Status**<br>No |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--***

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1.☑ This communication is responsive to 6/14/2023.

☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on ______.

2.☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on ______; the restriction requirement and election have been incorporated into this action.

3.☑ The allowed claim(s) is/are 37 and 41-43 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4.☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

**Certified copies:**

a) ☐All b) ☐ Some* c) ☐ None of the:

1. ☐ Certified copies of the priority documents have been received.
2. ☐ Certified copies of the priority documents have been received in Application No. ______ .
3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

* Certified copies not received: ______ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5.☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date ______ .

**Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6.☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1.☐ Notice of References Cited (PTO-892)
2.☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date ______.
3.☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material ______.
4.☐ Interview Summary (PTO-413), Paper No./Mail Date. ______.
5. ☐ Examiner's Amendment/Comment
6. ☐ Examiner's Statement of Reasons for Allowance
7. ☐ Other ______.

| | |
|---|---|
| /MICHAEL J SCHMITT/<br>Examiner, Art Unit 1629 | /JEFFREY S LUNDGREN/<br>Supervisory Patent Examiner, Art Unit 1629 |

# EXHIBIT JJ

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | |
|---|---|---|
| | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

## U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

## FOREIGN PATENT DOCUMENTS

Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

## NON-PATENT LITERATURE DOCUMENTS

Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | | |
|---|---|---|---|
| | 1 | Mintz, et al., Ocular Manifestations of Inflammatory Bowel Disease, Inflammatory Bowel Diseases, Vol. 20, Issue 2, pp.13-139, March, 24. | |
| | 2 | NEFF et al., Analysis of hospitalizations comparing rifaximin versus lactulose in the management of hepatic encephalopathy. Transplant Proc. 2006 Dec;38(10):3552-5. | |
| | 3 | Newman et al., 1: Form selection of pharmaceutical compounds. Handbook of Pharmaceutical Analysis. eds. Ohannesian and Streeter. Marcel Dekker, Inc. New York, NY. 61 pages. (2002). | |
| | 4 | PAIK et al., Comparison of Rifaximin and Lactulose for the Treatment of Hepatic Encephalopathy: A Prospective Randomized Study. Yonsei Med J. 2005 Jun;46(3):399-407. | |
| | 5 | Pakyz, Rifaximin: a new treatment for travelers' diarrhea. Ann Pharmacother. 39(2):284-9 (2005). | |
| | 6 | Pawlowski et al., Diagnosis and treatment of acute of persistent diarrhea. Gastroenterology. 136(6):1874-86 (2009). | |
| | 7 | Pelizza et al., Polymorphism of rifaximin. Il Farmaco. 32(7):471- 481 (1977). | |
| | 8 | Pigott, Foodborne illness. Emerg. Med. Clin. N. Am. 26: 475-497 (2008). | |
| | 9 | Pimental, Mark, "Review of Rifaximin as Treatment for SIBO and IBS," Expert Opinion on Investigational Drugs, Vol. 18, No. 3, March 1, 2009, pages 349-358, XP055046239 | |
| | 10 | Pimental, Mark, et al., "A 10-day Course of Rifaximin, A Non-Absorbable Antibiotic, Produces a Durable Improvement in All Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study," Gastroenterology, Vol. 130, No. 4, Suppl. 2, April, 2006, Page A26, XP002718616 | |
| | 11 | Pimentel et al. "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome" Annals of InternalMedicine. vol. 145, Issue 8, p. 557-563, Oct. 17, 2006, entire document. cited by other. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | |
|---|---|---|
| | 12 | Preidis et al., Targeting the human microbiome with antibiotics, probiotics, and prebiotics: gastroenterology enters the metagenomics era. Gastroenterology. 136(6):2015-31 (2009). |
| | 13 | Prescribing Information For Rifaximin, United States, May, 2004 (13 pages). |
| | 14 | Rifaximin Tablet Label, July, 2006 (16 pages). |
| | 15 | Salix Pharmaceuticals "Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome" Dec. 6, 2007, <http://clinicaltrials.gov/ct2/show/NCT00269412>, p. 1,para 1. cited by other. |
| | 16 | Scarpellini, E., et al., "High Dosage Rifaximin for the Treatment of Small Intestinal Bacterial Overgrowth" Aliment Pharmacol Ther., April 1, 2007; 25(7), p. 781-786 |
| | 17 | Scarpignato et al., Prevention and treatment of traveler's diarrhea: a clinical pharmacological approach. Chemotherapy. 41 Suppl 1:48-81 (1995). |
| | 18 | SCARPIGNATO et al., Rifaximin, a poorly absorbed antibiotic: pharmacology and clinical potential. Chemotherapy. 2005;51 Suppl 1:36-66. |
| | 19 | Shahara et al. "Randomized Double-Blind Placebo-Controlled Trial of Rifaximin in Patients with Abdominal Bloating and Flatulence" American Journal of Gastroenterology. vol. 101, Issue 2, p. 326-333, Feb. 2006. cited by other. |
| | 20 | Steffen et al., Therapy of travelers' diarrhea with rifaximin on various continents. Am J Gastroenterol. 98(5):1073-8 (2003). |
| | 21 | Steffen, Rifaximin: a nonabsorbed antimicrobial as a new tool for treatment of travelers' diarrhea. J Travel Med. 8 (Suppl 2):S34-9 (2001). |
| | 22 | Su et al., Utility of nonabsorbed (<0.4%) antibiotic rifaximin in gastroenterology and hepatology. Gastroenterol Hepatol (N Y). 2(3):186-197 (2006). |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | | |
|---|---|---|---|
| | 23 | TAYLOR et al., A randomized, double-blind, multicenter study of rifaximin compared with placebo and with ciprofloxacin in the treatment of travelers' diarrhea. Am J Trop Med Hyg. 2006 Jun;74(6):1060-6. | |
| | 24 | TAYLOR et al., Systemic pharmacokinetics of rifaximin in volunteers with shigellosis. Antimicrob Agents Chemother. 2008 Mar;52(3):1179-81. | |
| | 25 | Tillisch, et al., "Characterization of the Alternating Bowel Habit Subtype in Patients with Irritable Bowel Syndrome," The American Journal of Gastroenterology, Vol. 100, No. 4, April 1, 2005, pages 896-904 (XP055175635) | |
| | 26 | Trinh et al., Diarrheal diseases in the elderly.Clin Geriatr Med. 23(4):833-56 (2007). | |
| | 27 | Vaira et al., "Rifaximin suspension for the eradication of helicobacter pylori." Current Therapeutic Research. 58(5): 300-8 (1997). | |
| | 28 | VIGNALI et. al. "TIPS with Expanded Polytetrafluoroethylene-Covered Stent: Results of an Italian Multicenter Study"; August 2005 (08.2005) American Roentgen Ray Society, 185;472-480; table 1, figure 5, abstract; page 474, col 1, para 2; page 478, col 3, para 1. | |
| | 29 | Vippagunta et al., Crystalline solids. Adv Drug Deliv Rev. 48(1):3-26 (2001). | |
| | 30 | Viscomi Declaration under 37 C.F.R. 1.132 filed in U.S. Application No. 10/728,090. Dated January 10, 2006 (12 pages). | |
| | 31 | WILLIAMS et al., Evaluation of the efficacy and safety of rifaximin in the treatment of hepatic encephalopathy: a double-blind, randomized, dose-finding multi-centre study. Eur J Gastroenterol Hepatol. 2000 Feb;12(2):203-8. | |
| | 32 | Williams et al., Rifaximin, a nonabsorbed oral antibiotic, in the treatment of hepatic encephalopathy: antimicrobial activity, efficacy, and safety. Antibiotics for Hepatic Encephalopathy. 5(Suppl. 1):S10-S18 (2005). | |
| | 33 | Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (45 pages). | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | | |
|---|---|---|---|
| | 34 | Transcript of Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (14 pages). | |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Michael J. DeGrazia, Ph.D./ | Date (YYYY-MM-DD) | 2022-08-22 |
|---|---|---|---|
| Name/Print | Michael J. DeGrazia, Ph.D. | Registration Number | 68,901 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed
PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 17892982 |
| Filing Date | 2022-08-22 |
| First Named Inventor | William Forbes |
| Art Unit | 1629 |
| Examiner Name | M. J. Schmitt |
| Attorney Docket Number | 119557-04014 |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 7718608 | B2 | 2010-05-18 | Lin et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

## U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

## FOREIGN PATENT DOCUMENTS

Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2006/102536 | WO | A2 | 2006-09-28 | Univ Southern California | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

## NON-PATENT LITERATURE DOCUMENTS

Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17892982 |
| | Filing Date | 2022-08-22 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04014 |

| | | | |
|---|---|---|---|
| | 1 | BARRETT et al., Benefits of the Antibiotic Rifaximin as Empiric Therapy in Patients with Irritable Bowel Syndrome. The American Journal of Gastroenterology. 2006 Sept;101(9):S479-S480. Abstract 1238. | |
| | 2 | ClinicalTrials.gov, NCT00269412, Randomized, Double Blind, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Different Doses of Rifaximin Administered BID Either Two or Four Weeks in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome. NIH, U.S. National Library of Medicine. 9 pages, November 21, 2019. | |
| | 3 | CUOCO et al., Small intestine bacterial overgrowth in irritable bowel syndrome: a retrospective study with rifaximin. Minerva Gastroenterol Dietol. 2006 Mar;52(1):89-95. | |
| | 4 | DERBYSHIRE, Securities and Exchange Commission, Form 8-K. Salix Pharmaceuticals, Ltd., 6 pages, September 5, 2007. | |
| | 5 | LAURITANO et al., Rifaximin dose-finding study for the treatment of small intestinal bacterial overgrowth. Aliment Pharmacol Ther. 2005 Jul 1;22(1):31-5. | |
| | 6 | Salix Pharmaceuticals, Ltd., et al., v. Norwich Pharmaceuticals, Inc., Trial Opinion, Case 1:20-cv-00430-RGA, Civil Action No. 20-430-RGA. 46 pages, August 10, 2022. | |
| | 7 | YANG et al., Rifaximin versus other antibiotics in the primary treatment and retreatment of bacterial overgrowth in IBS. Dig Dis Sci. 2008 Jan;53(1):169-74. | |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 17892982 |
| | Filing Date | 2022-08-22 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04014 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Michael J. DeGrazia, Ph.D./ | Date (YYYY-MM-DD) | 2022-11-29 |
|---|---|---|---|
| Name/Print | Michael J. DeGrazia, Ph.D. | Registration Number | 68,901 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# EXHIBIT KK

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | |
|---|---|---|
| | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

**U.S.PATENTS** Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

**U.S.PATENT APPLICATION PUBLICATIONS** Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

**FOREIGN PATENT DOCUMENTS** Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | | |
|---|---|---|---|
| | 1 | Mintz, et al., Ocular Manifestations of Inflammatory Bowel Disease, Inflammatory Bowel Diseases, Vol. 20, Issue 2, pp.13-139, March, 24. | |
| | 2 | NEFF et al., Analysis of hospitalizations comparing rifaximin versus lactulose in the management of hepatic encephalopathy. Transplant Proc. 2006 Dec;38(10):3552-5. | |
| | 3 | Newman et al., 1: Form selection of pharmaceutical compounds. Handbook of Pharmaceutical Analysis. eds. Ohannesian and Streeter. Marcel Dekker, Inc. New York, NY. 61 pages. (2002). | |
| | 4 | PAIK et al., Comparison of Rifaximin and Lactulose for the Treatment of Hepatic Encephalopathy: A Prospective Randomized Study. Yonsei Med J. 2005 Jun;46(3):399-407. | |
| | 5 | Pakyz, Rifaximin: a new treatment for travelers' diarrhea. Ann Pharmacother. 39(2):284-9 (2005). | |
| | 6 | Pawlowski et al., Diagnosis and treatment of acute of persistent diarrhea. Gastroenterology. 136(6):1874-86 (2009). | |
| | 7 | Pelizza et al., Polymorphism of rifaximin. Il Farmaco. 32(7):471- 481 (1977). | |
| | 8 | Pigott, Foodborne illness. Emerg. Med. Clin. N. Am. 26: 475-497 (2008). | |
| | 9 | Pimental, Mark, "Review of Rifaximin as Treatment for SIBO and IBS," Expert Opinion on Investigational Drugs, Vol. 18, No. 3, March 1, 2009, pages 349-358, XP055046239 | |
| | 10 | Pimental, Mark, et al., "A 10-day Course of Rifaximin, A Non-Absorbable Antibiotic, Produces a Durable Improvement in All Symptoms of Irritable Bowel Syndrome: A Double-Blind Randomized Controlled Study," Gastroenterology, Vol. 130, No. 4, Suppl. 2, April, 2006, Page A26, XP002718616 | |
| | 11 | Pimentel et al. "The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome" Annals of InternalMedicine. vol. 145, Issue 8, p. 557-563, Oct. 17, 2006, entire document. cited by other. | |

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | | |
|---|---|---|---|
| | 12 | Preidis et al., Targeting the human microbiome with antibiotics, probiotics, and prebiotics: gastroenterology enters the metagenomics era. Gastroenterology. 136(6):2015-31 (2009). | |
| | 13 | Prescribing Information For Rifaximin, United States, May, 2004 (13 pages). | |
| | 14 | Rifaximin Tablet Label, July, 2006 (16 pages). | |
| | 15 | Salix Pharmaceuticals "Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome" Dec. 6, 2007, <http://clinicaltrials.gov/ct2/show/NCT00269412>, p. 1,para 1. cited by other. | |
| | 16 | Scarpellini, E., et al., "High Dosage Rifaximin for the Treatment of Small Intestinal Bacterial Overgrowth" Aliment Pharmacol Ther., April 1, 2007; 25(7), p. 781-786 | |
| | 17 | Scarpignato et al., Prevention and treatment of traveler's diarrhea: a clinical pharmacological approach. Chemotherapy. 41 Suppl 1:48-81 (1995). | |
| | 18 | SCARPIGNATO et al., Rifaximin, a poorly absorbed antibiotic: pharmacology and clinical potential. Chemotherapy. 2005;51 Suppl 1:36-66. | |
| | 19 | Shahara et al. "Randomized Double-Blind Placebo-Controlled Trial of Rifaximin in Patients with Abdominal Bloating and Flatulence" American Journal of Gastroenterology. vol. 101, Issue 2, p. 326-333, Feb. 2006. cited by other. | |
| | 20 | Steffen et al., Therapy of travelers' diarrhea with rifaximin on various continents. Am J Gastroenterol. 98(5):1073-8 (2003). | |
| | 21 | Steffen, Rifaximin: a nonabsorbed antimicrobial as a new tool for treatment of travelers' diarrhea. J Travel Med. 8 (Suppl 2):S34-9 (2001). | |
| | 22 | Su et al., Utility of nonabsorbed (<0.4%) antibiotic rifaximin in gastroenterology and hepatology. Gastroenterol Hepatol (N Y). 2(3):186-197 (2006). | |



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | | |
|---|---|---|---|
| | 23 | TAYLOR et al., A randomized, double-blind, multicenter study of rifaximin compared with placebo and with ciprofloxacin in the treatment of travelers' diarrhea. Am J Trop Med Hyg. 2006 Jun;74(6):1060-6. | |
| | 24 | TAYLOR et al., Systemic pharmacokinetics of rifaximin in volunteers with shigellosis. Antimicrob Agents Chemother. 2008 Mar;52(3):1179-81. | |
| | 25 | Tillisch, et al., "Characterization of the Alternating Bowel Habit Subtype in Patients with Irritable Bowel Syndrome," The American Journal of Gastroenterology, Vol. 100, No. 4, April 1, 2005, pages 896-904 (XP055175635) | |
| | 26 | Trinh et al., Diarrheal diseases in the elderly.Clin Geriatr Med. 23(4):833-56 (2007). | |
| | 27 | Vaira et al., "Rifaximin suspension for the eradication of helicobacter pylori." Current Therapeutic Research. 58(5): 300-8 (1997). | |
| | 28 | VIGNALI et. al. "TIPS with Expanded Polytetrafluoroethylene-Covered Stent: Results of an Italian Multicenter Study"; August 2005 (08.2005) American Roentgen Ray Society, 185;472-480; table 1, figure 5, abstract; page 474, col 1, para 2; page 478, col 3, para 1. | |
| | 29 | Vippagunta et al., Crystalline solids. Adv Drug Deliv Rev. 48(1):3-26 (2001). | |
| | 30 | Viscomi Declaration under 37 C.F.R. 1.132 filed in U.S. Application No. 10/728,090. Dated January 10, 2006 (12 pages). | |
| | 31 | WILLIAMS et al., Evaluation of the efficacy and safety of rifaximin in the treatment of hepatic encephalopathy: a double-blind, randomized, dose-finding multi-centre study. Eur J Gastroenterol Hepatol. 2000 Feb;12(2):203-8. | |
| | 32 | Williams et al., Rifaximin, a nonabsorbed oral antibiotic, in the treatment of hepatic encephalopathy: antimicrobial activity, efficacy, and safety. Antibiotics for Hepatic Encephalopathy. 5(Suppl. 1):S10-S18 (2005). | |
| | 33 | Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (45 pages). | |



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | |
| | Filing Date | |
| | First Named Inventor | William Forbes |
| | Art Unit | N/A |
| | Examiner Name | Not Yet Assigned |
| | Attorney Docket Number | 119557-04014 |

| | | |
|---|---|---|
| | 34 | Transcript of Salix Pharmaceuticals, Ltd. presentation for the Banc of America Conference 2005. July 28, 2005. (14 pages). |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| | | | |
|---|---|---|---|
| Examiner Signature | /MICHAEL J SCHMITT/ | Date Considered | 11/03/2022 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

# EXHIBIT LL

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 17892982 |
| Filing Date | 2022-08-22 |
| First Named Inventor | William Forbes |
| Art Unit | 1629 |
| Examiner Name | M. J. Schmitt |
| Attorney Docket Number | 119557-04014 |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 7718608 | B2 | 2010-05-18 | Lin et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

## U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

## FOREIGN PATENT DOCUMENTS

Remove

| Examiner Initial* | Cite No | Foreign Document Number3 | Country Code2 i | Kind Code4 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2006/102536 | WO | A2 | 2006-09-28 | Univ Southern California | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

## NON-PATENT LITERATURE DOCUMENTS

Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number: 17892982 |
| | Filing Date: 2022-08-22 |
| | First Named Inventor: William Forbes |
| | Art Unit: 1629 |
| | Examiner Name: M. J. Schmitt |
| | Attorney Docket Number: 119557-04014 |

| | | |
|---|---|---|
| | 1 | BARRETT et al., Benefits of the Antibiotic Rifaximin as Empiric Therapy in Patients with Irritable Bowel Syndrome. The American Journal of Gastroenterology. 2006 Sept;101(9):S479-S480. Abstract 1238. |
| | 2 | ClinicalTrials.gov, NCT00269412, Randomized, Double Blind, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Different Doses of Rifaximin Administered BID Either Two or Four Weeks in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome. NIH, U.S. National Library of Medicine. 9 pages, November 21, 2019. |
| | 3 | CUOCO et al., Small intestine bacterial overgrowth in irritable bowel syndrome: a retrospective study with rifaximin. Minerva Gastroenterol Dietol. 2006 Mar;52(1):89-95. |
| | 4 | DERBYSHIRE, Securities and Exchange Commission, Form 8-K. Salix Pharmaceuticals, Ltd., 6 pages, September 5, 2007. |
| | 5 | LAURITANO et al., Rifaximin dose-finding study for the treatment of small intestinal bacterial overgrowth. Aliment Pharmacol Ther. 2005 Jul 1;22(1):31-5. |
| | 6 | Salix Pharmaceuticals, Ltd., et al., v. Norwich Pharmaceuticals, Inc., Trial Opinion, Case 1:20-cv-00430-RGA, Civil Action No. 20-430-RGA. 46 pages, August 10, 2022. |
| | 7 | YANG et al., Rifaximin versus other antibiotics in the primary treatment and retreatment of bacterial overgrowth in IBS. Dig Dis Sci. 2008 Jan;53(1):169-74. |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | /MICHAEL J SCHMITT/ | Date Considered | 12/07/2022 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.J.S/

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 17892982 |
|---|---|---|
| | Filing Date | 2022-08-22 |
| | First Named Inventor | William Forbes |
| | Art Unit | 1629 |
| | Examiner Name | M. J. Schmitt |
| | Attorney Docket Number | 119557-04014 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Michael J. DeGrazia, Ph.D./ | Date (YYYY-MM-DD) | 2022-11-29 |
|---|---|---|---|
| Name/Print | Michael J. DeGrazia, Ph.D. | Registration Number | 68,901 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# EXHIBIT MM

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

75093 7590 12/22/2022
McCarter & English, LLP / Salix Pharmaceuticals
265 Franklin St.
Boston, MA 02110

| EXAMINER | |
|---|---|
| SCHMITT, MICHAEL J | |
| ART UNIT | PAPER NUMBER |
| 1629 | |

DATE MAILED: 12/22/2022

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/892,982 | 08/22/2022 | William P. Forbes | 119557-04014 | 1001 |

TITLE OF INVENTION: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 03/22/2023 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

# PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to: Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

By fax, send to: (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

75093 7590 12/22/2022
McCarter & English, LLP / Salix Pharmaceuticals
265 Franklin St.
Boston, MA 02110

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

(Typed or printed name)

(Signature)

(Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/892,982 | 08/22/2022 | William P. Forbes | 119557-04014 | 1001 |

TITLE OF INVENTION: METHODS FOR TREATING IRRITABLE BOWEL SYNDROME (IBS)

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 03/22/2023 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SCHMITT, MICHAEL J | 1629 | 514-279000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

❑ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

❑ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1________________
2________________
3________________

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ❑ Individual ❑ Corporation or other private group entity ❑ Government

4a. Fees submitted: ❑Issue Fee ❑Publication Fee (if required) ❑Advance Order - # of Copies __________

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

❑ Electronic Payment via EFS-Web ❑ Enclosed check ❑ Non-electronic payment by credit card (Attach form PTO-2038)

❑ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. __________

5. **Change in Entity Status** (from status indicated above)

❑ Applicant certifying micro entity status. See 37 CFR 1.29

❑ Applicant asserting small entity status. See 37 CFR 1.27

❑ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature ____________________ Date ____________________

Typed or printed name ____________________ Registration No. ____________________

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/892,982 | 08/22/2022 | William P. Forbes | 119557-04014 | 1001 |

75093 7590 12/22/2022
McCarter & English, LLP / Salix Pharmaceuticals
265 Franklin St.
Boston, MA 02110

| EXAMINER | |
|---|---|
| SCHMITT, MICHAEL J | |
| ART UNIT | PAPER NUMBER |
| 1629 | |

DATE MAILED: 12/22/2022

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 17/892,982 | Applicant(s) Forbes et al. | |
|---|---|---|---|
| | Examiner MICHAEL J SCHMITT | Art Unit 1629 | AIA (FITF) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1.☑ This communication is responsive to 11/29/2022.

☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on ______.

2.☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on ______; the restriction requirement and election have been incorporated into this action.

3.☑ The allowed claim(s) is/are 37-43 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4.☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

**Certified copies:**

a) ☐All b) ☐ Some* c) ☐ None of the:

1. ☐ Certified copies of the priority documents have been received.
2. ☐ Certified copies of the priority documents have been received in Application No. ______ .
3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

* Certified copies not received: ______ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5.☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date ______ .

**Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6.☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1.☐ Notice of References Cited (PTO-892)
2.☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date ______.
3.☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material ______.
4.☐ Interview Summary (PTO-413), Paper No./Mail Date. ______.
5. ☐ Examiner's Amendment/Comment
6. ☐ Examiner's Statement of Reasons for Allowance
7. ☐ Other ______.

| | |
|---|---|
| /MICHAEL J SCHMITT/<br>Examiner, Art Unit 1629 | /JEFFREY S LUNDGREN/<br>Supervisory Patent Examiner, Art Unit 1629 |

# EXHIBIT NN

OIPE IAP38 JAN 17 2006 PATENT & TRADEMARK OFFICE

Express Mail: ________________

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

Application of: **Viscomi G. C. et al.**

Confirmation No.: **7305**

Serial No.: **10/728,090**

Art Unit: **1624**

Filed: **December 5, 2003**

Examiner: **Kifle Bruck**

For: **Polymorph forms of rifaximin, processes for their production and use thereof in medicinal preparations.**

Attorney Docket No.: **2965-128**

**DECLARATION Under 37 C.F.R. § 1.132**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

I, Giuseppe C. Viscomi, do declare and state as follows:

1. I am a citizen of Italy, born in Monterotondo (Rome) on January 18, 1954, residing at Via XXV Aprile n. 17, Sasso Marconi (BO) Italy.

2. I am a co-inventor of the invention described and claimed in the above-identified patent application ("the '090 application").

3. I received a degree in Industrial Chemistry from the University of Rome in 1978 (110/110). From 1978 to 1987 I was a researcher at Eniricerche in Monterotondo (Rome) and in Bioengineering Dept. Yale University (New Haven, CT, USA). From 1988 to 1992 I was head of Biotechnology DownStream Processing at Sclavo. From 1992 to 1998 I was Head of Immunological and Biotechnology Dept. at the company Alfa Wassermann S.p.A. in Bologna. Since 1998 I have been Research and Development Director at Alfa Wassermann S.p.A. in Bologna. I am the author of more than thirty scientific publications, most of which concern medicines and molecules with pharmacological activity. I am the inventor or co-inventor listed on more than twenty patents all concerning purification,

analysis and preparation of molecules with pharmacological activity. I am a member of the International Society for Interferon Cytokine Research and I was head of Scientific European Programs.

4. I have read and am familiar with the above-captioned '090 application and the September 16, 2005 non-final Office Action. I understand the Examiner has rejected claims 1-5 under 35 U.S.C. § 102, alleging that the specification is anticipated by Cannata V. et al. (US 4,557,866) and Marchi E. et al. (US 4,341,785).

5. Alfa Wassermann became aware of the existence of the polymorph forms of rifaximin (alpha, beta, gamma, delta and epsilon) some time before filing the priority application on November 7, 2003 (MI2003A002144) .

6. Alfa Wassermann filed on March 3, 2005 a European priority application for the polymorph δ and ε and it will be extended in USA in 2006.

7. Rifaximin prepared according the old patents US '866 and US '785 was never tested for polymorph. Samples of batches manufactured in 2000-2001, presently re-tested, are composed either of mixture of polymorph (alpha and beta, and in some case alpha and epsilon) or different polymorphs.

Therefore it was possible at that time to obtain rifaximin polymorphs α and frequently also different polymorphs or mixture of them. Some example are reported below:

(i) A batch manufactured in 2001 and measured by X-ray diffractogram in 2002, turned out to be entirely composed of a polymorph subsequently defined " delta polymorph" (see Figure 1).

(ii) A batch manufactured in 2001, later analysed in 2002, consisted exclusively of the epsilon form ( see Figure 2).

(iii) Another batch manufactured in 2001, instead, turned out to be a mixture of the alpha and epsilon form( see Figure 3).

(iv) A batch manufactured in 2004 ( batch no. 2000 0827) and retested in 2005 was a mixture of the alpha and delta forms ( see Figure 4).

8. Alfa Wassermann has moreover demonstrated by means of the following example, referring to batch no. 2000 0827 manufactured in 2000, that the crystalline forms are susceptible ( before proceeding according to he present application) to transition from one form to another. A sample of this batch was stored in a small conventional screw-cap glass container; this sample was used to record the X-ray diffractograms after some time.

(v) The diffractogram of June 2000 revealed that rifaximin belonged to the alpha form with a certain amount of the beta form (see Figure 5).

(vi) The diffractogram of May 2001, on the other hand, turned out to be a mixture of the alpha and epsilon forms (see Figure 6).

(vii) Finally, the diffractogram of February 2002 corresponded to a mixture of the epsilon and beta forms (see Figure 7).

In the meantime, the humidity content of the sample, due to repeated opening of the container and collection time of the samples under non-controlled humidity conditions had increased from the initial value of 1,3% to the final value of 4,5%, which was enough to change one form to another.

9. Alfa Wassermann has pointed out definite process in order to obtain pure polymorphs and not mixture of polymorphs using the information described in the US application 10/728,090 (2003) in order to obtain polymorph with definite pharmacological characteristics.

10. Alfa Wassermann observed a batch was constituted by a polymorph with peaks different from the polymorph described in the invention filed on November 7, 2003 and only after that time Alfa Wassermann was able to assign these peaks and find out the polymorph $\delta$.

11. Alfa Wassermann, now with the knowledge of the polymorphs is able to reject production batch not complying with the polymorph requested. Only recently (from 2000 onwards) it has been gradually observed that the desired pure polymorph can be obtained only by optimising the various parameters of drying, e.g. temperature, time and other conditions.

(viii) This has been confirmed by means of a test carried out recently. During the drying of batch no 050064 huge clots of product formed accidentally, preventing the rational drying of the polymorph, which

eventually turned out to be a mixture of the alpha and beta forms (see Figure 8). It was necessary to carry out again the crystallization and drying processes in order to obtain the pure polymorph.

12. I declare further that all statements made in this Declaration of my own knowledge are true and that all statements made on information and belief are believed to be true and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Date: January 10, 2006

Giuseppe C. Viscomi

PATENT & TRADEMARK OFFICE
OIPE
JAN 17 2006
IAP38




Figure 1 – Diffractogram of delta rifaximin



AMN-RFXMN_0003703




Figure 2 – Diffractogram of epsilon rifaximin manufactured in 2001



AMN-RFXMN_00037104




Figure 3 – Diffractogram of rifaximin – mixture of alpha and epsilon form manufactured in 2001



AMN-RFXMN_0003705




Figure 4 – Diffractogram of mixture of alpha and delta rifaximin (the arrows indicate the peaks attributable to the delta form)




Figure 5 – Rifaximin batch No. 2000 0827: diffractogram of June 14, 2000 (the arrows indicate the peaks corresponding to the beta form only)




Figure 6 – Rifaximin batch No. 2000 0827: diffractogram of May 2001 (the arrows indicate the peaks corresponding to the epsilon form only)



AMN-RFXMN_00037108




Figure 7 – Rifaximin batch No. 2000 0827: diffractogram of February 2002 (the arrows indicate the peaks corresponding to the beta form only)



AMN-RFXMN_00037109




Figure 8-Diffractogram of mixture of alpha and beta rifaximin (the arrows indicate the peaks attributable to the beta form)



AMN-RFXMN_00037110

# EXHIBIT OO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
C.A. No. 20-430 (RGA)

SALIX PHARMACEUTICALS LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A.,

Plaintiffs,

vs.

NORWICH PHARMACEUTICALS, INC.,

Defendant.

______________________________________/

- CONFIDENTIAL -

DEPOSITION OF DR. GIUSEPPE VISCOMI
TAKEN REMOTELY BY VIDEOCONFERENCE
June 16, 2021

Reported by: Anne Vosburgh, CSR, RPR, CRR
Job No. 195402

G. Viscomi - Confidential

A. The evidence -- there is no evidence that is mandatory to go to the form beta.

The wet rifaximin could be -- could be dried out with less than 3 percent of water to end -- obtain the alpha form.

In this part -- in this drying process, it was not -- there is no experimental evidence that the beta form was formed before.

Q. Let's start with the wet rifaximin that you originally had. When that is dried to a range between 6 and 40 percent, you will have rifaximin beta, right?

A. Yes.

Q. And if you dry it further to a range between 4 and 6 percent, you would have form delta, right?

A. Yes. Observing that the -- in the document that you submitted to me, it is written that it is requested for one to three days to obtain the delta form.

Q. And if that rifaximin delta is further dried to a water content of less than

G. Viscomi - Confidential

3 percent, you would then have rifaximin alpha, right?

A. No.

CHECKING INTERPRETER: It was not a complete -- it was not 3 percent -- (indecipherable).

(Clarification by the reporter.)

CHECKING INTERPRETER: That's okay. It doesn't matter. I see that it is written right now in the script.

A. (In English) In the application is not written that drying the delta form, alpha form is obtained.

BY MR. LANDMON:

Q. I know that it might say that, but if the delta form is dried further below 3 percent, won't it form alpha?

A. No.

Q. Can you explain that to me?

A. In the document, it is not written that the drying of delta form is obtained in alpha form.

Q. How about if you dried the beta form to a water content of less than

G. Viscomi - CONFIDENTIAL

A. No.
Q. Then what is this first sentence saying?
A. The sentence says the rifaximin prepared on the old patents, it was never tested for polymorphism.
Q. I think I understand.
So you did not prepare new rifaximin, you were just talking about older rifaximin prepared according to these patents?
A. The first sentence is referring to what was done for the old patents.
Q. And the samples you tested were prepared according to the old patents, correct?
MR. KLINE: Objection to the form.
A. The sample prepared, they were taking points from the old patents.
BY MR. LANDMON:
Q. Okay. Let's look at paragraph 8.
Do you see that it refers to Batch Number 2000827?
A. (In English) Yes.

G. Viscomi - CONFIDENTIAL

Q. And this batch was also prepared according to the process of the U.S. '866 and '785 patents, right?

MR. KLINE: Objection to the form.

A. This batch concerned the production of rifaximin and, therefore, is under the indication of the patent '785.

And the chart of the -- synthesized to prepare rifaximin followed the example for the patent '866.

Q. Which example in patent '866 did you follow -- strike that.

Which example in the patent '866 was followed?

MR. KLINE: Objection, vague.

CHECKING INTERPRETER: He said, "method," not "example."

MR. LANDMON: I'm sorry, when the check interpreter just said, "He said 'method'," are you talking about Dr. Viscomi or me?

CHECKING INTERPRETER: No, no. Dr. Viscomi. He did not say "example."

MR. LANDMON: Okay.

G. Viscomi - CONFIDENTIAL

CHECKING INTERPRETER: He said "method." "They followed the method."

BY MR. LANDMON:

Q. Okay. Is that method laid out in an example on the '866 patent?

MR. KLINE: Objection to the form.

A. In the example number 1 --

THE INTERPRETER: Professor, can you please repeat what is used?

A. As far as I know -- I'll give you the answer in other words. As far as I know, there is no one example that describes exactly what was done to prepare this batch.

I mean by that, the origin, the solvent, and the production process was definite -- was definitely done. It was definitely -- the -- (Italian words) -- "quattro" -- "metil piridina" --

THE COURT REPORTER: I don't understand that.

THE INTERPRETER: (In Italian) "Metil piridina."

THE COURT REPORTER: Is that English?

# EXHIBIT PP

8508191

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*July 18, 2024*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** *11/658,702*
**FILING DATE:** *October 08, 2007*
**PATENT NUMBER:** *8193196*
**ISSUE DATE:** *June 05, 2012*

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

Certified by

Katherine Kelly Vidal

Performing the Functions and Duties of the
Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

| PRC TICINUMLAB s.r.l. | EXAMPLE 7<br>PATENT EP 0 161 534 | *Pag. 1 of 2* |
|---|---|---|

# Synthesis of 4-deoxy-4'methyl-pyrido-[1',2':1,2]imidazo[5,4-c] ryfamicin SV

Reagents:

Ryfamicin O batch 200703112
2-amino-4-methyl pyridine
Ethanol batch Fluka 1340389

Procedure according to Example 7 described in patent EP 0 161 534:

In a round bottom flask 199.5 g of Ryfamicin O and 64.2 g of 2-amino-4-methyl pyridine were dissolved in 1000 mL of methylene chloride. The solution was kept under stirring for 40 hours at room temperature then washed with HCl 1N and water. After evaporating the solvent under vacuum, the residue was crystallized with 400 ml of a mixture Ethanol / Water 7/3 (v/v).
Part of the solid was transferred into a glass container and dried at 105°C.

The X-Ray difractogram of the dried solid (see following page) shows the following peak list:

Peak list:
5.87°; 6.58°; 7.39°; 7.90°; 8.82°; 10.60°; 11.21°; 11.80°; 13.05°; 17.61°; 18.60°; 19.70°; 21.04°; 21.39°; 22.04°

| PRC TICINUMLAB s.r.l. | EXAMPLE 7<br>PATENT EP 0 161 534 | *Pag. 2 of 2* |
|---|---|---|

**Difractogram of Example 7 – Patent EP 0 161 534:**



DOCUMENT 01 b

| PRC TICINUMLAB S.r.l. | EXAMPLE 9<br>PATENT EP 0 161 534 | *Pag. 1 of 2* |
|---|---|---|

**Synthesis of 4-deoxy-4'methyl-pyrido-[1',2':1,2]imidazo[5,4-c] ryfamicin SV**

Reagents:

Ryfamicin O batch 200703112

2-amino-4-methyl pyridine batch SA 546488-508

Ethanol batch VWR UN1170

Procedure according to Example 9 described in patent EP 0 161 534:

In a round bottom flask (1 L) 100.30 g of Ryfamicin O and 57.4 g of 2-amino-4-methyl pyridine were mechanically stirred in 400 ml of a 1:1 (v/v) mixture of ethanol/water at room temperature (not controlled) for 20 hours.

The obtained solid was filtered with Buckner (under vacuum) and washed with 100 mL of a 1:1 (v/v) mixture of ethanol/water.

2.5 g of the obtained washed solid were transferred into a glass container and dried at 105°C until constant weight.

The X-Ray difractogram of the dried solid is shown on the following page, giving the following peak list:

Peak list:

5.88°; 6.52°; 7.32°; 7.84°; 8.76°; 10.52°; 11.16°; 11.72°; 13.00°; 17.60°; 18.60°; 19.72°; 20.88°; 21.40°; 22.00°

The result of the Karl Fischer determination on the dried solid is 4.40%.

| | | |
|---|---|---|
| PRC TICINUMLAB S.r.l. | EXAMPLE 9<br>PATENT EP 0 161 534 | *Pag. 2 of 2* |

**Difractogram of Example 9 – Patent EP 0 161 534:**



Zach
Zambon Chemicals

D23
EP 1 557 421
19057EP

Zambon Chemicals
Fine Chemical Plant
Ricerca e Sviluppo Industriale (Research and Industrial Development)
Lonigo-Vicenza-Italy

| | | | | |
|---|---|---|---|---|
| Document N. / Type | 006-10 | SIGNATURE AND DATE | Issued Date | 13/05/2010 |
| Version | 2 | | Electronic File | - |
| Lab Book | EP158, EP166, EP167, EP168, EP162-9, EP235, UD828, UD829 | | Electronic Mail | - |
| Authored by | D. Urbani | [signature] 13/05/2010 | Internal Communication | - |
| Checked by | G. Soriato | [signature] 13/05/2010 | Distributed to | L. Cotarca[1]<br>T. Pallotta[2]<br>G. Visconti[3] |
| Approved by | M. Verzini | [signature] 13/05/2010 | | |

**Document title: Synthesis of rifaximin obtained according to examples 7 and 9 reported in European Patent EP0161534**

**Summary:** The document describes preparation of rifaximin according to Examples 7 and 9 of European Patent EP0161534 by adapting those process parameters not described. For each experiment, yield, water content (measured by the Karl Fisher method, KF) and crystalline form (by XRPD) are reported.

JA0771

Zach
Zambon Chemicals

**Introduction**: Rifamycin-O (batch 09J0000177 and 10B0000797), 2-amino-4-picoline (batch 0904002913 and 10B0000751), methylene chloride (technical grade), absolute ethanol (Carlo Erba) and demineralized water have been used for the experiments.

**Materials and Apparatus:** Macrolab equipment has been used for all the experiments.

Summary of the results

| Patent example | ID # | KF | Yield* | Solid state analysis (XRPD) |
|---|---|---|---|---|
| 7 | EP166 | 0.68% | 72.3% | Polymorphic form not referable to characterized species. Presence of amorphous form. |
| 7 | EP167 | 13.4% | 70.5% | Polymorphic form not referable to characterized species. Presence of amorphous form. |
| 7 | EP168 | 0.24% | 60.8% | Polymorphic form not referable to characterized species. Presence of amorphous form. |
| 7 | UD828 | 1.00% | 59.5% | Polymorphic form not referable to characterized species. Presence of amorphous. |
| 7 | UD829 | 0.69% | 64.0% | Polymorphic form not referable to characterized species. Presence of amorphous form. |
| 9 | EP162-9 | 0.55% | 65.3% | Mixture of form α, form β with probable presence of amorphous form |
| 9 | EP235 | 1.05% | 72.1% | Polymorphic form not referable to characterized species. Presence of amorphous form. |

*from Rifamycin-O (approx.)

**Experiment EP158 (Example 7 - patent EP0161534 )**

**Synthesis of crude rifaximin for the experiments of crystallisation EP166, EP167 and EP168.**

Rifamycin-O, g 250

2-amino-4-picoline, g 81.9

Methylene chloride, g 1646 (ml1250)

Stir for approx. 40 hours at room temperature (amount of unreacted Rifamycin-O approx. 10%)

Wash with:

1N hydrochloric acid (ml 1125), then 4 times with 500 ml of demineralized water (500 ml each washing) (neutral pH). Remove water from organic layer with sodium sulphate (approx. 200 grams), then evaporate to dryness on a rotative evaporator.

283.9 grams of crude Rifaximin are obtained (unreacted Rifamycin-O approx. 10%).

**Experiment EP166 (Example 7 - patent EP0161534 )**

**Crystallisation**

Crude Rifaximin EP158, g 30

Absolute ethanol, ml 81.7

Demineralized water, ml 34.92 (w/w ratio ethanol-water 7:3)

Crude Rifaximin is dissolved at 70°C; the so-obtained solution is maintained at 70°C for approx. 15' and cooled to 0°C in 30 minutes. After 1 hour at 0°C the suspension is filtered and washed with 5 ml of ethanol-water (7:3).

38.8 grams of wet product are obtained, which are dried under vacuum (0.068 bar) at 100°C till constant weight.

19.9 grams of Rifaximin are obtained (KF = 0.68%); approx. yield from Rifamycin-O 72.3%; polymorphic form not referable to characterized species, presence of amorphous (Figure EP166).



Zach Zambon Chemicals

**Experiment EP167 (Example 7 - patent EP0161534 ).**

**Crystallisation**

Crude Rifaximin EP158, g 30

Absolute ethanol, ml 81.7

Demineralized water, ml 34.92 (w/w ratio ethanol-water 7:3)

Crude Rifaximin is dissolved at 60 ÷ 70°C, the so-obtained solution is maintained at 60 ÷ 70°C for approx. 15' and cooled to 0°C in 30 minutes. After 1 hour at 0°C it is filtered and washed with 5 ml of ethanol-water (7:3).

36.8 grams of wet product are obtained, which are dried under vacuum (0.068 bar) at 40°C under relative humidity higher than 60%, till constant weight.

22.4 grams of Rifaximin are obtained (KF = 13.4%); approx. yield from Rifamycin-O 70.5%; polymorphic form not referable to characterized species, presence of amorphous (Figure EP167).

EP167



Zach Zambon Chemicals

**Experiment EP168 (Example 7 - patent EP0161534 )**

**Crystallisation**

Crude Rifaximin EP158, g 30

Absolute ethanol, ml 81.7

Demineralized water, ml 34.92 (w/w ratio ethanol-water 7:3)

Crude Rifaximin is dissolved at 70°C; the so-obtained solution is maintained at 70°C for approx. 15' and cooled to 0°C in 30 minutes. After 1 hour at 0°C it is filtered and washed with 5 ml of ethanol-water (7:3).

35.3 grams of wet product are obtained, which are dried under vacuum (0.068 bar) at 60°C for 100 minutes; measured KF = 4.24%); polymorphic form not referable to characterized species, presence of amorphous (Figure EP168c).

After 24 hours the drying is restarted under vacuum (0.068 bar) at 60°C till constant weight.

20 grams of Rifaximin are obtained (KF = 0.24%); approx. yield from Rifamycin-O 60.8%; polymorphic form not referable to characterized species, presence of amorphous (Figure EP168c24h).

(XRPD scan EP168 - product with KF = 4.24%)




JA0776

Zach
Zambon Chemicals

(XRPD scan EP168 - product after 24 hours of drying stopping)



Zach
Zambon Chemicals

**Experiment UD828 (Example 7 - patent EP0161534 ):**

**Synthesis**

Rifamycin-O, g 200

2-amino-4-picoline, g 65.5

Methylene chloride, g 1317 (ml1000)

Stir for approx. 40 hours at room temperature (amount of unreacted Rifamycin-O approx. 10%)

Wash with:

1N hydrochloric acid (ml 900), then 4 times with 400 ml of demineralized water (400 ml each washing) (neutral pH). Remove water from organic layer with sodium sulphate (approx. 160 grams), then evaporate to dryness on a rotative evaporator.

229.5 grams of crude Rifaximin are obtained (unreacted Rifamycin-O approx. 10%).

**Crystallisation**

Crude Rifaximin UD828, g 229.5

Absolute ethanol, ml 618.5

Demineralized water, ml 264.3 (w/w ratio ethanol-water 7:3)

Crude Rifaximin is dissolved at 70°C; the so-obtained solution is maintained at 70°C for approx. 15' and cooled to 0°C in 30 minutes. After 1 hour at 0°C it is filtered and washed with 38 ml of ethanol-water (7:3).

236.3 grams of wet product are obtained, which are dried under vacuum (0.068 bar) at 60°C till KF = 4 ÷ 5% (measured KF = 4.00%); polymorphic form not referable to characterized species, presence of amorphous (Figure UD828).

Drying is stopped over the weekend (XRPD analysis before restarting drying: polymorphic form not referable to characterized species, presence of amorphous), then restarted under vacuum (0.068 bar) at 60°C till constant weight.

124 grams of Rifaximin are obtained (KF = 1.00%); approx. yield from Rifamycin-O 59.5%; polymorphic form not referable to characterized species, relevant presence of amorphous form (Figure UD828 KF 1).

(XRPD scan UD828 - product with KF = 4.00%)



Zambon Chemicals

(XRPD scan UD828 - product after drying)



**Experiment UD829 (Example 7 - patent EP0161534)**

**Synthesis**

Rifamycin-O, g 200

2-amino-4-picoline, g 65.5

Methylene chloride, g 1317 (ml1000)

Stir for approx. 40 hours at room temperature (amount of unreacted Rifamycin-O approx. 10%)

Wash with:

1N hydrochloric acid (ml 900), then 4 times with 400 ml of demineralized water (400 ml each washing) (neutral pH). Remove water from organic layer with sodium sulphate (approx. 160 grams), then evaporate to dryness on a rotative evaporator.

227.2 grams of crude Rifaximin (UD829) are obtained (unreacted Rifamycin-O approx. 10%).

**Crystallization**

Crude Rifaximin UD829, g 227.2

Absolute ethanol, ml 618.5

Demineralized water, ml 264.3 (w/w ratio ethanol-water 7:3)

Crude Rifaximin is dissolved at 70°C; the so-obtained solution is maintained at 70°C for approx. 15' and cooled to 0°C in 30 minutes. After 1 hour at 0°C the suspension is filtered and washed with 38 ml of ethanol-water (7:3).

248.5 grams of wet product are obtained, which are dried under vacuum (0.068 bar) at 100°C till constant weight.

133.4 grams of Rifaximin are obtained (KF = 0.69%); approx. yield from Rifamycin-O 64.0%; polymorphic form not referable to characterized species, presence of amorphous (Figure UD829).

Case 1:24-cv-04607-JFM Document 138-3 Filed 03/10/26 Page 786 of 874 PageID: 3835





**Experiment EP162-9 (Example 9 - patent EP0161534) :**

Rifamycin-O, g 100

2-amino-4-picoline, g 57.1

Absolute ethanol - water 1:1 v/v, ml 400

The mixture is maintained under stirring at 20÷22°C for 20 hours (residual Rifamycin-O < 1%)

The product is filtered and the cake is washed with absolute ethanol - water 1:1 (20 ml), obtaining 100.6 grams of wet Rifaximin (residual Rifamycin-O < 1%), which is dried under vacuum (0.010 bar) at 60 °C.

20.3 grams of Rifaximin are obtained (KF = 0.55%); approx. yield from Rifamycin-O 65.3%; polymorphic form mixture of the form β and form α, with probable presence of amorphous form (Figure EP162 e9).



Zach
Zambon Chemicals

**Experiment EP235 (Example 9 - patent EP0161534):**

Rifamycin-O, g 100

2-amino-4-picoline, g 57.1

Absolute ethanol - water 1:1 v/v, ml 400

The mixture is maintained under stirring at 20÷22°C for 20 hours (residual Rifamycin-O < 1%)

The product is filtered and the cake is washed with absolute ethanol - water 1:1 (20 ml), obtaining 117.8 grams of wet Rifaximin (residual Rifamycin-O < 1%), which is dried under vacuum (0.010 bar) at 60 °C.

75.2 grams of Rifaximin are obtained (KF = 1.05%); approx. yield from Rifamycin-O 72.1%; polymorphic form not referable to characterized species. Relevant presence of amorphous form (Figure EP235).

(XRPD scan EP235 - product after drying)



Rejections under 35 U.S.C. § 102(b)

Claims 12-18 and 36-42 stand rejected under 35 U.S.C. § 102(b) for allegedly being anticipated by the inherent disclosure of EP 0161534. Applicants respectfully traverse.

In a previous Office Action, dated September 22, 2009, the Examiner rejected the claims directed to essentially similar subject matter as the pending claims for allegedly having been anticipated by the inherent disclosure of USP 7,045,620. In a response filed on November 5, 2009, Applicants argued that the '620 patent, while disclosing various polymorphic forms of rifaximin, did not inherently disclose the presently claimed polymorphic forms δ and ε. Applicants' arguments were convincing because shortly thereafter, November 18, 2009, Applicants received a Notice of Allowability.

The Examiner has now raised a similar rejection over the disclosure of EP 0161534. Applicants respectfully submit that the same arguments set forth in the November 2009 response also apply here. Applicants refer the Examiner back to the arguments set forth in that response.

The polymorphic forms δ and ε claimed here were not disclosed either explicitly or inherently by the '534 application. In addition, the methods disclosed in the '534 application are not directed at, nor do they result in, rifaximin products having consistent polymorphic forms. Because EP 0161534 does not teach that crystallized rifaximin should be dried in a particular way, its teachings do not lead one to necessarily and always obtain polymorphic forms δ and ε.

This point is further proved by repeating Examples 7 and 9 of EP 0161534, i.e., the two examples that teach the crystallization of rifaximin. The results are shown in the report by Zach™ Zambon Chemicals, submitted with the IDS dated January 13, 2011. As the report shows, when these experiments are repeated, different crystalline forms of rifaximin are obtained. Some of the deficiencies of the '534 application are specifically recited in the specification of the present application that states:

> As already said, the process for manufacturing rifaximin from rifamycin O disclosed and claimed in EP 0161534 is deficient from the point of view of the purification and identification of the product obtained… .
> Paragraph [0028].

Because one cannot consistently and invariably obtain the same crystalline form of rifaximin using the teachings of EP 0161534, then EP 0161534 does not inherently disclose

specific polymorphic forms δ and ε of rifaximin. Applicants therefore request withdrawal of this ground of rejection.

Rejections under 35 U.S.C. § 103(a)

Claims 12-42 stand rejected under 35 U.S.C. § 103(a) for allegedly being obvious over the disclosure of EP 0161534. The Examiner has required Applicants to prove that the prior art process, i.e., the process of EP 0161534, does not produce the presently claimed rifaximin polymorphs δ and ε.

The procedures described in the '534 application encompass broad reaction conditions. Without any knowledge of polymorphs, or the conditions under which they may be obtained, there is no basis to adjust the specific reaction conditions of the '534 application to obtain specific rifaximin polymorphs that were not known to exist. Even if the '534 application occasionally resulted in the δ and ε polymorphs, the '534 application does not render Applicants' claims obvious because 1) the different polymorphic forms were not recognized at the time of filing; 2) different forms of polymorphs, including mixtures of polymorphs, were produced using the methods of the '534 patent; and 3) there was no knowledge provided by the '534 application that such different polymorphic forms of rifaximin were produced or that procedures were known or disclosed in the '534 application to enable one of skill in the art to obtain any specific form, or mixtures of polymorphic forms. For these reasons alone, the '534 does not makes Applicants' claims to the specific δ and ε polymorphs obvious.

Further, Applicants point out that Viscomi et al.[1] showed that the various polymorphic forms of rifaximin had different solubility and bioavailability properties.[2] Applicants respectfully submit that these differences in solubility and bioavailability were not *a priori* evident and it is surprising and unexpected to see crystalline polymorphs of the same compound show such drastic and dramatic differences in their solubility and bioavailability.

In view of the above, Applicants respectfully request that the Examiner reconsider and withdraw the rejections under 35 U.S.C. §§ 102(b) and 103(a).

---

[1] Viscomi, et al. "Crystal forms of rifaximin and their effect on pharmaceutical properties" *CrystEngComm*, **2008**, *10*, 1074-1081.
[2] *Id.*, Table 5 and Table 7.

# EXHIBIT QQ

# Crystal forms of rifaximin and their effect on pharmaceutical properties

G. C. Viscomi,*[a] M. Campana,[a] M. Barbanti,[a] F. Grepioni,[b] M. Polito,[b] D. Confortini,[a] G. Rosini,[c] P. Righi,[c] V. Cannata[a] and D. Braga[b]

*Received 19th November 2007, Accepted 29th April 2008*
*First published as an Advance Article on the web 28th May 2008*
**DOI: 10.1039/b717887e**

Five distinct crystal forms of rifaximin (α, β, γ, δ and ε) have been identified and characterised by X-ray powder diffraction, solid state $^{13}$C NMR, and HATR-IR spectroscopy. Changes in the crystal structure may produce differences of two to three orders of magnitude in the rate of intrinsic dissolution, solubility and bioavailability of rifaximin. Alteration of the pharmacokinetic parameters is of particular interest; the $C_{max}$ values of the crystal forms range from 1.1 to 1085.31 ng ml$^{-1}$ and the AUC$_{0-24\ h}$ values range from 10 to 4795 ng h ml$^{-1}$. These findings are relevant to the therapeutic use of rifaximin.

Downloaded by Laurentian University on 24 February 2013
Published on 28 May 2008 on http://pubs.rsc.org | doi:10.1039/B717887E

## Introduction

Many compounds can exist as polymorphs: crystalline forms with different arrangements of the same molecule in the solid state, solvates containing stoichiometric or non-stoichiometric amounts of a solvent[1,2] or hydrates.[3] Chemical and physical properties such as solubility may differ between polymorphs, which may significantly affect absorption *in-vivo*. This is particularly important for pharmaceutical products as drug efficacy and safety may be altered.[4] The impact of polymorphism on bioavailability has already been reported for chloroamphenicol,[5] phenylbutazone,[6] amobarbital[7] and a quinolinone derivative.[8] More recent examples include doxazosin,[9] tranilast,[10] clopidogrel,[11] celecoxib,[12] ketorolac,[13] fuconazole,[14] piroxicam,[15] and theophylline.[16]

Modification of polymorphism can occur, sometimes unexpectedly, during the manufacturing process,[17–20] emphasising the importance of knowing and being able to control the crystal form, particularly in the case of pharmaceutical compounds.

Rifaximin (4-deoxy-4′-methylpyrido[1′,2′-1,2]imidazo-[5,4-c] rifamycin SV) is a synthetic antibiotic,[21] which has been manufactured by Alfa Wassermann S.p.A. for many years.

Both *in-vitro* and clinical pharmacology show that rifaximin is a locally acting antibiotic with a broad spectrum of antibacterial action against Gram-positive and Gram-negative, aerobic and anaerobic organisms.[22–28] Due to the lack of systemic absorption rifaximin has no application outside the gastrointestinal tract and has an excellent safety profile.

A novel method of production of rifaximin was also reported;[29] in the past the X-ray crystal structure of the bromine analogue was elucidated,[30] but this gave no hint of the possibility that different crystal forms existed.

The objective of this study is to identify the presence of crystal forms of rifaximin and to assess their impact on parameters such as solubility, intrinsic dissolution and bioavailability.

[a]*Alfa Wassermann S.p.A., Via Ragazzi del '99, 5, Bologna, Italy. E-mail: gcviscomi@Alfawassermann.it*
[b]*Dipartimento di Chimica "G. Ciamiciam", Università di Bologna, Via Selmi 3, Bologna, Italy*
[c]*Dipartimento di Chimica Organica "A. Mangini", Università di Bologna, Viale del Risorgimento, 4, Bologna, Italy*

## Materials and methods

### Preparation of wet rifaximin

Demineralised water (1.2 l), 1.0 l of ethyl alcohol, 1.0 mole of rifamycin-O and 3.0 moles of 2-amino-4-methylpyridine at room temperature were placed in a three-necked reactor equipped with a mechanical stirrer, thermometer and reflux condenser. The suspension was heated to about 50 °C for 5 h and cooled to about 20 °C. A mixture of 0.1 moles of ascorbic acid and 2.5 moles of concentrated hydrochloric acid in 220 ml of 58% ethyl alcohol in water was added over 30 min and then concentrated hydrochloric acid was added dropwise until a pH of 2.0 was reached.

After 30 min the precipitate was filtered and washed with a 44% (v/v) ethyl alcohol solution and dried under vacuum at room temperature. The precipitate was then suspended in 1.6 l ethyl alcohol, the suspension was heated at about 57 °C until dissolution, and 700 ml of demineralised water were added. The temperature was lowered to about 30 °C over 40 min, then increased to about 40 °C and maintained for 20 h; finally the temperature was brought down to 0 °C in 30 min. The crystalline powder sediment is wet rifaximin.

### Preparation of the crystalline forms of rifaximin

**β-form.** Wet rifaximin was collected in a sintered glass Gooch filter and washed with about 2 l demineralised water. The β-form was obtained by drying the powder in a vacuum at room temperature to a residual water content ranging from 6% to about 40% (w/w).

**α- and δ-forms.** The wet rifaximin was collected in a sintered glass Gooch filter and washed with about 2 l demineralised water. The δ-form was obtained by drying at 65 °C in a vacuum dryer until a residual water content in the range of 4 to 6% (w/w) was obtained (generally from one to three days); the α form was obtained by drying until a water content of less than 3% was reached. Alternatively, the α- and δ-forms can be obtained by drying the β-form under the conditions reported above.


This journal is © The Royal Society of Chemistry 2008

View Article Online

Downloaded by Laurentian University on 24 February 2013
Published on 28 May 2008 on http://pubs.rsc.org | doi:10.1039/B717887E

**Table 3** Transformation of crystalline rifaximin forms at 79.5% RH for 24 h

| Initial | | Final | |
|---|---|---|---|
| Crystalline form | Moisture KF % | Crystalline form | Moisture KF % |
| α | 1.8 | β | 9.2 |
| δ | 4.0 | δ + β | 6.3 |
| γ | 0.8 | γ | 6.5 |




**Fig. 4** The relationship between the various crystal forms of rifaximin.

In order to assess the dose-dependent mechanism of absorption, the γ-form was administered to dogs at doses of 25, 100 and 300 mg $kg^{-1}$. The results show that absorption increases dose-dependently, but not linearly, in the range tested (Table 8).

The data reported in Tables 2 and 3, together with the intrinsic dissolution values (Table 4), and the kinetic solubility of Fig. 5 reveal that the rifaximin forms take up water at different rates. This feature might help to interpret the bioavailability data. The difference observed in the plasma concentrations suggests that during absorption *in vivo* the crystalline forms are maintained.

Crystal engineering of active pharmaceutical ingredients has been proposed as a tool to control drug bioavailability.[36] This




**Fig. 5** "Kinetic" solubility of rifaximin polymorphous forms in water over time at the mixing rate of 250 rpm (A) and 100 rpm (B).

could be the case for the five crystal forms of rifaximin. In terms of bioavailability the α-, β- and ε-forms can be considered nearly equivalent; they show negligible absorption and therefore act

**Table 4** Intrinsic dissolution values of crystalline forms of rifaximin

| | Rifaximin forms[a] | | | | |
|---|---|---|---|---|---|
| Time/min | α<br>Dissolved rifaximin/mg $cm^{-2}$ | β | γ | δ | ε |
| 15 | ND[b] | 0.28 | 2.46 | 0.88 | 0.46 |
| 30 | ND | 0.50 | 4.52 | 1.12 | 0.66 |
| 45 | ND | 0.72 | 6.44 | 1.28 | 0.82 |
| 60 | ND | 0.94 | 9.04 | 1.58 | 1.02 |
| | Intrinsic dissolution rate/mg $min^{-1}$ $cm^{-2}$ | | | | |
| | ND | 0.0147 | 0.1444 | 0.0151 | 0.0123 |

[a] The identity of the crystalline forms was confirmed after the tablet compression. [b] Not determined. The α-form tablet disintegrated within 10 min. The phenomenon was observed even when the tablets were compacted at higher pressure, up to 10 tonnes.

This journal is © The Royal Society of Chemistry 2008

# EXHIBIT RR

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
----------------------------------x
SALIX PHARMACEUTICALS INC., SALIX :
PHARMACEUTICALS, LTD., ALFASIGMA :
S.P.A. and BAUSCH HEALTH IRELAND :
LTD., :
Plaintiffs, :
v. : Case No.: 1:24-04607 (JFM)
AMNEAL PHARMACEUTICALS OF NEW :
YORK, LLC, AND AMNEAL EU, LIMITED ,:
Defendants. :
----------------------------------x
SALIX PHARMACEUTICALS INC., SALIX :
PHARMACEUTICALS, LTD., ALFASIGMA :
S.P.A. and BAUSCH HEALTH IRELAND :
LTD., :
Plaintiffs, :
v. : Case No.: 1:24-09512 (JFM)
ZYDUS PHARMACEUTICALS (USA) INC. :
AND ZYDUS PHARMACEUTICALS LIMITED, :
Defendants. :
----------------------------------x

(Caption continued on next page.)

2

SALIX PHARMACEUTICALS INC., SALIX :
PHARMACEUTICALS, LTD., ALFASIGMA :
S.P.A. and BAUSCH HEALTH IRELAND :
LTD., :
Plaintiffs, :
v. : Case No.: 1:24-10213 (JFM)
CIPLA USA, INC. AND CIPLA LIMITED, :
Defendants. :
----------------------------------x
CONFIDENTIAL ATTORNEYS' EYES ONLY
Videotaped Video-Teleconference Deposition of
SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS,
LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND
LTD.
By and Through its Designated Corporate
Representative
DR. DONATELLA CONFORTINI
Wednesday, July 30, 2025
10:10 a.m. CEST
Volume I

Job No.: 593872
Pages: 1 - 103
Reported Stenographically by:
Cassidy Western, RPR, CRR, CA CSR #14722, WA CCR

3

Videotaped Deposition of DR. DONATELLA CONFORTINI, Volume I, conducted virtually.

Pursuant to notice, before Cassidy Western, RPR, CRR, CA CSR #14722, WA CCR #24000046.

4

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. AND BAUSCH HEALTH IRELAND LTD.:
WAN-SHON LO, ESQUIRE
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1000

ON BEHALF OF THE DEFENDANTS, ZYDUS LIFESCIENCES LTD. AND ZYDUS PHARMACEUTICALS (USA) INC.:
TIMOTHY FLYNN PETERSON, ESQUIRE
BUCHANAN INGERSOLL & ROONEY PC
150 N. Riverside Plaza
Chicago, IL 60606
(312) 261-8777

65

at 65 degrees will always form form delta if the resulting water content ranges from about 4 to 6 percent and result in form alpha when the water content is below 3 percent?
MS. LO: Objection; foundation.
THE WITNESS: I cannot say that these -- this always happens.
BY MR. PETERSON:
Q Let's take a look at Figure 4. This is on page 1079 of the reference.
So Figure 4, do you see it's pointing to form beta when it says "wet rifaximin"?
**A Yes.**
Q And removing $H_2O$ can result in form alpha, form -- or form delta. Do you see that?
**A This figure says that the relationship between form beta and form alpha and between form --**
INTERPRETER SALVI: Sorry. Let me strike that.
THE WITNESS: (Through Interpreter) The figure shows that the relationship between form beta and form delta and form beta and form alpha is water loss.
BY MR. PETERSON:

66

Q And do you see that there's a relationship between form alpha and form delta where it's water gain from one to the other?
**A Yes.**
Q Does form delta ever convert to form alpha by the loss of water under any conditions you've seen?
MS. LO: Objection to the form of the question.
THE WITNESS: Well, no. Form delta turns into form epsilon as a result of a water loss.
BY MR. PETERSON:
Q Okay. Looking at the -- a little -- couple of paragraphs down from Figure 4, do you see there's a paragraph there on the left side that starts "crystal engineering"?
**A Yes, I do.**
Q And it says:
Crystal engineering of active pharmaceutical ingredients has been proposed as a tool to control drug bioavailability.
**A Yes, I can see it.**
Q And it goes on to say that the alpha, beta, and epsilon form have negligible absorption

67

and therefore act locally, i.e. in the GI tract, with the advantage of excellent tolerability?
**A Yes, I can see it.**
Q Do you see the next paragraph talks about the delta and the gamma forms having bio -- bioavailability more similar to -- to absorbable active ingredients?
**A Yes, I can see that.**
Q And it goes on to say:
Under these conditions, there's a risk of the potential selection of bacterial strains resistant to rifaximin.
Do you see that?
**A Yes, I do. I see it.**
Q At the time that you submitted this paper, did you have a concern that delta form could lead to a selection of bacterial strains resistant to rifaximin?
MS. LO: I object to the form of the question.
THE WITNESS: Well, that was not the goal of the patent. I don't understand.

BY MR. PETERSON:
Q That wasn't my question.

68

At the time that this paper was submitted, were you concerned about the use of form delta in a rifaximin product because it could potentially lead to selection of bacterial strains resistant to rifaximin?
MS. LO: I object to the form of the question.
THE WITNESS: Actually, the purpose of this paper was to -- to demonstrate the different -- the various characteristics of the forms.
BY MR. PETERSON:
Q Dr. Confortini, did you have any input into the statement about the selection of bacterial strains resistant to rifaximin in this paper?
**A No. I'm not an expert in this field.**
Q Of the authors of this paper, is there someone that would have been an expert in that area of potential bacterial resistance?
**A Dr. Barbanti and Dr. Viscomi maybe.**
Q So Dr. Barbanti, you said, was the head of pre-clinical development at -- at Alfasigma before?
**A Yes, at that time. Yes, at that time.**

are you anticipating additional --
MR. PETERSON: I don't.
MS. LO: -- 30 --
MR. PETERSON: I don't -- I don't know what your -- what your redirect might look like. And if it is extensive and goes into topics that we haven't explored, I'm not sure what that would look like.
So if that changes your start time analysis, you know, let me know.
MS. LO: Okay. I think -- okay. I think I understand your position. So we can start at 11:00 and maybe do two sessions, take our break for lunch and then finish out in the early afternoon.
MR. PETERSON: Great.
THE VIDEOGRAPHER: All right. Thank you. And that concludes today's proceedings. We're off the record at 4:27.
(Off the record at 4:27 p.m.)



ACKNOWLEDGMENT OF DEPONENT

I, DR. DONATELLA CONFORTINI, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

____________________ ____________________
(DATE) (SIGNATURE)



REPORTER'S CERTIFICATE

I, CASSIDY WESTERN, RPR, CRR, CA CSR, WA CCR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of August, 2025.

Cassidy Western, RPR, CRR, CA CSR, WA CCR

# EXHIBIT SS

Case 1:24-cv-04607-JFM Document 138-3 Filed 03/10/26 Page 799 of 874 PageID: 3848

View Online / Journal Homepage

CrystEngComm

Cite this: DOI: 10.1039/c2ce25920f

www.rsc.org/crystengcomm

PAPER

# The structure–property relationship of four crystal forms of rifaximin†

**Dario Braga,*[a] Fabrizia Grepioni,*[a] Laura Chelazzi,[a] Manuela Campana,[b] Donatella Confortini[b] and Giuseppe C. Viscomi[b]**

***Received 8th June 2012, Accepted 3rd August 2012***
**DOI: 10.1039/c2ce25920f**

Published on 09 August 2012 on http://pubs.rsc.org | doi:10.1039/C2CE25920F
Downloaded on 05 September 2012

The crystal structures of four crystal forms of rifaximin, named α, β, δ and ε, have been elucidated by a combination of single crystal and powder diffraction experiments with synchrotron and X-ray sources. The crystal structures of the δ and ε forms have been determined from powder diffraction data alone. Hot stage microscopy has also been of paramount importance in the understanding of the β → α conversion process.

## 1. Introduction

In 2008, we reported the identification of five different crystal forms of the synthetic antibiotic rifaximin (4-deoxy-40-methyl-pyrido[10,20-1,2]imidazo-[5,4-c]rifamycin SV),[1] manufactured by Alfa Wassermann S.p.A. Rifaximin is a broad spectrum locally acting antibiotic against Gram-positive and Gram-negative, aerobic and anaerobic organisms.[2] Due to the lack of systemic absorption, rifaximin has only local action (*e.g.* in the gastrointestinal tract) and has an excellent safety profile. The method of production of rifaximin was reported in 1989.[3]

The existence of different crystal forms of rifaximin was ascertained and their impact on parameters such as solubility, intrinsic dissolution and bioavailability were investigated at the time of patenting and were reported for the different crystal forms.[1,4] All the crystal forms were investigated by X-ray powder diffraction.[1] In the same year, a structure of the β-form, with a water content of 8.40% w/w, was reported by Bacchi *et al.*,[5] while a bromine analogue had been reported much earlier.[6] All crystal forms of rifaximin are obtained from either crystallization (β- and γ-forms) or different drying conditions (α-, δ- and ε-forms).[4] In particular, the β-form is obtained from wet rifaximin after partial drying, while the α- and δ-forms are obtained by more extensive drying *i.e.* to a water content of between 4 and 6% (w/w) for the δ-form and less than 3% for the α-form. The ε-form can only be obtained by drying the δ-form while this last process never results in the formation of the α-form. The relationship between the rifaximin crystal forms and the preparation conditions is depicted in Scheme 1.

Clearly, such a complex phase relationship, in view of the substantially different physicochemical properties of solid rifaximin in its different forms, calls for a deeper understanding of the structure–property relationship. The degree of hydration seems to play a key role, although the path leading from one form to the other is not irrelevant: both the α- and ε-forms are characterized by a low water content but they are not directly related. Therefore, it would be very useful to know how the water molecules interact with rifaximin and/or among themselves in the crystal packing. This knowledge would then cast some light on the mechanisms of (inter)conversion and on the reason for the increased/decreased stability of each form with respect to the others.

Many molecular compounds exist as different crystal forms, such as hydrates that may contain stoichiometric or non-stoichiometric amounts of water molecules. Chemical and physical properties, such as solubility and dissolution rate, may differ between polymorphs, which may significantly affect the absorption *in vivo* as well as between the anhydrous and hydrated forms of a same API. Changes in the crystal form, whether as transitions between true polymorphs or between solvates/hydrates can occur, sometimes unexpectedly, during the manufacturing process, emphasizing the importance of knowing



**Scheme 1** Sketch of the rifaximin molecule.

[a]*Dipartimento di Chimica "G. Ciamician", Università di Bologna, via Selmi 2-40126 Bologna, Italy. E-mail: fabrizia.grepioni@unibo.it; Fax: +39 051 2099456*
[b]*Alfa Wassermann S.p.A., via Ragazzi del 99, 5, 40133 Bologna, Italy*
† Electronic supplementary information (ESI) available: CIF files for all compounds; comparisons between calculated powder patterns for all structures reported in the present work and experimental patterns from ref. 1 for patented α, β, δ and ε forms of rifaximin. CCDC reference numbers 886509–886516. For ESI and crystallographic data in CIF or other electronic format see DOI: 10.1039/c2ce25920f


JA0795
Confidential XIFAX_AMN_1141184

View Online

Downloaded on 05 September 2012
Published on 09 August 2012 on http://pubs.rsc.org | doi:10.1039/C2CE25920F




**Scheme 2** The relationship between the various crystal forms of rifaximin.

and being able to control the crystal form, particularly in the case of pharmaceutical compounds. It is undisputable that the investigation of the diverse crystal forms in which a given molecule can appear has become one of the most active fields of research and a source of innovation in sectors where the production, transport, distribution marketing and exploitation of the chemicals as a solid formulation is relevant. This is particularly true for drugs but also holds well for agrichemicals, nutrichemicals, explosives, pigments *etc.*

Much of this interest and knowledge stems from the seminal work of a few pioneers, such as McCrone and Leiserowitz and to the studies and active dissemination by Joel Bernstein.[7] Under the pressure of ethical and intellectual property issues, the investigation of crystal polymorphism emerged from academic laboratories to become an industrial objective as well as an instrument for intellectual property protection and patenting.[7g]

The formation of hydrates, as of any other solvate crystal, is often unpredictable and the role of water in stabilizing the crystal packings, and hence on the bulk materials properties, such as hydration/dehydration, physico-chemical stability, wettability, comminution and tableting properties,[8a] is difficult to understand. Even more so when the same compound shows a non-stoichiometric behaviour, *i.e.* it is stable in a given crystal structure in a wide range of water content.[8b]



**Fig. 1** The result of a typical drying process with $P_2O_5$: a single crystal of rifaximin form *β* (left) converts into a single crystal of rifaximin form *α* (right), which is then used for an X-ray single crystal data collection.

Several examples of hydrates have been studied in detail by Grant.[9] Theophylline forms an anhydrate and a monohydrate, which are present in mixtures of organic solvents and water depending on the water concentration: if the water activity value is less than 0.25, the anhydrate is the only species present, whereas at values greater than 0.25, the monohydrate is the most stable form.[9a] Anhydrous crystalline ampicillin has also been shown to be kinetically stable for several days in MeOH–$H_2O$ mixtures over the whole range of water activity. Even though the crystalline trihydrate is more thermodynamically stable and less soluble than the anhydrate, interconversion occurs only with the addition of seeds and with a water activity value greater than 0.381.[9b] A useful classification scheme, proposed by Morris and Rodriguez-Hornedo,[10] considers three categories of crystalline hydrates, *i.e.* isolated site hydrates, channel hydrates and metal-ion-associated hydrates. As we will show in the following sections, rifaximin hydrates fall into both the first two categories.

With the aim of learning more about the rifaximin crystal forms, we have started a thorough investigation to determine the crystal structure of each form of rifaximin. In order to do so, we have used crystallography, single-crystal and powder diffraction. Rifaximin is not a small molecule, however, and in order to obtain sufficient information from the powder samples, we resolved to use X-ray radiation from synchrotron sources besides that available from conventional laboratory instruments.

The possibility of obtaining good quality single crystals of the β-form of rifaximin has strong implications on the characterization of the α-form, as the α-form can only be obtained *via* dehydration of the β-form. This process is normally conducted by moderate heating of a crystalline powder sample of the β-form. Dehydration of the β-form in a SCSC process (single crystal to single crystal), on the contrary, is not generally a feasible process as the cell parameters of the β- and α-forms are significantly different and therefore, the crystal experiences internal pressures during the dehydration process that easily cause crystal disintegration.[11]

Good quality crystals, such as those obtained by the procedure described here, can be dehydrated in mild conditions *i.e.* at room temperature in the presence of $P_2O_5$, yielding single crystals of the α-form of rifaximin, even if the crystals break (see Scheme 2). As a consequence, the collection of single crystal data *via* X-ray diffraction becomes possible and molecular and crystal structure determination of rifaximin form α can be obtained (Fig. 1).

In view of the need to gather reliable structural information, several diffraction experiments have been carried out for each crystal form of rifaximin and will be discussed in the following sections. Three crystal structures for the α-form and two new



**Fig. 2** Different conformations at the amidic junction in the two independent molecules of rifaximin $\alpha_0$.

 This journal is © The Royal Society of Chemistry 2012



Confidential 

# EXHIBIT TT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC and AMNEAL EU, LIMITED,<br><br>Defendants. | Civil Action No. 3:24-cv-04607-JFM |

**REPLY EXPERT REPORT OF WILLIAM C. SCHINZER, PH.D., REGARDING THE INVALIDITY OF U.S. PATENT NO. 8,193,196**

Dated: NOV 12 2025

William C. Schinzer
William C. Schinzer, Ph.D.

8:48-60, 9:10-19. As I described in my Opening Report, a person of ordinary skill in the art would have analyzed the crystallized rifaximin synthesized according to Examples 1, 6-7, and 9 of Cannata using conventional techniques to evaluate its chemical and physical characteristics, including water content and XRPD profiles.

33. Similarly, with regard to the ’620 patent and the New Zealand Application, Dr. Chyall contends “that to discover a new polymorph, experimental parameters would need to be investigated by conducting broad screens that vary the conditions of crystallization, most typically crystallization solvent, temperature, concentration, and pH.” Chyall Reb. Rpt., ¶ 137. None of these conditions are claimed. No process limitations are recited in the asserted ’196 patent claims. And, as I describe further below in § IX.C, the only difference between the disclosure in the ’620 patent/New Zealand Application for forming rifaximin α and the disclosure in the ’196 patent for forming rifaximin δ and ε is the water content, which is an inherent property of the polymorphic form and a function of the drying time. Therefore, a POSA would not have needed to “vary the conditions of crystallization, most typically crystallization solvent, temperature, concentration, and pH” to discover the claimed forms δ and ε, as Dr. Chyall contends. A POSA would have needed only to follow the disclosure of the ’620 patent or New Zealand Application and dry to a different water content.

34. Dr. Chyall also contends that a POSA reading the ’620 patent or the New Zealand application would not have been motivated by the Normix label to prepare a pharmaceutical composition containing rifaximin δ or ε as the active ingredient because the Normix Label “says nothing about [rifaximin] being polymorphic, let alone that δ or ε forms exist.” Chyall Reb. Rpt., ¶ 146. I do not see why this alleged omission would impede a POSA in any way. I point to the Normix label in my Opening Report as motivating a POSA and showing a reasonable expectation

of success in putting rifaximin into a pharmaceutical formulation, not as motivating a search for additional polymorphic forms. In my opinion, as detailed in my Opening Report, a POSA would arrive at the rifaximin forms δ or ε with the claimed XRPD peaks by (i) following the disclosures of the '620 patent or the New Zealand application or (ii) using the processes described in Cannata and/or Marchi. The Normix label would provide the further motivation for putting the rifaximin into a pharmaceutical formulation with the claimed excipients and form, regardless of whether the label disclosed polymorphs. I also disagree with Dr. Chyall's contention that the Normix label teaches *away* from using rifaximin δ or ε because a POSA would have believed it contained either the α or β forms. Chyall Reb. Rpt., ¶ 146. As I explain below in § IX.D, in my opinion a POSA would have understood that polymorphic forms impact stability and bioavailability and would therefore have been motivated to characterize other forms, indeed all forms, and put them into pharmaceutical formulations to test their effectiveness and stability. The Normix label would have provided requisite guidance for the latter.

### C. Dr. Chyall Cannot Reconcile His Opinion that the New Zealand Application Does Not Anticipate or Render Obvious the Asserted Claims with His Opinion that the Asserted Claims Are Enabled/Adequately Described

35. Dr. Chyall opines at ¶ 117 of his report that "Viscomi 2008 and inventor testimony show that the '620 Patent process does *not* itself produce forms δ or ε," and further that "[t]he formation of δ or ε requires different processes and the water content of the product to yield form δ, which is then required as a precursor to form ε." I disagree with Dr. Chyall, and in any event, he does not specify what these "different processes" are. But assuming for the sake of argument that he is correct, his opinion further underscores the lack of enablement/adequate written description of the asserted '196 claims, because both the '620 patent (and New Zealand Application) and the '196 patent describe the same process for making rifaximin up to the point

38. For all the unpredictability that Dr. Chyall describes in producing polymorphs of rifaximin, however, the process ultimately disclosed by the ’196 patent for producing forms δ and ε is remarkably straightforward in view of the disclosures of the ’620 patent and New Zealand Application (with which a POSA would have been familiar). The ’196 patent does not disclose any more information on how to make crystalline rifaximin than the ’620 patent or the New Zealand Application. Dr. Chyall cannot have it both ways: if the ’196 patent is not obvious because the prior art does not disclose these unpredictable process steps, experimental parameters, broad screens, conditions of crystallization, etc., then those process steps need to be disclosed in the ’196 patent to enable/adequately describe to a POSA how to make the purported invention. They are not. Therefore, Dr. Chyall’s response to my opinions concerning lack of enablement of claims 7-9 of the ’196 patent is inconsistent with his opinions concerning alleged validity.

39. Dr. Chyall provides his own table showing Example 1 of the ’196 patent and Example 1 of the ’620 Patent/New Zealand Application side by side and opines that there are differences between them. Chyall Reb. Rpt., ¶ 184. But neither Dr. Chyall nor the ’196 patent explains how obtaining “dried raw rifaximin” with water content of 5.6% and a diffractogram corresponding to form β (’620 Patent/New Zealand Application) differs from obtaining “dried raw rifaximin” with water content of 5.6% more generally (’196 patent).

40. Dr. Chyall further opines that the ’196 patent disclosure is enabling because it “specif[ies] the desired water content [for rifaximin δ], and with this knowledge, a POSA would be able to adjust the drying conditions to obtain the desired form.” Chyall Reb. Rpt., ¶ 186. But Dr. Chyall does not explain what these “drying conditions” should be, and the ’196 patent does not disclose them either. Indeed, as Dr. Chyall’s side-by-side examples make clear, the only difference in the “drying” disclosed between Example 1 of the ’196 patent and Example 1 of the

# EXHIBIT UU

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC and AMNEAL EU, LIMITED,<br><br>Defendants. | Civil Action No. 3:24-cv-04607-JFM |

**REBUTTAL EXPERT REPORT OF BART KAHR, PH.D., REGARDING NON-INFRINGEMENT OF ASSERTED U.S. PATENT NO. 8,193,196**

Dated: October 22, 2025

Bart Kahr
Bart Kahr, Ph.D.

for powders used in the S-XRPD structure determinations of δ and ε, different particles in the powder may well have different compositions (states of hydration) (*see* Braga 2012 at p. 6408).

31. Rifaximin hydrate crystallography is complex, confounding simple comparisons, as the authors themselves explain (Braga 2012 at p. 6405):

> "The formation of hydrates, as of any other solvate crystal, is often unpredictable and the role of water in stabilizing the crystal packings, and hence on the bulk materials properties, such as hydration/dehydration, physico-chemical stability, wettability, comminution and tableting properties, is difficult to understand. Even more so when the same compound shows a nonstoichiometric behaviour, i.e. it is stable in a given crystal structure in a wide range of water content."

32. Figure 2 of Braga 2012 (p. 6405) shows the relationships among different hydrates of rifaximin, in particular forms α, ß, γ, δ, and ε.




33. As shown in the figure, ß can be dehydrated to α, which can be rehydrated to δ. The changes to the unit cell are substantial in going from ß to α. The beta angle ("*ß* (°)" in Braga's Table 2) between the *a* and *c* axes changes by as much as 20°, as seen, e.g., for $ß_4$ and $\alpha_{0.5}$ in Braga's Table 2. The changes in the unit cell dimensions from α to δ are subtle by comparison (e.g., ~5° in beta angle between $\delta_4$ and $\alpha_{0.5}$), and the two structures could well be convolved in

# EXHIBIT VV

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
----------------------------------x
SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., ALFASIGMA S.P.A. and BAUSCH HEALTH IRELAND LTD.,

Plaintiffs,

V. Case No.: 1:24-cv-04607-JFM

AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, and AMNEAL EU, LIMITED,

Defendants.
----------------------------x

"HIGHLY CONFIDENTIAL"

Videotape Deposition of BART KAHR, Ph.D. taken on January 9, 2026 at 9:06 a.m. pursuant to Notice, held at the offices of Robins Kaplan, LLP, 1325 Avenue of the Americas, New York, New York 10019, stenographically reported by Maureen Ratto, a Registered Professional Reporter, Certified Court Reporter and Notary Public.

Case No. 7819900

Q. In paragraph 27 you cite an article by Braga, et al published in 2012, correct?
A. I'm sorry. Paragraph 27, that's 2. Sorry. Yes, I did, Braga 2012.
Q. And at the end of paragraph 27 you say that, "Braga 2012 provides helpful background on the subject consistent with my own knowledge." Do you see that sentence?
A. Yes, I see it.
Q. I was wondering what knowledge you were referring to there?
A. I believe my own knowledge about non-stoichiometric hydrates.
Q. In paragraph 31 of your report you wrote here that, "Rifaximin hydrate crystallography is complex, confounding simple comparisons." Do you see that?
A. I see that.
Q. And then you quote a little passage from Braga 2012, yes?
A. That's correct.
Q. Do you agree with the quote



here that "the formation of hydrates is unpredictable"?
A. I'm quoting the -- one of the inventors and a scientist who studied rifaximin. And so I'm saying that he has a lot of experience with rifaximin and he's saying that it's very complicated, it's a very complicated crystallographic system, it has a bunch of polymorphs and a continuum of hydrates, and I don't see any reason to doubt his characterization of the crystallographic system.
Q. Do you agree generally that the formation of hydrates is unpredictable?
A. Epsom salt is magnesium sulfate heptahydrate. It has seven water molecules and it always has seven water molecules, and it holds onto them quite tightly. So I wouldn't say that the formation of hydrates is always unpredictable.
Q. But you do agree that the formation of rifaximin hydrates is



unpredictable?
MR. PINAHS: Objection, form, mischaracterizes testimony.
A. I quoted Dr. Braga and he said the formation of hydrates is often unpredictable.
Q. Do you agree that non-stoichiometric hydrates are more unpredictable than stoichiometric hydrates?
A. You're asking about stoichiometry, that is the ratio of water molecules to some other analyte. And in a non-stoichiometric hydrate, water can have a continuum of equivalence relative to the analyte of interest.
And so, yes, when you have a choice between infinity or a small number of hydrates, then I would say choosing among an infinite number of things is more unpredictable then choosing something that has a fixed ratio.
Q. So Braga wrote that, "The formation of hydrates, as of any other



solvate crystal, is often unpredictable." And you agree that the formation of non-stoichiometric hydrates is even more unpredictable?
A. Whether or not a molecule will crystallize from water as a hydrate is hard to reckon from first principles. And if there's no fixed stoichiometry, it's even harder.
Q. Does the complexity of the rifaximin crystal system also confound predictability in addition to simple comparisons, as you have wrote?
A. Yes, I believe it does.
Q. And in the next paragraph you reproduced a figure here from Braga 2012, right?
A. Correct.
Q. And according to the figure, if you dry beta, rifaximin beta you can get either rifaximin alpha or rifaximin delta?
A. That's correct.
Q. And if you dry the delta form,

# EXHIBIT WW

NEUROGASTROENTEROLOGY

# Small intestinal bacterial overgrowth in patients with irritable bowel syndrome

**Iris Posserud, Per-Ove Stotzer, Einar S Björnsson, Hasse Abrahamsson, Magnus Simrén**

*Gut* 2007;**56**:802–808. doi: 10.1136/gut.2006.108712

See end of article for authors' affiliations

Correspondence to: M Simrén, Section of Gastroenterology and Hepatology, Department of Internal Medicine, Sahlgrenska University Hospital, 41345 Göteborg, Sweden; magnus.simren@medicine.gu.se

Revised 14 November 2006
Accepted 22 November 2006
**Published Online First 4 December 2006**

**Background:** Small intestinal bacterial overgrowth (SIBO) has been proposed to be common in irritable bowel syndrome (IBS), with altered small-bowel motility as a possible predisposing factor.
**Aim:** To assess the prevalence of SIBO, by culture of small-bowel aspirate, and its correlation to symptoms and motility in IBS.
**Methods:** 162 patients with IBS who underwent small-bowel manometry and culture of jejunal aspirate were included. Cultures from 26 healthy subjects served as controls. Two definitions of altered flora were used: the standard definition of SIBO ($\geqslant 10^5$ colonic bacteria/ml), and mildly increased counts of small-bowel bacteria ($\geqslant$95th centile in controls).
**Results:** SIBO (as per standard definition) was found in 4% of both patients and controls. Signs of enteric dysmotility were seen in 86% of patients with SIBO and in 39% of patients without SIBO (p = 0.02). Patients with SIBO had fewer phase III activities (activity fronts) than patients without SIBO (p = 0.08), but otherwise no differences in motility parameters were seen. Mildly increased bacterial counts ($\geqslant 5\times10^3$/ml) were more common in patients with IBS than in controls (43% vs 12%; p = 0.002), but this was unrelated to small intestinal motility. No correlation between bacterial alterations and symptom pattern was observed.
**Conclusions:** The data do not support an important role for SIBO according to commonly used clinical definitions, in IBS. However, mildly increased counts of small-bowel bacteria seem to be more common in IBS, and needs further investigation. Motility alterations could not reliably predict altered small-bowel bacterial flora.

The irritable bowel syndrome (IBS) is a common disorder in Western populations,[1] and so far many pathophysiological mechanisms have been considered. Recently, small intestinal bacterial overgrowth (SIBO) has been proposed to be an important factor, with prevalence figures of 38–84% in patients with IBS.[2–4] However, these results were obtained using hydrogen breath tests, which are indirect tests of SIBO with poor sensitivity and specificity.[5 6] So far, no studies have assessed systematically the prevalence of SIBO in IBS using a direct test—that is, bacterial cultures of aspirate from the small bowel.

Bacterial overgrowth is a condition caused by an abnormal number of bacteria in the small intestine, owing to different predisposing conditions, such as impaired motility or failure of the gastric-acid barrier.[7–9] The stomach and proximal small bowel normally contain relatively small numbers of bacteria in adults. The concentration of bacteria in the gut increases from $10^{0-4}$ colony forming units per ml (cfu/ml) in the duodenum and the jejunum to $10^{0-5}$ cfu/ml in the proximal ileum, $10^{5-8}$ cfu/ml in the terminal ileum and $10^{10-12}$ cfu/ml in the caecum.[10 11] The flora in the upper small bowel consists mainly of Gram-positive bacteria; the numbers of Gram negatives are low and anaerobes are rare.[12]

Opinions regarding the preferred diagnostic test for SIBO are conflicting. Many regard aspiration and direct culture of jejunal contents as the gold standard,[5 13 14] even though the limited reach of the instrumentation leaves cases with isolated distal SIBO undiagnosed.[15 16] However, evidence of the existence and clinical relevance of culture-proven ileal bacterial overgrowth is lacking. In addition, there is no consensus on the definition of a positive culture. SIBO is usually defined as a total growth of $\geqslant 10^5$ cfu/ml of intestinal fluid.[5 17] However, this definition includes Gram-positive flora, in turn including upper respiratory flora, which has not been correlated with the symptoms of SIBO.[18 19] Growth of colonic bacteria (mainly Gram negatives, strictly anaerobes and enterococci) correlates with symptoms of SIBO.[20 21] Therefore, the definition of SIBO as $\geqslant 10^5$ colonic bacteria seems to be more clinically relevant.

Indirect tests such as $^{14}$C-xylose breath test and hydrogen breath tests using lactulose or glucose have been widely used in diagnosing SIBO. The glucose hydrogen breath test (GHBT) and $^{14}$C-xylose breath test have been considered as fairly reliable tools,[17] whereas the accuracy of the lactulose hydrogen breath test (LHBT) is questionable, owing to both low sensitivity and specificity in comparison with culture of small-bowel aspirate.[22 23] Pimentel *et al*[2 3] reported on SIBO diagnosed by means of LHBT in 78–84% of patients with IBS. Patients with IBS with positive LHBT were found to have altered small-bowel motility,[24] and motility alterations are known to cause SIBO in other conditions.[7 8] Both IBS symptoms and small-bowel motility alterations improved in patients with abnormal LHBT after treatment with antibiotics,[2 3 24] and evidence of a positive effect of antibiotics on IBS symptoms has been found in some previous studies.[25–27] These findings have contributed to the suggestion that IBS could be a result of SIBO, explaining several of the symptoms reported.[15] However, these studies have been heavily criticised, mainly because of the weakness of the LHBT and the interpretation of the results, and contradictory results exists.[27–31]

Therefore, the aim of our study was to determine the prevalence of SIBO in a large sample of patients with IBS by culture of small-bowel aspirate. Moreover, we also wanted to evaluate whether overgrowth of bacteria in these patients could be related to small-bowel motility characteristics, and to the

**Abbreviations:** GHBT, glucose hydrogen breath test; IBS, irritable bowel syndrome; LHBT, lactulose hydrogen breath test; MMC, migrating motor complex; SIBO, small intestinal bacterial overgrowth



JA0809

XIFAX_AMN_1996648

symptom profile of the patients. After we had commenced our study, Pimentel *et al*[2 3 24] reported some of the findings mentioned above. Because of this, GHBT and LHBT were performed in a number of patients with negative small-bowel cultures.

## MATERIALS AND METHODS

### Subjects

We recruited patients with a clinical diagnosis of IBS, based on the ROME II criteria,[32] referred to our outpatient clinic because of symptoms refractory to standard treatment. During 1999–2004, we included 162 patients (mean (range) age 38 (19–68) years; 120 women) and divided them into subgroups on the basis of their predominant bowel habit, yielding 49 patients with diarrhoea-predominant IBS (IBS-D), 37 with constipation-predominant IBS and 76 with alternating-type IBS (IBS-A). We also recruited 42 healthy volunteers (mean (range) age 40 (20–79) years; 22 women) without any history of gastrointestinal symptoms. No subjects had been treated with antibiotics within 2 weeks before the study, and drugs known to affect the gastrointestinal tract were not allowed within 48 h of the study. All subjects gave informed consent, and the study was approved by the ethics committee of the University of Göteborg (Göteborg, Sweden).

### Study design

Antroduodenojejunal manometry was recorded after an overnight fast. The manometry catheter was placed under fluoroscopic guidance, with the tip in the proximal part of the jejunum, as described in more detail previously.[33] Interdigestive motility was recorded for 3 h. A test meal (500 kcal) was then given, and the recording continued for another hour. At the end of the procedure, jejunal aspirate for culture was obtained via the central lumen of the manometry catheter. Hydrogen breath tests (glucose and lactulose) were added to the protocol during the course of the study, as studies reporting high prevalence of SIBO in IBS using these methods had been published,[2 3 24] and all subjects with negative cultures during 2003–4 were asked to undergo these tests. GHBT and LHBT were carried out on separate mornings after an overnight fast.

### Manometry

Motility was recorded using an eight-channel assembly for pressure recording (Zinetics, Salt Lake City, Utah, USA). The water-perfused catheter had an outside diameter of 4.8 mm, a central lumen with a diameter of 1.8 mm for the guidewire and eight lumens with a diameter of 0.8 mm each for pressure recording. The pressure recording side ports were situated at 2, 17, 30, 32, 34, 45.5, 47 and 48.5 cm from the tip. Thus, three ports were situated in the antrum 1.5 cm apart (A1–3), three in the descending part of the duodenum 2 cm apart (D1–3), one in the distal duodenum close to the ligament of Treitz (T) and one in the proximal jejunum (J; fig 1). The eight channels were connected to capillaries, and each channel was perfused under a low-compliance condition with water at 0.3 ml/min. The catheter was connected to pressure transducers and recorded with a polygraph (PC Polygraph, Synetics, Stockholm, Sweden). The information was transformed to a computer via a fibreoptic interface. The individual recordings were displayed on the computer screen and stored for later analysis.

### Jejunal cultures

Jejunal juice was aspirated via the central lumen of the manometry catheter and collected in a sterile plastic tube. The samples were sent to a microbial laboratory within 2 h, and cultured for aerobic and anaerobic bacteria on blood agar plates with 4% defibrinated horse blood in aerobic and anaerobic atmospheres of $N_2$ and 10% $CO_2$. Selective cultivation of Gram-negative strains was performed on Drigalski agar under aerobic conditions. Yeast fungus was cultured on Sabouraud's agar. The minimum incubation time was 48 h. Identification of the microorganisms was based on colony characteristics, Gram staining, biochemical and chromatographic tests. Quantification was performed by counting the number of colony-forming units (cfu/ml). Culture-verified SIBO was defined as $\geqslant 10^5$ cfu/ml of colonic bacteria. These patients were given appropriate open-label antibiotics for 10 days, and the severity of symptoms was assessed on a seven-grade Likert scale assessing a number of IBS symptoms before and after therapy. These subjects also underwent a second manometry within 2 weeks after treatment. For explorative analyses, we also looked at lower cut-off levels, including non-colonic bacteria, as well as bacterial counts $\geqslant$95th centile in our healthy volunteers, to represent increased counts of small-bowel bacteria.

### Hydrogen breath tests

After an overnight fast and at least 1 day of low-fibre diet, the subjects presented at the laboratory. Hydrogen concentrations were measured in parts per million (ppm) with a GMI exhaled $H_2$ monitor (GMI Medical., Inchinistan Estate, Renfrew, UK). A $H_2$ breath sample was obtained at baseline before the intake of a solution containing 50 g glucose dissolved in 300 ml of water or 10 g lactulose (15 ml of a 670 mg/ml syrup solution). $H_2$ in end-expiratory breath samples was then continuously analysed every 15 min for 120 (glucose) or 180 min (lactulose). The measurements were plotted graphically and analysed. The breath tests were considered to indicate SIBO on the basis of the following criteria: (1) a >15 ppm increase in $H_2$ 15–120 min after ingestion of glucose in at least two breath samples,[17] (2) two distinct $H_2$ peaks (>20 ppm increase) 15–180 min after ingestion of lactulose—that is, an early peak consisting of two consecutive hydrogen values >20 ppm above the baseline value, clearly distinguishable from the later "colonic" peak.[34] For comparison, we also used the recently proposed criteria for a positive LHBT: rise in $H_2$ >20 ppm by 90 or 180 min.[3]

### Data analysis

The manometric data were reviewed in regard to the characteristics of phase III, migrating motor complex (MMC), motility indices, postprandial motor pattern and presence of enteric dysmotility. Analysis of the different phases of interdigestive motility was performed by direct visual inspection on the computer screen. The number of phase III activities of the MMC was counted and presented as the average number per 3 h, and the duration of phase III was measured. The MMC cycles were analysed qualitatively and quantitatively with a commercially available program (Polygram, V.5.06 X1, Synetics Medical, Stockholm, Sweden). The area under the curve was used as motility index, expressed as millimeters of mercury (mm Hg)×seconds(s), and calculated for the last 30 min of phase II (late phase II), and for 30 min after the subjects had finished their meal. The following recording points were used for calculation of motility index in the four segments studied: A3, D2, T and J (fig 1). The propagation velocity of phase III from proximal to distal duodenum and from distal duodenum to jejunum was analysed with a computerised calculation after manual marking on the computer screen (cm/min).

The presence of enteric dysmotility was diagnosed by a more conventional evaluation of the condensed manometric data, performed by two of the investigators (MS and HA), and then reaching a consensus.[35] Specifically, findings compatible with neuropathy and/or myopathy were sought for,[36 37] as well as




**Figure 1** Schematic picture of the manometric catheter with eight pressure-recording ports: three in the antrum (A1–3), three in the descending duodenum (D1–3), one close to the ligament of Treitz (T) and one in the proximal jejunum (J).

specific motor patterns falling outside the normal range found in healthy controls previously investigated at our laboratory[38] (box 1). However, the true pathological meaning and the relevance for symptoms of some of the included alterations—for instance, clusters—are still debated.[39]

### Statistical analysis

Comparisons within the IBS group were made using paired and unpaired non-parametric analyses (Wilcoxon's test and Mann–Whitney U test). The number of positive tests on small-bowel culture, LHBT and GHBT, using different definitions in patients with IBS versus controls, were compared using $\chi^2$ test. Changes in $H_2$ over time during the LHBT were compared between controls and patients with IBS, and analysed using repeated-measures analysis of variance. A significance level of 0.05 was accepted.

**Box 1: Criteria for enteric dysmotility**

MMC

- >3 MMCs per 3 h of recording
- Phase III duration >10 min
- Phase III propagation ≤1 cm/min
- Simultaneous or retrograde phase III
- Elevation of basal line >30 mm Hg for >3 min

Contraction amplitude

- <20 mm Hg

Postprandial pattern

- No established feeding pattern

Presence of specific contractile patterns

- Isolated bursts
- Sustained incoordinated phasic activity
- Multiple, simultaneous, prolonged (>8 s) phasic contractions
- Postprandial discrete clustered contractions >30 min duration
- Postprandial phase III-like activity
- Frequent long clusters (>30 s)

MMC, migrating motor complex.
Signs of enteric dysmotility using criteria from Kellow[37] modified on the basis of normal values from healthy controls at our lab.[38]

## RESULTS

### Bacterial cultures

The cultures were obtained from 162 patients with IBS (mean age: 38 years; 120 women) and 26 controls (mean age: 40 years; 15 women). Few subjects had completely sterile cultures, and most subjects had cultures with low counts ($10^{1-3}$) of yeast fungus, and/or respiratory/oral flora. In all, 7 (4%) patients had jejunal cultures showing bacterial overgrowth, with $\geq 10^5$ cfu/ml colonic bacteria (mean (range) age 49 (34–67) years; 5 women; table 1). In addition, three patients had cultures with $10^5$, $5\times10^5$ and $10^6$ cfu/ml of *Staphylococcus aureus*. This was not significantly different from the control group, in which 1 (4%) healthy volunteer had a culture with $5\times10^5$ *Enterococci*/ml (woman aged 71 years).

The 95th centile in our control group was $5\times10^3$ cfu/ml of any bacteria (respiratory and oral flora excluded). Mildly increased counts of small-bowel bacteria were more common in patients with IBS than in controls. Cultures with $\geq 10^4$ cfu/ml were found in 24% of the patients with IBS compared with 4% in controls ($p = 0.02$), and cultures with $\geq 5\times10^3$ cfu/ml were observed in 43% vs 12% ($p = 0.002$; table 2). Several different organisms were found in these cultures, non-fermentative Gram-negative *Bacilli* and *Enterobacter* being the most common.

### Breath tests

In all, 54 patients with IBS with $<10^5$ colonic bacteria/ml (mean age: 39 years; 42 women) and 20 controls (mean age: 39 years; 10 women) underwent a GHBT. No healthy volunteer and only one patient had a positive test indicating SIBO (fig 2). The culture from this patient showed only respiratory tract flora ($10^3$ cfu/ml).

A total of 46 patients with $<10^5$ colonic bacteria/ml (mean age: 40 years; 34 women) and 21 controls (mean age: 39 years; 10 women) underwent an LHBT. In all, 7 (15%) patients and 4 (20%) controls had a positive test using the double-peak definition (p = NS). Of the patients with a positive LHBT, three had bacterial counts of $5\times10^3$, $10^4$ and $5\times10^4$ cfu/ml, respectively, but none had growth of colonic bacteria $\geq 5\times10^3$ cfu/ml. A 20 ppm rise in $H_2$ within 90 min was observed in 35% of the

**Table 1** Species of bacteria in subjects with small intestinal bacterial overgrowth

| Subject | Before treatment | After treatment | Responder |
|---|---|---|---|
| IBS-C | $5\times10^5$ *Escherichia coli* | — | No |
| IBS-A | $10^6$ mixed *G-flora* | $10^6$ *Klebsiella* | No |
| | $10^5$ *Enterococci* | $10^6$ *Enterococci* | |
| | $5\times10^5$ *Clostridium* | $5\times10^3$ *Staphylococcus aureus* | |
| IBS-C | $10^6$ mixed *G-flora* | $5\times10^5$ *Serratia* | No |
| | | $10^5$ *Enterococci* | |
| IBS-D | $5\times10^5$ *Enterobacter* | — | Yes |
| | $10^5$ *Staphylococcus aureus* | | |
| IBS-D | $>10^7$ *Klebsiella* | $5\times10^5$ *Klebsiella* | No |
| IBS-A | $10^7$ *E coli* | $10^3$ *E coli* | Yes |
| IBS-C | $>10^7$ *Enterococci* | $10^6$ *Klebsiella* | Yes |
| | $5\times10^5$ mixed *G-flora* | | |

IBS-A, alternating-type irritable bowel syndrome; IBS-C, constipation-predominant IBS; IBS-D, diarrhoea-predominant IBS.
The amounts and different types of bacteria (cfu/ml) found in the cultures of the patients with small intestinal bacterial overgrowth before and after antibiotic treatment, as well as the effect of treatment (responder = ≥25% symptom improvement).
— no bacteria.

**Table 2** Jejunal cultures

| Bacteria (cfu/ml) | Patients with IBS, n (%) | Controls, n (%) | p Value |
|---|---|---|---|
| ⩾$10^5$, colonic bacteria | 7 (4%) | 1 (4%) | NS |
| ⩾$10^5$, any bacteria | 10 (6%) | 1 (4%) | NS |
| ⩾$5\times10^4$, colonic bacteria | 10 (6%) | 1 (4%) | NS |
| ⩾$5\times10^4$, any bacteria | 17 (11%) | 1 (4%) | NS |
| ⩾$10^4$, colonic bacteria | 13 (8%) | 1 (4%) | NS |
| ⩾$10^4$, any bacteria | 39 (24%) | 1 (4%) | p = 0.02 |
| ⩾$5\times10^3$, colonic bacteria | 17 (11%) | 1 (4%) | NS |
| ⩾$5\times10^3$, any bacteria | 70 (43%) | 3 (12%) | p = 0.002 |

Proportion of patients with IBS and controls with varying amounts of bacteria, divided into colonic and any bacteria (respiratory tract flora excluded). Mildly increased bacterial counts were more common in patients with IBS than in controls.

patients and in 45% of the controls (p = NS). A 20 ppm rise in $H_2$ within 180 min was observed in 78% of the patients and in 70% of the controls (p = NS; fig 2). No significant differences were observed when comparing the rise in $H_2$ over time between patients and controls (fig 3).

### Small-bowel motility

Conventional manometric evaluation in the 162 patients discovered motor abnormalities suggesting enteric dysmotility (box 1) in 86% (6/7) of the patients with culture-positive SIBO (⩾$10^5$ cfu/ml of colonic bacteria), compared with 39% of the patients without SIBO (p = 0.02).

A more extended analysis of small-bowel motility, as described in Materials and methods, was performed in patients with SIBO (n = 7) and in 74 of the patients without SIBO (mean age: 39 years; 52 women). The patients with culture-proven SIBO tended to have fewer phase III activities than those without SIBO (0.6 (0–1.8) vs 1.2 (0–4)/3 h; median (range); p = 0.08). Otherwise, no group differences were observed for the remaining analysed motility parameters, such as phase III duration, propagation velocity, MMC cycle length or motility index (table 3). The manometry results for the patients with mildly increased bacterial counts (⩾$5\times10^3$ cfu/ml) were not different from those for the patients with <$5\times10^3$ cfu/ml (data not shown).

The manometry findings before and after antibiotic treatment in patients with SIBO did not show any differences in the presence of enteric dysmotility or in any of the other motility parameters evaluated (table 3).

### Predominant bowel habit and effects of treatment

Small intestinal overgrowth did not correlate with IBS subtype with regards to the predominant bowel habit. Of the seven patients with SIBO, three had constipation-predominant IBS, two had diarrhoea-predominant IBS and two had alternating-type IBS. They were all treated with antibiotics (ciprofloxacin 500 mg twice a day for 10 days). Cultures after treatment showed decreased levels of bacteria in five patients after treatment, and four patients still fulfilled the standard definition for SIBO. Three patients reported ⩾25% improvement in symptoms compared with that before treatment (table 1). However, being a responder was unrelated to IBS subtype, as well as to bacterial counts after treatment.




**Figure 2** Percentages of subjects with tests indicating altered small-bowel flora according to the different diagnostic methods and definitions used; jejunal culture (⩾$10^5$ and ⩾$5\times10^3$ cfu/ml), glucose hydrogen breath test (GHBT), lactulose hydrogen breath test (LHBT) with two distinct $H_2$ peaks after ingestion of lactulose (LHBT double peak), LHBT with a rise in $H_2$ within 90 min (LHBT 90 min), and LHBT with a rise in $H_2$ within 180 min (LHBT 180 min). IBS, irritable bowel syndrome. **$p<0.01$.

## DISCUSSION

We found SIBO, only in a small subset of patients with IBS (4%), diagnosed by jejunal cultures, using the definition of ⩾$10^5$ cfu/ml of colonic bacteria. This was not different from controls without gastrointestinal symptoms. However, cultures with ⩾$5\times10^3$ and ⩾$10^4$ cfu/ml were more frequently seen in patients with IBS than in controls. We could not identify a specific motor pattern predicting SIBO, even though these patients tended to have fewer activity fronts, and signs of enteric dysmotility were more common. These manometric abnormalities were not more common in patients with mildly increased bacterial counts. Moreover, similar proportions of positive LHBT and GHBT were obtained in patients with IBS and controls, regardless of how we defined a positive test. In agreement with some earlier studies,[27–29] our findings do not confirm a strong association between IBS and SIBO as proposed by others,[2–4 40] even though the relevance of minor alterations of the bacterial flora in the upper gut is unclear.

To the best of our knowledge, this is the first study evaluating growth of bacteria in the small bowel in a large sample of patients with IBS. A previous small study of the microflora of the proximal jejunum included some patients with IBS (n = 7) as part of a mixed patient group with gastrointestinal symptoms suggestive of SIBO. In this study, no major differences were found between patients with IBS and controls, but specific information regarding the patients with IBS was not provided.[41]

Pimentel *et al*[2 3] have reported on SIBO diagnosed by means of LHBT in 78–84% of patients with IBS. We found SIBO in 4% of patients with IBS, defined as ⩾$10^5$ cfu/ml of colonic bacteria, which is the definition most clearly associated with gastrointestinal symptoms.[20 21] The reliability of our findings from the jejunal cultures is supported by the results from the GHBT, for which only 1 of 54 patients had a positive test. Similarly, previous studies using the GHBT and $^{14}C$-xylose test have failed to show a high prevalence of abnormal tests in IBS.[28 29] Our results from the LHBT, using the double-peak definition, with 15% positive tests in patients are in agreement with Walters *et al*,[29] who observed positive LHBT in 10% of patients with IBS.



JA0812

XIFAX_AMN_1996651




**Figure 3** Rise in hydrogen ($H_2$) over time in patients with irritable bowel syndrome (IBS) and in controls, expressed as a group mean, during the lactulose hydrogen breath test. ppm, parts per million.

The discrepancy between Pimentel *et al*'s[3] findings and ours may partly be due to the use of different assessment methods, definitions and inclusion criteria. We could not measure expiratory methane, which has been reported to be important in constipation-predominant IBS (23% of our patients). Therefore, the breath tests of possible methane-producing patients would be interpreted as being normal—that is, false negative. At least in their first study, Pimentel *et al*[2] identified Rome I-positive patients with IBS using a questionnaire among patients initially referred for LHBT. This could perhaps explain the high prevalence of abnormal tests. Our patients also constitute a selected group of patients, as they were referred to our unit due to symptoms refractory to standard treatment. Based on this selection bias, neither our results nor the results of Pimentel *et al*[3] could be generalised to all patients with IBS. When we applied the criteria for an abnormal LHBT with a single peak $H_2$ within 90 or 180 min, the prevalences of abnormal tests were found to be 35% and 78%, respectively. Also, when using these definitions, we could not, similarly to Walters *et al*,[29] demonstrate an increased prevalence of positive tests in patients with IBS relative to controls. Supported by one study combining LHBT with scintigraphy, enabling anatomical location of the lactulose bolus,[22] this late $H_2$ rise is probably due to physiological variations in transit, reflecting colonic fermentation, and not due to bacteria in the small bowel.[30] Abnormal colonic fermentation has been reported in IBS,[42] and therapies that modify the gut flora may improve symptoms in some patients.[26 27 43] Studies on patients with IBS showing symptom improvement after antibiotic treatment[2 3 25] have been used to further support the conclusion that SIBO is a pathophysiological factor in IBS.[15] However, an antibiotic-sensitive pathophysiology in IBS may be explained by alterations of colonic bacterial flora[25 27 30] resulting in symptom improvement. In bacterial overgrowth caused by delayed transit, antibiotics produce prompt improvements.[44 45] About half of the patients with SIBO in our study reported symptom improvement after antibiotic treatment. Unfortunately, our sample was too small to perform a randomised placebo-controlled evaluation.

We do not have data on antibiotic use before 2 weeks of the study, or on the last use of antibiotics. The time for recolonisation of the small bowel could possibly be >2 weeks. However, this study was conducted in a setting where antibiotics are not available over-the-counter, and Sweden is a low consumer of antibiotics compared with other European countries.[46] Moreover, we have no reason to believe that patients with IBS would use more antibiotics than healthy subjects.

It has been argued that direct culture is not sufficient to detect SIBO, as sampling is restricted to one location in the proximal small bowel, missing more distal overgrowth.[15] As lactulose is not absorbed in the small bowel, LHBT is supposed to be superior in detecting distal bacterial overgrowth.[2 3] However, the clinical relevance of such findings is questionable, as the distal ileum is normally colonised with $10^{5-8}$ cfu/ml.[10 11] Furthermore, it is a common belief that cultures are often false negative, especially concerning obligate anaerobes,[11] and modern molecular identification techniques have identified several unculturable bacteria.[47] Our aspirates were not immediately incubated, but even strict anaerobic bacteria are thought to tolerate at least 8 h in an environment that is not depleted of oxygen.[48] The aspirates were obtained after a meal and a water-perfused manometry. The amount of bacteria in the proximal gastrointestinal tract is thought to increase soon after a meal,[11] whereas the water-perfused manometry could instead result in a dilution and a lower count of bacteria. However, none of these explanations are likely to explain the differences seen between patients with IBS and controls.

Few of the cultures were completely negative, possibly indicating contamination with oral flora, which is known to be common.[49] The patients tended to have higher counts of bacteria, possibly owing to a slightly impaired ability to rinse

**Table 3** Motility parameters

| | Patients with IBS without SIBO (n = 74) | SIBO (n = 7) | After treatment (n = 7) |
|---|---|---|---|
| MI phase II (mm Hg×s) | 6700 (3500) | 7700 (3000) | 7000 (2200) |
| MI postprandial (mm Hg×s) | 12 900 (6400) | 10 300 (4000) | 12 000 (3000) |
| Phase III duration (s) | 330 (120) | 384 (144) | 406 (90) |
| Propagation velocity phase III (cm/min) | 13.9 (8.9) | 15.1 (6.4) | 13.1 (9.1) |
| Number of phase III activities/3 h | 1.4 (0.8) | 0.9 (0.8)* | 0.7 (0.5) |
| MMC cycle length (min) | 90 (41) | 99 (39) | 113 (39) |

IBS, irritable bowel syndrome; MI, motility index; MMC, migrating motor complex; SIBO, small intestinal bacterial overgrowth.
Results from the small-bowel manometries in patients with IBS with and without SIBO according to the standard definition, before and after treatment (mean (SD)). MI is presented as the mean value of measurements from the proximal and distal duodenum and the jejunum. The results of phase III duration and propagation are from the distal duodenum. Patients with SIBO tended to have fewer phase III activities compared with those without SIBO.
*p = 0.08.

the upper bowel of bacteria in IBS, as suggested previously.[15 24] In line with this, the patients with culture-verified SIBO had fewer phase III activities, which is thought to be one of the most important mechanisms in the protection against colonisation by rinsing the bowel.[7 8] Most of the patients also had enteric dysmotility, as defined by the criteria in box 1. However, this was also seen in several patients without SIBO, making it impossible to predict the presence of overgrowth just by analysis of the small-bowel motility patterns. We did not perform a formal correlation analysis between the amount of bacteria and the degree of abnormality of MMC, as this cannot be easily quantified. The duration of our manometry recordings were, for practical reasons, relatively short, possibly diminishing the clinical value of our manometries, and of course a possibility that a longer recording time could have discovered an even larger proportion of patients with motor abnormalities. Moreover, the short duration of our recording also made it impossible to assess the cycle length of the MMC in subjects without or with one phase III activity during the 3 h recording. However, the lack of group differences is unlikely to be explained by this.

Except for impaired motility, failure of the gastric-acid barrier is also known to predispose to bacterial colonisation in the small bowel.[7] No drugs known to affect the gastrointestinal tract were allowed within 48 h before the study. However, prior to this, we did not control for use of proton pump inhibitors or other antacids that could affect the bacterial flora of the intestine.[50 51] One might expect the use of these drugs to be more frequent in patients with IBS, considering the high overlap with functional dyspepsia.[1] This could be one explanation for alterations in the gut flora in patients with IBS, even though our study did not assess this in detail.

The importance of mildly increased small-bowel bacteria seen in IBS is unclear. This could just be an epiphenomenon due to altered motility. The bacteria could also be the cause of the observed motility alterations. To some extent, the fact that there were no significant differences in the motility parameters before and after treatment speaks against this. However, only seven patients with SIBO were evaluated, and four patients still fulfilled the criteria for SIBO after treatment. Further studies are needed to better characterise these bacterial alterations in IBS, including possible correlations to symptoms. Altered counts of bacteria could induce a low-grade inflammation, which also needs to be assessed in further studies looking at both systemic and local inflammatory activity, together with an evaluation of the presence of post-inflammatory IBS.

In conclusion, using several diagnostic methods including culture of jejunal aspirate and hydrogen breath tests, our results do not support a strong association between IBS and SIBO according to the standard definition. Most patients with high counts of bacteria were found to have minor uncharacteristic motility alterations, which may have been a predisposing factor in these cases. Of interest, but of uncertain relevance, a significant subset of patients with IBS seem to have mildly increased counts of bacteria in the upper gut. This finding, and the correlation with symptoms in IBS, needs to be evaluated in further studies.

## Authors' affiliations

**Iris Posserud, Per-Ove Stotzer, Einar S Björnsson, Hasse Abrahamsson, Magnus Simrén,** Department of Internal Medicine, Sahlgrenska University Hospital, Göteborg, Sweden

Funding: This study was supported by the Swedish Medical Research Council (grant number 13409), and by the Faculty of Medicine, University of Göteborg.

Competing interests: None.

## REFERENCES

1 **Agréus L**, Svärdsudd K, Nyrén O, *et al*. Irritable bowel syndrome and dyspepsia in the general population: overlap and lack of stability over time. *Gastroenterology* 1995;**109**:671–80.
2 **Pimentel M**, Chow EJ, Lin HC. Eradication of small intestinal bacterial overgrowth reduces symptoms of irritable bowel syndrome. *Am J Gastroenterol* 2000;**95**:3503–6.
3 **Pimentel M**, Chow EJ, Lin HC. Normalization of lactulose breath testing correlates with symptom improvement in irritable bowel syndrome. A double-blind, randomized, placebo-controlled study. *Am J Gastroenterol* 2003;**98**:412–19.
4 **McCallum R**, Schultz C, Sostarich S. Evaluating the role of small intestinal bacterial overgrowth (SIBO) in diarrhea predominant IBS (IBS-D) patients utilizing the glucose breath test. *Gastroenterology* 2005;**128**:T1118.
5 **Corazza GR**, Menozzi MG, Strocchi A, *et al*. The diagnosis of small bowel bacterial overgrowth. Reliability of jejunal culture and inadequacy of breath hydrogen testing. *Gastroenterology* 1990;**98**:302–9.
6 **Stotzer P-O**, Simrén M. Use and abuse of hydrogen breath tests. *Gut* 2006;**55**:297–303.
7 **Husebye E**, Skar V, Hoverstad T, *et al*. Abnormal intestinal motor patterns explain enteric colonization with gram-negative bacilli in late radiation enteropathy. *Gastroenterology* 1995;**109**:1078–89.
8 **Vantrappen G**, Janssens J, Hellemans J, *et al*. The interdigestive motor complex of normal subjects and patients with bacterial overgrowth of the small intestine. *J Clin Invest* 1977;**59**:1158–66.
9 **Stotzer PO**, Björnsson ES, Abrahamsson H. Interdigestive and postprandial motility in small-intestinal bacterial overgrowth. *Scand J Gastroenterol* 1996;**31**:875–80.
10 **Gorbach SL**. Intestinal microflora. *Gastroenterology* 1971;**60**:1110–29.
11 **Drasar BS**, Shiner M, McLeod GM. Studies on the intestinal flora. I. The bacterial flora of the gastrointestinal tract in healthy and achlorhydric persons. *Gastroenterology* 1969;**56**:71–9.
12 **Simon GL**, Gorbach SL. Intestinal flora in health and disease. *Gastroenterology* 1984;**86**:174–93.
13 **King CE**, Toskes PP. Comparison of the 1-gram [14C]xylose, 10-gram lactulose-H2, and 80-gram glucose-H2 breath tests in patients with small intestine bacterial overgrowth. *Gastroenterology* 1986;**91**:1447–51.
14 **Bauer TM**, Schwacha H, Steinbruckner B, *et al*. Diagnosis of small intestinal bacterial overgrowth in patients with cirrhosis of the liver: poor performance of the glucose breath hydrogen test. *J Hepatol* 2000;**33**:382–6.
15 **Lin HC**. Small intestinal bacterial overgrowth: a framework for understanding irritable bowel syndrome. *JAMA* 2004;**292**:852–8.
16 **Rumessen JJ**, Gudmand-Hoyer E, Bachmann E, *et al*. Diagnosis of bacterial overgrowth of the small intestine. Comparison of the 14C-D-xylose breath test and jejunal cultures in 60 patients. *Scand J Gastroenterol* 1985;**20**:1267–75.
17 **Kerlin P**, Wong L. Breath hydrogen testing in bacterial overgrowth of the small intestine. *Gastroenterology* 1988;**95**:982–8.
18 **MacMahon M**, Lynch M, Mullins E, *et al*. Small intestinal bacterial overgrowth—an incidental finding? *J Am Geriatr Soc* 1994;**42**:146–9.
19 **Lipski PS**, Kelly PJ, James OF. Bacterial contamination of the small bowel in elderly people: is it necessarily pathological? *Age Ageing* 1992;**21**:5–12.
20 **Donaldson RM Jr**. Role of enteric microorganisms in malabsorption. *Fed Proc* 1967;**26**:1426–31.
21 **King CE**, Toskes PP. Small intestine bacterial overgrowth. *Gastroenterology* 1979;**76**:1035–55.
22 **Riordan SM**, McIver CJ, Walker BM, *et al*. The lactulose breath hydrogen test and small intestinal bacterial overgrowth. *Am J Gastroenterol* 1996;**91**:1795–803.
23 **Corazza G**, Strocchi A, Sorge M, *et al*. Prevalence and consistency of low breath H2 excretion following lactulose ingestion. Possible implications for the clinical use of the H2 breath test. *Dig Dis Sci* 1993;**38**:2010–16.
24 **Pimentel M**, Soffer EE, Chow EJ, *et al*. Lower frequency of MMC is found in IBS subjects with abnormal lactulose breath test, suggesting bacterial overgrowth. *Dig Dis Sci* 2002;**47**:2639–43.
25 **Nayak AK**, Karnad DR, Abraham P, *et al*. Metronidazole relieves symptoms in irritable bowel syndrome: the confusion with so-called 'chronic amebiasis'. *Indian J Gastroenterol* 1997;**16**:137–9.
26 **Dear KL**, Elia M, Hunter JO. Do interventions which reduce colonic bacterial fermentation improve symptoms of irritable bowel syndrome? *Dig Dis Sci* 2005;**50**:758–66.
27 **Sharara AI**, Aoun E, Abdul-Baki H, *et al*. A randomized double-blind placebo-controlled trial of rifaximin in patients with abdominal bloating and flatulence. *Am J Gastroenterol* 2006;**101**:326–33.
28 **Parisi G**, Leandro G, Bottona E, *et al*. Small intestinal bacterial overgrowth and irritable bowel syndrome. *Am J Gastroenterol* 2003;**98**:2572.
29 **Walters B**, Vanner SJ. Detection of bacterial overgrowth in IBS using the lactulose H2 breath test: comparison with 14C-D-xylose and healthy controls. *Am J Gastroenterol* 2005;**100**:1566–70.
30 **Riordan SM**, McIver CJ, Duncombe VM, *et al*. Small intestinal bacterial overgrowth and the irritable bowel syndrome. *Am J Gastroenterol* 2001;**96**:2506–8.
31 **Hasler WL**. Lactulose breath testing, bacterial overgrowth, and IBS: just a lot of hot air? *Gastroenterology* 2003;**125**:1898–900.
32 **Thompson WG**, Longstreth GF, Drossman DA, *et al*. Functional bowel disorders and functional abdominal pain. *Gut* 1999;**45**(Suppl 2):II43–7.
33 **Björnsson ES**, Abrahamsson H. Interdigestive gastroduodenal manometry in humans. Indication of duodenal phase III as a retroperistaltic pump. *Acta Physiol Scand* 1995;**153**:221–30.

34 **Rhodes JM**, Middleton P, Jewell DP. The lactulose hydrogen breath test as a diagnostic test for small-bowel bacterial overgrowth. *Scand J Gastroenterol* 1979;**14**:333–6.
35 **Wingate D**, Hongo M, Kellow J, *et al*. Disorders of gastrointestinal motility: towards a new classification. *J Gastroenterol Hepatol* 2002;**17**(Suppl):S1–14.
36 **Stanghellini V**, Camilleri M, Malagelada JR. Chronic idiopathic intestinal pseudo-obstruction: clinical and intestinal manometric findings. *Gut* 1987;**28**:5–12.
37 **Kellow JE**. Small intestine: normal function and clinical disorders. In: Schuster MM, Crowell MD, Koch KL, eds. *Schuster atlas of gastrointestinal motility in health and disease*. 2nd edn. Hamilton: BC Decker, 2002:219–36.
38 **Simrén M**, Castedal M, Svedlund J, *et al*. Abnormal propagation pattern of duodenal pressure waves in the irritable bowel syndrome (IBS). *Dig Dis Sci* 2000;**45**:2151–61.
39 **Husebye E**. The patterns of small bowel motility: physiology and implications in organic disease and functional disorders. *Neurogastroenterol Motil* 1999;**11**:141–61.
40 **Nucera G**, Gabrielli M, Lupascu A, *et al*. Abnormal breath tests to lactose, fructose and sorbitol in irritable bowel syndrome may be explained by small intestinal bacterial overgrowth. *Aliment Pharmacol Ther* 2005;**21**:1391–5.
41 **Sullivan Å**, Törnblom H, Lindberg G, *et al*. The micro-flora of the small bowel in health and disease. *Anaerobe* 2003;**9**:11–14.
42 **King TS**, Elia M, Hunter JO. Abnormal colonic fermentation in irritable bowel syndrome. *Lancet* 1998;**352**:1187–9.
43 **Nobaek S**, Johansson ML, Molin G, *et al*. Alteration of intestinal microflora is associated with reduction in abdominal bloating and pain in patients with irritable bowel syndrome. *Am J Gastroenterol* 2000;**95**:1231–8.
44 **Attar A**, Flourie B, Rambaud JC, *et al*. Antibiotic efficacy in small intestinal bacterial overgrowth-related chronic diarrhea: a crossover, randomized trial. *Gastroenterology* 1999;**117**:794–7.
45 **Bouhnik Y**, Alain S, Attar A, *et al*. Bacterial populations contaminating the upper gut in patients with small intestinal bacterial overgrowth syndrome. *Am J Gastroenterol* 1999;**94**:1327–31.
46 **Ferech M**, Coenen S, Malhotra-Kumar S, *et al*. European Surveillance of Antimicrobial Consumption (ESAC): outpatient antibiotic use in Europe. *J Antimicrob Chemother* 2006;**58**:401–7.
47 **Hart AL**, Stagg AJ, Graffner H, *et al*. *Gut ecology*. London: Martin Dunitz, 2002.
48 **Tally FP**, Stewart PR, Sutter VL, *et al*. Oxygen tolerance of fresh clinical anaerobic bacteria. *J Clin Microbiol* 1975;**1**:161–4.
49 **Hamilton I**, Worsley BW, Cobden I, *et al*. Simultaneous culture of saliva and jejunal aspirate in the investigation of small bowel bacterial overgrowth. *Gut* 1982;**23**:847–53.
50 **Fried M**, Siegrist H, Frei R, *et al*. Duodenal bacterial overgrowth during treatment in outpatients with omeprazole. *Gut* 1994;**35**:23–6.
51 **Stockbrugger RW**, Cotton PB, Eugenides N, *et al*. Intragastric nitrites, nitrosamines, and bacterial overgrowth during cimetidine treatment. *Gut* 1982;**23**:1048–54.

# EDITOR'S QUIZ: GI SNAPSHOT

## Answer

*From question on page 762*

Histological analysis of the nodules disclosed hamartomatous polyps. Figures 1 and 2 show finger-like projections with a fibrotic axis run by numerous small capillaries, and surface squamous epithelium undergoing a severe orthokeratosis. In fact, this patient had Cowden's disease (CD) and no other member of her family was affected.

CD, also termed "multiple hamartoma syndrome", is a rare complex disease, inherited in an autosomal dominant condition with variable expression. Its prevalence has been estimated at about 1 in 250 000 in the Dutch population. It results, most commonly, from a mutation in the tumour suppressor gene *PTEN*. Mucocutaneous lesions are the most constant feature and include facial papules, oral papillomas and acral and palmoplantar keratoses. Digestive polyps are often present. Histologically, they are hamartomas in most cases, but lipomas, adenomas and ganglioneuromas have also been found, among others. They can occur in the oesophagus, stomach, small or large intestine but exceptional cases of anal hamartomas have been reported. CD is also associated with the development of several types of malignancy, which is why recognition of individuals with the disease is important. In particular, for these patients there is an increased risk of breast and thyroid carcinoma. On the other hand, it is unclear whether patients with CD have an increased risk for colon carcinoma. Clinical epidemiological studies have not shown that colon carcinoma is associated with CD. However, a few cases of colon carcinoma have been reported in CD. So, at the moment, it is difficult to know whether this association is a coincidence or whether there is a low but authentic risk of colon carcinoma in CD. Although, if there is, with increased knowledge of this disease, earlier diagnosis and appropriate surveillance of these patients for cancer might be possible.



**Figure 1** Hamartomatous polyp: finger-like projection with a fibrotic axis run by numerous small capillaries, and surface squamous epithelium undergoing a severe orthokeratosis.



**Figure 2** Hamartomatous polyp: finger-like projection with a fibrotic axis run by numerous small capillaries, and surface squamous epithelium undergoing a severe orthokeratosis.

doi: 10.1136/gut.2006.094276a

# EXHIBIT XX

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>NORWICH PHARMACEUTICALS, INC.,<br><br>Defendant. | Case No. 1:24-CV-07140-JFM |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT'S**
**FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFFS (NOS. 1–14)**

Under Rules 26 and 36 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), the applicable Local Rules for the United States District Court for the District of New Jersey ("the Civil Local Rules"), and the Definitions and Instructions that follow, Plaintiffs Salix Pharmaceuticals, Inc., Salix Pharmaceuticals, Ltd., and Bausch Health Ireland, Ltd. (collectively, "Salix" or "Plaintiffs"), provide the following Responses and Objections to Defendant Norwich Pharmaceuticals, Inc.'s ("Defendant") First Set of Requests for Admission to Plaintiffs (Nos. 1–14), dated June 18, 2025 ("Requests").

Plaintiffs based their responses on documents and information currently available to them. The information herein is true and correct to Plaintiffs' best knowledge. The responses and objections herein are given without prejudice to Plaintiffs' rights to produce evidence of any subsequently discovered facts, documents, or interpretations thereof, or to modify, change or amend their responses and objections, and to correct for errors, mistakes, or omissions.

irritable bowel syndrome with diarrhea and describes "bloating" as a symptom of that condition. *Id.* at –588 (§ 14.3, titled "Irritable Bowel Syndrome with Diarrhea," describing symptoms including "bloating."). The Xifaxan® Label also makes clear that "adults" includes female subjects. *Id.* at –574–576 (§ 6.1 explaining that three placebo-controlled clinical studies in adult patients conducted to examine the efficacy of rifaximin for the treatment of IBS-D in an IBS-D population, where 72% of patients were female). Moreover, Section 14.3 of the Xifaxan® Label describes studies that established "[t]he efficacy of Xifaxan® for the treatment of IBS-D" in adult patients, including female subjects, where "bloating" was clinically assessed and reported as a symptom of IBS-D. *Id.* at –588–592, tbls. 6-8.

**REQUEST FOR ADMISSION NO. 6**

Section 2.3 ("Dosage for Irritable Bowel Syndrome with Diarrhea") of the Xifaxan® Prescribing Information does not state a recommended dosage of Xifaxan® (550 mg rifaximin tablets) for the treatment of bloating associated with diarrhea predominant irritable bowel syndrome (IBS-D) in adult female subjects.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

In addition to the foregoing General Objections and Objections to Definitions, Plaintiffs specifically object to this Request as vague and ambiguous with respect to the terms "recommended dosage" and "associated."

Subject to and without waiving the foregoing objections, and reserving the right to supplement this Response, if necessary, at the appropriate time, Plaintiffs respond as follows:

Plaintiffs deny Request No. 6. Section 2.3 of the Xifaxan® Approved Label, dated October 2023, states the "recommended dosage of XIFAXAN is 550 mg taken orally three times a day for 14 days. Patients who experience a recurrence of symptoms can be retreated up to two times with the same dosage regimen." *See* Norwich_NJ_RIFAX_028569 at –572. Physicians or users of Xifaxan® (550 mg rifaximin tablets) would not read Section 2.3 of the Xifaxan® Label in isolation;

rather, they would read Section 2.3 in context, including the Label's "Clinical Studies" section. *See id.* at –584 (§ 14). Section 14.3 of the Xifaxan® Label discusses irritable bowel syndrome with diarrhea and describes "bloating" as a symptom of that condition. *Id.* at –588 (§ 14.3, titled "Irritable Bowel Syndrome with Diarrhea," describing symptoms including "bloating."). The Xifaxan® Label also makes clear that "adults" includes female subjects. *Id.* at –574–576 (§ 6.1 explaining that three placebo-controlled clinical studies in adult patients conducted to examine the efficacy of rifaximin for the treatment of IBS-D in an IBS-D population, where 72% of patients were female). Moreover, Section 14.3 of the Xifaxan® Label describes studies that established "[t]he efficacy of Xifaxan® for the treatment of IBS-D" in adult patients, including female subjects, where "bloating" was clinically assessed and reported as a symptom of that condition. *Id.* at –588–592, tbls. 6-8.

**REQUEST FOR ADMISSION NO. 7**

Section 14.3 ("Irritable Bowel Syndrome with Diarrhea") of the Xifaxan® Prescribing Information does not state efficacy data for the treatment of bloating associated with diarrhea predominant irritable bowel syndrome (IBS-D) in adult female subjects.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

In addition to the foregoing General Objections and Objections to Definitions, Plaintiffs specifically object to this Request as vague and ambiguous with respect to the terms "efficacy data" and "associated."

Subject to and without waiving the foregoing objections, and reserving the right to supplement this Response, if necessary, at the appropriate time, Plaintiffs respond as follows:

Plaintiffs deny Request No. 7. Section 14.3 of the Xifaxan® Approved Label, dated October 2023, describes the efficacy data for the treatment of IBS-D, including symptoms such as "bloating." *See* Norwich_NJ_RIFAX_028569 at –588 (§ 14.3, titled "Irritable Bowel Syndrome with Diarrhea" describing symptoms, including "bloating"). Section 14.3 further describes "3

randomized, multi-center, double-blind, placebo-controlled trials in adult patients," including female subjects. *Id*. Physicians or users of Xifaxan® (550 mg rifaximin tablets) would not read Section 14.3 of the Xifaxan® Label in isolation; rather, they would read Section 14.3 in context, including the Label's "Adverse Reactions" section. *See id*. at –574 (§ 6). Under the heading "Clinical Trials Experience," Section 6.1 of the Xifaxan® Label makes clear that "adults" includes female subjects. *Id.* at –574–576 (§ 6.1 explaining that three placebo-controlled clinical studies in adult patients conducted to examine the efficacy of rifaximin for the treatment of IBS-D in an IBS-D population, where 72% of patients were female). In addition, Section 14.3 of the Xifaxan® Label describes studies that established "[t]he efficacy of Xifaxan® for the treatment of IBS-D" in adult patients, including female subjects, where "bloating" was clinically assessed and reported as a symptom of that condition. *Id.* at –588–592, tbls. 6-8.

**REQUEST FOR ADMISSION NO. 8**

Clinicians prescribed rifaximin tablets to female patients for the treatment of irritable bowel syndrome in the United States before February 26, 2008.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

In addition to the foregoing General Objections and Objections to Definitions, Plaintiffs specifically object to this Request as vague and ambiguous with respect to the terms "clinician," "rifaximin tablets," and "prescribed."

Subject to and without waiving the foregoing objections, and reserving the right to supplement this Response, if necessary, at the appropriate time, Plaintiffs admit rifaximin tablets were provided to female patients for the treatment of irritable bowel syndrome in the United States before February 26, 2008. Plaintiffs deny the remainder of Request No. 8.

**REQUEST FOR ADMISSION NO. 9**

Clinicians prescribed rifaximin tablets to female patients for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in the United States before February 26, 2008.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

In addition to the foregoing General Objections and Objections to Definitions, Plaintiffs specifically object to this Request as vague and ambiguous with respect to the terms "clinician," "rifaximin tablets," and "prescribed."

Subject to and without waiving the foregoing objections, and reserving the right to supplement this Response, if necessary, at the appropriate time, Plaintiffs respond as follows:

Plaintiffs made a reasonable inquiry into the information sought in this Request; however, the knowledge and information possessed and readily obtainable by Plaintiffs is insufficient to enable them to admit or deny Request No. 9.

**REQUEST FOR ADMISSION NO. 10**

Xifaxan® (200 mg rifaximin tablets) was the only rifaximin drug approved for use in the United States before February 26, 2008.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

In addition to the foregoing General Objections and Objections to Definitions, Plaintiffs specifically object to this Request as vague and ambiguous with respect to the terms "rifaximin drug" and "use." Plaintiffs also object to this Request as overbroad and not proportional to the needs of the case to the extent it seeks information relating to Xifaxan® tablets, 200 mg.

Subject to and without waiving the foregoing objections, and reserving the right to supplement this Response, if necessary, at the appropriate time, Plaintiffs admit that in 2004, rifaximin was approved for commercial use under the tradename Xifaxan® (200 mg rifaximin tablets). Plaintiffs deny the remainder of Request No. 10.

**REQUEST FOR ADMISSION NO. 11**

Salix Pharmaceuticals, Inc. distributed Xifaxan® (200 mg rifaximin tablets) in the United States before February 26, 2008.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

In addition to the foregoing General Objections and Objections to Definitions, Plaintiffs specifically object to this Request as vague and ambiguous with respect to the terms "distributed." Plaintiffs also object to this Request as overbroad and not proportional to the needs of the case to the extent it seeks information relating to Xifaxan® tablets, 200 mg.

Subject to and without waiving the foregoing objections, and reserving the right to supplement this Response, if necessary, at the appropriate time, Plaintiffs admit that Salix Pharmaceuticals, Inc. distributed Xifaxan® (200 mg rifaximin tablets) in the United States as of December 31, 2008. Plaintiffs deny the remainder of Request No. 11.

**REQUEST FOR ADMISSION NO. 12**

Salix Pharmaceuticals, Inc. earned revenue from sales of Xifaxan® (200 mg rifaximin tablets) dispensed to fill prescriptions for the treatment of irritable bowel syndrome in female patients before February 26, 2008.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

In addition to the foregoing General Objections and Objections to Definitions, Plaintiffs specifically object to this Request as vague and ambiguous with respect to the terms "earned revenue," "sales," and "dispensed to fill." Plaintiffs also object to this Request as overbroad and not proportional to the needs of the case to the extent it seeks information relating to Xifaxan® tablets, 200 mg.

Subject to and without waiving the foregoing objections, and reserving the right to supplement this Response, if necessary, at the appropriate time, Plaintiffs respond as follows:

Plaintiffs made a reasonable inquiry into the information sought in this Request; however, the knowledge and information possessed and readily obtainable by Plaintiffs is insufficient to enable them to admit or deny Request No. 12.

Plaintiffs made a reasonable inquiry into the information sought in this Request; however, the knowledge and information possessed and readily obtainable by Plaintiffs is insufficient to enable them to admit or deny Request No. 14.

Dated: July 25, 2025

By: */s/ Harvey Bartle IV*
Harvey Bartle IV
**MORGAN, LEWIS & BOCKIUS LLP**
502 Carnegie Center
Princeton, NJ 08540-6241
Phone: (609) 919-6600

OF COUNSEL
Michael J. Abernathy
Wan-Shon Lo
Maria Doukas
**MORGAN, LEWIS & BOCKIUS LLP**
110 North Wacker Drive
Chicago, IL 60606-1511
Phone: (312) 324-1000

Margaret A. McGreal
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Phone: (215) 963-5000

*Attorneys for Plaintiffs Salix Pharmaceuticals, Inc., Salix Pharmaceuticals, Ltd., and Bausch Health Ireland Ltd.*

# EXHIBIT YY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SALIX PHARMACEUTICALS, LTD,; )
SALIX PHARMACEUTICALS, INC.,; )
BAUSCH HEALTH IRELAND LTD,; )
ALFASIGMA S.P.A., )
)
Plaintiffs, )
) C.A. No. 20-430-RGA
v. )
) Trial Volume II
NORWICH PHARMACEUTICALS, INC., )
)
Defendant. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Tuesday, March 22, 2022
8:28 a.m.
Bench Trial

BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: KAREN JACOBS, ESQUIRE

-and-

VENABLE LLP
BY: SCOTT K. REED, ESQUIRE
BY: STEVEN C. KLINE, ESQUIRE
BY: SHANNON K. CLARK, ESQUIRE

For the Plaintiffs

brain.

Now, back in 2008, we were also using tricyclic antidepressants because they modified pain at -- they modify activity in pain centers in the brain, and because we thought there were defects in brain-gut communication, we thought that would be beneficial. Also, the only FDA-approved product for the treatment of irritable bowel syndrome with diarrhea in 2008 would have been alosetron, and that was only approved for women with severe irritable bowel syndrome with diarrhea. But that worked by binding to a receptor in the enteric nervous system of the gut, and we might use probiotics, which are just live bacteria in a capsule, in hopes that's going to somehow change the kind of bacteria that live inside the colon. And we may try to identify foods that trigger the symptoms and have the patients stop using those foods.

Q. So in managing IBS-D, how do physicians assess the patient's symptoms?

A. So, this is a picture on the slide of what's called the Bristol Stool Scale. I literally have big posters of this on the walls of my exam room, and a picture is worth a thousand words, so I'll have the patient look at the poster and say what's your bowel habit like when you're having severe symptoms?

And they may look at this and say, you know,

gosh, Dr. Schoenfeld, you know, a few days a week I just get this intense cramping and all of a sudden I rush to the bathroom and pass these Type 6 or 7 stools. And then I'll also ask the patients some more questions to help characterize the intensity of their symptoms and the frequency of their symptoms of bloating or cramping.

Q. What do you ask about pain?

A. So, with respect to pain, I'll ask the patient where is it located in their abdomen, how often it occurs, when it does occur, how intense that pain is. So, those are some specific questions I will ask.

Q. Does IBS-D affect a patient's quality of life?

A. Sure. As a physician who's really devoted myself and my career to taking care of these patients, it's sometimes disheartening to me that physicians will minimize the impact of irritable bowel syndrome on their patients' quality of life. You know, I have many patients who have, I mean, literally started crying in my office because they'll tell me they're afraid, back when we used to actually go to meetings, they're afraid to go to a meeting with their staff because they might have to rush out to go to the bathroom because of explosive loose, watery stools. And you know, in the afternoon, they begin to get a little bit of cramping, and they don't want to go to their kid's soccer game because they're worried they're going to end up doubled up and cause

a scene at their kid's soccer game, and so they just stay home. So you know, patients with irritable bowel syndrome frequently have a big detriment in their quality of life due to their symptoms, although it's not a fatal disorder.

Q. I'd like you to come and look at your binder because I want to ask one of the terms in Claim 2 of the '569 patent. Claim 2 refers to adequate relief of symptoms. Is that a phrase that you're familiar with?

A. Yes. "Adequate relief of symptoms" is a term of the art that was the primary endpoint that was used in IBS treatment trials circa 2008 as well as reflecting what we ask patients about when we see them after a treatment.

Q. Does the '569 patent address adequate relief?

A. The '569 patent does address adequate relief, and, as you can see on this slide, it specifically states that in one embodiment, adequate relief of bowel disease symptoms comprises an affirmative response, e.g. yes, from a subject if asked whether they have had adequate relief of symptoms of bowel disease. In one embodiment, adequate relief of bowel disease symptoms comprises a reduction of bowel disease symptoms.

And per the schematic at the bottom of that slide, I think it's very important to emphasize that I, and hopefully a POSA circa 2008, would proactively educate their patients that an IBS treatment is unlikely to produce

complete resolution of symptoms. When I start a patient on a treatment, I educate the patient that decreasing the frequency of your symptoms and reducing the severity of your symptoms when it does occur is my goal. In other words, I'm trying to adequately relieve their symptoms while educating the patient complete relief is unlikely to occur.

Q. Who is it that assesses whether there is adequate relief of the IBS-D symptoms?

A. Ultimately, it's the patient. This is a disorder that's characterized by the patient's subjective assessment of their bloating and cramping and loose, watery stools. As a physician, I may ask some specific questions to guide the discussion.

Q. Now, in clinical practice, do physicians assess adequate relief based on the yes-or-no question?

A. Sure. After I've started a treatment on a patient and I see them back two months later, when I come in the room and sit down, my first question is: How are you feeling? Are you doing better compared to the last time you saw me? And the patient may say, no, unfortunately, I'm not doing any better. Or the patient may say, yes, you know, I'm really doing better. And then we go into more detail, but that patient interaction really reflects the initial primary endpoint, which is have you had adequate relief of your symptoms.

Q. In clinical practice, do physicians assess adequate relief based on the symptomology?

A. Sure. And they may use that Bristol Stool Scale that I showed as well as specific questions about frequency of abdominal pain and severity of abdominal pain.

Q. Now, in clinical trials, do researchers assess adequate relief based on yes-or-no questions?

A. Yes. And as you see on this slide here, this actually comes from the Xifaxan clinical trials target one and target two. And as you can see from this slide, the endpoint that was the preferred FDA endpoint for IBS treatment trials and that was also commonly used in IBS treatment research was to say to a patient something along the lines that you see here. You know, in regards to your IBS symptoms, compared to the way you felt before you started this study medication, have you, in the past seven days, had adequate relief of your IBS symptoms, yes or no?

Q. And where is this quote coming from?

A. This is actually coming from the Xifaxan label, and, again, this is the question that was asked in order to assess improvement from target 1 and 2, which were the first two pivotal Phase III trials used with Xifaxan.

Q. So, in clinical trials, do researchers assess adequate relief based on symptom reduction?

A. Sure. So, in 2012, the FDA provided updated

guidance. They had gathered a team and looked at what we call patient reported outcomes in order to produce a more numeric or quantitative approach to adequate relief. And they determined, as you see at the bottom of the slide here, that if a patient had at least a 30 percent improvement from baseline in their weekly average abdominal pain score based on the daily question, what was your worst abdominal pain today, and had at least a 50 percent reduction in the number of days in a week with daily stool consistency of a Bristol Stool Scale Type 6 or 7 compared with baseline, that if you had both of those, that numeric change in your bowel symptoms in your abdominal discomfort symptoms equaled a response.

Of course, as you can tell from that definition, it's not talking about a hundred percent improvement in your abdominal pain. It's not talking about a hundred percent reduction in your stool consistency.

Q. And where are you quoting this from?

A. This is, again, in the Xifaxan label, and this is for the target 3 clinical trial, which was an additional trial that the FDA requested that Salix perform prior to approval.

Q. I think you called it a responder analysis?

A. I may have.

Q. Would a POSA understand that this responder analysis or the target 3 clinical trial endpoint that's on slide 20,

would they understand that that endpoint reflects adequate relief of IBS-D symptoms?
A. Yes. In my opinion, a POSA would understand that. That a person of ordinary skill in the art realizes the FDA has decided this is the appropriate definition to say a patient has gotten adequate relief, that they have gotten better in terms of an important improvement in their abdominal pain and in an important reduction in loose, watery stools.
Q. But at the end of the day, who's the person that's ultimately deciding whether or not they have adequate relief?
A. At the end of the day, it's still the patient that tells me whether or not they feel like they're adequately improved or not.
Q. So, Claim 2 of the '569 patent also refers to something called a durability of response. Are you familiar with that phrase?
A. I am.
Q. What is that?
A. So durability of response refers to the idea that with respect to rifaximin that once I complete 14 days of treatment with antibiotics that I will continue to have adequate relief of my symptoms beyond completing the antibiotic course. If I had to take antibiotics every

single day, then that would be problematic.

So durability of response means I continue to have adequate relief of my symptoms for a certain number of weeks after I complete 14 days of antibiotics.

Q. Is this a concept that's discussed in the '569 patent?

A. It is. And as you can see on the slide here, it specifically says in the '569 patent that as used here in, durability of response includes, for example, adequate relief of symptoms after removal of treatment. And also it goes on to say that the response may be measured, for example, using a subject's subjective assessment of their symptoms or a health care provider's or caretaker's assessment of the subject's symptoms.

Q. So in clinical practice, how would the durability of response be measured?

A. So, in clinical practice, you're essentially asking a patient, you know, how they have done since I last saw them. If the patient says to me, I felt good for the two weeks I was taking the antibiotics, but two days after I stopped them, I went back to feeling horrible again, then there's no durability of response.

Q. So, I want to turn now to the FDA approval of Xifaxan and the resulting drug product label. Are you familiar with the FDA approval process for IBS drugs?

A. I am. I've been fortunate to be involved in the drug development process, or I should say I've been fortunate to be a consultant during the drug development process and the FDA approval process for every drug the FDA has approved for irritable bowel syndrome in the last 20 years as well as being involved in the drug development and FDA approval process for many drugs that did not actually get FDA approval.

Q. So, are you familiar with the FDA approval process for Xifaxan?

A. I am. I was a consultant for Salix during the process.

Q. What was the first clinical study that Salix conducted?

A. So, as you can see on the schematic here, Salix first filed their investigational new drug application in May of 2000 -- excuse me November of 2005. Ultimately, it took ten years to get approval, and it was a long and detailed process, as you'll see.

So, shortly after filing that investigational new drug application, they conducted what's called RFIB 2001. That's a Phase II B study that's intended to try to find the best dose and duration for using Xifaxan to effectively and safely treat irritable bowel syndrome with diarrhea.

And as you can see on the slide, multiple different dosages and durations were used. Specifically, they looked at using 275 milligrams twice a day for 14 days. They looked at 550 milligrams twice a day for 14 days. They looked at 1,100 milligrams twice a day for 14 days. They looked at 550 milligrams twice a day for 28 days, and then they had a placebo arm for comparison.

Q. Is this clinical trial in the Xifaxan label?

A. I don't believe so.

Q. So, what were the results of this clinical trial?

A. Confusing. And to be specific, the 550-milligram-twice-a-day dose for 14 days met the primary endpoint for adequate relief of IBS symptoms as measured in this trial. However, using the same dose, 550 milligrams twice a day, for 28 days did not achieve a significant improvement in responders compared to placebo.

Using higher doses, 1,100 milligrams twice a day for 14 days also did not achieve more responders compared to the placebo for adequate relief. But when we just looked at abdominal pain improvement, it showed significant improvement just in abdominal pain at that dose.

So, as I recall, the consultants -- and I began to work as a consultant after this study was completed. When different IBS experts were brought in to look at the results, they looked at this and were confused about what

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SALIX PHARMACEUTICALS, LTD, ; )
SALIX PHARMACEUTICALS, INC., ; )
BAUSCH HEALTH IRELAND LTD,; )
ALFASIGMA S.P.A., )
)
Plaintiffs, )
) C.A. No. 20-430-RGA
v. )
) Trial Volume III
NORWICH PHARMACEUTICALS, INC., )
)
Defendant. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Wednesday, March 23, 2022
8:29 a.m.
Bench Trial

BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: KAREN JACOBS, ESQUIRE

-and-

VENABLE LLP
BY: SCOTT K. REED, ESQUIRE
BY: STEVEN C. KLINE, ESQUIRE
BY: SHANNON K. CLARK, ESQUIRE

For the Plaintiffs

to chronic fatigue syndrome. Would a POSA rely on data from a chronic fatigue study to reasonably predict the efficacy of rifaximin and IBS-D?

A. No.

Q. Why not?

A. It's -- chronic fatigue syndrome is a different disorder than irritable bowel syndrome. It's certainly possible that an individual could have both chronic fatigue syndrome and irritable bowel syndrome, but using an antibiotic to treat small intestinal bacterial overgrowth with the hope -- I emphasize that word, hope -- that it might improve the chronic fatigue symptoms is -- is not reflective of what might happen with irritable bowel syndrome symptom.

MS. CLARK: Plaintiffs move to introduce into evidence PTX 1029, PTX 2507, PTX 675, PTX 684, and PTX 694.

MR. MURPHY: No objection, Your Honor.

THE COURT: Admitted without objection.

(PTX Exhibit No. 675, PTX Exhibit No. 684, PTX Exhibit No. 694, PTX Exhibit No. 1029, and PTX Exhibit No. 2507 were admitted into evidence.)

BY MS. CLARK:

Q. Would a POSA have been familiar with Pimentel 2006?

A. Yes.

Q. Would a POSA have understood whether or not this

study included different subtypes of IBS?
A. A POSA would understand that this study included patients with irritable bowel syndrome and that it was not limited to any specific subtype of IBS.
Q. And if with he could pull up Pimentel 2006. JTX 53.
And if we could scroll down to the table -- or it's really a figure. Keep going. It's the one with all the dots and the lines connected. There we go.
Would a person of ordinary skill in the art as of 2008 have understood how Pimentel 2006 assessed patients' symptoms?
A. I think that's very debatable, based on the data that's provided in the method section of the manuscript.
Q. Based on your understanding of the study design, how did Pimentel 2006 measure the primary endpoint?
A. Sure. So, in the 2006 publication Dr. Pimentel used, did look at global improvement in IBS symptoms. However, he used a statistical model and a visual analog scale that, to the best of my knowledge, has not been used in any prior IBS treatment randomized control trial, nor has it been used again in any subsequent IBS treatment randomized control trial. Specifically, he had patients look at a scale from zero to a hundred and put a line some place in that scale to say, I'm 20 percent better. Or I'm 50 percent better or 70 percent better. And then, and this is where it gets very

complicated, used a mixed method modeling analysis to try to account for what we call repeated measurements to, ultimately, produce a result for that primary endpoint.
Q. Was the primary endpoint based on the measurements at week ten?
A. It was not based solely on the measurements at week ten, to the best of my recollection.
Q. How was it calculated?
A. Okay. You would need more than my knowledge as a master's degree recipient in health research methodology. It's a very complicated biostatistical formula that's meant to account for dropouts and repeated measurements. But, again, they're trying to assess on a weekly basis what did the patients say about how much their global IBS symptoms were improved compared to baseline.
Q. Would a person of ordinary skill in the art have given weight to that kind of statistical analysis?
A. I think a person of ordinary skill in the art would have looked for guidance, probably, about how they should interpret the results of this article, since they probably would not have the grounding to truly understand that statistical analysis.
Q. So, let's go back to the slide, 28, and look at the results and the text.
How would a POSA have interpreted Pimentel 2006

results with respect to the primary endpoint?

A. So, with respect to the primary endpoint, what they would see is that the group main effect was significant with the P-value of 0.02. And then states -- and the group by week interactions and week effects were not significant, P = 0.78 and 0.96 respectively. I would offer that a POSA would not know what that last part meant.

And they would go down and be able to look at the rest of the secondary symptoms that were assessed.

Q. What would a POSA understand about the secondary symptoms?

A. Well, a POSA would see that, as is highlighted here on slide 28, that there was not significant improvement in abdominal pain. There was not significant improvement in diarrhea, not significant improvement in constipation symptoms. And they would see, though, that there had been significant improvement in bloating, based on the way these visual analog scales were used to try to assess improvement.

Q. What would a POSA in 2008 consider the hallmark symptoms of IBS-D to be?

A. Abdominal pain, diarrhea, and bloating for IBS with diarrhea. And frankly, a POSA would be a bit puzzled by why the primary endpoint would be positive but those secondary symptoms would not show any significant benefit.

Q. So, how would a POSA reconcile the global endpoint

with the secondary endpoints?

A. Okay. Ultimately, as I alluded to, I think you would look for some guidance about how to interpret these results beyond just what's published in the paper.

Q. Did Pimentel 2006 include a note from the editors?

A. It did.

Q. Would that have been significant to a POSA reading this paper?

A. It would.

Q. Why?

A. Well, to start, I can say, based on my own experience as previously serving as an associate editor for the American Journal of Gastroenterology, which was referenced here several times, as well as being an associate editor for the Journal of Gastroenterology, that's the primary publication of the American Gastrological Association, it's very infrequent that you would get a note similar to what you're seeing here on slide 29 from the editors about a research study. And to phrase it in my own words, this is, essentially, a red flag saying this is interesting data, hold your horses. Don't start thinking this is something that you should be doing in every one of your patients. That's my interpretation of it, I will say, based on that experience.

But to state it specifically, what the editors

doctor was saying he wanted to say some more stuff. PTX 681 and 452, there's no objection to their admission?

MS. CLARK: Well we're not going to try to enter that right now. I think those are -- might be references that we did not discuss.

THE COURT: Okay. All right. Well, so, get back to me on that.

BY MS. CLARK:

Q. So, let's turn to written description. Do you agree with Dr. Harary that the '569 patent does not adequately describe a durability of response comprising about 12 weeks of adequate relief of symptoms?

A. I disagree with him about that.

Q. So, what is the bowel disease that is the focus of the '569 patent?

A. So, the bowel disease that is the focus of the '569 patent is irritable bowel syndrome with diarrhea.

Q. And what support do you have for that?

A. As we can see on Slide 73, it's a Methods for Treating Diarrhea-Associated Irritable Bowel Syndrome, is the title.

Q. And then what else in the -- what else in the specification would suggest to a POSA or reasonably convey to a POSA that we're talking about irritable bowel syndrome?

A. The first line is "The present invention provides

methods of treating diarrhea-associated irritable bowel syndrome or IBS-D following rifaximin administration."

It then goes on to say disclosed herein et cetera. For treating bowel diseases. Abbreviated BDs and then at the end of the same paragraph saying subjects who may particularly benefit from this treatment include those who are or may be suffering from or susceptible to irritable bowel syndrome.

Q. And does the patent disclose the rifaximin dosage regimen to treat IBS-D?

A. It does.

Q. And where does it cite that?

A. As we can see on slide 74 here, it specifically states in one embodiment, the 650 milligrams is administered as 550 milligrams, three times a day. Above that in the sentence, it says that the administration will be for 14 days.

Q. And does the patent reasonably convey what effect rifaximin administration has?

A. It does.

Q. And if you could look at the summary section of the '569 patent. JTX 26.

A. And as displayed here, specifically the patent says, "In one aspect presented herein are methods of treating bowel disease with a durability of antibiotic response,

comprising administering a therapeutically effective amount of erythromycin-class antibiotic to a subject in need thereof, selecting subjects who respond to treatment after being treated for between about one and about 24 weeks, and removing a responding subject from treatment wherein after removal of treatment, there is a durability of response." And then goes on to say, "In one embodiment, the bowel disease comprises irritable bowel syndrome."

And this one embodiment, the bowel disease comprises diarrhea-associated irritable bowel syndrome.

Q. So, would a POSA understand what the response in the durability of response in the claim is?

A. A POSA would understand that there is -- once the antibiotic is stopped, any relief of IBS-D symptoms that occur while on the antibiotic does not immediately go away. When you complete 14 days of treatment, you continue to have relief of your IBS-D symptoms. And when I say relief, I should emphasize that means adequate relief for reduction in the frequency of your IBS-D symptoms and a reduction in the severity of those IBS-D symptoms when they do occur.

Q. You heard Dr. Harary point to the '569 patent to assert that a POSA would know that the response to the drug is based on a subjective assessment of subject's symptoms.

A. That is correct.

Q. And if we could have slide 76.

Does the patent provide guidance to a POSA on how to make that assessment in clinical practice?
A. Yes.
Q. And what does it say?
A. So, a subject's subjective assessment of their symptoms or health care provider's or care taker's assessment of a subject's symptoms can be used. In one embodiment, this is adequate relief of bowel disease symptoms. And in one embodiment, adequate relief of bowel disease symptoms comprises a reduction of bowel disease symptoms. And in one embodiment, adequate relief of bowel disease symptoms comprises an affirmative response, that is yes, from a subject, if asked whether they have had adequate relief of symptoms of bowel disease.
Q. So, in terms of the adequate relief that's claimed in Claim 2 of the '695 patent, would a POSA understand how to put that into practice or understand what the scope of that was?
A. Yes.
Q. Can you explain.
A. I will relate my experience as well as the experience of a POSA when they use rifaximin. If a patient comes back to my office four months after they receive their rifaximin and they -- and I ask them, so how are you doing compared to when I saw you last and started you on rifaximin? And the

patient says, I'm doing a lot better. And then I may go into some detail about the frequency and severity of symptoms, but I recognize that patient clearly has had adequate relief of their symptoms at that point, 16 weeks after I last saw them and prescribed antibiotics.

Q. So, let's turn to the Example 2, slide 79. Does the patent disclose an example of administering 550 milligrams of rifaximin three times a day for 14 days?

A. It does.

Q. How so?

A. It specifically says in Example 2 that "A study (Figure 3) is designed to evaluate the efficacy of a 14-day course of oral rifaximin at 550 milligrams three times a day." And Figure 3 is a reference to a figure that shows the study design for a randomized, double-blind, placebo controlled trial.

Q. And how does the specification describe Figure 3?

A. As a proposed study design for treatment with rifaximin to show durability of response.

Q. And other than the description of it and its notation in Example 2, is there any other reference to Figure 3 in the specification?

A. I believe so.

Q. Can we turn to Figure 3.

A. I could be mistaken. Yes.

Q. What does Figure 3 convey?
A. Figure 3 is a schematic of a study design for a randomized, double-blind -- hopefully double-blind -- placebo-controlled trial wherein a patient gets treated with medication for a period of 14 days. And then, ultimately, has a post-treatment phase of 12 weeks.
Q. And how long is the treatment period?
A. Treatment period is in this Figure 3. Treatment period is four weeks.
Q. And what's that consist of?
A. It consists of a combination of rifaximin for two weeks plus placebo for two weeks. It could even continue rifaximin for up to four weeks or placebo for up to four weeks.
Q. And if we could turn back to Example 2, slide 79. What's the length of the total treatment period in Example 2?
A. The length of the total treatment period in Example 2 is a 14-day course of oral rifaximin at 550 milligrams three times a day.
Q. And is that followed by a placebo period?
A. It is not, as I read it here in Example 2.
Q. What's it refer to when it refers to a four-week study duration?
A. A measure of efficacy based on the subject's answers

to the weekly subject global assessment question over the four-week study duration in relation to their IBS symptoms.
Q. And do you agree with Dr. Harary that the specification does not tie Figure 3 to a study of 550 milligrams three times a day for 14 days, but instead ties it to a twice-a-day dosing?
A. I understand that's his opinion, but I disagree with it. Example 3 clearly ties Figure 3 to using a dose of 14 days of rifaximin 550 milligrams three times a day.
Q. And then what is the post-treatment phase in Figure 3?
A. 12 weeks.
Q. And what is the purpose of the design in Figure 3?
A. To assess the durability of response.
Q. Do you agree with Dr. Harary that a POSA would not understand how to determine whether a patient has a durability of response?
A. With respect to individual patient-physician interactions or based on physician and the patient?
Q. So --
A. For some patients, the patient and the physician can definitely tell that you've had an adequate relief of your symptoms comprising about 12 weeks or more.
Q. Yeah. So, we're talking about, you know, would a POSA who's reading the claim language, would they understand

when the patient who's been administered rifaximin has had a durability of response comprising 12 weeks of adequate relief?

A. Yes.

Q. How would they know that?

A. Well, because you're recording data about the patient's absence or presence of IBS-D symptoms over that 12-week post-treatment phase.

Q. So, if we look at column 11, lines 44 through 45 of the patent, and do you see that there's a durability of response includes for example, and then there's three examples? Do you see that?

A. I do.

Q. Which of those examples is consistent with what's actually claimed in the patent?

A. Well, it's adequate relief of symptoms after removal of treatment. That's the first example in the '569 patent specifically. Specifically going on to say "Removing the subject from treatment after the 14 days resulted in durability of response wherein the durability of response comprises about 12 weeks of adequate relief of symptoms." And goes on to emphasize "wherein the 1,650 milligrams is administered at 550 milligrams three times a day.

Q. So, would a person of ordinary skill in the art understand that the adequate relief of symptoms after

removal from treatment in the claim, would they believe that this has to be continuous?
A. They would not. It specifically says in this example that it could be continuous adequate relief of symptoms after removal of treatment or a response that is greater than or superior to the placebo response.
Q. But are those two examples of durability of response what's claimed?
A. What's claimed is adequate relief of symptoms comprising about 12 weeks.
Q. And when does that occur?
A. After you had been removed from the 14 days of treatment of rifaximin.
Q. And do you agree with Dr. Harary that a POSA would not understand how to determine whether a patient has adequate relief because the result is subjective?
A. I disagree with that.
Q. Does the specification explain how to determine whether or not a patient has had adequate relief?
A. It does.
Q. And what information does it provide?
A. Well, as we see here on slide 84, the response be measured, for example, using one or more of the methods outlined below including the subject's subjective assessment of their symptoms.

And as I alluded to yesterday, we asked the patient, are you feeling better? Yes? No? And I may ask additional questions specifically about their bowel habits, and as I mentioned, you know, although it may not seem very polite to show, using the Bristol Stool Scale to have the patient tell me about how their stools are changing, using a scale, as we see also here on slide 84, to assess their level of abdominal pain.

Q. So, in clinical practice, would you, as a physician or would a POSA understand whether -- when they've administered rifaximin in 550 milligrams three times a day, would they be able to determine whether or not they've had a durability of response comprising about 12 weeks of adequate relief?

A. Yes.

Q. How so?

A. Because they're going to see the patient back in their office 12 weeks or -- after the patient took their two weeks of rifaximin. And the patient's subjective assessment of their symptoms as well as the physician asking some additional questions about specific symptoms is going to allow an assessment of whether or not the patient's had adequate relief. I may not be explaining that as precisely as I'd like, but as I believe came up, I think, during Mr. Murphy's cross-examination of me, you certainly know it

when you see it.

Q. Would a POSA be bothered by the fact that subjects are going to have different opinions on what is adequate relief to them?

A. A POSA who takes care of IBS patients recognizes that what constitutes adequate relief of symptoms may vary between individual IBS-D patients.

Q. But is a physician or a patient ever confused about whether or not there has been adequate relief?

A. In my experience, patients are quite clear with physicians about whether or not they have experienced adequate relief or whether they fear that they have not and want other treatments, and that they usually express that well to the physician, if the physician listens to the patient's symptoms.

Q. Okay. Just a few more questions about the patent claims.

THE COURT: All right. So, I thought maybe you'd be done.

All right. We'll take a break for 15 minutes.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: All right. Dr. Schoenfeld, why don't you come on back.

MR. REED: Your Honor, we're just having a little bit of a health difficulty here, and we are asking, with the Court's permission to let Ms. Steephenson finish the last five questions.

THE COURT: Yes, okay.

MR. REED: Okay.

THE COURT: That's all right. But just it appears as though your side doesn't have much time left. You're aware of this?

MR. REED: I am, Your Honor, and I was going to ask for one hour of extra time.

THE COURT: No. That's not the way it works.

MR. REED: Okay. Thank you, Your Honor.

THE COURT: Okay. All right.

Go ahead, Ms. Steephenson. Be quick, I imagine.

MS. STEEPHENSON: Thank you, Your Honor.

BY MS. STEEPHENSON:

Q. Okay. Dr. Schoenfeld, just a few quick questions for you. Do the IBS-D patents claim administering 550 milligrams three times a day?

A. Yes.

Q. Are the claimed dosage regimens that you mentioned for IBS-D specified instructed in the FDA approved label and prescribing information for Xifaxan 550?

A. Yes.

Q. Is prescribing Xifaxan 550 for IBS-D in accordance with the FDA approved label an embodiment of practicing those claimed methods?

A. Yes.

Q. Do physicians follow the FDA-approved label when prescribing Xifaxan 550 to IBS-D patients?

A. Yes.

Q. Do physicians and health care professionals recognize that the therapeutic benefits, safety, and efficacy of Xifaxan 550 for IBS-D is due to the claimed dosing regimens?

A. Yes.

Q. And last question. Do the asserted claims of the IBS-D patents require a specific polymorphic form of rifaximin?

A. No, not to the best of my knowledge.

MS. STEEPHENSON: No further questions, Your Honor.

THE COURT: Thank you, Ms. Steephenson.

Mr. Moore.

MR. MURPHY: May we approach with binder, Your Honor?

THE COURT: Sure.

MR. MURPHY: Thank you.

CROSS-EXAMINATION

BY MR. MURPHY:

# EXHIBIT ZZ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 20-430 (RGA) |
| NORWICH PHARMACEUTICALS, INC., | ) | |
| Defendant. | ) | |

**<u>PLAINTIFFS' ANSWERING POST-TRIAL BRIEF ON VALIDITY</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com
*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
Daniel A. Apgar
Alexis M. McJoynt
Damien N. Dombrowski
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 218-2100

Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5598

regimen." Def's Br. at 30-31. Neither is correct. First, the '569 patent makes clear it is about IBS-D, Tr. 812:14-813:8 (Schoenfeld), and so a POSA would understand that "durability of response" in the '569 patent is tied to IBS-D, not just "any medical condition." *See In re Wright*, 866 F.2d 422, 425 (Fed. Cir. 1989) (for written description "the specification as a whole must be considered"). Second, a POSA would recognize the connection between the dosage regimen in column 5 that "results in *a durability of response*" and "*duration of response, may be*, …" in column 11. *See* Tr. 813:9-814:20 (Schoenfeld); JTX 9 at 5:49-56, 11:44-57. This one-step connection is not the "amalgam of disclosures" "never linked together" that was insufficient in *Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *3, 4 (Fed. Cir. July 14, 2021) (unpublished). *Contra* Def's Br. at 31.

Norwich is also incorrect that the specification fails "to describe the specific 'durability of response' that is claimed." Def's Br. at 30. A durability of response of "12 weeks" is disclosed in: "[t]he duration of response, may be, for example, 2 days, 7 days, two weeks, 3 weeks, 4 weeks, *12 weeks*, between about 1 week and about 24 weeks or longer." JTX 9, 11:44-57 (emphasis added). *See Snitzer v. Etzel*, 465 F.2d 899, 902 (C.C.P.A. 1972) ("[T]here would seem to be little doubt that the literal description of a species provides the requisite legal foundation for claiming that species").[8] *Contra* Def's Br. at 31 and Tr. 688:4-9 (Harary). And Dr. Harary was incorrect that the specification fails to say what the Figure 3, 12-week post-treatment phase entails. *See* Tr. 686:8-17 (Harary). The specification discloses that "FIG. 3 shows a proposed study design for treatment with rifaximin *to show durability of response*." JTX 9 at 6:10-12 (emphasis added).

---

[8] This is not a situation in which the specification identifies a broad genus but claims a species. *See Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1370 (Fed. Cir. 2022) ("'Blaze marks' are not necessary where the claimed species is expressly described in the specification, as the 0.5 mg daily dosage is here.").

**D. Definiteness**

Norwich failed to prove that claim 2 of the ’569 patent is indefinite. How other courts have decided whether other claim terms are indefinite does not control the inquiry here; definiteness is a case-by-case assessment of “reasonableness.” *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377-78 (Fed. Cir. 2015) (*Nautilis III*) (Supreme Court’s “reasonable certainty standard” requires analysis of specification and POSA’s knowledge in the relevant art area); *see also Sonix Tech. Co. v. Publications Int’l, Ltd.*, 844 F.3d 1370, 1377-81 (Fed. Cir. 2017) (refusing to rashly apply *Datamize’s* “vagaries of any one person’s opinions” statement to hold “visually negligible” indefinite; “whether a claim is indefinite must be judged in light of the specification and prosecution history of the patent in which it appears”) (cleaned up).

“In the face of an allegation of indefiniteness, general principles of claim construction apply,” *Nautilus III*, 783 F.3d at 1377, and here, “adequate relief” and “durability of response” are terms with customary meanings to a POSA. Pls’ FoF ¶¶ 213-214. In IBS-D, there is no biomarker to determine successful treatment (e.g., like a blood test or CT scan). Tr. 507:24-508:7 (Schoenfeld). Rather, a POSA would recognize that patient-reported “adequate relief” was (and still is) used to determine IBS-D treatment success, and “the certainty necessary for definiteness is only that which is reasonable under the unique circumstances of the case and relevant industry or scientific discipline.” *Evonik Degussa GmbH v. Materia, Inc.*, 274 F. Supp. 3d 241, 245 (D. Del. 2017). That “adequate relief” is patient-dependent does not mean it is indefinite. *H. Lundbeck A/S v. Apotex Inc.*, No. 18-88-LPS, 2020 WL 777210, at *3 (D. Del. Feb. 18, 2020). And a Wisconsin district court’s opinion that a “you’ll know it when you see it approach” was not compatible with the definiteness requirement does not control here, nor is it the test set forth in *Nautilus*. *Contra* Def’s Br. at 29.

Even a “purely subjective” claim phrase is not *per se* indefinite, as Norwich’s own case

law makes clear. *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014) (court must look to the written description for guidance on "purely subjective" claim phrase). The '569 patent teaches an objective method for "adequate relief:" a "yes" response from a patient asked if they have had adequate relief. Pls' FoF ¶ 213. It explains that patients with physicians' help can consider symptom reduction to determine adequate relief. *Id. See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017) ("[A] claim is not indefinite if a [POSA] would know how to utilize a standard measurement method … to make the necessary measurement.").

Ostensibly as evidence that "adequate relief" lacks objectivity, Norwich offers one example: a 30% improvement from baseline in an IBS-D patient's abdominal pain may or may not be "adequate relief." Def's Br. at 29. A "30% improvement from baseline in … abdominal pain" was part one of a two-part endpoint Salix used to determine adequate relief in phase 3 trials; a patient had to have both abdominal pain *and* stool consistency improvement. Pls' FoF ¶ 213; JTX 74, § 14.3. Thus, a "30% improvement from baseline in … abdominal pain" "may or may not be 'adequate relief of symptoms'" only because abdominal pain was just half of adequate relief. *Id*. In any event, Norwich's example raises an infringement dispute, not an indefiniteness issue. *Presidio*, 875 F.3d at 1377 (application of claimed method to an individual case is a dispute "about whether there is infringement, not [a] dispute[] about whether the patent claims are indefinite").

Finally, Norwich asserts there is uncertainty on how to measure the "durability of response." Durability of response varies from patient-to-patient because it is a patient-reported outcome, Pls' FoF ¶ 214, but "[t]he test for indefiniteness is not whether infringement of the claim must be determined on a case-by-case basis." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020). Thus, patient-to-patient variation is not the method-driven difference that *Dow* and

*Teva* found problematic. *Contra* Def's Br. at 29-30. The specification offers objective criteria to determine if a patient has had about 12 weeks of adequate relief (i.e., a yes/no question), even if two patients have different opinions on what length is adequate to them. Pls' FoF ¶¶ 214-215.

## III. POLYMORPH PATENT VALIDITY

### A. Priority Date and Level of Skill in the Art

The priority date for the Polymorph Claims is November 7, 2003. Pls' FoF ¶ 216. Although offering different definitions of a POSA, both experts agree that their validity analyses would not change under either definition. Tr. 860:7-861:8 (Zaworotko); Tr. 936:21-937:13 (Myerson).

### B. No Anticipation

Norwich failed to prove claim 4 of the '199 patent is anticipated. The rifaximin *compound* had been known since the 1980s, but the fact that it is polymorphic was unknown publicly until the priority date. Pls' FoF ¶ 218. The inventors unexpectedly discovered the existence of rifaximin polymorphs, including rifaximin β, and that the key to synthesizing a specific crystalline form was controlling the temperature and length of time of the crystallization, and the drying parameters. Pls' FoF ¶ 229.

Norwich's anticipation defense is based on inherency because Norwich and its expert acknowledge that each and every element of claim 4 is not expressly disclosed in Cannata.[9] Pls' FoF ¶ 219. But Norwich has no direct evidence that any of Cannata's examples anticipate. Indeed, Norwich's expert, Dr. Zaworotko, did not try to recreate any example in Cannata. Pls' FoF ¶ 220.

Without direct evidence, Norwich must look outside Cannata to the Viscomi Declaration, Viscomi 2008, Braga, 2012, and Bacchi 2008, which are dated well after the priority date. Pls. FoF ¶ 221. Norwich uses these references not to shed light on what Cannata would have meant to a

[9] Cannata was considered during prosecution of the '199 patent. *Infra* note 12.

POSA, but to impermissibly fill Cannata's gaps. *See Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 726-27 (Fed. Cir. 1984). However, the post-dated references do not – indeed cannot – show that Cannata inherently results in rifaximin β with the claimed XRPD peaks and water content as an intermediate or final product *every time* those examples are practiced. *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-48 (Fed. Cir. 1995) (affirming no inherency where testing showed the prior art could yield crystals of the claimed polymorph or a different polymorph); *In re Armodafinil Pat. Litig. Inc.*, 939 F. Supp. 2d 456, 465 (D. Del. 2013).

Norwich failed to show that rifaximin β necessarily results when following the Cannata processes. It is undisputed that the batches of rifaximin tested in the Viscomi Declaration[10] did not yield rifaximin β every time. Pls' FoF ¶ 222. In fact, the batches contained a *different* polymorph or *mixtures* of different polymorphs. *Id.* That rifaximin β *may* result or *sometimes* results from following Cannata is insufficient. *Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1381 (Fed. Cir. 2018); *In re Armodafinil*, 939 F. Supp. 2d at 465.

Moreover, Dr. Zaworotko's reliance on post-filing Viscomi 2008 and Braga 2012, which disclose processes for preparing rifaximin that closely follow those in the '199 patent, Pls' FoF ¶ 223, to argue that rifaximin β forms as an intermediate in the Cannata examples is misplaced. Viscomi 2008 and Braga 2012 disclose processes for preparing rifaximin that significantly differ in the reactives, reaction steps, washing/filtering steps and crystallization steps compared to those in Cannata. Tr. 950:14-23 (Myerson); Pls' FoF ¶¶ 223-226. "Experiments that do not follow the prior art procedure alleged to inherently anticipate cannot show inherent anticipation." *Merck & Cie v. Watson Lab'ys, Inc.*, 125 F. Supp. 3d 503, 513 (D. Del. 2015) (cleaned up), *rev'd on other*

---

[10] Plaintiffs submitted the Viscomi Declaration to the Patent Office in 2006 in connection with a related patent application to overcome a rejection of the claims as anticipated by Cannata and Marchi. Tr. 879:5-11 (Zaworotko); Tr. 947:13-948:1 (Myerson); JTX 80, at ¶ 4.

*See Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*, 882 F. Supp. 2d 643, 702 (D. Del. 2012) (written description for chemical compounds requires only that the application "details relevant identifying characteristics such that the compound can be distinguished from other compounds") (cleaned up), *aff'd*, 555 F. App'x 961 (Fed. Cir. 2014) (same); *Yeda*, 837 F.3d at 1345-46 (application provided sufficient written description where no known protein other than the claimed protein had the disclosed and claimed characteristics). XRPD peaks at about 5.4°, 9.0°, and 20.9° 2θ – structural features common to the rifaximin β "genus" – were sufficient as of November 7, 2003 to distinguish rifaximin β from the other known rifaximin polymorphs. Pls' FoF ¶ 242.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com
*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
Daniel A. Apgar
Alexis M. McJoynt
Damien N. Dombrowski
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 218-2100

Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5598

June 2, 2022

# EXHIBIT AAA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) | |
| Plaintiffs, | ) | C.A. No. 20-430 (RGA) |
| v. | ) | |
| NORWICH PHARMACEUTICALS, INC., | ) | |
| Defendant. | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**
**ON INFRINGEMENT AND SECONDARY CONSIDERATIONS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com
*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
Daniel A. Apgar
Alexis M. McJoynt
Damien N. Dombrowski
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 218-2100

Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5598

April 28, 2022

89. **Rifaximin Dosage**. For the same reasons as in ¶¶ 59-60, Norwich will knowingly induce direct infringement of the rifaximin dosage element of claim 12: "administering to the subject between about 1000 mg to about 1200 mg of rifaximin daily."

90. **Co-administering Rifaximin and Lactulose.** Norwich's Label will encourage co-administration of rifaximin and lactulose. JTX 73, §§ 1.2, 14.2; 75:24-76:9 (Brown).

91. Norwich's "Indications and Usage" and "Clinical Studies" sections explain that "91% of the patients" in the randomized, double-blind clinical trial were using lactulose concomitantly." JTX 73, §§ 1.2, 14.2; Tr. 75:24-76:9 (Brown).

92. Patients in remission continue to be at risk of overt HE recurrence until they have a liver transplant or die. Tr. 71:25-72:2 (Brown); Tr. 155:2-20 (Berg). Today, the primary goal is to keep patients in remission of HE to avoid the debilitating consequences of overt HE episodes, and the bulk of the clinical trial enrollees took rifaximin and lactulose to achieve that goal. JTX 73, §§ 1.2, 14.2; Tr. 121:25-122:25 (Mahl); Tr. 75:24-76:9 (Brown). Thus, in clinical practice, if patients can tolerate lactulose, rifaximin will be co-administered with lactulose. Tr. 76:10-19 (Brown).

93. Thus, Norwich will knowingly induce direct infringement of the co-administration element of claim 12: "further comprising administering lactulose."

### 3. IBS-D Patent Claims

#### a) '667 Patent, Claim 3

94. Norwich is aware of the '667 patent. Uncontested Facts, ¶ 112.

95. Claim 3 of the '667 patent has 3 elements: (1) administering 550 mg of rifaximin three times a day for 14 days; (2) treating one or more symptoms of IBS-D; (3) in a subject 65 years of age or older. Tr. 502:7-14 (Schoenfeld); JTX 26 at claim 3.

96. A POSA would understand that “administering” in claim 3 (and claim 2 of the ’569 patent) means delivering into the body (*e.g.*, swallowing). Tr. 542:7-11 (Schoenfeld); Tr. 568:13-18 (Triadafilopoulos).

97. **Administering.** Norwich’s Label will encourage administration of “one 550 mg tablet taken orally three times a day for 14 days.” JTX 73, § 2.3; Tr. 533:16-23 (Schoenfeld); *see* Tr. 580:13-20 (Triadafilopoulos).

98. Thus, Norwich will knowingly induce direct infringement of the first element of claim 3: “administering, 550 mg of rifaximin TID for 14 days to the subject.”

99. **Treatment.** Norwich’s Label will encourage administering Norwich’s ANDA Product for “the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.” JTX 73, §§ 1.3, 14.3; Tr. 534:18-535:8 (Schoenfeld).

100. Thus, Norwich will knowingly induce direct infringement of the second element of claim 3: “treating one or more [d]IBS symptoms.”

101. **65 Years of Age or Older.** Norwich’s Label will encourage administering Norwich’s ANDA Product “in adults” with IBS-D, which includes subjects 65 years of age or older. JTX 73, §§ 1.3, 8.5; Uncontested Facts, ¶ 109; Tr. 534:1-15 (Schoenfeld).

102. Thus, Norwich will knowingly induce direct infringement of the third element of claim 3: “thereby treating one or more symptoms of IBS in the subject 65 years of age or older.”

### b) ’569 Patent, Claim 2

103. Norwich is aware of the ’569 patent. Uncontested Facts, ¶ 110.

104. The ’569 Patent has 2 elements: (1) administering 550 mg of rifaximin TID for 14 days; and (2) after stopping rifaximin, achieving a durability of response that comprises about 12 weeks of adequate relief of symptoms. JTX 9 at claim 2; Tr. 535:9-18 (Schoenfeld).

105. A POSA would understand "adequate relief of symptoms" in claim 2 of the '569 patent as a term of art reflecting the goal of IBS-D treatment—a positive response when a patient is asked if rifaximin has adequately relieved his/her symptoms. Tr. 514:9-518:15 (Schoenfeld); JTX 9 at 2:42-45, 2:50-51, 2:56-62.

106. A POSA would understand "durability of response" in claim 2 of the '569 patent as the extension of adequate relief beyond the 14 days that patients take the drug, the length of which is determined by asking patients how long they have had adequate relief of symptoms. Tr. 518:16-519:22, 554:1-555:1, 555:20-556:12 (Schoenfeld); JTX 9 at 11:44-48, 11:53-57.

107. Thus, a POSA would understand that a patient achieves a "durability of response comprising about 12 weeks of adequate relief of symptoms" when the patient reports 12 weeks after stopping rifaximin that her IBS-D symptom relief has been adequate. Tr. 536:2-537:11, 553:19-555:1, 555:20-556:12 (Schoenfeld); Tr. 580:25-581:8 (Triadafilopoulos); JTX 9 at 2:42-45, 2:50-51, 2:56-62, 11:44-48, 11:53-57.

108. **Administering.** Norwich's Label will encourage administration of "one 550 mg tablet taken orally three times a day for 14 days." JTX 73, § 2.3; Tr. 535:19-536:1 (Schoenfeld); *see* Tr. 580:13-20 (Triadafilopoulos).

109. Thus, Norwich will knowingly induce direct infringement of the first element of claim 2: "administering 1650 mg/day of rifaximin for 14 days to a subject in need thereof" "wherein the 1650 mg is administered as 550 mg three times per day."

110. **About 12 Weeks of Adequate Relief.** Norwich's Label will encourage administration of "one 550 mg tablet taken orally three times a day for 14 days" for the treatment of IBS-D, which inevitably will result in at least some patients having a durability of response

comprising about 12 weeks of adequate relief after stopping rifaximin. JTX 73, §§ 1.3, 2.3, 14.3; Tr. 539:12-540:4, 555:6-9 (Schoenfeld); Tr. 581:16-22 (Triadafilopoulos).

111. Norwich knows that it will be encouraging a durability of response comprising about 12 weeks of adequate relief after stopping rifaximin because that result is in section 14.3 of Norwich's Label. JTX 73, § 14.3; Tr. 537:21-539:18 (Schoenfeld).

112. Thus, Norwich will knowingly induce direct infringement of the second element of claim 2: "wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms."

## III. SECONDARY CONSIDERATIONS

### A. HE Patent Claims

#### 1. Long-Felt but Unmet Medical Need

113. Xifaxan® (rifaximin) 550 mg taken BID for 12 months or more (the claimed regimen) met a long-felt but unmet medical need for a way to prevent HE recurrence and maintain remission. Tr. 348:8-11, 348:20-349:9, 369:4-13, 401:17-403:16 (Brown); JTX 104 at 71; PTX 414 at 81.

114. As of October 8, 2008, management of HE was largely an experimental endeavor. Tr. 348:20-349:9, 351:24-353:12 (Brown). Although rifaximin 200 mg tablets were available outside the U.S. since the mid-1980s, expert consensus held that there was a lack of adequate HE therapies. PTX 465 at 716 ("The current decade has not witnessed major therapeutic breakthroughs in" the field of HE.); Tr. 400:18-23 (Brown). Bass 2004 proved in a phase 3 randomized, placebo-controlled clinical trial that treating HE with rifaximin was no better than placebo. Tr. 359:21-360:3, 364:9-22, 400:18-23 (Brown); PTX 588.

115. As of October 2008, no HE drug had been approved in over 30 years, and no drug had ever been approved to prevent HE recurrence. Tr. 242:2-25 (Berg); Tr. 69:1-4, 348:8-11, 399:25-400:17, 403:8-16 (Brown). RFHE3001 and RFHE3002 were the only HE Phase III clinical studies to demonstrate success. Tr. 380:20-381:4 (Brown). RFHE3001 was the "first positive randomized, placebo-controlled trial of rifaximin and the only trial of any agent to prevent recurrent HE." Tr. 401:17-402:1 (Brown). The results demonstrated that 550 mg rifaximin BID significantly reduced risk of overt HE recurrence and maintained remission from HE for a longer period of time. JTX 104 at 71; Tr. 402:2-403:7 (Brown). And RFHE3002 demonstrated that 550 mg rifaximin BID could be administered for over a year to reduce risk of overt HE recurrence. PTX 414 at 81; Tr. 404:1-405:1 (Brown).

**2. Skepticism of Experts**

116. As of October 2, 2008, many experts were skeptical that rifaximin 550 mg TID for 14 days (the claimed regimen) could safely and effectively be administered for 12 months or longer to prevent HE recurrence and maintain remission. For example, when Salix was designing RFHE3001 and RFHE3002, the FDA expressed concern that long-term use of rifaximin would lead to the development of antibiotic resistance. Tr. 377:14-20 (Brown); *see also* Tr. 444:6-17, 470:10-21 (DuPont).

117. Even after October 2008, there was skepticism that rifaximin 550 mg TID for 14 days (the claimed regimen) could safely and effectively prevent HE recurrence and maintain remission. In 2010, after Salix conducted RFHE3001 and RFHE3002, the FDA convened an advisory board to evaluate the results of these studies. Tr. 405:12-20 (Brown). At this meeting, experts on the FDA's advisory committee expressed concern that indefinite use of rifaximin could

change the gut flora and cause antibiotic resistance. PTX 512 at 153, 231, 233-234; Tr. 405:21-406:14 (Brown); Tr. 482:5-21 (DuPont).

**B. IBS-D Patent Claims**

118. Prior to February 26, 2008, experts were skeptical that rifaximin 550 mg TID for 14 days could treat IBS-D. PTX 692 at 1142; PTX 693 at 1319; PTX 457 at 627; Tr. 809:13-19 (Schoenfeld).

119. After February 26, 2008, experts on the FDA's advisory committee were skeptical that rifaximin (in a dosage regimen of 550 mg TID for 14 days) could treat IBS-D safely and effectively. PTX 535 at 137, 162, 302, 307; Tr. 809:20-811:11 (Schoenfeld).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com
*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
Daniel A. Apgar
Alexis M. McJoynt
Damien N. Dombrowski
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 218-2100

Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5598

April 28, 2022